**No. 26-4716**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

ASHLEY M. GJOVIK,

*Plaintiff-Appellant,*

v.

APPLE INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-04597-EMC
Hon. Edward M. Chen

---

**EXCERPTS OF RECORD**
**VOLUME 1 OF 4**

---

Ashley M. Gjovik
2108 N St., Ste. 4553
Sacramento, CA 95816
(408) 883-4428
legal@ashleygjovik.com

*Plaintiff-Appellant, In Propria Persona*

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,
Plaintiff,

v.

APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**JUDGMENT**

On June 24, 2026, the Court granted Defendant's motion for summary judgment. Pursuant to Federal Rule of Civil Procedure 58, the Court hereby ENTERS judgment in favor of Defendant and against Plaintiff. The Clerk of Court shall close the file in this matter.

**IT IS SO ORDERED.**

Dated: June 24, 2026



EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,
Plaintiff,

v.

APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Docket Nos. 359, 361, 367

Plaintiff Ashley Gjovik, proceeding *pro se*,[1] filed suit against her former employer, Apple Inc., alleging that Apple retaliated against her – ultimately firing her – because she made complaints about various issues, including environmental safety, workers' rights, and sex discrimination and harassment.[2] According to Apple, it terminated her employment for legitimate, nonretaliatory reasons: in particular, because she disclosed confidential business information on Twitter and to a reporter. Now pending before the Court is each party's motion for summary

[1] Although Ms. Gjovik is proceeding *pro se*, she appears to have received a J.D. from Santa Clara University.

[2] While this case has been narrowed to retaliation claims, Ms. Gjovik's initial complaints against Apple alleged a variety of claims.

For example, in her third amended complaint ("TAC"), Ms. Gjovik asserted fifteen causes of action, including claims for violation of RICO, violation of the Sarbanes-Oxley Act, violation of the Dodd-Frank Act, nuisance, ultrahazardous/abnormally dangerous activities, violation of the Bane and Ralph Civil Rights Acts, and intentional and negligent infliction of emotional distress. Ms. Gjovik asserted, *inter alia*, that Apple created environmentally unsafe conditions at two different locations; engaged in illegal conduct such as bribery, witness tampering, witness retaliation, wire fraud, securities fraud, and possessing and using chemical weapons; and, post-termination, harassed her, surveilled her, and broke into her apartment and handled her dog.

judgment. In addition, Apple has filed a motion to strike all of Ms. Gjovik's briefs and supporting evidence on the basis that they were not timely filed.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of the parties, the Court hereby **DENIES** Ms. Gjovik's motion for summary judgment, **GRANTS** Apple's motion for summary judgment, and **GRANTS** in part Apple's motion to strike.

## I. FACTUAL & PROCEDURAL BACKGROUND

The evidence submitted by the parties in conjunction with summary judgment reflects the following. The underlying facts are, for the most part, undisputed. To the extent there are or may be any disputes of fact, they are so noted.[3]

Ms. Gjovik was formerly an employee of Apple. During the relevant period prior to her termination, Ms. Gjovik worked in an Apple office that was located on a Superfund site, known as the TRW Microwave Superfund Site. Apple leased the building from a third party. Another third party, Northrup Grumann, had responsibility for site cleanup. Ms. Gjovik's immediate supervisor was David Powers. Mr. Powers, in turn, reported to Dan West, and Dan West to Yannick Bertolus.

In March 2021, approximately six months before her termination, Ms. Gjovik began to express concern to Apple about the environmental safety of the office where she worked. Ms. Gjovik's concerns were prompted by an email from Apple, informing employees that it would be conducting, *inter alia*, a vapor intrusion survey of the building. The following month, Ms. Gjovik began to relay her concerns to the Environmental Protection Agency ("EPA").

In April 2021, Ms. Gjovik made complaints to Apple about sex discrimination and/or a hostile work environment. Apple began an investigation. The investigation was led by Jenna Waibel of Employee Relations. Ms. Gjovik asked to be put on paid administrative leave during the investigation, and Apple agreed. Ms. Gjovik was put on leave from late May to early June 2021. According to Ms. Gjovik, Ms. Waibel ultimately determined there were no issues, and thus Ms. Gjovik did not obtain any relief.

[3] In addition, the evidence the Court considers here is informed by its ruling on Apple's motion to strike, which includes a request to strike all evidence submitted by Ms. Gjovik.



United States District Court
Northern District of California

In early June 2021, the EPA informed Ms. Gjovik that, in essence, it did not have any concerns about the Apple office.

In early July 2021, Apple met with Ms. Gjovik because she continued to be troubled about the environmental safety of the office. Apparently, Ms. Gjovik was not satisfied with the meeting because she reached out to the EPA again, asserting that there had been significant changes to the site condition which warranted agency review. Based on Ms. Gjovik's claim, the EPA decided – in or about late July 2021 – to conduct a site visit. That site visit was conducted in mid-August 2021. The EPA ultimately concluded that the likelihood of vapor intrusion was low.[4]

Starting in late July 2021 and continuing into August 2021, Apple employees began to submit Business Conduct Tickets to Apple about Ms. Gjovik. (Business Conduct Tickets are a means by which an employee can report a violation of Apple policies.) For example, in late July 2021, two employees filled out separate tickets noting that Ms. Gjovik was speaking to the press about Apple's return-to-work practice (post-COVID) that was to go into effect in the fall. As another example, in early August 2021, an employee reported that Ms. Gjovik was posting Apple information on Twitter that the employee believed should not be publicly shared.[5]

In or about this same timeframe (*i.e.*, July-August 2021), Ms. Gjovik made another complaint to Apple about sex discrimination and a hostile work environment, as well as a number of other matters.[6] Apple began to investigate. This time the investigator was Ekelemchi Okpo of Employee Relations. During her communications with Mr. Okpo, Ms. Gjovik indicated that she wanted to be put on paid administrative leave pending an investigation into her managers. Apple gave Ms. Gjovik the paid administrative leave. After Ms. Gjovik complained to others that the leave was involuntary and/or indefinite, Mr. Okpo informed Ms. Gjovik on two different

---

[4] It is not clear from the record whether Apple knew the EPA's site inspection was spurred by a complaint from Ms. Gjovik. For purposes of this order, the Court assumes Apple had such knowledge and/or otherwise knew that Ms. Gjovik had made complaints about environmental safety to the EPA.

[5] These facts are contained in the Business Conduct Tickets that Ms. Gjovik submitted in support of her motion for summary judgment.

[6] Ms. Gjovik identified a multitude of issues in a 34-page, single-spaced document which she refers to as the "Issue Confirmation" document.

United States District Court
Northern District of California

United States District Court
Northern District of California

occasions that she could return to work. However, Ms. Gjovik did not respond to Mr. Okpo's offers.

In or about mid-August 2021, Ms. Gjovik contacted the EEOC about her employment at Apple, and an interview was scheduled. There is no evidence that Apple knew about Ms. Gjovik's communications with the EEOC before it terminated her.

On or about August 26, 2021, Ms. Gjovik filed a charge with the NLRB, asserting, *inter alia*, that she had been instructed to refrain from talking about environmental safety with other employers. Several days later, Ms. Gjovik filed a charge with the California Labor Commissioner, claiming retaliation. Apple appears to admit it knew about the NLRB charge (or at least one of Ms. Gjovik's NLRB charges) prior to Ms. Gjovik's termination, but there is no evidence that Apple knew about the complaint with the Labor Commissioner prior to her termination.

On August 28, 2021, Ms. Gjovik tweeted about a user study that Apple was conducting for an unreleased product under development. The user study was related to ear scans. Ms. Gjovik was invited to participate in the study but she did not do so. Below is Ms. Gjovik's tweet.



On August 29, 2021, Ms. Gjovik filed a retaliation complaint with the California Department of Industrial Relations. There is no evidence that Apple knew about the complaint prior to Ms. Gjovik's termination.[7]

On August 30, 2021, Ms. Gjovik posted three more tweets – this one about a different user study that Apple was conducting related to Face ID. Ms. Gjovik voluntarily participated in this user study.[8] Through the study, Apple employees could upload data, including images captured on their iPhones, "to help develop, test, and train the next version of the algorithm underlying Face ID." Aloe Decl. ¶ 3. Specifically, as explained by an Apple witness:

> Gobbler/Glimmer is an internal Apple application that Apple uses to allow employees to securely encrypt data from the phone and send it to a backend server to upload user study data from the phone.[[9]] Employees must individually select images to upload through the Glimmer application; no images are ever auto-uploaded. **The images that can be uploaded through Glimmer are not just photographs (like an iPhone user would see in their Photos app); they are images from a separate module of the phone that provide insights into confidential intrinsic camera characteristics that are relevant to Face ID's operation, and these images are only viewable with confidential Apple tools.** Images that an employee chooses to upload through Glimmer (if any) remain encrypted on Apple's servers and can only be accessed by individuals authorized to view data related to the specific user study in which the employee is participating (e.g., here, a small group of engineers working on Face ID). Employees who need to use this data for their jobs use specific software that allows them to view the encrypted data.

Aloe Decl. ¶ 7 (emphasis added).[10]

---

[7] In her second reply/opposition declaration, Ms. Gjovik provides evidence that, at or about this same date, she also made a report to the EPA about a possible environmental violation. In the report, she largely reiterated her concerns about environmental safety at the Apple office where she worked. As discussed below, the Court is striking all evidence contained in Ms. Gjovik's two reply/opposition declarations. However, the Court also notes there is no evidence that Apple knew about this report Ms. Gjovik made to the EPA prior to her termination.

[8] Ms. Gjovik signed an Informed Consent Form before participating in the user study. The Form stated that participation in the study was voluntary and that an individual could decline to stop at any time. Ms. Gjovik never asked to be removed from the study.

[9] The application was originally named Gobbler but was subsequently renamed Glimmer.

[10] Ms. Gjovik never ended up uploading any images from her Glimmer application in 2021. Therefore, the images that she tweeted (see *infra*) "were only on her device [*i.e.*, iPhone], and they were encrypted and only accessible by her through the internal Glimmer application." Aloe Decl.

United States District Court
Northern District of California

Below are Ms. Gjovik's tweets related to the Face ID user study. As reflected below, Ms. Gjovik's tweets consisted of not only text but also screenshots and images.




/ / /

¶ 12.


Ashley M. Gjøvik
@ashleygjovik
Follow
#Apple's Global Security team of ex-U.S. intelligence employees includes ex-NSA, ex-FBI, ex-military, and ex-Secret Service workers.
"Very little is know about the way it operates."
Why wouldn't they use this internal data?
theoutline.com/post/1766/leak …
vice.com/en/article/3aq …
9:35 AM - 30 Aug 2021

/ / /


Ashley M. Gjøvik
@ashleygjovik
Totally normal. Nothing weird about any of this. Just the video/photos my internal #Apple iPhone captures of me while I'm not paying attention, and stores on device, and also maybe uploads too?
volume-assets.voxmedia.com/production/773...
12:40
10:49 AM · Aug 30, 2021 · Twitter Web App

/ / /

One of Ms. Gjovik's tweets above included a link to an article published in the Verge on August 30, 2021. The article is titled "Apple cares about privacy, unless you work at Apple." Ms. Gjovik spoke to the Verge reporter and provided the reporter with information for the article. That information that Ms. Gjovik gave to the reporter included the screenshots and images that she tweeted above (but in "unredacted" form[11]). The Verge article that was ultimately published included a "video" consisting of images that Ms. Gjovik's phone had collected for the Face ID study.

According to Apple, the images that Ms. Gjovik disclosed in her tweets and in the article revealed confidential information belonging to Apple.[12] As explained by Dr. Aloe, who was Apple's "Directly Responsible Individual . . . for user studies utilizing the Glimmer app that Apple was conducting prior to Ms. Gjovik's termination," Bertolus Decl. ¶ 13, the images "uploaded through Glimmer are not just photographs (like an iPhone user would see in their Photos app); they are images from a separate module of the phone that provide insights into confidential intrinsic camera characteristics that are relevant to Face ID's operation." Aloe Decl. ¶ 7. Furthermore, the "images are only viewable with confidential Apple tools." Aloe Decl. ¶ 7. Thus, when Ms. Gjovik posted the images and the images were published as part of the article, "information [1] not visible to customers, competitors, or hackers about [2] how the camera used for Face ID operates and [3] the data Apple uses to develop the algorithm behind Face ID" was disclosed. Aloe Decl. ¶ 8. Ms. Gjovik has not provided any evidence suggesting that, *e.g.*, the images could, in fact, be accessed by customers, competitors, or hackers or otherwise viewed without confidential Apple tools.

Apple learned quickly about Ms. Gjovik's tweets and the Verge article. In the days that followed, Mr. Bertolus – who was one of Ms. Gjovik's superiors and who made the ultimate decision to terminate – had multiple communications with legal counsel, Human Resources, and

[11] Ms. Gjovik had the reporter blur out certain information for the published article.

[12] Apple does not assert that any text included by Ms. Gjovik in her tweets constituted confidential information.



United States District Court
Northern District of California

Employee Relations about Ms. Gjovik's conduct.[13] Mr. Bertolus viewed at least one image that Ms. Gjovik had tweeted and got confirmation that the image was confidential and that Ms. Gjovik was not authorized to disclose it.

On September 9, 2021, Apple terminated Ms. Gjovik's employment. The immediate events leading up to the termination were as follows. At 2:08 p.m., a member of the Global Security team, Mr. Kagramanov, reached out to Ms. Gjovik by email, stating that he wanted to connect with her as soon as possible that day, "within this hour." Gjovik Decl., Ex. 41 (ECF Page 521) (email from Mr. Kagramanov, dated 9/9/2021). Ms. Gjovik responded within 2 minutes, asking for everything to be written. Then, about 15 minutes after that, she told the investigator that she had forwarded his email to the NLRB because his communication felt like witness intimidation.

At 2:50 p.m., Mr. Kagramanov stated that, because she had chosen not to participate in the discussion, Apple was moving forward with the information that it had and, given the seriousness of her conduct, it had suspended her access to the company systems. Several hours later, at 6:07 p.m., Ms. Gjovik wrote back, stating that she was willing to participate in the investigation: "I only asked that the discussion be kept to email . . . . [¶] I offered to help via email to ensure we have a documented recored [sic] of our conversations considering everything that's currently going on with my investigation and my complaints to the government." Gjovik Decl., Ex. 41 (ECF Page 520) (email from Ms. Gjovik). Ms. Gjovik also reiterated that "this really does feel like intimidation and additional retaliation and I will consider it as such." Gjovik Decl., Ex. 41 (ECF Page 520).

At 6:20 p.m., Ms. Bowman of Human Resources emailed Mr. Bertolus. She stated:

> This afternoon, Sophi Jacobs and Aleks Kagramanov, members of our Global Security and [Employee Relations] teams, reached out to

[13] During this same timeframe (early September 2021), it appears Mr. Okpo was still communicating with Ms. Gjovik regarding his investigation. Mr. Okpo asked to meet with Ms. Gjovik about certain inconsistencies. After Ms. Gjovik asked that all conversations be written, Mr. Okpo wrote in an email: "Since you have declined to speak with me, I will move forward based on the information I have." 2d Gjovik Reply Decl., Ex. T (email from Mr. Okpo, dated 9/7/2021).

United States District Court
Northern District of California

> Ashley to talk with her about allegations that she had disclosed confidential production-related information on Twitter.
>
> Ashley chose not to talk with the team and asked for all communication to be in writing. She was informed that because she chose not to participate in the discussion, Apple would move forward with the information that we had, and that due to the seriousness of the allegations her systems access would be suspended.
>
> Ashley disclosed confidential product-related information on Twitter, and this conduct, *on its own*, warrants termination. In addition, she failed to cooperate in Apple's investigative process today and during the [Employee Relations] investigation into her workplace concerns. More specifically, she failed to accurately and completely provide information, including actively redacting relevant information from documents that she presented to Apple's [Employee Relations] investigator.
>
> Based on her conduct which violates Apple policies,[[14]] the People team recommends that her employment be terminated.

Gjovik Decl., Ex. 30 (ECF Pages 245-46) (email from Ms. Bowman) (emphasis added); *see also* Bertolus Decl. ¶ 9.

Several minutes later, Mr. Bertolus responded, stating: "Understood. I agree with the termination decision." Gjovik Decl., Ex. 30 (ECF Page 245) (email from Mr. Bertolus, dated 9/9/2021). In his declaration, Mr. Bertolus states that he considered Ms. Gjovik's disclosure of information egregious because (1) "it was intentional" and (2) it "involved what was then confidential and sensitive information about unreleased product features." Bertolus Decl. ¶ 6. Mr.

---

[14] For the relevant Apple policies, see generally the Bowman Declaration. The policies that Apple contends were violated were:

- The Confidentiality and Intellectual Property Agreement. *See* Bowman Decl., Ex. A.
- The Business Conduct Policy. *See* Bowman Decl., Ex. B.
- The Misconduct and Discipline Policy. *See* Bowman Decl., Ex. C.
- The Employee Use of Electronic Systems and Communications Policy. *See* Bowman Decl., Ex. D.
- The Social Media and Online Communications Policy. *See* Bowman Decl., Ex. E.

Most of these policies included warnings that violations of confidentiality could result in termination. *See, e.g.*, Bowman Decl., Ex. A (Confidentiality and Intellectual Property Agreement ¶¶ I.A, IV) (prohibiting disclosure of proprietary information (*i.e.*, information not generally known outside of Apple and/or kept confidential by Apple) and providing that, if there is a breach of the agreement, "Apple is entitled to take any action to the extent permissible under applicable laws and this Agreement, including but not limited to terminating employment").

Bertolus adds that "I am aware of at least two employees who were terminated for similar conduct in my organization during my time at Apple. I was directly involved in terminating one of those employees for publishing an image that showed an unreleased airpod product in the background."[15] Bertolus Decl. ¶ 6. According to Mr. Bertolus, although he was

> generally aware that Ms. Gjovik had raised a variety of concerns to Apple over time, . . . the fact that she had raised concerns was not a factor in my decision to terminate her employment. Additionally, at the time I made the decision to terminate Ms. Gjovik's employment, I was not aware that Ms. Gjovik had filed any complaints against Apple with any government or administrative agencies.[[16]] But even if she had filed any such complaints, that would not have motivated me or been part of my decision making. I terminated Ms. Gjovik's employment for the independent reason that she disclosed confidential product information.

Bertolus Decl. ¶ 11.

After Mr. Bertolus stated that he wanted to terminate, Ms. Bowman provided him with documents that he could send to Ms. Gjovik informing her of the termination. *See* Gjovik Decl., Ex. 30 (ECF Page 245) (email from Ms. Bowman). At 6:54 p.m., Mr. Bertolus emailed Ms. Gjovik the termination letter. *See* Gjovik Decl., Ex. 31 (email from Mr. Bertolus). The letter stated in relevant part:

> Apple has determined that you have engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. You disclosed confidential product-related information in violation of Apple policies and your obligations under the Intellectual Property Agreement (IPA). We also found that you failed to cooperate and to provide accurate and complete information during the Apple investigatory process.

Gjovik Decl., Ex. 29 (ECF Page 242) (termination letter).

/ / /

---

[15] Ms. Bowman has also submitted a declaration, stating that there have been terminations of at least 13 employees "for disclosing confidential product-related information." Bowman Decl. ¶ 7 & Exs. F-R (notices of termination of employment). Ms. Gjovik has not submitted any evidence to the contrary.

[16] Although Apple has admitted that it had knowledge of an NLRB complaint prior to Ms. Gjovik's termination, there is no evidence establishing that Mr. Bertolus specifically knew about that complaint or any other complaint that Ms. Gjovik had made to a governmental agency. There is also no evidence that Mr. Bertolus was involved in any of the prior investigations handled by Employee Relations.

United States District Court
Northern District of California

United States District Court
Northern District of California

As indicated above, the termination letter referred to not only the disclosure of confidential information but also a failure to cooperate and misrepresentations. The claimed failure to cooperate referred to Ms. Gjovik's refusal to speak directly and live with Mr. Kagramanov, as well as Mr. Okpo, as part of their investigations. The asserted misrepresentations related to statements Ms. Gjovik had made about one of her managers, Mr. West. Ms. Gjovik charged Mr. West with "pimping & pandering with receipt of indirect benefits." Gjovik Decl., Ex. 19 (ECF Page 163) ("Issue Confirmation"). In her "Issue Confirmation" document,[17] Ms. Gjovik described the incident (that took place some four years earlier) as follows.

> - I was eating out at a Michelin star restaurant in Mt View in winter of 2017. It was a restaurant Dan [West] insisted I try several times, so when I sat down I texted him that I looked forward to the meal. I didn't realize before that Dan West and Yannick Bertolus (Dan's boss, our VP) are very very good friends with the head Chef of the restaurant. As soon as I texted Dan, he replied right away and within maybe 10min the Chef came out to greet me personally as a friend of Dan and was bringing out special dishes I didn't ask for. He also came out to talk to me mid-way and was telling me very personal stuff about Yannick. About 1/2 way through the dinner the Chef and Dan both told me they were trying to set me up with the Sous Chef at the restaurant, Andrew. Apparently they told Andrew the same thing. Andrew was 24, ten years my junior. I expressed no interest in Andrew or dating him – but they persisted. Dan also told the head Chef he would pay my entire bill, and he did. I protested strongly to both the Chef and Dan and told the Chef to reject Dan's payment and I would pay myself, but they wouldn't let me. They both also continued to send the Sous Chef out to wait on me instead of the waiter and pressured both of us to exchange numbers. It's [sic] was humiliating. I've met Dan's wife & daughter a couple times and they were/are both aware of this night and say it's [sic] is a running topic in the household of how weird and inappropriate it was of Dan to do that.
> - Ashley texted Dan in Dec after the dinner and told him she's dating a professor now and needs to turn down the sous chef and Dan said "I'm not even a little concerned. Regarding Andrew – to [sic] bad it didn't work out, but there was absolutely no pressure from me. I don't know him too well. Just learn and move on."

Gjovik Decl., Ex. 19 (ECF Page 163).

/ / /

[17] The "Issue Confirmation" document was dated August 23, 2021.

According to Mr. Bertolus, Ms. Gjovik's characterization of the events was misleading.

> I . . . reviewed a single text message Ms. Gjovik provided to Mr. Okpo in the course of his investigation into her workplace concerns, and I also reviewed additional messages that Ms. Gjovik did not share that were part of the same text exchange that provided additional context to the conversation. My assessment of the text exchange was that Ms. Gjovik was attempting to mislead the investigator through her selective disclosure of the lone message she shared. . . . I was also aware that Ms. Gjovik refused to meet with Mr. Okpo about the text exchange.

Bertolus Decl. ¶ 8.[18]

On September 9, 2021, the same day as her termination, Ms. Gjovik filed a discrimination charge with the EEOC and DFEH, In the charge, Ms. Gjovik claimed, *e.g.*, discrimination on the basis of sex and disability, failure to address discrimination and harassment, and retaliation (including because she had raised concerns about environmental safety and resulting disability). It is not clear from the record whether Ms. Gjovik filed her charge before or after the actual termination.[19] Even assuming the former (especially as the charge does not refer to any termination), there is no evidence that anyone at Apple, including but not limited to Mr. Bertolus, knew about the EEOC/DFEH charge prior to Ms. Gjovik's termination.

On September 15, 2021, Apple (through its attorneys) asked Ms. Gjovik to remove certain images contained in her tweets as well as the Verge "video" showing the images collected by her iPhone.

Several years later, in September 2024, the NLRB issued a complaint against Apple based on one of the charges filed by Ms. Gjovik. The NLRB alleged that, through various policies, Apple was interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in § 7 of the NLRA, in violation of § 8(a)(1) of the NLRA. That dispute settled later in the spring of 2025. Under the settlement agreement, Apple agreed to post a notice informing employees that they had the right to discuss working conditions and that Apple would not interfere

---

[18] The full text exchange between Mr. West and Ms. Gjovik can be found at Exhibit 36, attached to the Gjovik Declaration. *See* Gjovik Decl., Ex. 36 (West Depo.) (ECF Pages 420-59).

[19] The digital signature on the DFEH charge appears to be 7:27 pm *ET*. The relevant Apple emails have the time of around 6:30 pm, though it is not clear if that was PT or ET. Either way, they were very close in time.



United States District Court
Northern District of California

with the exercise of that right. For instance, employees had the right to publish articles; however, Apple could still require employees to receive approval about articles about Apple products or services. The NLRB case appears to have been opened based on a complaint from Ms. Gjovik, but her complaint does not appear to be tied to any action that Apple took against her specifically. The NLRB matter in 2024-2025 is not consequential to the issues addressed herein.

## II. APPLE'S MOTION TO STRIKE

Before addressing the parties' summary judgment motions, the Court addresses Apple's motion to strike. Apple moves to strike all of Ms. Gjovik's summary judgment filings, including all evidence submitted in support of her briefs, on the basis that they were not timely filed.[20] Apple emphasizes that the Court previously warned Ms. Gjovik that she "risks being sanctioned if she continues to make late filings. While a filing that is not unduly late may not be so prejudicial to the opposing party as to warrant severe sanctions, a pattern or practice of late filings is a different matter." Docket No. 137 (Order at 3 n.3).

Apple is correct that all of Ms. Gjovik's filings were late.

- Ms. Gjovik's motion for summary judgment was due on **April 23, 2026**.
  - She filed her opening brief on April 24, 2026, at 9:59 a.m.
  - She filed the evidence in support of her opening brief on April 24, 2026, at 4:20 p.m.
- Ms. Gjovik's reply/opposition was due on **May 21, 2026**.
  - Ms. Gjovik filed a reply/opposition brief at midnight on May 22, 2026 (Docket No. 374) but then filed a "corrected" or "replacement" version at 11:31 a.m. on the same day (Docket No. 375). The corrected/replacement brief was not simply a brief with minor changes from the prior version. Rather, as Apple argues, the corrected/replacement brief was essentially "a

[20] This Court set up a four-brief summary judgment process. The four briefs are as follows:

(1) Ms. Gjovik's motion for summary judgment.
(2) Apple's opposition and cross-motion for summary judgment.
(3) Ms. Gjovik's reply/opposition to the cross-motion.
(4) Apple's sur-reply/reply in support of the cross-motion.



United States District Court
Northern District of California

United States District Court
Northern District of California

complete rewrite of the timely filing." Sur-Reply at 1.

- Although Ms. Gjovik's reply/opposition cited to evidence in support, she did not provide any evidence to the Court or Apple until days later. Specifically, Ms. Gjovik filed her first reply/opposition declaration, containing evidence in support of her brief, on **May 25, 2026**, at 4:26 p.m. (Docket No. 377). The declaration, with supporting exhibits, was more than 600 pages long (although some of the evidence had been previously submitted).
- Ms. Gjovik then filed a second reply/opposition declaration, containing additional evidence in support of her brief, on **May 27, 2026**, at 12:09 a.m. (Docket No. 379). This declaration, with supporting exhibits, was almost 500 pages long. The declaration is problematic not only because it was filed the day before Apple's sur-reply/reply was due but also because it contains evidence that Ms. Gjovik could – and should – have filed in conjunction with her opening motion for summary judgment.

The Court could, in its discretion, reject all of Ms. Gjovik's filings. However, in the interest of justice, the Court shall take a more measured approach. It shall accept most of Ms. Gjovik's filings since they were not unduly late. But it shall strike Ms. Gjovik's two reply/opposition declarations. This evidence was unfairly prejudicial to Apple as it was submitted just one or three days before Apple's sur-reply/reply was due. The evidence consisted of more than a thousand pages. *See Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010) (stating that, "as part of its power to 'manage [its] own affairs,' a district court can use less drastic measures such as striking documents from the docket to address litigation conduct that does not warrant outright dismissal"); *Wood v. Santa Barbara Chamber of Commerce*, 705 F.2d 1515, 1519 (9th Cir. 1983) (holding that district court did not abuse its discretion in striking untimely affidavits in opposition to summary judgment motion where party failed to request extension of time or show excusable neglect).

/ / /

United States District Court
Northern District of California

Ms. Gjovik argues that she should be given, in effect, an extension for her filings under Federal Rule of Civil Procedure 6(b). *See* Fed. R. Civ. P. 6(b) ("When an act mayor must be done within a specified time, the court may, for good cause, extend the time: . . . on motion made after the time has expired if the party failed to act because of excusable neglect."). Ms. Gjovik's assertion that there is excusable neglect for the late filings lacks merit. The fact that Ms. Gjovik is a pro se litigant does not mean that she should not be held to deadlines. Ms. Gjovik has a J.D., and the Court expressly warned her about late filings. Ms. Gjovik claims that she lacks resources to litigate, but this is belied by the docket sheet in this matter which demonstrates Ms. Gjovik's ability to make numerous and voluminous filings – and in a short timeframe. Ms. Gjovik's charge that Apple prevented her from working on summary judgment is not supported. Apple is entitled to defend itself, and Apple was reasonably working on discovery matters given the schedule set by this Court and Judge Westmore. Ms. Gjovik's contention that Apple came up with a new reason for termination – which upended her work on summary judgment – is also unsupported. Apple's termination letter gave notice to Ms. Gjovik that she had purportedly failed to provide accurate and complete information during the investigation. Although the letter did not give specifics, Ms. Gjovik knew by April 6, 2026 (from an interrogatory response that Apple provided) that the alleged misrepresentations were related to the incident regarding a sous chef at a local restaurant. This was more than two weeks before her summary judgment motion was due. It is also worth noting that Ms. Gjovik's reply/opposition declarations covered evidence far beyond the sous chef incident; for example, in the declarations, Ms. Gjovik provided for the first time evidence related to Apple's claim that the images disclosed were confidential. As noted above, the belated reply/opposition declarations had more than 1,000 pages attached.

Accordingly, the Court grants in part and denies in part Apple's motion to strike. The motion is denied with two exceptions. Specifically, the Court strikes both of Ms. Gjovik's reply/opposition declarations. *See* Docket Nos. 377, 379 (reply/opposition declarations).

/ / /

/ / /

/ / /

United States District Court
Northern District of California

## III. APPLE'S MOTION FOR SUMMARY JUDGMENT

A. Legal Standard

Having resolved what evidence the Court shall consider in conjunction with summary judgment, the Court now turns to the parties' motions.

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

The Court begins with Apple's motion because, if Apple is entitled to summary judgment, then – necessarily – Ms. Gjovik's motion must be denied. Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As indicated above, because Ms. Gjovik is the nonmoving party with respect to Apple's motion, the Court draws all justifiable inferences in her favor.

B. Retaliation Claims

There are four retaliation claims at issue in this case: (1) wrongful termination in violation of public policy; (2) violation of California Labor Code § 1102.5; (3) violation of California Labor Code § 6310; and (4) violation of California Labor Code § 98.6.

- A claim for wrongful termination is predicated on a termination being "substantially motivated by a violation of public policy." *Nosal-Tabor v. Sharp Chula Vista Med. Ctr.*, 239 Cal. App. 4th 1224, 1234-1235 (2015).
- As for § 1102.5, it basically "provides whistleblower protections to employees who

United States District Court
Northern District of California

disclose wrongdoing to authorities [including a government authority or a person with authority over the employee]." *Lawson v. PPG Arch. Finishes, Inc.*, 12 Cal. 5th 703, 709 (2022).

- In turn, § 6310 is designed, among other things, to "prevent retaliation against those who in good faith report working conditions they believe to be unsafe." *Freund v. Nycomed Amersham*, 347 F.3d 752, 759 (9th Cir. 2003).
- Finally, § 98.6 "prohibits an employer from retaliating against an applicant or employee because the applicant or employee exercised a right afforded him or her under the Labor Code." *Garcia-Brower v. Premier Auto. Imports of CA, LLC*, 55 Cal. App. 5th 961, 972 (2020). Those rights include the right to disclose information about an employer's working conditions. *See* Cal. Lab. Code § 232.5(a) (providing that "[n]o employer may . . . [r]equire, as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions"). *But see id.* § 232.5(d) (providing that "[t]his section is not intended to permit an employee to disclose proprietary information, trade secret information, or information that is otherwise subject to a legal privilege without the consent of his or her employer").

The parties are in agreement that all of the claims, except for the § 1102.5 claim, are evaluated under the same basic framework. The § 1102.5 claim follows a similar, but a slightly different, framework.

1. Wrongful Termination, § 6310, and § 98.6 Claims

For the wrongful termination, § 6310, and § 98.6 claims, courts apply, at summary judgment,

> the burden-shifting analysis of *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973), to determine whether there are triable issues of fact for resolution by a jury. In the first stage, the plaintiff must show (1) he or she engaged in a protected activity, (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. If the employee successfully establishes these elements and thereby shows a prima facie case exists, the burden shifts to the employer to provide evidence that there was a legitimate,

> nonretaliatory reason for the adverse employment action. If the employer produces evidence showing a legitimate reason for the adverse employment action, the presumption of retaliation drops out of the picture, and the burden shifts back to the employee to provide substantial responsive evidence that the employer's proffered reasons were untrue or pretextual.

*Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1108-09 (2007) (internal quotation marks omitted). *See, e.g.*, *id.* (applying *McDonnell Douglas* to a wrongful termination claim); *Rounds v. Bd. of Trs. of the Cal. State Univ.*, No. 1:20-cv-00170-DAD-CKD, 2024 U.S. Dist. LEXIS 175877, at *75 (E.D. Cal. Sept. 26, 2024) (applying *McDonnell Douglas* to a § 6310 claim); *Cervantes v. Concentra Health Services, Inc.*, No. 2:21-cv-02502-SB (AGRx), 2021 U.S. Dist. LEXIS 248667 (C.D. Cal. Dec. 21, 2021) (applying *McDonnell Douglas* to a § 98.6 claim).

Notably, at the third step, there must be substantial evidence of pretext. *See Loggins*, 151 Cal. App. 4th at 1109. The plaintiff cannot simply rest on their prima facie case. *See id.* at 1113 ("[A]n employee seeking to avoid summary judgment cannot simply rest on the prima facie showing, but must adduce substantial additional evidence from which a trier of fact could infer the articulated reasons for the adverse employment action were untrue or pretextual.").

To be clear, the Court is applying the *McDonnell Douglas* framework because Ms. Gjovik has presented a pretext case only, and not a mixed motive case. *See Lawson*, 12 Cal. 5th at 714 ("Although we acknowledged in *Harris* that courts have adopted the *McDonnell Douglas* test for FEHA employment discrimination cases that do not involve mixed motives, we declined to adopt the same test to govern mixed-motives cases."). Ms. Gjovik confirmed at the hearing that she was bringing a pretext case only.[21] In contrast to a mixed motive case, a pretext case is predicated on the contention that "the *only* actual motive is the discriminatory one and the purported legitimate reasons are fabricated in order to disguise the true motive." CACI 2512, Directions for Use (emphasis added).

/ / /

/ / /

---

[21] The relief available in a pretext case is more extensive than that available in a mixed motive case. *See* CACI 2512 (Directions for Use) (noting that, "in a mixed motive case, the employer is *relieved* from an award of damages but may still be liable for attorneys' fees and costs and injunctive relief") (emphasis added).





United States District Court
Northern District of California

2. Section 1102.5 Claim

Unlike the claims above, a claim brought under § 1102.5 follows a slightly different approach dictated by statute – specifically, § 1102.6.

> By its terms, section 1102.6 describes the applicable substantive standards and burdens of proof for both parties in a section 1102.5 retaliation case: First, it must be "demonstrated by a preponderance of the evidence" that the employee's protected whistleblowing was a "contributing factor" to an adverse employment action. (§ 1102.6.) Then, once the employee has made that necessary threshold showing, the employer bears "the burden of proof to demonstrate by clear and convincing evidence" that the alleged adverse employment action would have occurred "for legitimate, independent reasons" even if the employee had not engaged in protected whistleblowing activities.

*Lawson*, 12 Cal. 5th at 712. The analytical frame of §1102.6 appears to track (roughly) the analytical framework used in a mixed motive case. *See Lampkin v. County of Los Angeles*, 112 Cal. App. 5th 920, 924 (2025) (noting that "section 1102.6 affords employers an affirmative defense, if they prove the alleged retaliatory action 'would have occurred for legitimate, independent reasons' had the employee not been a whistleblower"; "[c]ases where this defense may apply are known as 'mixed-motive' cases"). Once the plaintiff demonstrates retaliation was in fact a contributing factor to the employer's decision, the employer may escape liability if it proves it would have terminated the plaintiff anyway, though under §1102.5, the employer must do so by clear and convincing evidence. As discussed below, the focus in this case is whether Apple's decision to terminate was motivated (at all) by retaliation. For the reasons set forth below, the Court holds that no reasonable jury could so find.

C. Protected Activity and Adverse Employment Action

As reflected by the above, although there are some differences between the claims governed by *McDonnell Douglas* and the § 1102.5 claim, all of the claims require that Ms. Gjovik establish both protected activity and an adverse employment action.

According to Ms. Gjovik, Apple retaliated against her because she made complaints about various issues, including environmental safety, workers' rights, and sex discrimination and hostile work environment. For purposes of the pending motion, Apple does not dispute that Ms. Gjovik engaged in at least some protected activity.

As for adverse employment action, Apple concedes that its termination of Ms. Gjovik constitutes such an action. However, Apple maintains that Ms. Gjovik did *not* suffer an adverse employment action when she was put on paid administrative leave on August 4, 2021, *i.e.*, about a month before her termination. The Court agrees. Based on the undisputed evidence of record, no reasonable jury could find that the paid administrative leave constituted an adverse employment action. The undisputed evidence shows that Ms. Gjovik *asked* to be put on such leave (*i.e.*, so that she would not have to interact with her managers while Mr. Okpo investigated her complaints). Furthermore, when Ms. Gjovik complained to others that the leave was indefinite and/or involuntary, Mr. Okpo told her on two separate occasions that she could return to work if she wanted, but she did not respond to either overture.

In her deposition, Ms. Gjovik suggested that she was "testing the water" for a return to work when she asked if she could take a class Apple was offering, but Apple told her she could not take the class. From this, Ms. Gjovik seems to suggest a jury could infer that she would not be allowed to return to work either. But asking Apple for permission to take a single class is different from asking Apple for a return to work. In any event, even assuming Ms. Gjovik was testing the water for a return, no reasonable jury could find that the paid administrative leave was an adverse employment action because it is undisputed that, several days *after* Mr. Okpo told Ms. Gjovik she could not take the class, Mr. Okpo told Ms. Gjovik that she could return to work if she wanted, but Ms. Gjovik still did not respond.

In her papers, Ms. Gjovik also asserts that Apple put her on leave because it wanted to "remove[] [her] from the workplace to block her access to evidence." Pl.'s Mot. at 21; *see also* Pl.'s Mot. at 4-5 (asserting that, when Apple put her on leave on August 4, 2021, she "was planning to retrieve from her office the next day, August 5, a laptop containing text-message evidence relevant to her harassment complaint against West[;] Okpo later cited Plaintiff's inability to product the full text exchange as the basis for his 'misleading complaint' finding"). This is sheer speculation on Ms. Gjovik's part. Ms. Gjovik has not pointed to evidence suggesting that Mr. Okpo, or anyone else at Apple, knew Ms. Gjovik was intending to get her laptop so that she could access evidence. More important, even if someone did know, the fact remains that Ms.

Gjovik had asked to be put on leave and she never responded to Mr. Okpo's offers for her to return to work which would have allowed her to access any evidence she needed.

Accordingly, the only adverse employment action at issue here is Ms. Gjovik's termination. No reasonable jury could find that the paid administrative leave was an adverse employment action. The only adverse action cognizable under Ms. Gjovik's claims is her termination.

D. <u>Claims Governed by *McDonnell Douglas*</u>

Having addressed the elements of protected activity and adverse employment action, the Court now turns to the claims governed by the *McDonnell Douglas* framework – *i.e.*, the wrongful termination, § 6310, and § 98.6 claims.

1. <u>First Stage</u>

Under the first stage of *McDonnell Douglas*, "the plaintiff must show (1) he or she engaged in a protected activity, (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Loggins v*, 151 Cal. App. 4th at 1109 (internal quotation marks omitted). A plaintiff who establishes these elements establishes a prima facie case.

For purposes of summary judgment, Apple effectively assumes that Ms. Gjovik has presented sufficient evidence to establish a prima facie case. Presumably, Apple has proceeded with this assumption because a causal link between Ms. Gjovik's protected activity and the adverse employment action (her termination) could arguably be inferred for purposes of this motion from timing: (1) on or about August 26, 2021, Ms. Gjovik filed a charge with the NLRB, asserting, *inter alia*, that she had been instructed to refrain from talking about environmental safety with other employers; (2) Apple does not dispute that it knew about at least one NLRB charge prior to terminating Ms. Gjovik; and (3) Ms. Gjovik was terminated on September 9, 2021.

2. <u>Second Stage</u>

The Court thus moves on to the second step of the *McDonnell Douglas* analysis. *See also Batarse v. Serv. Emps. Int'l Union, Loc. 1000*, 209 Cal. App. 4th 820, 831 (2012) (noting that "[a] defendant moving for summary judgment "may skip to the second step of the analysis and

demonstrate that it had a legitimate business reason, unrelated to . . . retaliation, for taking its employment action"). Apple has satisfied its burden of production at this step. *See Loggins*, 151 Cal. App. 4th at 1109 (stating that, if a plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence showing a legitimate reason for the adverse employment action).

According to Apple, it terminated Ms. Gjovik because she had disclosed confidential business information to the public, *i.e.*, through her tweets and the Verge article. In this regard, the timing supports Apple. Ms. Gjovik's tweets and the Verge article took place on August 30, 2021. She was terminated approximately a week later, on September 9, 2021, after an investigation took place into the disclosure, which included Mr. Bertolus (the final decisionmaker) seeing at least one image that had been disclosed and getting confirmation that the image was confidential.

The undisputed evidence also reflects that the information Ms. Gjovik disclosed was, in fact, confidential. To be clear, Apple did not terminate Ms. Gjovik because of the *text* contained in her tweets where she complained about, *e.g.*, "systemic oppression & retaliation" at Apple. Rather, she was terminated because of the *images* she posted in the tweets (which she also gave to the reporter from Verge). Dr. Aloe has explained why that information was confidential: the images "uploaded through Glimmer are not just photographs (like an iPhone user would see in their Photos app); they are images from a *separate module* of the phone that provide insights into confidential intrinsic camera characteristics that are relevant to Face ID's operation." Aloe Decl. ¶ 7 (emphasis added). Furthermore, the "images are *only* viewable with confidential Apple tools." Aloe Decl. ¶ 7 (emphasis added). Thus, when Ms. Gjovik posted the images and the images were published as part of the article, "information [1] not visible to customers, competitors, or hackers about [2] how the camera used for Face ID operates and [3] the data Apple uses to develop the algorithm behind Face ID" was disclosed.[22] Aloe Decl. ¶ 8.

[22] In her papers, Ms. Gjovik has suggested there are disputes about, *e.g.*, whether the images were ever uploaded to Apple, but that issue is not material. The critical question here is whether the images Ms. Gjovik posted were confidential. *See* Sur-Reply at 6 n.9.



United States District Court
Northern District of California

The Court acknowledges that, in her most recent filings (*i.e.*, her first and second reply/opposition declarations), Ms. Gjovik submitted – for the first time – evidence to support her contention that the information she posted did not contain anything confidential. But the Court does not consider this evidence because, as discussed above, it has stricken the evidence as untimely filed. (It is also problematic that Ms. Gjovik waited until her reply/opposition to provide any evidence on confidentiality. In other words, Ms. Gjovik easily could, and should, have provided such evidence in conjunction with her opening brief.)

Moreover, even if the Court were to consider the untimely-filed information, no reasonable jury could find in Ms. Gjovik's favor.

- For example, Ms. Gjovik claims that, before she disclosed the images, a co-worker told her that they were not confidential. But Ms. Gjovik has failed to establish that the co-worker had the requisite knowledge to make this determination. The mere fact that the co-worker was in Apple's Video Engineering organization is not (by itself) enough to create a genuine dispute of material fact on the question of confidentiality. There is no indication that the co-worker even worked on Face ID.
- Ms. Gjovik also points to disclosures of the images by Cher Scarlett (another former Apple employee with whom Ms. Gjovik once had a friendly relationship) and a French reporter. But even if Apple knew about these disclosures, they came well *after* Ms. Gjovik had already publicly disclosed the images – *i.e.*, the cat was already out of the bag.

In her papers, Ms. Gjovik further suggests she was entitled to post the images because they shed light on the working conditions at Apple. In other words, Ms. Gjovik appears to take the position that, even if the information at issue *was* confidential, she was still allowed to disclose it because she was making complaints about Apple's working conditions. That is not supported by the law. Although California Labor Code § 232.5 states that "[n]o employer may . . . [r]equire, as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions," it also states that "[t]his section is not intended to permit an employee to disclose proprietary information … without the consent of his or her employer." Cal.

United States District Court
Northern District of California

Lab. Code § 232.5(a), (d); *see also Joaquin v. City of Los Angeles*, 202 Cal. App. 4th 1207, 1223 (2012) (stating that "[a]n employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action") (internal quotation marks omitted); *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 354 (2008) (stating that "[p]recedent does not prevent [an employer] from removing . . . an employee [who performs poorly, engages in improper work conduct, or severely disrupts the workplace] simply because the employee [recently] engaged in a protected work activity") (internal quotation marks omitted). In short, because the information was confidential, Ms. Gjovik had no right to post and claim it as protected activity.

In her reply/opposition, Ms. Gjovik, argues: "Apple's reliance on § 232.5(d)'s proprietary-information carve-out fails for many reasons including on this ground: information whose disclosure is independently protected under § 1102.5(b), Gov. Code § 12964.5, and Cal. Civ. § 1668 cannot be 'proprietary' within the meaning of § 232.5(d), or the carve-out would swallow each independent protection." Reply at 22. But Ms. Gjovik cites no concrete authority to support her position. Moreover, none of these statutes affords protection to Ms. Gjovik. For example:

- Section 1102.5(b) provides that there can be no retaliation against an employee for disclosing information "to a government or law enforcement agency" or a "person with authority over the employee." Cal. Lab. Code § 1102.5(b). Here, Ms. Gjovik made a disclosure to the public (via Twitter) and to the press (Verge).
- Section 12964.5 provides in relevant part that an employer cannot, "as a condition of employment or continued employment, . . . require an employee to sign a nondisparagement agreement or other document to the extent it has the purpose or effect of denying the employee the right to disclose information about unlawful acts in the workplace." Cal. Gov't Code § 12964.5(a)(1)(B)(i). There is no allegation or evidence that Ms. Gjovik was forced to sign such an agreement.
- Section 1668 states: "All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful

United States District Court
Northern District of California

injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Cal. Civ. Code § 1668. Similar to above, Ms. Gjovik has not pointed to any contract between herself and Apple that violates the statute.

The bottom line is that § 232.5 articulates a public policy that an employer still has a legitimate interest in protecting its confidential business information even if there is also a public policy that an employee has the right to comment on their working conditions. In this regard, it is worth noting that Ms. Gjovik could easily have made criticisms about Apple's capturing of her images without showing the actual images themselves.

Apple has satisfied its burden of showing it had a legitimate nonretaliatory business reason for terminating Ms. Gjovik. It has done so as a matter of law as no reasonable jury could conclude otherwise.

3. Third Stage

Because Apple has met its burden of production at step two of *McDonnell Douglas*, the Court moves on to the third step which focuses on pretext. "In a pretext case, the *only* actual motive is the discriminatory one and the purported legitimate reasons are *fabricated* in order to disguise the true motive." CACI 2512, Directions for Use (emphasis added). Ms. Gjovik has the burden at this stage, and there must be substantial evidence of pretext. *See Loggins*, 151 Cal. App. 4th at 1109. Ms. Gjovik is not entitled at the third stage to simply rest on her prima facie case. *See id.* at 1113 ("[A]n employee seeking to avoid summary judgment cannot simply rest on the prima facie showing, but must adduce substantial additional evidence from which a trier of fact could infer the articulated reasons for the adverse employment action were untrue or pretextual.").

Based on the undisputed evidence of record, no reasonable jury could find substantial, let alone modest, evidence of pretext. The evidence reflects that Apple terminated Ms. Gjovik very soon after her tweets and the Verge article, both of which disclosed confidential information. The disclosure was serious: the information could only be viewed with confidential Apple tools, and it could have benefited competitors of Apple as well as hackers. Furthermore, Ms. Gjovik's disclosure was intentional and designed to be disseminated as broadly as possible, as demonstrated

by the fact that Ms. Gjovik provided the images to a reporter for publication. Apple's decision to terminate Ms. Gjovik because of the disclosure of confidential information was consistent with several of its policies where it expressly warned that an employee could be terminated for such a disclosure. Ms. Gjovik was cognizant of this risk as she asked that the reporter blur out at least some of the information in the images she collected. Other employees had also been terminated for their disclosure of confidential information. Ms. Gjovik was not subject to selective treatment. If Apple had wanted to terminate Ms. Gjovik for making complaints about environmental safety, then it could have done so in March 2021 when she first raised the issue or in July 2021 when she and Apple had a meeting to discuss her continued concerns about environmental safety. It did not do so. If Apple had wanted to terminate Ms. Gjovik for making complaints about sex discrimination or a hostile work environment, it could have done so in April 2021 when she first raised the issue or in July-August 2021 when she made additional complaints about such conduct. It did not. When Ms. Gjovik submitted her 34-page "Issue Confirmation" document to Apple in or about August 23, 2021, Apple still did not terminate her. Nor did it terminate her after it learned that she had made a complaint with the NLRB. (There is no evidence that Apple knew about any complaints Ms. Gjovik had made to governmental agencies other than the NLRB, and possibly the EPA, before it terminated her.) There is also no evidence of, *e.g.*, any internal comments by Apple decision makers suggesting they were upset or unhappy about Ms. Gjovik's complaints. Instead, Apple only terminated Ms. Gjovik after she disclosed confidential images on Twitter and via a news article, and only after investigating and giving her an opportunity to give her side of the story on her actions – which she declined to do, unless communications were reduced to written form only. Ms. Gjovik never even made a written claim to Apple that she did not believe the information she had disclosed was not confidential. Nor did she make a modest request that any interview with an investigator be recorded to protect her rights. *See also* Part III.F, *infra* (discussing Ms. Gjovik's failure to cooperate as one of the reasons supporting Apple's decision to terminate).

The Court has considered Ms. Gjovik's various arguments on pretext, both on an individual or collective basis. They do not alter the Court's analysis on pretext.



United States District Court
Northern District of California

**Shifting explanations.** According to Ms. Gjovik, it can reasonably be inferred that the termination was retaliatory because Apple provided shifting explanations for her termination. That is incorrect. Ms. Bowman (Human Resources) identified three reasons to terminate. Mr. Bertolus agreed with those three reasons (although he emphasized that the first, *i.e.*, the disclosure of confidential information, was the most important). Apple's actual termination letter gave the same three reasons. Apple's operative answer did the same. That Apple did not give *specifics* about the third reason (related to the sous chef incident) until it served an interrogatory response in early April 2026, does not at all establish that Apple's reasons for termination *changed*. Furthermore, Apple's decision to terminate based on the disclosure of confidential information did not target Ms. Gjovik in any way, as demonstrated by the fact that other people (as many as a dozen) have also been terminated based on breach of confidentiality.

Ms. Gjovik argues that there was still some shifting in explanation because, in an interrogatory response, Apple indicated that she had disclosed confidential information about not only Face ID but also ear scans. This was, according to Ms. Gjovik, inconsistent with the deposition testimony of Apple's 30(b)(6) witness who disclaimed reliance on the confidentiality of the ear scans. Apple disagrees with Ms. Gjovik's characterization of its interrogatory response, maintaining that its discussion of ear scans in the response was simply background information. Even assuming in Ms. Gjovik's favor that Apple once claimed that information about ear scans was confidential, that does not detract from Apple's clear and consistent reliance on the disclosure of confidential information related to Face ID.

**Timing.** Ms. Gjovik suggests that it can reasonably be inferred from the timing that she was fired for retaliatory reasons – *e.g.*, the termination came "14 days after the NLRB filing; 11 days after the OSHA and Labor Commissioner filings; 21 days after EPA's inspection [of the Apple building]; 28 days and hours after the EEOC/DFEH charge; and 17 days after the Issue Confirmation was transmitted to [Apple]." Pl.'s Mot. at 20. As an initial matter, the Court notes that Ms. Gjovik's reliance on timing alone is not enough to establish pretext. Case law is clear on this point. *See Arteaga*, 163 Cal. App. 4th at 353 (stating that, "[b]ecause the employee's burden of establishing a prima facie case under *McDonnell Douglas* is fairly minimal, the temporal

proximity between an employee's disclosure of his symptoms and a subsequent termination may satisfy the causation requirement at the *first step* of the burden-shifting process," but "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination") (emphasis in original); *Loggins*, 151 Cal. App. 4th at 1112 (stating that "temporal proximity, although sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual"). Second, Ms. Gjovik presents no evidence that Apple knew about any of Ms. Gjovik's complaints or reports to government agencies other than the NLRB (and possibly the EPA) prior to her termination. Third, Ms. Gjovik's reliance on timing ignores the fact that, as mentioned above, Ms. Gjovik had a long history of making complaints to Apple but, for months, Apple did not terminate her or take any steps towards termination. Ms. Gjovik began to make complaints to Apple about environmental safety starting in March 2021, but Apple did not terminate her at that point. Nor did Apple terminate her after, *e.g.*, she complained to Apple in April, July, and August 2021 about various matters, including environmental safety, sex discrimination, and a hostile work environment. Rather, Apple did not terminate Ms. Gjovik until some six months after her first complaint – and within days after her disclosure of confidential information (and refusal to engage in a live interview about her actions).

**Privileged document.** Ms. Gjovik also argues that it is reasonable to infer her termination was "pre-planned" based on a document listed on Apple's privilege log. Pl.'s Mot. at 22. Ms. Gjovik notes that, four days before she made the tweets on August 30, 2021, "Apple circulated by email an internal Keynote file entitled 'Draft Exit Outcomes ACP.key." Pl.'s Mot. at 5-6.

The inference Ms. Gjovik attempts to draw is not reasonable given the timing. The document is dated long after (*i.e.*, months after) Ms. Gjovik first engaged in protected activity in filing complaints with Apple and the EPA.

In addition, the title of the document – "Draft Exit Outcomes" – is hardly damning in light of the full record. Ms. Gjovik ignores the fact that she herself had, in late July 2021, suggested

"an exit package that will compensate me and provide benefits through that time." Okpo Decl., Ex. A (email from Ms. Gjovik, dated 7/28/2021) ("I'm still looking for a short-term response to mitigate the current hostile work environment I'm experiencing reporting to Dave and Dan and Helen. . . . [¶] Further, . . . I am requesting a long term solution to the hostile work environment and unsafe work conditions. There are two options we've discussed. First, a new role at Apple that is not a hostile work environment and not in unsafe work conditions (and I mentioned that because I will not be at Apple after Dec 31, 2022, I cannot find a new role to transfer to for such a short period of time, so I need your assistance with placement). *The 2nd option is an exit package that will compensate me and provide benefits through that time.*") (emphasis added). Given the obvious alternative explanation for the document when viewed in context, Ms. Gjovik's assertion that the content of the privileged document would show her termination was preplanned as retaliation is speculative and not based on a reasonable inference.

To the extent Ms. Gjovik asserts that a negative inference can be made from the fact that Apple asserted a privilege over the document's contents, courts have commonly held that it is not appropriate to draw such an adverse inference from the mere assertion of the attorney-client privilege. *See United States v. St. John*, 267 Fed. Appx. 17, 22 (2d Cir. 2008) (stating that, "in the civil context, we have held that there is no basis for the jury to draw an adverse inference because of the assertion of the attorney-client privilege"); *Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772 (4th Cir. 1990) (stating that, to protect the right to effective counsel, "a client asserting the privilege should not face a negative inference about the substance of the information sought"); *Yue v. Chordiant Software, Inc.*, No. C 08-00019 JW, 2010 U.S. Dist. LEXIS 159634 (N.D. Cal. Apr. 22, 2010) (holding that "any presentation of evidence or line of questioning designed to show Defendant's assertion of the attorney-client privilege would serve no relevant purpose and would unduly prejudice Defendant by allowing the jury to infer that Defendant was improperly withholding evidence"); *Sharer Inc. v. Tandberg*, No. 06-626, 2007 U.S. Dist. LEXIS 22391, 2007 WL 983849, at *9 (ED. Va. Mar. 27, 2007) (noting that attorney-client communication "is only relevant to the extent that an inference may be drawn as to the substance of legal communications" but "any such inference would intrude upon the protected realm of the attorney-

United States District Court
Northern District of California

client privilege") (internal quotation marks omitted).

**No progressive discipline.** Ms. Gjovik further asserts that a retaliatory animus can be inferred from the fact that Apple immediately fired her – *i.e.*, no progressive discipline was used. But there is no evidence that Apple's policies required it to use progressive discipline, particularly given the kind of conduct at issue here, *i.e.*, intentional disclosure of confidential information. Moreover, Apple's policies expressly indicated that termination was a possibility for a disclosure of confidential information, and Apple has provided evidence that it has terminated other individuals' employment for disclosing confidential information. Ms. Gjovik has provided no contrary evidence.

**Cat's paw theory.** Ms. Gjovik suggests that animus can reasonably be inferred under a cat's paw theory. *See Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) (describing the cat's paw theory as follows: "if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process"). But it is not even clear from Ms. Gjovik's papers who harbored the retaliatory animus and then influenced Mr. Bertolus (the final decisionmaker on the termination). To the extent Ms. Gjovik suggests that those persons are Ms. Bowman and/or Mr. Kagramanov, it is not clear how there was a retaliatory animus on the part of either individual: each was simply part of the process of Apple's looking into the disclosure of confidential information. Ms. Gjovik has not pointed to evidence establishing a connection between either of them and, *e.g.*, her earlier complaints about workplace conditions such as environmental safety or a hostile work environment.

**Deviation from procedure/inadequate investigation.** Ms. Gjovik further argues that a reasonable inference can be made of a retaliatory animus because Apple deviated from procedure and conducted an inadequate investigation. But while Mr. Kagramanov did cut off the investigation quickly, that was because Ms. Gjovik refused to engage in a live voice-to-voice interview, which, as discussed below, was a reasonable request from Mr. Kagramanov. Moreover,

United States District Court
Northern District of California

given that Ms. Gjovik had intentionally disclosed the confidential information through a series of actions (multiple tweets and the Verge article), no reasonable jury could infer something nefarious from the mere fact that Mr. Kagramanov moved quickly. There is no evidence that, *e.g.*, Ms. Gjovik informed Mr. Kagramanov she believed the images she disclosed were not confidential in nature.

**Disparate treatment.** Finally, in her papers, Ms. Gjovik seemed to suggest that retaliation can be inferred from the fact that Dr. Aloe disclosed confidential information about Face ID but was not terminated. At the hearing, however, Ms. Gjovik clarified that she did *not* believe Dr. Aloe's disclosures (made in articles he published) were confidential. Ms. Gjovik's position, therefore, seems to be that her disclosures were just as innocuous as Dr. Aloe's (*i.e.*, in neither situation was there a disclosure of confidential information); thus, she should not have been terminated just as Dr. Aloe was not terminated. Ms. Gjovik is essentially arguing that her conduct and Dr. Aloe's conduct are comparable.

But notably, Ms. Gjovik did not even provide Dr. Aloe's publications until her untimely filed second reply/opposition declaration, which the Court has stricken. And even when Ms. Gjovik did provide the publications, she did not point to anything concrete therein to support her contention that her conduct and Dr. Aloe's were materially identical. Dr. Aloe's articles, for instance, did not include any images nor did it contain any specifics about the data that was collected for Face ID. In any event, Apple has provided evidence establishing that other people have also been terminated for disclosing confidential information. Notably, Mr. Bertolus was also the decisionmaker in one of these instances. Ms. Gjovik has provided no evidence contradicting this information.

4. Summary

Even assuming Ms. Gjovik established a prima facie case for her wrongful termination, § 6310, and § 98.6 claims under the first stage of *McDonnell Douglas*, Apple has satisfied its burden of production at the second stage. Apple had a legitimate, nonretaliatory reason to terminate – *i.e.*, because Ms. Gjovik had disclosed confidential information related to Face ID. At the third stage of *McDonnell Douglas*, Ms. Gjovik has the burden of providing substantial evidence to support

pretext – *i.e.*, that Apple's reason to terminate was fabricated and the only reason why it terminated her was to retaliate against her for having engaged in protected activity. No reasonable jury could find pretext based on the undisputed evidence of record. Apple, therefore, is entitled to summary judgment on all claims governed by *McDonnell Douglas*.

E. <u>Section 1102.5 Claim</u>

Unlike the claims above, Ms. Gjovik's § 1102.5 claim is not subject specifically to the *McDonnell Douglas* framework. Instead, § 1102.6 dictates the following two-step analysis for a § 1102.5 claim.

> First, it must be "demonstrated by a preponderance of the evidence" that the employee's protected whistleblowing was a "contributing factor" to an adverse employment action. (§ 1102.6.) Then, once the employee has made that necessary threshold showing, the employer bears "the burden of proof to demonstrate by clear and convincing evidence" that the alleged adverse employment action would have occurred "for legitimate, independent reasons" even if the employee had not engaged in protected whistleblowing activities.

*Lawson*, 12 Cal. 5th at 712. Although the second step does impose a significant evidentiary burden on Apple, the first step puts the initial burden on Ms. Gjovik and that burden involves more than just establishing a prima facie case. Ms. Gjovik must establish by a preponderance of the evidence that Apple's retaliatory motive was a contributing factor to her termination.

For largely the same reasons discussed above, the Court concludes that, at the first step, no reasonable juror could find Ms. Gjovik's protected activity was a contributing factor to her termination. As the Court has concluded above, Apple is entitled to a finding as a matter of law that there was no pretext, and thus the *sole* reason for the termination was based on legitimate nonretaliatory business reasons. Accordingly, retaliation was not a contributing factor in the decision to terminate.

Furthermore, even assuming a reasonable jury could find in Ms. Gjovik's favor on the first step, no reasonable jury could find in her favor on the second step. The undisputed evidence shows that, on August 30, 2021, Ms. Gjovik tweeted images from the Face ID study, that the Verge article published the same and/or similar images on the same date, that the images were confidential, that Apple's policies specified an employee could be terminated for disclosing

United States District Court
Northern District of California

United States District Court
Northern District of California

confidential information, that Apple promptly began to investigate Ms. Gjovik's disclosures, and that Ms. Gjovik was terminated approximately 10 days after the initial disclosure after Mr. Bertolus viewed at least one image and received confirmation that the image was in fact confidential. Under § 1102.5, "if an employer satisfies its burden at the second step in making a same decision showing, the employer is not liable regardless of whether the employee made an initial showing that his or her protected disclosure was a 'contributing factor.'" *Veverka v. Dep't of Veterans Affairs*, 102 Cal. App. 5th 162, 173-74 (2024) (agreeing with the defendant's position; plaintiff's contention that "a plaintiff may be entitled to certain relief even if the employer satisfies its burden under section 1102.6 is belied by the statute's plain language"); *see also Lampkin*, 112 Cal. App. 5th at 929 (stating that, if the defendant proves their same-decision defense, the case ends; § 1102.6 "does not include an exception to the same-decision defense [or] a limitation on its extent").

F. <u>Failure to Cooperate</u>

Because the disclosure of confidential information by itself was a basis to terminate (as Mr. Bertolus testified in his deposition, the disclosure was "so egregious that that in itself warranted termination," Gjovik Decl., Ex. 32 (Bertolus Depo. at 99)), the Court need not consider the additional reasons offered by Apple to bolster the termination – *i.e.*, Ms. Gjovik's failure to cooperate with the investigation and her misrepresentations about the sous chef incident. The additional reasons, however, were also legitimate, nonretaliatory reasons to terminate.

Regarding Ms. Gjovik's failure to cooperate, this was predicated on Ms. Gjovik being willing to participate in a "written" interview only; she refused the investigators' request to engage with her live voice-to-voice. No reasonable jury could find in Ms. Gjovik's favor that the request for a live voice-to-voice interview was retaliatory. Rather, the undisputed evidence reflects that Apple had legitimate, nonretaliatory reasons for wanting live voice-to-voice communications. As explained by Mr. Kagramanov, who investigated the disclosure made by Mr. Gjovik,

> the intention for having a live conversation is to ensure that we have a natural recollection of . . . whatever the discussion is at hand relating to the investigation. It also allows for natural follow-up questions in the moment and also to kind of just gauge tone, behavior in the call where we have that natural live dialogue.

Kagramanov Depo. at 59. Mr. Okpo, who conducted the investigation into Ms. Gjovik's complaints about, *inter alia*, a hostile work environment, provided similar testimony in his deposition, stating, *e.g.*, that

> [t]he work that we do, investigating claims, it would be very difficult to get to the heart of the issue and fact-find via email. What I mean by that is, as investigators, similar to what you're doing here, it's important to receive answers . . . from . . . the person you're interviewing in realtime so that you could ask follow-up questions where appropriate. And so . . . it's just not part of my process or our ER investigate [sic] process to conduct investigations via email.

Okpo Depo. at 104.

Mr. Kagramanov and Mr. Okpo's reasoning makes sense. Indeed, as Mr. Okpo suggested, this is consistent with how litigation is typically run. For instance, although the Federal Rules of Civil Procedure allow for depositions by written questions, *see* Fed. R. Civ. P. 31, the vast majority of the time, parties take live depositions instead. A live deposition better allows for natural/noncomposed responses, assessment of demeanor, and follow-up questions.

Ms. Gjovik's contention that the requirement of a voice-to-voice interview was retaliatory because she had requested a "written" investigation to "preserve a record for her NLRB proceedings and her other pending complaints," Pl.'s Mot. at 1, is entirely speculative. Tellingly, Ms. Gjovik could have consented to voice-to-voice live interviews and requested that they be taped/recorded, but she did not do so. To the extent Ms. Gjovik asserts that there was no formal policy requiring voice-to-voice interviews, the absence of a formal policy is not enough to create a genuine dispute of material fact about the reasonableness of the investigators' request and the unreasonableness of her refusal, particularly here because the *practice* was to conduct such interviews. As Mr. Okpo testified in his deposition: "Yes [other employees have asked for communications to be kept in writing. But] [d]uring the actual investigation process, I've been consistent around the need to have live conversations." Riechert Decl., Ex. E (Okpo Depo. at 105). There is no evidence that Apple did not have such a practice, particularly when the concern was that an employee had disclosed confidential information.

Apple thus has a second legitimate business reason for terminating Ms. Gjovik.

G. Misrepresentations about the Sous Chef Incident

Finally, contrary to what Ms. Gjovik contends, there is no evidence that Apple terminated her simply because she had made a complaint that Mr. West sexually harassed her (or was engaging in pimping and pandering in violation of California criminal law). *See* Mot. at 1. Rather, the record is clear and undisputed that Apple took issue with the fact that Ms. Gjovik had *misrepresented* the text exchange between her and Mr. West (giving only a single text message). The full text exchange did not show "pimping" or "pandering" as Ms. Gjovik had claimed in her "Issue Confirmation" document.

The text exchange (see Gjovik Decl., Ex. 36) began when Ms. Gjovik texted Mr. West to let him know she was dining at a restaurant which Mr. West knew well and which was run by a chef with whom Mr. West had a personal relationship. At one point, Mr. West noted in one of his texts that his wife, with whom Ms. Gjovik was apparently friendly, "tells me you want to set you up with someone," to which Ms. Gjovik responded: "LOL! I think I told her I need to find the male version of her since you & I are so similar." Gjovik Decl., Ex. 36 (ECF Page 428). Mr. West then replied: "So I may have mentioned to the chef that you are single and that his sous chef should introduce himself to you." Gjovik Decl., Ex. 36 (ECF Page 429). Ms. Gjovik stated in response: "Oh no. Dan!! [¶] Is he cute?" Gjovik Decl., Ex. 36 (ECF Page 429). After Mr. West said at least one plate would be delivered by the sous chef, Ms. Gjovik stated: "Oh Lordy. Ok. Than you for the good intentions!" Gjovik Decl., Ex. 36 (ECF Page 430). Mr. West responded in part: "He's a nice guy though." Gjovik Decl., Ex. 36 (ECF Page 431). Mr. West also stated that the "chef said they will treat you like family." Gjovik Decl., Ex. 36 (ECF Page 432). Ms. Gjovik later stated: "[The sous chef] Andrew's a cutie," but "[h]e also looked super uncomfortable. Was he a willing participant in this?" Gjovik Decl., Ex. 36 (ECF Page 434-35). Additional texts from Ms. Gjovik included the following:

- "We were both blushing the entire time. Poor guy," Gjovik Decl., Ex. 36 (ECF Page 436);
- "Andrew came back. He said he's giving me complementary wagyu. Ok, maybe you two are Cupids after all. Im [sic] a sucker for both blonde guys and wagyu,"



United States District Court
Northern District of California

Gjovik Decl., Ex. 36 (ECF Page 438);

- "I'll leave my # for Andrew. Should take care of it," Gjovik Decl., Ex. 36 (ECF Page 446); and
- "He already bought me a 100 [dollar] dinner.[23] At least deserves a #." Gjovik Decl., Ex. 36 (ECF Page 447).

Mr. West's texts in response included the following statement: "In all candor . . . no pressure from me. [¶] I only know Andrew a little." Gjovik Decl., Ex. 36 (ECF Page 449). Ms. Gjovik replied: "I wouldn't do it if I wasn't actually interested. I'm very picky." Gjovik Decl., Ex. 36 (ECF Page 450). Then, after Ms. Gjovik was told the cost of the meal was being covered by Mr. West and the chef, she texted: "Would you please tell [the chef] I say huge thank you for the generosity, the delicious, amazing food, and the cute blondes." Gjovik Decl., Ex. 36 (ECF Page 457).

As reflected by the above, Apple had a sufficient basis to conclude that Ms. Gjovik's characterization of the events was not pimping or pandering – at the very least, was not complete. To be sure, this is not to say that Mr. West behaved appropriately. One could still argue that Mr. West's conduct was not proper given that he was her supervisor, and Mr. West was apparently reprimanded (or at least counseled) for not separating friendship from work. But the full text exchange gave Apple a sufficient basis to conclude that Ms. Gjovik's characterization of the sous chef incident was not entirely accurate. *See Joaquin*, 202 Cal. App. 4th at 1226 (stating that, "in appropriate circumstances, an employer may discipline or terminate an employee for making false charges, *even where the subject matter of those charges is an allegation of sexual harassment*") (emphasis added); *see also id.* at 1223 (noting that this principle applies so long as the employer took the adverse employment action based on a *good faith belief* that the employee had engaged in misconduct) (emphasis added). Apple's third reason for termination was not retaliatory.

/ / /

/ / /

[23] It appears that Mr. West and the chef paid for Ms. Gjovik's meal.

H. Summary

For the foregoing reasons, the Court concludes that Apple is entitled to summary judgment on all of her retaliation claims: both those governed by *McDonnell Douglas* and the § 1102.5 claim. A reasonable jury could reach only one conclusion based on the undisputed evidence of record: Apple had legitimate, nonretaliatory reasons to terminate Ms. Gjovik's employment, and there was no evidence sufficient to support a finding of retaliatory motive by Apple.

## IV. MS. GJOVIK'S MOTION FOR SUMMARY JUDGMENT

Because Apple prevails on its motion for summary judgment, Ms. Gjovik necessarily fails on her cross-motion. *See Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (stating that, "if the movant bears the burden of proof on an issue, [*e.g.*] because he is the plaintiff . . . , he must establish beyond peradventure all of the essential elements of the claim . . . to warrant judgment in his favor") (emphasis omitted); *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 607 (N.D. Cal. 1992) (noting that, where a plaintiff moves for summary judgment on claims that it has brought (*i.e.*, for which it has the burden of proof), it "must prove each element essential of the claims . . . by undisputed facts").

Similarly, because Apple prevails on its summary judgment motion, Ms. Gjovik's additional request for a preliminary injunction (*i.e.*, reinstatement of pay and benefits) is denied. The Court further notes that the relief Ms. Gjovik seeks is in the nature of damages, which also establishes that any injunction is not warranted.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

Case: 26-4716, 11/13/2026, DktEntry: 10.1, (42 of 233)

## V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Apple's motion to strike, grants Apple's motion for summary judgment, and denies Ms. Gjovik's motions for summary judgment and a preliminary injunction.

The Clerk of the Court is instructed to enter a final judgment in accordance with this order and close the file in this case.

This order disposes of Docket Nos. 359, 361, and 367.

**IT IS SO ORDERED**.

Dated: June 24, 2026

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,
Plaintiff,
v.
APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**ORDER DENYING PLAINTIFF'S MOTION FOR RELIEF FROM MAGISTRATE ORDER**

Docket No. 384

Pending before the Court is Ms. Gjovik's motion for relief from an order issued by Judge Westmore. *See* Docket No. 383 (MJ Order). Having considered Ms. Gjovik's motion as well as all other evidence of record, the Court **DENIES** her request for relief.

"When a magistrate judge issues an order on a non-dispositive matter, the district judge in the case 'must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.'" *De Leon v. Clorox Co.*, No. 19-mc-80296-EMC, 2021 U.S. Dist. LEXIS 34791, at *8 (N.D. Cal. Feb. 24, 2021). Ms. Gjovik has failed to show clear error or a result contrary to law.

As one example,[1] one of Ms. Gjovik's arguments in Objection No. 2 is that Judge Westmore erred in concluding that certain information was privileged because Apple was using the privilege not only as a shield but also as a sword. That is incorrect. Apple is not claiming as a defense that it made the decision to terminate Ms. Gjovik because counsel so advised. To be sure, Apple may have consulted with counsel before making the decision to terminate. But that is

[1] To be clear, the Court has considered all objections and all sub-arguments contained therein in Ms. Gjovik's motion. None has merit.

simply a fact that was disclosed as part of discovery. Apple has not indicated that it will argue to the trier of fact (or the Court) that its decision to terminate was informed by communications from counsel. *See Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994) ("Advice [of counsel] is not in issue merely because it is relevant, and does not necessarily become an issue merely because the attorney's advice might affect the client's state of mind in a relevant manner. The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication."); *Rask v. Fresenius Med. Care N. Am.*, No. 05-1267 (ADM/RLE), 2006 U.S. Dist. LEXIS 118882, *16-17 (D. Minn. July 25, 2006) ("From the filings, the disputed communications fall squarely within the confines of the attorney-client privilege. The Defendant advises that, 'prior to carrying out her decision to terminate Rask, Mitchell sought the advice of corporate counsel' for the purposes of seeking a legal opinion. The Plaintiff states that the Defendant, by asserting an advice-of-counsel defense, waives the privilege. However, the Defendant has not asserted such a defense in this action. Furthermore, this is not a case where counsel was merely present at a meeting, in an attempt to invoke the privilege. Instead, on this Record, the circumstances present a scenario in which the attorney-client privilege properly attaches – a corporate employee seeks legal advice as to a corporate decision from in-house counsel.").

As another example, Ms. Gjovik argues in Objection No. 8 that, contrary to what Judge Westmore stated in her order, Ms. Gjovik did not manually change the filing date of her discovery motion, *i.e.*, to make it appear that the motion was timely filed. *See* Docket No. 383 (MJ Order at 1 n.1) ("Plaintiff filed her opening brief on April 24, 2026 at 12:28 a.m., but she manually changed the filing date to April 23, 2026, so it would appear to have been timely filed. Instead of attempting to mislead the Court, Plaintiff should have left the actual filing date intact and filed a separate administrative motion to ask for relief because it was only 28 minutes late. The Court would have granted that relief, because Defendant did not suffer any prejudice due to the short delay."). Even if Ms. Gjovik is correct that she did not manually change the filing date, the relief she seeks – striking of the relevant portion of Judge Westmore's order – is not necessary. Judge

United States District Court
Northern District of California

Westmore did not reject Ms. Gjovik's discovery motion on the basis that it was not timely filed.

Accordingly, Ms. Gjovik's motion for relief from Judge Westmore's order is denied.

This order disposes of Docket No. 384.

**IT IS SO ORDERED**.

Dated: June 9, 2026



EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY M GJOVIK,<br>Plaintiff,<br>v.<br>APPLE INC.,<br>Defendant. | Case No. 3:23-cv-04597-EMC (KAW)<br>**ORDER RESOLVING REMAINING FACT DISCOVERY DISPUTES**<br>Re: Dkt. Nos. 358, 363, 365 |

In order to preserve the Court's limited judicial resources, the Court fashioned a process by which the parties may raise any remaining disputes pertaining to fact discovery. (Dkt. No. 327.) This process required each party to "raise their initial dispute(s) with the opposing party via email by April 9, 2026 (one week before the discovery cut-off) in a single email (e.g. Plaintiff sends one email to Defendant with all outstanding disputes and vice versa)." *Id.* at 7. The parties were then instructed to go back and forth on that email thread to narrow the scope of any remaining disputes. *Id.* The initiating party was instructed to attach a copy of the complete thread as an exhibit, so that the Court could ensure that they had sufficiently met and conferred on every issue presented. *Id.*

The fact discovery cut-off in this case was April 16, 2026. (Dkt. No. 274.) Plaintiff's opening brief was due on April 23, 2026, but Plaintiff did not file it until April 24, 2026.[1] (Pl.'s Br., Dkt. No. 358.) On Araise, 2026, Defendant filed a brief responding to Plaintiff's disputes and raising two of its own. (Def.'s Br., Dkt. No. 363.) On May 6, 2026, Plaintiff filed her responsive

[1] Plaintiff filed her opening brief on April 24, 2026 at 12:28 a.m., but she manually changed the filing date to April 23, 2026, so it would appear to have been timely filed. Instead of attempting to mislead the Court, Plaintiff should have left the actual filing date intact and filed a separate administrative motion to ask for relief because it was only 28 minutes late. The Court would have granted that relief, because Defendant did not suffer any prejudice due to the short delay.

United States District Court
Northern District of California

brief. (Pl.'s Resp., Dkt. No. 365.)

## I. PLAINTIFF'S DISCOVERY DISPUTES

### A. Whether Plaintiff complied with the meet and confer requirements of this dispute resolution process.

As an initial matter, Apple contends that Plaintiff did not meet and confer in good faith, and she failed to follow the Court's instruction to maintain a separate email chain for her disputes, such that the Court should dismiss her requests for relief. (Def.'s Br. at 7.) Since an adequate meet and confer process is required before the Court addresses a particular discovery dispute, this is a threshold issue, and so it must be addressed first.

The parties were clearly instructed to meet and confer via email "in an attempt to narrow the scope of any remaining disputes." (Dkt. No. 327 at 7.) The Court notes that Plaintiff failed to follow the Court's instructions as set forth in the March 30, 2026 order. First, Plaintiff did not initiate a separate email thread as clearly instructed, and, instead, opted to hijack the Apple-initiated email thread in contravention of the court order. Second, instead of selectively raising issues of import at this late stage of the case, Plaintiff took this process as an invitation to raise every conceivable discovery dispute, including several that were already addressed by prior discovery orders. This conduct flies in the face of the Court's intention. Third, she did not attempt to narrow any of her requests for production to address proportionality even after Apple laid out a cogent response on April 14, 2026.[2]

Based on Plaintiff's failure to follow the Court's instructions, the undersigned is under no obligation to address any of the disputes raised. Nonetheless, the Court will briefly address the disputes below.

//

//

//

[2] Due to Plaintiff's failure to provide a complete email thread, Apple attached the missing emails with its responses as an exhibit to its brief. (Def.'s Br. at 7 n.3, Ex. P.)

**B. On the merits**

**i. Environmental records pertaining to 825 Stewart Drive and 3250 Scott Boulevard responsive to RFP Nos. 7–10 (Set One) and 24, 28–32 (Set Two)**

Plaintiff again seeks to compel documents in response to Requests for Production Nos. 7-10, 24, 28-32. (Pl.'s Br. at 2-5.) Plaintiff previously attempted to compel supplemental responses, but the Court declined to address her arguments, because the parties did not meet and confer on those requests. (*See* Dkt. No. 327 at 4.)

Now, Plaintiff is raising this issue again. The Court notes that Plaintiff's initial April 9, 2026 email does not address the substance of any of these requests rendering the initial meet and confer attempt woefully inadequate given that Plaintiff bears the burden of showing proportionality under Federal Rule of Civil Procedure 26. Plaintiff did not address any of the individual requests until her April 15, 2026 email. (Pl.'s Br., Ex. A at 22-25.[3]) Accordingly, Plaintiff did not timely raise these disputes by the April 9, 2026 deadline, and the Court denies her request to compel supplemental documents in response to these requests.

**ii. Production of documents relating to Plaintiff's protected activity and Apple's knowledge of that activity.**

Plaintiff contends that documents exist in response to Request Nos. 4, 7, 11–16, 36, 43, 44, 55, 56, and 60 (Set Two), because they were confirmed by the deposition testimony of Ekelemchi Okpo. (Pl.'s Br. at 5.) In opposition, Apple confirms that it has produced all non-privileged, responsive documents, which consisted of more than 4,000 pages of documents. (Def.'s Br. at 14.)

---

[3] Reviewing Plaintiff's email thread is further complicated by two factors. First, Plaintiff's refusal to comply with the Court's procedures for this process; namely, her failure to start her own email thread to address her remaining disputes despite Apple bringing the violation to her attention means that both sets of disputes are in a single email thread. A fate the Court explicitly attempted to avoid by requiring each initiating party to start their own thread. Second, Plaintiff has failed to pincite to any of the pages in the 44-page email thread, and the Court is not required to look at it let alone decipher it, particularly given that the emails are not consistently in reverse chronological order. Since Plaintiff has provided more than 200 pages of exhibits, the failure to pincite is separately fatal, because the Court is not required to review exhibits that are not pincited. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).



United States District Court
Northern District of California

United States District Court
Northern District of California

The Court must take Apple at its word and trusts that it is aware of its ongoing responsibility to supplement its responses under Rule 26 if it locates additional non-privileged, responsive documents.

**iii. The validity of Apple's assertions of privilege, including Apple's instructions to witnesses not to answer foundational deposition questions about internal investigations, and Apple's failure to provide a privilege log.**

Plaintiff did not raise the issue of improper privilege objections during the meet and confer process. Therefore, the issue is not ripe.

Notwithstanding, the Court's civil standing order does not require a party to prepare and provide a privilege log for privilege objections raised during a deposition, and Plaintiff provides no authority requiring same.

Accordingly, Plaintiff's request is denied.

**iv. Apple's failure to search for or log documents responsive to RFP No. 43.**

Next, Plaintiff contends that Apple has refused to search for and/or log documents responsive to Request No. 43 as it pertains to Apple Legal or the internal investigations team. (Pl.'s Br. at 6.) Request No. 43 seeks

> All internal communications, messages, emails, notes, summaries, or reports exchanged between or among any of the following groups: Plaintiff's managers or direct supervisors; Apple's Human Resources (HR) personnel; Employee Relations (ER) team; Apple Security personnel; Apple Legal or internal investigations teams; any executive team or risk management personnel discussing, referencing, or relating to Plaintiff between February 1, 2021 and September 10, 2021.

(Pl.'s Br., Ex. 4 at 17-18.)

In opposition, Apple argues that, as discussed in the meet and confer, "when a request seeks clearly privileged information, the responding party is not required to log those documents because Rule 26 confirms privileged information is not discoverable." (Def.'s Br. at 17.) Defendant contends that Plaintiff's attempt is an assault on attorney-client privilege, and the Court agrees. Accordingly, Plaintiff's request is denied.

**v. Apple's refusal to identify those involved in the decision to terminate Plaintiff, its defense witnesses, and any Rule 35 examiner or medical expert.**

Plaintiff contends that Apple has not identified everyone involved in the decision to

terminate her, its defense witnesses, and Apple's Rule 35 independent medical examiner. (Pl.'s Br. at 8-9.)

In opposition, Apple contends that it has listed everyone involved in Plaintiff's termination, names those individuals, and that its disclosures are complete. (Def.'s Br. at 18-19.) As a result, there is nothing to add. As to its defense witnesses, Apple contends that this issue was not raised in the April 9 email and is unripe. *Id.* at 19. Moreover, Apple contends that Plaintiff's speculation is unfounded. The Court agrees. Finally, Apple identified Dr. Frederick Stampler, Psy.D. as the provider who will conduct the IME,[4] and expert witnesses do not need to be disclosed until June 30, 2026, rendering this dispute moot. *Id.* Again, the Court agrees.

**vi. Apple's refusal to state, on an RFP-by-RFP basis, whether production is complete or documents are being withheld.**

Apple is only required to confirm that they have no additional responsive, non-privileged documents. They are not required to amend their responses to confirm this for every document request.

**vii. Apple's purported refusal to produce the records it obtained from Plaintiff's subsequent employer via third-party subpoena.**

Plaintiff contends that Apple should produce documents that it subpoenaed from Plaintiff's subsequent employer pursuant to an April 2, 2026 subpoena. (Pl.'s Br. at 11.) As Apple points out, Civil Local Rule 37-3 does not require compliance, because the compliance date on the subpoena was after the fact discovery cut-off. (Def.'s Br. at 20.) Even so, Apple produced the records on April 27, 2026. *Id.* Thus, this dispute has been resolved, and the Court will take no further action.

**viii. Additional disputes crystallized by Apple's April 23, 2026 email, including Plaintiff's contention that Apple's "no responsive documents" assertions for RFP Nos. 40–42 is implausible, the narrowed RFP No. 49, the broader scope of RFP Nos. 61–62, and Apple's declared impasse on RFP Nos. 7, 19, 43, 47, 51, 59.**

None of Plaintiff's issues raised are meritorious. (*See* Pl.'s Br. at 12-13.) Apple told

---

[4] The Court notes that Apple disclosed Dr. Stampler's identity on April 28, 2026, which was after Plaintiff filed her opening brief.

Plaintiff that it had no responsive documents in response to Requests Nos. 40-42, and Plaintiff's opinion that Apple's position is implausible is not a basis for compelling a supplemental production. *See id.* As Apple points out, Plaintiff actually broadened the scope of Request No. 49 by adding additional senior level leaders who fell outside the custodians in the original request, which requires that Plaintiff's request be denied. (*See* Def.'s Br. at 21.) In regard to Requests Nos. 61-62, Apple represents that it produced all non-privileged, responsive documents, which, again, is all the Court requires. (*See* Def.'s Br. at 21.) The fact that Mr. Okpo testified at deposition to the existence of additional documents does not render them non-privileged. (*See* Pl.'s Br. at 12-13.) Finally, as to Plaintiff's request that Apple serve amended responses, Apple need only serve supplemental responses in the event that it locates additional responsive documents. *See id.* at 13.

Accordingly, these requests are denied.

## II. DEFENDANT'S DISCOVERY DISPUTES

Apple raises two remaining discovery disputes: (1) discovery regarding Plaintiff's alleged emotional distress damages; specifically, a Rule 35 independent medical examination ("IME"), and medical records by subpoena; and (2) Plaintiff's failure to produce documents evidencing the full extent of her disclosure of Apple's confidential product-related information (RFP 1 and 10). (Def.'s Br. at 1.)

### A. Medical Discovery

a. Independent Medical Examination ("IME")

Apple argues that the Court should order an independent medical examination ("IME") and compel Plaintiff's medical providers to produce her medical records. (Def.'s Br. at 1.) Plaintiff previously agreed to undergo an IME, but she is now arguing that the disclosure of the examiner is untimely. (Pl.'s Resp. at 5.) The Court disagrees. The Court appreciates Plaintiff's willingness to go forward with the IME, and orders that she do so as soon as practicable, but by no later than the June 30, 2026 deadline set by the presiding judge. *See id.*

b. Medical Record Subpoenas

Apple is under no obligation to use the HIPAA authorization drafted by Plaintiff. As previewed in the February 23, 2026 order, the Court hereby orders the following medical

Case: 26-4716, 11/13/2026, DktEntry: 10.1, (52 of 233)

United States District Court
Northern District of California

providers to produce records consistent with the subpoenas that Apple served:

1. Sutter Health PAMF
2. Boston Medical Center
3. Atrius Health
4. The Clinic / Optum Behavioral Care
5. AC Wellness Group
6. MD Live by Evernorth
7. Paragon Consulting Group
8. Delmar Family Medicine
9. Heally
10. Aptihealth
11. One Medical

(*See* Dkt. No. 291 at 2; *See* Def.'s Br. at 3, Exs. E-O.) The medical providers are ordered to produce all responsive medical records within 14 days of this order.

**B. Documents Reflecting her Disclosures of Confidential Apple Production Information**

Finally, Apple seeks to compel the production of documents in response to Requests for Production Nos. 1 and 10, which relate to "Plaintiff's apparent failure to produce all documents reflecting her disclosure of confidential Apple product information to unauthorized parties during her employment." (Def.'s Br. at 4.) Apple contends that these are relevant to its defense that it terminated Plaintiff's employment because she disclosed Apple's confidential product information in violation of her Intellectual Property Agreement and Apple policies. *Id.* After meeting and conferring, Plaintiff produced 35,000 pages of documents since the close of discovery, but Apple's review indicates that some documents are missing, because Apple is aware of some communications she did not produce. *Id.* at 5. After meeting and conferring, Plaintiff produced an additional 9,732 pages on April 29, 2026, in which she allegedly asserted that she had sold her iPhone and deleted her iCloud account shortly after her termination, which Apple characterizes as spoliation. *Id.* at 6. Despite this representation, on April 30, 2026, the day Defendant's discovery

brief was due, Plaintiff produced an additional 2,442 pages. *Id.* As a result, Apple requests that it be permitted to seek further relief regarding these productions and apparent spoliation if appropriate. *Id.* at 7.

In opposition, Plaintiff contends that Apple does not identify any specific document to compel, and that its spoliation argument was not included in the meet and confer. (Pl.'s Resp. at 2-3.) Plaintiff also states that her iCloud account was not deleted and remains active. *Id.* at 4.

The Court will not require Apple to identify specific documents when it received a document dump on the eve of its discovery brief being due—and long after the meet and confer efforts concluded— because that is not sufficient time to review the respective productions. The Court, however, is not persuaded that Plaintiff spoliated evidence, but Apple is permitted to seek further relief pertaining to the belated production if appropriate. Notwithstanding, within 14 days of this order, Plaintiff is ordered to produce any non-privileged documents from her iCloud account that are responsive to these requests.

## III. CONCLUSION

For the reasons set forth above, Plaintiff's requests are DENIED. Defendant's requests are GRANTED as follows:

(1) Plaintiff is ordered to appear for an IME prior to June 30, 2026;

(2) Plaintiff's medical providers, listed above, shall produce records responsive to Apple's subpoenas;

(3) Within 14 days of this order, Plaintiff shall produce any remaining non-privileged documents responsive to Apple's Requests for Production Nos. 1 and 10 that are stored in her iCloud account; and

(4) Apple is permitted to seek further relief regarding Plaintiff's belated productions of documents.

This resolves Dkt. Nos. 358, 363, and 365. IT IS SO ORDERED.

Dated: June 4, 2026

KANDIS A. WESTMORE
United States Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,
Plaintiff,
v.
APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**ORDER GRANTING IN PART PLAINTIFF'S MOTION RE DISCOVERY DEADLINE**

Docket No. 346

Previously, the Court granted in part Apple's motion for an extension of discovery deadlines. *See* Docket No. 345 (Order at 4) (extending discovery deadlines "only with respect to (1) Ms. Gjovik's medical records (from the health care providers); (2) the IME; and (3) expert reports related to Ms. Gjovik's medical condition"). Now pending before the Court is a motion filed by Ms. Gjovik in which she also seeks an extension of the fact discovery cut-off (which, generally speaking, is April 16, 2026). Having considered the parties' papers and accompanying submissions, the Court hereby **GRANTS** in part Ms. Gjovik's motion for relief.[1]

## I. DISCUSSION

### A. Legal Standard

Under Federal Rule of Civil Procedure 16(b), "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The good cause standard "'primarily considers the diligence of the party seeking amendment.'" *Lyles v. Dollar Rent a Car, Inc.*, 849 Fed. Appx. 659, 660 (9th Cir. 2021). A court may also consider prejudice to the party

[1] Ms. Gjovik also has a separate motion in which she seeks an extension for other discovery matters. *See* Docket No. 347 (motion). The Court shall address that motion in a separate order.

opposing modification but, if the moving party was not diligent, the inquiry should end. *See id.* at 661.

B. Deposition of Ms. Gjovik

Judge Westmore authorized a continued deposition of Ms. Gjovik, *see* Docket No. 327 (order), and this Court upheld her decision. *See* Docket No. 344 (order). The continued deposition began on April 8, 2026, but Apple suspended the deposition after Ms. Gjovik testified that she was sick and not well enough to proceed. The parties dispute whether, *e.g.*, Ms. Gjovik was sick on that day and/or whether Apple should have started the deposition given that Ms. Gjovik gave it advance notice via email that she was sick. For purposes of the pending motion, these disputes are not material. The only issue here is whether Ms. Gjovik's continued deposition may take place after the fact discovery cut-off of April 16, 2026.

Because the parties are in agreement that the continued deposition should take place after the fact discovery cut-off, and neither party suggests a lengthy extension is needed, the Court shall allow the continued deposition to take place after April 16. The deposition shall take place no later than April 30, 2026. To be clear, a dispute about what parts, if any, of the deposition should be designated as confidential is **not** a reason for the deposition not to go forward. Issues related to confidentiality can be worked out with Judge Westmore, as necessary, **after** the deposition takes place.

C. Deposition of Yannick Bertolus

Ms. Gjovik seeks to take the deposition of Mr. Bertolus who, apparently, was the Apple employee who authored a communication related to her termination. Apple represents that Mr. Bertolus is no longer an Apple employee, and there is no evidence to the contrary. It seems Mr. Bertolus is not available for a deposition until April 17, 2026. The parties disagree whether Mr. Bertolus could have been made available at an earlier date, but, similar to above, any such disagreement is not material to the pending motion. The parties agree that Mr. Bertolus's deposition should take place on April 17, 2026, and, given that this is just one-day past the fact discovery deadline, the Court shall permit the deposition.

United States District Court
Northern District of California

Case: 26-4716, 11/13/2026, DktEntry: 10.1, (56 of 233)

D. 30(b)(6) Deposition of Apple

Ms. Gjovik seeks to take a 30(b)(6) deposition of Apple past the fact discovery cut-off of April 16, 2026. Contrary to what Ms. Gjovik suggests, this is an issue for this Court to resolve, and not Judge Westmore.

Apple argues that a discovery extension should not be given because Ms. Gjovik has failed to show good cause why she could not have taken the deposition before the discovery deadline. The Court is not without some sympathy for Apple's position. Although Ms. Gjovik maintains that Apple is to blame for the deposition not moving forward, that position is not supported. For example, Ms. Gjovik suggests in her declaration that she issued a deposition notice in August 2025, *see* Gjovik Decl. ¶ 20, but, notably, she did not attach to her declaration a copy of any deposition notice. Apple has also provided an email from August 2025 where Ms. Gjovik states her *intent* to take a 30(b)(6) deposition, *see* Perry Decl., Ex. L (email), but Ms. Gjovik never provided a formal deposition notice at that time – including specific topics for the 30(b)(6) deposition. *See* Fed. R. Civ. P. 30(b)(6) (providing that a 30(b)(6) notice "must describe with reasonable particularity the matters for examination"). The evidence of record indicates that Ms. Gjovik did not identify any specific topics for Apple until April 1, 2026. *See* Perry Decl., Ex. M (email).

That being said, Ms. Gjovik did effectively give notice of the 30(b)(6) deposition to Apple on April 1, 2026 – or April 3, 2026, when she sent a subpoena to Apple by email, *see* Perry Decl., Ex. N (email) – and the 30(b)(6) deposition *was* noticed within the discovery deadline. (The deposition was noticed for April 14, 2026.) The question thus becomes whether it was appropriate for Ms. Gjovik to give Apple only 11 (or 13) days' notice of the 30(b)(6) deposition – *i.e.*, was this "reasonable notice" as required by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 30(b)(1) ("A party who wants to depose a person by oral questions must give reasonable written notice to every other party. The notice must state the time and date of the deposition . . . ."). Apple contends it did not get reasonable notice.

The Federal Rules do not specify how many days of advance notice are needed to be considered reasonable. *See* 7 Moore's Fed. Prac. – Civ. § 30.20 ("The Federal Rules of Civil

United States District Court
Northern District of California

Procedure do not require any particular number of days' advance notice of a deposition."). Nor do this Court's Local Rules. *See id.* (noting that "some courts have established a required number of days' advance notice). Some legal commenters have indicated that the prevailing practice is to give the opposing side 14 days' advance notice of a deposition. *See Engage Healthcare Communs., LLC v. Intellisphere, LLC*, No. 12-cv-00787(FLW)(LHG), 2017 U.S. Dist. LEXIS 214569, at *7 (D.N.J. Nov. 1, 2017); *cf.* Fed. R. Civ. P. 32(a)(5)(A) (providing that "[a] deposition must not be used against a party who, having received less than 14 days' notice of the deposition, promptly moved for a protective order under Rule 26(c)(1)(B) requesting that it not be taken or be taken at a different time or place – and this motion was still pending when the deposition was taken."). But courts have been willing to allow fewer than 14 days. *See, e.g.*, D. Del. L.R. 30.1 ("Unless otherwise ordered by the Court, 'reasonable notice' for the taking of depositions under Fed. R. Civ. P. 30(b)(1) and 30(b)(6) shall be not less than 10 days."); *In re SanDisk SSDS Litig.*, No. 23-cv-04152-RFL (LJC), 2025 U.S. Dist. LEXIS 84523, at *8-9 (N.D. Cal. May 2, 2025) (noting that "'courts in this Circuit have found that a week to ten day[s'] notice is reasonable where the party is seeking a deposition without the production of documents'"). Ultimately, courts have stated that the degree of notice needed will vary depending on the circumstances. *See id.* at *9; *see also* Moore's § 30.20.

In the case at bar, it appears that Ms. Gjovik is seeking a deposition without the production of documents. This suggests that a shorter period of notice is acceptable. On the other hand, Ms. Gjovik identified 14 topics for the 30(b)(6) deposition – covering a fairly broad range of information. This weighs in favor of a longer period for Apple to prepare. Because it is a close call as to whether Ms. Gjovik gave Apple reasonable notice, the Court shall allow Ms. Gjovik to take Apple's deposition after the fact discovery cut-off of April 16, 2026, but it shall **not** change the summary judgment briefing schedule, particularly in light of Ms. Gjovik's prior representations that she does not need additional discovery to proceed with summary judgment.

Ms. Gjovik has until **May 14, 2026**, to take Apple's 30(b)(6) deposition. Because it appears the parties will likely have a dispute about the deposition topics, the Court orders the parties to **immediately** meet and confer regarding the topics. If they cannot reach agreement, they

United States District Court
Northern District of California

shall file a joint letter (no longer than three single-spaced pages) with Judge Westmore by April 21, 2026. This *discrete* discovery issue shall not be subject to the discovery process previously established by Judge Westmore. *See* Docket No. 327 (order setting process for remaining discovery disputes).

## II. CONCLUSION

For the foregoing reasons, the Court grants in part Ms. Gjovik's motion.

This order disposes of Docket No. 346.

**IT IS SO ORDERED**.

Dated: April 14, 2026



EDWARD M. CHEN
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-04597-EMC

**ORDER GRANTING IN PART DEFENDANT'S MOTION TO EXTEND DISCOVERY CUT-OFF DEADLINE**

Docket No. 341

United States District Court
Northern District of California

Currently pending before the Court is Apple's motion to extend discovery deadlines. Specifically, Apple asks that the Court extend fact and expert discovery deadlines by roughly 90 days for the limited purpose of allowing Apple "to complete third-party medical records discovery, conduct an independent medical examination, and finalize expert reports relating to Plaintiff's medical condition." Prop. Order at 1 (adding that the extension would not authorize Ms. Gjovik "to propound an additional discovery on Defendant or any other third parties"). Having considered the parties' filings and accompanying submissions, the Court hereby **GRANTS** in part Apple's motion.

## I. <u>DISCUSSION</u>

### A. <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 16(b), "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The good cause standard "'primarily considers the diligence of the party seeking amendment.'" *Lyles v. Dollar Rent a Car, Inc.*, 849 Fed. Appx. 659, 660 (9th Cir. 2021). A court may also consider prejudice to the party opposing modification but, if the moving party was not diligent, the inquiry should end. *See id.* at

661.

B. Good Cause

There is good cause for the extension sought by Apple – *i.e.*, Apple has been reasonably diligent in proceeding with discovery related to Ms. Gjovik's medical condition. To be sure, Ms. Gjovik seems to have identified the bulk of the medical providers in her initial disclosures served in July and September 2024. *See* Perry Decl. ¶¶ 3-4; *see also* Perry Decl. ¶ 5 (noting that Ms. Gjovik amended her initial disclosures in late February 2026). However, the Court did not set discovery deadlines until January 2026, *see* Docket No. 274 (order), and, in the following month, Apple filed a discovery motion seeking medical discovery – well in advance of the April 16, 2026, fact discovery deadline and the May 28, 2026, expert discovery deadline. *See* Docket No. 276 (discovery letter). In late February 2026, Judge Westmore held that Ms. Gjovik's medical records were discoverable, *see* Docket No. 291 (Order at 2) (finding that Ms. Gjovik had put her medical and mental conditions in controversy and therefore her medical records were discoverable), but she directed the parties to meet and confer to see if they could reach agreement on an authorization from Ms. Gjovik to release the medical records sought. If no agreement could be reached, she directed Apple to issue subpoenas and, then, if the information could not be obtained through subpoenas, Apple could seek ask her to issue an order compelling the medical providers to release records based on a Court order. *See* Docket No. 291 (Order at 2).

Thereafter, Apple and Ms. Gjovik met and conferred for some two weeks but were unable to reach agreement and thus Apple began to issue subpoenas starting in mid-March 2026. *See* Perry Decl. ¶ 11 & Ex. E (email exchange). It appears that one subpoena did not issue until April 6, 2026, but that seems to have been related to an issue regarding a proper address. *See* Docket No. 343-1 (Gjovik Decl., Ex. A) (ECF Page 6). Apple has now received responses from some medical providers stating that they will not produce medical records absent a signed authorization from Ms. Gjovik or a Court order. *See* Perry Decl. ¶ 13 & Exs. G-I (responses to subpoenas). Apple intends to ask Judge Westmore to issue an order to give to the medical providers, but, under the discovery process recently established by Judge Westmore, Apple cannot seek relief until its discovery brief is filed on April 30, 2026, which is past the discovery deadline of April 16.

United States District Court
Northern District of California

United States District Court
Northern District of California

Taking into account all of the above, the Court concludes that Apple has been reasonably diligent such that its request for an extension is justified.

C. Prejudice

Having found good cause, the Court now considers whether an extension would prejudice Ms. Gjovik or whether there are other considerations that would weigh against an extension.

Ms. Gjovik contends that Apple's motion was improperly filed with this Court and not Judge Westmore. *See* Opp'n at 1-2. She is incorrect. This Court issues case management deadlines, not Judge Westmore. Apple still needs (and intends) to ask Judge Westmore to issue an order so that it can obtain medical records from the health care providers.

Ms. Gjovik also suggests that Apple should have asked her for her medical records but failed to issue any formal document request seeking such records from her. *See* Opp'n at 3; *see also* Perry Decl. ¶ 9 (testifying that Ms. Gjovik had produced limited medical records). But Judge Westmore has already held that Apple may issue subpoenas to the providers if the parties were unable to reach agreement on an authorization from Ms. Gjovik.

Ms. Gjovik suggests that it is unfair for Apple to get an extension (to obtain her medical records, to take an IME, and to finalize expert reports related to her medical condition) whereas she cannot take any additional discovery. However, Ms. Gjovik has not identified why she needs an extension and for what purpose.

Ms. Gjovik protests that Apple never disclosed an IME provider in its initial disclosures. *See* Opp'n at 2. That is an issue that can, if needed, be raised with Judge Westmore.

The only issue remaining is whether a 90-day extension – as sought by Apple – is appropriate. The Court finds that an extension of this length is difficult to accommodate given the existing trial schedule. For example, under Apple's proposal, expert discovery would close on August 31, 2026; however, the final pretrial conference is set for September 22, 2026, which means that pretrial filings are due by September 1, 2026, at the latest.

Given the existing trial schedule, the Court shall permit a (roughly) 60-day extension of deadlines for the discovery identified by Apple. The new deadlines are set forth below. All other deadlines (*e.g.*, for summary judgment, the final pretrial conference, and trial) remain the same.

| | **Prior Deadline** | **New Deadline** |
|---|---|---|
| **Fact Discovery and IME Cut-off** | 4/16/2026 | 6/30/2026 |
| **Opening Expert Reports** | 4/16/2026 | 6/30/2026 |
| **Rebuttal Expert Reports** | 5/7/2026 | 7/14/2026 |
| **Expert Discovery Cut-off** | 5/28/2026 | 7/31/2026 |

## II. <u>CONCLUSION</u>

For the foregoing reasons, the Court grants in part Apple's motion. Discovery deadlines are extended only with respect to (1) Ms. Gjovik's medical records (from the health care providers); (2) the IME; and (3) expert reports related to Ms. Gjovik's medical condition. An extension of roughly 60 days, not 90, is provided for.

This order disposes of Docket No. 341.

**IT IS SO ORDERED**.

Dated: April 8, 2026



EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,
Plaintiff,

v.

APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**ORDER DENYING PLAINTIFF'S MOTIONS FOR RELIEF FROM NONDISPOSITIVE ORDERS OF MAGISTRATE JUDGE**

Docket Nos. 336-39

Currently pending before the Court are four motions filed by Ms. Gjovik. Each motion is a motion for relief from a nondispositve order of a magistrate judge. *See* Civ. L.R. 72-2. Having considered Ms. Gjovik's filings, the Court finds the matters suitable for resolution without briefing from Apple and without oral argument. *See* Civ. L.R. 72-2(d) ("Unless otherwise ordered by the assigned District Judge, no response need be filed and no hearing will be held concerning the motion."). Ms. Gjovik's motions for relief are **DENIED**.

## I. DISCUSSION

### A. Legal Standard

A magistrate judge's ruling on a nondispositive pretrial matter

> may be modified or set aside only if "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). A magistrate judge's factual determinations are reviewed for clear error, a standard that allows the district court to overturn those factual determinations only when the court reaches a "definite and firm conviction that a mistake has been committed." *Perry v. Schwarzenegger*, 268 F.R.D. 344, 348 (N.D. Cal. 2010). In addition, a magistrate judge's legal conclusions are reviewed de novo to determine whether they are contrary to law. *Id.*

*FTC v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2018 U.S. Dist. LEXIS 85942, at *10 (N.D. Cal.

United States District Court
Northern District of California

May 22, 2018).

B. Incorporation by Reference

As a preliminary matter, the Court notes that, in several of her motions, Ms. Gjovik incorporates by reference some of her prior filings. *See* Docket Nos. 330-32 (objections). Ms. Gjovik cannot do so. These filings were stricken from the record because they violated the page limits set by the District's Civil Local Rules. *See* Docket No. 335 (order). Ms. Gjovik's attempt to incorporate by reference is an attempt to evade page limits. The Court shall not consider the stricken filings.

C. Motion for Relief at Docket No. 336 – Challenge to Order at Docket No. 326

In late February 2026, Apple filed a motion in which it asked Judge Westmore: (1) to find that Ms. Gjovik had violated the protective order; (2) to instruct Ms. Gjovik to "de-publish" material that Apple had designated as confidential under the protective order; and (3) to seal certain filings made by Ms. Gjovik that contained information Apple had designated as confidential. *See* Docket No. 294 (motion). Judge Westmore denied Apple's motion because it had failed to properly meet and confer with Ms. Gjovik before filing the motion. However, Judge Westmore noted that Ms. Gjovik was bound by the protective order "which sets forth the method of challenging confidentiality designations. Thus, if Plaintiff has published information designated 'Confidential' by Apple, that information is considered Confidential until found otherwise, and must be de-published **until the Court resolves the pending motion [by Apple] to retain confidentiality**." Docket No. 326 (order) (emphasis added). Judge Westmore also noted that, to the extent information designated as confidential was already publicly posted on the docket, the parties were to meet and confer regarding a stipulation to seal but, if the parties could not agree, Apple could file an administrative motion seal which Judge Westmore would be inclined to grant.

Ms. Gjovik now challenges Judge Westmore's order. She makes a number of arguments – *e.g.*, that she was coerced into signing the protective order; that Judge Westmore lacked the authority to issue her order described above because it constitutes an injunction; that Judge Westmore could not deny Apple's motion but, at the same time, hold that information should be

maintained as confidential; that Judge Westmore's order constitutes an improper prior restraint because the information is publicly known; that Judge Westmore rendered a prejudgment that information filed on the public docket should be sealed; and that Judge Westmore's sealing of information violates various laws including but not limited the Norris-LaGuardia Act as well as the settlement that Apple entered into with the NLRB.

Ms. Gjovik has failed to show that Judge Westmore acted contrary to law or committed clear error. At bottom, all that Judge Westmore did was hold that information Apple had designated confidential should be maintained as confidential *until* she can resolve the issue of whether Apple's confidentiality designations were proper.[1] That was the procedure laid out in the protective order and, even if Ms. Gjovik claims that she was coerced into signing the protective order, that is the basic procedure used in this District as reflected by the District's Model Protective Order.

D. Motion for Relief at Docket No. 338 – Challenge to Order at Docket No. 329

At the time that Apple filed its motion to enforce the protective order, *see* Docket No. 294 (motion), it also moved to seal certain information filed in conjunction with that motion. *See* Docket No. 293 (motion to seal). Judge Westmore granted Apple's motion to seal. *See* Docket No. 329 (order).

Ms. Gjovik moves for relief from Judge Westmore's order granting the sealing motion. Similar to above, she makes a number of arguments – *e.g.*, that Judge Westmore failed to provide findings to justify sealing; that there was neither a compelling reason nor good cause to seal the information; that Judge Westmore sealed the information simply because Apple had designated the information confidential, which violates a Civil Local Rule; that the information is not confidential because it is publicly known; that Judge Westmore cannot seal the information when Ms. Gjovik is contesting the propriety of Apple's confidentiality designations; and that Judge Westmore's order means Ms. Gjovik must file information under seal in conjunction with her summary judgment motion even though she does not believe the information is confidential.

[1] As indicated above, Judge Westmore has not yet issued a ruling on Apple's motion to retain confidentiality designations.

As above, Ms. Gjovik has failed to show that Judge Westmore acted contrary to law or committed clear error. Judge Westmore's ruling here simply reflected her decision to retain confidentiality for the time being – *i.e.*, *until* she can resolve the issue of whether Apple's confidentiality designations were proper. There is nothing wrong with this approach. To the extent Ms. Gjovik has brought up summary judgment filings, the Court refers her to Civil Local Rule 79-5(f), which allows a party to file a motion to consider whether another party's material should be sealed.

As for Ms. Gjovik's request to unseal Docket Nos. 282-83 (notices filed by Ms. Gjovik), the Court previously directed Ms. Gjovik to raise that issue with Judge Westmore. *See* Docket No. 303 (Order at 2). Ms. Gjovik has not done so. Instead, she simply asserts that the reason why the notices are sealed is because of Judge Westmore. That the documents may have initially been sealed by Judge Westmore does not mean that the Court cannot redirect the issue to Judge Westmore. There are no express rulings by Judge Westmore on the docket for this Court to review.

E. <u>Motion for Relief at Docket No. 339 – Challenge to Order at Docket No. 334</u>

In early March 2026, Ms. Gjovik filed a motion for declaratory relief and sanctions. In the motion, Ms. Gjovik argued, *inter alia*, that Apple failed to narrow its confidentiality designations with respect to her deposition testimony on a timely basis and that, when Apple did provide its narrowed designations, it failed to sign them, thus violating Federal Rule of Civil Procedure 26(g). *See* Docket No. 302 (motion). Judge Westmore denied Ms. Gjovik's motion. *See* Docket No. 334 (order). She held, *inter alia*, that Rule 26(g) did not apply to Apple's confidentiality designations because the rule covers only discovery requests, responses, or objections. *See* Fed. R. Civ. P. 26(g) (providing that "[e]very disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record" and that "[o]ther parties have no duty to act on an unsigned disclosure, request, response, or objection until it is signed, and the court must strike it unless a signature is promptly supplied after the omission is called to the attorney's . . . attention"). Judge Westmore also noted that she had not yet ruled on Apple's motion to retain confidentiality designations.

United States District Court
Northern District of California

Ms. Gjovik contests Judge Westmore's ruling, arguing, *e.g.*, that the order is improper because it contains no reasoning in support; that the order conflicts with an order from this Court which stated that Apple had a Rule 11 obligation to make confidentiality designations in good faith, *see* Docket No. 303 (Order at 2); and that Judge Westmore should have held a hearing on the matter and not simply ruled on the papers because a novel issue was being raised.

Again, Ms. Gjovik has failed to show that Judge Westmore acted contrary to law or committed clear error. Judge Westmore properly relied on the clear language of Rule 26(g) (*i.e.*, the confidentiality designations by Apple were not in a discovery response but rather were provided in a chart to a court reporter). Judge Westmore's order is not in conflict with this Court's prior order. When Apple filed its motion to retain confidentiality designations, it became subject to Rule 11.

F. <u>Motion for Relief at Docket No. 337 – Challenge to Order at Docket No. 327</u>

In late March 2026, Judge Westmore issued a discovery order that covered a number of issues. She held, for example, that Apple had provided a sufficient interrogatory response regarding the reasons for her termination; that Ms. Gjovik had propounded an interrogatory that should be deemed multiple interrogatories because of its subparts; that Apple did not have to respond to one subpart because it asked for a legal conclusion (the legal basis for Apple's affirmative defenses); that the parties had not sufficiently met and conferred on some of Ms. Gjovik's document requests; that one of Ms. Gjovik's document requests was overbroad in terms of time period; that Apple must produce Ms. Gjovik's personnel file; that Ms. Gjovik would be subject to a continued deposition; and that Apple did not have to amend its subpoenas for medical records so that the subpoenaed parties must also produce documents to Ms. Gjovik. *See* Docket No. 327 (Order at 1-6).

In the same order, Judge Westmore also established a process for any remaining discovery disputes. Judge Westmore set the process because of the large number of discovery disputes raised by the parties in the past. Under the Civil Local Rules, the last day to bring a discovery dispute to her attention is April 23, 2026 (*i.e.*, because fact discovery closes one week earlier, on April 16, 2026). Ms. Gjovik's opening discovery brief (15 pages) is due by April 23, 2026;

Apple's responsive and opening brief (25 pages) is due by April 30, 2026; and Ms. Gjovik's responsive brief (10 pages) is due by May 10, 2026. *See* Docket No. 327 (Order at 6-7).

In her motion for relief, Ms. Gjovik argues, *inter alia*, that the schedule for future discovery disputes impacts her ability to proceed with summary judgment; that a continued deposition will result in more confidentiality designations from Apple and thereby additional "gag orders" on Ms. Gjovik; that Judge Westmore did not sufficiently address whether responses such as "I don't know" or "the premise is incorrect because the NLRB found those terms unlawful" were appropriate; that Ms. Gjovik should be entitled to see what medical information Apple received from her providers; that Judge Westmore's counting of interrogatories was erroneous and rewarded Apple for asserting unnecessary, duplicate, and frivolous defenses; that asking for the legal basis of a defense is not a legal conclusion; that Apple's interrogatory response on the reasons for her termination lacks information about the decisionmaker, the timeline, and policy violated and Ms. Gjovik has no other discovery mechanism to get the information because Apple refuses to meet and confer regarding a deposition; that Apple should not be able to assert lack of relevance as an objection to document requests in future meet and confers given Judge Westmore's ruling on one document request; and that production of her personnel file does not satisfy her request for other information.

As above, Ms. Gjovik has failed to show that Judge Westmore acted contrary to law or committed clear error. For example, Judge Westmore's order did not preclude either party from raising issues related to Ms. Gjovik's document requests or Apple's deposition after meeting and conferring. Likewise, Judge Westmore's order did not preclude either party from contacting Judge Westmore during the continued deposition of Ms. Gjovik (if necessary). Ms. Gjovik's concern about summary judgment is understandable, but the process established by Judge Westmore is for any remaining discovery disputes. Those disputes should not be numerous given that fact discovery is set to close on April 16, 2026. Furthermore, Ms. Gjovik has not pointed to any concrete matter that needs early resolution from Judge Westmore because it is needed for summary judgment. In fact, Ms. Gjovik has stated on more than one occasion that she has everything she needs for her own summary judgment motion. In any event, should there be a

United States District Court
Northern District of California

*discrete* issue in need of early resolution for summary judgment, neither party is precluded from asking Judge Westmore for relief from the process she established.

G. <u>Request for an Interlocutory Appeal</u>

Finally, to the extent Ms. Gjovik asks that this Court certify any ruling adverse to her for an interlocutory appeal, the request is denied. Ms. Gjovik has failed to establish that the requirements of 28 U.S.C. § 1292(b) have been satisfied. *See* 28 U.S.C. § 1292(b) ("When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves *a controlling question of law* as to which there is *substantial ground for difference of opinion* and that an immediate appeal from the order may *materially advance the ultimate termination of the litigation*, he shall so state in writing in such order.") (emphasis added).

## II. <u>CONCLUSION</u>

For the foregoing reasons, Ms. Gjovik's motions for relief are all denied.

This order disposes of Docket Nos. 336-39.

**IT IS SO ORDERED**.

Dated: April 8, 2026

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,
Plaintiff,
v.
APPLE INC.,
Defendant.

Case No. 3:23-cv-04597-EMC (KAW)

**OMNIBUS DISCOVERY ORDER; ORDER SETTING FINAL FACT DISCOVERY DISPUTE PROCESS**

Re: Dkt. Nos. 309, 310, 315, 317, 318, 319, 324

This case has produced an unprecedented number of discovery disputes, which has expended a considerable amount of the Court's limited judicial resources. In an effort to resolve the seven pending discovery letters (Dkt. Nos. 309, 310, 315, 317-319), the Court will address each dispute briefly and resolve them below.

Fact discovery closes on April 16, 2026. In the interest of judicial economy, the Court will also set forth the procedure by which the parties may raise any final issues involving fact discovery cut.

## I. DISCOVERY LETTERS

### A. Plaintiff's Request to Compel Supplemental Interrogatory Responses (Dkt. Nos. 309 & 317)

On March 16, 2026, Plaintiff filed a letter in which she seeks to compel supplemental responses to Interrogatory Nos. 1-16. (Dkt. No. 309.)

#### i. Interrogatory No. 1

Interrogatory No. 1 asks that Apple "[s]tate in detail Defendant Apple Inc's complete and formal reason(s) for terminating Employee, Ashley Gjovik's, employment as of the time of the termination on Sept. 9[,] 2021[.]" *Id.*, Ex. A at 1. Apple objected on the grounds that "complete

and formal" reasons for termination was vague, overly broad, and unduly burdensome. *Id.* Then, subject to objection, Apple provided a robust response spanning approximately three pages. *Id.* at 1-4. In opposition, Apple contends that it fully responded. (Dkt. No. 317 at 1.) The Court agrees. The fact that the response did not include every piece of information that Plaintiff seeks does not mean that the response was inadequate. It simply means that Plaintiff needs to use other discovery devices to obtain that specific information. Thus, the Court denies Plaintiff's request to compel a supplemental response to Interrogatory No. 1.

**ii. Interrogatory No. 2**

Interrogatory No. 2 seeks:

> For each affirmative defense Apple Inc asserts in Apple's Amended Answer (or otherwise plans to use in this litigation) that bars, limits, or reduces the employee's recovery on any claim in this action:
>
> (a) State the complete factual basis for each defense;
> (b) State the complete legal basis for each defense;
> (c) Identify all Documents that support each defense; and,
> (d) Identify all Persons with knowledge of facts supporting each defense.

(Dkt. No. 309, Ex. B at 2.) Apple objected on the grounds that, based on the 14 asserted affirmative defenses and the four subparts, this interrogatory contains 56 discrete subparts, which exceeds the limit of 25 interrogatories set forth in Federal Rule of Civil Procedure 33(a)(1). *Id.*

Interrogatories virtually identical to Interrogatory No. 2 have been found to be improperly compound and in violation of Rule 33's numerical limitation on interrogatories. *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-CV-03393-YGR (JSC), 2014 WL 7188779, at *6 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories which contain multiple subparts, i.e., those which 'introduce a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it' are generally construed as separate interrogatories."). While the Court finds the interrogatory to be compound, the Court finds that each affirmative defense is a subpart, such that this counts as 14 interrogatories, rather than Apple's asserted 54. *See Synopsys, Inc. v. ATopTech, Inc,* 319 F.R.D. 293, 299 (N.D. Cal. 2016) (finding interrogatory seeking "facts, documents, and witnesses" subparts subsumed by the primary topic of the invalidity defense). Thus, the Court finds that Apple's counting methodology was flawed, and orders Apple to supplement its

United States District Court
Northern District of California

responses to this interrogatory for each of the 14 affirmative defenses.

Notwithstanding, Apple's objection to subpart (b) on the grounds that it calls for a legal conclusion is sustained.

Thus, Plaintiff's request to compel supplemental responses to interrogatory No. 2 is granted in part, and Apple shall serve supplemental responses consistent with this order within 7 days.

**iii. Interrogatory Nos. 3-16**

Although Plaintiff seeks supplemental responses to Interrogatory Nos. 3-16, she only attached Interrogatory No. 3 to her letter. Thus, the Court cannot possibly address Interrogatory Nos. 4-16. Interrogatory No. 3, however, asks:

> Do You contend that Plaintiff engaged in any "protected activity" as defined under federal or state whistleblower, retaliation, or labor laws during her employment with Apple?
>
> (a) If yes, identify each such activity with date ranges for the acknowledged activity.
>
> (b) If no, state that You contend Plaintiff engaged in no protected activities.

(Dkt. No. 309, Ex. B at 6.) Apple objected on the grounds that it exceeded the 25-interrogatory limit set forth in Rule 33(a)(1), that it contains discrete subparts, and presumably on some other bases.[1] *Id.* As discussed above, Apple miscounted its interrogatories, so the Court finds that Plaintiff had not exceeded her 25-interrogatory limit. Thus, Apple is ordered to supplement its responses to Interrogatory No. 3, which will be the sixteenth interrogatory. Apple must then answer the next nine interrogatories propounded, which are Interrogatory Nos. 4-12. All other interrogatories exceed the Rule 33 limit, and no response is required. Apple shall serve supplemental response within 7 days of this order.

**B. Plaintiff's Request to Compel Supplemental Responses to Requests for Production of Documents (Dkt. Nos. 310 & 318)**

Next, Plaintiff seeks to compel documents in response to Request Nos. 7-10, 23, 24, 28-32, 37, 40-44, and 54. (Dkt. No. 310.) These can be broken down into two categories of documents:

[1] Apple's complete response to Interrogatory No. 3 was also not provided.



United States District Court
Northern District of California

environmental records and documents referencing Plaintiff.

**i. Environmental Requests (Nos. 7-10, 23, 24, 28-32)**

Plaintiff states that "[e]very one of these Requests seeks evidence of Plaintiff's environmental, health, and safety ("EH&S")-related protected activity and Apple's knowledge of it — threshold elements of all four retaliation causes of action in this case." (Dkt. No. 310 at 1.)

In opposition, Apple argues that this dispute is premature, because the only request Plaintiff attempted to meet and confer on was No. 23. (Dkt. No. 318 at 1.) The meet and confer emails attached to Plaintiff's letter confirm that the accuracy of this representation. (Dkt. No. 310, Ex. B.) Indeed, parties are not permitted to raise disputes before the Court regarding specific requests without having first discussed them in an attempt to narrow the scope of the dispute.[2] As a result, the Court finds that the only request remotely ripe for resolution is Request No. 23.

Regarding Request No. 23, Apple contends that the documents sought are unrelated to whether Apple retaliated against her. (Dkt. No. 318 at 1.) Request No. 23 seeks "[a]ll internal audits, assessments, or reports concerning environmental hazards, chemical exposure, vapor intrusion, or air quality testing at Apple's 825 Stewart Drive and 3250 Scott Boulevard campuses between January 1, 2019 and the present." (Dkt. No. 310, Ex. A at 30.) Apple objected on several grounds, including relevancy and proportionality. *Id.*

Plaintiff's retaliation case includes allegations that she was retaliated against for reporting environmental hazards to the California Department of Industrial Relations ("DIR"). It would follow that the existence of those hazards may be relevant to Plaintiff's retaliation claims. Apple's proportionality argument, however, is well taken, but narrowing the relevant time period from January 1, 2019 to October 31, 2021[3] should obviate that concern. Thus, the Court orders Apple to produce all responsive, non-privileged documents in response to Request No. 23 for the narrowed time period within 14 days of this order.

---

[2] The Court recognizes that the parties met and conferred regarding Request No. 20, which is not part of this dispute, and it appreciates the efforts of the parties to resolve that dispute without court intervention.

[3] Plaintiff's last DIR complaint was filed in September 2021. (Order Granting in Part and Denying in Part Def.'s Mot. to Dismiss, Dkt No. 179 at 30.)



United States District Court
Northern District of California

**ii. Requests References Plaintiff (Nos. 37, 40-44, 54)**

The remaining requests seek information referencing Plaintiff. As discussed above, none of these requests were part of the meet and confer process, so any request to compel responses is premature. Nonetheless, if Apple has not done so already, it shall, subject to the stipulated protective order, produce Plaintiff's personnel file with 7 days of this order.

**C. Defendant's Request to Continue Plaintiff's Deposition (Dkt. Nos. 315 & 319)**

On March 19, 2026, Apple filed a discovery letter seeking an additional four hours to depose Plaintiff. (Dkt. No. 315 at 1.) In sum, Plaintiff agreed to the additional four hours in January, but, given the other disputes in this case, she is now refusing to undergo further deposition without a court order. *Id.* at 2, Exs. A & B. Apple argues that Plaintiff cannot withdraw from the stipulation, and, in the alternative, that good cause exists under Federal Rule of Civil Procedure 30(d)(1). *Id.* at 1, 4.

In opposition, Plaintiff acknowledges that she agreed to the additional time, but that Apple's request should be denied for three reasons. (Dkt. No. 319 at 2.) First, the agreement was conditioned on her ability to object to improper questions,[4] which are the same objections to which Apple is arguing were improper. *Id.* Second, Apple was dilatory in noticing the deposition. *Id.* Third, Apple's refusal to fulfill its discovery obligations renders the demand for further testimony not proportional. *Id.*

As an initial matter, whether Apple has satisfied its discovery obligations in this case is independent from Plaintiff's discovery obligations— there is no tit for tat. Furthermore, Plaintiff informed the Court at the February 20, 2026 discovery conference that she agreed to undergo four additional hours of deposition. (2/20/26 Tr., Dkt. No. 301-1 at 46:10-17.) The Court is going to hold her to that agreement and representation, and orders Plaintiff to undergo four additional hours of deposition. The parties are ordered to meet and confer regarding scheduling, but the deposition shall occur by April 8, 2026.

[4] For the sake of time, if Plaintiff believes an objection is warranted, she is ordered to state her objection on the record and then answer the question subject to objection unless it calls for privileged information. Admissibility will be addressed before trial.

United States District Court
Northern District of California

### D. Plaintiff's Request regarding Production of Medical Records obtained by Subpoena[5]

Finally, Plaintiff seeks to compel "Apple to amend its subpoenas to include dual-production language directing providers to produce Plaintiff's medical records simultaneously to both parties, so that Plaintiff receives unrestricted copies of her own records outside the Protective Order framework." (Dkt. No. 324 at 1.)

The Court will resolve this dispute without Apple's response. Apple subpoenaed those medical records, and it is under no obligation to produce them at this juncture. Indeed, Plaintiff can request her own medical records from her provider(s) at any time, and that does not render them any less confidential. Thus, Plaintiff's request is denied.

## II. PROCESS FOR ALL OTHER DISPUTES REGARDING FACT DISCOVERY

Fact discovery closes on April 16, 2026. (Dkt. No. 274.) The last day to bring a dispute to the Court's attention is seven days after the cut-off, which is April 23, 2026. *See* Civil L.R. 37-3 (N.D. Cal. 2025).

In an effort to preserve the Court's limited resources, the parties will have one final opportunity to address all outstanding fact discovery issues not otherwise pending. All filings must be on pleading paper, formatted in accordance with Civil Local Rule 3-4, and in Times New Roman font (12-point type or larger). The failure to comply with the Civil Local Rules, including the requirement that footnotes be in 12-point font, or attempting to circumvent the page limits through liberal use of footnotes, exhibits, or other attachments, may result in an adverse finding to the violating party.[6]

**Most importantly, all disputes not raised in these briefs will be deemed waived**; the letters **must** encompass all remaining fact discovery disputes for which the parties seek court intervention. The procedure is outlined below:

1. The parties shall meaningfully meet and confer via email regarding every outstanding

---

[5] Plaintiff included 68 pages of exhibits, which violates the Court's Civil Standing Order, which permits only 12 pages of exhibits. As a result, the Court did not review them.

[6] The parties are not permitted to attach supporting declarations. The inclusion of a particular issue in the respective brief, and the attachment of the respective email thread, will be considered the filer's attestation that the parties sufficiently met and conferred prior to filing.

issue. To give the parties an opportunity to meaningfully meet and confer, each party shall raise their initial dispute(s) with the opposing party via email by **April 9, 2026** (one week before the discovery cut-off) in a single email (e.g. Plaintiff sends one email to Defendant with all outstanding disputes and vice versa). The parties will then go back and forth on the same email thread in an attempt to narrow the scope of any remaining disputes.

a. To ensure that the parties have adequately met and conferred, the initiating party shall attach a copy of their complete, email thread as an exhibit to the opening and responsive briefs only.

b. If the dispute involves written discovery, the opening brief should include the pertinent request(s) and response(s) as an exhibit.

2. Plaintiff's opening discovery brief shall be filed by **April 23, 2026**. The brief shall not exceed 15 pages.

3. Defendant's responsive brief is due **April 30, 2026**. Therein, Defendant shall respond to Plaintiff's opening brief and raise any additional disputes. The brief shall not exceed 25 pages.

4. Plaintiff shall file a responsive brief by **May 7, 2026**, in which she responds only to the disputes Apple is raising. She is not to address any disputes raised in the opening brief or raise any new issues. This brief shall not exceed 10 pages.

5. Each side gets a total of 25 pages, which, given the sheer volume of fact discovery disputes to date, should be more than sufficient to address any remaining issues. The Court will take the disputes under submission with the caveat that it may set an in-person discovery conference if deemed necessary.

IT IS SO ORDERED.

Dated: March 30, 2026

KANDIS A. WESTMORE
United States Magistrate Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,
Plaintiff,
v.
APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**ORDER GRANTING DEFENDANT'S MOTION TO STAY**

Docket No. 247

In July 2025, Ms. Gjovik initiated Chapter 7 bankruptcy proceedings in the District of Massachusetts. *See* Docket No. 257 (notice). Apple now moves for a stay of all proceedings in this case, either (1) "until such time as the Trustee decides how to proceed [with this suit] as the real party in interest with the exclusive authority to prosecute this action" or (2) should Ms. Gjovik "challenge the Trustee's statutory authority, . . . until such time as the bankruptcy court has made a final determination of that issue." Mot. at 9. Ms. Gjovik opposes the request for a stay, arguing, *inter alia*, that Apple is simply trying to avoid litigation in this case, including but not limited to discovery and summary judgment. Having considered the parties' briefs and accompanying submissions,[1] the Court finds this matter suitable for resolution without oral argument. The Court hereby **GRANTS** the motion to stay.

Contrary to what Plaintiff suggests, Apple is not arguing here that there is an automatic stay because of the bankruptcy proceedings. Rather, Apple seeks a *Landis* stay. *See Lockyer v.*

[1] The Court has considered the entirety of Ms. Gjovik's opposition, although it exceeds 25 pages. Ms. Gjovik is forewarned that, although the Court is considering the entirety of the brief, that does not mean that it will do so in the future should Ms. Gjovik file excess pages without Court permission.

*Mirant* Corp., 398 F.3d 1098, 1109 (9th Cir. 2005) (noting that "[a] district court has discretionary power to stay proceedings in its own court under *Landis v. North American Co.*, 299 U.S. 248, 254 (1936)). According to Apple, a *Landis* stay is warranted because, once Ms. Gjovik filed her Chapter 7 bankruptcy petition, the Trustee became the sole person with standing to decide whether to prosecute this suit. Apple did not move for relief earlier because, only recently, did the Trustee take action suggesting that he might not abandon Ms. Gjovik's claims against Apple (*e.g.*, the Trustee asked the bankruptcy court for approval to employ legal counsel and, after the initial meeting of creditors, continued that meeting to October so that he could, *inter alia*, meet with Ms. Gjovik). *See, e.g.*, Reply at 1 (noting that Apple filed its motion to stay "just four days after the Section 314 Meeting of the Creditors which clarified the Trustee was not abandoning the litigation, as Plaintiff/Debtor told this Court she thought he would").

Under *Landis*, a court considers the following factors in deciding whether to stay proceedings: "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Lockyer*, 398 F.3d at 1110. In the instant case, these factors weigh in favor of a stay.

In particular, the orderly course of justice weighs in favor of a stay. Since Ms. Gjovik's bankruptcy proceeding is a Chapter 7 proceeding, the Trustee must in the first instance decide how to proceed with the case at bar. *See In re DiSalvo*, 219 F.3d 1035, 1039 (9th Cir. 2000) (stating that, "'[i]n [Chapter 7] liquidation proceedings, *only* the trustee has standing to prosecute or defend a claim belonging to the state [but] [t]he same cannot be said for trustees under the reorganization chapters [where] the debtor has express authority to sue and be sued'"); *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (noting that, "[b]ecause a Chapter 7 debtor forfeits his prepetition assets to the estate, only the Chapter 7 trustee, not the debtor, has standing to pursue a civil legal claim unless the trustee abandons the asset, which then returns the claim to the possession and control of the debtor"); *Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513, 515 (2d Cir. 1998) ("conclud[ing] that a Chapter 13 debtor, unlike a Chapter 7 debtor, has



United States District Court
Northern District of California

standing to litigate causes of action that are not part of a case under title 11"); *Haskins v. FMHA*, No. 95-35004, 1996 U.S. App. LEXIS 16773, at *3 (9th Cir. June 19, 1996) (in Chapter 7 case, stating that, "[u]pon filing a petition for bankruptcy, a debtor's legal or equitable interests in all property becomes property of the bankruptcy estate," and "[a] trustee, as the representative of the bankruptcy estate, is 'the proper party in interest, and the only party with standing' to prosecute causes of action belonging to the estate"); *In re Lazo*, No. 90-56128, 1991 U.S. App. LEXIS 30307, *2-3 (9th Cir. Dec. 17, 1991) (in Chapter 7 case, stating that "[a]ll causes of action that the Lazos had as of June 13, 1983, whether filed or unfiled, became property of the Chapter 7 estate," and "[t]hese claims could be prosecuted only by the trustee of the estate"); *Lennear v. Diamond Pet Food Processors of Cal., LLC*, 147 F. Supp. 3d 1037, 1044 (E.D. Cal. 2015) (stating that, "[u]nder Chapter 7 bankruptcy, once the petition is filed, all pre-petition causes of action become part of the estate[;] [a]s such, the bankruptcy trustee is the sole individual with standing to maintain the pre-petition claim").

Ms. Gjovik has failed to cite any authority to counter the authority cited above or to otherwise support her position that there should be "continued debtor control over [this] litigation" *at this time*. Opp'n at 10. *See, e.g., In re Starky*, 522 B.R. 220, 227 (9th Cir. BAP 2014) (noting that, in a Chapter 7 proceeding, all of a debtor's assets become the property of the bankruptcy estate subject to the debtor's right to reclaim certain property as exempt; a trustee has the ability to file an objection to an exemption claim).

A stay of proceedings also would not impose undue hardship on Ms. Gjovik. Apple does not seek an indefinite stay, and the stay sought should not be unduly lengthy, especially as Ms. Gjovik has now filed an emergency motion with the bankruptcy court asking for relief with respect to actions taken by the Trustee. *See* Docket No. 251 (notice of motion filed in bankruptcy court).

The Court therefore grants Apple's motion to stay. Proceedings in this case are stayed pending a decision by the bankruptcy court as to the propriety of the Trustee's actions. If the bankruptcy court holds that the Trustee alone has standing to decide whether to prosecute this action (at least until he abandons it), the instant case shall continue to be stayed until the Trustee

United States District Court
Northern District of California

makes that decision.

Finally, to the extent Ms. Gjovik has asked for leave to amend her complaint to add in RICO and/or other claims because of, *e.g.*, Apple's recent conduct related to the bankruptcy proceedings, the request is denied. Likewise, the Court denies Ms. Gjovik's request that the Court reconsider her motion to disqualify Apple's counsel.[2]

The parties shall file a joint status report – in particular, addressing what has taken place in the bankruptcy proceedings – within sixty (60) days.

This order disposes of Docket No. 247.

**IT IS SO ORDERED**.

Dated: September 4, 2025

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

[2] Ordinarily, the Court would not entertain such requests for relief as they were raised in an opposition brief. Moreover, as indicated above, it is – at the very least – questionable whether Ms. Gjovik has standing to make the requests for relief. However, in the interest of moving this case forward, the Court has considered Ms. Gjovik's requests and denies them on the merits.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY GJOVIK

Plaintiff,

v.

APPLE INC.

Defendant.

Case No. 23-cv-4597-EMC [KAW]

MODEL STIPULATED PROTECTIVE ORDER
(for standard litigation)

1. PURPOSES AND LIMITATIONS

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

2. DEFINITIONS

2.1 Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2 "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

United States District Court
Northern District of California

2.3 Counsel (without qualifier): Outside Counsel of Record and House Counsel (as well as their support staff).

2.4 Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL."

2.5 Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.6 Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action.

2.7 House Counsel: attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.8 Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.9 Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.10 Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.11 Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.12 Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.13 Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL."

2.14 Receiving Party: a Party that receives Disclosure or Discovery Material from a

Producing Party.

3. SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4. DURATION

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5. DESIGNATING PROTECTED MATERIAL

5.1 Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. The Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within

the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2 Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a) For information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "CONFIDENTIAL." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the "CONFIDENTIAL" legend to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

Case: 26-4716, 11/13/2026, DktEntry: 10.1, Page 85 of 233

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.3 Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6. CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1 Timing of Challenges. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2 Meet and Confer. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and

must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3 Judicial Intervention. If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

7. ACCESS TO AND USE OF PROTECTED MATERIAL

7.1 Basic Principles. A Receiving Party may use Protected Material that is disclosed or

produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 13 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2 Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately

bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

8. <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION</u>

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL," that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

9. <u>A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION</u>

(a) The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order.

Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(3) make the information requested available for inspection by the Non-Party.

(c) If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

10. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

11. INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

12. <u>MISCELLANEOUS</u>

12.1 Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

12.2 Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

12.3 Filing Protected Material. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule 79-5 is denied by the court, then the Receiving Party may file the information in the public record pursuant to Civil Local Rule 79-5 unless otherwise instructed by the court.

13. <u>FINAL DISPOSITION</u>

Within 60 days after the final disposition of this action, as defined in paragraph 4, each

Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

DATED: 7/2/2025 — *_/s/ Ashley M. Gjovik_*
Plaintiff (*Pro Se*)

DATED: 7/2/2025 — *_/s/ Melinda S. Riechert_*
Attorney for Defendant

PURSUANT TO STIPULATION, IT IS SO ORDERED.

DATED: July 7, 2025

Kandis A. Westmore
United States Magistrate Judge

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, ______________________________ [print or type full name], of _________________ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of California on [date] in the case of Gjovik v. Apple Inc., Case No. 23-cv-4597-EMC . I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint __________________________ [print or type full name] of _______________________________________ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.

Date: ______________________________________

City and State where sworn and signed: _________________________________

Printed name: _______________________________

Signature: __________________________________

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,
Plaintiff,
v.
APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**ORDER DENYING PLAINTIFF'S MOTION TO QUASH AND STAY**

Docket No. 211

Currently pending before the Court is Ms. Gjovik's motion in which she asks for several forms of relief, specifically: (1) a stay pending appeal; (2) revocation of the discovery referral to Judge Westmore; and (3) an order requiring full briefing on a protective order to govern, *inter alia*, discovery produced in the case. Ms. Gjovik has noticed the motion for hearing on June 26, 2025. The Court hereby **VACATES** the hearing and further rules on the motion without waiting for an opposition or reply brief because the motion clearly lacks merit.

The request for a stay pending appeal is **DENIED**. The Court previously denied Ms. Gjovik's request for a partial final judgment under Federal Rule of Civil Procedure 54(b). Ms. Gjovik made that request so she could appeal this Court's orders that dismissed multiple claims pursuant to Rule 12(b)(6) and/or did not allow her to further amend. In spite of the Rule 54(b) order, Ms. Gjovik proceeded to file an appeal of, *inter alia*, those orders. She appears to have done so based on the contention that an interlocutory appeal is permitted under 28 U.S.C. § 1292(a)(1). That statute provides for appellate jurisdiction of "[i]nterlocutory orders . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1).

United States District Court
Northern District of California

But § 1292(a)(1) has no application in this case because Ms. Gjovik never moved for, and therefore was never denied, an injunction. The fact that the Court dismissed certain claims pursuant to Rule 12(b)(6) and those claims included requests for injunctive relief does not mean that the Court denied Ms. Gjovik injunctive relief for purposes of triggering § 1292(a)(1). *Cf. CDK Global LLC v. Brnovich*, 16 F.4th 1266, 1273 (9th Cir. 2021) ("Although 28 U.S.C. § 1292(a)(1) gives us jurisdiction to review an interlocutory order denying injunctive relief, we generally lack jurisdiction to review a non-final order dismissing claims under Federal Rule of Civil Procedure 12(b)(6)."). Moreover, as the Court explained to Ms. Gjovik in a prior order, *see* Docket No. 123 (Order at 2), the Supreme Court has underscored that § 1292(a)(1) is very limited in scope. *See* Carson v. Am. Brands, 450 U.S. 79, 84 (1981) (stating that, "[f]or an interlocutory order to be immediately appealable under § 1292(a)(1) . . . a litigant must show more than that the order has the practical effect of refusing an injunction[;] [b]ecause § 1292 (a)(1) was intended to carve out only a limited exception to the final-judgment rule, we have construed the statute narrowly to ensure that appeal as of right under § 1292(a)(1) will be available only in circumstances where an appeal will further the statutory purpose of '[permitting] litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence'").

The Court also **DENIES** Ms. Gjovik's request for a revocation of the referral to Judge Westmore. That Ms. Gjovik is not happy with rulings or indicative rulings made by the judge is not a reason to revoke a referral. *Cf. Taylor v. Regents of Univ. of Cal.*, 993 F.2d 710, 712 (9th Cir. 1993) ("'[A] judge's prior adverse ruling is not sufficient cause for recusal.'"). Furthermore, that Judge Westmore has a joint letter process for discovery disputes does not deprive Ms. Gjovik of the right to be heard (*i.e.*, due process). *See, e.g., Cornerstone Staffing Solutions v. James*, No. C 12-01527 RS, 2013 U.S. Dist. LEXIS 207049, at *11 (N.D. Cal. Feb. 22, 2013) ("James provides no support for the contention that the magistrate judge's appropriate procedures facilitating the efficient adjudication of non-dispositive discovery disputes represents some kind of 'due process' violation."). This Court also uses a joint letter process for discovery disputes. *See* https://cand.uscourts.gov/wp-content/uploads/judges/chen-emc/EMC-Standing-Order-Civil-Discovery.pdf (¶ 4). The Court also notes that Ms. Gjovik's request for relief seems premature in

Case: 25-4716, 11/13/2025, DktEntry: 10.1, (95 of 233)

several ways: (1) Judge Westmore has not issued a final ruling on the terms of a protective order governing, *inter alia*, discovery; and (2) even if Apple designates certain documents as confidential, that does not bar Ms. Gjovik from contesting a designation.

Finally, the Court **DENIES** the request for an order requiring full briefing on the matter of a protective order. That is an issue to be brought to Judge Westmore in the first instance.

This order disposes of Docket No. 211.

**IT IS SO ORDERED**.

Dated: May 14, 2025

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

ASHLEY M GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-04597-EMC

**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL FINAL JUDGMENT**

Docket No. 189

Pending before the Court is Ms. Gjovik's motion for partial final judgment pursuant to Federal Rule of Civil Procedure 54(b). Having considered the papers submitted, the Court finds the matter suitable for resolution without oral argument. The hearing on the motion is therefore **VACATED**. Ms. Gjovik's motion for relief is **DENIED**.

Rule 54(b) provides as follows:

> When an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).

The Supreme Court has instructed that,

> in deciding whether there are no just reasons to delay . . . , a district court must take into account judicial administrative interests as well as the equities involved. Consideration of the former is necessary to

> ensure that application of the Rule effectively "preserves the history federal policy *against piecemeal appeals*."

*Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980) (emphasis added). Thus, "if the unadjudicated claims are closely related to those [already] decided, the district court should generally refuse to enter a judgment under Rule 54(b)" but, if "the claims are sufficiently distinct so that duplicative appellate review will be avoided, the court of appeals will generally find that entry of a Rule 54(b) judgment was not an abuse of discretion." Moore's Fed. Prac. – Civ. § 54.23[1][b]; *see also Curtiss-Wright*, 466 U.S. at 10 (indicating that a court should consider the "interrelationship of the claims so as to prevent piecemeal appeals in cases which should be reviewed only as single units").

In the instant case, Ms. Gjovik asks that the Court enter a partial final judgment on all claims that the Court has dismissed with prejudice and/or all claims for which the Court has denied her leave to amend. *See* Docket Nos. 112, 179 (orders filed on 10/1/2024 and 2/27/2025). Included among these claims are claims related to alleged environmentally unsafe conditions, either at an Apple office or at Ms. Gjovik's former residence (close to an Apple factory).[1] Ms. Gjovik's main contentions in her motion are as follows:

(1) allowing an early appeal on these already-decided claims does not raise the prospect of duplicative appellate review because the claims are factually and legally distinct from her retaliation claims that survived Apple's 12(b)(6) challenges, *see* Mot. at 7 (contending that Apple has also characterized the claims as distinct from the retaliation claims);

(2) the claims should be adjudicated by the Ninth Circuit now since they affect the public interest (*e.g.*, because they concern environmental safety), *see* Mot. at 17; and

(3) Ms. Gjovik has a strong interest in having the claims adjudicated by the Ninth Circuit now because, otherwise, she would not be able to tell the full narrative of what transpired between her and Apple at trial. *See* Mot. at 10 (arguing that "[a]n

[1] Other claims include: violation of RICO; violation of SOX; violation of the Dodd-Frank Act; violation of the Bane Civil Rights Act; and violation of the Ralph Civil Rights Act.

United States District Court
Northern District of California

> appellate ruling restoring these claims would allow the jury to consider, in one proceeding, whether Apple engaged in dangerous and unlawful conduct, concealed its wrongdoing, and then retaliated against an employee who came close to uncovering it"); Mot. at 16 (arguing that "[t]he surviving retaliation claims cannot fill the evidentiary or narrative gap left by the dismissed tort and statutory claims" as "[t]he jury will not hear the details of Plaintiff's toxic exposures, emotional trauma, or Apple's concealment unless those claims are reinstated [by the Ninth Circuit]").

The Court has considered Ms. Gjovik's main contentions as well as the other contentions in her papers. It concludes that entry of a partial final judgment under Rule 54(b) is not appropriate for a number of reasons, including the following.

First, as Apple correctly points out, several of the already-decided claims do involve allegations of retaliation, and thus they are not distinct from the retaliation claims that the Court is allowing to proceed. *See, e.g.*, Opp'n at 10-12.

Second, entry of a partial final judgment does not require that factual and legal issues between adjudicated and unadjudicated claims be identical; similarity is sufficient. *See Morrison-Knudsen Co. v. Archer*, 655 F.2d 962, 965 (9th Cir. 1981) (asking whether "the appellate court will be required to address legal or factual issues that are *similar* to those contained in the claims still pending before the trial court[;] [a] similarity of legal or factual issues will weigh heavily against entry of judgment under [Rule 54(b)]") (emphasis added). Here, there are at the very least similar factual issues. For example, for the retaliation claim brought under California Labor Code § 1102.5(b), Ms. Gjovik maintains that Apple retaliated against her because she complained about, *inter alia*, environmental safety violations. Although Ms. Gjovik will not have to prove that Apple actually violated an environmental safety law for this retaliation claim, she will still have to show that she reasonably believed there was such a violation. *See Killgore v. SpecPro Pro. Servs., LLC*, 51 F.4th 973, 988 (9th Cir. 2022). Typically, a reasonable belief has a factual basis of some kind. Thus, there will be similar factual issues raised in both the claims already adjudicated and the unadjudicated § 1102.5 retaliation claim.

United States District Court
Northern District of California

Third, allowing an appeal of the adjudicated claims now does give rise to the threat of duplicative appeals. Ms. Gjovik suggests that duplicative appeals could be avoided if the Ninth Circuit were to rule in her favor before the trial on her retaliation claims. But this assumes that the Ninth Circuit would rule in her favor *and* that it would do so prior to the trial on the retaliation claims. Neither assumption is a guarantee – especially the latter since Ms. Gjovik has not asked for a stay of proceedings on the retaliation claims pending appeal (which the Court would not be inclined to grant if sought). And if she were to seek such a stay, that would, if anything, underscore that there is factual overlap among her various claims since that would be the likely basis for any stay request.

Fourth, that the claims at issue include claims related to environmental safety does not, in and of itself, weigh in favor of "expedited" appellate review through Rule 54(b). Certainly, Ms. Gjovik has not cited any authority to support this proposition.

Accordingly, the Court hereby denies Ms. Gjovik's Rule 54(b) motion. The Court shall not enter a partial final judgment on claims that have been dismissed or otherwise not permitted to proceed. The Court also denies Ms. Gjovik's alternative request for leave to amend.

This order disposes of Docket No. 189.

**IT IS SO ORDERED**.

Dated: April 15, 2025

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY M GJOVIK,<br>Plaintiff,<br>v.<br>APPLE INC.,<br>Defendant. | Case No. 23-cv-04597-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS; AND DENYING PLAINTIFF'S MOTION TO AMEND**<br><br>Docket Nos. 145 and 155 |

Plaintiff Ashley Gjovik, proceeding pro se,[1] is a former employee of Defendant Apple, Inc. She started to work for Apple in February 2015 and was ultimately terminated in September 2021. About two years after she was fired, she initiated this lawsuit. In the operative fifth amended complaint ("5AC"), Ms. Gjovik asserts seven different claims against Apple, all predicated on state law. For the most part, the claims fall into two basic categories: (1) Apple engaged in environmentally unsafe conduct that harmed Ms. Gjovik and (2) Apple retaliated against Ms. Gjovik – including by terminating her from employment – because she complained about certain company conduct, including but not limited to environmentally unsafe conduct.

Now pending before the Court is Apple's motion to dismiss portions of the 5AC. Having considered the parties' briefs and accompanying submissions, as well as the oral argument presented at the hearing on February 21, 2025,[2] the Court hereby **GRANTS** in part and **DENIES**

[1] Ms. Gjovik appears to have a J.D. from Santa Clara University.

[2] After the hearing was held, a declaration was submitted by a third party, Cher Scarlett. *See* Docket No. 186 (Scarlett Decl.). The Court does not consider the declaration because pending before it is a 12(b)(6) motion.

in part the motion to dismiss.

## I. FACTUAL & PROCEDURAL BACKGROUND

The 5AC is largely consistent with the prior pleadings. That is, as before, the main categories of misconduct by Apple as alleged in the 5AC are as follows:

> (1) During her employment with Apple, Ms. Gjovik lived in an apartment near an Apple factory (known as the ARIA factory) and became ill because the factory released toxic substances into the environment.
>
> (2) Ms. Gjovik's office at Apple (known as Stewart 1) was located on a contaminated site subject to EPA regulation, *i.e.*, a Superfund site, and she became ill because of Apple's actions/omissions related to the site.
>
> (3) Apple made employees, including Ms. Gjovik, participate in studies related to Apple products that were invasive to their privacy.
>
> (4) Apple retaliated against Ms. Gjovik for making complaints about harassment and environmental safety. Ms. Gjovik's complaints included internal complaints, complaints to governmental agencies, complaints to the press, and complaints made in social media. The retaliation by Apple included but was not limited to the termination of Ms. Gjovik from employment.

Docket No. 73 (Order at 2).

Based on, *inter alia*, these factual allegations, Ms. Gjovik asserts the following causes of action in the 5AC:

(1) Wrongful termination in violation of public policy.

(2) Violation of the California Whistleblower Act. *See, e.g.*, Cal. Lab. Code § 1102.5(b) (providing that an employer "shall not retaliate against an employee for disclosing information . . . to [*inter alia*] a government or law enforcement agency [or] to a person with authority over the employee . . . if the employee has reasonable cause to believe that the information discloses a violation of a state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation").

(3) Violation of California Labor Code § 6310. *See, e.g.*, *id.* § 6310(a) (providing that "[n]o person shall discharge or in any manner discriminate against any

United States District Court
Northern District of California

employee because the employee has [*e.g.*] [m]ade any oral or written complaint to the [Division of Occupational Safety and Health] [or] other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health”).

(4) Violation of California Labor Code § 98.6. *See id.* § 98.6(a) (providing that “[a] person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee . . . because the employee . . . engaged in any conduct delineated in this chapter . . . or because the employee . . . has filed a bona fide complaint or claim . . . under or relating to their rights that are under the jurisdiction of the Labor Commissioner . . . or because of the exercise by the employee . . . on behalf of themselves or others of any rights afforded them”).

(5) Creation and maintenance of a private nuisance at the ARIA factory.

(6) Intentional infliction of emotional distress – fear of cancer.

(7) Intentional infliction of emotional distress – “traditional.”

Apple has challenged Counts 5-7 above (*i.e.*, the non-retaliation claims) in their entirety. It also has moved to dismiss part of two retaliation claims – *i.e.*, the § 1102.5 claim (Count 2) and the § 98.6 claim (Count 4). Apple has not moved to dismiss in whole or in part the other two retaliation claims (Counts 1 and 3, respectively, termination in violation of public policy and violation of § 6310).

## II. DISCUSSION

### A. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include “a short and plain statement of the claim showing that the pleader is entitled to relief.” Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court’s decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff’s “factual allegations [in the complaint] ‘must .

. . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

B. Untimely and Oversized Opposition

As an initial matter, the Court takes note that Ms. Gjovik initially filed an opposition at Docket No. 149 that was 26 pages in length (*i.e.*, only one page over the 25-page limit). However, approximately seven hours later, she filed a corrected version of the brief at Docket No. 150; that corrected opposition is 36 pages in length. She claims that this brief is her "Final 2.0" brief "[r]evised with legal citations & missing sections." Docket No. 150 (Opp'n). The corrected opposition was not timely filed (about seven hours late).

Because Ms. Gjovik filed an untimely and oversized opposition, the Court could well strike her brief – notwithstanding her pro se status. *See, e.g.*, *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343, 345 (9th Cir. 1996) (holding that district court did not abuse its discretion in striking portions of a brief that violated page limits). Taking this course of action would not be unwarranted given that Ms. Gjovik has, in the past, on more than one occasion failed to comply with deadlines and/or page limits.

Although the Court could fairly take that course of action, it shall not at this time; instead, it shall, in the interest of justice, consider the corrected opposition and address Apple's motion to dismiss on the merits. Ms. Gjovik is forewarned, however, that, in the future, she must comply with all deadlines, page limits, and/or other rules or orders, just as any litigant before this Court

United States District Court
Northern District of California

Case: 25-4716, 11/13/2025, DktEntry: 10.1, Page 104 of 233

United States District Court
Northern District of California

must. The Court has already given Ms. Gjovik substantial leeway in the past and will no longer excuse her compliance with the rules.

C. Environmental Safety Claims

Ms. Gjovik has two environmental safety claims: (1) private nuisance (Count 5) and (2) intentional infliction of emotional distress ("IIED") based on "fear of cancer" (Count 6). Both claims are based on an Apple semiconductor fabrication factory (located at 3250 Scott Blvd.) allegedly releasing toxic chemicals into the environment which affected Ms. Gjovik because she lived in an apartment nearby (located at 3255 Scott Blvd.). The factory is also known as the ARIA factory.

In its most recent order, the Court held that the environmental safety claims were time barred based on the face of the then-operative pleading, but it gave Ms. Gjovik leave to amend to try to plead around the statute-of-limitations bar (specifically, through the delayed discovery rule). The Court also held that, with respect to the IIED claim, Ms. Gjovik failed to state a claim for relief; however, it gave her leave to amend. *See* Docket No. 112 (Order at 31) (indicating that Ms. Gjovik would have to "allege that Apple directed its conduct at her specifically or with knowledge of her presence specifically, and that its conduct was calculated to cause her severe emotional distress").

1. Statute of Limitations

In its motion to dismiss, Apple renews its argument that the environmental safety claims are time barred. Although the statute of limitations is an affirmative defense, it can be raised in a 12(b)(6) motion if it is apparent from the face of the complaint. *See Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013).

As alleged in the 5AC, Ms. Gjovik sustained injury as a result of the ARIA factory while she lived in the nearby apartment from February 2020 through October 2020. *See* 5AC ¶ 12. Ms. Gjovik, however, did not file this lawsuit until September 2023, *i.e.*, some three years later. This is, on its face, problematic given that Ms. Gjovik's claims for nuisance and IIED have a two-year statute of limitations. *See* Cal. Code Civ. Proc. § 340.8(a) ("In any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of

the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later.").

Ms. Gjovik argues, however, that she is not time barred under § 340.8 because she did not become aware of, and reasonably should not have become aware of, the cause of her injury – *i.e.*, the ARIA factory – until February 2023. *See* 5AC ¶ 269 (asserting that the statute of limitations "should be tolled until February 2023, the date when Plaintiff first discovered the nature of Apple's hazardous activities at 3250 Scott"). As alleged in the 5AC, February 2023 was when Ms. Gjovik discovered that the Apple factory had "permits for semiconductor fabrication equipment" for the ARIA factory. 5AC ¶ 259. Ms. Gjovik obtained these documents "after filing multiple Public Records Act requests about various Apple buildings." 5AC ¶ 259; *see also* RJN, Ex. 2 (tweet from Ms. Gjovik, dated 2/21/2023) (stating that "I just received Public Records results on the 3250 building permits & its [sic] a doozy[;] Apple registered the building in 2015 for haz waste storage & generation").

Ms. Gjovik does not dispute that, well before February 2023, she knew Apple had a factory close to her apartment. In fact, she admits that she knew the factory "was registered as a hazardous waste generator," 5AC ¶ 262, and that she voiced concern about the factory to Apple's Environmental Health & Safety and Legal Departments in 2020 and 2021. *See* 5AC ¶ 265.[3] However, Ms. Gjovik maintains that, until she knew *specifically* that semiconductor fabrication was occurring at the factory, she did not know and should not have reasonably known that her injuries were caused by the factory as opposed to a different cause. *See, e.g.*, 5AC ¶¶ 259, 261 (alleging that "knowledge of the semiconductor operations at the facility" was critical to Ms. Gjovik "connect[ing] Apple's hazardous manufacturing activities at 3250 Scott to her 2020

[3] *See also* 5AC ¶ 25 (indicating that, in or about December 2020, "Plaintiff . . . notified Apple EH&S and environmental legal about what occurred to her near 3250 Scott"); 5AC ¶ 36 (alleging that, in or about September 2020, "[t]he plaintiff notified several Apple executives of her findings and activities" with respect to air monitor testing in her apartment next to the Apple factory).

Case: 26-4716, 11/13/2026, DktEntry: 10.1, (106 of 233)

illness"); 5AC ¶ 268 (alleging that, "[u]pon learning of the semiconductor fabrication at 3250 Scott, Plaintiff immediately identified the facility's toxic emissions as the plausible cause of her severe health problems"). According to Ms. Gjovik, the fact that she knew the factory was a hazardous waste generator is not important because (1) Apple did not warn her that the factory posed a danger after she raised concerns about it to EH&S and Legal, *see* 5AC ¶ 265; (2) "[r]ecords on the EPA's Toxics Release Inventory (TRI) and other federal and state databases showed no significant toxic chemical releases from 3250 Scott," 5AC ¶ 261; and (3) "[t]he region's history of industrial activity and the current presence of research and development facilities that generate hazardous waste did not raise any alarms." 5AC ¶ 262. Ms. Gjovik also claims that Apple engaged in action that concealed semiconductor fabrication was occurring at the factory. *See, e.g.*, 5AC ¶ 263 (alleging that Apple pressured government agencies such as "the fire department and EPA to avoid documenting or discussing its activities"); 5AC ¶ 267 (alleging that Apple used "misleading permits and improper classifications that obscured the facility's true nature"). Finally, she emphasizes that government agencies "investigated the area and found no records that would indicate a direct link to her health issues," 5AC ¶ 263 – *i.e.*, if the government found no problem, she could not have reasonably been expected to find one either.

In response, Apple argues that Ms. Gjovik's attempt to rely on the delayed discovery rule fails because, at bottom, the information she discovered in February 2023 – in particular, the permits for the ARIA factory showing that it engaged in semiconductor fabrication – was publicly available at the time she was injured in 2020, and Ms. Gjovik has failed to show why she could not have found that publicly available information until February 2023.

2. Delayed Discovery Rule

Before delving into the merits of the parties' dispute, the Court first addresses Ms. Gjovik's contention that the Court is applying the wrong discovery rule. According to Ms. Gjovik, although she has asserted two state law claims, federal law on delayed discovery applies. Ms. Gjovik further argues that, under federal law on delayed discovery, the appropriate standard is not what *she* knew or should have known but rather what a *reasonable person* in her position knew or should have known (*i.e.*, an objective inquiry, not a subjective one).





United States District Court
Northern District of California

Case: 26-4716, 11/13/2026, DktEntry: 10.1, (107 of 233)

United States District Court
Northern District of California

Ms. Gjovik is correct that federal law on delayed discovery applies. In *O'Connor v. Boeing North America*, 311 F.3d 1139 (9th Cir. 2002), the plaintiffs sued two companies alleging that substances released from their facilities caused the plaintiffs to suffer illnesses. The plaintiffs brought tort claims under California law. California law had a limitations period of one year. The issue was whether the delayed discovery rule allowed the plaintiffs to get around the time bar.

The Ninth Circuit held that a CERCLA provision, 42 U.S.C. § 9658, applied to the claims even though the plaintiffs were asserting only state law claims "without an accompanying CERCLA action." *Id.* at 1149. Section 9658 provided:

> In the case of any action brought *under State law for personal injury* . . . which [is] caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

*Id.* at 1146 (quoting § 9658(a)(1); emphasis added). Thus, in the case under consideration, "§ 9658 preempts California's commencement date if that date is earlier than the federally required commencement date."[4] *Id.*; *see also id.* at 1143-44 (noting that § 9658 "retains the state statute of limitations[] and establishes a federal standard that governs when delayed discovery of a plaintiff's claims will toll the statute of limitations[;] [t]his federal standard trumps a less generous state rule that would start the limitations period earlier").

The Ninth Circuit went on to evaluate whether the accrual date was different under state and federal law. "Under both federal and California law, the discovery rule provides that a limitations period does not commence until a plaintiff discovers, or reasonably could have discovered his claim," *i.e.*, "through investigation of sources open to her." *Id.* at 1147. But under California law, "a plaintiff discovers a claim when the plaintiff 'suspects or should suspect that her injury was caused by wrongdoing.'" *Id.* In contrast, federal law "requires more than suspicion

---

[4] In its reply brief, Apple argues that *O'Connor* is not applicable because Ms. Gjovik's "claim is for nuisance and is not brought under CERCLA." Reply at 4 n.4. However, that argument does not square with what the Ninth Circuit held in *O'Connor*.

alone"; discovery turns on when the plaintiff "knows or reasonably should have known of that cause." *Id.* at 1148. Because federal law on delayed discovery was more generous to the plaintiff, the Ninth Circuit held that federal law, and not state law, applied.

Based on *O'Connor*, Ms. Gjovik is correct that the Court should not have relied on state law for delayed discovery in its prior order. *See, e.g.*, Docket No. 112 (Order at 27) (noting that, under California's delayed discovery rule, "'a cause of action accrues . . . when the plaintiff has reason to suspect an injury and some wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action[;] [i]n that case, the statute of limitations . . . will be tolled until such time as a reasonable investigation would have revealed its factual basis'"). To be clear, though, neither party raised § 9658 at the time of the prior hearing.

Ms. Gjovik also argues that, under federal law on delayed discovery, the issue is "not whether Plaintiff herself should have discovered the source of the emissions but rather whether a reasonable person in Plaintiff's position would have been able to identify the source." Opp'n at13; *see also* Opp'n at 13 ("Plaintiff's claims in this case are not simply based on subjective awareness; rather, they are grounded in the objective standard of a reasonable person."). Here, Ms. Gjovik is not entirely correct. As noted above, the delayed discovery rule under federal law turns on when the plaintiff "knows or reasonably should have known" the existence and cause of her injury, *O'Connor*, 311 F.3d at 1148 (emphasis added). In *O'Connor*, the Ninth Circuit stated that

> [a] two-part analysis determines whether Plaintiffs reasonably should have known of their claim. . . . First, we consider whether a reasonable person in Plaintiffs' situation would have been expected to inquire about the cause of his or her injury. Second, if the plaintiff was on inquiry notice, "we must next determine whether [an inquiry] would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim." The plaintiff will be charged with knowledge of facts that he would have discovered through inquiry.

*O'Connor*, 311 F.3d at 1150. While the first inquiry evaluates whether a reasonable person in a plaintiff's situation would have been expected to inquire about the cause of his or her injury, the second inquiry does not use the same benchmark. "The second prong of the test for application of





United States District Court
Northern District of California

United States District Court
Northern District of California

the discovery rule is whether a reasonable inquiry would have put [a] Plaintiff[] on notice of their claim." *Id.* at 1155.

3. <u>"Reasonably Should Have Known"</u>

Because Ms. Gjovik has claimed that she did not *actually know* the cause of her injuries until February 2023, the critical question in the instant case is when she *reasonably should have known* of that cause. As noted above, *O'Connor* establishes a two-part analysis.

In the instant case, Ms. Gjovik does not make any argument that, at the first prong, a reasonable person in her situation would not have been expected to inquire about the cause of her injuries. This is likely because Ms. Gjovik *did*, at or about the time she was suffering her injuries, start to make inquiries about the cause thereof. *Cf. Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983) (noting that plaintiff suspected copyright infringement and this suspicion "placed upon [him] a duty to investigate further into possible infringements of his copyright"); *see also Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1048 n.5 (9th Cir. 2020) (stating that *O'Connor* did not discuss *Wood*, which "provides that suspicion of infringement triggers a duty to investigate"). Thus, the question here is whether, at the second prong, "a reasonable inquiry would have put [Ms. Gjovik] on notice of [her] claim." *Id.* at 1155; *see also id.* at 1155-56 (noting that this step "focuses on whether, if the Plaintiffs had inquired about the cause of their illnesses, the result of that inquiry would have provided Plaintiffs with knowledge of the connection between the injury and its cause"). This inquiry *does* bear similarity to the California delayed discovery rule. *See* Docket No. 112 (Order at 27) (noting that, under California's delayed discovery rule, a plaintiff must "'plead[] and prove[] that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action[;] [i]n that case, the statute of limitations . . . will be tolled until such time as a reasonable investigation would have revealed its factual basis'").

4. <u>Permits and Other Publicly Available Documents</u>

As to whether a reasonable inquiry would have put Ms. Gjovik on notice of her claims, the Court must bear in mind what Ms. Gjovik has already alleged in her 5AC. According to Ms. Gjovik, what actually put her on notice was the discovery (in February 2023) of permits for the

Apple factory which showed it was engaged in semiconductor fabrication. Thus, Apple makes a fair contention that, if a reasonable inquiry would have led Ms. Gjovik to the permits *before* February 2023, then her claim she could not have reasonably known about the semiconductor fabrication until February 2023 is not tenable.

Apple has asked the Court to take judicial notice of the fact that the permits for the ARIA factory are publicly available on the website for the City of Santa Clara (https://aca-prod.accela.com/santaclara/Default.aspx (last visited 1/28/2025)).

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | 01/02/2018 | BLD2018-49344 | Building Permit | RENEW APP 02/01/19 ALT TOOL INSTALL: Phase 23- Demolition and installation of tool install(SEM;AFM, and RTA). Oven, bonder, and vector tester. "ARIA" | 3250 SCOTT BL, SANTA CLARA CA 95054 | Finaled |
| ☐ | 12/05/2017 | BLD2017-49104 | Building Permit | RENEW 10/9/2018 PHASE 20 Oerlikon Cluster Sputting tool in Fab | 3250 SCOTT BL, SANTA CLARA CA 95054 | Finaled |
| ☐ | 12/05/2017 | BLD2017-49103 | Building Permit | PHASE 19 HF Vapor tool hook up Installation tool wiht 2 chambers, electrical cabinet, Vacuum pumps, Exhaust ductwork in a Fab clean room | 3250 SCOTT BL, SANTA CLARA CA 95054 | Finaled |

*See* RJN, Ex. 4B (ECF Page 23) (website results search, showing permits from December 2017 that refer to semiconductor fabrication). Notably, these are the same permits that Ms. Gjovik tweeted about in February 2023 when she announced her discovery of the cause of her injuries. *See* RJN, Ex. 1 (ECF Pages 2-3) (tweet, dated 2/21/2023). Apple has also asked the Court to take judicial notice of "historical pages that show the publicly available City of Santa Clara permit website as it existed *back in 2020*." RJN at 6 (noting that "Exhibits 5A-5B show what the City of Santa Clara's permit center website looked like back in 2020, while Exhibits 4A-4G show what the City's permit center website looks like presently"; the historical "'Smart Permit Search' link [was] preserved by the Internet Archive WayBack Machine on November 11, 2020").

In addition to the permits, Apple points out that Ms. Gjovik mentions in the 5AC a "2019 gas leak report" that "confirmed [her] belief that Apple's activities at the facility caused her illness." 5AC ¶ 260. That gas leak report "mentioned phosphine – an indicator of Apple's toxic emissions at 3250 Scott." 5AC ¶ 260. The gas leak report appears to have come from Santa Clara City Fire Department records for the factory. *See* 5AC ¶ 23 (alleging that the records included "chemical spill reports" from 2019-2022 and reflected "eight confirmed leaks/spills: leaks of phosphine and silane on June 1 2019; a phosphine leak on October 21 2019; a tetraethyl orthosilicate leak on July 17 2020; a significant phosphine leak on April 30 2021; a 5% fluorine



United States District Court
Northern District of California

gas leak on April 18 2022, a hexafluorobutadiene leak on May 29 2022, and leaks of two unnamed toxic gases on September 20 2022 and December 21 2022"). Apple asks the Court to take judicial notice that the gas leak report is publicly available through the Santa Clara Fire Department website. *See* RJN, Ex. 3 (incident report, dated 6/2019) (ECF Page 15) ("E99 and H99 responded to a gas leak . . . . ERT was on scene . . . . The alarm was for .5 parts per billion that was going through their scrubbers. The chemicals were Silane and Phosephine [sic]."). The face of the document also indicates that the report was publicly accessible as of 2020; the document reflects an "**upload date**" of February 18, 2020. *See* RJN, Ex. 3 (ECF Page 11).

Finally, Apple notes that, in the 5AC, Ms. Gjovik refers to allegedly "difficult-to-find agency filings" – specifically, that Apple made with the Bay Area Air Quality Management Board. According to Ms. Gjovik, the filings reflect that, "in at least 2019-2021, 3250 Scott exhausted reportable amounts of mercury, arsenic, carbon monoxide, and formaldehyde into the ambient air around the factory." 5AC ¶ 25. Apple asks the Court to take judicial notice of the fact that this information was publicly available on the Bay Area Air Quality Management District ("BAAQMD" ) website – specifically, "the BAAQMD 2018 emissions data was publicly available online [back] in August 2021, and shows that 3250 Scott emitted the same substances Plaintiff alleges she saw in the 2019-2021 permits that allegedly put her on notice of potential exposure." Mot. at 13; *see also* RJN, Ex. 6A (BAAMQ website) (ECF Page 46) (reflecting that "Toxic Air Containment Inventory for 2018 – Sorted by County, by City, and by Facility Name" was **posted** on 8/24/2021); RJN, Ex. B (Toxic Air Containment Inventory for 2018) (ECF Pages 52, 170) (reflecting that 3250 Scott produced certain levels of "Diesel Engine Exhaust Particulate Matter" which includes, *e.g.*, formaldehyde, arsenic, and mercury).

In her opposition brief, Ms. Gjovik states she opposes Apple's request for judicial notice, but she did not provide any argument as to why. Nor did she file a brief in opposition to the request for judicial notice concurrently with her opposition to the motion to dismiss. Instead, Ms. Gjovik did not file an opposition to the request for judicial notice until some ten days after the brief was due. *See* Docket No. 154-2 (opposition to RJN). While the Court, in the interest of justice, is considering Ms. Gjovik's substantive opposition to the motion to dismiss in spite of its

untimeliness, it will not consider Ms. Gjovik's untimely opposition to the request for judicial notice. There is absolutely no reason why this opposition could not have been filed at the time she filed her opposition to the motion to dismiss. Certainly, there is no justification for filing the opposition ten days late.

The Court, therefore, deems Ms. Gjovik's failure to timely oppose the request for judicial notice a waiver of any argument challenging the request for judicial notice. In any event, the Court independently finds that it may take judicial notice of the documents submitted by Apple (*i.e.*, the Santa Clara building permits, a Santa Clara Fire Department gas leak report, and a BAAMQD publication) pursuant to Federal Rule of Evidence 201(b).[5] *See, e.g., Organic Cannabis Found., LLC v. Comm'r*, 962 F.3d 1082, 1096 (9th Cir. 2020) (taking judicial notice that the U.S. Postal Service has reserved a certain zip code for P.O. Boxes in Santa Rosa because "judicial notice may be taken of official information that is posted on a government website and that is not subject to reasonable dispute") (internal quotation marks omitted); *United States SBA v. Bensal*, 853 F.3d 992, 1003 & n.3 (9th Cir. 2017) (indicating that a court may take judicial notice of information "'made publicly available by government entities'"; here, that information was from a government website that "[t]he SBA requires personal guarantees from individuals who own at least 20% of or hold significant management positions in any business seeking a direct loan or guarantee"); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) ("tak[ing] into consideration the list of approved 403(b) vendors displayed publicly on the respective web sites of the South Kitsap and El Dorado School Districts" because "it was made publicly available by government entities (the school districts), and neither party disputes the authenticity of the web sites or the accuracy of the information displayed therein"); *United States v. Basher*, 629 F.3d 1161, 1165 n.2 (9th Cir. 2011) (taking judicial notice of information in the Bureau of Prisons Inmate Locator Service because "[w]e take judicial notice of this information that is available to the public").

---

[5] *See* Fed. R. Evid. 201(b) (providing that a court may take judicial notice of a "fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Apple also argues that the Court could consider the documents based on the incorporation-by-reference doctrine.

United States District Court
Northern District of California

Under the above authorities, the Court may *also* take judicial notice of the dates the documents were publicly available. As noted above, the face of the gas leak report indicates that the report was publicly accessible as of 2020: the document reflects an "upload date" of February 18, 2020. *See* RJN, Ex. 3 (ECF Page 11). Similarly, the BAAMQ website reflects that the "Toxic Air Containment Inventory for 2018 – Sorted by County, by City, and by Facility Name" was posted on August 24, 2021. *See* RJN, Ex. 6A (BAAMQ website) (ECF Page 46).

The closest call concerns the date that the building permits were available; this is because Apple is relying on the Internet Archive's WayBack Machine to show what the Santa Clara permit center website looked like back in 2020. "'The Wayback Machine is an online digital archive of web pages. It is run by the Internet Archive, a nonprofit library in San Francisco, California.'" *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021). District courts in this circuit have routinely taken judicial notice of content from the Wayback Machine. *See Parziale v. HP, Inc.*, No. 5:19-cv-05363-EJD, 2020 U.S. Dist. LEXIS 179738, at *8 (N.D. Cal. Sept. 29, 2020) (stating that "'[d]istrict courts in this circuit have routinely taken judicial notice of content from the Internet Archive's Wayback Machine pursuant to this rule'"; at issue in the case was a "historical snapshot of the online store page for [a product], as archived on the Wayback Machine"). This Court has done so on a prior occasion and was affirmed. *See Steinberg v. Icelandic Provisions, Inc.*, No. 21-CV-05568-EMC, 2022 U.S. Dist. LEXIS 13478, at *4 n.1 (N.D. Cal. Jan. 25, 2022), (granting judicial notice of fact from website as it existed on a given date, preserved by the WayBack Machine), *aff'd*, No. 22-15287, 2023 U.S. App. LEXIS 14431 (9th Cir. June 9, 2023).

The Ninth Circuit does not appear to have explicitly weighed in on the issue of whether content from the Wayback Machine may be judicially noticed. However, the Federal Circuit has held that judicial notice is appropriate, at least for purposes of establishing when a web reference was first made available to the public. *See Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021) (noting that patent "[e]xaminers use The Wayback [M]achine as a source of information to determine when a Web reference was first made available to the public") (internal quotation marks omitted). The Federal Circuit stated as follows:

> District courts have taken judicial notice of the contents of webpages available through the Wayback Machine "as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Erickson v. Neb. Mach. Co.*, No. 15-CV-01147-JD, 2015 U.S. Dist. LEXIS 87417, 2015 WL 4089849, at *1 n.1 (N.D. Cal. July 6, 2015) (comparing "copies of current versions" of websites with versions available on the Wayback Machine to determine "that the websites were substantively identical during the relevant timeframe"); *see also Pohl v. MH Sub I, LLC*, 332 F.R.D. 713, 716 (N.D. Fla. 2019) (collecting cases); *UL LLC v. Space Chariot Inc.*, 250 F. Supp. 3d 596, 603-04 & n.2 (C.D. Cal. 2017) (determining when websites began advertising a certification mark and collecting cases). We agree.

*Id.* at 1374-75.

On the other hand, the Fifth Circuit reached a different conclusion in *Weinhoffer v. David Shoring, Inc.*, 23 F.4th 579 (5th Cir. 2022). There, the court noted that, "[b]eyond the context of judicial notice, our sister circuits have allowed district courts to rely on archived webpages where someone with personal knowledge of the reliability of the archive service has been authenticated pursuant to Rule 901." *Id.* at 584 (citing Second, Seventh, and Third Circuit decision). It then stated:

> This reliance on personal knowledge indicates that exhibits derived from these sources are not inherently or self-evidently reliable in the same way as documents designated as self-authenticating by Rule 902.
>
> . . . .
>
> Our sister circuits' decisions that the Wayback Machine is not self-authenticating are persuasive in the context of judicial notice. In sum, the district court erred in taking judicial notice of the terms because a private internet archive falls short of being a source whose accuracy cannot reasonably be questioned as required by Rule 201.

*Id.*

The Fifth Circuit, however, acknowledged that the Federal Circuit had reached a different result in *Valve*. But it distinguished *Valve* on the following basis:

> At issue [in *Valve*] was whether an exhibit was authenticated as identical to the document viewed by the patent examiner and whether the exhibit could be prior art. . . . [T]he Federal Circuit held that judicial notice of the Wayback Machine could be used to establish that an otherwise authenticated exhibit was publicly

United States District Court
Northern District of California

> accessible on the webpage's archive date as determined by a patent examiner who was "trained and required to determine publication dates." Here [in *Weinhoffer*], the Wayback Machine content containing the auction terms has not been otherwise authenticated.

*Id.*

Even if the Court were to follow the more restrictive view of the Fifth Circuit, the instant case is more analogous to *Valve* which the Fifth Circuit essentially deemed distinguishable. In the case at bar, the building permits themselves are judicially noticeable and thus they are "authenticated"; the limited issue is whether the Court may take judicial notice of information obtained from the Wayback Machine to show that the permits were available to the public on a particular date. That was essentially the issue in *Valve*, and the Federal Circuit held (and the Fifth Circuit did not disagree) that judicial notice was proper for that purpose.[6]

Accordingly, the Court takes judicial notice of not only the documents at issue but also the date the documents were publicly available.[7]

Because the Court takes judicial notice of the information requested by Apple, Ms. Gjovik's position that she could not have reasonably known that ARIA was a semiconductor fabrication factory until February 2023 lacks merit. Given that Ms. Gjovik started investigating causes of her injuries in at least September 2020, *see, e.g.*, 5AC ¶¶ 35-36 (alleging that, "[i]n September 2020, Plaintiff hired an industrial hygienist to evaluate the indoor air at her apartment" and that, the same month, she "set up more air monitors to observe the levels of volatile organic compounds in her apartment"), it is implausible that she could not have found the documents at issue – which were publicly available in 2020 and/or 2021 – until some two to three years later. This is especially true since Ms. Gjovik has actually alleged in the 5AC that she knew the ARIA factory "was registered as a hazardous waste generator." 5AC ¶ 262. Reasonable further inquiry would have led to the discovery of the nature of the ARIA manufacturing activities.

---

[6] The Court also notes that, given Santa Clara's permit center website was operational back in 2020, there is nothing to indicate that the building permits for the ARIA factory were not available at that time, including for the year 2017 which reflected semiconductor fabrication.

[7] Even if Wayback Machine information is not judicially noticeable, that affects only the building permits. The dates that the gas leak report and BAAMQ document were available is reflected on the face of the report and/or BAAMQ website.

Ms. Gjovik's remaining arguments in her opposition brief are not compelling. For example:

(1) Ms. Gjovik asserts that Apple concealed information which made discovery of the semiconductor fabrication at the factory difficult. The problem with this argument is that, as noted above, the building permits – which she claims were the basis of her discovery of the semiconductor fabrication – were all publicly available before February 2023.

(2) According to Ms. Gjovik, it is reasonable that she did not discover the semiconductor fabrication until February 2023 because government agencies who were also investigating were never able to pinpoint the cause of her injuries. *See* SAC ¶ 263 ("Government agencies, including the EPA, had also investigated the area and found no records that would indicate a direct link to her health issues. They, too, could not identify a clear cause, which further obscured Plaintiff's ability to connect the dots before discovering Apple's involvement in February 2023."). The problem for Ms. Gjovik is that, once again, the building permits reflecting that there was semiconductor fabrication at the factory were publicly available. In addition, the allegations made in ¶ 263 are vague. While government agencies may have, as alleged, investigated Apple after Ms. Gjovik complained, that is not an allegation that the agencies were investigating what the cause of Ms. Gjovik's medical issues were. There are also no allegations that government agencies found, *e.g.*, illegal toxic air emissions and tried to locate the source of the emissions but were not able to do so. The agencies simply may have found no such emissions. Furthermore, as Apple points out in its reply brief, Ms. Gjovik "does not allege in her 5AC that any government agency has ***ever*** concluded that the 'source of the emissions' was 3250 Scott (despite having equal access to the same publicly available documents that Plaintiff relies upon to support her nuisance claim)." Reply at 4 (emphasis in original).

(3) Finally, Ms. Gjovik seems to suggest that she has a different theory to get around

any limitations bar – *i.e.*, a continuing violations theory. *See* Opp'n at 17-18 (arguing that, because "both parties agree that Plaintiff's Tamney claims [wrongful termination in violation of public policy] are based on Defendant's unlawful retaliation . . . , Plaintiff's claims also satisfy the requirements for tolling due to continuing violations"). But this argument does not make sense. The issue here is whether the environmentally unsafe claims are time barred, not any retaliation claim. And to the extent Ms. Gjovik is trying to argue continuing violations for her nuisance and IIED claims, she fails to take into account that she moved out of the apartment at issue in October 2020. Thus, even if the ARIA factory continued to emit pollutants thereafter, she would not have standing to challenge such subsequent conduct. The Court's prior order already recognized these points. *See* Docket No. 112 (Order at 29 n.11) ("To the extent Ms. Gjovik asserts that there is no time-bar problem because the ARIA factory is a continuing nuisance, that argument lacks merit. Ms. Gjovik moved out of her apartment near the ARIA factory in October 2020."),

5. <u>Summary</u>

For the foregoing reasons, the Court holds that, based on judicially noticeable and other facts, Ms. Gjovik's claims for nuisance and IIED (fear of cancer) are time barred.[8] The Court dismisses with prejudice because it previously gave Ms. Gjovik an opportunity to address the time bar but she failed to do so on amendment.

D. <u>IIED Claim – "Traditional"</u>

In Count 7, Ms. Gjovik has a separate claim for IIED based on post-termination conduct by Apple. According to Ms. Gjovik, Apple engaged in various kinds of misconduct, including but not limited to the following:

- Mailing Ms. Gjovik her personal belongings but intentionally damaging the belongings and covering them in glass shards. *See* 5AC ¶ 296.

[8] Because the Court is dismissing the IIED claim based on the time bar, it need not address Apple's additional arguments challenging the claim.



United States District Court
Northern District of California

- Bugging and surveilling her. *See, e.g.*, 5AC ¶¶ 296, 298, 300 (alleging that, when Apple mailed her personal belongings, it put a "hidden listening device" into a statute; also alleging that Apple installed "some sort of electronic equipment" in her fake fig tree and hacked her network).
- Breaking into her residence on multiple occasions (both when she lived in California and when she lived in Massachusetts). *See* 5AC ¶¶ 299, 302-05.
- Harassing her online, including through social media – *e.g.*, "falsely accusing [her] of dishonesty and criminal conduct," making "disparaging remarks" about her, calling her names, and even "suggest[ing] that [she] should be executed." 5AC ¶¶ 308, 310, 312, 316, 320.

Apple moves to dismiss the claim, primarily for two reasons: (1) some of the conduct alleged by Ms. Gjovik is, as a matter of law, not outrageous, and (2) some of the conduct is not sufficiently tied to Apple and, even if it were (*e.g.*, misconduct was committed by an Apple employee), there is not a basis to hold Apple accountable (*e.g.*, no respondeat superior liability).

1. <u>Outrageousness</u>

Apple's arguments have merit. For example, simply claiming that Ms. Gjovik was dishonest is not outrageous as a matter of law. *See* Docket No. 112 (Order at 35) (stating that "[b]eing called, *e.g.*, a liar is, as a matter of law, not outrageous conduct sufficient to support a claim for IIED"). Similarly, the kind of insulting comments identified by Ms. Gjovik in much of the 5AC is not outrageous. *See* 5AC ¶ 316 (alleging that "Apple's agents have publicly [and] repeatedly called Plaintiff a liar, predator, bitch, cunt, toxic, attention-seeking, [etc.]"); *King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 786 (N.D. Cal. 2021) (noting that "[l]iability for IIED does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities").

In one paragraph, Ms. Gjovik alleges that "an Apple Global Security Crisis Manager, Vicki, call[ed] Plaintiff on October 2, 2024, to harass Plaintiff about Plaintiff's struggle to litigate against Apple's army of attorneys," 5AC ¶ 342, but without more specific allegations about what the manager said or did that was allegedly harassing, the alleged conduct cannot be said to be

outrageous.

In several paragraphs, Ms. Gjovik asserts that Apple's attorneys representing Apple in the NLRB proceedings she initiated against the company are "implicated in the harassment," *see* 5AC ¶¶ 347-48, but the alleged conduct is either not outrageous, *see, e.g.*, 5AC ¶ 347 (alleging that the attorneys' asked for production of "the defamatory paper trail created by Appleseed"), or not fairly attributable to the attorneys. *See* 5AC ¶ 348 (alleging that the attorneys "used fake social media accounts to attack [Ms. Gjovik]" but providing no factual basis for that conclusory claim).

With respect to Ms. Gjovik's allegation that her personal belongings were damaged and covered in glass shards when Apple mailed them to her, the conduct cannot be deemed outrageous when there are no factual allegations to support the claim that the conduct was intentional. The mere fact that the belongings were damaged and covered in glass shards is not enough by itself to give rise to a reasonable inference of intentional (as opposed to negligent) conduct by Apple.

2. <u>Liability on the Part of Apple</u>

Even if some alleged misconduct is or plausibly could be characterized as outrageous in nature, it is not sufficiently connected to Apple as a factual matter or there is not a sufficient legal basis to hold Apple liable.

For example, as a factual matter, the claims that Apple was responsible for the bugging/surveillance and breaking into her home are entirely speculative. In the 5AC, Ms. Gjovik asserts that "[t]here is no one else except Apple that Plaintiff could plausibly attribute responsibly for the things that occurred to her since 2020. No one else would have the motive or resources to do these things, and the harassment was perfectly timed with her conflict with Apple." 5AC ¶ 295. But again, this is nothing more than speculation.

In some instances, Ms. Gjovik has alleged that misconduct was engaged in by an Apple employee – *e.g.*, the online harassment. But here, Ms. Gjovik has failed to explain how Apple can be held legally liable for such conduct. For example, Ms. Gjovik seems to suggest that Apple actively directed the online harassment, *see* Opp'n at 21, 23, but no concrete facts are alleged to support such. There are no specific allegations that the alleged conduct was done at Apple's behest.




United States District Court
Northern District of California

United States District Court
Northern District of California

To the extent Ms. Gjovik relies on respondeat superior as a basis for Apple's liability, the Court has previously explained that such liability "'should apply only to the type of injuries that as a practical matter are sure to occur in the conduct of the employer's enterprise. The employment, in other words, must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought.'" Docket No. 112 (Order at 37). In the 5AC, Ms. Gjovik suggests that the employees' misconduct "was an outgrowth of Apple's corporate culture, which emphasized silencing internal dissent at all costs." 5AC ¶ 350. However, Ms. Gjovik has failed to cite any authority indicating that corporate culture could satisfy the requirement that the challenged conduct be "engendered *by the employment*." Docket No. 112 (Order at 37) (emphasis added); *see also Lisa M. v. Henry Mayo Newhall Mem. Hosp.*, 12 Cal. 4th 291, 297-99 (1995) (stating that an employer will not be held liable for an "intentional tort that did not have a causal nexus to the employee's work"; *e.g.*, "California courts have . . . asked whether the tort was, in a general way, foreseeable from the employee's duties" or whether "the risk of tortious injury [was] inherent in the working environment or typical of or broadly incidental to the enterprise [the employer] has undertaken") (internal quotation marks omitted); *Alma W. v. Oakland Unified Sch. Dist.*, 123 Cal. App. 3d 133, 142-43 (1981) (stating that "[t]he test is not whether it is foreseeable that one or more employees might at some time act in such a way as to give rise to civil liability, but rather, whether the employee's act is foreseeable *in light of the duties* the employee is hired to perform") (emphasis in original). The 5AC does not contain specific allegations establishing the requisite causal nexus.

Ms. Gjovik also suggests that Apple could be held liable because it benefitted from the misconduct (*i.e.*, its corporate goals were furthered), *see* Opp'n at 23, and/or because it failed to intervene despite knowledge of employee misconduct. *See* 5AC ¶¶ 346, 349, Opp'n at 26. However, she fails to explain how this could satisfy the level of intent required for an intentional tort such as IIED. *See generally Christensen*, 54 Cal. 3d at 903 (stating that one element of an IIED claim is extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress). Nor does it establish the required nexus for respondeat superior.

Finally, to the extent Ms. Gjovik tries to hold Apple liable for the acts of "Joanna Appleseed" (*i.e.*, Cher Scarlett), *see* Opp'n at 28-29, a former colleague who once supported but no longer supports Mr. Gjovik, the Court noted in a previous order that Ms. Gjovik was relying on conduct taken after Ms. Scarlett was no longer an Apple employee. *See* Docket No. 73 (Order at 44). "That being the case, Ms. Gjovik [could not] argue respondeat superior as a basis to hold Apple liable. And the [then-operative pleading did] not contain any concrete allegations indicating that, post-employment, Ms. Scarlett was part of some kind of conspiracy with Apple." Docket No. 73 (Order at 44). The 5AC does not address these problems. For example, nowhere in the 5AC does Ms. Gjovik clearly point to any alleged misconduct by Ms. Scarlett while she was still an employee of Apple, nor has Ms. Gjovik alleged any concrete facts suggesting that, when Ms. Scarlett left Apple, it was some kind of ruse.

The Court, therefore, dismisses the IIED claim based on post-termination conduct, and with prejudice.

E. Retaliation Claims

In the motion to dismiss, Apple also challenges in part two of the retaliation claims – specifically, the § 1102.5 claim (Count 2) and the § 98.6 claim (Count 4),

1. Section 1102.5 Claim

Section 1102.5 is part of the California Whistleblower Act. It provides, in essence, that an employer shall not retaliate against an employee for disclosing information to the government, or to a person with authority over the employee, if the employee has reasonable cause to believe that the information discloses a violation of the law. *See* Cal. Lab. Code § 1102.5.

In its prior motion to dismiss, Apple argued that, to the extent Ms. Gjovik sought civil penalties for a violation of § 1102.5, there was a time bar. For civil penalties, there is a one-year statute of limitations. Since Ms. Gjovik was fired in September 2021, she had to bring suit by September 2022; however, she did not file suit until September 2023. The Court agreed with Apple that, as a facial matter, there was a time bar. But it noted that there might be a basis for equitable tolling under *Elkins v. Derby*, 12 Cal. 3d 410 (1974).

The California Supreme Court has held that, "whenever the

> exhaustion of administrative remedies is a prerequisite to the initiation of a civil action, the running of the limitations period is tolled during the time consumed by the administrative proceeding." *Elkins v. Derby*, 12 Cal. 3d 410, 414 (1974). It has also held that, "regardless of whether the exhaustion of one remedy is a prerequisite to the pursuit of another, if the defendant is not prejudiced thereby, the running of the limitations period is tolled '[w]hen an injured person has several legal remedies and, reasonably and in good faith, pursues one.'" *Id.*; *see also id.* at 418 (noting that "this and other courts as well as legislatures have liberally applied tolling rules or their functional equivalents to situations in which the plaintiff has satisfied the notification purpose of a limitations statute").

Docket No. 112 (Order at 12-13).

The Court therefore dismissed the claim for civil penalties for a violation of § 1102.5 but gave Ms. Gjovik leave to amend to plead *Elkins* tolling – *i.e.*, tolling for the period in which she was pursuing legal remedies in a different forum (*e.g.*, with an administrative agency). *See also* Docket No. 112 (Order at 13) (noting that, for *Elkins* tolling, a plaintiff has to prove "three elements: timely notice, and lack of prejudice, to the defendant, and reasonable and good faith conduct on the part of the plaintiff") (internal quotation marks omitted).

In the pending motion to dismiss, Apple argues that Ms. Gjovik has failed to plead *Elkins* tolling and thus the claim for civil penalties should be dismissed, this time with prejudice. In evaluating this argument, the Court must first consider whether the 5AC contains allegations that Ms. Gjovik pursued legal remedies in a different forum to address the alleged retaliation against her (*i.e.*, for disclosing violations of the law). There are such allegations. For example, Ms. Gjovik alleges that she filed complaints with (1) EPA, California EPA, and the U.S. Department of Labor, *see* 5AC ¶ 230; (2) the NLRB, *see* 5AC ¶ 230; (3) the California Department of Labor and the U.S. Department of Labor, *see* 5AC ¶¶ 230-31; and (4) the U.S. Department of Justice, the U.S. EEOC, and California DFEH. *See* 5AC ¶ 233. Although not entirely clear, the complaints seemed to have included complaints that she was being retaliated against for disclosing violations of the law.

Although Ms. Gjovik has made reference to various agencies with whom she was pursuing legal remedies, she expressly asserts equitable tolling based on a filing(s) made with one agency only, *i.e.*, the California Department of Labor/Department of Industrial Relations:



United States District Court
Northern District of California

Case: 26-4716, 11/13/2026, DktEntry: 10.1, Page 123 of 238

> For California Labor Code §§ 98.6 and 1102.5, any issues with statute of limitations related to the claims or remedies (i.e., penalties/fines) are equitably tolled by Plaintiff's timely complaints sitting in the California Department of Labor queue for years before Plaintiff kicked the claims out into this lawsuit. This lawsuit replaced the California Department of Labor DIR case *Ashley Gjovik v Apple Inc*, RCI-CM-842830. Plaintiff filed the first claim on August 29 2021, before Apple terminat[ed] her employment.

5AC ¶ 205; *see also* Opp'n at 29 ("Plaintiff filed a complaint with the California Department of Industrial Relations (DIR) in August 2021, which tolled the statute of limitations for [the § 1102.5] claim. The DIR complaint sufficiently put Defendant on notice of Plaintiff's retaliation claims, which involved reporting workplace safety violations and environmental hazards."). Given that Ms. Gjovik is limiting herself to the DIR complaint(s), the Court need not consider other complaints she made to different agencies for purposes of *Elkins* tolling.

Ms. Gjovik's allegation above about the DIR complaint(s) is, admittedly, a bit vague. Although she explicitly refers to one specific complaint (RCI-CM-842830) – made before Apple terminated her employment – she also indicates that she made more than one complaint (*e.g.*, mentioning "timely complaint*s*" and "the *first* claim"). Given that Ms. Gjovik is pro se, the Court does not limit her to solely the one specific complaint identified above. This is especially true since, in a prior filing made with the Court, located at Docket No. 35-5, Ms. Gjovik provides not just the DIR complaint made *before* she was fired but also the DIR complaint made *after* she was fired. The latter complaint has the case number RCI-CM-846638 and was filed on September 29, 2021. The Court will consider both DIR complaints.

Consideration of both of these DIR complaints is important because one of Apple's arguments is that the first DIR complaint, taken alone, did not give Apple "timely notice" as required by *Elkins*. "The timely notice requirement essentially means that the first claim [where legal remedies were being pursued] must have been filed within the statutory period. Furthermore[,] the filing of the first claim **must alert** the defendant in the second claim [*i.e.*, the lawsuit under consideration] of the need to begin investigating the facts which form the basis for the second claim." *Hopkins v. Kedzierski*, 225 Cal. App. 4th 736, 747 (2014) (internal quotation marks omitted; emphasis added). According to Apple,



United States District Court
Northern District of California

United States District Court
Northern District of California

> the August 2021 DIR Complaint did not put Apple on notice to investigate the facts that form her Section 1102.5 claim. The August 2021 DIR Complaint contains a general allegation that Plaintiff was retaliated against for "rais[ing] concerns about work place safety" (see Dkt. 35-5 at 5-7) but does not reference retaliation for complaining about the myriad alleged violations of the law on which Plaintiff's Section 1102.5 claim relies.

Mot. at 16.

As noted above, the Court considers whether the timely notice requirement was made based on both DIR complaints, and not just the first. Below is information about the two complaints.

- In the first DIR complaint (RCI-CM-824830), filed in August 2021, Ms. Gjovik described the factual basis for her retaliation complaint as follows: "I raised concerns about work place safety and was told to stop speaking about my concerns. Then I was threatened, harassed, intimidated, suspended, & constructively terminated." Docket No. 35-5 (ECF Page 6).
- In the second DIR complaint (RCI-CM-846638), filed in September 2021, Ms. Gjovik described the retaliation as follows:

> 3/17: Raised concerns abt safety at my Superfund office;
> 3/22: Told to stop sharing concerns;
> 3/29: Reported intimidation to [Employee Relations] & then ER retaliated;
> Apr.: Constructive termination (HWE) by Sr Dir;
> Apr.-Jun: Still raising concerns abt safety & also abt sexism & retaliation;
> July: ER launches 2nd investigation I actually req;
> 8/3: Taking pics of safety issues;
> 8/4: ER suspends me & pressures me to stop organizing with other employees;
> 9/9: Terminated
> 9/10: NLRB affidavit abt Apple.

Docket No. 35-5 (ECF Page 9).

As indicated by the above, the second DIR complaint is more *specific* and more *expansive* than the first, suggesting retaliation for raising concerns about environmental safety specifically (given the reference to "Superfund") *and* sex discrimination and for engaging in employee organization. Given the two DIR complaints, the Court– with certain exceptions – rejects Apple's contention that the subject matter of the DIR complaint is not fairly coextensive with the subject

United States District Court
Northern District of California

matter of the § 1102.5 claim asserted in this lawsuit. The § 1102.5 claim, as pled in the 5AC, covers:

- Retaliation related to environmental safety.
  - 42 U.S.C. §§ 9610, 7622. *See* 5AC ¶ 230 & n.45. Section 9610 is an anti-retaliation provision in CERCLA: "No person shall fire or in any other way discriminate against, or cause to be fired or discriminated against, any employee . . . by reason of the fact that such employee or representative has provided information to a State or to the Federal Government, filed, instituted, or caused to be filed or instituted any proceeding under this Act, or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this Act." 42 U.S.C. § 9610(a). Section 7622 is an anti-retaliation provision in the Clean Air Act: "No employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee . . . – (1) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this Act or a proceeding for the administration or enforcement of any requirement imposed under this Act or under any applicable implementation plan . . . ." 42 U.S.C. § 7622(a).
  - 29 U.S.C. § 660. Section 660 includes an anti-retaliation provision as part of OSHA: "No personal shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any rights afforded by this Act." 29 U.S.C. § 660(c)(1).
  - 8 Cal. Code Reg. § 5194. *See* 5AC ¶ 230. This section requires, *inter alia*, "all employers to provide information to their employees about the

hazardous chemicals to which they may be exposed, by means of a hazard communication program, labels and other forms of warning, safety data sheets, and information and training." 8 Cal. Code Reg. § 5194(b)(1). With respect to information and training, the regulation states: "Employers shall provide employees with effective information and training on hazardous chemicals in their work area at the time of their initial assignment, and whenever a new chemical hazard is introduced into their work area." 8 Cal. Code Reg. § 5194(h)(1). This includes informing employees of the right "[a]gainst discharge or other discrimination due to the employee's exercise of the rights afforded pursuant to the provisions of the Hazardous Substances Information and Training Act." *Id.* § 5194(h)(2)(G)(3).

- Retaliation related to employee organization.
    - NLRA § 8(a)(1). *See* 5AC ¶ 230. Title 29 U.S.C. § 158(a)(1) provides that "[i]t shall be an unfair labor practice for an employer – (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." 29 U.S.C. § 158(a)(1). Section 157 in turn provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." *Id.* § 157.
- Retaliation related to sex discrimination.
    - 42 U.S.C. § 2000e and California Government Code § 12920. *See* 5AC ¶ 233. Related employment discrimination statutes contain anti-retaliation provisions. *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."); Cal. Gov. Code

§ 12940(h) ("It is an unlawful employment practice . . . (h) For any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.").

To be sure, in the DIR complaints, Ms. Gjovik did not mention the above laws specifically. But the "timely notice" requirement in *Elkins* focuses on whether the *factual* basis of the first claim and second claim are reasonably coextensive. *See Hopkins*, 225 Cal. App. 4th at 747 (stating that "the filing of the first claim must alert the defendant in the second claim of the need to begin *investigating the facts* which form the basis for the second claim") (emphasis added).[9] The DIR complaints give sufficient notice of alleged retaliation based workplace environmental safety and discrimination concerns expressed by Ms. Gjovik.

Notice on other matters is more problematic:

(1) Section 1102.5 provides that an employer cannot retaliate because an employee discloses to the government or to a person with authority over the employee what the employee reasonably believes to be a law violation. Although the DIR complaints suggested that she was retaliated against for presenting concerns about environmental safety and sex discrimination, she claimed she was retaliated against for *engaging* in employee organization – not for *disclosing information* about a law violation related to employee organization.

(2) Ms. Gjovik's § 1102.5 claim includes an allegation that complained to Apple

---

[9] In this regard, an analogy to Title VII can be made. *See Sydnor v. Fairfax Cty., Va.*, 681 F.3d 591, 594 (4th Cir. 2012) ("[A]n 'administrative charge of discrimination does not strictly limit a Title VII suit which may follow.' Instead, so long as 'a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation,' she 'may advance such claims in her subsequent civil suit.'"); *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002) ("Although allegations of discrimination not included in a plaintiff's EEOC charge generally may not be considered by a federal court, subject matter jurisdiction extends over all allegations of discrimination that either 'fell within the scope of the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'").



United States District Court
Northern District of California

management about violations of the California Constitution's right to privacy. *See* 5AC ¶ 232 (also alleging that she "shared concerns with a report for an advocacy article in August 2021 . . . and made complaints on social media in August-September 2021"). However, neither DIR complaint seems to mention anything about privacy rights, let alone retaliation for complaining about a violation of privacy rights.

Taking into account all of the above, the Court concludes that, in part, there is not a time bar for civil penalties under § 1102.5 (at least for purposes of 12(b)(6)). However, there is a time bar to the extent civil penalties are sought for retaliation based on complaints made about violation of privacy rights. That was a subject matter not pursued with the DIR. In addition, even though the DIR complaints did reference retaliation for *engaging* in employee organization, § 1102.5 only bars retaliation for *disclosing information* about law violations. Section 1102.5 concerns disclosures only. In short, the § 1102.5 claim for civil penalties as pled is not time barred for alleged retaliation based on disclosing information about law violations related to workplace environmental safety and sex discrimination, but is barred for alleged retaliation for organizing Apple employees and violation of her privacy rights.

2. Section 98.6 Claim

California Labor Code § 98.6 provides that

> [a] person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee . . . because the employee . . . engaged in any conduct delineated in this chapter . . . or because the employee . . . has filed a bona fide complaint or claim . . . under or relating to their rights that are under the jurisdiction of the Labor Commissioner . . . or because of the exercise by the employee . . . on behalf of themselves or others of any rights afforded them.

Cal. Lab. Code § 98.6(a).

In the 5AC, Ms. Gjovik alleges that Apple violated § 98.6 by retaliating against her for filing her DIR complaint in August 2021. *See* 5AC ¶ 239. She also alleges that Apple violated § 986 because it retaliated against her for exercising her rights as provided for in California Labor Code §§ 232, 232.5, and § 96(k). *See* 5AC ¶¶ 243-55.



United States District Court
Northern District of California

- Under § 232(c), "[n]o employer may . . . (c) Discharge, formally discipline, or otherwise discriminate against an employee who discloses the amount of his or her wages." Cal. Lab. Code § 232(c).
- Under § 232.5(c), "[n]o employer may . . . (c) Discharge, formally discipline, or otherwise discriminate against an employee who discloses information about the employer's working conditions." *Id.* § 232.5(c).
- Under § 96(k), "[t]he Labor Commissioner . . . shall, upon the filing of a claim therefor by an employee . . . with the Labor Commissioner, take assignments of . . . (k) Claims for loss of wages as the result of demotion, suspension, or discharge from employment for lawful conduct occurring during nonworking hours away from the employer's premises." *Id.* § 96(k). The 5AC indicates that the "lawful conduct occurring during nonworking hours away from the employer's premises" included Ms. Gjovik "complaining on social media and to the press" about (1) "unlawful and unethical surveillance and invasions of privacy by Apple", (2) "the environmental crimes she witnessed" and suffered in her apartment and office, and (3) Apple's intimidation and threats based on her advocacy for crime victim's rights (with Ms. Gjovik also being a victim of Apple's crimes). 5AC ¶¶ 252-54.

a. Civil Penalties

For the § 98.6 claim, Apple launches two arguments. The first argument is that, similar to above, any claim for civil penalties is subject to a one-year statute of limitations and thus there is a time bar. Apple asserts that *Elkins* tolling does not apply because the subject matter of the DIR complaint in August 2021 does not match the subject matter of the § 98.6 claim.

Apple's argument has partial merit. First, neither DIR complaint (*i.e.*, the one in August 2021 or the one in September 2021) contends that Ms. Gjovik was retaliated against for making the August 2021 complaint. Indeed, it would have been impossible for Ms. Gjovik to contend in the August 2021 DIR complaint that she was retaliated against for making that complaint.

Second, neither DIR complaint mentions "unlawful and unethical surveillance and invasions of privacy by Apple" or intimidation and threats based on her advocacy for crime

United States District Court
Northern District of California

victim's rights. 5AC ¶¶ 252, 254.

However, the DIR complaints do mention retaliation because Ms. Gjovik engaged in employee organization (which Apple plausibly would have known was related to wages) and had made complaints about environmental safety.

Therefore, the Court grants in part and denies in part the motion to dismiss the claim for civil penalties for a violation of § 98.6. In short, the § 98.6 claim for civil penalties as pled is not time barred for alleged retaliation related to employee organization and complaints about environmental safety but is barred for alleged retaliation related to the August 2021 complaint, privacy violations, and advocacy for crime victim's rights.

b. <u>Section 232 and 232.5 Violations – Apple's Knowledge of Ms. Gjovik's Conduct</u>

Apple's second challenge to the § 98.6 claim focuses on Ms. Gjovik's assertion that Apple retaliated against because she was exercising her rights under §§ 232 and 232.5 (*e.g.*, engaging with other employees about wages paid by Apple). *See* 5AC ¶¶ 243-44 (alleging that, in July and August 2021, Ms. Gjovik participated in a pay survey among coworkers on Slack (where she suggested that a question should be included about gender) and that, in August 2021, she "openly discussed her wages on social media and encouraged her coworkers to do the same"). In its prior order, the Court noted that, for this part of the § 98.6 claim to be viable, there had to be allegations that Apple knew Ms. Gjovik was engaging in this activity. Without such knowledge, it could not retaliate against her for engaging in the activity. *See* Docket No. 112 (Order at 22) ("The §§ 232 and 232.5 claims – to the extent based on disclosure of wages – shall be dismissed but with leave to amend (i.e., so that Ms. Gjovik can allege knowledge on the part of Apple of the wage disclosure).").

In the motion to dismiss, Apple argues that Ms. Gjovik has still failed to allege knowledge on the part of the company of either her participation in pay surveys on Slack or her discussion of wages on social media. *See* Mot. at 18 (arguing that Ms. Gjovik "does not allege that Apple (and certainly not anyone at Apple who would have been in a position to control the terms or conditions of her employment) knew about those alleged social media posts"). Ms. Gjovik's opposition brief

is not particularly helpful in evaluating Apple's argument. The 5AC, however, does contain some allegations that suggest knowledge on the part of Apple. For example:

- The timing of events suggest Apple knew about Ms. Gjovik's activity. In August 2021, "the day after she shared a post on Slack referencing Apple's policies on employees' right to speak freely about wages, hours, and working conditions," Apple placed her on leave. 5AC ¶ 245.
- Apple knew about the survey because it shut the survey down. *See* 5AC ¶ 246. Presumably, Ms. Gjovik is suggesting that, if Apple knew about the survey, it can reasonably be inferred it knew who participated in and/or was involved with the survey.
- Apple's shutting down the survey garnered press attention. Presumably, Ms. Gjovik is suggesting that, given the publicity over the survey and its shutdown, Apple was likely to know who participated in and/or was involved with the survey.

For purposes of 12(b)(6), Ms. Gjovik has alleged enough to support knowledge – particularly based on the first and second bullet points above.

F. Outside Scope of the Amendment

As discussed above, the Court has granted in part Apple's motion to dismiss. Specifically, it has:

(1) dismissed the environmental safety claims (private nuisance and IIED based on fear of cancer) based on the statute of limitations;

(2) dismissed the IIED claim based on post-termination conduct because the alleged misconduct is not outrageous as a matter of law and/or because there is no sufficient factual connection to Apple or a legal basis to hold Apple liable; and

(3) dismissed in part the claims for civil penalties for violations of § 1102.5 and § 98.6 based on the statute of limitations.

The only issue remaining is whether Ms. Gjovik has – as claimed by Apple – made amendments outside the scope permitted by the Court.

To the extent Apple argues Ms. Gjovik has made amendments outside the scope related to

United States District Court
Northern District of California

her environmental safety claims or her IIED claim based on post-termination conduct, that argument is moot. Those claims are dismissed for the reasons stated above.

Apple, however, still contends that Ms. Gjovik made amendments outside the scope permitted for the § 1102.5 and § 98.6 claims. Here, the only amendment that is problematic is the following: for the § 98.6 claim related to wage disclosures, Ms. Gjovik alleges in ¶ 246 that she "shared information and commented on Twitter about an earlier U.S. Department of Justice lawsuit against Apple for illegal wage-fixing practices." 5AC ¶ 246. That factual allegation is stricken as wage fixing is a subject matter not implicated in any previous complaint.

The other amendments complained about by Apple, however, present a closer call – *e.g.*, new allegations about alleged adverse actions. *See* Mot. at 6. Although the Court recognizes Apple's concern – *i.e.*, that discovery is dictated by the parameters of the complaint – it is hard to say that these factual allegations are *necessarily* improper in this case because, even if not made in a prior complaint, they are still related to allegations that Ms. Gjovik *did* make in her prior complaints. The Court will not dismiss those allegations and shall rely on the good faith of the parties and/or the rulings of the discovery judge to determine the permissible scope of discovery.

G. <u>Motion to Amend (Docket No. 155)</u>

Now that the Court has resolved the motion to dismiss, it turns to Ms. Gjovik's motion to amend. The Court previously stayed briefing and a hearing on the motion to amend so that it could address first the motion to dismiss.

The Court has reviewed the motion to amend. Ms. Gjovik seeks to:

- Add claims that the Court previously dismissed with leave to amend but Ms. Gjovik did not amend. This includes: the RICO claim, the Bane Act claim, the Ralph Act claim, and the claim for nuisance per se.
- Replead claims that the Court previously dismissed with prejudice because she purportedly has new support. This includes: the claim for ultrahazardous activity and the part of the § 1102.5 claim related to privacy.
- Add new facts about the Gobbler application (related to privacy). She indicates this will strengthen one of her IIED claims because Apple has engaged in "revenge

porn."

- "Revise" her vicarious liability theory.

At the hearing, the Court stated that it was not inclined to allow any further amendment because Ms. Gjovik is already on her 5AC and the pleadings in this case need to be settled so that the litigation can proceed. Nothing in Ms. Gjovik's motion to amend alters the Court's initial views. Ms. Gjovik has had ample multiple opportunities to plead her claims. No further amendment shall be allowed absent Court order. Accordingly, the Court hereby **DENIES** the motion for leave to amend.

## III. CONCLUSION

For the foregoing reasons, the motion to dismiss is granted in part and denied in part. Based on the Court's rulings, Ms. Gjovik's case is essentially a retaliation case (Counts 1, 2, 3, and 4). Apple did not challenge Counts 1 and 3. Counts 2 and 4 have been limited with respect to civil penalties – *i.e.*, the claims for civil penalties are partially time barred.

This order disposes of Docket Nos. 145 and 155.

**IT IS SO ORDERED**.

Dated: February 27, 2025

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-04597-EMC

**ORDER DENYING PLAINTIFF'S MOTION FOR EXTENSION**

Docket No. 115

Now pending before the Court is Plaintiff's motion for an extension of time. Plaintiff asks that she be given more time to file an amended complaint. The current deadline for that filing is October 29, 2024. *See* Docket No. 112 (Order at 41). She argues that an extension is appropriate because she has appealed the Court's most recent 12(b)(6) order, *see* Docket No. 113 (notice of appeal), and the Ninth Circuit is likely to rule in her favor. She also notes that she has filed a motion to stay proceedings altogether in this Court pending her appeal before the Ninth Circuit.

Having considered the parties' briefs as well as all other evidence of record, the Court hereby **DENIES** Plaintiff's motion. The motion is denied because, even though Plaintiff has an appeal pending before the Ninth Circuit, it is unlikely that the Ninth Circuit has jurisdiction over the appeal. "The courts of appeals . . . shall have jurisdiction of appeals from all *final decisions* of the district courts of the United States . . . ." 28 U.S.C. § 1291 (emphasis added). "[A] final decision 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Hall v. Hall*, 584 U.S. 59, 64 (2018) (adding that "[t]he archetypal final decision is 'one[ ] that trigger[s] the entry of judgment'"); *see also* Moore's Fed. Prac. – Civ. § 202.02 (noting that courts have construed the term "final decisions" to mean final judgments); *United*

United States District Court
Northern District of California

United States District Court
Northern District of California

*States v. Allahyari*, 99 F.4th 486, 491 (9th Cir. 2024) (stating that finality must be given a practical construction and "a judgment will be deemed final 'if it fully adjudicates the issues and clearly evinces the district court's intention that it be that court's final act in the matter'"). Here, the Court's 12(b)(6) order did not end the case in its entirety as there are still claims remaining in the case that have not been dismissed as well as claims that the Court has allowed Plaintiff to amend. *Cf.* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

Furthermore, although 28 U.S.C. § 1292 allows for appeals of interlocutory orders in some instances, such appeals are very limited in nature. *See, e.g.*, *Carson v. Am. Brands*, 450 U.S. 79, 84 (1981) (stating that, "[f]or an interlocutory order to be immediately appealable under § 1292 (a)(1), however, a litigant must show more than that the order has the practical effect of refusing an injunction[;] [b]ecause § 1292 (a)(1) was intended to carve out only a limited exception to the final-judgment rule, we have construed the statute narrowly to ensure that appeal as of right under § 1292 (a)(1) will be available only in circumstances where an appeal will further the statutory purpose of '[permitting] litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence'").

Because it is unlikely that Plaintiff's appeal is proper, an extension of time for Plaintiff to file an amended complaint is delay that is unwarranted. However, to ensure that there is no prejudice to Plaintiff (*e.g.*, if she were waiting for this Court's decision), the Court shall give Plaintiff one additional week to file her amended pleading, and, correspondingly, Defendant shall have one additional week to file a response to the amendment. More time is not warranted given that the Court already gave Plaintiff four weeks to amend and Plaintiff could have moved for relief earlier. In this regard, the Court notes that Plaintiff filed her notice of appeal the same day that the Court issued its order. At or about that time, Plaintiff could have asked for an extension of time. Instead, she waited for another three weeks – and when her amendment was due only a week later – to seek relief.

Case: 26-4716, 11/13/2026, DktEntry: 10.1, Page 136 of 233

Plaintiff has, in the alternative, asked for leave to file a 200-page amended complaint. The Court has limited Plaintiff to 75 pages. Plaintiff asserts that a pleading of 200 pages is necessary for two reasons: "to 1) retain the claims dismissed with prejudice for the sake of preserving error for later appeal, and to 2) ensure adequate pleading of claims that were given leave to amend." Mot. at 2. This alternative request for relief is also denied. As Defendant points out, she does not need to replead dismissed claims in order to preserve them for appeal. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc) ("For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal."); *Najarian Holdings LLC v. Corevest Am. Fin. Lender LLC*, No. 20-cv-00799-PJH, 2020 U.S. Dist. LEXIS 188667, at *24 (N.D. Cal. Oct. 9, 2020) ("The Ninth Circuit does not require plaintiffs to replead claims that were dismissed with prejudice in an amended complaint in order to preserve them for appeal."). Moreover, as this Court has previously noted, this is not the kind of case that warrants a pleading of that length. Although there is a long history between Plaintiff and Defendant, the gist of her claims is that Defendant has engaged in conduct detrimental to environmental safety and that Defendant retaliated against her when she complained about this conduct as well as other conduct by the company. Federal Rule of Civil Procedure 8 simply requires:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

Case: 26-4716, 11/13/2026, DktEntry: 10.1, (137 of 233)

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a).

This order disposes of Docket No. 115.

**IT IS SO ORDERED**.

Dated: October 25, 2024

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

ASHLEY M GJOVIK,
Plaintiff,

v.

APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS; DENYING DEFENDANT'S MOTION TO STRIKE; AND GRANTING PLAINTIFF'S MOTION TO STRIKE**

Docket Nos. 78-79, 101

Plaintiff Ashley Gjovik, proceeding pro se,[1] is a former employee of Defendant Apple, Inc. She started to work for Apple in February 2015 and was ultimately terminated on September 9, 2021. On September 7, 2023, about two years after she was fired, she initiated this lawsuit. In the operative fourth amended complaint ("4AC"), Ms. Gjovik asserts thirteen different claims against Apple, all predicated on state law. For the most part, the claims fall into two basic categories: (1) Apple engaged in environmentally unsafe conduct that harmed Ms. Gjovik and (2) Apple retaliated against Ms. Gjovik – including by terminating her from employment – because she complained about certain company conduct, including but not limited to environmentally unsafe conduct.

Now pending before the Court are three motions: (1) a motion to dismiss filed by Apple, targeted at eleven of the thirteen claims (either in whole or in part); (2) a motion to strike filed by Apple; and (3) a motion to strike filed by Ms. Gjovik. Having considered the parties' briefs and accompanying submissions, the Court hereby **GRANTS** in part and **DENIES** in part Apple's

[1] Ms. Gjovik appears to have a J.D. from Santa Clara University.

motion to dismiss, **DENIES** Apple's motion strike, and **GRANTS** Ms. Gjovik's motion to strike.

## I. FACTUAL & PROCEDURAL BACKGROUND

The factual allegations in the 4AC largely replicate the factual allegations in the prior third amended complaint ("TAC"). As the Court stated in its prior order, the main categories of alleged misconduct by Apple are as follows:

> (1) During her employment with Apple, Ms. Gjovik lived in an apartment near an Apple factory (known as the ARIA factory) and became ill because the factory released toxic substances into the environment.
>
> (2) Ms. Gjovik's office at Apple (known as Stewart 1) was located on a contaminated site subject to EPA regulation, *i.e.*, a Superfund site, and she became ill because of Apple's actions/omissions related to the site.
>
> (3) Apple made employees, including Ms. Gjovik, participate in studies related to Apple products that were invasive to their privacy.
>
> (4) Apple retaliated against Ms. Gjovik for making complaints about harassment and environmental safety. Ms. Gjovik's complaints included internal complaints, complaints to governmental agencies, complaints to the press, and complaints made in social media. The retaliation by Apple included but was not limited to the termination of Ms. Gjovik from employment.

Docket No. 73 (Order at 2).

Based on, *inter alia*, the above allegations, Ms. Gjovik asserts the following causes of action in the 4AC:

(1) Wrongful termination in violation of public policy.

(2) Violation of the California Whistleblower Act. *See, e.g.*, Cal. Lab. Code § 1102.5(b) (providing that an employer "shall not retaliate against an employee for disclosing information . . . to [*inter alia*] a government or law enforcement agency [or] to a person with authority over the employee . . . if the employee has reasonable cause to believe that the information discloses a violation of a state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation").

(3) Violation of California Labor Code § 6310. *See, e.g.*, *id.* § 6310(a) (providing

that "[n]o person shall discharge or in any manner discriminate against any employee because the employee has [*e.g.*] [m]ade any oral or written complaint to the [Division of Occupational Safety and Health] [or] other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health").

(4) Violation of California Labor Code § 6399.7. *See id.* § 6399.7 (providing, *inter alia*, that "[n]o person shall discharge or in any manner discriminate against, any employee because such employee has filed any complaint . . . under or related to the provisions of this chapter [*i.e.*, the Hazardous Substances Information and Training Act]").

(5) Violation of California Labor Code § 98.6. *See id.* § 98.6(a) (providing that "[a] person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee . . . because the employee . . . engaged in any conduct delineated in this chapter . . . or because the employee . . . has filed a bona fide complaint or claim . . . under or relating to their rights that are under the jurisdiction of the Labor Commissioner . . . or because of the exercise by the employee . . . on behalf of themselves or others of any rights afforded them").

(6) Violation of California Labor Code §§ 232, 232.5, 1101, and 1102. *See id.* § 232 (providing, *inter alia*, that an employer may not "[r]equire, as a condition of employment, that an employee refrain from disclosing the amount of his or her wages"); *id.* § 232.5 (providing, *inter alia*, that an employer may not "[r]equire, as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions"); *id.* § 1101 (providing, *inter alia*, that an employer shall not "make, adopt, or enforce any rule, regulation or policy . . . [c]ontrolling or directing, or tending to control or direct the political activities or affiliations of employees"); *id.* § 1102 (providing that "[n]o employer shall coerce or influence . . . his employees

United States District Court
Northern District of California

through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity").

(7) Violation of California Labor Code § 96(k). *See id.* § 96(k) (providing that the Labor Commissioner "shall, upon the filing of a claim therefor by an employee, . . . take assignments of . . . [c]laims for loss of wages as the result of demotion, suspension, or discharge from employment for lawful conduct occurring during nonworking hours away from the employer's premises").

(8) Breach of the implied covenant of good faith and fair dealing.

(9) Violation of California Business & Professions Code § 17200.

(10) Intentional infliction of emotional distress – "traditional."

(11) Creation and maintenance of a private nuisance at the ARIA factory.

(12) Strict liability for ultrahazardous activities at the ARIA factory.

(13) Intentional infliction of emotional distress – fear of cancer.

Apple has challenged all of the above claims, either in whole or in part, except for the first and third causes of action.

## II. <u>DISCUSSION</u>

### A. <u>Legal Standard</u>

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and

United States District Court
Northern District of California

construe[s] the pleadings in the light most favorable to the nonmoving party."[2] *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

B. Rule 12(g)(2)

Before the Court considers the specific arguments made by Apple in its motion, and Ms. Gjovik's responses thereto, it notes that there is a procedural matter that affects several, although not all, claims. Specifically, in the pending motion to dismiss, which targets the 4AC, Apple makes arguments that it *could* have made in its prior motion to dismiss the TAC but did not.

---

[2] On a motion to dismiss, a court generally limits its review to the four corners of the complaint. *See Van Buskirk v. Cnn*, 284 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss."); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[W]hen the legal sufficiency of a complaint's allegations is tested by a motion under Rule 12(b)(6), 'review is limited to the complaint.'"). Accordingly, the Court does not consider the declaration filed by Cher Scarlett at Docket No. 99 (and grants Ms. Gjovik's motion to strike the same). For the same reasons, the Court does not consider the bulk of the Gjovik Declaration, including Exhibits D-F thereto.

Exhibits A-C attached to the Gjovik Declaration are documents that Ms. Gjovik created for the asserted purpose of helping the Court understand the history of her claims. They are more in the nature of attorney argument and theoretically could be considered. The Court, however, largely finds the exhibits unhelpful. Moreover, the exhibits arguably reflect an attempt on the part of Ms. Gjovik to get around the page limits on briefing.

Finally, a court may take judicial notice of documents, if appropriate, on a 12(b)(6) motion. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (noting that a court may "consider materials outside a complaint" at the 12(b)(6) phase if it can, e.g., take judicial notice of materials). Ms. Gjovik has filed a request for judicial notice ("RJN") implicating fifteen documents. They include a report issued by the EPA on the ARIA factory (Exhibit A); an article on hazardous production gases (Exhibit C); and chemical safety cards for gases (Exhibit E). It is questionable whether all of the documents can be judicially noticed (*e.g.*, the articles). However, the bigger problem for Ms. Gjovik is that she has failed to explain how the RJN is relevant to the arguments made in her opposition brief. To be clear, the opposition does contain references to the RJN but those references are not followed by any concrete explanation of how the documents at issue are relevant. Thus, at the end of the day, the RJN is largely unhelpful, too.

United States District Court
Northern District of California

United States District Court
Northern District of California

Notably, this includes challenges to claims pled in the 4AC that Apple did not challenge when pled in the prior TAC (*e.g.*, the claim that the ARIA factory constituted a private nuisance and the claim that Apple violated certain protections provided by California Labor Code §§ 232 and 232.5).

Ms. Gjovik argues that any of these arguments that could have been made, but were not, should be entirely disregarded. In support, she cites Federal Rule of Civil Procedure 12(g)(2). That rule provides as follows: "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). The exception identified in Rule 12(h)(2) provides: "[f]ailure to state a claim upon which relief can be granted . . . may be raised: (A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or at trial." Fed. R. Civ. P. 12(h)(2).

As a facial matter, Rule 12(g)(2) does lend support to Ms. Gjovik's position. However, in *In re Apple iPhone Antitrust Litigation*, 846 F.3d 313 (9th Cir. 2017), the Ninth Circuit explained that the rule is not as unforgiving as it might appear at first blush:

> We read Rule 12(g)(2) in light of the general policy of the Federal Rules of Civil Procedure, expressed in Rule 1. That rule directs that the Federal Rules "be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." *Denying late-filed Rule 12(b)(6) motions and relegating defendants to the three procedural avenues specified in Rule 12(h)(2) can produce unnecessary and costly delays, contrary to the direction of Rule 1.*

*Id.* (emphasis added). Accordingly, "'[a]lthough Rule 12(g) technically prohibits successive motions to dismiss that raise arguments that could have been made in a prior motion . . . courts faced with a successive motion often exercise their discretion to consider the new arguments in the interests of judicial economy.'" *Id.* at 319.

Here, the Court shall, in the exercise of its discretion, consider Apple's new arguments. If the Court were to reject consideration of the arguments through the 12(b)(6) vehicle, Apple would no doubt raise the same arguments through a 12(c) motion. As a matter of judicial economy, it makes more sense to address the arguments sooner rather than later. Furthermore, there is no

indication that Apple's new arguments are being made for purposes of delay or some other "strategically abusive purpose." *Id.* at 319-20. Rather, Apple is trying to streamline this case which, quite frankly, Ms. Gjovik has made unwieldy. Furthermore, Apple's arguments are made in good faith as reflected by the fact that the Court finds merit to Apple's motion to dismiss.

C. Ms. Gjovik's Claims

Ms. Gjovik's 4AC continues to be a sprawling pleading with many claims. She has also made her pleading messier by choosing to restructure some of her claims – in particular, her retaliation claims. For example, in the TAC, she asserted a claim for violation of California Labor Code § 98.6 which was predicated on protections provided in §§ 96(k), 232, and 232.5. *See* TAC, Count 9. However, in the 4AC, she now splits that claim up into three claims: a violation of § 98.6; a violation of §§ 232 and 232.5 (as well as §§ 1101 and 1102); and a violation of § 96(k). *See* 4AC (Counts 5-7).

As a result of the above, Apple's motion to dismiss can be difficult to follow. The Court has attempted to provide some clarity by grouping Ms. Gjovik's claims for analysis. The first group (addressed in Part II.D) consists of her **retaliation** claims. The second group (addressed in Part II.E) consists of her claims asserting injury as a result of **environmentally unsafe conditions**. These two groups seem to contain the most important claims being made by Ms. Gjovik. Finally, the last group (addressed in Part II.F) consists of her **remaining** claims.

D. Retaliation Claims

The retaliation claims are in Counts 1-7. In the motion to dismiss, Apple challenges all of the claims, either in whole or part, except for Count 1 (termination in violation of public policy) and Count 3 (violation of California Labor Code § 6310).

1. Count 2 – Claim for Violation of § 1102.5

In Count 2, Ms. Gjovik asserts a violation of the California Whistleblower Act. *See* Cal. Lab. Code § 1102.5. Section 1102.5 provides in relevant part that an employer

> shall not retaliate against an employee for disclosing information . . . to [*inter alia*] a government or law enforcement agency [or] to a person with authority over the employee . . . if the employee has reasonable cause to believe that the information discloses a violation of a state or federal statute, or a violation of or noncompliance with

United States District Court
Northern District of California

a local, state, or federal rule or regulation.

*Id.* § 1102.5(b).

In the prior TAC, Ms. Gjovik included a § 1102.5 claim. In its order addressing the TAC, the Court noted that, for the § 1102.5 claim, Ms. Gjovik made two main allegations – specifically, that Apple retaliated after she complained to various government agencies about (1) the Gobbler application and (2) environmental and safety violations. On (1), the Court held that Ms. Gjovik sufficiently alleged that the Gobbler application violated the right to privacy protected by the California Constitution; however, she failed to allege *to whom* she made complaints about the Gobbler application. On (2), Apple argued that Ms. Gjovik failed to specify which environmental or safety statutes/regulations were allegedly violated. The Court did not decide whether the failure to cite specific provisions deprived Apple of the right to fair notice about the scope of Ms. Gjovik's claims. This was because, "[a]t the hearing, Ms. Gjovik indicated that she had a list of provisions at hand, and, as the Court is already giving Ms. Gjovik leave to amend other claims, she may supplement this claim by including the specific provisions in the amended pleading." Docket No. 73 (Order at 35-36).

In the 4AC, Ms. Gjovik now alleges that Apple retaliated against her after she made complaints to, *inter alia*:

(1) Apple management, the EPA, California EPA, and the California Air Resource Board about violations of CERCLA, RCRA, and/or the Clean Air Act;

(2) the Santa Clara County DA's Office, the EPA, and Apple about fraud related to environmental crimes;

(3) the NLRB, DOL, California DOL, and Cal OSHA about violations of the NLRA, the California Labor Code, and OSHA;

(4) Apple management about violations of the right to privacy under the California Constitution;

(5) the DOJ, EEOC, and California DFEH about violations of anti-discrimination laws (on the basis of sex and disability); and

(6) her supervisors (including Mr. West and Mr. Powers) and the FBI about smuggling

United States District Court
Northern District of California

and violations of sanctions.

*See* 4AC ¶ 168.[3]

Apple now moves to dismiss in part the § 1102.5 claim.

a. <u>Beyond the Scope of Amendment</u>

Apple argues first that part of the claim should be dismissed because Ms. Gjovik made an amendment to the claim beyond the scope permitted by the Court. Specifically, in the 4AC, Ms. Gjovik alleges that she was retaliated against because she made complaints to her supervisors and the FBI about smuggling and sanctions violations. *See* 4AC ¶ 168. Apple asserts that this factual predicate was never part of the § 1102.5 claim in the TAC and the Court never permitted Ms. Gjovik to add new factual predicates to the § 1102.5 claim.

Apple's argument has merit. To be clear, the prior TAC did mention smuggling and sanctions violations. *See, e.g.*, TAC ¶ 84 (alleging that, in September 2021, Ms. Gjovik "told the FBI about Apple's involvement in concealing possible sanctions violations and smuggling[;] in the crime field, she wrote: '*Possible violations of sanctions against Syria, possible cover-up of that knowledge, retaliation for reporting concerns about said violation and coverup*'") (emphasis in original). However, Ms. Gjovik's allegations about smuggling and sanctions violations were made in support of the SOX claim (which the Court ended up dismissing with prejudice), not in support of the § 1102.5 claim. *See* TAC ¶¶ 167-68 (SOX claim).

Ms. Gjovik cannot avoid this problem simply because her § 1102.5 claim, as pled in the TAC, contained the allegation that "Plaintiff re-alleges and incorporates by reference each and every allegation set forth above, as though fully set forth in this Claim for Relief." TAC ¶ 204 (§ 1102.5 claim). She shall not be rewarded for this generic allegation, particularly in light of her long and difficult-to-follow complaint. Furthermore, the § 1102.5 claim, as pled in the TAC, clearly had a different focus. She asserted retaliation for three reasons only: "Reporting Unlawful Labor/Employment Conduct," "Reporting Environmental & Safety Violations," and "Refusal to Participate in Unlawful Conduct." *See* TAC ¶¶ 208-12. She did not identify smuggling and

[3] The list in ¶ 168 is longer; the above provides some examples only.



United States District Court
Northern District of California

sanctions violations.

To the extent Ms. Gjovik suggests she should be now allowed to amend to include the factual predicate, the Court does not agree. Ms. Gjovik has filed five pleadings at this point. The Court shall not allow her to continue to modify her positions.

b. Failure to Address Deficiencies Identified in Court Order

Apple argues next that more of the § 1102.5 claim should be dismissed because, when the Court considers the amendment that it *did* permit to the claim, Ms. Gjovik failed to address – in large part – the deficiencies identified by the Court in the TAC. According to Apple:

(1) Ms. Gjovik still fails to specify to whom she made complaints about the Gobbler application; she mentions "Apple management" only.

(2) In multiple instances, Ms. Gjovik does not specify which statutes/regulations were allegedly violated. While Ms. Gjovik does reference some specific statutes/regulations in the 4AC, she also continues to cite to *entire* statutory frameworks – *e.g.*, for CERCLA, RCRA, and the Clean Air Act.

Apple's arguments again have merit. As to (1), Ms. Gjovik contends that Apple is trying to get her to "publicly name who at the company she raised the Gobbler issue to prior to taking it public, despite having said it would fire anyone involved in making Gobbler public – thus demanding Gjovik immediately snitch on her coworker, knowing Apple's lawyers may then fire that person." Opp'n at 11. This argument does not make sense. In the 4AC, Ms. Gjovik asserts that she complained to "Apple management," not a coworker. In any event, regardless of the status of the person to whom she complained, Ms. Gjovik does not have the right to unilaterally decline to disclose the identity of the person. The issue here is one of fair notice to Apple so that it can defend itself, and Ms. Gjovik did not even ask for any protective measures such as disclosure to outside counsel only. Finally, it is notable that Ms. Gjovik did not raise any concern about snitching in the prior 12(b)(6) round. Accordingly, the Court dismisses from the § 1102.5 claim the factual predicate that Ms. Gjovik was retaliated against because she made complaints about privacy rights being violated as a result of the Gobbler application.

As for (2), Ms. Gjovik asserts that she has a valid claim so long as she reasonably believed,

at the time of her complaint, that there was a violation of the law; she did not have to know at the time what laws exactly were being violated. *See*, *e.g.*, Opp'n at 10 (arguing that a layperson "probably will not know exactly what laws are being violated down to the statute"). The problem for Ms. Gjovik is that Apple is not arguing such. Rather, Apple is making a different point: as a matter of fair notice, Ms. Gjovik now, *as part of litigation*, has to identify specific statutes/regulations so that Apple can properly defend itself. *See Ling La v. San Mateo County Transit Dist.*, No. 14-cv-01768-WHO, 2014 U.S. Dist. LEXIS 131316, at *18 (N.D. Cal. Sept. 16, 2014) (holding that "[plaintiff's] allegation that she disclosed conduct in violation of the Davis-Bacon Act, related federal statutes, and related regulations is . . . insufficient" because "[t]he point of notice pleading is to 'give the defendant fair notice of what the claim is and the grounds upon which it rests,'" and plaintiff's "citation *to a whole statutory framework* does not serve this purpose, in particular where [plaintiff] does not use her opposition brief to clarify the specific statutes and regulations that were violated") (emphasis added).

Apple's position has merit, at least to the extent that all that Ms. Gjovik does is cite an entire statutory framework, without reference to any kind of benchmark (*e.g.*, CERCLA, RCRA, and the Clean Air Act). *See* 4AC ¶ 168. In her papers, Ms. Gjovik contends that, at least in some instances, she cannot provide any more specific information on statutes or regulations because

> CERCLA oversight is implemented through tailored settlements, contracts, and restrictive covenants – not regulations. Plaintiff challenged land use covenants, records of decision, and other contractual matters related to the CERLA site [and] Apple is aware of what those claims are from the emails Plaintiff sent them, the US EPA investigation into her claims and finding Apple at fault in [a] number of ways, including documented on formal reports.

Opp'n at 6. But assuming that is the benchmark, then it is not clear why Ms. Gjovik did not identify that benchmark in the 4AC, and with some specificity (*e.g.*, which tailored settlements, contracts, and restrictive covenants). Again, the issue here is one of fair notice to Apple. Furthermore, it is not sufficient for Ms. Gjovik to refer to documents outside the complaint for additional details because those documents do not define the scope of the complaint.

To the extent Ms. Gjovik suggests that she was waiting for a report from the EPA to put in more specifics, *see* Opp'n at 10 (asserting that she was "waiting to receive the results of the US

EPA Enforcement inspection report before making a conclusive statement"; adding that "[t]he report was released last month and found "several . . . violations" of "statutes that provide both civil and criminal enforcement"), that makes no sense. Ms. Gjovik should have been able to provide more specifics regardless of what the EPA found. It is also notable that Ms. Gjovik did not assert this excuse (*i.e.*, that she had to wait for the EPA report) during the prior 12(b)(6) hearing.

Accordingly, the Court dismisses any part of the § 1102.5 claim where all that Ms. Gjovik does is cite wholesale to a statutory framework. That includes general reference to CERCLA, RCRA, and the Clean Air Act without any degree of further specificity. Ms. Gjovik still has a § 1102.5 claim (albeit more limited) to the extent she does cite some statutes/regulations in her pleading. *See* 4AC ¶ 168.

Because Ms. Gjovik has failed to cure deficiencies previously identified by the Court, the Court's dismissal here is with prejudice.

c. Time Bar on Civil Penalties

Finally, Apple argues that, for the part of the § 1102.5 claim it does not challenge on the grounds noted above, Ms. Gjovik still cannot seek any civil penalties as relief because they are time barred.[4] *See* 4AC, Prayer for Relief ¶ viii (asking for a civil penalty of $10,000 per employee for each violation of California Labor Code § 98.6 and § 1102.5).[5] In support of this position,

---

[4] A contention that a claim is time barred is an affirmative defense, and ordinarily a plaintiff need not plead on the subject of an anticipated affirmative defense. But when an affirmative defense is apparent on the face of a complaint, a defendant may raise that defense in a motion to dismiss. *See Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013).

[5]

> Two categories of remedies exist for violations of . . . § 1102.5. The first is a civil penalty. *Id.* § 1102.5(f) ("In addition to other penalties, an employer that is a corporation or limited liability company is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation of this section."). The second is a claim for damages. *Id.* § 1105 ("Nothing in this chapter shall prevent the injured employee from recovering damages from his employer for injury suffered through a violation of this chapter."); *see also Gardenhire v. Hous. Auth.*, 85 Cal. App. 4th 236, 241 (2000) (recognizing a right of action for damages for violations of § 1102.5); Cal. Sen. Judiciary Comm., Analysis of S.B. 777 (Apr. 8, 2003) (recognizing that § 1102.5 provides for recovery of

United States District Court
Northern District of California

Apple cites California Code of Civil Procedure § 340(a). Section 340(a) provides for a *one*-year limitations period for "[a]n action upon a statute for a penalty or forfeiture, if the action is given to an individual, or to an individual and the state, except if the statute imposing it prescribes a different limitation." Cal. Code Civ. Proc. § 340(a). In the case at bar, the last act of retaliation alleged by Ms. Gjovik was her termination. That occurred in September 2021. However, Ms. Gjovik did not initiate this lawsuit until *two* years later, in September 2023.[6]

As a facial matter, Apple's position has merit. *See Minor v. FedEx Office & Print Servs.*, 182 F. Supp. 3d 966, 988 (N.D. Cal. 2016) (determining that a § 1102.5 claim "must be brought within three years" unless "the suit seeks the civil penalty provided in § 1102.5(f)," in which case "the claim is subject to a one-year limitations period"). However, Ms. Gjovik suggests that there should be some kind of tolling because she was "waiting on California Dept. of Labor to start investigating her claims up until the point she removed her agency claims to this lawsuit" but "[t]he agency failed to act in a timely fashion." Opp'n at 11.

The California Supreme Court has held that, "whenever the exhaustion of administrative remedies is a prerequisite to the initiation of a civil action, the running of the limitations period is tolled during the time consumed by the administrative proceeding." *Elkins v. Derby*, 12 Cal. 3d 410, 414 (1974). It has also held that, "regardless of whether the exhaustion of one remedy is a prerequisite to the pursuit of another, if the defendant is not prejudiced thereby, the running of the limitations period is tolled '[w]hen an injured person has several legal remedies and, reasonably and in good faith, pursues one.'" *Id.*; *see also id.* at 418 (noting that "this and other courts as well as legislatures have liberally applied tolling rules or their functional equivalents to situations in

---

compensatory damages).

*Newton v. Bank of Am.*, CV 16-09581-AB (RAOx), 2018 U.S. Dist. LEXIS 228955, at *6-7 (C.D. Cal. Jan. 18, 2018).

[6] Ms. Gjovik does assert that Apple harassed her post-termination. *See* 4AC ¶ 138 ("From at least July 2021 through current day – Apple employees stalked, harassed, and tormented Gjovik . . . ."). However, Ms. Gjovik cannot base her § 1102.5 claim on post-termination conduct because she was no longer an employee and the statute provides protection only where there is an employer-employee relationship. *See* Cal. Lab. Code § 1102.5(b) ("An employer, or any person acting on behalf of the employer, shall not retaliate against an employee . . . .").

which the plaintiff has satisfied the notification purpose of a limitations statute").

> In the wake of *Elkins*, the California Supreme Court has stated that in order to prove the applicability of the equitable tolling doctrine, a party must establish "three elements: 'timely notice, and lack of prejudice, to the defendant, and reasonable and good faith conduct on the part of the plaintiff.'" """The timely notice requirement essentially means that the first claim must have been filed within the statutory period. Furthermore[,] the filing of the first claim must alert the defendant in the second claim of the need to begin investigating the facts which form the basis for the second claim. Generally this means that the defendant in the first claim is the same one being sued in the second." "The second prerequisite essentially translates to a requirement that the facts of the two claims be identical or at least so similar that the defendant's investigation of the first claim will put him in a position to fairly defend the second." "The third prerequisite of good faith and reasonable conduct on the part of the plaintiff is less clearly defined in the cases. But in *Addison v. State of California* [(1978)] 21 Cal. 3d 313[,] the Supreme Court did stress that the plaintiff filed his second claim a short time after tolling ended."""

*Hopkins v. Kedzierski*, 225 Cal. App. 4th 736, 747 (2014).

In the instant case, it is possible that there could be a basis for tolling. However, as the 4AC currently stands, there is not a basis to support such. For instance, Ms. Gjovik has not made allegations establishing that the *Elkins* rule is applicable here; nor has she made allegations supporting the three elements listed above.

The Court therefore grants the motion to dismiss the claim for a civil penalty as time barred. The only question remaining is whether the Court should give Ms. Gjovik leave to amend. Here, the Court does give leave because the time bar is a new argument raised by Apple that it could have asserted in the prior motion to dismiss but did not. Therefore, Ms. Gjovik has not yet had a chance to correct this deficiency, *i.e.*, by pleading some kind of tolling. It is not clear at this juncture that it would be futile for Ms. Gjovik to argue tolling. Any amendment permitted herein is limited to allegations supporting a tolling argument.

d. <u>Summary</u>

Apple's motion to dismiss with respect to the § 1102.5 claim is granted. The following factual predicates are eliminated from the claim (with prejudice): (1) that Ms. Gjovik complained about smuggling and sanctions violations; (2) that Ms. Gjovik complained about privacy

violations related to Gobbler; and (3) that Ms. Gjovik made complaints about violations of CERCLA, RCRA, the Clean Air Act, and any other whole statutory framework.[7] The Court's ruling here leaves Ms. Gjovik with a substantive § 1102.5 claim based on complaints made about: (1) "[v]iolations of the anti-retaliation provisions of environmental laws," specifically, 42 U.S.C. §§ 9610 and 7622 and 15 U.S.C. 2622; (2) violation of § 8(a)(1) of the NLRA; (3) violation of California General Industry Safety Order 5194; (4) violation of 29 U.S.C. § 660; (5) violation of the California Constitution's right to privacy (but not related to Gobbler); and (6) violation of 42 U.S.C. § 2000e and California Government Code § 12920. To the extent Ms. Gjovik seeks a civil penalty on this remaining portion of the § 1102.5 claim, there is a time bar, but Ms. Gjovik has leave to amend to plead tolling.

2. <u>Count 4 – Claim for Violation of the HSITA</u>

In Count 4, Ms. Gjovik asserts a violation of California Labor Code § 6399.7. Apple has moved to dismiss Count 4 in its entirety.

Section 6399.7 provides, *inter alia*, that "[n]o person shall discharge or in any manner discriminate against, any employee because such employee has filed any complaint . . . under or related to the provisions of this chapter," *i.e.*, the Hazardous Substances Information and Training Act ("HSITA"). Cal. Lab. Code § 6399.7.

Section 6362 of the HSITA covers the application of the statute. It provides as follows:

> The rights and duties set forth in this chapter apply to all employers who use hazardous substances in this state, to any person who sells a hazardous substance to any employer in this state, and to manufacturers who produce or sell hazardous substances in this state. *The provisions of this chapter apply to hazardous substances which are present in the workplace as a result of workplace operations in such a manner that employees may be exposed under normal conditions of work or in a reasonably foreseeable emergency resulting from workplace operations.*

*Id.* § 6362 (emphasis added).

The HSITA also contains the following provisions:

---

[7] For instance, in the 4AC, Ms. Gjovik alleges that she made complaints about "[f]raud related to environmental claims" and then cites a huge swath of statutes: 42 U.S.C. §§ 7401-7676; 42 U.S.C. §§ 9601-75; 42 U.S.C. §§ 11001-50; and 15 U.S.C. §§ 2601-92. *See* 4AC ¶ 168.

United States District Court
Northern District of California

- "Employers shall furnish employees who may be exposed to a hazardous substance with information on the contents of the MSDS for the hazardous substances or equivalent information, either in written form or through training programs, which may be generic to the extent appropriate and related to the job." *Id.* § 6398(b).
- "Provision shall be made for employees to be informed of their rights under this chapter and under the standard to be adopted." *Id.* § 6398(c).

In the 4AC, Ms. Gjovik alleges that she

> repeatedly complained to Apple about employee's Right to Know about chemical exposure, about Apple's duty to disclose to workers if they were disclosed and if so to what and how much, and to explain the health impacts of those chemical exposures. Apple EH&S [*i.e.*, Environmental Health & Safety] told Gjovik that Apple legal decided that Apple employees "*have no Right to Know*." Gjovik then complained about this to the US EPA and other agencies and told Apple she was complaining about them.

4AC ¶ 176 (emphasis in original).

a. <u>Beyond the Scope of Amendment</u>

As an initial matter, Apple argues that the HSITA claim should be dismissed because Ms. Gjovik did not assert such a claim in the prior TAC and she was never given leave to include a HSITA claim in the 4AC.

Although Apple's argument is not entirely lacking in merit, the Court rejects it. In the prior TAC, Ms. Gjovik asserted in Count 10 a claim for violation of California Labor Code § 6310. *See* Cal. Lab. Code § 6310(a) (providing that "[n]o person shall discharge or in any manner discriminate against any employee because the employee has [*e.g.*] [m]ade any oral or written complaint to the [Division of Occupational Safety and Health] [or] other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health"). Count 10 included a reference to the HSITA (*i.e.*, § 6399.7). Paragraph 221 of the TAC stated:

> Apple discriminated against and discharged Gjovik because Gjovik complained about safety and health conditions or practices at the workplace to Apple managers and her coworkers. Apple discriminated against and discharged Gjovik because Gjovik reported work-related injuries and illnesses and requested information about work-related injury and illness reports or records.

> Apple knew about Gjovik's complaints through conversations, emails, meeting notes, internal complaints, external complaints, public interviews, and social media posts. Gjovik complained about possible violations of and issues related to:
>
> . . . .
>
> f. Right-to-Know Protection [Cal. Labor Code § 6399.7].

TAC ¶ 221 (bracketed reference to § 6399.7 in the original).

It appears that, with the 4AC, Ms. Gjovik tried to restructure the pleading by "breaking out" the HSITA claim as a separate claim. But notably, she still seems to consider the HSITA claim as tied her § 6310 claim because she has titled the HSITA claim as "Violation of Cal. Lab. C. § 6399.7 *via § 6310*." 4AC at 52 (emphasis added). She has also alleged in the 4AC that "'[a] violation of the provisions of this section *shall be a violation of the provisions of Section 6310*.'" 4AC ¶ 176 (quoting Cal. Lab. Code § 6399.7; emphasis added).

Given these circumstances, the Court rejects Apple's contention that Ms. Gjovik made an amendment beyond the scope of the original TAC. Ms. Gjovik is not bringing a new standalone claim based on § 6399.7; rather, she is still asserting a § 6310 claim that is predicated (in part) on § 6399.7. (The Court acknowledges that Ms. Gjovik also has a separate § 6310 claim in the 4AC which is pled as Count 3.)

b. <u>Hazardous Substances Present in the Workplace as a Result of Workplace Operations</u>

Apple argues next that, even if the Court were to consider the merits of the HSITA claim, it fails for two reasons: (1) Ms. Gjovik has failed to make allegations about exposure to any "hazardous substances," as that term is defined in the statute; and (2) Ms. Gjovik has failed to allege that there was exposure "as a result of workplace operations." Cal. Lab. Code § 6362.

The Court addresses the issue in (2) first. As noted above, the HSITA provides in relevant part as follows:

> The provisions of this chapter apply to hazardous substances which are present in the workplace *as a result of workplace operations* in such a manner that employees may be exposed under normal conditions of work or in a reasonably foreseeable emergency resulting from workplace operations.

Cal. Lab. Code § 6362 (emphasis added). Here, Apple notes that the workplace is implicitly



United States District Court
Northern District of California

Stewart 1 where Ms. Gjovik's office was located. (In other words, the claim does not implicate the ARIA factory since Ms. Gjovik did not work there.) Apple then argues that Ms. Gjovik has failed to allege that there were hazardous substances in Stewart 1 "as a result of workplace operations." This is because the vapors were allegedly present in Stewart 1 based on prior contamination by prior tenants or owners, and not based on current workplace operations by Apple. *See* Mot. at 21.

Apple's position relies on a reading of § 6362 which is arguably in some tension with the purpose of HSITA. *See* Cal. Lab. Code § 6361(b) ("The Legislature . . . intends by this chapter to ensure the transmission of necessary information to employees regarding the properties and potential hazards of hazardous substances in the workplace."). On the other hand, the California legislature could have specified that the statute applies to hazardous substances present in the workplace *without* the qualifier "as a result of workplace operations," but did not. The fact that the legislature chose to use the qualifier should not be discounted. In any event, the Court need not resolve the matter definitively because, in her opposition brief, Ms. Gjovik failed to address Apple's argument. The Court therefore deems any opposition waived. Although Ms. Gjovik is a pro se litigant, she appears to have a J.D. and is thus aware of the consequences of a failure to oppose. As a practical matter, the Court notes that its ruling here has a limited impact on Ms. Gjovik's case; it simply prevents Ms. Gjovik from including the factual predicate that she complained about employees' "right to know." This ruling does not entirely bar her from asserting retaliation for reporting environmental hazards to governmental authorities.

Given the Court's ruling, it need not address Apple's argument in (1) above (*i.e.*, that Ms. Gjovik failed to make allegations about exposure to any "hazardous substances," as that term is defined in the HSITA).[8]

c. Summary

Ms. Gjovik has alleged a violation of HSITA but only as a predicate to a violation of §

[8] At the hearing, Ms. Gjovik made several references to her sur-reply in support of her opposition to the motion to dismiss the HSITA claim. The Court has stricken the sur-reply, *see* Docket No. 98 (order), and therefore Ms. Gjovik cannot rely on it.



United States District Court
Northern District of California

6310. That particular § 6310 claim is dismissed with prejudice based on Ms. Gjovik's failure to oppose a substantive argument made by Apple (*i.e.*, on exposure "resulting from workplace operations").

3. Count 5 – Claim for Violation of § 98.6

In Count 5, Ms. Gjovik alleges a violation of California Labor Code § 98.6. Section 98.6 provides in relevant part that

> [a] person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee . . . because the employee . . . engaged in any conduct delineated in this chapter . . . or because the employee . . . has filed a bona fide complaint or claim . . . under or relating to their rights that are under the jurisdiction of the Labor Commissioner . . . or because of the exercise by the employee . . . on behalf of themselves or others of any rights afforded them.

Cal. Lab. Code § 98.6(a).

In its motion to dismiss, Apple makes a limited challenge to this claim. It argues only that, to the extent Ms. Gjovik is seeking a civil penalty, *see id.* § 98.6(b)(3) (providing that, "[i]n addition to other remedies available, an employer who violates this section is liable for a civil penalty not exceeding ten thousand dollars ($10,000) per employee for each violation of this section, to be awarded to the employee or employees who suffered the violation"); 4AC, Prayer for Relief ¶ viii (asking for a civil penalty of $10,000 per employee for each violation of California Labor Code § 98.6 and § 1102.5), the claim is time barred.

The analysis above in Part II.D.1.c is applicable here. That is, Apple is correct that, under California Code of Civil Procedure § 340(a), there is a one-year limitations period for "[a]n action upon a statute for a penalty or forfeiture, if the action is given to an individual, or to an individual and the state, except if the statute imposing it prescribes a different limitation." Cal. Code Civ. Proc. § 340(a). Because Ms. Gjovik was terminated in September 2021, she should have filed by September 2022 if she wanted to include a civil penalty as relief. She did not do so. If Ms. Gjovik is asking for equitable tolling, she currently has not pled enough to support such tolling. The Court gives Ms. Gjovik leave to amend to make allegations on tolling.

4. Count 6 – Claim for Violation of §§ 232, 232.5, 1101, and 1102

In Count 6, Ms. Gjovik asserts a claim for violation of various California Labor Code statutes:

- Section 232, which provides, *inter alia*, that an employer may not "[r]equire, as a condition of employment, that an employee refrain from disclosing the amount of his or her wages." Cal. Lab. Code § 232.
- Section 232.5, which provides, *inter alia*, that an employer may not "[r]equire, as a condition of employment, that an employee refrain from disclosing information about the employer's working conditions." *Id.* § 232.5.
- Section 1101, which provides, *inter alia*, that an employer shall not "make, adopt, or enforce any rule, regulation or policy . . . [c]ontrolling or directing, or tending to control or direct the political activities or affiliations of employees." *Id.* § 1101.
- Section 1102, which provides that "[n]o employer shall coerce or influence . . . his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity." *Id.* § 1102.

Apple moves to dismiss Count 6 in part, as discussed below.

a. Beyond the Scope of Amendment

In the 4AC, Ms. Gjovik argues that Apple violated §§ 232.5, 1101, and 1102 because it retaliated against her for disclosing information about working conditions at Apple. Apple moves to dismiss the claims to the extent they are based on a specific factual predicate – *i.e.*, that it retaliated against her for making "statements to her [co-]workers about Palestinian and Muslim human rights, and [expressing] concerns about a recent article that was published alleging Apple is using Uyghur forced labor in its supply chain." 4AC ¶ 183. Apple argues that this factual predicate was never part of the prior TAC, and the Court did not give Ms. Gjovik leave to add new factual predicates to her claims.

Apple's argument has merit. And notably, in her opposition, Ms. Gjovik does not have any real response, simply arguing that she "may not have mentioned" such in "prior versions of

United States District Court
Northern District of California

her complaint – but her prior complaints were also dedicated to several large complex claims she ha[s] since dropped. Further, Apple is fully aware of the Palestine activism, as Gjovik fought with her managers and HR Business Partner over the matter in July 2021." Opp'n at 14.

To the extent Ms. Gjovik asks for leave to amend to include this factual predicate, the request is denied. Ms. Gjovik has filed five pleadings to date. She did not include the factual predicate in her original complaint or any of her amended complaints until the 4AC. Even if Apple was aware of the Palestine activism, it was not given notice in the pleadings that she has a legal claim against Apple based on that activism. Ms. Gjovik shall not be permitted to continue to modify her litigation positions on this issue.

Because the Court is not permitting an amendment here, it does not address Apple's additional arguments that there are deficiencies with the §§ 232.5, 1101, and 1102 claims to the extent they are based on the allegations related to Palestine, Muslim human rights, and Uyghur forced labor. The Court notes, however, that its ruling above does impact the §§ 1101 and 1102 claims as they seem to be based exclusively on allegations related to Palestine, Muslim human rights, and Uyghur forced labor. In other words, based on the Court's ruling above, Count 6 is now only a claim for violation of §§ 232 and 232.5.

b. <u>Claims Based on §232 and 232.5</u>

Apple argues that the §§ 232 and 232.5 claims must be dismissed to the extent they are based on allegations about disclosure of wages because Ms. Gjovik did not allege that "Apple *knew* about the alleged social media posts disclosing her wages that she contends prompted retaliation." Mot. at 23 (emphasis added); *see also* 4AC ¶ 181 ("[Ms. Gjovik] shared her wages on social media and discussed pay with her coworkers on social media in August 2021.").

In response, Ms. Gjovik suggests that she "posted on Twitter about wages at the same time Defendant was admittedly surveilling her Twitter posts." Opp'n at 14. But she does not point to any allegation that Apple admitted to surveilling or reading her Twitter posts. In her 4AC, she does suggest that Apple must have been surveilling her Twitter posts but again there are no specific facts to support this allegation.

The Court therefore dismisses the claims to the extent the claims are based on allegations

United States District Court
Northern District of California

about disclosure of wages. The only issue remaining is amendment. *See* Opp'n at 14 ("These claims were not pled in detail in the 4AC because of the page limits and because they were not challenged in a way that Plaintiff would expect they would be challenged now."). The Court gives Ms. Gjovik leave to amend to correct this deficiency since Apple presented a new argument that it never did before.

c. Summary

The §§ 232.5, 1101, and 1102 claims shall not be based on the factual predicate related to statements or expressions of concern about Palestine, Muslim human rights, and Uyghur forced labor. Because the §§ 1101 and 1102 claims are based on that factual predicate alone, they are dismissed in their entirety, and with prejudice. The §§ 232 and 232.5 claims – to the extent based on disclosure of wages – shall be dismissed but with leave to amend (*i.e.*, so that Ms. Gjovik can allege knowledge on the part of Apple of the wage disclosure).

5. Count 7 – Claim for Violation of § 96(k)

In Count 7, Ms. Gjovik asserts a claim for violation of California Labor Code § 96(k). *See* Cal. Lab. Code § 96(k) (providing that the Labor Commissioner "shall, upon the filing of a claim therefor by an employee, . . . take assignments of . . . [c]laims for loss of wages as the result of demotion, suspension, or discharge from employment for lawful conduct occurring during nonworking hours away from the employer's premises").

In the prior TAC, Ms. Gjovik included an alleged § 96(k) violation but it was part of her cause of action for violation of § 98.6. She has now in the 4AC pled a separate claim for violation of § 96(k) but she has also asserted that this claim is "via § 98.7." Section 98.7 states: "The complainant may, after notification of the Labor Commissioner's determination to dismiss a complaint, bring an action in an appropriate court, which shall have jurisdiction to determine whether a violation occurred, and if so, to restrain the violation and order all appropriate relief to remedy the violation." Cal. Lab. Code § 98.7(d)(1).

Apple argues that the § 96(k) claim should be dismissed because there is no such thing as a private right of action for violation of § 96(k) – *i.e.*, the claim cannot be brought as a "standalone." Mot. at 24. Apple is correct that there is no such thing as a standalone § 96(k) claim. *See*

*Fleeman v. County of Kern*, No. 1:20-cv-00321-NONE-JLT, 2021 U.S. Dist. LEXIS 64294, at *16 (E.D. Cal. Mar. 31, 2021) (noting that "both state and district courts alike have determined § 96(k) provides only a procedure for the Labor Commissioner and does not provide for a private right of action"); *Grinzi v. San Diego Hospice Corp.*, 120 Cal. App. 4th 72, 84 (2004) (stating that "section 96, subdivision (k), 'does not set forth an independent public policy that provides employees with any substantive rights, but rather, merely establishes a procedure by which the Labor Commissioner may assert, on behalf of employees, recognized constitutional rights'"). In spite of these authorities, Ms. Gjovik still takes the position that there *may* be a private right of action under § 96(k), but she offers no real support for the position other than public policy.

That being said, in her complaint, Ms. Gjovik has suggested that the § 96(k) claim is really being brought pursuant to § 98.7, which as noted above provides as follows: "The complainant may, after notification of the Labor Commissioner's determination to dismiss a complaint, bring an action in an appropriate court, which shall have jurisdiction to determine whether a violation occurred, and if so, to restrain the violation and order all appropriate relief to remedy the violation." Cal. Lab. Code § 98.7(d)(1). Furthermore, in her opposition, she has returned to § 98.6 as a predicate for the § 96(k) violation (as asserted in the TAC). *See* Opp'n at 17 (arguing that "[t]here is probably a private action for 96(k) via 98.6"). The latter argument has merit. *See Grinzi*, 120 Cal. App. 4th at 85 ("Section 98.6, subdivision (a) prohibits, in relevant part, termination because 'the employee . . . engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96. . . .'").

In light of the above, the Court does not view the § 96(k) claim as a true stand-alone claim. Rather, it construes the claim as a *§ 98.6 claim* predicated on § 96(k) (*i.e.*, consistent with what Ms. Gjovik pled in the TAC).

E. <u>Claims Related to Environmentally Unsafe Conditions</u>

The next group of claims brought by Ms. Gjovik are claims that relate to environmentally unsafe conditions, specifically, at the ARIA factory (located close to an apartment where Ms. Gjovik lived for a time).

- In Count 11, Ms. Gjovik alleges that the ARIA factory is a private nuisance.



United States District Court
Northern District of California

United States District Court
Northern District of California

- In Count 12, Ms. Gjovik alleges that there is strict liability because ultrahazardous activities are conducted at the ARIA factory.
- Finally, in Count 13, Ms. Gjovik alleges that Apple intentionally inflicted emotional distress on her by "deliberately vent[in]g deadly substances on [her] and then deliberately ma[king] false statements to conceal [its] actions." 4AC ¶ 241. Ms. Gjovik maintains that the severe emotional distress she has suffered includes "the fear of developing cancer." 4AC ¶ 243.

1. <u>Time Bar</u>

Apple argues that all of the claims – which are tied to environmentally unsafe conditions at the ARIA factory – are time barred. Apple maintains that each of the claims has a two-year limitations period pursuant to California Code of Civil Procedure § 340.8. That statute provides:

> In any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later.

Cal. Code Civ. Proc. § 340.8(a). Section 340.8 essentially "incorporates the discovery rule into the statute of limitations for toxic torts."[9] *Rosas v. BASF Corp.*, 236 Cal. App. 4th 1378, 1390 (2015). Apple then argues that, based on the allegations in the 4AC, Ms. Gjovik was aware of each of the elements above, or reasonably should have become aware of such, by March 2021 *at the latest*. Apple recites as follows:

- "Plaintiff alleges that she became severely ill in February 2020." Mot. at 13; *see*

---

[9] Ms. Gjovik suggests that § 340.8 is not the controlling statute on the limitations period but rather § 338(b) and/or § 335.1. *See* Opp'n at 21; *see also* Cal. Code Civ. Proc. § 338(b) (providing for a three-year limitations period for "[a]n action for trespass upon or injury to real property"); *id.* § 335.1 (providing for a two-year limitations period for "[a]n action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another"). Ms. Gjovik's reliance on § 338(b) is not on point as she is not claiming injury to real property (as opposed to personal property). *See, e.g.*, 4AC, Prayer for Relief ¶ vi (referring to "cost to replace clothing and other chattel property that were destroyed by Apple's tortfeasing"). As for her citation to § 335.1, it has the same two-year limitations period as § 340.8.

*also* 4AC ¶ 31 (alleging that Ms. Gjovik moved into her apartment on Scott Boulevard in February 2020 and "quickly became severely ill").

- "She further alleges that she discovered 'elevated levels' of chemicals in her apartment in September 2020 and that certain of the chemicals she believes were in her apartment are carcinogenic." Mot. at 13; *see also* 4AC ¶¶ 34-35 (alleging that Ms. Gjovik "discovered elevated levels of volatile organic compounds in her indoor air" in September 2020 and that she thereafter "sought out multiple occupational and environmental exposure doctors, who told [her] that all of her symptoms were consistent with solvent and other chemical exposures"; adding that, "[a]fter Gjovik discovered her medical issues at the apartment were due to a chemical emergency, [she] quickly filed complaints" with the City of Santa Clara, the California EPA and other state agencies, and the EPA); 4AC ¶ 40 (alleging that Ms. Gjovik, hired an industrial hygienist to test the indoor air in her apartment in September 2020; results showed, *e.g.*, the presence of Toluene); 4AC ¶ 242 (alleging that Apple exposed Ms. Gjovik to carcinogens such as "TCE, Toluene, Arsine, and Vinyl Chloride).
- "She further asserts that she concluded in September 2020 that 'her medical issues at the apartment were due to a chemical emergency.'" Mot. at 13; *see also* 4AC ¶¶ 34-35 (alleging that Ms. Gjovik "discovered elevated levels of volatile organic compounds in her indoor air" in September 2020 and that she thereafter "sought out multiple occupational and environmental exposure doctors, who told [her] that all of her symptoms were consistent with solvent and other chemical exposures"; adding that, "[a]fter Gjovik discovered her medical issues at the apartment were due to a chemical emergency, [she] quickly filed complaints" with the City of Santa Clara, the California EPA and other state agencies, and the EPA); 4AC ¶ 41 (alleging that, in September 2020, Ms. Gjovik "set up additional air monitors to observe the levels of VOCs in her apartment" – "though she was not aware of the factory exhaust at the time").

United States District Court
Northern District of California

- "She even alleges that she wrote and published an article on March 26, 2021 'about her chemical exposure with the air around ARIA' entitled 'I thought I was dying: My apartment was built on toxic waste' – clearly indicating that she suspected as of that date that her alleged injuries had a tortious cause." Mot. at 13; *see also* 4AC ¶ 57 (referring to article published in the SF Bay View newspaper and adding that, after the article was published, "[m]ore victims and witnesses promptly came forward," some being Apple employees).
- "She moved out of [her] apartment in October 2020." Mot. at 13; *see also* 4AC ¶ 8 (alleging that Ms. Gjovik "held a leasehold . . . in February 2020 through October 2020").

According to Apple, if Ms. Gjovik knew or should have been aware that **(1)** she was ill (an injury) **(2)** due to chemical exposure (the physical cause) **(3)** caused or contributed to by another (someone's toxic waste) – and all by March 2021 at the latest when she published her article – then she should have filed suit by March 2023, but she did not file suit until September 2023. Apple adds that the fact that Ms. Gjovik allegedly did not know the *identity* of the wrongdoer until 2023 is irrelevant because the California Supreme Court has held as follows:

> While ignorance of the existence of an injury or cause of action may delay the running of the statute of limitations until the date of discovery, the general rule in California has been that ignorance of the identity of the defendant is not essential to a claim and therefore will not toll the statute. As we have observed, "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." Aggrieved parties generally need not know the exact manner in which their injuries were "effected, nor the identities of all parties who may have played a role therein."

*Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926, 932 (1994); *see also Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) (stating that "[t]he discovery rule . . . allows accrual of the cause of action even if the plaintiff does not have reason to suspect the defendant's identity . . . because the identity of the defendant is not an element of a cause of action"; adding that, once a plaintiff is aware of a cause of action, "he normally has sufficient opportunity, within the applicable limitations period, to discover the identity") (internal quotation marks omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

In evaluating Apple's argument, the Court must take into account that § 340.8 effectively "incorporates the discovery rule into the statute of limitations for toxic torts." *Rosas*, 236 Cal. App. 4th at 1390.

> [U]nder the delayed discovery rule, a cause of action accrues and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause, **unless** the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action. In that case, the statute of limitations for that cause of action will be tolled until such time as a reasonable investigation would have revealed its factual basis.

*Fox*, 35 Cal. 4th at 803 (emphasis added).

Based on the allegations in the complaint, the Court agrees with Apple that the statute of limitations began to run at the latest by March 2021: at that time, she knew she was injured and she suspected that her injury was the result of someone else's wrongdoing – as reflected in her article published at the time.[10] *See Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988) (stating that, "[u]nder the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her"; "[s]o long as a suspicion exists, it is clear that the plaintiff must go find the facts" and "cannot wait for the facts to find her").

However, as indicated above, if Ms. Gjovik can

> plead[] and prove[] that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action . . . . , the statute of limitations for that cause of action will be tolled until such time as a reasonable investigation would have revealed its factual basis.

*Fox*, 35 Cal. 4th at 803 (emphasis added); *cf. id.* at 808 (stating that "a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury").

In the case at bar, Ms. Gjovik would have a factual basis for her environmental claims

[10] At the time that she wrote her article in March 2021, it seems Ms. Gjovik believed that her apartment was built on a toxic site. See https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/ (last visited 9/30/2024).

against Apple once she knew or suspected that the ARIA factory was the source of the chemical exposure. Apple correctly argues that a plaintiff need not know of a defendant's identity in order for the statute of limitations to begin to run. However, Ms. Gjovik still had to know or suspect that the cause of her injury was chemical exposure emanating from the factory close to her apartment – as opposed to her apartment being located on a toxic site, as she believed at the time she wrote her article in March 2021. *Cf. Fox*, 35 Cal. 4th at 813 (noting that, "if a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim").

The Court also acknowledges that a plaintiff does not have to know of "the specific causal mechanism by which he or she has been injured" in order for the statute of limitations to run – *e.g.*, "the precise manner in which a wrongdoer was negligent." *Knowles v. Superior Ct.*, 118 Cal. App. 4th 1290, 1298 (2004). But there is a difference between a specific causal mechanism and the (purported) cause itself. Even if Ms. Gjovik did not have to know the precise manner in which the factory (allegedly) leaked chemicals into the environment, she still had to know or suspect that it was the factory responsible for the incidental chemical exposure at her home, a site apart from the factory. *Cf. Rosas*, 236 Cal. App. 4th at 1391-92 (noting that, in a prior case, where plaintiff suffered injuries caused by mold exposure, delayed discovery rule was rejected; "[t]here was undisputed evidence that the plaintiff experienced severe bouts of asthma and was hospitalized in the summer of 1984, and on or before October 1984, plaintiff had her condominium unit tested for mold contamination, *retained a microbiologist to pinpoint the source of the mold*, and her husband sent a letter to the defendant stating that the flooding caused mold which caused the plaintiff to suffer extreme allergic reactions a year earlier") (emphasis added).

In the 4AC, Ms. Gjovik has alleged that she did not know about the semiconductor fabrication activities at ARIA until February 2023. *See* 4AC ¶ 149. The problem is that she has not pled any "facts to show (1) the . . . manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808. Ms. Gjovik attempted to correct this deficiency with her sur-reply, but a sur-reply is not a pleading and, in any event, it was

United States District Court
Northern District of California

stricken. *See* Docket No. 98 (order).

That the Court struck the sur-reply does not preclude the Court from giving Ms. Gjovik the opportunity to amend to correct the deficiency in her pleading. Apple contends that amendment should not be permitted because it would be a futile exercise. Specifically, Apple asserts that certain allegations Ms. Gjovik made in her prior second amended complaint ("SAC") are judicial admissions demonstrating that amendment would be futile. *Cf. In re Bang Energy Drink Mktg. Litig.*, No. 18-cv-05758-JST, 2021 U.S. Dist. LEXIS 146977, at *10 (N.D. Cal. June 30, 2021) (indicating that "factual allegations in a prior complaint are 'judicial admissions,' and 'when the party fails to provide a credible explanation for its "error," the [c]ourt may disregard the contradictory pleading").

The Court has reviewed the portions of the SAC identified by Apple. The allegations in the SAC do reflect that Ms. Gjovik knew about the ARIA factory in September 2020 and that, at that time, she seems to have considered it as a possible source of the chemical exposure – specifically, because "'[i]t was registered with the EPA for Toxic Releases (TRI).'" SAC ¶ 185. However, Ms. Gjovik goes on to allege that "[t]he prior TRI registration was for a different company and Apple did not submit their first filing until mid-2021." SAC ¶ 185. The allegations in the SAC, therefore, do not establish futility of amendment. Accordingly, the Court shall allow Ms. Gjovik to amend to address the time-bar problem.[11]

2. <u>Count 12 – Claim for Ultrahazardous Activities</u>

Apple contends that, even if there is no time bar, Count 12 at the very least should still be dismissed because Ms. Gjovik has failed to sufficiently plead ultrahazardous activities (thus giving rise to strict liability).

In its prior order on the TAC, the Court held that Ms. Gjovik's claim that there were ultrahazardous activities at ARIA survived only to the extent she had "made allegations that there are chemicals used for which there is no safe level of exposure, thus implying they are absolutely

---

[11] To the extent Ms. Gjovik asserts that there is no time-bar problem because the ARIA factory is a continuing nuisance, that argument lacks merit. Ms. Gjovik moved out of her apartment near the ARIA factory in October 2020.

prohibited under any circumstance." Docket No. 73 (Order at 29). In the pending motion to dismiss, Apple argues that, "for the first time," Ms. Gjovik identifies the "specific statutes on which she relies for the assertion that certain chemicals are 'absolutely prohibited' – yet under the plain language of those statutes, the chemicals at issue are not 'absolutely prohibited.'" Mot. at 17-18. *See, e.g.*, 17 Cal. Code Regs. § 93000 (providing that "[e]ach substance identified in this section has been determined by the State Board to be a toxic air contaminant as defined in Health and Safety Code section 39655" but finding that, for each substance, "there is not sufficient available scientific evidence to support the identification of a threshold exposure level").

In her opposition, Ms. Gjovik argues that the chemicals at issue could establish that Apple engaged in ultrahazardous activities because they are poisonous and there are multiple considerations in whether an activity is ultrahazardous – *e.g.*, "[a]n activity might be reasonably safe if performed in an isolated area, yet involve an unreasonable risk of harm if conducted in a highly populated area." Opp'n at 25. The problem for Ms. Gjovik is that she previously claimed ultrahazardous activity because Apple used chemicals for which there is *no* safe level of exposure. She is now backtracking from that position. The Court holds Ms. Gjovik to her prior position. Because Ms. Gjovik now essentially concedes that the chemicals at issue are not absolutely prohibited, the Court dismisses the claim for ultrahazardous activities, and with prejudice.

3. Count 13 – Claim for IIED

Count 13 is the claim for intentional infliction of emotional distress ("IIED").

> The elements of the tort of intentional infliction of emotional distress are: "'(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . .' Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." The defendant must have engaged in "conduct intended to inflict injury or engaged in with the realization that injury will result."

*Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991).

For Count 13, Apple argues that, even if there is no time bar, the claim is deficient because Ms. Gjovik has failed to allege that Apple's conduct was "directed at [her] or undertaken with



United States District Court
Northern District of California

knowledge of [her] presence and [exposure to the chemicals].” Mot. at 14 (internal quotation marks omitted). In *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1002 (1993), the California Supreme Court stated that, to establish an IIED claim, the conduct must be not only intentional and outrageous but also “directed at the plaintiff, or occur[ring] in the presence of a plaintiff of whom the defendant is aware[;] [t]he requirement that the defendant's conduct be directed primarily at the plaintiff is a factor which distinguishes intentional infliction of emotional distress from the negligent infliction of such injury.” *Id.* at 1002 (internal quotation marks omitted).

*Potter* supports Apple’s position. Notably, *Potter* took into account a possible “finding that [the defendant] had to have realized that its misconduct was almost certain to cause severe emotional distress to any person who might foreseeably consume the water and subsequently discover the facts.” *Id.* at 1003. Nevertheless, the Court held this was not good enough to support a claim for IIED:

> because knowledge *of these particular plaintiffs* is lacking.
>
> This conclusion is consistent with the result reached in *Christensen, supra*, 54 Cal.3d 868, itself. There we held that, even though it was alleged that defendants' conduct in mishandling the remains of deceased persons was intentional and outrageous and was substantially certain to cause extreme emotional distress to relatives and close friends of the deceased, the plaintiffs' cause of action for intentional infliction of emotional distress was not sufficiently supported where there was no allegation that the defendants' misconduct was directed primarily at plaintiffs, or that it was calculated to cause them severe emotional distress, or that it was done with knowledge of their presence and with a substantial certainty that they would suffer severe emotional injury.

*Id.* (emphasis in original).

Accordingly, the Court dismisses the IIED claim. The Court shall give Ms. Gjovik leave to amend here because Apple has made a new argument in challenging the claim. That being said, the Court notes that it is extremely skeptical that Ms. Gjovik could, in good faith and in compliance with her Rule 11 obligations, allege that Apple directed its conduct at her specifically or with knowledge of her presence specifically, and that its conduct was calculated to cause her severe emotional distress.

4. Summary

Count 12 is dismissed with prejudice. Counts 11 and 13 are dismissed but with leave to amend. For Count 11, there is the time-bar problem. For Count 13, there is both the time-bar problem and a merits problem. Any amendment will have to overcome these problems.

F. Remaining Claims

1. Count 9 – Claim Related to Privacy Violation

Count 9 is Ms. Gjovik's claim for violation of § 17200.

In its prior order, the Court noted that the claim (as pled in the TAC) seemed

> to be based on three factual predicates: (1) Apple's coercing employees to provide personal data for Apple's commercial use, such as with the Gobbler application, *see* TAC ¶ 255 (alleging that no consent was obtained or compensation provided); (2) Apple's coercing employees to be a part of invasive studies, *see* TAC ¶ 258; and (3) Apple's establishment of a health care clinic, called AC Wellness, which it then used improperly. *See* TAC ¶ 259. (To be frank, the Court does not understand the allegations made with respect to (3).)

Docket No. 73 (Order at 45).

Apple argued that Ms. Gjovik lacked statutory standing to proceed with the claim because she failed to allege that she lost money to Apple which Apple should disgorge. *See* Cal. Bus. & Prof. Code § 17203 (providing that a "court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition"); *see also Shersher v. Superior Court*, 154 Cal. App. 4th 1491, 1497-98 (2007) (noting that the California Supreme Court has "held that the only remedy expressly authorized by section 17203 was restitution to individuals who had an ownership interest in money paid to the defendants; there was nothing, either in the express language of the statute or in its legislative history, to indicate that the legislature intended to authorize a court to 'order a defendant to disgorge all profits to a plaintiff who does not have an ownership interest in those profits'"). The Court agreed with Apple that disgorgement would not be an available remedy but stated that Apple had failed to explain why Ms. Gjovik lacked standing to pursue injunctive relief. The Court added that it was giving Ms. Gjovik leave to amend to clarify her claim based on AC Wellness. *See* Docket No. 73 (Order at 45-46).





United States District Court
Northern District of California

United States District Court
Northern District of California

In the pending motion, Apple moves to dismiss the § 17200 claim as repleaded in the 4AC, even though Ms. Gjovik now seeks only injunctive relief and has dropped allegations related to AC Wellness. *See, e.g.*, 4AC ¶¶ 205-06 (asking the Court to order Apple "to disgorge unlawful data and the fruit of the poisoned data" and to prohibit Apple "from using personal employee data in for-profit product development"); *see also* Opp'n at 18 (stating that "Plaintiff does not need economic restitution – and instead requests disgorgement (deletion) of data and software – not money"). Apple has made multiple arguments – that Ms. Gjovik has made an amendment beyond the scope permitted; that she lacks statutory standing to proceed with the claim; that she also lacks Article III standing; that the claim is time barred; and that the relief sought is improper. In her opposition, Ms. Gjovik addresses at most the standing issues. Because Ms. Gjovik has failed to address the remaining arguments made by Apple, the Court deems any opposition waived, and therefore dismissal of the claim is appropriate.

The Court also concludes, based on its independent review, that, at the very least, Apple's arguments on the time bar and improper relief have merit. Regarding the time bar, there is a four-year limitations period under California Business & Professions Code § 17208. Apple notes that, in her prior pleading (the SAC), Ms. Gjovik alleged that Apple "coerced her to provide personal data in August 2017, nearly seven years before she introduced this cause of action in March 2024." Mot. at 8; *see also* SAC ¶¶ 136-42 (alleging that, in August 2017, an Apple engineering manager emailed a list of Apple employees, including Ms. Gjovik, about a Gobbler user study and that Ms. Gjovik was coerced to use the Gobbler application to provide biometrics and videos at a supposed social event). Ms. Gjovik cannot avoid her own allegations even if these allegations were made in a prior pleading. *See Bang Energy Drink*, 2021 U.S. Dist. LEXIS 146977, at *10 (N.D. Cal. June 30, 2021) (indicating that "factual allegations in a prior complaint are 'judicial admissions,' and 'when the party fails to provide a credible explanation for its "error," the [c]ourt may disregard the contradictory pleading'").

Ms. Gjovik could have, but did not, contend there is no time bar because there is some kind of continuing accrual, *i.e.*, because Gobbler is still on her personal account. *See Aryeh v. Canon Bus. Solns., Inc.*, 55 Cal. 4th 1185, 1198 (2013) (noting that, under the continuing accrual

theory, "recurring invasions of the same right can each trigger their own statute of limitations"). Any such argument has been waived.

As for improper relief, Apple argues that, at best, Ms. Gjovik can only obtain relief for herself and not others, especially as she has not pled a class action. The Court agrees. Section 17203 provides in relevant part:

> Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 *and* complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state.

Cal. Bus. & Prof. Code § 17203 (emphasis added). Section 382 in turn provides:

> If the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint; and when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all.

Cal. Code Civ. Proc. § 382; *see also Woods v. Am. Film Instit.*, 72 Cal. App. 5th 1022, 1028-29 (2021) ("A lawsuit may proceed as a class action 'when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court.' (Code Civ. Proc., § 382.)"). The California Supreme Court has noted:

> The voters restricted private enforcement of the UCL in 2004, by approving Proposition 64. . . . Proposition 64 . . . required that representative actions by private parties must "compl[y] with Section 382 of the Code of Civil Procedure." Therefore, a private plaintiff must file a class action in order to represent the interests of others.

*Zhang v. Superior Court*, 57 Cal. 4th 364, 372 (2013).

Accordingly, the Court dismisses the § 17200 claim because, even if Ms. Gjovik has standing (both statutory and Article III), she has failed to address the other arguments made by Apple. Apple's arguments on the time bar and improper relief also have merit.

2. <u>Count 10 – Claim Related to Post-Termination Conduct</u>

Count 10 is another claim for IIED. In Count 10, Ms. Gjovik largely targets post-

United States District Court
Northern District of California

termination conduct by Apple employees:

> [S]everal named Apple employees posted on social media, under their own names, claiming Gjovik's claims were bogus, that Gjovik was a liar and bad actor, and that Gjovik deserved the harm Apple was causing her. Five named employees took an active role in posting defamatory and harassing things about Gjovik, contacting Gjovik's friends and associates to speak negatively about Gjovik and urge them not to associate with her, and to create negative rumors about Gjovik in order to ostracize and alienate her.

4AC ¶ 210.

Ms. Gjovik also makes more serious claims, asserting that Apple engaged in

> witness intimidation, witness retaliation, burglary, extortion, threats, and surveillance. Apple stalked Gjovik in California and New Yok, sending people to sit outside her apartment, follow her around, and take photos/videos of her inside her home from outside the windows. Apple surveilled Gjovik and even bugged her property, including, apparently, directly intercepting her home internet.
>
> . . . . Apple repeatedly broke into Gjovik's home in at least the state of California and Commonwealth of Massachusetts, but probably also the state of New York.

4AC ¶¶ 215-16. Ms. Gjovik further asserts that Apple "handle[d] [her dog] during one of the break-ins, leaving a strong odor of cigarettes on his little body," "sent her possessions to her in a box with broken glass and threatened it could contain a severed head," "repeatedly threatened to 'ruin' and 'destroy' her, and even sent her emails pretending to be government employees threatening her to stop speaking about Apple's chemical leaks." 4AC ¶¶ 217-28.

In its motion to dismiss, Apple argues that some of the conduct is not actionable as it is not outrageous – *e.g.*, Ms. Gjovik being called a liar. As for the more serious conduct, Apple argues that Ms. Gjovik's allegations are too conclusory, not giving enough information about how, *e.g.*, Apple stalked her or broke into her home, who at Apple engaged in this conduct (or how Ms. Gjovik knew that it was an Apple employee), and when. The Court agrees with both of Apple's criticisms. Being called, *e.g.*, a liar is, as a matter of law, not outrageous conduct sufficient to support a claim for IIED. *See King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 786 (N.D. Cal. 2021) (noting that "[l]iability for IIED does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities"); *Yurick v. Superior Court*, 209 Cal. App. 3d 1116, 1124-25, 1129 (1989) (stating that "[defendant's] alleged conduct [which included calling plaintiff a



United States District Court
Northern District of California

liar], while objectively offensive and in breach of common standards of civility, was not so egregiously outside the realm of civilized conduct as to give rise to actionable infliction of mental distress"). To the extent Ms. Gjovik claims that Apple has engaged in more serious conduct, there must be some specificity about what exactly the wrongdoing was (or Apple cannot fairly defend itself). Ms. Gjovik must also provide specific, concrete facts establishing a plausible basis for her belief that the wrongdoing she generally describes was in fact conducted by Apple. *See Iqbal*, 556 U.S. at 678 (stating that a complaint is insufficient "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement'"). Specificity is particularly important where the claims on their face strain plausibility. *Cf. Lindblad v. Livermore Chamber of Commerce*, No. 21-cv-06464-WHO, 2021 U.S. Dist. LEXIS 237998, at *1 (N.D. Cal. Dec. 13, 2021) (noting that "[a] court may dismiss a claim as 'clearly baseless,' including allegations that are 'fanciful' or 'fantastic'") (quoting *Denton v. Hernandez*, 504 U.S. 25 (1992)). Furthermore, if Ms. Gjovik is arguing that Apple should be held liable because the misconduct was carried out by an Apple employee, Apple is not automatically liable for the intentional torts of its employees. As the Court noted in its prior order, an employer can be held vicariously liable for the torts of its employees only if they were committed within the scope of the employment; an employer will not be held liable if an employee inflicts injury out of personal malice not engendered by the employment. *See* Docket No. 73 (Order at 32-33); *see also Alma W. v. Oakland Unified Sch. Dist.*, 123 Cal. App. 3d 133, 142-43 (1981) (stating that "[t]he test is not whether it is foreseeable that one or more employees might at some time act in such a way as to give rise to civil liability, but rather, whether the employee's act is foreseeable in light of the duties the employee is hired to perform") (emphasis in original).

The only issue remaining is whether Ms. Gjovik should be given leave to amend. The Court shall not permit Ms. Gjovik to base an IIED claim simply because she was allegedly called a liar (or other similar conduct). Such a claim would be futile as that conduct is not, as a matter of law, outrageous. However, the Court shall allow Ms. Gjovik to amend to the extent she has implicated more serious misconduct (*e.g.*, stalking, breaking into her home, etc.) because Apple's challenge is a new one not previously made before. *See* Docket No. 73 (Order at 42) (expressing confusion that Ms. Gjovik made allegations about bugging, etc. but, at that time, did not base her

United States District Court
Northern District of California

IIED claim in her TAC on these allegations). That being said, the Court reiterates statements made in its prior order: even though an employer can be held vicariously liable for the torts of its employees committed within the scope of the employment (even if willful and without the authorization of the employer), "an employer will not be held liable for an intentional tort that did not have a *causal nexus* to the employee's work. For instance, [i]f an employee inflicts an injury out of personal malice, not engendered by the employment, the employer is not liable." Docket No. 73 (Order at 33) (emphasis added; internal quotation marks omitted). "Respondeat superior liability should apply only to the type of injuries that as a practical matter are sure to occur in the conduct of the employer's enterprise. The employment, in other words, must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." Docket No. 73 (Order at 33) (internal quotation marks omitted). If Ms. Gjovik does amend Count 10, she must allege specific concrete facts to support a basis for respondeat superior liability. The Court has strong concerns as to whether Ms. Gjovik can, in good faith, allege a basis for respondeat superior liability.

3. Count 8 – Claim for Breach of the Implied Covenant

Finally, in Count 8, Ms. Gjovik asserts a claim for breach of the implied covenant of good faith and fair dealing.

In its prior order, the Court allowed the claim to proceed to the following extent:

> Apple does not seem to have taken into account the suggestion in the TAC (albeit, not a clear one) that Apple timed her firing her to deprive her of a performance bonus. *See Guz*, 24 Cal. 4th at 353 n.18 (stating that "the covenant prevents a party from acting in bad faith to frustrate the contract's actual benefits" – *e.g.*, "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned") (emphasis in original).

Docket No. 73 (Order at 41).

In its motion, Apple's main argument is that the claim should be dismissed because the implied covenant inherent in all contracts simply prevents a contracting party from unfairly frustrating the other party's right to receive the benefits of the contract, and, here, Ms. Gjovik has not identified "any contract obligating Apple to pay out [performance] bonuses [including]

United States District Court
Northern District of California

irrespective of whether an employee was terminated prior to payment." Mot. at 25; *see also* 4AC ¶ 190 (simply alleging that "Apple breached the covenant by intentionally terminating Gjovik [in September 2021] when her annual performance review was due, which would have been accompanied by a performance bonus that she had already earned through her successful performance in 2020-2021").

Apple raises a fair argument, and, in her opposition, Ms. Gjovik fails to address it in any way. That being the case, the Court dismisses the claim with prejudice; any opposition has been waived.

G. Motion to Strike

Apple has moved to strike certain allegations to the extent the Court dismisses any of the claims which are based on those allegations. As a practical matter, this is not a helpful approach because it is possible that an allegation may be relevant to more than one cause of action. If Apple's concern here is that Ms. Gjovik will seek discovery beyond the scope of the claims that survive the 12(b)(6) challenge, then it can raise that concern before the magistrate judge or this Court, where needed, and when the adjudicator will have more concrete facts before it. The motion to strike therefore is denied, but without prejudice to Apple seeking relief in a different context, where appropriate.

## III. CONCLUSION

For the foregoing reasons, the Court denies Apple's motion to strike but grants in part and denies in part its motion to dismiss. Specifically:

**Retaliation Claims**

- Count 2 – claim for violation of § 1102.5. Apple has moved to dismiss part of the claim. The motion is granted. The following factual predicates are eliminated from the claim (with prejudice): (1) that Ms. Gjovik complained about smuggling and sanctions violations; (2) that Ms. Gjovik complained about privacy violations related to Gobbler; and (3) that Ms. Gjovik made complaints about violations of CERCLA, RCRA, and the Clean Air Act or any other whole statutory framework. The following substantive claims remain as pled: complaints about (1) violations

United States District Court
Northern District of California

of the anti-retaliation provisions of environmental laws, specifically, 42 U.S.C. §§ 9610 and 7622 and 15 U.S.C. 2622; (2) violation of § 8(a)(1) of the NLRA; (3) violation of California General Industry Safety Order 5194; (4) violation of 29 U.S.C. § 660; (5) violation of the California Constitution's right to privacy (but not related to Gobbler); and (6) violation of 42 U.S.C. § 2000e and California Government Code § 12920. To the extent Ms. Gjovik seeks a civil penalty on the remaining portion of the § 1102.5 claim, there is a time bar; however, Ms. Gjovik has leave to amend. Ms. Gjovik has leave to amend to plead tolling only.

- Count 4 – claim for violation of HSITA. Apple has moved to dismiss the claim in its entirety. The motion is granted. The claim for violation of the HSITA (§ 6399.7) is deemed a claim for violation of § 6310. This specific § 6310 claim is dismissed with prejudice based on Ms. Gjovik's failure to oppose Apple's argument that she failed to allege exposure resulting from workplace operations.
- Count 5 – claim for violation of § 98.6. Apple has moved to dismiss the claim in part. The motion is granted. The claim for a civil penalty is time barred, but Ms. Gjovik has leave to amend to plead tolling.
- Count 6 – claim for violation of §§ 232, 232.5, 1101, and 1102. Apple has moved to dismiss the claim in part. The motion is granted. The factual predicate related to Palestine, Muslim human rights, or Uyghur forced labor is eliminated from the §§ 232.5, 1101, and 1102 claims (with prejudice). As a practical matter, this also results in the dismissal with prejudice of the §§ 1101 and 1102 claims. To the extent the §§ 232 and 232.5 claims are predicated on disclosure of wages, it is dismissed but with leave to amend (*i.e.*, so that Ms. Gjovik can allege knowledge on the part of Apple of the wage disclosure). This is the only amendment permitted.
- Count 7 – claim for violation of § 96(k). Apple has moved to dismiss the claim in its entirety. The motion is denied. The Court does not view the § 96(k) as a true stand-alone claim but rather construes the claim as a § 98.6 claim predicated on §

United States District Court
Northern District of California

96(k). This is consistent with the position Ms. Gjovik took in the TAC.

**Claims Related to Environmentally Unsafe Conditions**

- Count 11 – claim for private nuisance. Apple has moved to dismiss the claim in its entirety. The motion is granted. The claim is time barred but Ms. Gjovik has leave to amend to address the statute-of-limitations problem.
- Count 12 – claim for ultrahazardous activities. Apple has moved to dismiss the claim in its entirety. The motion is granted. As above, there is a time bar. Moreover, the Court does not give leave to amend and dismisses the claim with prejudice because Ms. Gjovik previously claimed ultrahazardous activity on the basis that Apple used chemicals for which there is no safe level of exposure, but the chemicals she identified in the 4AC are not absolutely prohibited.
- Count 13 – claim for IIED. Apple has moved to dismiss the claim in its entirety. The motion is granted. As above, there is a time bar. Also, on the merits, the claim fails. Ms. Gjovik has leave to amend to address the statute-of-limitations problem and the merits problem. As to the merits, the Court is extremely skeptical that Ms. Gjovik can amend in good faith and in compliance with her Rule 11 obligations.

**Remaining Claims**

- Count 9 – claim related to privacy violation (§ 17200 violation). Apple has moved to dismiss the claim in its entirety. The motion is granted. Even if Ms. Gjovik has standing, she has failed to address the other arguments made by Apple (*e.g.*, time bar and improper relief sought). Dismissal is with prejudice.
- Count 10 – claim related to post-termination conduct (IIED). Apple has moved to dismiss the claim in its entirety. The motion is granted. The claim is dismissed with prejudice to the extent Ms. Gjovik asserts IIED based on being called a liar, bad actor, and the like. However, Ms. Gjovik has leave to amend to provide nonconclusory allegations on the more serious conduct identified in the 4AC (*e.g.*, stalking, breaking into Ms. Gjovik's home, etc.). If Ms. Gjovik amends, she must plead nonconclusory allegations on the more serious conduct, *and* she must plead

concrete facts to support a basis for respondeat superior liability. The Court has serious concerns as to whether Ms. Gjovik can plead in good faith a basis for respondeat superior liability.

- Count 8 – claim for breach of the implied covenant. Apple has moved to dismiss the claim in its entirety. The motion to dismiss is granted and with prejudice. Any opposition has been waived.

The Court emphasizes that Ms. Gjovik is not permitted to amend her pleading except as expressly authorized in this order. If the Court has not explicitly allowed Ms. Gjovik to plead a new claim, legal theory, or factual predicate, then she cannot plead such in the amended complaint.

The fifth amended complaint shall be filed by **October 29, 2024**, and shall be limited to seventy-five (75) pages in length. Apple shall file its response to the amended pleading by **November 26, 2024**.

Based on the Court's ruling here, the only discovery permitted at this time is "Phase I" discovery (*i.e.*, discovery needed for the settlement conference) on Counts 1 and 3 (which Apple did not contest at all in its motion to dismiss) and those parts of the retaliation claims above that were not challenged or that otherwise survived.

This order disposes of Docket Nos. 78, 79, and 101.

**IT IS SO ORDERED**.

Dated: October 1, 2024

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

**OFFICE OF THE CLERK**
**UNITED STATES DISTRICT COURT**
**Northern District of California**

**CIVIL MINUTES**

**Date:** August 28, 2024 **Time:** 9:40-10:10
30 minutes **Judge:** EDWARD M. CHEN

**Case No.**: 3:23-cv-04597-EMC **Case Name:** Gjovik v. Apple Inc.

**Pro Se Plaintiff:** Ashley Gjovik
**Attorney for Defendant:** Melinda Riechert

**Deputy Clerk:** Vicky Ayala **Court Reporter:** Kelly Shainline

**PROCEEDINGS HELD BY ZOOM WEBINAR**

Motion to Dismiss; Motion to Strike; Initial Case Management Conference – Held.

**SUMMARY**

Parties stated appearances.

Oral argument presented. Matter submitted; order to issue. The Court shall not accept any further filings related to the motion to dismiss.

The Court shall refer the case to a settlement conference with a magistrate judge (to be held within 120-150 days).

In addition, the Court shall require the parties to complete initial disclosures. However, it temporarily stays discovery pending a ruling on Apple's motion to dismiss. It makes sense to stay discovery temporarily so that the parties will have the benefit of the Court's ruling which will then inform the scope of the litigation.

Once the Court rules on Apple's motion to dismiss, then it shall allow discovery to proceed. Discovery shall be limited, for the time being, to "Phase I" discovery – i.e., discovery narrowly tailored to that needed in order for the parties to be adequately prepared for the settlement conference. The Court does not see a need for more than 1-2 depositions per side for purposes of Phase I discovery. Plaintiff indicated that she cannot afford to take depositions; that is a decision for her to make. Plaintiff cannot avoid having her deposition taken.

If the case does not settle, then the Court shall open discovery in full.

**REFERRALS:**
Case referred to Magistrate Judge for settlement conference to be completed within 120-150 days.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,
Plaintiff,

v.

APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE SUR-REPLY**

Docket Nos. 93-96

Plaintiff's motion for leave to file a sur-reply is **DENIED**. The brief is not targeted to any alleged new contention in Defendant's reply. Furthermore, the proposed sur-reply is more than seventy pages in length, exceeding the page lengths permitted for motions, oppositions, and reply briefs.

The Court therefore **STRIKES** the sur-reply and the documents submitted in support. The declaration is also improper as the motion pending before the Court is a 12(b)(6) motion and not, *e.g.*, a summary judgment motion.

Finally, to the extent Plaintiff has asked the Court to consider additional case authorities, *see* Docket No. 96, the Court reserves ruling as to whether it shall do so.

**IT IS SO ORDERED**.

Dated: August 22, 2024

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,
Plaintiff,
v.
APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS; DENYING DEFENDANT'S MOTION TO STRIKE; AND GRANTING PLAINTIFF'S MOTION TO STRIKE**

Docket Nos. 48, 49, 64



Plaintiff Ashley Gjovik, proceeding pro se,[1] is a former employee of Defendant Apple, Inc. She started to work for Apple in 2015 and was terminated in September 2021. About two years after she was fired, she initiated this lawsuit. Ms. Gjovik has asserted fifteen different claims against Apple, both federal and state. The gist of her suit is that Apple retaliated against her because she complained about conduct at the company, including but not limited to environmentally unsafe conditions.

Now pending before the Court are several motions. The primary motions are two motions filed by Apple: (1) a motion to dismiss the operative third amended complaint ("TAC") and (2) a related motion to strike. In addition to Apple's motions, there is a motion that Ms. Gjovik has filed. Specifically, Ms. Gjovik has moved to strike two declarations that were filed by an ex-Apple employee, Cher S. Scarlett, whom Ms. Gjovik has referred to in the TAC as "Joanna Appleseed." *See* Docket No. 62 (Scarlett Decl.); Docket No. 66 (Supp. Scarlett Decl.).

[1] Ms. Gjovik appears to have a J.D. from Santa Clara University.

United States District Court
Northern District of California

Having considered the parties' briefs, as well as the oral argument presented at the hearing on May 16, 2024, the Court hereby **GRANTS** in part and **DENIES** in part Apple's motion to dismiss; **DENIES** Apple's motion to strike; and **GRANTS** Ms. Gjovik's motion to strike.

## I. FACTUAL & PROCEDURAL BACKGROUND

The operative pleading is the third amended complaint ("TAC"). Although the TAC is difficult to follow at times, the main categories of misconduct as described in the TAC are as follows:

(1) During her employment with Apple, Ms. Gjovik lived in an apartment near an Apple factory (known as the ARIA factory) and became ill because the factory released toxic substances into the environment.

(2) Ms. Gjovik's office at Apple (known as Stewart 1) was located on a contaminated site subject to EPA regulation, *i.e.*, a Superfund site, and she became ill because of Apple's actions/omissions related to the site.

(3) Apple made employees, including Ms. Gjovik, participate in studies related to Apple products that were invasive to their privacy.

(4) Apple retaliated against Ms. Gjovik for making complaints about harassment and environmental safety. Ms. Gjovik's complaints included internal complaints, complaints to governmental agencies, complaints to the press, and complaints made in social media. The retaliation by Apple included but was not limited to the termination of Ms. Gjovik from employment.

Below, the Court provides more details regarding Apple's alleged misconduct and Ms. Gjovik's termination from employment. To be clear, the discussion below is based on the allegations made in the TAC.

### A. Harassment at Work

In February 2015, Ms. Gjovik began to work for Apple. She started out as an Engineering Project Manager in Software Engineering and continued to work in that office until January 2017. *See* TAC ¶ 13. During her time in that office, she was harassed, primarily by two male co-workers. *See* TAC ¶ 13. In addition, during her time in the office, she investigated a trend of

battery failures in the field. When she did not comply with her managers' directive to ignore the problem, she was essentially forced out of that office. *See* TAC ¶ 17.

In January 2017, she left Software Engineering and joined Hardware Engineering as a Senior Engineering Project Manager. *See* TAC ¶ 18. There, she was harassed by two of her superiors, including on the basis of her sex and disability. *See* TAC ¶ 18. As indicated below, Ms. Gjovik became disabled because of Apple's release of toxic substances into the environment.

B. Chemical Exposure from the Apple ARIA Factory

In February 2020, while she was still working for Apple, Ms. Gjovik moved into an apartment building located at 3255 Scott Blvd. in Santa Clara. *See* TAC ¶ 25. There was an Apple factory located less than 300 feet away at 3250 Scott Blvd. *See* TAC ¶ 22. The factory had the code name "ARIA" and was used for semiconductor fabrication. *See* TAC ¶ 22. "Apple intentionally vented its fabrication exhaust – . . . consisting of toxic solvent vapors, gases, and fumes – into the ambient outdoor air." TAC ¶ 22.

Because of Apple's release of toxic substances into the air, Ms. Gjovik became "severely ill," *i.e.*, because she was living in the apartment near the Apple ARIA factory. TAC ¶ 25. Ms. Gjovik suffered "severe fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion fatigue, . . . strange sensations in her muscle and skin," a slow heart rate, volatile blood pression, and arrythmia. TAC ¶ 25. At some point, she became so sick that she went on disability. *See* TAC ¶ 26.

From February through September 2020, Ms. Gjovik sought medical treatment, including at a medical clinic sponsored by Apple, known as AC Wellness. *See* TAC ¶¶ 25-26. In or about September 2020, she consulted with "multiple occupational and environmental exposure doctors, who told [her] that all of her symptoms were consistent with solvent and other chemical exposures." TAC ¶ 29. Ms. Gjovik hired an industrial hygienist to test the indoor air at her apartment, and the results showed a number of chemicals which were "in use by Apple at ARIA." TAC ¶ 30. (At that time, Ms. Gjovik knew that there was an Apple facility near her apartment, *see* TAC ¶ 32, but it appears she did not know about the semiconductor fabrication at the factory until February 2023. *See* TAC ¶ 39.)



United States District Court
Northern District of California

United States District Court
Northern District of California

Subsequently, from September 2020 through April 2021, Ms. Gjovik contacted various governmental agencies about the problem, including the EPA and California EPA. *See* TAC ¶¶ 29, 36.

In March 2021, Ms. Gjovik wrote an article, which was published in the SF Bay View newspaper, about her chemical exposure experience with the air around her apartment. This led to other victims coming forward, including other Apple employees. *See* TAC ¶¶ 33-34.

In April 2021, Ms. Gjovik met with several local, state, and federal politicians "about what occurred to her next to ARIA." TAC ¶ 36.

In July and August 2021, Ms. Gjovik continued to meet with local, state, and federal politicians. *See* TAC ¶ 38.

As discussed in more detail, *infra*, in September 2021, Apple terminated Ms. Gjovik.

Not until some two years later, in February 2023, did Ms. Gjovik learn that there was semiconductor fabrication taking place at the Apple ARIA factory. *See* TAC ¶ 39.

In June 2023, Ms. Gjovik filed a complaint about the ARIA factory with the EPA and California EPA. The EPA inspected in August 2023 and January 2024. Ms. Gjovik is still waiting for the results of the investigation. *See* TAC ¶ 40.

C. <u>Chemical Exposure from the Apple Stewart 1 Office</u>

From about 2017 to the date of her termination (in September 2021), Ms. Gjovik worked at an Apple office located at 825 Stewart Dr. in Sunnyvale. The office was known as "Stewart 1." It was located on a Superfund site (*i.e.*, a contaminated site regulated by the EPA). The contamination was in the groundwater and came about due to a semiconductor fabrication facility that used to be on the site. *See* TAC ¶¶ 41-42. It appears that the Northrop Grumman used to operate on the site. *See* TAC ¶ 43.

Apple became a tenant on the site in 2015. *See* TAC ¶ 45. In late 2015, after it became a tenant, Apple installed a new HVAC system in the building. As a part of the installation, Apple sawed off vent stacks on the main building roof; these stacks had been put in place as part of the ventilation of the area beneath the concrete slab foundation, *i.e.*, to allow hazardous waste vapors to discharge to the atmosphere. After Apple sawed off the vent stacks (from three feet to one

foot), it then put the HVAC system in close proximity to the stacks, so that the discharge from the stacks could be taken in by the intake of the HVAC system. *See* TAC ¶¶ 44-46. Apple did vapor intrusion testing in December 2015, and the results showed an increase in indoor air pollution (compared to a test that Northrop Grumman had conducted back in May 2015). Nevertheless, Apple had its employees move into the building. *See* TAC ¶ 47.

In March 2021, Apple informed Ms. Gjovik and others that it would be conducting vapor intrusion testing for Stewart 1. *See* TAC ¶ 49. Ms. Gjovik expressed concern to her superiors because the office was on the Superfund site, and she shared that fact with her coworkers. *See* TAC ¶¶ 49, 51. She also met subsequently (on more than one occasion) with Apple's Environmental Health & Safety ("EH&S") office. *See* TAC ¶ 52.

In April 2021, Ms. Gjovik contacted the EPA about the Superfund site and continued to communicate with the agency through August 2021. See TAC ¶ 52.

In June 2021, Apple's EH&S office and its Employee Relations office notified Ms. Gjovik that the foundation of Stewart 1 was cracked, that the foundation would need to be repaired, and that air testing would be conducted thereafter. *See* TAC ¶ 53. Apple refused to contact the EPA; therefore, Ms. Gjovik reported Apple to the EPA herself (and told Apple that she had done so). *See* TAC ¶ 53.

By the end of July 2021, Ms. Gjovik made open complaints about Apple's conduct at Stewart 1 to various people: coworkers, the press, and social media. *See* TAC ¶ 59.

In response, Apple retaliated against Ms. Gjovik. For example:

- In or about July 2021, Apple issued "gag orders" to Ms. Gjovik, *e.g.*, to prevent her from communicating about safety concerns to her coworkers. *See* TAC ¶ 55; *see also* TAC ¶ 60 (alleging that an Apple investigator "interrogated" her about communications with coworkers).
- In or about July 2021, Apple opened what Mr. Gjovik seems to allege as an investigation into sexism by Ms. Gjovik's superiors. There was in fact no real investigation; rather Ms. Gjovik's superiors were simply told that she was complaining about their behavior. *See* TAC ¶ 56.

United States District Court
Northern District of California

- In or about July 2021, Ms. Gjovik discovered that one of her superiors (Mr. West) "had been reassigning her best projects (things that would help her receive a positive review)" to others. TAC ¶ 58. At or about the same time, another superior (Mr. Powers) "quadrupled her workload with highly unfavorable projects (things that were certain to upset people and fail)." TAC ¶ 58.
- In or about July 2021, Apple assigned an investigator (Mr. Okpo) to look into Ms. Gjovik's concerns apparently about retaliation and fraud dating back to 2015 but this was essentially a meaningless gesture; there was no intent that the investigator would act in good faith (*e.g.*, he tried to prevent her from communicating with coworkers, and he did not comply with her request to keep things in writing). *See* TAC ¶¶ 58-60, 62; *see also* TAC ¶¶ 98-100.
- Apple persistently told Ms. Gjovik to take a leave. *See* TAC ¶ 59.

In late July 2021, the EPA told Apple, as well as Northrop Grumman, that it wanted to inspect Stewart 1. *See* TAC ¶ 61. Thereafter, in August 2021, Apple announced that they would begin to do maintenance at the building – implicitly to cover up the problems at the site. *See* TAC ¶¶ 61, 64. Ms. Gjovik told her coworkers to take pictures of problems at the site – *e.g.*, cracks in the foundation of the building. *See* TC ¶ 64. The next day, Mr. Okpo (the Apple investigator) put Ms. Gjovik on an indefinite administrative leave. *See* TAC ¶ 65.

In mid-August 2021, the EPA conducted an inspection of Stewart 1. *See* TAC ¶ 68. The EPA noted, *inter alia*, that cracks had been sealed but it was not clear whether the foundation slab had been penetrated due to equipment bolted to the slab. The EPA also noted that there could be a problem given the proximity of the vent stacks on the roof to the HVAC intake. *See* TAP ¶ 68.

As discussed in more detail, *infra*, in September 2021, Apple terminated Ms. Gjovik.

In May 2022, the EPA instructed Northrop Grumman to do air testing. *See* TAC ¶ 69.

In January 2023, the EPA again instructed that air testing be done. *See* TAC ¶ 70.

In August 2023, the EPA commented on vapor intrusion testing that Apple had done in May 2023, "calling Apple's testing report and strategy 'fundamentally incorrect,' having 'no fundamental basis,' and [being] 'not accurate,' 'confusing,' and 'misleading.'" TAC ¶ 70

United States District Court
Northern District of California

(emphasis omitted).

D. Termination in September 2021

As noted above, Ms. Gjovik was put on indefinite administrative leave in August 2021. In or about that period (July-August 2021), Ms. Gjovik made various public complaints about Apple. *See* TAC ¶ 71 *et seq.* Some complaints were made to coworkers (*e.g.*, through Slack channels), to the press, or to social media; other complaints were filed with governmental agencies such as the EEOC, the California DFEH, the NLRB, the U.S. Department of Labor, the California Department of Labor, and even the SEC and FBI. The complaints covered a wide range of conduct by Apple – *e.g.*, its response to COVID-19, its response to her complaints about sexism, its response to her complaints about unsafe work conditions, its forcing her on administrative leave, etc.

On September 9, 2021, Apple terminated Ms. Gjovik's employment. *See* TAC ¶ 90. The day that she was terminated, Ms. Gjovik was contacted by an Apple Workplace Violence and Threat Assessment investigator (Mr. Kagramanov) via email. The investigator claimed that he was looking into a sensitive IP matter and demanded to speak to her within the hour. Ms. Gjovik said she was willing to participate but wanted a written record of their conversation. The investigator replied that Apple was investigating allegations that she had improperly disclosed confidential information belonging to Apple and falsely asserted that she was refusing to participate in the investigation. The investigator then suspended all of Ms. Gjovik's account access at Apple (including Slack). *See* TAC ¶ 101-03; *see also* TAC ¶¶ 83, 88. Ms. Gjovik reiterated to the investigator that she was willing to participate. However, a few hours later, she was terminated. *See* TAC ¶ 105. "The termination letter repeated an ambiguous charge of leaking and said she 'failed to cooperate and to provide accurate and complete information during the Apple investigatory process.'" TAC ¶ 105.

About a week later, Apple's outside counsel emailed Ms. Gjovik a letter, suggesting that Apple had terminated her because (1) she had complained about Apple asking to 3-D scan her ear canals and (2) she had "posted some of the surveillance photos Apple secretly took of her through her phone when it was illegally harvesting her biometrics through its face Gobbler app." TAC ¶ 106; *see also* TAC ¶ 80 (alleging that "Apple frequently requested that Gjovik and her coworkers

United States District Court
Northern District of California

United States District Court
Northern District of California

participate in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA test, biometrics data collection (like the Gobbler app), and other highly personal studies").

E. Post-Termination Harassment

Even after Ms. Gjovik was fired from Apple, the company harassed her. In fact, Apple conducted a campaign of harassment against her from at least July 2021 (*i.e.*, a few months before it terminated her). The harassment included the following conduct:

- Making repetitive, unwanted communications to Ms. Gjovik. *See* TAC ¶ 107.
- Making false accusations against Ms. Gjovik. *See* TAC ¶ 107.
- Mailing to Ms. Gjovik "menacing packages." TAC ¶ 107.
- Physically surveilling Ms. Gjovik, including through the use of private investigators. *See* TAC ¶¶ 107, 110.
- Using fake social media accounts to make, *inter alia*, threatening, defamatory, and insulting statements about Ms. Gjovik. *See* TAC ¶ 108.
- "[B]ugging [Ms. Gjovik's] chattel property" such as the statute on her desk and her fig tree. TAC ¶ 110 (also alleging that Apple installed cables and cords in her attic).
- Breaking into her apartment and adjacent apartments, and even handling her dog during one of the break-ins. *See* TAC ¶ 110.

For similar allegations, see also TAC ¶ 132 (alleging that Apple engaged in criminal witness tampering "with break-ins, stalking, destruction of property, physical and digital harassment, lawsuits, reports to police and FBI (SWATing), and threats of physical violence sent over wires such as threatening to decapitate one of Gjovik's loved ones, or that Gjovik would be found dead of 'suicide' but 'never mind the double-tap'") (emphasis omitted); and TAC ¶ 134 (alleging that Apple broke into her apartment, messed with her telephone/cable/electrical lines, stalked her, etc.)

F. Causes of Action

Based on, *inter alia*, the above allegations, Ms. Gjovik has asserted the following causes of action:

(1) Violation of RICO.

(2) Violation of the Sarbanes-Oxley Act (whistleblower).

(3) Violation of the Dodd-Frank Act (whistleblower).

(4) Private nuisance and nuisance per se.

(5) Ultrahazardous/abnormally dangerous activities (strict liability).

(6) Violation of the Bane Civil Rights Act.

(7) Violation of the Ralph Civil Rights Act.

(8) Violation of the California Whistleblower Protection Act.

(9) Retaliation for filing complaints in violation of California Labor Code § 98.6.

(10) Retaliation for safety activities in violation of California Labor Code § 6310.

(11) Termination in violation of public policy.

(12) Breach of implied contract and breach of the implied covenant of good faith and fair dealing.

(13) Intentional infliction of emotional distress.

(14) Negligent infliction of emotional distress.

(15) Violation of California Business & Professions Code § 17200.

In the pending 12(b)(6) motion, Apple moves to dismiss outright 11 out of the 15 causes of action – specifically, Counts 1-3, 5-8 and 12-15. Apple also moves for partial dismissal of 2 other counts – specifically, Counts 4 and 9. The only claims that Apple does not challenge in its 12(b)(6) motion are Count 10 (retaliation for safety activities) and Count 11 (termination in violation of public policy).

## II. MOTION TO DISMISS

A. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A

United States District Court
Northern District of California

complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."[2] *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

B. <u>Violation of RICO (Count 1)</u>

In Count 1, Ms. Gjovik asserts a claim for violation of RICO, but there are technically subclaims to the extent she has asserted violations of 18 U.S.C. §§ 1962(a), (c), and (d). The factual predicate for the RICO claim, including the subclaims, is muddled. The gist of it (as described in the TAC) seems to be that Apple markets itself as a progressive brand – *e.g.*,

---

[2] On a motion to dismiss, a court generally limits its review to the four corners of the complaint. *See Van Buskirk v. Cnn*, 284 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss."); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("[W]hen the legal sufficiency of a complaint's allegations is tested by a motion under Rule 12(b)(6), 'review is limited to the complaint.'"). Accordingly, the Court does not consider the two declarations filed by Ms. Scarlett (and grants Ms. Gjovik's motion to strike the same), nor does it consider the declaration filed by Ms. Gjovik.

A court may still take judicial notice of documents, if appropriate, on a 12(b)(6) motion. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (noting that a court may "consider materials outside a complaint" at the 12(b)(6) phase if it can, *e.g.*, take judicial notice of materials). The Court addresses Apple's requests for judicial notice, where necessary, below.

environmentally responsible – when in fact it is not. By marketing itself as a progressive brand, Apple benefits financially. In addition, because Apple does not comply with regulations on health, safety, employment, etc., it gets an edge over its competitors: while the competitors spend money to comply with regulations, Apple saves money by not complying. Apple conceals the truth that it is not progressive by retaliating against employees who report issues, using unlawful NDAs, and so forth. *See* TAC ¶¶ 115, 123, 126. The specific racketeering activity in which Apple engages includes bribery, witness tampering, witness retaliation, wire fraud, securities fraud, and possessing and using chemical weapons. *See* TAC ¶¶ 128-65 (describing ten predicate acts).

1. <u>Section 1962(a)</u>

As noted above, Ms. Gjovik first asserts a claim for violation of § 1962(a). Section 1962(a) provides in relevant part as follows: "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in . . . the establishment or operation of, any enterprise . . . ." 18 U.S.C. § 1962(a). "This provision was primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering." *Brittingham v. Mobil Corp.*, 943 F.2d 297, 303 (3d Cir. 1991).

A plaintiff asserting a § 1962(a) claim must prove the following: (1) the defendant received money from a pattern of racketeering activity; (2) the defendant used or invested that money in an enterprise; and (3) the plaintiff was injured as a result of the use or investment of racketeering income. *See Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir. 1993).

Regarding element (3), "an injury resulting from the [use or] investment of racketeering income [is] *distinct* from an injury caused by the predicate acts themselves." *Id.* (emphasis added). The former is required because § 1962(a) "'is directed specifically at the use or investment of racketeering income.'" *Id.*; *see also Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 829 (9th Cir. 2003) (stating that a plaintiff must allege that "funds derived from the alleged racketeering activity . . . were used to injure him"); *NRB Indus. v. R.A. Taylor & Assocs.*, No. 97

United States District Court
Northern District of California

United States District Court
Northern District of California

Civ. 181 (JSR), 1998 U.S. Dist. LEXIS 25, at *4 (S.D.N.Y. Jan. 6, 1998) (stating that "'the essence of a violation of § 1962(a) is *not commission of predicate acts* but investment of racketeering income,'" and therefore, "a plaintiff suing under § 1962(a) must 'allege a "use or investment injury" that is distinct from the injuries resulting from predicate acts'") (emphasis added). *See, e.g., Compagnie De Reassurance D'Ile De Fr. v. New Eng. Reinsurance Corp.*, 57 F.3d 56, 91 (1st Cir. 1995) ("Even assuming that [plaintiffs] had been defrauded through the use of the mails or international wires, that alone is not enough to show that they were harmed additionally by [defendant's] use or investment of the proceeds of that fraud to establish or operate [the enterprise].").

Furthermore, "[r]einvestment of proceeds from alleged racketeering activity back into the enterprise to continue its racketeering activity is insufficient to show proximate causation." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1149 (9th Cir. 2008). The rationale behind that principle is that a distinction between § 1962(a) and (c) must be maintained. *See id.* at 1150.

> As the Third Circuit in *Brittingham* explained, "[a] plaintiff must allege . . . more than a remote connection between the use or investment of racketeering income and the injury suffered." 943 F.2d at 304. The *Brittingham* court concluded that the reinvestment of racketeering proceeds is too remote a connection. *See id.* at 305.
>
> > If this remote connection were to suffice, the use-or-investment injury requirement would be almost completely eviscerated when the alleged pattern of racketeering is committed on behalf of a corporation . . . Over the long term, corporations generally reinvest their profits, regardless of the source. Consequently, almost every racketeering act by a corporation will have some connection to the proceeds of a previous act. Section 1962(c) is the proper avenue to redress injuries caused by the racketeering acts themselves. If plaintiffs' reinvestment injury concept were accepted, almost every pattern of racketeering activity by a corporation would be actionable under § 1962(a), and the distinction between § 1962(a) and § 1962(c) would become meaningless.

*Westways World Travel v. AMR Corp.*, 182 F. Supp. 2d 952, 960 (C.D. Cal. 2001).

In the instant case, Apple argues that the § 1962(a) claim should be dismissed because Ms. Gjovik has failed to make allegations that satisfy element (3). The Court agrees.

United States District Court
Northern District of California

For example, Ms. Gjovik argues that "Defendant . . . reinvested its earnings and saved costs back into its enterprise, in order to be able to continue silencing witnesses, including Plaintiff, and to be able to more effectively silence witnesses in order to engage in more fraud and chemical weapon use." Opp'n at 18. But, as noted above, "[r]einvestment of proceeds from alleged racketeering activity back into the enterprise to continue its racketeering activity is insufficient to show proximate causation." *Sybersound*, 517 F.3d at 1149. The same problem arises to the extent Ms. Gjovik suggests that Apple invested its racketeering profits by (1) hiring lawyers "to harass, intimidate, and coerce . . . witnesses" to its misconduct or by (2) investing in progressive nonprofit organizations "in order to capture and control them, conspire with them, and prevent them from protecting and helping witnesses to Defendant's racketeering." Opp'n at 18-19.

To the extent Ms. Gjovik asserts Apple invested its racketeering profits by bribing local law enforcement, *see* Opp'n at 18, there is another problem. The bribery incident described in the TAC has to do with Tom Moyer, Apple's Head of Global Security, "paying bribes to public officials in exchange for concealed carry handgun permits for Apple employees." TAC ¶ 128. Ms. Gjovik fails to explain how this use of racketeering profits injured her; there is no allegation that, *e.g.*, an Apple employee threatened her with a gun obtained through this bribery scheme. And even if that happened, it is clear how Ms. Gjovik's business or property was harmed as a result. *See Glob. Master Int'l Grp., Inc. v. Esmond Nat., Inc.*, 76 F.4th 1266, 1271, 1274 (9th Cir. 2023) (stating that "[a] civil RICO plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation"; *e.g.*, "a plaintiff must demonstrate (1) harm to a specific property interest cognizable under state law, and (2) that the injury resulted in concrete financial loss") (internal quotation marks omitted).

Finally, the Court takes note that, in her papers, Ms. Gjovik recognizes a RICO injury requires an injury to business or property. Thus, she contends in her opposition that she was injured because her "chattel property" was damaged or destroyed,[3] because she lost an

[3] *See, e.g.*, TAC ¶ 110 (alleging that Apple engaged in "aggressive surveillance (including lurking Private Investigators . . . ), bugging her chattel property (the statute Apple mailed Gjovik from her

employment performance bonus, and because she became disabled which thereby caused her "to be away from work and to take a reduced course load in law school while she was exposed to . . . chemical weapon releases." Opp'n at 17. Even if the Court were to credit the above allegations, Mr. Gjovik has failed to explain how any of those injuries is causally connected to Apple's use of racketeering income. Rather, those injuries are the result of Apple's alleged racketeering activity itself (*e.g.*, witness tampering or retaliation and possession or use of chemical weapons).

Accordingly, the Court concludes that Ms. Gjovik has failed to state a plausible § 1962(a) claim. The alleged relationship between any harm she suffered and the use of racketeering income is too remote as a matter of law. Because Ms. Gjovik did not, at the hearing, explain how she could overcome the above deficiencies, the Court dismisses the § 1962(a) claim with prejudice. Amendment of the claim would be futile.

2. <u>Section 1962(c)</u>

Section 1962(c) provides in relevant part that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

It is well established that, under § 1962(c), the defendant and the enterprise must be distinct from one another; this is based on the language of § 1962(c) itself. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name. The statute's language, read as ordinary English, suggests that principle."). Thus, Ms. Gjovik must allege an association-in-fact enterprise that consists of more than just Apple. *See* 18 U.S.C. § 1961(4) (stating that

---

desk; Gjovik's fig tree, etc.), whatever Apple installed in her attic (photos show cables/cords laid in away [sic] landlord denied was them), breaking into her apartment (at least once in 2021 and 2022), breaking into adjacent apartments (at least once in 2021)," etc.); TAC ¶ 180 (alleging that the Apple ARIA factor "emits large quantities of vapors, dust, chemicals, and other contaminants into the air, which are carried by the natural winds and air currents onto Gjovik's property and collect Gjovik's chattel property and are generally injurious to Gjovik's health, are offensive to the senses, and interfered with Gjovik's comfortable enjoyment of life and property").



United States District Court
Northern District of California

"'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity").

Ms. Gjovik calls the association-fact-enterprise the "Worldwide Loyalty Enterprise." She asserts that the enterprise is made up of:

(1) Apple and its employees;

(2) Apple's outside counsel;

(3) trade and nonprofit organizations (*e.g.*, that Apple partners with to promote itself as environmentally responsible);

(4) "certain tech reporters";

(5) certain "companies and third-party administrators (e.g., Sedgwick, Northop Grumann, Oaktree Capital, etc.")[4];

(6) "certain governmental employees and agencies, law enforcement officers and agencies (e.g., Santa Clara County Sheriff's Office, Cupertino Police Department, Santa Clara HazMat, etc.)"[5];

(7) certain "doctors and clinics (e.g., A.C. Wellness Center, etc.)"[6]; and

(8) certain "environmental consultants (e.g., EKI, ACT Environmental, etc.)."

---

[4] The TAC does not make any other reference to Sedwick or Oaktree Capital. As noted above, Northrop Grumman appears to have operated a factory on the Superfund site prior to Apple becoming a tenant.

[5] Presumably, Ms. Gjovik makes this allegation because Tom Moyer, Apple's Head of Global Security, allegedly bribed "public officials in exchange for concealed carry handgun permits for Apple employees." TAC ¶ 128.

[6] A.C. Wellness appears to be "Apple's for-profit in-house clinic." TAC ¶ 26. Ms. Gjovik received treatment from doctors there, but

> transitioned her medical care to a different clinic and provider after her Apple primary care provider at AC Wellness refused to help her triage her 2020 medical issues (due to exposure to Apple's factory exhaust) and instead suggested Gjovik could be suffering from anxiety and enrolled Gjovik in an Apple internal user study related to blood pressure . . . and participate in weekly life coaching sessions . . . .

TAC ¶ 27.

TAC ¶ 120. As indicated above, she claims that this enterprise "engaged in systemic criminal conduct in pursuit of enabling Apple's race to the bottom on regulatory compliance and use of intimidation, threats, and false statements about its actual practices to increase profits and maintain a positive reputation." TAC ¶ 123.

As an initial matter, the Court notes that some of the persons/entities above may not be distinct from Apple for purposes of RICO. Agents of Apple can still be considered part of Apple for RICO purposes. *See Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016) (stating that "plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation because a corporation necessarily acts through its agents and employees"; acknowledging that, "[w]hen an individual defendant acts through a corporation, he may have formed an association-in-fact with an entity distinct from himself" but, "[i]n contrast to an individual, a corporation cannot act except through its officers, agents, and employees"); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227-28 (7th Cir. 1997) (stating that "we cannot imagine . . . applying RICO to a free-standing corporation such as Chrysler merely because Chrysler does business through agents, as virtually every manufacturer does"; "where a large, reputable manufacturer deals with its dealers and other agents in the ordinary way, so that their role in the manufacturer's illegal acts is entirely incidental, differing not at all from what it would be if these agents were the employees of a totally integrated enterprise, the manufacturer plus its dealers and other agents . . . do not constitute an enterprise within the meaning of the statute"); *Brittingham*, 943 F.2d at 303 (recognizing that the alleged enterprise consisted of not just the defendant companies but also their advertising agencies; however, finding the entities "in reality no different from each other" because "[t]he advertising agencies were defendants' agents, and did no more than conduct the normal affairs of the defendant corporations").

The Court also notes that, even if the persons/entities were distinct from Apple, it often is not clear from the TAC how they above were involved in the predicate acts (*i.e.*, racketeering activity). *See Coronavirus Rptr. v. Apple*, No. 21-cv-05567-EMC, 2021 U.S. Dist. LEXIS 249564, at *55 (N.D. Cal. Nov. 30, 2021) (acknowledging plaintiffs' contention that "the alleged



United States District Court
Northern District of California

enterprise consisted of [not just Apple but also] Apple's 'crony app developers,' 'law firms,' and 'PR firms' who allegedly 'divert profits,' 'spread Apple's gospel,' or obfuscate 'Apple's competitive agenda,'" but stating that these allegations were insufficient because "none of these groups are alleged to have participated in an alleged enterprise involving the predicate acts of wire and mail fraud[;] [t]he allegations are also conclusory").

Along similar lines, in order for all of the persons/entities above to be deemed part of the association-in-fact enterprise, they must all have shared a common purpose – a purpose of the enterprise.

> [A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. [In short], an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."

*Boyle v. United States*, 556 U.S. 938, 946 (2009).

In her TAC, Ms. Gjovik alleges that "Apple engaged in a complex, cold, and calculated conspiracy to enable and conceal their systemic, long-running, intentional violations of basic environmental, health/safety, and labor laws – and censorship, obstruction, and concealment of these acts to profit from a progressive brand." TAC ¶ 126. However, Ms. Gjovik has failed to allege sufficiently that all of the persons above (including, *e.g.*, nonprofit organizations and doctors) shared this purpose; she has not alleged a nonconclusory, factual, and plausible basis for such an assertion as to these non-Apple entities. *See, e.g.*, *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1214 (11th Cir. 2020) (stating that plaintiff's "RICO complaint may only proceed if we can find facts within it that plausibly yield the inference that these defendants and the other participants in the alleged association-in-fact enterprise acted with the common purpose to engage in a scheme to defraud"; even if a defendant "independently commit[s] fraud," a RICO complaint must be dismissed if "the plaintiff fail[s] to plead that the other participants in the alleged enterprise shared a common purpose to do so"); *cf. Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (indicating that liability under § 1962(c) "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs")

(emphasis in original); *Gomez v. Guthy-Renker, LLC*, No. EDCV 14-01425 JGB (KKx), 2015 U.S. Dist. LEXIS 90725, at *26 (C.D. Cal. July 13, 2015) (finding no common purpose "when the alleged association-in-fact is merely a routine contract for services, because the entities are actually pursuing their individual economic interests, rather than any shared purpose").

At the hearing, Ms. Gjovik argued that Apple shared a common purpose with at least one environmental consultant, ACT Environmental. She asserted that Apple falsified certain EPA-related paperwork and that Apple could not have done so by itself but would have had to conspire with ACT Environmental to do so. As an initial matter, this was not alleged in the TAC. Even if Ms. Gjovik was referring to the events described in ¶¶ 142 and 143 of the TAC, she fares no better. She does not explain why Apple could not have accomplished the false filing without the assistance of the environmental consultant and how the environmental consultant knew that Apple was engaging in fraudulent conduct and joined in the purpose of defrauding authorities.

Finally, even if the Court were to credit this incident related to ACT Environmental, it is but one incident. That is insufficient to support a § 1962(c) claim which requires that a plaintiff allege a *pattern* of racketeering activity, which is "'defined as "at least *two* acts of racketeering activity" within ten years of each other.'" *Attia v. Google LLC*, 983 F.3d 420, 427 (9th Cir. 2020) (emphasis added). Moreover, to meet the requirement of a pattern of racketeering activity, a plaintiff must show that the racketeering acts making up the pattern (1) are related and (2) "'amount to or pose a threat of continued criminal activity.'" *Id.* "'Related' conduct 'embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Howard v. Am. Online, Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (noting, however, that "merely having the same participants is insufficient to establish relatedness"). As for the continuity requirement, a plaintiff "must prove either 'a series of related predicates extending over a substantial period of time' [known as closed-ended continuity], or 'past conduct that by its nature projects into the future with a threat of repetition' [known as open-ended continuity]." *Id.* at 750. Notably, predicate acts that last for a few weeks or months alone and that do not threaten future criminal conduct are not enough to establish closed-ended continuity. *See id.* (stating that

United States District Court
Northern District of California

Case: 26-4716, 11/13/2026, DktEntry: 10.1, (199 of 233)



"[a]ctivity that lasts only a few months is not sufficiently continuous"). At the hearing, Ms. Gjovik did not make any representations that Apple and ACT Environmental had an enterprise that engaged in a *pattern* of racketeering activity – *i.e.*, more than one predicate act, with such acts being related and that supported either closed-ended or open-ended continuity.

The Court therefore dismisses the § 1962(c) claim based on the multiple deficiencies above. Although the Court has serious concern as to whether Ms. Gjovik can plead a plausible § 1962(c) claim, it shall, out of an abundance of caution, give Ms. Gjovik leave to amend.

3. Section 1962(d)

Section1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a) . . . or (c) of this section." *Id.* § 1962(d). As indicated by this language, Ms. Gjovik's § 1962(d) claim is derivative of her § 1962(a) and § 1962(c) claims. Because the Court has dismissed with prejudice the § 1962(a) claim, the related § 1962(d) is dismissed with prejudice as well. Because the Court has dismissed the § 1962(c) claim, but with leave to amend, the related § 1962(d) is also dismissed but with leave to amend.

C. Violation of the Sarbanes-Oxley Act (Count 2)

In Count 2, Ms. Gjovik asserts a claim for violation of the Sarbanes-Oxley Act ("SOX").

> Congress enacted the Sarbanes-Oxley Act in the wake of the Enron scandal to "'prevent and punish corporate and criminal fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions.'" "Of particular concern to Congress was abundant evidence that Enron had succeeded in perpetuating its massive shareholder fraud in large part due to a 'corporate code of silence'" that "'discourage[d] employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally.'" . . .
>
> Congress' response was 18 U.S.C. § 1514A, which prohibits publicly traded companies from retaliating against employees who report what they reasonably believe to be instances of [1] criminal fraud or [2] securities law violations. The provision establishes that no employer may "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of" the employee's protected whistleblowing activity.

*Murray v. UBS Sec., LLC*, 144 S. Ct. 445, 449 (2024).

For purposes of the instant case, the relevant text from § 1514A is provided below:

Case: 26-4716, 11/13/2026, DktEntry: 10.1, (200 of 233)

> No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 . . . , or that is required to file reports under section 15(d) . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee . . . because of any lawful act done by the employee –
>
> (1) to provide information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by –
>
> (A) a Federal regulatory or law enforcement agency; [or]
>
> . . .
>
> (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

18 U.S.C. § 1514A.

In its motion, Apple argues that the SOX claim should be dismissed because Ms. Gjovik "fails to allege facts that, even if true, demonstrate she complained about conduct that she reasonably believed violated an enumerated SOX provision." Mot. at 10. Apple is correct.

As a preliminary matter, the Court notes that Ms. Gjovik's opposition spends little time on her SOX claim and fails to address Apple's argument directly. *See* Opp'n at 11 ("Plaintiff responds generally here instead of point by point."). That alone warrants dismissal.

The Court, however, has also independently reviewed the allegations in the TAC and concludes that the claim is deficient. In the TAC, Ms. Gjovik provides a laundry list of matters that she reported, either internally or to a government agency. *See* TAC ¶¶ 167-68. But many of these acts do not have anything to do with the kinds of criminal fraud identified in § 1514A above or with securities law violations. *See, e.g.*, TAC ¶¶ 84, 167-68 (referring to hoarding of COVID-19 vaccines, smuggling, and witness intimidation). While some acts could possibly relate to securities law violations, *see e.g.*, TAC ¶ 167 (referring to false statements about Apple's environmental and labor practices), the acts are described in vague terms, and, in any event, Ms. Gjovik has failed to allege how her subjective belief that there were violations was objectively



United States District Court
Northern District of California

United States District Court
Northern District of California

reasonable: "'[t]o have an objectively reasonable belief there has been shareholder fraud, the complaining employee's theory of fraud must at least approximate the basic elements of a claim of securities fraud,'" including that any misrepresentation or omission be *material*. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009); *see also Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 222 (2d Cir. 2014) (noting that "'it may well be that a complainant's complaint concerns such a trivial matter,' in terms of its relationship to shareholder interests, 'that he or she did not engage in protected activity under [§ 1514A].'"). A conclusory allegation that a misrepresentation or omission is material is not sufficient. Statements that amount to puffery (*e.g.*, claims by Apple that it is a progressive company) are not actionable. *See Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 U.S. Dist. LEXIS 200769, at *31-32 (N.D. Cal. Nov. 27, 2018) (stating that vague and amorphous statements – *e.g.*, "'we've got a great product experience'" or results were "'strong'" – "'do not give rise to liability for securities fraud, since reasonable investors do not consider such puffery material when making an investment decision'"). The allegedly false statements either amount to puffery[7] or, to the extent they pertain to specific incidents about which Apple lied, they were not demonstrably material to shareholders when viewed in the context of the far more global and consequential business and financial issues facing Apple.

One example in the TAC where Ms. Gjovik provides specificity is illustrative of why her claims fall short. (She called out this same example during the hearing on Apple's motion.) In the TAC, Ms. Gjovik alleges that Ronald Sugar is a member of the Apple Board of Directors. *See* TAC ¶ 91. But prior thereto, he "worked at TRW Microwave Inc." (or Northrop Grumman, which appears to be the successor company) which was responsible for creating the pollution that needed cleanup at Stewart 1. TAC ¶ 170; *see also* TAC ¶ 91. According to Ms. Gjovik, "[i]t's improbable that Ronald Sugar was not personally involved in TRW Microwave use and disposal of industrial hazardous materials at [Stewart 1] or not personally involved in the environmental

---

[7] Even statements that are not puffery are not actionable if they are inherently subjective, *i.e.*, if they cannot be measured by an objective standard. *See In re Philip Morris Int'l Inc.*, 89 F.4th 408, 418-19 (2d Cir. 2023).

clean-up of spills/dumping of those chemicals at [Stewart 1]." TAC ¶ 171. Ms. Gjovik suggests that this created some kind of conflict of interest on the part of Mr. Sugar once he was at Apple. *See* TAC ¶ 171. She also alleges that she reported this conflict of interest internally in or about August 2021 (*i.e.*, shortly before she was terminated in September 2021). *See* TAC ¶ 98. In addition, it appears she reported the conflict of interest to the SEC at about the same time. *See* TAC ¶ 169 (alleging that she "filed an SEC whistleblower tip on August 31, 2021").

But Ms. Gjovik was not complaining about criminal fraud (in particular, mail fraud, wire fraud, bank fraud, or securities or commodities fraud) or securities law violations, as opposed to, *e.g.*, safety. *See Magnuson v. Exelon Corp.*, 658 F. Supp. 3d 652, 662 (C.D. Ill. 2023) ("Plaintiff's words, actions, and the animating beliefs he alleges overwhelmingly demonstrate that a concern for nuclear safety, not fraud, motivated his [Issue Reports] and related disclosures to the [U.S. Nuclear Regulatory Commission]."). In the TAC, Ms. Gjovik tries to get around this by alleging that she was "inquir[ing] if Ronald Sugar was involved in [Apple's] fraud [on the EPA, *e.g.*, trying to conceal problems at Stewart 1] due to his conflicts of interest related to the property." TAC ¶ 171. But simply labeling Apple's conduct "fraud" does not make it the kind of fraud covered by SOX (*i.e.*, mail fraud, wire fraud, bank fraud, securities or commodities fraud). Ms. Gjovik's conduct here still seems to be motivated by a concern about safety, not fraud.[8] In any event, this specific alleged conflict of interest in handling the Stewart I office space would not be sufficiently

---

[8] To support its position that Ms. Gjovik was not reporting a concern about the kinds of fraud identified in § 1514A, Apple has asked the Court to take judicial notice of the complaint Ms. Gjovik filed with the SEC. *See* Mot. at 11; RJN No. 1, Ex. A (submission to SEC, dated September 1, 2021). Apple argues that it is appropriate for the Court to take judicial notice because (1) Ms. Gjovik references the complaint she made with the SEC in her TAC, *see* TAC ¶ 169, and (2) she provided a copy of the complaint as an attachment in her prior motion for judicial notice. *See* Docket No. 35-7, at 3-21. *See, e.g.*, *Davis v. HSBC Bank*, 691 F.3d 1152, 1160 (9th Cir. 2012) ("Under the 'incorporation by reference' doctrine . . . , 'a court may look beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary judgment.' Specifically, courts may take into account 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff 's] pleading.'").

Ms. Gjovik opposes judicial notice but Apple's argument above has merit. Moreover, Ms. Gjovik's opposition – that the TAC does not rely on the document and/or that the document cannot be authenticated – is not compelling.

material to give rise to a securities fraud claim.

Accordingly, the Court dismisses the SOX claim. Dismissal is with prejudice, both because of Ms. Gjovik's failure to respond directly to Apple's argument in her opposition and her failure to articulate at the hearing new facts that would suggest a violation of the relevant criminal fraud statutes or securities laws.

D. Violation of the Dodd-Frank Act (Count 3)

In Count 3, Ms. Gjovik asserts a claim for violation of the Dodd-Frank Act. The relevant portion of the statute provides as follows:

> No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower –
>
> (i) in providing information to the Commission in accordance with this section;
>
> (ii) in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or
>
> (iii) in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), including section 10A(m) of such Act (15 U.S.C. 78f(m)), section 1513(e) of title 18, United States Code, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

15 U.S.C. § 78u-6(h)(1)(A). (The caption of Ms. Gjovik's TAC cites (iii) above as the relevant subsection.)

The Supreme Court has noted that both SOX and Dodd-Frank

> shield whistleblowers from retaliation, but they differ in important respects. Most notably, Sarbanes-Oxley applies to all "employees" who report misconduct to the Securities and Exchange Commission (SEC or Commission), any other federal agency, Congress, or an internal supervisor.18 U. S. C. §1514A(a)(1). Dodd-Frank delineates a more circumscribed class; it defines "whistleblower" to mean a person who provides "*information relating to a violation of the securities laws to* the Commission." 15 U. S. C. §78u-6(a)(6). A whistleblower so defined is eligible for an award if original information he or she provides to the SEC leads to a successful enforcement action. §78u-6(b)-(g). And, most relevant here, a whistleblower is protected from retaliation for, *inter alia*, "making disclosures that are required or protected under" Sarbanes-Oxley,



United States District Court
Northern District of California

> the Securities Exchange Act of 1934, the criminal anti-retaliation proscription at 18 U. S. C. §1513(e), or any other law subject to the SEC's jurisdiction. 15 U. S. C. §78u-6(h)(1)(A)(iii).

*Dig. Realty Trust, Inc. v. Somers*, 583 U.S. 149, 152-153 (2018) (emphasis added).

As indicated in the discussion above, Ms. Gjovik did not directly respond to Apple's challenge to the Dodd-Frank claim; furthermore, she has failed to explain how she provided information relating to a violation of the securities laws. Accordingly, dismissal of her Dodd-Frank claim, with prejudice, is warranted.

Ms. Gjovik's reliance on *Wadler v. Bio-Rad Labs., Inc.*, 141 F. Supp. 3d 1005 (N.D. Cal. 2015), is unavailing. She argues that *Wadler* is factually similar to the instant case as it involved an employee who suspected a company of engaging in violations of the Foreign Corrupt Practices Act ("FCPA") and who started an investigation, "only to meet a variety of types of retaliation and obstruction." Opp'n at 12. But as Apple points out, the appellate decision in *Wadler* makes clear that a violation of the securities laws was implicated in the case because, as the defendant "correctly conceded in the district court," "one of the FCPA books-and-records provisions . . . is also an SEC regulation within the scope of [SOX]." *Wadler v. Bio-Rad Labs, Inc.*, 916 F.3d 1176, 1185 (9th Cir. 2019).[9]

E. Private Nuisance and Nuisance Per Se (Count 4)

In Count 4, Ms. Gjovik asserts a nuisance claim. Specifically, she maintains two subclaims: (1) private nuisance and (2) private nuisance per se. Each subclaim is based on Apple's conduct at (a) the ARIA factory (which was located close to Ms. Gjovik's apartment) and (b) Stewart 1 (where Ms. Gjovik's office was located and where the Superfund site was located).[10]

> In 1872, the California Legislature codified a number of common law principles regarding the law of nuisance. For example, the Legislature defined a "nuisance" in Civil Code section 3479 as

[9] The Ninth Circuit ultimately held that *other* FCPA provisions were not rules or regulations of the SEC, and therefore could not support a Sarbanes-Oxley claim. *See Wadler*, 916 F.3d at 1185.

[10] In the TAC, Ms. Gjovik also refers to an "absolute nuisance." Ms. Gjovik seems to consider an absolute nuisance as something similar to a nuisance per se or an ultrahazardous activity – *i.e.*, as a basis for strict liability to apply. *See* TAC ¶ 178. Because Ms. Gjovik has already asserted both a nuisance per se and an ultrahazardous activity, any claim for absolute nuisance would appear to be duplicative.

> anything that is "injurious to health, . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway."

*Mendez v. Rancho Valencia Resort Partners, LLC,* 3 Cal. App. 5th 248, 261 (2016).

California law draws a distinction between public and private nuisances.

> A nuisance is considered a "public nuisance" when it "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." A "private nuisance" is defined to include any nuisance not covered by the definition of a public nuisance and also includes some public nuisances.

*Id.* at 261-62 (citing Cal. Civ. Code § 3480-81). Unlike a claim for public nuisance, "'[a] private nuisance cause of action requires the plaintiff to prove an injury specifically referable to the use and enjoyment of his or her land.'" *Id.* at 262; *see also* CACI 2021 (essential factual elements for a claim of private nuisance).

> [T]he [California] Supreme Court [has] outlined the elements of an action for private nuisance [as follows]. First, the plaintiff must prove an interference with his use and enjoyment of his property. Second, "the invasion of the plaintiff's interest in the use and enjoyment of the land [must be] substantial, i.e., that it cause[s] the plaintiff to suffer 'substantial actual damage.'" Third,"'[t]he interference with the protected interest must not only be substantial, but it must also be unreasonable,' i.e., it must be 'of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land.'"

*Id.* at 262-63. The second and third elements are to be judged by an objective standard. *See id.* at 263.

California law also provides that, in certain instances, something may be deemed a nuisance per se.

> [W]here the law expressly declares something to be a nuisance, then no inquiry beyond its existence need be made and in this sense its mere existence is said to be a nuisance per se. . . . [T]o rephrase the rule, to be considered a nuisance per se the object, substance, activity or circumstance at issue must be expressly declared to be a nuisance by its very existence by some applicable law.

*Beck Development Co. v. Southern Pac. Transp. Co.*, 44 Cal. App. 4th 1160, 1207 (1996); *see also*



United States District Court
Northern District of California

*City of Costa Mesa v. Soffer*, 11 Cal. App. 4th 378, 382 (1992) ("[T]he legislature has the power to declare certain uses of property a nuisance and such use thereupon becomes a nuisance per se. . . . Nuisances per se are so regarded because no proof is required, beyond the actual fact of their existence, to establish the nuisance.") (internal quotation marks omitted); *Rincon Band of Luiseño Mission Indians etc. v. Flynt*, 70 Cal. App. 5th 1059, 1102 (2021) ("Nuisances per se are so regarded because no proof is required, beyond the actual fact of their existence, to establish the nuisance.") (internal quotation marks omitted).

1. Private Nuisance

Apple moves to dismiss the claim for private nuisance in part. Specifically, it moves to dismiss the private nuisance claim to the extent it is based on Apple's conduct at Stewart 1 (the Superfund site) as opposed to Apple's conduct at the ARIA factory *See* Reply at 5 ("Apple has not moved to dismiss the private nuisance claim related to [the ARIA] facility."). Apple is not moving to dismiss the claim as related to the ARIA factory because it concedes Ms. Gjovik has met the requirement that "'[a] private nuisance cause of action requires the plaintiff to prove an injury specifically referable to the use and enjoyment of *his or her* land.'" *Mendez,* 3 Cal. App. 5th at 262 (emphasis added); *see also* CACI 2021 (providing that one of the essential elements of a claim for private nuisance is that "[name of plaintiff] [owned/leased/occupied/controlled] the property"). This is because Ms. Gjovik is asserting that that Apple's conduct at the ARIA factory affected her nearby apartment. In contrast, Stewart 1 is simply where Ms. Gjovik's office is located. *Cf. Barrous v. BP P.L.C.*, No. 10-CV-02944-LHK, 2011 U.S. Dist. LEXIS 113597, at *20-21 (N.D. Cal. Oct. 3, 2011) (in discussing standing to sue for tort claims, stating that "'[a]ny interest sufficient to be dignified as a property right' will support an action based on a private nuisance, including a tenancy for a term," but "'such right does not inure in favor of a licensee, lodger or employee'").

The Court dismisses the private nuisance claim to the extent it is based on Stewart 1. Apple's position has merit, and, notably, Ms. Gjovik does not address Apple's argument in her opposition. The dismissal is with prejudice.



United States District Court
Northern District of California

2. Private Nuisance Pe Se

As for the claim for nuisance per se, Apple argues for dismissal on the basis that there is no law (including law passed by the state legislature) providing that running a factory (ARIA) or maintaining an office at a Superfund site (Stewart 1) is a nuisance per se. *See Costa*, 11 Cal. App. 4th at 382 (1992) (stating that "the legislature has the power to declare certain uses of property a nuisance and such use thereupon becomes a nuisance per se") (internal quotation marks omitted). Because the Court agrees with Apple's argument above, it need only concern itself with a claim of private nuisance per se as related to the ARIA factory, and not Stewart 1.

Ms. Gjovik's main response is that releasing "hazardous waste into the air and environment" must be a nuisance per se. TAC ¶ 176; *see also* Opp'n at 9 (asserting that "'[e]missions of hazardous substances into the environment have constituted nuisances per se'"; quoting *Espinosa v. Roswell Tower, Inc.*, 121 N.M. 306, 310 (N.M. Ct. App. 1995)). But Ms. Gjovik has failed to cite any *California* authority declaring the release of hazardous substances to be a nuisance. That the release of hazardous substances may be a violation of federal or state laws, *see, e.g.*, TAC ¶¶ 176 (referring to, *e.g.*, the Clean Air Act and California Health & Safety Code § 41700), does not automatically amount to a declaration by the state legislature that the conduct constitutes a nuisance per se. Therefore, the claim for nuisance per se is dismissed but with leave to amend, though the Court is skeptical whether such a claim can be stated.

To be clear, even if Ms. Gjovik were to decide *not* to amend the claim for nuisance per se, she would still have a "regular" claim for private nuisance based on the ARIA factory.

F. Ultrahazardous/Abnormally Dangerous Activities (Count 5)

In Count 5, Ms. Gjovik makes a claim similar to the nuisance per se claim above – *i.e.*, that Apple should be held strictly liable for conducting ultrahazardous activities at (1) the ARIA factory and (2) Stewart 1.

> The modern rule of strict liability without fault for injuries resulting from an ultrahazardous activity was adopted in [California] by the decision in *Luthringer v. Moore* (1948) 31 Cal.2d 489. Applying the standard set forth in the Restatement of Torts, the Supreme Court stated: "'One who carries on an ultra-hazardous activity is liable to another whose person, land or chattels the actor should recognize [are] likely to be harmed by the unpreventable miscarriage

> of the activity for harm resulting thereto from that which makes the activity ultra-hazardous, although the utmost care is exercised to prevent the harm. . . . An activity is ultra-hazardous if it (a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage. . . An activity is a matter of common usage if it is customarily carried on by the great mass of mankind or by many people in the community. . . .

*Tri-Star Dyeing & Finishing v. Brenntag Pac.*, No. 23STCV00357, 2023 Cal. Super. LEXIS 24088, at *7-8 (L.A. Super. Ct. Apr. 19, 2023).

Consistent with the above,

> Section 520, Restatement Second of Torts enumerates the [following] factors to be considered in determining whether an activity is "abnormally dangerous" or "ultrahazardous": "(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes." Whether a particular activity is abnormally dangerous is to be determined by the court "upon consideration of all the factors listed in this Section, and the weight given to each that it merits upon the facts in evidence." Due to the interplay of the various factors, it is impossible to define abnormally dangerous activities. "The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability from the harm that results from it, even though it is carried on with all reasonable care. In other words, are its dangers and inappropriateness for the locality so great that, despite any usefulness it may have for the community, it should be required as a matter of law to pay for any harm it causes without the need of a finding of negligence." Thus, by its very nature, the issue of whether an activity is ultrahazardous cannot be decided on demurrer.

*SKF Farms v. Superior Court*, 153 Cal. App. 3d 902, 906 (1984).[11]

In the instant case, Ms. Gjovik claims an ultrahazardous activity related to the ARIA factory because, "[f]or decades," semiconductor fabrication "has been known to require pyrophoric gases, which have a 'serious fire hazard,' combustible and flammable chemicals that

---

[11] Note that "[t]he question of whether a case is a proper one for imposing strict liability is one of law for the court. Moreover, [what] facts are necessary to make an activity ultrahazardous . . . is a matter for the judgment of the court." *Garcia v. Estate of Norton*, 183 Cal. App. 3d 413, 419 (1986) (internal quotation marks omitted; concluding facts at trial provided "ample evidence from which the trial court could properly conclude that the subject activity was ultrahazardous").

United States District Court
Northern District of California

must be 'carefully monitored and handled by experienced personnel.'" TAC ¶ 184. She also maintains that the ARIA factory released substances identified as toxic air contaminants under state and federal law for which "there is no safe level of exposure without 'significant adverse health effects.'" TAC ¶ 185.

As for Stewart 1, Ms. Gjovik has less to say. Her allegations are conclusory in nature – *e.g.*, "[o]perating a business on a Superfund mega-site with a pathway for vapor intrusion and contaminants of concern, including TCE and Vinyl Chloride, is an ultrahazardous activity." TAC ¶ 186.

Ms. Gjovik's claim for ultrahazardous activity survives Apple's 12(b)(6) challenge in part. Regarding the ARIA factory, Ms. Gjovik has made allegations that there are chemicals used for which there is no safe level of exposure, thus implying they are absolutely prohibited under any circumstance. *Cf.* TAC ¶ 37 (alleging that "[m]any of Apple's chemicals at the plant were characterized as 'extremely hazardous' or 'acutely hazardous' materials"). The claim is viable to that extent and only to that extent. However, Ms. Gjovik has also included allegations suggesting that there are some hazards (in particular, fire hazards) that can be managed with care, *see* TAC ¶ 184 (alleging that the chemicals "must be 'carefully monitored and handled by experienced personnel'"); that suggests the opposite of ultrahazardous. To that extent, the claim is not viable. These chemicals are not absolutely prohibited.

As for Ms. Gjovik's claim for ultrahazardous activity based on Stewart 1, it also is not viable. In contrast to above, here, Ms. Gjovik simply makes allegations that there are "contaminants of concern." TAC ¶ 186. An issue with "contaminants of concern" is too vague. At one point in her pleading, Ms. Gjovik suggests that there are contaminants of concern because some of the chemicals are carcinogens. *See* TAC ¶ 42 ("The primary contaminants in the groundwater contamination plume are chlorinated volatile organic compounds, including the carcinogen trichloroethene ('TCE') and its daughter products cis-1,2-dischloroethene and vinyl chloride."). But that fact *in and of itself* is not enough to raise a question of fact as to whether Apple engaged in ultrahazardous activity. Carcinogens often may be used subject to regulations.

Furthermore, even if the Court were inclined to rule otherwise on the Stewart 1-based

claim, Apple has fairly argued that the claim should be dismissed for the independent reason: specifically, it is time barred. There is a two-year statute of limitations for the claim. *See* Cal. Code Civ. Proc. § 335.1 (providing for a two-year limitations period for "[a]n action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another"); *id.* § 340.8(a) (providing that, "[i]n any civil action for injury or illness based upon exposure to a hazardous material or toxic substance, the time for commencement of the action shall be no later than either two years from the date of injury, or two years after the plaintiff becomes aware of, or reasonably should have become aware of, (1) an injury, (2) the physical cause of the injury, and (3) sufficient facts to put a reasonable person on inquiry notice that the injury was caused or contributed to by the wrongful act of another, whichever occurs later"). Given that Ms. Gjovik filed suit on September 7, 2023, any claim that accrued before September 7, 2021, is time barred. Apple points out that, as alleged in the TAC, Ms. Gjovik told Apple in March 2021 (*i.e.*, well before September 2021) that she was concerned about the safety of the Superfund site and that she believed "her fainting spell in 2019 in her office was due to vapor intrusion." TAC ¶ 51; *see also* TAC ¶ 35 (alleging that, in April 2021, Ms. Gjovik saw an occupational exposure doctor, and the doctor's notes referred to a statement by Ms. Gjovik that she had "'an unexplained episode of fainting at work in Sept 2019 at her office on a Superfund site with a long history of vapor intrusion issues'"). This supports a time bar.

Ms. Gjovik does not have much of a comeback in response. In her papers, she suggests that there were different kinds of safety issues at Stewart 1 – *e.g.*, some related to the cracked foundation and some related to the HVAC intake. *See, e.g.*, Opp'n at 9-10 ("Each location/vector, occurrence, and type of injury may be a different claim. The exposure to the vapor intrusion from the cracked floor is a different vector and exposure[] then [sic] the chlorinated solvent vapors piped into the HVAC system . . . ."). But that gives short shrift to the fact that there was a single contaminated site, from which Ms. Gjovik had a single injury. *See Berson v. Browning-Ferris Indus.*, 7 Cal. 4th 926, 932 (1994) ("'[T]he statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her.' Aggrieved parties generally need not know *the exact manner in which*

*their injuries were 'effected*, nor the identities of all parties who may have played a role therein.'") (emphasis added).

The Court therefore allows the claim based on the Aria factory to proceed (in part), but not Stewart 1. The dismissal of the Stewart 1-related claim is with prejudice because the time bar makes amendment futile.

G. Violation of the Bane Civil Rights Act (Count 6)

In Count 6, Ms. Gjovik has asserted a claim for violation of the Bane Civil Rights Act. The statute allows an individual to bring a private right of action if their "exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (b)." Cal Civ Code § 52.1(c). Subdivision (b) refers to interference and attempts to interfere by a "person or persons,[[12]] whether or not acting under color of law, . . . by threat, intimidation, or coercion." *Id.* § 52.1(b).

In the instant case, Ms. Gjovik identifies the following rights as having been interfered with: (a) the right to provide testimony to agencies (*e.g.*, the NLRB); (b) the right to meet with legislatures and appear as a legislative witness; (c) the right to report criminal acts to law enforcement; (d) the right to privacy as protected by the California Constitution; and (e) the right to free speech and assembly. She alleges that Apple interfered with these rights via, *e.g.*,

> threatening messages and social media posts about guns, ruin/destruction, and even her death; sending threatening and dangerous packages in the mail; tampering with Gjovik's chattels to the extent of conversion; surveilling and stalking Gjovik; hacking Gjovik's electronics and utilities; destroying Gjovik's chattels; trespassing and burglarizing Gjovik's home; and other inherently violent misconduct.

TAC ¶ 188; *see also* TAC ¶ 189 (referring to a "psychological torture campaign" with "harassment of Gjovik [coming] from all corners of the internet, including forums, social media sites, email, texts, website webform, phone calls, blog posts, news articles, and other mediums").

---

[12] The Bane Act does not itself define "person." However, the California Civil Code of which the Bane Act is a part provides that "the word person includes a corporation as well as a natural person." Cal. Civ. Code § 14.



United States District Court
Northern District of California

Apple launches a number of challenges to the civil rights claim – *e.g.*, (1) some of the alleged misconduct (*e.g.*, termination of employment, a "harassing" letter from a law firm) cannot support a Bane Act claim, and (2) some of the alleged misconduct was conduct undertaken by an ex-Apple employee (Ms. Scarlett, the individual whom Ms. Gjovik refers to as Ms. Appleseed). The most compelling arguments, however, are that (3) Ms. Gjovik does not identify any specific Apple employee that engaged in misconduct, and (4) Ms. Gjovik has not sufficiently explained how any of the alleged interferences with her rights were done via threat, intimidation, or coercion. *See* Mot. at 19 ("Plaintiff alleges . . . vague and conclusory examples of purported threats, coercion, and intimidation (*see* TAC ¶¶107-10, 188-89) but fails to *tie* them to any purportedly interfered-with right; as such, they cannot ground a Bane Act claim.") (emphasis added). The Court agrees that more clarity is needed on these issues, and therefore grants the motion to dismiss, albeit with leave to amend.

Because the Court is giving Ms. Gjovik leave to amend this claim, it notes that the issue of respondeat superior is a complicated matter that she should also address should she choose to amend. Courts have recognized that respondeat superior can make a public entity vicariously liable for a Bane Act violation. *See, e.g., Uganda Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1168-69 (N.D. Cal. 2009) (noting that, under California Government Code § 815.2(a), a city can be held "vicariously liable under the theory of respondeat superior" if the employee was "acting in the course and scope of employment"). There is no reason to think that respondeat superior would not also apply to private entities such as Apple. *See Presbyterian Camp & Conference Centers, Inc. v. Superior Court*, 12 Cal. 5th 493, 503 (2021) ("As a general rule, '[u]nless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules.") (internal quotation marks omitted). That being said, respondeat superior does not mean that an employer is automatically liable for all of its employee's acts.

Under the general doctrine, "an employer is vicariously liable for the torts of its employees committed within the scope of the employment," and this is true even if the employee commits a willful, malicious, or even criminal tort and the employer has not authorized the employee to

United States District Court
Northern District of California

commit the tort. *Lisa M. v. Henry Mayo Newhall Memorial Hospital*, 12 Cal. 4th 291, 296 (1995). Furthermore, "California no longer follows the traditional rule that an employee's actions are within the scope of employment only if motivated, in whole or part, by a desire to serve the employer's interests." *Id.* at 297.

However, an employer will not be held liable for an "intentional tort that did not have a causal nexus to the employee's work." *Id.* For instance, "'[i]f an employee inflicts an injury out of personal malice, *not engendered by the employment*, the employer is not liable.'" *Id.* at 298 (emphasis in original).

> The nexus required for respondeat superior liability – that the tort be engendered by or arise from the work – is to be distinguished from "but for" causation. That the employment brought tortfeasor and victim together in time and place is not enough. We have used varied language to describe the nature of the required additional link (which, in theory, is the same for intentional and negligent torts): the incident leading to injury must be an "outgrowth" of the employment; the risk of tortious injury must be '"inherent in the working environment'" or '"typical of or broadly incidental to the enterprise [the employer] has undertaken.'"
>
> Looking at the matter with a slightly different focus, California courts have also asked whether the tort was, in a general way, foreseeable from the employee's duties. Respondeat superior liability should apply only to the types of injuries that '"as a practical matter are sure to occur in the conduct of the employer's enterprise.'" The employment, in other words, must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought.
>
> In what has proved an influential formulation, the court in *Rodgers v. Kemper Constr. Co., supra*, 50 Cal. App. 3d at page 618, held the tortious occurrence must be "a generally foreseeable consequence of the activity." In this usage, the court further explained, foreseeability "merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business."

*Id.* at 298-99; *see also Alma W. v. Oakland Unified Sch. Dist.*, 123 Cal. App. 3d 133, 142-43 (1981) (stating that "[t]he test is not whether it is foreseeable that one or more employees might at some time act in such a way as to give rise to civil liability, but rather, whether the employee's act is foreseeable *in light of the duties* the employee is hired to perform") (emphasis in original).

Accordingly, if Ms. Gjovik does amend the Bane Act claim, she must allege specific facts

to support a basis for respondeat superior liability – *i.e.*, that an intentional tort committed by an Apple employee had a causal nexus to the employee's work.

H. Violation of the Ralph Civil Rights Act (Count 7)

In Count 7, Ms. Gjovik asserts a claim for violation of the Ralph Civil Rights Act. The relevant provision of the statute states as follows:

> All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics. The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive.

Cal Civ Code § 51.7(b)(1). Section 51(b) refers to the following characteristics: "sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status." *Id.* § 51(b). Section 51(e) also refers to the same. *See id.* § 51(e). According to Ms. Gjovik, Apple threatened and committed violent acts against her based on her making labor-related complaints with government agencies (*e.g.*, the NLRB), her sex, her disabilities, her activism, and her membership in a protected class of victims of environmental crime. *See* TAC ¶ 199-203.

Apple's main argument in its motion to dismiss is that Ms. Gjovik has failed to state a claim because she "does not provide any facts regarding what Apple supposedly did or said to threaten violence or commit violence against her." Mot. at 19. As above, more clarity is needed, and thus dismissal is warranted, although with leave to amend. As above, should Ms. Gjovik decide to amend this claim, any amendment must address whether there is a basis for respondeat superior liability. *See, e.g.*, *Beliveau v. Caras*, 873 F. Supp. 1393, 1399 (C.D. Cal. 1995) (addressing respondeat superior liability with respect to a claim under the Ralph Civil Rights Act).

I. Violation of the California Whistleblower Act (Count 8)

In Count 8, Ms. Gjovik asserts a claim for violation of the California Whistleblower Act. California Labor Code § 1102.5 provides in relevant part as follows:

> (b) An employer, or any person acting on behalf of the

United States District Court
Northern District of California

United States District Court
Northern District of California

employer, shall not retaliate against an employee for [1] disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for [2] providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(c) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

Cal. Lab. Code § 1102.5. To establish a prima facie violation of § 1102.5, a plaintiff "must show (1) she engaged in protected activity, (2) her employer subjected her to an adverse employment action, and (3) a causal link between the two." *St. Myers v. Dignity Health*, 44 Cal. App. 5th 301, 314 (2019).

In the TAC, Ms. Gjovik makes two main allegations in support of her § 1102.5 claim: specifically, that Apple retaliated against her after she complained to various government agencies (*e.g.*, the NLRB, the U.S. Department of Labor, the California Department of Labor, the California DFEH, the EEOC, the EPA, the California EPA, etc.) about (1) the Gobbler application[13] and (2) environmental and safety violations. (Although Ms. Gjovik also refers, in the TAC, to her refusal to participate in Apple's misconduct, *see* TAC ¶ 211, that allegation is also related to her complaints about the Gobbler application and the environmental and safety violations.)

As to the Gobbler application, Apple identifies two alleged deficiencies with the § 1102.5 claim: (1) Ms. Gjovik does not sufficiently identify to whom she made her complaint; and (2) Ms. Gjovik has not sufficiently identified what state or federal laws Apple allegedly violated. The second argument is not persuasive. Ms. Gjovik has alleged that the Gobbler application violated

[13] *See* TAC ¶ 106 (alleging that Apple "was illegally harvesting her biometrics through its face Gobbler app"); TAC ¶ 242 (alleging that the Gobbler app "was taking photos of her while undressed and using the bathroom and engaged in sexual activity").

Case: 26-4716, 11/13/2026, DktEntry: 10.1, Page 216 of 233



the right to privacy protected by the California Constitution. *See* TAC ¶ 209. That Ms. Gjovik also cites other statutes that may not be on point, *see* TAC ¶ 209 (referring to California Labor Code § 435 (recording employees in a restroom or locker room or room designated for changing) and § 1101-02 (prohibiting certain employer conduct related to political activities or affiliations of employees), is not dispositive since the § 1102.5 claim could be based on the California Constitution. However, Apple's first argument has some merit: based on the language of the statute and the fair notice requirements of the Federal Rules of Civil Procedure, Ms. Gjovik should provide information about to whom she complained about the Gobbler application. Although Ms. Gjovik has referred to various government agencies, it is not clear that she actually complained to those agencies about the Gobbler application specifically as opposed to, *e.g.*, environmental and safety issues.

As for the environmental and safety violations, Apple's only contention is that, again, Ms. Gjovik has failed to adequately identify what state or federal laws it allegedly violated. In the TAC, Ms. Gjovik has referred to CERCLA, OSHA, the Resource Conservation and Recovery Act, and the Clean Air Act but she has not cited to any specific provisions within those statutes. The Court need not decide whether the failure to cite specific provisions from these statutes deprived Apple of fair notice of the scope of Ms. Gjovik's claim. *See Ling La v. San Mateo County Transit Dist.*, No. 14-cv-01768-WHO, 2014 U.S. Dist. LEXIS 131316, at *18 (N.D. Cal. Sept. 16, 2014) ("La's allegation that she disclosed conduct in violation of the Davis-Bacon Act, related federal statutes, and related regulations is also insufficient. The point of notice pleading is to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.' La's citation to a whole statutory framework does not serve this purpose, in particular where La does not use her opposition brief to clarify the specific statutes and regulations that were violated."). At the hearing, Ms. Gjovik indicated that she had a list of provisions at hand, and, as the Court is already giving Ms. Gjovik leave to amend other claims, she may supplement this claim by including the specific provisions in the amended pleading.

J. <u>Retaliation for Filing Complaints in Violation of California Labor Code § 98.6 (Count 9)</u>

In Count 9, Ms. Gjovik asserts a claim for violation of California Labor Code § 98.6. The

statute provides in relevant part as follows:

> A person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter [covering the Division of Labor Standards Enforcement], including the conduct described in subdivision (k) of Section 96,[14] and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2,[15] or because the employee or applicant for employment has filed a bona fide complaint or claim or instituted or caused to be instituted any proceeding under or relating to their rights that are under the jurisdiction of the Labor Commissioner, made a written or oral complaint that they are owed unpaid wages, or because the employee has initiated any action or notice pursuant to Section 2699, or has testified or is about to testify in a proceeding pursuant to that section, or because of the exercise by the employee or applicant for employment on behalf of themselves or others of any rights afforded them.

Cal. Lab. Code § 98.6(a). As with a § 1102.5 claim, a prima facie case for a § 98.6 violation consists of the following showing: "(1) [the plaintiff] engaged in protected activity, (2) her employer subjected her to an adverse employment action, and (3) a causal link between the two." *St. Myers*, 44 Cal. App. 5th at 314.

In the instant case, Ms. Gjovik's § 98.6 claim is predicated on the protections provided in California Labor Code § 96(k), 232, and 232.5.

- As noted above, § 96(k) refers to "[c]laims for loss of wages as the result of demotion, suspension, or discharge from employment for lawful conduct occurring during nonworking hours away from the employer's premises." Cal. Lab. Code § 96(k); *see also Grinzi v. San Diego Hospice Corp.*, 120 Cal. App. 4th 72, 85 (2004) (stating that, "[b]y its plain language, . . . 98.6, subdivision (a) limits the rights of employers to discharge at-will employees for section 96, subdivision (k) conduct").
- Section 232 provides that no employer may, *inter alia*, "[d]ischarge, formally discipline, or otherwise discriminate against an employee who discloses the amount

[14] California Labor Code § 96(k) refers to "[c]laims for loss of wages as the result of demotion, suspension, or discharge from employment for lawful conduct occurring during nonworking hours away from the employer's premises." Cal. Lab. Code § 96(k).

[15] Chapter 5 relates to political affiliations.



United States District Court
Northern District of California

of his or her wages." *Id.* § 232(c).

- Section 232.5 provides that no employer may, *inter alia*, "[d]ischarge, formally discipline, or otherwise discriminate against an employee who discloses information about the employer's working conditions." *Id.* § 232.5(c).

In the pending motion, Apple does not move to dismiss the § 98.6 claim in its entirety. Rather, it takes issue with the claim only to the extent that Ms. Gjovik asserts that she was retaliated against for engaging in "lawful conduct asserting 'recognized constitutional rights.'" TAC ¶ 216 (alleging that "Gjovik engaged in lawful conduct asserting 'recognized constitutional rights' and 'rights under the Labor Code' . . . during nonworking hours – while she was on leave, away from Apple's premises[;] Apple retaliated . . . because of some of this protected conduct"). Apple argues that Ms. Gjovik has failed to allege any specific constitutional rights that were violated. Apple adds that, to the extent the constitutional right claimed is the First Amendment or comparable rights under the California Constitution, Ms. Gjovik cannot claim a violation because those rights provide protection vis-à-vis a state actor only, and not a private one. *See, e.g.*, *Grinzi*, 120 Cal. App. 4th at 85 ("[T]o successfully establish a tortious discharge claim under this provision of section 98.6, Grinzi must allege her discharge occurred because she asserted a recognized constitutional right. . . [But] the First Amendment free speech guarantees at issue are only recognized against *government* interference. Grinzi does not have a recognized constitutional right protecting her against private acts implicating her employment under the First Amendment . . . .") (emphasis in original); *Yu v. Univ. of La Verne*, 196 Cal. App. 4th 779, 790 (2011) ("A person's free speech rights under the federal and state constitutions are not infringed unless there is state action.").

Apple's argument above is meritorious; thus, dismissal is justified to the extent Ms. Gjovik is claiming lawful conduct involving the assertion of constitutional rights. To be sure, Ms. Gjovik now refers, in her opposition brief, to a number of other rights under the California Constitution: the right to privacy (art. I, § 1), the right to safety (art. I, § 1), the right to be free of discrimination (art. I, §§ 8, 31), the right to be free from water pollution (art. X, § 2), and the right to be protected as a victim of a crime (art. I, § 28), some of which do not require state action in the same way as

United States District Court
Northern District of California

the federal Constitution does. *See* Opp'n at 7. Those allegations, however, are not specified or otherwise fairly noticed in the TAC, and thus the Court does not consider them at this juncture. Ms. Gjovik has leave to amend the claim.

K. Breach of Implied Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count 12)

In Count 12, Ms. Gjovik asserts both (1) a claim for breach of implied contract and (2) a claim for breach of the implied covenant of good faith and fair dealing.[16]

Regarding breach of implied contract, Ms. Gjovik admits at first that she and Apple entered into an express employment agreement ("signed [and] written") in 2015. TAC ¶ 234. However, she then suggests that, at some point, the parties entered into an implied contract – specifically, she was "no longer an at-will employee and could only be fired by Apple for cause, as [she] had a reasonable belief, due to Apple's words or conduct, that she would only be discharged for good cause." TAC ¶ 234; *see also* TAC ¶ 235 (referring to "an implied contract making her no longer an at-will employee"). Implicitly, Apple breached the implied contract because it fired her in bad faith, *i.e.*, without good cause.

In addition to the above, Ms. Gjovik also seems to suggest that an implied contract was created because one of her superiors told her that he appreciated her willingness to speak the truth and that, if she continued to do so, "'good things will continue to follow.' This was a promise to Gjovik that if she reported unethical and unlawful conduct and held leaders to account, she would have continued employment at Apple." TAC ¶ 235. Implicitly, Apple breached this implied contract because it fired her in response to her complaints about unethical and unlawful conduct.

As for breach of the implied covenant of good faith and fair dealing, Ms. Gjovik alleges that "Apple deliberately undermined [her] ability to fulfill her contractual obligations, frustrating her ability to benefit from the agreement." TAC ¶ 235. However, Ms. Gjovik does not seem to

[16] Ms. Gjovik seems to have shaped this claim based on comments made by Judge Seeborg in a different case involving Apple. *See Banko v. Apple*, 20 F. Supp. 3d 749 (N.D. Cal. 2013). Apple has asked the Court to take judicial notice of certain filings in *Banko*, *see* Docket No. 61 (RJN); Ms. Gjovik has filed a conditional nonopposition. *See* Docket No. 65 (Opp'n at 3) (indicating that there is no opposition so long as the Court takes into account additional filings made in *Banko*).

include any other concrete factual allegations to flesh out this contention. The one possible allegation that might support a claim for breach of the implied covenant is that Apple fired Ms. Gjovik "shortly after her annual performance review was due, which would be accompanied by a performance bonus that she had already earned." TAC ¶ 237.

Apple moves to dismiss the claim for breach of contract on the basis that Ms. Gjovik has failed to allege any breach. In support, it provides a copy of the offer letter that Apple gave to Ms. Gjovik. Apple asks the Court to take judicial notice of the document. *See* RJN, Ex. B (offer letter). The Court does not take judicial notice of the offer letter given that Ms. Gjovik appears to challenge its authenticity. Admittedly, Ms. Gjovik may not be objecting in good faith here. For example, she asks who Ashley Henderson is (the name of the person on the offer letter), but presumably that was Ms. Gjovik's prior name.

Even if the Court were to take judicial notice of the offer letter, however, that still would not favor Apple. The offer letter does state that "[y]our employment relationship with Apple will be at will" and that, "[b]y signing this letter you agree that these are the only terms and conditions of your employment and acknowledge that you have not relied upon any other promises or representations, except those made in this letter." RJN, Ex. B (Offer Letter at 2). However, Ms. Gjovik alleges in the TAC that, *after* the offer letter, Apple made representations to her that created a new contract – an implied contract that she could only be terminated for cause. Similarly, Ms. Gjovik alleges that, *after* the offer letter, Apple represented that she would have continued employment if she continued to "tell the truth." *Cf. Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 352 (2000) (noting that an "employer's personnel policies and practices may become *implied-in-fact* terms of the contract between employer and employee[;] [i]f that has occurred, the employer's failure to follow such policies when terminating an employee is a breach of the contract itself") (emphasis in original).

That being said, there is a more fundamental problem with the claim for breach of implied contract: Ms. Gjovik does not identify what words or conduct Apple engaged in that gave rise to a reasonable belief that she could only be terminated for cause. Getting good performance reviews, bonuses, and promotions *by themselves* is not enough; otherwise, employers would never engage

in that conduct for fear of converting at-will employment to employment that can be terminated only for cause. *See* TAC ¶ 234; *see also Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 680 (1988) (stating that, "[i]n the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged'"). To the extent Ms. Gjovik is relying on the statement from her superior that good things would happen if she continued to tell the truth, that is too vague a statement to constitute a promise. *Compare Banko*, 20 F. Supp. 3d at 759 (holding that plaintiff had adequately alleged that "his employment agreement evolved to where he could only be fired for cause" – *e.g.*, "Banko avers *repeated oral assurances of job security* and consistent promotions, salary increases and bonuses during the term of his employment that contributed to his reasonable expectation of discharge only for good cause") (emphasis added).

As for the claim for breach of the implied covenant, Apple argues that it is duplicative of the claim for breach of contract itself. But here, Apple does not seem to have taken into account the suggestion in the TAC (albeit, not a clear one) that Apple timed her firing her to deprive her of a performance bonus. *See Guz*, 24 Cal. 4th at 353 n.18 (stating that "the covenant prevents a party from acting in bad faith to frustrate the contract's *actual* benefits" – *e.g.*, "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned") (emphasis in original).

Accordingly, the Court dismisses the claim for breach of implied contract but allows the claim for breach of the implied covenant to proceed. The Court shall allow Ms. Gjovik to amend her claim for breach of implied contract but only if she can do so in good faith, consistent with her Rule 11 obligations.

L. Intentional Infliction of Emotional Distress (Count 13)

In Count 13, Ms. Gjovik asserts a claim for intentional infliction of emotional distress ("IIED").

United States District Court
Northern District of California

United States District Court
Northern District of California

> A cause of action for intentional infliction of emotional distress exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. A defendant's conduct is "outrageous" when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community. And the defendant's conduct must be intended to inflict injury or engaged in with the realization that injury will result.

*Hughes v. Pair*, 46 Cal. 4th 1035, 1050-51 (2009) (internal quotation marks omitted).[17]

The IIED claim is somewhat confusing. Ms. Gjovik starts out with a prefatory allegation that Apple

> bugged [her] objects and home, sent her possessions to her in a box with broken glass and threatened it could contain a severed head, . . . repeatedly threatened to "ruin" and "destroy" her, and even sent her emails pretending to be government employees threatening her to stop speaking about Apple's chemical leaks.

TAC ¶ 238 (emphasis omitted). However, she then does not seem to predicate her IIED claim on those allegations but rather spends the bulk of the claim talking about (1) her termination and other employment-related retaliation, (2) the Gobbler application, (3) Apple's environmental pollution; and (4) a retaliatory lawsuit which appears to have filed by Ms. Scarlett, not Apple. Her opposition is consistent with this approach. The Court, accordingly, follows suit.

As a result, much of the IIED claim (although not all) is problematic. For example, on (1), Apple correctly argues that a termination or retaliation by itself is not enough to establish outrageous conduct. California courts have held "[m]anaging personnel is not outrageous conduct beyond the bounds of human decency, [and] [a] simple pleading of personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged." *Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 80 (1996); *see also Light v. Dep't of Parks & Rec.*, 14 Cal. App. 5th 75, 101 (2017) (stating that "[a] retaliatory motive alone is insufficient to sustain a claim for [IIED]"); *Garcia v. W. Coast Dental Servs.*, No.

[17] Ms. Gjovik indicates that her claim is based on not only California but also New York and Massachusetts law. Because no party has argued that the law at issue matters, the Court focuses on California law only.

22SMCV00228, 2023 Cal. Super. LEXIS 51588, at *16 (L.A. Cty. Super. Ct. Aug. 2, 2023) (noting that, "[i]n the employment context, a pleading of personnel management activity is insufficient to support a claim of IIED, even if improper motivation, such as retaliation, is alleged"). While IIED claims may be asserted where there is, *e.g.*, race- or sex-based discrimination, Ms. Gjovik has not alleged such discrimination in support of the IIED claim. *See Light*, 14 Cal. App. 5th at 101 (stating that plaintiff "may pursue a claim for [IIED] in the employment context where the conduct at issue violates FEHA and also satisfies the elements of the claim").

Apple also correctly asserts that a common law claim based upon mere termination or retaliation would be barred by workers' compensation exclusivity. This includes allegations of whistleblower retaliation. *See id.* at 99 (noting that, even though it might seem that whistleblower retaliation is not a risk inherent in the employment relationship, California courts have rejected the argument); *see also Miklosy v. Regents of Univ. of Cal.*, 44 Cal. 4th 876, 903 (2008).

As for (2) (pertaining to the Gobbler application), there is a statute-of-limitations problem. There is a two-year limitations period for IIED claims. *See* Cal. Code Civ. Proc. § 335.1 (providing for a two-year limitations period for "[a]n action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another"). The TAC indicates that Ms. Gjovik began complaining about the Gobbler application in August 2021, *see* TAC ¶¶ 80-81 – more than two years before she filed her original complaint in September 2023.

As for (3) (relating to environmental pollution), there is a *partial* time bar. As discussed above, Ms. Gjovik made complaints about the safety of Stewart 1 back in March 2021 (*i.e.*, more than two years before the original complaint was filed). *See* TAC ¶ 51 (alleging that Ms. Gjovik told Apple in March 2021 (*i.e.*, well before September 2021) that she was concerned about the safety of the Superfund site and that she believed "her fainting spell in 2019 in her office was due to vapor intrusion"). Ms. Gjovik could still have a claim based on the Aria factory; at least, Apple has not made a statute-of-limitations argument.

Finally, on (4) (retaliatory suit brought by Ms. Scarlett), it appears that the alleged retaliatory lawsuit took place after Ms. Scarlett was no longer an Apple employee. *See* TAC ¶ 137

United States District Court
Northern District of California

(alleging that Ms. Scarlett "supposedly quit Apple in late 2021"); TAC ¶ 247 (alleging that the "retaliatory litigation" was "filed in 2022"); *see also* SAC ¶ 879 (alleging that "Appleseed, as an agent of Apple, filed retaliatory litigation against Gjovik in a Washington state court (including evidence and testimony of the bogus FBI complaint, and testimony she also reported Gjovik to law enforcement)").[18] That being the case, Ms. Gjovik cannot argue respondeat superior as a basis to hold Apple liable. And the TAC does not contain any concrete allegations indicating that, post-employment, Ms. Scarlett was part of some kind of conspiracy with Apple.

Accordingly, the only partial claim for IIED that survives is based on Apple's conduct at the Aria factory (not time barred). The Court gives Ms. Gjovik leave to amend if she can do so in good faith.

M. Negligent Infliction of Emotional Distress (Count 14)

In Count 14, Ms. Gjovik asserts a claim for negligent infliction of emotional distress ("NIED"). Under California law, a claim for NIED is simply a claim for negligence; it is not an independent tort. *See Christensen v. Superior Ct.*, 54 Cal. 3d 868, 884 (1991). Thus, a claim for NIED consists of the traditional negligence elements: duty, breach of duty, causation, and damages. *See Belen v. Ryan Seacrest Prods., LLC*, 65 Cal. App. 5th 1145, 1165 (2021).

Here, Ms. Gjovik's NIED claim is predicated on the same facts asserted in support of the IIED claim. *See* TAC ¶ 252 ("The plaintiff incorporates and restates the 13th Cause of Action for IIED [in the claim for NIED]."). Thus, it is not surprising that Apple has made one of the same challenges to the NIED claim that it made for the IIED claim – *i.e.*, that the claim is preempted by workers' compensation exclusivity.

Apple also raises the contention that it cannot be held liable for a NIED claim because it had no duty to Ms. Gjovik. *See Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 985 (1993) (noting that a "duty may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship"; adding that, if the duty is assumed by the defendant, then the defendant must

[18] Although Ms. Gjovik suggests that the Court should not consider the SAC because it has been superseded by the TAC, it is fair to consider allegations to the extent they provide context on the TAC.

have "assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object"). Apple argues, for instance, that it did not assume a duty to Ms. Gjovik in which her emotional condition was an object. Ms. Gjovik does not clearly respond to this argument in her papers, and thus the Court dismisses the NIED claim in its entirety. The Court shall give Ms. Gjovik leave to amend; in amending, she must include nonconclusory, factual, and plausible allegations as to duty. She must also bear in mind the Court's ruling above on workers' compensation exclusivity.

N. Violation of California Business & Professions Code § 17200 (Count 15)

Finally, in Count 15, Ms. Gjovik asserts a claim for violation of California Business & Professions Code § 17200. The claim seems to be based on three factual predicates: (1) Apple's coercing employees to provide personal data for Apple's commercial use, such as with the Gobbler application, *see* TAC ¶ 255 (alleging that no consent was obtained or compensation provided); (2) Apple's coercing employees to be a part of invasive studies, *see* TAC ¶ 258; and (3) Apple's establishment of a health care clinic, called AC Wellness, which it then used improperly. *See* TAC ¶ 259. (To be frank, the Court does not understand the allegations made with respect to (3).)

Apple moves to dismiss the § 17200 claim on the basis that Ms. Gjovik lacks standing – *i.e.*, she has failed to allege that she lost money to Apple which Apple should be forced to disgorge. *See* Cal. Bus. & Prof. Code § 17203 (providing that a "court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition"); *see also* *Shersher v. Superior Court*, 154 Cal. App. 4th 1491, 1497-98 (2007) (noting that the California Supreme Court has "held that the only remedy expressly authorized by section 17203 was restitution to individuals who had an ownership interest in money paid to the defendants; there was nothing, either in the express language of the statute or in its legislative history, to indicate that the legislature intended to authorize a court to 'order a defendant to disgorge all profits to a plaintiff who does not have an ownership interest in those profits'"). As an initial matter, the Court bears in mind that Ms. Gjovik seeks not only disgorgement as a remedy but also injunctive relief. *See* TAC ¶ 260. Apple does not explain why she would not have standing to pursue

United States District Court
Northern District of California

injunctive relief. However, Apple otherwise makes a fair point on monetary relief, *i.e.*, that Ms. Gjovik has not clearly alleged how she lost any money or property as a result of Apple's actions.

The Court therefore grants in part and deny in part the motion to dismiss: Ms. Gjovik has standing to pursue injunctive relief but not monetary relief (based on the allegations in the TAC). The Court gives Ms. Gjovik leave to amend. If Ms. Gjovik chooses to amend, she should clarify her claim based on AC Wellness.

## III. MOTION TO STRIKE

In addition to a 12(b)(6) motion, Apple has filed a motion to strike pursuant to Federal Rules of Civil Procedure 12(f). Under Rule 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Apple moves to strike:

(1) allegations that do not relate to the 15 claims asserted by Ms. Gjovik in the TAC; and

(2) allegations that relate to the claims that Apple is moving to dismiss (assuming that the Court dismisses those claims).

The motion to strike based on (2) is essentially moot. As the Court is giving Ms. Gjovik to leave to amend on most claims (although not all), she will file a new pleading that supersedes the TAC.

As for (1), Apple has identified about 20 paragraphs that it believes has no relevance to any of the 15 claims Ms. Gjovik has asserted. Although Apple's position is not without any merit, it is essentially premature. At this early juncture, it is hard to say that the allegations in those paragraphs are entirely irrelevant. Apple makes a fair point that the case should be streamlined to focus on the claims that really are potentially viable; however, if Apple is worried about far-reaching discovery, that can be addressed through meet and confers and (if necessary) motion practice. The Court forewarns both parties that it expects discovery to be conducted in good faith.

## IV. CONCLUSION

For the foregoing reasons, the Court rules as follows:

- Violation of RICO (Count 1). The § 1962(a) claim is dismissed with prejudice.

United States District Court
Northern District of California

The § 1962(c) claim is dismissed with leave to amend. The § 1962(d) claim is dismissed with prejudice to the extent it is based on a § 1962(a) theory. The § 1962(d) claim is dismissed with leave to amend to the extent it is based on a § 1962(c) theory.

- Violation of SOX (Count 2). The claim is dismissed with prejudice.
- Violation of the Dodd-Frank Act (Count 3). The claim is dismissed with prejudice.
- Private Nuisance and Nuisance Per Se (Count 4). The claims based on Stewart 1 are dismissed with prejudice. The per se claim based on the Aria factory is also dismissed but with leave to amend. The "regular" claim based on the Aria factory is not dismissed as Apple did not challenge it.
- Ultrahazardous Activities (Count 5). The claim related to the Aria factory is dismissed but only in part. The claim related to Stewart 1 is dismissed – and with prejudice because of the time bar.
- Violation of the Bane Civil Rights Act (Count 6). The claim is dismissed with leave to amend.
- Violation of the Ralph Civil Rights Act (Count 7). The claim is dismissed with leave to amend.
- Violation of the California Whistleblower Act (Count 8). The claim is dismissed with leave to amend, and/or Ms. Gjovik may supplement the allegations in support of the claim.
- Retaliation for Filing Complaints in Violation of California Labor Code § 98.6 (Count 9). The claim is dismissed with leave to amend.
- Breach of implied contract and breach of the implied covenant of good faith and fair dealing (Count 12). The claim for breach of implied contract is dismissed with leave to amend. The claim for breach of the implied covenant is allowed to proceed.
- Intentional infliction of emotional distress (Count 13). The claim is dismissed with leave to amend. The only partial claim for IIED that survives at this juncture is

United States District Court
Northern District of California

based on Apple's conduct at the Aria factory (not time barred).

- Negligent infliction of emotional distress (Count 14). The claims is dismissed with leave to amend.
- Violation of California Business & Professions Code § 17200 (Count 15). The claim is dismissed with leave to amend. Ms. Gjovik has standing to seek injunctive relief but she has not alleged how she has standing for monetary relief.

As for the motion to strike, the Court denies it but without prejudice.

Ms. Gjovik shall file an amended complaint (again, within the page limits previously set by the Court) by June 17, 2024. Apple shall then file a response (whether an answer or another motion to dismiss) by July 15, 2024.

Although the Court is giving Ms. Gjovik leave to amend on the bulk of the dismissed claims, it suggests that she use some discretion in deciding which claims to amend (as the Court is not requiring her to amend). As the Court indicated at the hearing, some claims can probably be amended such that they would survive a 12(b)(6) challenge (assuming, as likely, that Apple responds to an amended pleading with another motion to dismiss). These claims are largely predicated on the theory that Apple retaliated against Ms. Gjovik for complaining about safety. On the other hand, there are also some claims that the Court views with skepticism. For these claims, the Court is not able to say at this juncture that they are futile; however, their viability appears problematic. It also is not clear that Ms. Gjovik needs them in her suit; Ms. Gjovik conceded as much by stating at the hearing that she does not intend to litigate all of her claims to a jury, should the case reach that stage). There are questions as to what these claims really add to her suit.

At the hearing, Ms. Gjovik indicated that she was including these claims to ensure her ability to get broad discovery. But Apple is not contesting (at this point at least) two of her claims (Counts 10 and 11), and these are two of her *primary* claims; thus, Ms. Gjovik's discovery concern seems to be unfounded or at least overstated. Furthermore, it is more than likely that, if Ms. Gjovik were to replead, *e.g.*, her § 1962(c) claim or Bane and Ralph civil rights claims, Apple would respond with another motion to dismiss, which, in the long run, means that resolution on

United States District Court
Northern District of California

her primary claims would be delayed. Although Ms. Gjovik is free to litigate her case as she chooses (so long as she does so in good faith and in compliance with her Rule 11 obligations), it is not clear that, as a practical matter, the benefit, if any, is worth the burden (*e.g.*, pleading a § 1962 claim is not an easy task given, *e.g.*, the multiple elements needed for a viable claim).

The Court sets an initial case management conference ("CMC") for **July 16, 2024, at 1:30 p.m.** The parties shall file a joint CMC statement one week in advance.

This order disposes of Docket Nos. 48, 49, and 64.

**IT IS SO ORDERED**.

Dated: May 20, 2024

EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,
Plaintiff,
v.
APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**ORDER DENYING PLAINTIFF'S MOTION FOR JUDICIAL NOTICE; AND DISMISSING PLAINTIFF'S SECOND AMENDED COMPLAINT**

Docket Nos. 35, 37

Currently pending before the Court is Plaintiff's motion for judicial notice. Having considered the parties' papers, the Court finds this matter suitable for resolution without oral argument. The motion for judicial notice is hereby **DENIED** without prejudice as moot.

At the time Plaintiff submitted her request for judicial notice, there was a pending motion to dismiss Plaintiff's first amended complaint ("FAC"). Plaintiff had filed an opposition to the motion but had also filed a second amended complaint ("SAC"). When Plaintiff filed her request for judicial notice, she stated that she was submitting it both (1) in support of her opposition to Defendant's motion to dismiss the FAC and (2) in support of her SAC.

Because Plaintiff had filed a SAC, Defendant withdrew its motion to dismiss the FAC. This rendered the reason in (1) above moot. As for (2), Plaintiff did not need the mechanism of a request for judicial notice to support her SAC. She could have simply attached the exhibits at issue to her SAC. Moreover, once Defendant filed a motion to dismiss the SAC (as it now has done), she could have submitted a *new* request for judicial notice in support of her opposition to *that* motion. Accordingly, the Court denies the motion for judicial notice as moot.



United States District Court
Northern District of California

This leads the Court to Plaintiff's operative pleading, the SAC. This is the third pleading filed by Plaintiff.

- Her original complaint was more than 150 pages; contained 440 paragraphs; and asserted ten causes of action.
- Her FAC was more than 330 pages; contained 1,121 paragraphs; and asserted twelve causes of action.
- The operative SAC is more than 650 pages; contains 1,620 paragraphs; and asserts twelve causes of action.

Defendant has filed a motion to dismiss and a motion to strike with respect to the SAC. The Court does not adjudicate those motions because it *sua sponte* **DISMISSES** the SAC for failure to comply with Federal Rule of Civil Procedure 8. *See In re Merrill Lynch & Co., Inc. Research Rpts. Sec. Litig.*, 218 F.R.D. 76, 77-78 (S.D.N.Y. 2003) (dismissing 98-page complaint consisting of 367 paragraphs; noting that, "[w]hen a complaint is not short and plain, or its averments are not concise and direct, 'the district court has the power, on motion or *sua sponte*, to dismiss the complaint'") (quoting *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995)).

Rule 8(a) provides that "[a] pleading that states a claim for relief must contain: . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. 8(a)(2). Rule 8(d) provides that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). "'Taken together, [these rules] underscore the emphasis placed on clarity and brevity by the federal pleading rules." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 702 (3d Cir. 1996). A complaint must "'be presented with clarity sufficient to avoid requiring a district court or opposing party to forever sift through its pages in search' of the nature of the plaintiff's claim." *Glover v. FDIC*, 698 F.3d 139, 147 (3d Cir. 2012) (quoting *Jennings v. Emry*, 910 F.2d 1434, 1436 (7th Cir. 1990)); *see also United States ex Rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud. Federal judges have better things to do, and the substantial subsidy of litigation (court costs do not begin to cover the expense of the judiciary) should be targeted on those litigants who take the

United States District Court
Northern District of California

Case: 25-4716, 11/13/2026, DktEntry: 10.1, Page 232 of 283



preliminary steps to assemble a comprehensible claim.").

Plaintiff's SAC violates Rule 8. It is, as noted above, more than 650 pages and contains 1,620 paragraphs. Moreover, if the Court were to deem the exhibits attached to Plaintiff's request for judicial notice as exhibits to the SAC, that would add another 1,500 pages (approximately) to her pleading. "While a complaint's excessive length alone is not determinative for a Rule 8(a) dismissal, its excessive length compounded by a lack of clarity should deem it unacceptable." *Parker v. Learn the Skills Corp.*, No. 03-6936, 2004 U.S. Dist. LEXIS 21499, at *4-5 (E.D. Pa. Oct. 25, 2004). Here, Plaintiff delves into minute detail about her relationship with Defendant starting in 2015 (for some 300 pages). She then goes into each of her twelve claims, sometimes assuming knowledge of the 300 pages of background and other times providing even more detail. The pleading, as a result, is difficult to follow – one cannot see the forest through the trees. *Cf. Jacob v. Trump*, No. 21-cv-00261-JD, 2021 U.S. Dist. LEXIS 6894, *2-3 (N.D. Cal. Jan. 13, 2021) (stating that "[t]he massive length of the complaint exponentially compounds its lack of clarity and readability"). The Court acknowledges that Defendant was able to craft a response to Plaintiff's SAC in spite of its density; but presumably, that is because has engaged with Plaintiff over many years. The Court is not in the same position and thus does not have the same advantage.

Although the Court is dismissing the SAC, it gives Plaintiff an opportunity to file a third amended complaint ("TAC"), one that complies with Rule 8. The Court recognizes that Plaintiff has a long history with Defendant and that some of her claims are complex (*e.g.*, RICO). Nevertheless, this is not the kind of case that warrants a complaint hundreds of pages in length. Moreover, Plaintiff is not expected to try the entirety of her case in the complaint. The Court notes that even her original complaint – which was more than 150 pages and contained 440 paragraphs – failed to comply with Rule 8. Accordingly, any amended complaint that Plaintiff files shall be no longer than 75 pages in length. Plaintiff also cannot use exhibits attached to the amended complaint as a means to bypass this page limit. The Court notes that Plaintiff appears to have a J.D. *See* SAC ¶ 12. That being the case, the Court is confident that Plaintiff can draft a complaint that contains the necessary details but that does not go into every nuance and aspect of

United States District Court
Northern District of California

her case.

For the reasons stated above, the Court (1) denies Plaintiff's motion for judicial notice and (2) dismisses her SAC but with leave to amend. Because the Court is dismissing the SAC, Defendant's motion to dismiss and motion to strike, *see* Docket Nos. 41-42 (motions), are denied as moot.

Plaintiff has until February 27, 2024, to file her TAC. Defendant shall then have until March 26, 2024, to file a response, whether an answer or a motion(s).

This order disposes of Docket Nos. 35, 37, 41, and 42.

**IT IS SO ORDERED**.

Dated: January 30, 2024



EDWARD M. CHEN
United States District Judge