**No. 26-4716**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ASHLEY M. GJOVIK,

*Plaintiff-Appellant,*

v.

APPLE INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-04597-EMC
Hon. Edward M. Chen

# EXCERPTS OF RECORD
# VOLUME 2 OF 4

*DRAFT - not for filing until the missing documents are inserted and the pagination is final*

Ashley M. Gjovik
2108 N St., Ste. 4553
Sacramento, CA 95816
(408) 883-4428
legal@ashleygjovik.com

*Plaintiff-Appellant, In Propria Persona*

Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

ASHLEY M. GJOVIK, Plaintiff,

VS. NO. 3:23-cv-04597-EMC

APPLE INC., Defendant.

San Francisco, California
Thursday, June 11, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
ASHLEY M. GJOVIK
2108 N Street, Suite 4553
Sacramento, CA 95816
BY: **ASHLEY M. GJOVIK, PRO SE**

For Defendant:
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
BY: **MELINDA S. RIECHERT, ATTORNEY AT LAW**

ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4497
BY: **NICHOLAS J. HORTON, ATTORNEY AT LAW**

REPORTED REMOTELY BY: Kendra A. Steppler, RPR, CRR
Official United States Reporter

Thursday - June 11, 2026 2:31 p.m.

P R O C E E D I N G S

---o0o---

**THE COURTROOM DEPUTY:** All rise. Court is now in session, the Honorable Edward M. Chen presiding.

**THE COURT:** I apologize for the sauna effect. The condenser's broken. That's why we're getting hot air instead of cool air. Have a seat, everyone.

**THE COURTROOM DEPUTY:** First case the court will be calling is Gjovik v. Apple Inc., Case Number 23-4597.

Please state your appearance for the record, beginning with the plaintiff.

**MS. GJOVIK:** I'm the plaintiff, Ashley Gjovik.

**THE COURT:** All right. Thank you, Ms. Gjovik.

**MS. RIECHERT:** My name is Melinda Riechert from Orrick, representing Apple.

**THE COURT:** All right. Thank you, Ms. Riechert.

So we are here on cross-motions for summary judgment. And the question is whether or not there are material issues of fact that will require a trial. And although there are a lot of disputed issues of fact, I think, clearly, there are questions about -- there's enough here to show that Ms. Gjovik did engage in protected activity -- some protected activity. I don't think -- that's not disputed. There is enough here to suggest potential causal relationship between those activities

and her termination. And, on the other hand, the defendant has raised neutral reasons -- at least two, if not three -- for the termination.

And so under the traditional test that would apply here -- what we refer to as the McDonnell Douglas test, which is kind of a three-step -- the critical issue is whether or not the plaintiff has met her burden of showing that these neutral reasons, such as disclosure of confidential information, was pretextual, not the true reason. The true reason was because of the protected activity.

But I do want to make sure that the plaintiff does not contend -- there is another set of cases and tests for what's called a mixed motive test. But I don't see that being raised here. This is more traditional McDonnell Douglas test. So I'm not hearing -- not much was cited on the mixed motive -- I just want to make sure I don't go off on a tangent there.

**MS. GJOVIK:** I believe all the reasons I've stated for the termination were unlawful, themselves.

**THE COURT:** Okay. Well, there is also a bit of a twist. Labor Code 1102.5, I think it is, kind of states it just a little differently. And it seems to place, under some circumstance, the burden on the employer just so that the -- the termination would have been -- would have occurred anyway, but by a clear and convincing evidence.

But what -- I want to spend a little bit of time -- and

is most indicative of a pretext. Which of those things would you say is most compelling?

**MS. GJOVIK:** First, Your Honor, I'd like to clarify, I believe all of these are not -- these are unlawful in their own right and under the statutes in this case. So this is actually kind of maybe a modified analysis where I am arguing that there was pretext that they fired me for other protected reasons, but that each of the reasons they're saying they fired me for --

**THE COURT:** Okay. I understand that argument.

**MS. GJOVIK:** Oh, sorry.

**THE COURT:** But I'm focusing on the pretext question.

**MS. GJOVIK:** Okay. I would say their hidden reason for firing me -- for reporting sexual harassment -- and then which they were advised to --

**THE COURT:** When you say "hidden reason," what --

**MS. GJOVIK:** They would not -- they had not disclosed the nature or any details of this reason they fired me. But under deposition, their witnesses said, concretely, I was fired for reporting various versions of sexual harassment. And even citing a criminal statute was somehow misconduct by me. There's complete shifting explanations between all witnesses. It was never disclosed in any of their discovery responses or filings. And I believe that also shows that they're concealing shifting and --

**THE COURT:** Well, I mean, I have to look at the

asserting pretext -- there's a document that was issued before her termination that was entitled the "Draft Exit Outcomes ACP.key," which sounds like a decision to -- or a predetermined decision to terminate. Why doesn't that raise an inference of a --

**MS. RIECHERT:** So that's a privileged document. And we're not required to breach the privilege by saying what was in that document. But as Ms. Gjovik has admitted, she had asked Apple about leaving the company and having -- getting paid severance in exchange for leaving. And so, again, I'm not going to reveal what was in that document, because I'm not allowed to, and I will not waive the privilege. But she has, herself, provided a potential explanation for what was in that document. But we cannot be forced to waive the privilege and reveal what was in that document. But it does not evidence pretext.

**THE COURT:** And I understand there's a privilege. And you have the right to assert the privilege. In this context, is there any authority to draw an inference -- an adverse inference -- from the nondisclosure?

**MS. RIECHERT:** Right. That's my understanding, is that you cannot draw an adverse inference from the fact that we've asserted the privilege.

**THE COURT:** And there's -- the *St. John* case says that, among others.

look to 1102.5, 232.5, et cetera, that employees have a right to talk about their work conditions, make complaints about them --

**THE COURT:** They do. But they can't disclose confidential information.

**MS. GJOVIK:** Okay. I argue -- yep. I argue this is not confidential. And they've made no showing that any of this is confidential.

In fact, the declaration I filed included my deposition taken by Apple, where I explained to them, in December of 2025, that I, in fact, escalated this matter to a senior manager in the video engineering department of Apple before I shared any of this content asking her her opinion if these photos would be confidential or not. I thought they were not. She agreed they were not.

I gave her name of who I talked to. And she encouraged me to share them, also expressing concern about all these photos being gathered. So I escalated to management at Apple. I asked if this was confidential or not. She suggested she did not believe they were and encouraged me to share them, in hoping to reform Apple's practices regarding privacy of employees.

**THE COURT:** Ms. Reichert, direct me to the most probative evidence about -- on the subject of confidentiality. That what specifically was posted and disclosed was indeed

Case: 26-4716, 11/13/2026, DktEntry: 10.2, Page 8 of 161

confidential.

**MS. RIECHERT:** Right.

**THE COURT:** Where would I find that?

**MS. RIECHERT:** So Dr. Aloe's deposition and declaration were both the most detailed, if subtle, description of what was confidential. So Ms. Gjovik asked him in his deposition what was confidential. I can get you the page number for that. And then in his declaration, he, again, explains what was confidential. That's document number 370 on the Court's docket. And he explains what was confidential about it.

**THE COURT:** All right. So he's -- his declaration -- does it say anything different than what he said in his deposition?

**MS. RIECHERT:** No. They're essentially the same. Again, we couldn't get into the real detail about what it is about the pictures that's confidential, because we were not allowed to produce testimony under the protective order and accept it as being honored, as Your Honor well knows.

And so he gave information that he believed that it was confidential. Bertolus gave information that he believed it was confidential; therefore, Apple determined that it was confidential. And Ms. Gjovik has not rebutted that by saying that anybody else was treated differently, that other people who published confidential information were not punished. So

Apple had the right to decide that it was confidential, and they did so.

**THE COURT:** Would you agree that, under the Labor Code Section 1102.5, that the burden is on the employer to prove that the same decision -- if the plaintiff shows a -- at least raises a plausible issue of fact of causal relationship between the retaliation -- alleged retaliation -- or the protected activity and the termination -- that the burden shifts to the employer to show by clear and convincing evidence?

**MS. RIECHERT:** I absolutely agree with that. That what the legislature intended, in my opinion, is just because you engage in protected activity, does not protect you from being terminated. That's what that statute says. That's what the case law says. So an employee cannot engage in protected activity, and then engage in misconduct, and then say, oh, you can't fire me for the misconduct, because I engaged in protected activity.

**THE COURT:** That allows the employer to terminate, but it has to do so by a fairly high burden of proof.

**MS. RIECHERT:** Right. And we have absolutely presented and met, in our opinion, the burden of proof to show that she was fired because she posted confidential information. We have the Bertolus declaration. We have the timing issue, which Your Honor pointed out. She had been complaining for a long time. We didn't terminate her when she started

had a law firm write a letter to her telling her to take it all down because it was confidential. I think that's very speedy.

**THE COURT:** All right. I will take the matter under submission -- the cross-motions.

**MS. RIECHERT:** Yeah. I'd would like to just make one more point, Your Honor.

**THE COURT:** Okay.

**MS. RIECHERT:** I would like to strike her motion, her oppositions, her replies. Everything was filed late again.

**THE COURT:** I understand that.

**MS. RIECHERT:** Okay.

**THE COURT:** I will take that under submission, as well.

**MS. RIECHERT:** Thank you.

**THE COURT:** Thank you.

Thank you, Ms. Gjovik.

**MS. GJOVIK:** Thank you, Your Honor.

**THE COURT:** Thank you.

(Proceedings adjourned at 3:06 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Saturday, June 27, 2026



Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**, *an individual*,

Plaintiff,

v.

**APPLE INC**, *a corporation*,

Defendant.

**Case No. 3:23-cv-04597-EMC**

**Judge**: Honorable Edward Chen

## PLAINTIFF'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE (DKT. 383)

## RULE 72(a)

4. *Second*, the Order directs Plaintiff to produce responsive documents "from her iCloud account" within fourteen days. (Dkt. 383 at 8.) The demanded exchange is not there. Plaintiff testified on December 16, 2025 that she does not have the full exchange because she is locked out of an encrypted Mac in storage, and that the parties were working from the third party's copy. (Dkt. 366 at 9–10.) She stopped using the iCloud account and changed devices in 2021. (Dkt. 363-1 at 5.) Apple has known since that deposition that Plaintiff lacks the exchange; it identified the specific document and conceded it already holds a portion obtained from the third party (Dkt. 363-1 at 9, 21); it did not subpoena the third party who holds the complete copy; and it did not pursue Plaintiff's offer of access to the Mac (Dkt. 363-1 at 7). Apple presented this as a deficiency in Plaintiff's supplemental productions — productions that followed a dozen earlier ones and largely responded to Apple's own last-minute requests and post-cutoff depositions. The Order found no spoliation (Dkt. 383 at 8), yet compels production of a document Plaintiff does not have, from a source that does not contain it.

**B. OBJECTION 2 — THE ORDER DOES NOT ADJUDICATE THE PRIVILEGE DISPUTES, WHICH WERE RAISED AND CONFERRED AND ARE AT ISSUE ON SUMMARY JUDGMENT.**

5. Plaintiff raised three related privilege disputes that the Order leaves undecided. *(a) Withholding and logging of the investigation documents.* Apple withheld documents concerning its internal investigation (including in response to RFP 43) on privilege grounds. Documents withheld as privileged must appear on a log sufficient to permit assessment under Rule 26(b)(5)(A), and Plaintiff challenged both assertion and the adequacy of Apple's log. (Dkt. 358 ¶ 13; Dkt. 363-1 at 33, 40.) The Order does not address that challenge; it states only that Apple need not produce privileged documents (Dkt. 383 at 4) and deems the issue "not ripe" (id. at 3) — though the parties conferred on it as "Dispute 8 — Privilege Log." (Dkt. 363-1 at 20.)

6. *(b) The deposition instructions.* Apple instructed its witnesses not to answer foundational questions about its investigations, asserting privilege, and Plaintiff sought to compel answers to those non-privileged foundational questions. (Dkt. 358 ¶ 12 & Relief ¶ (iv).) The Order addresses only whether a privilege log is required for deposition objections (Dkt. 383 at 4); it does not address Plaintiff's request to compel the foundational answers or her challenge to the instructions. *(c) Sword and shield.* Apple cannot withhold its investigation as privileged

while relying on that same investigation as its defense — a defense Apple advances in the summary-judgment briefing pending before this Court. (Dkt. 376.) A party that places its investigation at issue cannot simultaneously shield it from discovery.

7. The Order resolves none of these challenges. Plaintiff objects to preserve them; an unraised challenge is forfeited, and leaving these issues undecided now risks a downstream conflict at summary judgment and trial that would be unreviewable on appeal. Plaintiff requests that the "not ripe" determination be set aside and the privilege challenges adjudicated on the merits. raised, and the parties conferred on, Apple's categorical assertion of privilege over its internal investigation and related communications; Apple itself labeled the exchange "Dispute 8 — Privilege Log." (Dkt. 363-1 at 20.) The Order nonetheless declined to reach the issue, calling it "not ripe" (Dkt. 383 at 3), and elsewhere adopted Apple's privilege position without analysis (id. at 4). The "not ripe" finding is contradicted by the conferral record. The privilege Apple asserts as a shield in discovery rests on the same investigation and confidential-disclosure rationale Apple advances as its defense in the pending summary-judgment briefing. (Dkt. 376.) Plaintiff objects to the failure to adjudicate these disputes in order to preserve the issue for review.

### C. OBJECTION 3 — DENYING RFPS 7–10, 24, 28–32 ON THE GROUND THAT THEY WERE NOT RAISED IN PLAINTIFF'S APRIL 9 EMAIL IS CLEARLY ERRONEOUS.

8. The Order denies these requests in part on the finding that Plaintiff's April 9, 2026 email did not raise them. (Dkt. 383 at 2–3.) It did. The April 9 email identified the RFPs Apple "previously refused to produce documents for, including … those raised in [Plaintiff's] motion to compel," which encompassed these requests, and demanded confirmation of Apple's position and an updated privilege log. (Dkt. 363-1 at 39–40.) Apple's own April 20 email confirms that the April 9 email "discussed RFP Nos. 7-10 (Set One) and RFP Nos. … 24, 28-32 (Set Two)." (Dkt. 363-1 at 22–23; *see also id.* at 17–18.) The finding that these disputes were not raised on April 9 is clearly erroneous.

### D. OBJECTION 4 — DENYING THE SAME RFPS FOR LACK OF "SUBSTANCE" OR FAILURE TO "NARROW" IS CONTRARY TO LAW AND CANNOT BE RECONCILED WITH APPLE'S REFUSAL TO PRODUCE OR COURT'S PRIOR RELEVANCE RULING.

9. To the extent the denial rests on findings that Plaintiff did not address the

"substance" of the requests or "narrow" them (Dkt. 383 at 2–3), it is contrary to law. Apple's position on these RFPs was a refusal to produce anything, maintained for a year and restated in conferral. (Dkt. 363-1 at 17–18.) A flat refusal is a complete impasse: there is no substance to negotiate and nothing to narrow toward a party that has offered to produce nothing. The Court previously declined to reach these same requests as "premature" (Dkt. 327 at 4); they were then conferred and re-presented, and denied again on the same basis.

10. The timing finding also cannot stand. The disputes did not crystallize until Apple's April 23, 2026 email — served the day Plaintiff's opening brief was due — which offered, for the first time, narrowed searches and productions on more than fifteen RFPs. (Dkt. 358 ¶ 36.) Faulting Plaintiff for failing to substantiate or narrow these disputes by the April 9 initial-dispute deadline required her to respond to a position Apple did not state until fourteen days later. The Court has already held the underlying category relevant. (Dkt. 327 at 4.) The Order further misallocates the burden, stating Plaintiff "bears the burden of showing proportionality" (Dkt. 383 at 3), contrary to the 2015 Advisory Comm. Note to Rule 26(b)(1), which provides that the amendment "does not place on the party seeking discovery the burden of addressing all proportionality considerations." Plaintiff did, in any event, offer to narrow — accepting the October 31, 2021 cutoff and identifying custodians. (Dkt. 363-1 at 26, 29.)

### E. OBJECTION 5 — THE ORDER EXCUSES APPLE FROM CONFIRMING THE COMPLETENESS OF ITS PRODUCTION, WHICH PREVENTED PLAINTIFF'S COMPLETENESS DISPUTES FROM RIPENING BEFORE THE DEADLINE.

11. The Order holds that Apple need only confirm it has no additional responsive documents and need not state its position request-by-request. (Dkt. 383 at 5.) That is contrary to the Magistrate Judge's Standing Order ¶ 15, which requires a party to state "the full extent" of its production and to confirm completion after a diligent search, and which provides that it is "not sufficient … to state that 'responsive' materials will be or have been produced"; and to Rule 34(b)(2)(C). Apple gave only categorical confirmations that it had "satisfied its … obligations, consistent with its discovery responses" (Dkt. 363-1 at 18), and never served the required per-request statement. Because Apple withheld that confirmation past the April 9 deadline, Plaintiff's disputes about completeness could not ripen in time to be raised in her opening brief.

**F. OBJECTION 6 — THE ORDER DOES NOT RULE ON PLAINTIFF'S REQUEST TO BRING ADDITIONAL DISPUTES.**

12. Plaintiff stated, in her briefs and in the conferral record, that Apple's later conduct had generated additional disputes she needed to bring, and she requested leave to bring them; she noted the same in her summary-judgment filing. (Dkt. 358 ¶¶ 8, 38; Dkt. 365 ¶¶ 2, 4, 19; Dkt. 362-1 at 6; Dkt. 376.) The Order does not rule on that request. It instead grants Apple leave to "seek further relief regarding Plaintiff's belated productions" (Dkt. 383 at 8), although Apple itself served late supplemental productions on Plaintiff. The failure to rule on Plaintiff's request is a failure to exercise discretion, and it cannot be reconciled with this Court's holdings that the process "did not preclude either party from raising issues … after meeting and conferring" and that "neither party is precluded from asking … for relief from the process." (Dkt. 344 at 6–7.)

## IV. FINDINGS THAT SHOULD BE STRICKEN

**A. OBJECTION 7 — THE FINDING PLAINTIFF "HIJACK[ED]" THE EMAIL THREAD.**

13. The Order finds that Plaintiff failed to maintain a separate email thread and "hijack[ed]" Apple's thread. (Dkt. 383 at 2.) The scheduling order required each party to raise disputes "in a single email" and to "go back and forth on the same email thread." (Dkt. 327 at 6–7.) It did not require separate threads. The finding rests on a requirement the order did not impose and should be stricken.

**B. OBJECTION 8 — FOOTNOTE 1'S FINDING THAT PLAINTIFF "MANUALLY CHANGED THE FILING DATE … TO MISLEAD THE COURT."**

14. A CM/ECF filing timestamp is generated by the system and cannot be altered by a filer; a difference between the date stated in a caption and the system-applied stamp is not manipulation. The Plaintiff was also late while concurrently trying to file a Motion for Summary Judgment in this case (Dkt. 359-360), which was late also, and the Plaintiff had previously warned the overlapping deadlines were a problem for her (337 at 3). The finding of attempted deception (Dkt. 383 at 1 n.1) is clearly erroneous and should be stricken.



JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ASHLEY GJOVIK,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 23-cv-4597-EMC<br><br>**DECLARATION OF MELINDA S. RIECHERT IN SUPPORT OF DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date: June 11, 2026<br>Time: 1:30 p.m.<br>Dept: Courtroom 5, 17th Floor<br>Judge: Honorable Edward M. Chen |

I, Melinda S. Riechert, declare as follows:

1. I am an attorney admitted to practice law in the state of California and am a partner at the firm Orrick, Herrington & Sutcliffe LLP. I am counsel for Defendant Apple Inc. in this action. I submit this declaration in support of Apple's Reply in Support of its Motion for Summary Judgment. I defended the deposition taken by Plaintiff of Apple through its Federal Rule of Civil Procedure 30(b)(6) witness Adelmise Warner and my partner Jessica Perry defended the deposition of Yannick Bertolus. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently thereto.

2. A true and correct copy of excerpts from the transcript of the May 12, 2026 deposition of Apple through its representative Adelmise Warner—which includes (i) Ms. Warner's errata, which was timely submitted to correct a transcription error, and (ii) excerpts from Exhibit E4 to that deposition—is attached as **Exhibit A**.

3. A true and correct copy of excerpts from the transcript of the April 17, 2026 deposition of Yannick Bertolus is attached as **Exhibit B**.

4. Apple submits these portions of deposition testimony for context and completeness vis-à-vis the snippets Plaintiff included or characterized in her opposition and late-filed declaration. *See* Fed. R. Evid. 106; *Goins v. United Parcel Serv. Inc*., No. 21-CV-08722-PJH, 2024 WL 3331655, at *29 (N.D. Cal. July 8, 2024), *aff'd*, No. 24-4842, 2026 WL 84715 (9th Cir. Jan. 12, 2026); *accord* Fed. R. Civ. P. 32(a)(6).

I certify under penalty of perjury and pursuant to the laws of the United States that the foregoing is true and correct.

Executed May 28, 2026 in Menlo Park, California.

*/s/ Melinda S. Riechert*
Melinda S. Riechert

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ASHLEY GJOVIK,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 23-cv-4597-EMC<br><br>**DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date: June 11, 2026<br>Time: 1:30 p.m.<br>Dept: Courtroom 5, 17th Floor<br>Judge: Honorable Edward M. Chen |

## I. INTRODUCTION

Plaintiff intentionally leaked confidential Apple product information online and to the press and was fired promptly thereafter. Plaintiff does not and cannot dispute these core facts, which entitle Apple to judgment on all of Plaintiff's remaining claims. The undisputed facts establish that she was fired for this misconduct and would have been fired for it even had she never made any protected complaints. Nothing in her untimely and scattershot opposition (Dkt. 375; "Opp.")—an exercise in distraction and misrepresentation—warrants any different result.[1] At root, Plaintiff appears to believe that so long as she cast herself as a "whistleblower," she was immune from termination for admitted misconduct. She is wrong. Judgment for Apple should enter.

## II. ARGUMENT

### A. Plaintiff Once Again Violated Her Court-Ordered Filing Deadline.

In what has become a familiar pattern, Plaintiff did not timely file her opposition or any supporting evidence—nor did she seek an extension before once again violating a Court-ordered deadline.[2] While she filed a 23-page brief at 11:59 p.m. on the May 21, 2026 deadline (Dkt. 374), twelve hours later she filed a 25-page "corrected version" acknowledging that the timely filing was "not complete." Opp. ¶ 1. The "corrected" opposition does not merely make minor or typographical changes, however; it is a complete rewrite of the timely filing. And though Plaintiff represented on May 22 that her supporting evidence was being "filed concurrently" (*id.* ¶ 3), she filed a 610-page declaration (Dkt. 377) on May 25 and an additional 472-page declaration (Dkt. 379) on May 26—prejudicing Apple by once again depriving it of the full window to review and respond to her filings before Apple's own deadline. These late submissions appear to contain irrelevant documents and information and Plaintiff ignored the directive to highlight specific portions, leaving Apple and the Court to guess at what she contends is material or why. *See* Jan. 13, 2026 Hrg. Tr. (Dkt. 300) at 7:1-14, 8:22-9:5; *see also* Dkt. 273 at 1 ("While Plaintiff is entitled to support her motion with a

---

[1] Based on its understanding of the Court's order on cross-briefing, Apple confines its arguments to responding to the portion of Dkt. 375 that Apple understands to oppose its motion for summary judgment (rather than to reply in support of Plaintiff's own motion). *See* Dkt. 273.

[2] Plaintiff's social media posts make clear she knew on May 21, 2026, her opposition was "due today"—she just chose to ignore that deadline and file what she wanted, when she wanted. *See* https://x.com/ashleygjovik/status/2057510189876871435.

declaration, it must be concise.”).[3] The Court would be well within its discretion to refuse to consider her opposition and untimely, unwieldy declarations. *See* Dkt. 179 at 4-5; Dkt. 137 at 3 n.3.

**B. <u>The Facts Entitling Apple to Judgment Are Undisputed.</u>**

Plaintiff’s opposition does not dispute – because she cannot credibly dispute – ***any*** of the core facts on which Apple’s motion depends:

- Plaintiff publicly posted images in late August 2021 that revealed information regarding a non-public internal Apple user study application, and provided these images (and, as Apple later learned, additional non-public information) to a reporter.
- Plaintiff had previously signed an Intellectual Property Agreement (“IPA”) that required her to keep “Proprietary Information”—*i.e.*, “information not generally known outside of Apple and/or kept confidential by Apple” such as “trade secrets, R&D records,” and “other materials or information relating to past, existing, and future products and services”—confidential. *See* Bowman Decl. Ex. A at PDF p. 6.
- Apple policies also prohibit disclosure of confidential product information and reinforce that disclosure can lead to immediate termination. *See* Bowman Decl. Exs. B-E.
- Yannick Bertolus personally reviewed images she posted; determined the images revealed confidential product information and their disclosure violated Apple policy; and decided to terminate her employment on September 9, 2021.

***None of these facts is disputed***. They compel judgment in Apple’s favor on all of Plaintiff’s remaining claims—as these facts demonstrate that Apple terminated her employment for legitimate, non-retaliatory reasons and would have made the same decision irrespective of any prior protected activity (the vast majority of which Bertolus knew nothing about).

Rather than dispute these facts, Plaintiff largely ignores them. She attempts to stave off judgment through selectively misleading references to testimony from Apple witnesses about ancillary issues, her own self-serving speculation that surely Apple must have terminated her for

[3] The declaration and exhibits are also objectionable for a host of reasons—many apparent from their face (*e.g.*, hearsay; hearsay within hearsay), others requiring more analysis to develop (*e.g.*, sham attempts to offer “testimony” that contradicts earlier statements or declarations). Plaintiff’s nearly 500-page declaration—filed five days late and two days before Apple’s reply deadline—appears designed (and operates) to prevent Apple from making fulsome evidentiary objections.

discovered, to the press, in clear breach of her confidentiality obligations. … On August 30, 2021, Ms. Gjovik tweeted photographs and a video of herself created by the Alpha application, thus disclosing Apple confidential information.”).

None of Plaintiff's attempts to manufacture a shifting rationale for termination succeeds, or establishes a factual dispute as to anything material. First, she argues that Apple cannot really have fired her for this reason because, in its initial submission to the DOL back in March 2022 (a mere six months after her termination), its counsel used code names to refer to the then-recent Apple internal studies at issue, and Apple's Rule 30(b)(6) witness could not conclusively recall at her May 2026 deposition which code name counsel had used for which study. Opp. ¶¶ 15, 17. Nothing about this suggests pretext. *Compare* Dkt. 360, Ex. 25 at PDF p. 212 (Position Statement referring to “Alpha” and “Omega” studies, both of which Plaintiff leaked information regarding) *with* Reply Decl. of Melinda S. Riechert (“Riechert Reply Decl.”), Ex. A (“Warner Dep.”)[7] at 234:2-6, 358-360 (“One was -- the ear scan, one was the Face ID.”), 235:7-11 (“I don't want to speculate which one is which without looking at the document that describes it.”).[8] Plaintiff fundamentally misapprehends the summary judgment standard. The question is not whether a corporate designee has memorized every detail of code names used in an attorney submission five years earlier; it is whether the undisputed record establishes a legitimate reason for termination. Here, it does. *See* Bertolus Decl. ¶¶ 6-10, 12; *accord* Warner Dep. 45:23-46:11, 97:1-14 (articulating same rationale).

Next, Plaintiff takes issue with what she believes is an inadequately detailed explanation of why the images she posted from Glimmer were confidential. *See* Opp. ¶ 17. But Apple has offered extensive explanations as to why it regarded these images as confidential. *See, e.g.*, Bertolus Decl.

---

[7] Apple submits with this reply—and, unlike Plaintiff, properly excerpts and marks—portions of deposition testimony needed for context and completeness vis-à-vis the snippets Plaintiff included or characterized in her opposition and late-filed declaration. *See* Fed. R. Evid. 106; *Goins v. United Parcel Serv. Inc*., No. 21-cv-08722-PJH, 2024 WL 3331655, at *29 (N.D. Cal. July 8, 2024), *aff'd*, No. 24-4842, 2026 WL 84715 (9th Cir. Jan. 12, 2026); *accord* Fed. R. Civ. P. 32(a)(6).

[8] As discussed below, prior to leaking confidential images of the internal Glimmer app, Plaintiff also posted an internal email inviting her to participate in an undisclosed study related to AirPods involving studies of ears. *See, e.g.*, Dkt. 142 (Fifth Am. Compl.) at PDF p. 38 (Figure 3). That she committed this additional misconduct—and that Apple described that conduct as part of the sequence leading to her termination—does not undermine the legitimacy of Bertolus's decision to terminate her after viewing images she posted from Glimmer related to the FaceID user study.

¶¶ 4, 6-7; Aloe Decl. ¶¶ 7-11. Plaintiff's unwillingness to accept them does not transmute a legitimate reason for termination (violation of company policy) into something actionable. *See Wilkin v. Cmty. Hosp. of Monterey Peninsula*, 71 Cal. App. 5th 806, 823 (2021); *Wills v. Superior Court*, 195 Cal. App. 4th 143, 171 (2011) (both cited in Mot. at 8; neither addressed in Opp.).

Plaintiff then faults Bertolus for not being able to recall at his deposition nearly five years post-termination exactly which of the multiple confidential images from the Glimmer app he reviewed before determining she had violated policy and should be terminated. Opp. ¶ 18. Her argument appears to be that because she made ***so many*** unauthorized disclosures—and, to be clear, there is no dispute that she made ***all*** of the at-issue posts containing internal Glimmer app images—she can evade judgment by attempting to create confusion about which image(s) which person viewed at which specific point in time. Plaintiff is wrong. There is no dispute that Bertolus saw images she had leaked from the Glimmer app and fired her for that reason. *See* Bertolus Decl. ¶¶ 4, 6 ("I saw those images myself before I made the decision to terminate Ms. Gjovik's employment."); *see also* Riechert Reply Decl., Ex. B ("Bertolus Dep.") 71:23-72:10 ("I remember quite vividly seeing a picture in black and white, which I believe was a screenshot of an internal tool as part of a user study."); *see also id.* 33:8-19, 73:8-14, 99:4-15, 108:1-15, 123:7-13. Nothing in Warner's Rule 30(b)(6) testimony is to the contrary. *See* Warner Dep. 52:5-23 ("There was at least one Twitter post. … I don't have the exact number, but there was at least one.").[9]

Plaintiff then pivots to arguing that Apple's DOL Position Statement somehow gave a different account of why she was fired. Opp. ¶ 23. Not so. For example, Plaintiff claims that "Apple's evidence provided to DOL did not include photographs" in an effort to suggest the termination rationale has shifted. *Id.* But that allegation is false, and Plaintiff knows it. Apple provided versions of her tweets disclosing confidential product-related images to the agency (albeit

---

[9] Plaintiff misapprehends the import of Apple noting in its motion that, in addition to the public posts she made (which blurred some details from the Glimmer app images), she provided unblurred Glimmer app images to a reporter and asked the reporter to blur certain details. Opp. ¶ 19 (citing Aloe Decl. ¶ 11). This does not suggest the images she posted were not confidential; it underscores that she was aware that the ***additional*** information she shared with a reporter was. *See* Aloe Decl. ¶ 11; Mot. at 3 n.2 (citing admissions). Likewise, Plaintiff's claim that there are disputes as to, *inter alia*, whether the images were uploaded, how data was uploaded, and whether Plaintiff requested the images be deleted (*see* Opp. ¶¶ 20-22) cannot create any dispute that the images she posted were confidential.

with appropriate redactions), and Plaintiff used Apple's submission as a deposition exhibit in this case. *See* Warner Dep., Ex. E4 (relevant portions). She also claims that the Position Statement's representation that "Alpha" was a user study is somehow inconsistent with Dr. Aloe's testimony that Glimmer was an application used in various user studies, not itself a user study. Again, there is no inconsistency. *Compare* Dkt. 360, Ex. 25 at PDF p. 211 *with* Aloe Decl. ¶ 4.[10]

As a last-ditch effort to evade the core facts, Plaintiff tries to create the impression of inconsistency in how Apple has referred at various points to The Verge article. Opp. ¶¶ 26-27. But again, there has been no inconsistency. Apple knew pre-termination that images she leaked appeared not only on Plaintiff's Twitter account but also in a Verge article. Warner Dep. 79:7-20, 81:18-22; *see also* Bertolus Dep. 33:8-19 ("I saw examples of – of what you leaked both on social media and also in articles in the press, and that prompted the termination."), 77:20-24, 78:4-13 ("I did mention earlier a Verge article."), 116:7-25. What Apple did not know at the time of Plaintiff's termination is that she had shared ***additional*** details regarding the internal Glimmer app with the reporter—including "specific details about how the Face ID algorithm functions and how Apple determines what counts as a 'success' in an attempted Face ID recognition" (Aloe Decl. ¶ 11)—beyond what was included in the article itself. This later discovery of additional, even more robust disclosures (which Plaintiff concedes she made) further supports Plaintiff's termination and supports Apple's after-acquired evidence defense; it is not evidence of any inconsistent termination rationale. Apple has consistently explained its legitimate reason for firing her.

**b. <u>Apple's Reason for Firing Plaintiff Was Lawful.</u>**

Plaintiff next suggests that she could not have been terminated for leaking Glimmer app images because, in her view, "Apple's confidentiality theory itself is unlawful." Opp. ¶¶ 24-25; *see also* ¶¶ 22, 55. She appears to argue—by incanting a parade of statutes, cases, and FTC enforcement actions with minimal if any analysis—that a company cannot lawfully expect its employees to keep

[10] Plaintiff also confusingly references testimony about a 2017 form, citing to Exhibit C of Dr. Aloe's declaration (Opp. ¶ 23)—but Exhibit C is an Informed Consent Form ("ICF") Plaintiff undisputably signed in 2019 that Dr. Aloe declared "remained in effect as of September 2021," when Plaintiff leaked images and was terminated. Aloe Decl. ¶ 6, Ex. C. She also attempts to manufacture a dispute over whether the images she posted were ever uploaded to Apple (*see* Opp. ¶¶ 20-21)—but none of her speculation creates any genuine dispute as to the fact that they were not (contrary to her assumption), because she did not choose to upload them. Aloe Decl. ¶¶ 7, 12.

Bertolus—who decided to fire Plaintiff after learning of her leaks of confidential product information—made clear that "[t]he decision to terminate Ms. Gjovik's employment was mine and based on my own firsthand review of the images Ms. Gjovik posted publicly, my own independent assessment that her conduct constituted an egregious violation of Apple policies, and the additional facts [ ] concerning her refusal to cooperate with Apple's investigation and her misleading partial disclosure to Mr. Okpo." Bertolus Decl. ¶ 12; *accord* Bertolus Dep. 38:23-39:12, 70:2-12, 77:20-24, 78:4-13. But he has also consistently made clear that "***[t]he leak on Twitter of that internal tool was so egregious that that in itself warranted termination***. The fact that you did not cooperate was an addition to that, but not the main reason. The main was your leak." Bertolus Dep. 99:4-15; *see also id.* 132:4-5, 132:14-16 ("The primary reason you were terminated is because you violated your confidentiality agreement when you posted those pictures on Twitter.").

For example, Plaintiff attempts to argue that Apple has "revers[ed]" its position regarding her disclosure of an email with details about an internal AirPods study—which she publicly revealed on Twitter two days before posting the Glimmer app images and a link to The Verge article. Opp. ¶¶ 13-14. That Apple mentioned those disclosures in agency submissions and filings as background on the lead up to Plaintiff's termination does not somehow undermine the legitimacy of the reasons for which she was terminated. Apple's Rule 30(b)(6) witness did not "disclaim" any prior position of the company; she testified that "images that you had posted were confidential" but that "[y]ou speaking about the ear scan or being in the study was not the basis for your termination, and that by itself is not confidential." Warner Dep. 94:19-95:2. This is entirely consistent with Apple's position: expressions of concern about workplace issues (even if unfounded) are not confidential, but images of internal documents disclosing study details and applications are.

Plaintiff goes to great lengths to suggest that the additional reasons Bertolus cited—including that she had provided misleading information to the Apple investigator looking into her parade of complaints as of August 2021—were somehow unlawful. But she does so only by grossly mischaracterizing the actual evidence. Contrary to Plaintiff's allegations (*see* Opp. ¶¶ 9-12), Apple has never argued that making a good faith complaint (including one that alleges criminal violations or sexual harassment) is misconduct. The undisputed evidence establishes that Apple encourages

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**,
*an individual*,

**Plaintiff**,

v.

**APPLE INC.**,
*a corporation*,

**Defendant**.

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**DECLARATION OF PLAINTIFF ASHLEY GJOVIK**

**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION; & REPLY IN SUPPORT (Dkt. 359, 375)**

**Under Cal. Labor Code § § 98.6, 1102.5 6310, & the *Tamney* Termination in Violation of Public Policy**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

retaliation from Mr. West and Mr. Powers then before Ms. Waibel intervened. I asked to complaint to Ms. Waibel's manager, Mr. Tony Lagares, and started corresponding with him in June 2021. In July 2021, I was able to get Mr. Lagares to agree to open a new, second investigation into all of my concerns about my time at Apple and he assigned Mr. Ekelemchi Okpo as the investigator.

27. Mr. Okpo is named in the NLRB's complaints as an agent of Apple who violated the NLRA including by telling me "not to talk to other employees about Respondent's investigation of employees' workplace health and safety concerns," "to refrain from sharing communications about Respondent's investigation into employees' workplace health and safety concerns," and told me that he was "disappointed" that I "misrepresented" a discussion we had on August 4, 2021 without citing or referencing what he was even talking about. Dkt. 376, Exhibit A-B, ¶ 7(a)-(c)).

28. I prepared summarizes of my complaints for Mr. Lagares and Mr. Okpo, and used Apple's Box file management tool to share hundreds of documents of evidence. My complaints were documented in email to Apple's HR and management teams, during video/phone call meetings with Mr. Lagares and Mr. Okpo, in my government complaints and press interviews, and in the Aug. 2021 Issue Confirmation.

29. On example includes a detailed email chain with Mr. Lagares from June 10-July 7 2021, which he forwarded to Okpo on July 20 2021, and which Apple produced as APL-GAELG_00001452-1488. A true and correct copy is attached as Exhibit U. Another example are email updates I sent Mr. Okpo and Mr. Lagares documenting the evidence I was gathering and directing them to topics I thought should be investigated. This included an email from July 28 2021 to Mr. Okpo and Mr. Lagares from me, marked as Exhibit P, authenticated by Mr. Okpo during his deposition, and dually produced by Apple.

30. In late July 2021, I became to worry that Mr. Okpo was not going to earnestly

*about how bizarre the restaurant incident was*" and that: "*during a meeting, West made a "spanking" gesture with his hand to describe how [I] "keep him in line". Dan asked to delete this video.*" (Dkt. 360, Pl's. Decl, Ex. 19).

48. On May 29 2020 and Nov. 30 2020, Mr. West and I were texting on iMessage and discussed Chez TJ. In the May 29 2020 text messages, Mr. West was talking about his daughter who had started working at Chez TJ and that there was a change of ownership at Chez TJ. Mr. West wrote "I don't like the owner (George). The guy is an absolute creep." Mr. West added "he tried to get [Mr. West's teenage daughter] to sit with him and have Champagne. Fucker." Mr. West wrote "rest of the staff got her back (thank god)…and she was already telling him no." A true and correct copy is attached as Exhibit X.

49. In the Nov. 30 2020 messages Mr. West was texting about his family and cooking a large meal and noted his daughter (who then worked at Chez TJ) was "quite the baker." I responded "Whats his face should put her to work… The blonde you tried to arrange marry me to left I guess, so she could be sous chef now." Mr. West responded "oh...lol… #awkward. sorry to do that to you." I responded "#veryawkward." Mr. West responded: "of all the inappropriate things I've done. that might be top of the list. especially since I don't think you were comfortable telling me no." A true and correct copy is attached as Exhibit X.

50. In these Nov. 30 2020 texts, I responded, "Hey I got like a $300 free meal out of it" but added "I think I texted you no in all caps a few time about you paying and the Andrew thing. He was like 24 man." Mr. West responded, "I paid for it? Lol." I responded "Yes." Mr. West responded "I must have been drunk that's over the top." I responded "And you and the owner both went 1/2ies to get me double the waygu. Yeah, I was cursing at you. And he wouldn't let me pay myself. I think I gave them like a hundred dollar tip." Mr. West responded "good." I responded: "They charge you much more for mail order blondes in Russia...what a deal. He got dumped after he kept texting me at 3am, and spent his weekends gambling in Chino

80. On Aug. 19 2021, I asked to attend a racial justice training I had been registered for and noted the instructors – including my friend Dr. Cohen – had approved me attending. On Aug. 20 2021, Mr. Okpo told me I could not go to the training because I was on leave. On. Aug. 20 2021, I emailed Okpo complaining the administrative leave felt like "punishment, retaliation, or otherwise a negative employment action." A true and correct copy of the email exchanges with Mr. Okpo and Mr. Cohen are attached as Exhibit R, with the Okpo email authenticated by Mr. Okpo during his deposition and the Dr. Cohen email able to be authenticated by Mr. Cohen at trial.

81. On Aug. 23 2021, I asked Mr. Okpo for an update and some ETA of when he'd e done and we could talk about next steps writing: "I look forward to hearing your response and some sort of ETA for an update, even if it's "at least a week / month" etc. As of now I currently have zero timeframe from you on next steps whatsoever." Mr. Okpo responded on Aug. 24 2021, "am not able to communicate a timeframe on next steps, but as the investigation progresses, I will provide you with additional updates." A true and correct copy of this email is attached as Exhibit AA, produced under BATES PL-PRD-8-0147, and authenticated by Mr. Okpo during his deposition.

82. By the end of August 2021 I was certain I was going to be fired, would have to sue Apple, and needed to ensure I completed all of the filings necessary to meet statute of limitations requirements. I posted on Twitter on Aug. 31 2021: "Y'all, the process is so broken. The only way I'm figuring out what paperwork I need to submit is by reading old lawsuits against #Apple & listing all the reasons Apple was able to act like Teflon (mostly missing paperwork)." I noted so far I'd filed complaints with "SEC, OSHA, & CA DIR Whistleblowers, Claims/intake with: EEOC, DEFH, & NLRB, Federal EPA" and added "But I'm sure I'm still missing something. This is the worst puzzle." A true and correct copy of the Twitter post is attached as Exhibit KK, produced under BATES PL_PRD6_02706.

83. On Sept. 3 and 7 2021, I emailed Mr. Okpo asking to keep communications in writing and if he declined, to have Business Conduct review his denial – but he did not respond. A true and correct copy of the email is attached as Exhibit T, produced under PL-PRD-8-0157-PL-PRD-8-0159, and authenticated by Mr. Okpo during his deposition. I explained my reasoning was that "as I've complained previously, there have been frequent misrepresentations of my verbal conversations with my managers, with Human Resources, and with Employee Relations. This includes misrepresentations by yourself related to the nature of this leave. From what I've heard from other employees in similar situations, this appears to be a pattern by Apple's HR & ER teams to misrepresent and mischaracterize, likely to intimidate & retaliate — and I won't allow you to do continue doing this to me." Exhibit T,

84. In the same email I also wrote "I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance review this year." Mr. Okpo responded on Sept. 9 2021 simply saying "there are inconsistencies that have come up in the investigation. Since you have declined to speak with me, I will move forward based on the information I have." A true and correct copy of Okpo's response is at Exhibit T, produced by Apple under BATES APL-GAELG_00001135.

85. There were a number of news articles about my dispute with Apple published prior to my termination. They discussed my complaints, my government charges (including NLRB, EEOC/DFEH, Cal. DIR/OSHA, EPA, and others). The articles noted they asked Apple for comment and sometimes Apple provided the reported a comment – indicating Apple was aware of the protected activity discussed in those articles. True and correct copies of some of these articles are attached at Exhibit LLL, including from Financial Times, Business Insider, Engadget, and

## VIII. THE VERGE: "APPLE CARES ABOUT PRIVACY UNLESS YOU WORK AT APPLE" (AUGUST 30 2021)

the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment. *Sandoval v. County of San Diego*, 985 F.3d 657, 665–66 (9th Cir. 2021). Among other cures for any deficiency, Plaintiff plans to testify at trial to authenticate any documents that may otherwise be subject to hearsay objections. *JL Beverage Co. v. Jim Beam Brands Co.,* 828 F.3d 1098, 1110 (9th Cir. 2016) — At summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony.

128. ***Dual-Authentication of Performance Reviews***: I obtained copies of these documents from my supervisor David Powers and/or Apple's "myPage" HR website and I produced them to Apple under the following BATES numbers: my 2017 mid-year review feedback (Exhibit C) as PL_PROD_12_0310, my 2017 annual performance review (Exhibit D) as PL_PROD_12_3400-3408, my 2018 review (Exhibit E) as PL_PROD_12_5407- 5411, my 2019 (Exhibit F) review as PL_PROD_12_4004-4010, and my 2020 review (Exhibit G) as PL_PROD_12_5240-5243. Apple also produced redacted copies of these same reviews under the following BATES numbers: 2017 as APL-GAELG_00000480-486, 2018 as APL-GAELG_00000487-492, 2019 as APL-GAELG_00000493-499, and 2020 as APL-GAELG_00000501-503. Apple also produced my draft 2021 performance review as APL-GAELG_ (Exhibit H).

129. ***Dual-Authentication of EPA emails***: Emails cited and included here and I the prior Declaration that included my correspondence with the EPA can be authenticated by me testifying at trial and/or EPA's production of the same emails through the FOIA process – which covers all emails in question.

## XI. REQUEST FOR LEAVE TO FILE LATE

130. I apologize I was not able to file this Declaration at the time I filed my Reply/Opposition at Dkt. 375, and that my final Reply/Opposition was filed several hours past

the deadline (Dkt. 375), and that the version I filed by the deadline was incomplete and contained errors (Dkt. 375). I also apologize again that my Motion for Summary Judgment and Preliminary Injunction was filed several hours late (Dkt. 359) and the Declaration filed later that day (Dkt. 360), and that the Motion contained errors – including regarding the deposition pincites and certifications, placeholder text, and other issues.

131. I filed a request for leave to file my Motion and Declaration late at Dkt. 362, referencing Dkt. 359-360. I again ask the Court for leave, if needed, to consider the latest responsive documents now filed, including the corrected Reply/Opposition at Dkt. 375, the Opposition to Def.'s Request for Judicial Notice regarding some of the NLRB proceedings at Dkt. 376, my Declaration specific to deposition testimony and agency transcripts (including corrected pincites, certifications, and excerpts) at Dkt. 377, my Appendix/Request for Judicial Notice of relevant Cal. Code and pending legislation in the 2025-2026 Cal. Leg. session at Dkt. 378, and this substantive Declaration with attached and incorporated exhibits.

132. I feel like I have good cause in so far as I am delayed by lack of resources; I have no ill intent; have not been negligent; Defendant has repeatedly caused delays, complexity, and obstacles – including which delayed deposition testimony, material evidence and disclosures, etc.; and many of the current issues pending in this matter were raised at least partially with motions I filed earlier in this case (i.e. Motions: Requesting Disc. Conf. at Dkt. 162-165, to Amend at Dkt. 155; to Disqualify at Dkt. 156; for More Def. Statement at Dkt. 191; to Strike Answer at Dkt. 192, 221; to Compel. Interrogatory #1 – termination reason -- at Dkt. 309, etc.).

133. I am insolvent, disabled, *pro se*, and do not have the resources to complete the required work on time (*see* "Personal Background & Current Harm") – especially due to the Defendant's active and ongoing concealment of defenses and witnesses – including witnesses that have engaged with this Court over the last three years arguing they are not witnesses (*see* "Appleseed a.k.a. Cher Scarlett"); Defendant's use of footnotes, procedural-sounding motions,

and passing comments in its filings to incorporate complex, prejudicial allegations/inferences like implying I was running some sort of con on Apple and wanted to be fired (*see* "Hostile Work Environment" and "Settlement Negotiations"); or that informal NLRB statements arising from Apple's own prior defense counsel's recent leadership of the agency, should justify this Court dismissing this entire matter (*see* Pl.'s Opp. To Def.'s Req. for Judicial Notice, Dkt. 376).

134. In this litigation, many of my discovery requests and claims were dismissed for years as post-termination and not attributable to Apple, with Apple denying connection to one of the primary actors. Yet, Apple's Opposition/Cross-Motion (Dkt. 367) now cites one of the actors as, apparently, their primary defense witness in the retaliation litigation. Apple never disclosed this witness, did state and imply she was not a witness, she filed Declarations disclaiming involvement in this matter, and Apple obstructed discovery about her. (Dkt. 365-366 – discovery dispute briefing including about this issue). Similarly, Apple now seems to use Robert Aloe-McKeon as their primary defense witness regarding confidentiality determinations – yet Mr. Aloe-McKeon was also never disclosed as a fact or expert witness until after I deposed him in April 2026 as a disparate-impact comparator.

135. Concurrently, I've been trying to manage concurrent litigation in *Gjovik v. Apple Inc,* Case No. 5:25-cv-07360, N.D. California, San Jose Courthouse – an environmental Citizen Suit and public nuisance lawsuit filed separately after my personal tort claims about the same/similar subject matter were dismissed due to more concealment and misrepresentation by Apple Inc – including denying they were under investigation by the government when the were facing EPA inspections and enforcement action (*see*, Dkt. 48 at p. 72 – *Amended Complaint* citing Melinda Riechert's false statements to this Court). Apple has also used that litigation to try to dismiss claims pending in this lawsuit and agency proceedings, repeatedly requested Judicial Notice of filings/decisions from this case to try to create preclusion/estoppel issues

despite this Court deciding the cases were not related – and then having the Notice of Pendency to this Court about those issues sealed. (See, Dkt. 278 at p. 8).

136. Further, discovery is not yet complete with pending disputes (Dkt. 363, 365, & 358, per Omnibus Order at 327) – and additional, new disputes – not yet briefed but pending leave to file additional briefing. Further, the transcript from the second day of Apple's Rule 30(6)(b) deposition has not been released yet – and Plaintiff was hoping it would be released by today to include in these filings, but there is no ETA from the service provider. Additional days of Rule 30(b)(6) deposition are needed for trial on liability due to Apple's witnesses' inability to answer many basic questions – an issue which was raised to Apple via meet/confer with Apple responding that no further issues can be raised to the court. (Declaration – *Depositions* – Exhibit M). Apple also had not produced the majority of documents requested related to Plaintiff's protected activity, Apple's investigation into Plaintiff's complaints, or Apple's investigation into the Plaintiff. *Burlington N. Santa Fe R.R. v. Assiniboine & Sioux Tribes*, 323 F.3d 767, 773–74 (9th Cir. 2003); *California ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998).

137. This is further combined and exacerbated by the Defendant's abuse of the Court's Protective Order process which resulted dozens of filings (i.e., Dkt. 279, 280, 288, 293, 294, 295, 296, 297, 298, 302, 304, 312, 326, 328, 340, etc.), multiple scheduled hearings and conference calls, active gag orders against the Plaintiff, over twenty records on this docket being sealed in their entirety – and all based on information that has been public for years, the legal claims in this litigation itself, and the Plaintiff's protected labor complaints and whistleblower disclosures – including matters directly relevant to this Summary Judgment proceeding. (Dkt. 320-322; Gjovik Dep., April 8 2026, Dkt 377, 456-462).

138. Now, case filings and evidence related to topics relevant to the Summary Judgement proceeding are sealed and the Plaintiff has prior restraint orders issued against her on

the topics Apple "designated" – past the deadline to do so, without complying with the Protective Order, and while refusing to meet/confer. Further, critical to this pending matter, is the concurrent combination of the Defendant's concealed defense of terminating the employee for reporting sexual harassment and possible violations of criminal sex crime statutes, with many of Defendant's pending confidentiality "designations" directly referencing the Plaintiff's body, genitals, sexual activity, sexual partners, and her management's direct connection to the sexual surveillance complained about.

139. The Plaintiff asks the Court to consider this filing and the associated filings, despite being late and imperfect, out of fairness and in the interest of justice.

## XII. CONCLUSION

140. I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed on May 26 2026 in San Jose, California.

Respectfully filed,



**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed May 24 2026 in San José, California
(408) 883-4428
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816



ashley gjovik

RESULTS (1) All

Ashley Gjovik
Mac Systems Quality

Edit

**Ashley Gjovik**
Mac Systems Quality (0056/5741)
Apple Employee

Details | Availability | Location | Groups | External Reports

CONTACT — View All

| | |
|---|---|
| Office (primary) | +1-408-8625700 |
| Office (mobile) | +1-408-2049976 |
| Official | ashleygjovik@apple.com |
| Official chat | @Ashley Gjovik (Slack) |

LOCATION — View Less

| | |
|---|---|
| Location | Santa Clara Valley |
| Building | Stewart 1 |
| Office number | 1311-12 |
| Building address | 825 Stewart Drive<br>Sunnyvale, California, 94085<br>United States |
| Mail stop | 275-1MQA |

GENERAL — View Less

| | |
|---|---|
| First name | Ashley |
| Last name | Gjovik |
| Person type | Apple Employee |
| Company | Apple Inc. |
| Department | Mac Systems Quality |
| Department number | 0056/5741 |
| Person ID | 973551757 |
| Badge number | 293492 |
| Start date | 02/23/2015 |
| AppleConnect | ahenderson5 |
| Account status | Active |

ORGANIZATION

| | |
|---|---|
| Manager | DP David Powers |

**R. <u>EXHIBIT R: EMAIL WITH OKPO (8/20/21)</u>**

Exhibit FF
Okpo, E.
04/07/26
aptus

AG

**From:** **Ashley Gjovik** ashleygjovik@apple.com
**Subject:** Re: Welcome and Prep Work I AU Race & Justice
**Date:** August 20, 2021 at 12:05 PM
**To:** Ekelemchi Okpo (ER) eokpo@apple.com

Hello,

I continue to struggle to understand just how this current leave is not punishment, retaliation, or otherwise a negative employment action.

P.S. I should get you the updated Issue Confirm before Monday. It's taken a lot of time to sort through and make sense of.

—
**Ashley M. Gjøvik**
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

> On Aug 20, 2021, at 8:55 AM, Ekelemchi Okpo <eokpo@apple.com> wrote:
>
> Hi Ashley-
>
> Thank you for reaching out. Given that you are on leave, you will need to reschedule and attend a session in the future.
>
> 
> Best,
>
> Ekelemchi Okpo
> Corporate Employee Relations
> eokpo@apple.com
>
> This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.
>
>> On Aug 19, 2021, at 1:12 PM, Ashley Gjovik <ashleygjovik@apple.com> wrote:
>>
>> Hi Ekelemchi,
>>
>> I hope you're well.
>>
>> Yesterday you wrote, *"As we previously discussed, you are not expected to participate in any work related assignments while I conduct a thorough and objective investigation into the concerns you've raised."*
>>
>> I was previously invited & registered for this course with Apple University. I was & am very excited to attend. The coursework actually directly complements my current studies at Oxford. Becuase this course is voluntary and not a "work related assignment" — can you please reply and let me know if I'm allowed to attend? The first class is next Tuesday 8/24 and then continues weekly for a several weeks.
>>
>> I checked with Professors Cohen & Stout last night and they said they are still happy to have me in the course and can confirm that with you if needed. They asked me to confirm directly with you that I can attend though first, as they said they do not want my attendance to invite any sort of disciplinary action.
>>
>> Thanks,
>> -Ashley
>>
>> —
>> **Ashley M. Gjøvik**
>>  Engineering Program Manager
>> ✦ Mac Systems Quality Strategic Planning & Communications
>> ✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
>> ☎ (408) 204-9976
>>
>>> Begin forwarded message:
>>>
>>> **From:** Josh Cohen <joshua_cohen@apple.com>
>>> **Subject: Welcome and Prep Work | AU Race & Justice**

**Date:** August 11, 2021 at 6:01:42 PM PDT
**To:** Joshua Cohen <joshua_cohen@apple.com>

Hello,

Welcome to Apple University's ***Race and Justice in the United States: A Third Reconstruction?*** This course explores the longstanding tensions between the promise of multiracial democracy in the United States and the realities of racial injustice.

Our first session is on **Tuesday, August 24 at 1:05 PM** hosted in Webex, you'll find details for joining in your calendar invite.

Before the first session, please be sure to read:

- **Read *A Third Reconstruction?*** (ePUB/PDF attached below — around 90 mins)
- **Review the historical timeline** (PDF attached below — around 30 mins)

The course is open to all employees; no prior knowledge on the topic of race and justice is needed. The course reading, *A Third Reconstruction?,* therefore provides essential background for the course, and the timeline should serve as a resource that you can refer back to for orientation.

As you can imagine, *Race and Justice in the United States* will address topics that are emotionally, intellectually, and morally demanding. We are going to try to address them directly and frankly. So it will be important to approach the class with an open mind, sense of humility, and willingness to be challenged (and to challenge).

**IMPORTANT**: If you can no longer attend **all four sessions**, please return to our website, find the session under My Invitations, then click Drop. Reply to this email to let us know if you'd like to be invited to the course at a later date.

We care about having a learning environment that is designed for everyone. If you require any assistance to participate, please contact us.

Please let us know if you have any questions.

**We look forward to seeing you in class.**

All best, Josh and Noelle

Click to Download
Timeline (2).pdf
364 KB

Click to Download
A Third Reconstruction_ (1).pdf
59.6 MB

Click to Download
A Third Reconstruction_ (1).epub
26.9 MB

Case: 26-4716, 11/13/2026, DktEntry: 10.2, Page 40 of 161

### T. EXHIBIT T: OKPO EMAILS (9/3/2021-9/7/2021)

**Subject:** Re: Meeting Request
**From:** "Ekelemchi Okpo" Redacted
**Received(Date):** Thu, 09 Sep 2021 17:30:25 +0000
**To:** "Ashley Gjovik" Redacted
**Date:** Thu, 09 Sep 2021 17:30:25 +0000

---

Ashley-

As I said in my email on September 7, there are inconsistencies that have come up in the investigation. Since you have declined to speak with me, I will move forward based on the information I have.

Best,

Ekelemchi Okpo

Corporate Employee Relations

Redacted

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

On Sep 7, 2021, at 8:45 PM, Ashley Gjovik Redacted wrote:

Hi Ekelemchi!

Happy belated Labor Day! I hope you’re well.

**I. Updates in writing**

My previous email requested that we please keep future conversations in writing (9/3: "I’d like to request that we please keep our exchanges in writing.”)Will you please send me your updates / questions in writing? Or are you refusing my request? If refusing my request, can you please document your justification for doing so?

I feel like you’re implicitly denying my request otherwise — and because you’re an attorney and you’re in an adversarial position to me, if you are denying my request, I’d also like to request if there is there an appeal process (business conduct maybe?) to review my request to keep communications in writing?



APL-GAELG_00001135

Ekelemchi Okpo
Corporate Employee Relations
eokpo@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

On Sep 3, 2021, at 4:10 PM, Ashley Gjøvik <ashleygjovik@apple.com> wrote:

Hi Ekelemchi. I hope you're well.

As mentioned, I'm not actively checking messages on work devices on this indefinite leave situation, so the 2hr notice of your text wasn't enough. (At 8:36am you texted me "Hi Ashley, Good morning. I will like to schedule time for us to connect today at 10:30am PT via WebEx for an update. Will this time with for you? Thank you.") As mentioned, please send email to my personal address if you need a quick response.

<PastedGraphic-1.png>

I'd like to request that we please keep our exchanges in writing. If you are going to require a call or video meeting, I'm requesting that you grant me permission to record it.

As I've complained previously, there have been frequent misrepresentations of my verbal conversations with my managers, with Human Resources, and with Employee Relations. This includes misrepresentations by yourself related to the nature of this leave. From what I've heard from other employees in similar situations, this appears to be a pattern by Apple's HR & ER teams to misrepresent and mischaracterize, likely to intimidate & retaliate — and I won't allow you to do continue doing this to me.

I didn't want to dignify the mis-characterizations in your 8/4 & 8/5 emails with a response, but I will say it explicitly in email now (as I did on our WebEx on 8/4) — I didn't ask to be put on leave. I asked you to do a number of other things to mitigate the hostile work env. I said if you couldn't successfully do any of those other things (keep comms in writing, manage my workload, tell my managers and HR BP to stop harassing me and retaliating against me, etc.) then I said worst case we could discuss leave again, however I insisted if I went on leave, that I still be able to organize with other employees, gather evidence, and participate in the investigation.

On 8/4 we were supposed to meet at 10am for a WebEx to review the final Box folders of evidence. You had scheduled at 45min meeting, that was shortened to 30min due a scheduling conflict I had — a meeting with another Apple victim who wanted to share her concerns about discrimination at Apple & Apple's response to it. When I joined that 8/4 meeting you told me we were no longer going to review the evidence and instead you were "putting me on leave." I told you I didn't want to go on leave. I told you I wanted to continue reviewing evidence. I told you I wanted you to work with my managers & HR BP instead. You told me I didn't have a choice. I told you if you were going to force me on leave, I wanted to start the leave later in the week or even next week so I could wrap up some of my projects, exchange my personal information with the women I was organizing with, and reschedule meetings. You also knew, as I told you numerous times, I had planned to go to my office at Stewart 1 on 8/5 to get a laptop with "tons of evidence on it." I had also told you that on 8/3 that I was concerting with colleagues in Stewart 1 to gather evidence of the unsafe work conditions and Apple's activities around them, because myself and other colleagues have feared Apple has been covering up said unsafe work condition.

Despite all of this, your 8/4 email after our 10am conversation said "I was NOW on leave." You also said I was removed from the workplace, workplace interactions, and my actual job — which implied I was also to stop using Slack, stop organizing with employees, stop gathering evidence, and to not go to my office to get more evidence.

Your recent emails mischaracterizing the nature of our verbal conversations & our previous emails have brought even more harm to me through this process.

Due to all of the above, I am also requesting an explanation of how this paid administrative leave will not negatively impact my performance reivew this year. As discussed, I've only had positive performance reviews in the past and I'm already worried about a negative review this year and/or less money as retaliation for raising concerns & organizing. At the very least, you forcing me to drop my projects with no notice on 8/4y and not even allowing me a few days to hand things off, seems likely to negatively impact my review. Even more, the retaliation from my managers in reducing my supervisory capacity, reassigning my projects, increasing my workload dramatically, and adding unfavorable work — all seem like retaliation setting me up for a negative review. Because you removed me "from the workplace & workplace interactions" I haven't been able to do anything to try to advocate for myself around this. What is Employee Relations strategy to ensure everything that's happened this year around whistleblowing, complaints, retaliations, etc year does not negatively impact my performance review? I believe my review was supposedly finalized last week.

Finally, I am still eagerly awaiting an update from ER & EH&S on the safety of my office. The last I heard was from Jenna (employee relations) telling me that she, nor ER, nor EH&S will answer any more of my questions about workplace safety. Which is very concerning in itself, let alone in addition to the current silence while EH&S has apparently been doing work at my office frequently over the last few weeks.

-Ashley

## X. EXHIBIT X: DAN WEST TEXT MESSAGES (2020-2021)

the mailbox happens to be 10 from where they play frisbee

make up to walk to the mailbox...

Yeah teenagers getting the mail is unexpected

How are you dealing with the Chez TJ transition?

Also how do I get monk tea

I'm bummed for my friends

That was the best tea I've ever had

Sorry :(

Did he just want a change? Or pandemic biz hit?

I don't know the details yet

but I don't like the owner (George)

the guy is an absolute creep

Oh no

he tried to get [redacted] to sit with him and have Champagne

fucker

Eeeeeeeew

NO

rest of the staff got her back (thank god)

She says they're all like family

and she was already telling him no

yeah

Jesus



PL_PROD_12_6747

And he's staying?

he's the owner

only there every once in a while

pop in for an hour or two every couple of months

if that was a daily thing i would have suggested she quit

Yeah seriously

At least she has a bunch of protective big brothers with sharp knives

yeah. they all took her under their collective wings

very protective of her

I told her she can think of the TJ transition that now she's leaving for college, there's no point for them to go on without her

She laughed

oh. I bet she loved that

she hates the changes

It's a lot all at once

dunno

But she seems to have your spirit, she seems fierce

she has mom's spirit

I'm a flame that burns behind the scenes

I've only met [redacted] that once

I miss her now that I deleted social media

dude...zuckerberg on the twitter controversy for fact checking trump?!

Huh? What did Zuck say?

The twitter / Trump thing is bananas

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**,
*an individual*,

**Plaintiff**,

v.

**APPLE INC.**,
*a corporation*,

**Defendant**.

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**DECLARATION OF PLAINTIFF RE: DEPOSITION & INTERVIEW AUTHENTICATION**

**IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION (375); & OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT (Dkt. 367, 375)**

**Under Cal. Labor Code § § 98.6, 1102.5 6310, & the *Tamney* Termination in Violation of Public Policy**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

# PLAINTIFF'S DECLARATION (REGARDING DEPOSITIONS IN SUPPORT OF PL.'S REPLY IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT & PRELIM. INJ.; AND OPP. TO DEF.'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

1. I, Ashley Gjovik, swear under penalty of perjury that the statements made in this Declaration are true and correct. I am the Plaintiff in the above captioned matter. I write this Declaration in support of my Reply in support of my Motion for Summary Judgement & Preliminary Injunction at Dkt. 375 and 359; and my Opposition to Defendant's Cross-Motion for Summary Judgment at Dkt. 375 and 367.

## II. PINCITE CROSSWALK OF PRIOR CITED DEPOSITIONS

2. As addressed in the Reply/Opposition at Dkt. 375, Section II, in my Motion for Summary Judgment (Dkt. 359) and supporting Declaration (Dkt. 360), I used non-standard pincites for some deposition excerpts. This was due to me rushing to complete the work on time (and I was still not able to complete it on time and was late). I'm providing a cross-walk below of the standard pincites for those prior references, including where they were referenced in the prior Motion (Dkt. 359) and Declaration (Dkt. 360).

3. I'm also attaching as Exhibits the certified full-page transcript excerpts for all sections as a supplement to the mini-versions previously filed at Dkt. 360. The full excerpts for Mr. Bertolus are at Exhibit A, Mr. West at Exhibit B, Mr. Okpo at Exhibit C, Mr. Kagramanov at Exhibit D, and Mr. Aloe McKeon at Exhibit E.

4. Deposition excerpts with court reporter's certification, cited by page:line, and authenticated via declaration with declarant laying the foundation is self-authenticating including under FRE 902. Exhibits are authenticated by Plaintiff, and/or by Defendant's witnesses, and/or

B (CP Intake Interview Summary)_Redacted.pdf"), and audio file named "Exhibit 2-A (CP Intake 11.08.21).mp3".

## VII. CONCLUSION

13. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 25 2026 in San Jose, California.

Respectfully filed,

**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed May 25 2026 in San José, California
(408) 883-4428 | ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

**G. EXHIBIT G: WARNER DEP. (FULL/MINI)**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK, an individual,

Plaintiff,

3:23-CV-04597-EMC

vs.

APPLE INC., a corporation,

Defendant.

__________________________

REMOTE DEPOSITION OF APPLE INC.'S 30(b)(6)
ADELMISE R. WARNER
VIDEO-RECORDED VIA ZOOM
Tuesday, May 12, 2026

Reported by:
Layli Phillips
RPR, CRR, CSR No. 14402
Job No. 10190735



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK, an individual,

Plaintiff,

3:23-CV-04597-EMC

vs.

APPLE INC., a corporation,

Defendant.

__________________________

Remote Deposition of ADELMISE R. WARNER, taken on behalf of Plaintiff, beginning at 9:09 a.m. and ending at 5:00 p.m., on Tuesday, May 12, 2026, appearing remotely via Zoom before Layli Phillips, RPR, CRR, Certified Shorthand Reporter No. 14402.



REMOTE APPEARANCES:

For the Plaintiff:
A.M. GJOVIK CONSULTING, LLC
By: ASHLEY M. GJOVIK
In Pro Per
2108 N Street
Suite 4553
Sacramento, California 95816
(415) 964-6272
ashleymgjovik@protonmail.com

For the Defendants:
ORRICK, HERRINGTON & SUTCLIFFE LLP
By: MELINDA S. RIECHERT
Attorney at Law
1000 Marsh Road
Menlo Park, California 94025
(650) 614-7423
mriechert@orrick.com

ALSO PRESENT: Isela Perez, Apple in-house counsel

(Video-recorded via Zoom by Ms. Gjovik.)



I N D E X


| WITNESS | EXAMINATION |
|---|---|
| ADELMISE R. WARNER | |
| Examination By Ms. Gjovik | 15 |


E X H I B I T S


| Plaintiff's | | PAGE |
|---|---|---|
| Exhibit A | LinkedIn Profile | 181 |
| Exhibit B | Termination Communication Apple Produced Between Ms. Bowman and Mr. Bertolus | 181 |
| Exhibit C1 | Photo of Twitter Post | 209 |
| Exhibit C2 | Photo of Twitter Post | 211 |
| Exhibit C3 | Photo of Twitter Post | 212 |
| Exhibit D1 | Business Conduct Complaint Filed on August 29th | 216 |
| Exhibit D2 | Twitter Post About the Ear Scans | 216 |
| Exhibit C4 | Letter From O'Melveny & Myers Law Firm, Mr. David Eberhart, on September 15th, 2021 | 219 |

**Mr. Bertolus speak to to determine what I shared was confidential prior to my termination?**

A. I do not have the exact names. He spoke to various folks, as I mentioned, in global security, HR, and the business.

MS. RIECHERT: And a lot of that is confidential and privileged, and we've objected on that basis.

BY MS. GJOVIK:

**Q. Okay. So if you speak to someone who is not a lawyer, that can't be privileged, so --**

MS. RIECHERT: It can. It was in the presence of counsel and in connection with the obtaining of legal advice.

BY MS. GJOVIK:

**Q. Okay. So on behalf of Apple, as of the date of my termination, who by name at Apple were the ones to make the determination that what I shared in the Twitter post or posts was confidential?**

A. Mr. Bertolus determined it was confidential and it was in violation of policy, and he did that by having conversations; some of them were with counsel.

**Q. Is Apple planning to argue as a defense the adequacy of their investigation?**

MS. RIECHERT: Objection. This witness is not



here to talk about Apple's defense in this case. It's not one of the topics.

BY MS. GJOVIK:

**Q. Okay. So, Ms. Warner, is Apple going to claim that any further detail on this matter is privileged and they won't provide any other information?**

MS. RIECHERT: Okay. Ask your questions. I will object if the question calls for privileged information.

BY MS. GJOVIK:

**Q. Okay. Ms. Warner, is there anything else that you can share with me about Mr. Bertolus's investigation and determination on -- up to and when I was fired about the content I shared being confidential?**

MS. RIECHERT: Objection. Vague. Overbroad. Ask a question, and then she'll answer it.

MS. GJOVIK: That is the question because she's claimed privilege.

BY MS. GJOVIK:

**Q. You've claimed privilege, so is there anything else that you can share about Mr. Bertolus's investigation and determination that I shared confidential information on Twitter beyond what you've already testified just now?**

MS. RIECHERT: Okay. You already know what



she's allowed to testify about because Yannick already testified about his --

MS. GJOVIK: Objection. Speaking objection.

MS. RIECHERT: I know. But you asked anything else you can testify about. That's not a proper question.

Who did she consult with, what did they tell her, you can ask all of that.

MS. GJOVIK: I'm sorry. You're saying "her," but she said it was Mr. Bertolus who --

MS. RIECHERT: Right. Who did he consult with, you can ask that. And she can answer as to the stuff that's not privileged, which you know well about.

MS. GJOVIK: Okay. So I did ask, and she could not give me any names.

MS. RIECHERT: Incorrect, incorrect. That's not what --

BY MS. GJOVIK:

**Q. Okay. Ms. Warner, can you please provide me any names of the people that Mr. Bertolus consulted in making the determination that what I shared was confidential?**

A. I have already answer -- I've already answered that. In the course of him making the determination about the images, I've said there were discussions with



members of global security, the members of the HR team or the people team, and legal counsel.

And those conversations led to the conclusion that the information you had shared, the images, specifically, were confidential.

**Q. Thank you.**

**But can you identify the names of any of these people in these organizations that you're mentioning?**

A. Megan Bowman is one of them. Again, conversations that may have happened were with counsel. To the extent of that, I'm not going to speak to that.

Megan Bowman who is in HR. And we had the global security team. Sophi Jacobs is one individual. And I've already mentioned Robert Aloe who was one of the individuals consulted.

**Q. Thank you.**

**I just want to confirm again because we're talking about as of the date I was terminated. So did Mr. Bertolus consult with Mr. Aloe prior to my termination?**

A. I've already answered that. He consulted with various folks who included conversations with Mr. Aloe.

**Q. So you're saying Mr. Bertolus did talk to Mr. Aloe prior to terminating my employment about this matter?**

Page 77

MS. RIECHERT: Well, I don't know what you're talking about. I think that's the problem here.

MS. GJOVIK: This is Apple's defense for terminating me, and I'm asking for Apple's final answer of how many images supposedly contained Apple confidential information that it used as the basis to terminate my employment and --

MS. RIECHERT: Okay. Can she look at "The Verge" article and count the --

MS. GJOVIK: No speaking objection. We're not even talking about "Verge." You keep inserting "The Verge" article. I'm talking about the Twitter post.

MS. RIECHERT: You said "The Verge" article and the Twitter post were the basis for the termination, and so you're saying how many photos are there. And I'm saying if you want her to count the photos in "The Verge" article, she can do that.

MS. GJOVIK: Ms. Riechert, I'm going to ask to have you replaced by a different attorney if you do not stop with these speaking objections. You are testifying on behalf of Apple Inc. repeatedly. It's inappropriate. I'm going to ask you to please stop and reduce your objections to formal objections and not testimony.

BY MS. GJOVIK:

**Q. And I'm actually now going to pivot and ask for**

Page 78

**clarification here, if one of the -- if Apple considered "The Verge" article called "Apple Cares About Privacy Unless You Work At Apple" as part of the basis for terminating my employment prior to terminating my employment.**

A. Ms. Gjovik, I've said that a few times, for your termination, the images that you had, again, copies or screenshots of the images that you had on Twitter, and you also had similar images and videos that were included in "The Verge" or shared with "The Verge."

Again, those were considered. The -- again, if you want to go through, look at the images, we can count them. But I have said that, I think, at least 45 minutes ago since we've been starting down this line of questioning.

**Q. I'm asking for clarification because Apple has given inconsistent answers about whether "Verge" was considered at the time of termination or whether it's an affirmative defense after the fact.**

**And so I'm looking for Apple Inc.'s deposition testimony today whether the reason I was fired on September 9th, 2021, included that "Verge" article or if that was considered after the termination.**

MS. RIECHERT: Again, objection to your characterization. You've got to stop characterizing

Page 79

things that are wrong. Apple changed its reasons, that's just not true.

So just ask the question, did Apple consider "The Verge" article, yes or no. And then she'll answer that question.

BY MS. GJOVIK:

**Q. Ms. Warner, did Apple consider that "Verge" article called "Apple Cares About Privacy Unless You Work For Apple" when it decided to terminate my employment?**

A. Apple considered the images and videos that you had posted or included, shared on Twitter and "The Verge" article.

**Q. At the time it terminated me on September 9th, 2021, correct?**

A. I've already answered that. That was part of the reasons for your termination because there was -- it came to our attention that you had posted, again, the images, which, again, we can look at them, on Twitter, and you also had "The Verge" article.

**Q. This is where I just want to clarify because you said also "The Verge" article.**

**So when Apple terminated my employment on September 9th, 2021, was one of the reasons for that termination content I shared with "The Verge" and where**

Page 80

**it was in that "Verge" article called "Apple Cares About Privacy Unless You Work At Apple"?**

MS. RIECHERT: Objection. Asked and answered many, many times.

And objection also as to the word "content." She's told you it's the images. I don't know why we keep going through this over and over.

MS. GJOVIK: I would like her to answer this question.

MS. RIECHERT: Okay. So I'll object to the use of the word "content" with respect to "The Verge" article.

MS. GJOVIK: Okay.

A. I've already answered the question in terms of the images that you had shared. I don't have any other answer for you.

**Q. I am uncertain of what your answer is based on the answers you've given thus far. I would like a more -- so let me rephrase with pivoting from Melinda's objection.**

**Ms. Warner, at the time I was terminated on September 9th, 2021, was one of the reasons for that termination photos I shared with "The Verge" included in that "Verge" article called "Apple Cares About Privacy Unless You Work At Apple"?**

**article?**
A. As I've said before, Ms. Jacobs and Mr. Kagramanov were going to be the investigators or were the investigators to look into the concerns about you posting and sharing the confidential images. Aleks reached out to you to speak to you, and you refused.
Again, I know you don't like that, but that's my answer, and that's my understanding of what transpired.
**Q. So the -- so are you saying that the only part of this -- the only investigation that occurred was Mr. Kagramanov contacting me and if -- nothing else was done as part of this investigation?**
MS. RIECHERT: Objection. Assumes facts not in evidence. And the investigation is privileged. So I'm not going to let her answer questions about the investigation.
BY MS. GJOVIK:
**Q. Did Apple read the article, "The Verge" article, prior to my termination?**
MS. RIECHERT: Objection. Assumes -- to the extent it is part of the privileged investigation and I'm not going to let her to answer questions and instruct her not to answer questions about the investigation that was done prior to the decision.



BY MS. GJOVIK:
**Q. Did Apple watch the video in "The Verge" article prior to terminating me?**
MS. RIECHERT: Same objection. And same instruction.
BY MS. GJOVIK:
**Q. Okay. Did Apple see me linking to that "Verge" article in the social media posts I made prior to my termination?**
MS. RIECHERT: Same objection. Same instruction.
BY MS. GJOVIK:
**Q. Okay. You also mentioned something about ear scans. Was one of the reasons that Apple terminated me on September 9th, 2021, my complaints about ear scans?**
MS. RIECHERT: Objection. Misstates the testimony.
A. That was not my testimony.
**Q. Did Apple believe that me posting about those ear scans was me sharing Apple confidential information?**
A. What I've described before, I mentioned in the studies that you had done, the ear scans one, the concerns that were raised, then the Face ID.
Again, images that you had posted were confidential. You speaking about the ear scan or being



in the study was not the basis for your termination, and that by itself is not confidential.
**Q. Okay. Thank you.**
**And then the ear scans, are you saying that the images I shared related to ear scans were confidential? You said images. Can you clarify?**
A. I'm talking about the images for Face ID which was the nature of your termination.
**Q. Okay. Was one of the reasons I was terminated as of September 9th, 2021, related to ear scans?**
MS. RIECHERT: Objection. Just asked and answered.
BY MS. GJOVIK:
**Q. Apple previously filed things to the court saying it was one of the reasons, and it appears to be backtracking. So it's very material, and I would like a clear answer on this.**
MS. RIECHERT: You got a clear answer.
BY MS. GJOVIK:
**Q. What is the answer?**
A. It's on the record.
**Q. Is it no? Is that the answer?**
A. I've already answered that.
**Q. Okay. So, okay, let's go to the second bucket, something about me refusing to cooperate.**



**Can you please summarize for me the -- that second bucket of the reason I was terminated related to refusal to cooperate?**
A. In addition to what I have already shared where Aleks did reach out to you to speak with you and you refused, that was one of the reasons, and that was shared with Mr. Bertolus in addition to what I've already described about the images.
You also had a reach out from Ekelemchi Okpo who was investigating your concerns, and he had attempted to reach out to you, and you also refused to speak with him, and he had shared with you that because you had refused to speak with him, he would conclude his investigation based on what he had.
**Q. Okay. Can you clarify, then, the Okpo complaint about refusal to cooperate? That was a reason for termination as of September 9th, 2021?**
A. Clarification, it's not an Okpo complaint. Okpo was investigating the concerns. He had reached out to you to speak with you about, as you probably know from the emails, inconsistencies he had identified in the course of the investigation, and you had refused to actually speak with him, and you --
**Q. On the phone. I wanted things in writing, yeah.**

Page 189

MS. RIECHERT: Okay. First of all, please don't recite the law because I'm just going to object. Ask a question.
BY MS. GJOVIK:
**Q. Are you aware of the legal -- because -- so okay.**
**You were mentioning that the use of the term "pimping and pandering" as a sort of misconduct or basis of misconduct or the comparisons.**
**So I would like to ask if Apple is aware of the legal definition of a statute I was citing for pimping and pandering with indirect benefits and what the legal criteria is for that.**
MS. RIECHERT: Okay. Objection. Outside the scope of any of the topics --
MS. GJOVIK: Protected activity. Retaliation. Reason for termination.
MS. RIECHERT: Calls for a legal opinion. I think that's -- I'll stop at those two.
MS. GJOVIK: Okay. So if we leave it at that, though, it's basically like saying she said that we violated the NLRA and we think that's misconduct because we don't think we did, so her saying we violated the NLRA is misconduct.
If you want to leave it like that, we can, but

Page 190

I was hoping to get more information about why Apple would think me citing the violation of a statute is misconduct.
MS. RIECHERT: Okay. First of all, that is exactly not what the witness said and so misstates the witness's testimony.
MS. GJOVIK: That's why I'm trying to get more information.
THE WITNESS: If you would allow me to, again, make sure I clarify, I did not state that you simply citing pimping or pandering is misconduct.
Very clearly, my testimony and what I understand is that you had characterized the interaction, and how you described what happened and what you provided to Mr. Okpo seemed to be different than what he was able to see from the text thread. And he wanted to speak to you about it. And you refused.
So the reason for that part of the termination was the misleading information and your refusal to speak to him.
I did not say your citing the statute or any legal argument you made was the basis for the termination.
BY MS. GJOVIK:
**Q. Thank you.**

Page 191

**I was trying to do you a solid on that one because it sounded kind of bad, and I assumed it was not that wild.**
**But are you aware that Mr. West testified that he believed that there was a power imbalance that would prevent me from actually being able to consent to something like that?**
A. That Mr. Powers testified?
**Q. Or, sorry, Mr. West. Not Mr. Powers. Thank you.**
A. Yeah. Can you say that again? Just, like, there's a lot there.
**Q. Are you aware that Mr. West testified that he believed there was a power imbalance that would prevent me from actually being able to consent to something like that?**
MS. RIECHERT: Objection. That misstates the testimony.
But you can answer if you're aware of his testimony.
THE WITNESS: I am not.
BY MS. GJOVIK:
**Q. Okay. Are you aware that Mr. West and I had texted, and he had said it was one of the worst things he's ever done and confirmed that in his deposition?**

Page 192

A. I am not.
**Q. Are your aware that Mr. Okpo testified that me requesting to have communications in writing on this specific issue was a reason he closed the entire investigation and stopped investigating all of my other complaints?**
MS. RIECHERT: Objection. Misstates the testimony.
A. I do not believe that's what he said, so that is not an accurate characterization of what Mr. Okpo shared.
**Q. If that's not true, did Apple continue investigating my complaints after I was fired?**
A. Mr. Okpo -- the -- again, without disclosing any privileged investigation that had occurred, the investigation did not necessarily conclude with you simply refusing. There were lots of other things Mr. Okpo had done.
And so how you're characterizing his testimony, again, I read his testimony; I don't believe that is accurate.
**Q. Okay. When did the investigation into my concerns complete, then?**
A. Into which concerns?
**Q. The issue confirmation.**

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed by me; that the foregoing is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 12, 2026

_______________________________

Layli Phillips
RPR, CRR, CSR No. 14402



DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik
vs. Apple Inc.
Date of Deposition: 05/12/2026
Job No.: 10190735

I, ADELMISE R. WARNER, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2026, at ____________________.

_________________________________

ADELMISE R. WARNER

NOTARIZATION (If Required)
State of ________________
County of _______________
Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__,
by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.
Signature: ______________________________ (Seal)



DEPOSITION ERRATA SHEET
Case Name: Ashley Gjovik
vs. Apple Inc.
Name of Witness: Adelmise R. Warner
Date of Deposition: 05/12/2026
Job No.: 10190735
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________



DEPOSITION ERRATA SHEET
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
Page _____ Line ______ Reason ______
From ______________________ to ______________________
_______ Subject to the above changes, I certify that the transcript is true and correct
_______ No changes have been made. I certify that the transcript is true and correct.

___________________________________

ADELMISE R. WARNER

## H. EXHIBIT H: GJOVIK DEP. (12/16/25)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CERTIFIED TRANSCRIPT

ASHLEY GJOVIK,

Plaintiff,

vs. CASE NO. 23-cv-4597-EMC

APPLE INC.,

Defendant.

_______________________________/

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

ASHLEY MARIE GJOVIK

Pages 66 to 305 MARKED CONFIDENTIAL

DATE: Tuesday, December 16, 2025

TIME: 9:07 a.m. - 5:53 p.m.

LOCATION: (All attendees appearing remotely.)

REPORTED BY: JULIE L. ANDERSON, CSR
Stenographic California CSR No. 11422

Talty Court Reporters
2131 The Alameda, Suite D
San Jose, California 95126

::: CERTIFICATE OF REPORTER :::

I, JULIE L. ANDERSON, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, CSR No. 11422, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing remote deposition was administered an oath remotely to testify to the whole truth in the within-entitled cause.

That said deposition was taken down remotely by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision.

(X) Reading and signing was requested/offered.

Should the signature of the witness not be affixed to the original deposition transcript, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certificate null and void.

I further certify that I am neither counsel for nor related to any party in the foregoing depositions and caption named nor in any way interested in the outcome thereof.

DATED: January 5, 2026

Julie L. Anderson

JULIE L. ANDERSON, CSR
California Certified Shorthand Reporter 11422

from stuff ongoing, and that was my experience watching with other people. And I was also told directly from multiple people who have been at Apple for some time in positions of influence and power that you participate and you succeed on this -- any kind of stuff like this and if you don't, you will be excluded and you will not be given opportunities to advance your career at Apple.

Q. So, first of all, who -- which managers did you tell that you did not like participating in the Glimmer/Gobbler app program?

A. Aidria Astravas and I talked about it a bit. Aidria and I actually talked before I talked to Verge, and I was, like, I want to complain about this publicly because I don't like it at all. I don't think the way I want to complain about it is confidential, and I think Apple is not going to stop until it's public. And she actually agreed with me. She's a senior manager of the video engineering organization, which includes stuff like the camera app stuff. It also bothered her, and we'd talk a lot. Aidria and I talk to Deepa --

Q. That's way beyond my question.

A. Yeah.

Q. Did you ever talk to either of your

So did you do anything to try to organize your coworkers to stop the Glimmer studies at any time from 2017 to 2021 before you posted this?

A. I just answered and said yes.

Q. What did you do to try to organize your coworkers to stop the Glimmer study?

A. I was -- I already said earlier in here. I talked to other coworkers about their concerns.

Q. Close friends, uh-huh.

A. See if there's anything we thought we could do, and I already said too that I already talked to Aidria before I made the disclosures. Aidria is a senior manager. She's -- Aidria Astravas.

Q. I understand. You talked to your three close workers. You told me that. Your coworkers.

A. No. I'm saying I talked to Aidria before I posted this about my intention to share this information because I wanted a sanity check. I said I don't think this is confidential. I think this is not confidential, and I think it's important to share that I don't think Apple is going to do anything internally to ever make this better. And I knew she also had concerns, and I knew she was in a leadership position in an Apple organization where she would know if Apple had the willingness or

capability to ever do better about this specific thing that I knew she -- it also bothered her and she agreed --

Q. Did she tell you -- did she tell you it was okay for you to post this on Twitter?

A. She did.

Q. Okay.

A. She encouraged me. She thought it was the best chance we possibly had for Apple to do better and stop invading our privacy like this with Gobbler. And from what I've heard, it worked and Apple made pretty quick changes to that application in the way it's used with employees that was credited to this article.

Q. Okay. So we'll go back to that. But first of all, you -- I asked you if you made any efforts to organize your coworkers to stop the Glimmer application, and you said you talked to your friends. You talked to Aidria. Anything else you did to organize your coworkers to stop the Glimmer application prior to the August 30 tweets?

A. I believe I brought it up on some Slack group chats at some point. There's AI ethics group chats. To kind of gauge the feeling about it. But these kind of things were generally things we

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**,
*an individual*,

**Plaintiff**,

v.

**APPLE INC.**,
*a corporation*,

**Defendant**.

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION; & OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

**Under Cal. Labor Code 98.6, 1102.5 6310, & the Tamney Termination in Violation of Public Policy**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

# PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION; AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

1. Plaintiff's Motion for Summary Judgment (Dkt. 359) established the documented record entitling Plaintiff to summary judgment on the unrebutted elements for several retaliation sub-claims. Defendant Apple Inc.'s combined Opposition and Cross-Motion (Dkt. 367) does not actually rebut those elements, but instead attempts to mischaracterize and create confusion. Plaintiff apologizes for slightly delayed corrected version of this filing – with the original filed before midnight but not complete and trailing filings of the Declaration and RJN filings this morning. Apple's filings were chaotic and overlapping with ongoing discovery disputes including new allegations of protective order violations and threats of sanctions, along with the Rule 30(b)(6) depositions not occurring until May 12 and 14 2026, and while not expected to be needed for this filing – revealed material, critical information that took time to process after only receiving the transcript this week. Plaintiff ask for leave to file slightly late and apologizes.

2. Overall, Apple's defense is false on Apple's own binding admissions — the ear-scan basis is withdrawn or fabricated, the formal justification is code-named without definitions and generally undecipherable, the disputed photographs and Twitter posts cannot be identified, the "redaction" allegation cannot be explained, the full-text thread "contradiction" cannot be articulated, no legitimate basis is provided for designating employee requests to preserve evidence is misconduct, and the Verge article cannot be both pre- and post-termination. Apple does however assert that protected activity is somehow misconduct, and claims a vague right to fire employees for complaining about unlawful conduct by Apple and its management, while concurrently claiming any details about Apple's alleged misconduct is confidential and privileged. The cross-motion should be denied and Plaintiff's motion granted on liability, with the preliminary injunction issued.

## II. PROCEDURAL POSTURE AND CONCURRENT SUBMISSIONS

3. Plaintiff files concurrently: Declaration of Ashley Gjovik in Support of Reply and Opposition ("Pl. Opp./Reply Decl."), which includes a deposition pin-cite crosswalk together with the relevant pages from the certified transcripts; Plaintiff's Request for Judicial Notice in support of articles and government documents relevant to the public-policy framework; and Plaintiff's Opposition to Defendant's Request for Judicial Notice (Dkt. 373) together with a conditional cross-request for judicial notice if the Court considers Defendant's request.

4. Plaintiff's April 23 2026 motion cited the prior depositions to deposition-summary line numbering rather than to certified transcript page:line. The cited testimony exists in the certified transcripts. (Pl. Opp./Reply Decl.). Plaintiff did not invent any deposition testimony, its improper for Apple to suggest she did when the full deposition transcript was available and easily confirmed, and respectfully requests the Court treat cites by their substance.

## III. EVIDENTIARY POSTURE

5. In this filing, Plaintiff cites Defendant's Rule 30(b)(6) deposition of Adelmise Warner (May 12, 2026). That testimony post-dates Plaintiff's April 23 2026 motion and Defendant's May 7 2026 opposition/cross-motion because Defendant did not produce its corporate witness for deposition until May 12, six weeks past the discovery cutoff. The Magistrate characterized Defendant's Rule 30(b)(6) posture as "unreasonable" and stated Defendant "should know better." Dkt. 357 at 1-2. The testimony is Defendant's binding corporate position. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996); *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040-41 (9th Cir. 2003).

6. Apple's evidentiary objections to Plaintiff's characterizations of Apple's Amended Answer cite to the Answer paragraphs; Apple's quibbles with phrasing do not undo Apple's admissions of the underlying facts. However, additional evidence is provided with the Pl. Opp./Reply Decl. including EPA Exhibits authenticated by Plaintiff's personal knowledge as the

email where Plaintiff states "As mentioned, I refuse to quit or to take medical leave as a response to the hostility; this is on Apple ER to resolve, not for me to hide from. There are two options we've discussed. First, a new role at Apple that is not a hostile work environment and not in unsafe work conditions … The 2nd option is an exit package that will compensate me and provide benefits through that time. As mentioned this would only be a payment & exit to mitigate the current hostile work environment and unsafe work conditions and would not include any litigation/arbitration waiver agreements nor any non-disclosure agreements beyond what I've already signed as an employee.". Okpo Decl. Ex. A. The settlement-context communications Apple selectively excerpts, themselves confirm Plaintiff believed she was in a hostile work environment, did not want leave ("*As mentioned, I refuse to quit or to take medical leave as a response to the hostility; this is on Apple ER to resolve, not for me to hide from*" - Okpo Decl. Ex. A), and was attempting to resolve the matter through a negotiated separation while Apple was simultaneously planning the termination it then characterized as for cause and without warning or severance.

## IV. APPLE'S STATED REASONS FAIL ON APPLE'S OWN ADMISSIONS & CONTRADICTIONS

9. Apple's own MSJ identifies Plaintiff's invocation of a criminal statute in her harassment complaint as misconduct. That is per se § 1102.5(b) retaliation and direct evidence of unlawful motive across all four claims. Plaintiff's Issue Confirmation invoked California's pandering provisions (Penal Code §§ 266, 266h, 266i), based on Plaintiff's good-faith reading of those statutes and the facts of West's conduct in arranging a sexual liaison between Plaintiff and a sous chef at Chez TJ, the restaurant Bertolus's personal friend (head chef Jared Gallagher) worked at and where West regularly socialized, accompanied by a $200+ dinner West paid for. Pl. Opp./Reply Decl.

10. Warner initially testified Plaintiff's invocation of California's pimping/pandering

statute (Penal Code Section 266h-i) in her Issue Confirmation was an example of the supposed misconduct, then backtracked on the record when Plaintiff points out that reporting a crime is the core of § 1102.5(b). Warner said "without reading your issue confirmation, what I recall from reviewing it, you had used the word ·of being -- pimping and pandering, I believe, were the words." Warner Depo. 186. Plaintiff explained "pimping and pandering with indirect benefits" is an "allegation of a violation of a statute" making it a "whistleblower disclosure." Id. Counsel responded "please don't recite the law because I'm just going to object." Id 189. Plaintiff was questioning Warner that she indicted Apple believed "the use of the term 'pimping and pandering' as a sort of misconduct or basis of misconduct" and Apple is aware of the legal definition of a statute [she] was citing for pimping and pandering with indirect benefits." Id at 189. Counsel objected and Warner eventually clarified "I did not say your citing the statute or any legal argument you made was the basis for the termination." Warner Depo. 190.

11. Apple's MSJ — in writing, in the operative pleading — identifies Plaintiff's invocation of the penal statute in her complaint as part of what Apple complaints was misconduct by Plaintiff. The backtrack does not retract Apple's MSJ pleading. Apple's filed position remains that the invocation of the criminal statute was misconduct. That is per se retaliation under § 1102.5(b). *Killgore v. SpecPro Professional Services, LLC*, 51 F.4th 973, 984-90 (9th Cir. 2022). Independently, Apple's own corporate witness's adoption-then-retraction of the position is itself a sham-affidavit problem and a *Loggins* shifting-rationale problem. The result is the same either way: it violates § 1102.5(b) on its face, and the same conduct is direct evidence of unlawful motive supporting *Tameny*, § 98.6, and § 6310.

12. The conduct fits the elements of the cited statutes, including § 266h's indirect-benefits provision. (Pl. Opp./Reply Decl.). West himself was given Apple ER feedback that the conduct was "not appropriate," reflected a "power imbalance," and warranted corrective-action

*confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it*." – Pl. Decl. Ex. 25 at 210). Additionally, Defendant's own subject-matter expert testified Gobbler is not a user study, contradicting Apple's prior characterization ("*I would like to clarify that Glimmer is not a user·study itself.· It is an upload app….it is not a user study in and of itself*" Aloe Depo. 30). Worse, the Informed Consent Form Apple relies on was electronically signed in 2017 for a 20-minute session over two years before the operative conduct; no Glimmer-specific ICF was entered for the 2021 studies and expected a new ICF would be entered if the study continued through 2021. (Aloe Depo 45-46; Aloe Decl. Ex. C).[2]

24. Independently, Apple's confidentiality theory is itself unlawful. California Civil Code § 1668 forbids any contract "to exempt anyone from responsibility for his own . . . violation of law," and *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 669-70 (1988), and *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167, 176-77 (1980), establish that contractual confidentiality cannot defeat the public policy expressed in California's whistleblower statutes. *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937 (2008), holds that provisions interfering with statutorily protected activity are unenforceable. An employer cannot establish a legitimate, independent reason for an adverse action where its own records and sworn corporate testimony contradicts its sworn filings, and its own defense counsel and corporate witness cannot identify the operative facts. *Loggins v. Kaiser Permanente International*, 151 Cal. App. 4th 1102, 1112 (2007); *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1062 (2005); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014).

25. Plaintiff's disclosures concerned Apple's collection, on Apple-issued iPhones

[2] Q: would you expect·that this study would last for years after that 20 minute period without the additional ICF? | A· ·No.· I would not expect that

carried by Apple employees, of face images and biometric data from non-consenting members of the public — used to train Face ID, now deployed on over a billion consumer iPhones. The FTC has, in five recent enforcement actions, required deletion of data and AI models built on biometric data gathered without informed consent. *In re Rite Aid Corp.*, FTC File No. 2023190 (Dec. 19, 2023); *In re Everalbum, Inc.*, FTC File No. 1923172 (Jan. 11, 2021). A confidentiality designation that operates to shield evidence of conduct exposing Apple to enforcement actions for unlawful biometric data collection — and to silence employees who report it — is unenforceable as against public policy. The confidentiality theory cannot survive Cal. Civ. § 1668, Edwards, Tameny, and Foley because it operates to shield evidence of privacy invasions, labor law concerns, and unlawful biometric data collection; the refusal-to-cooperate theory cannot survive § 1102.5(b)'s and § 98.6's protection of communications with federal agencies; the penal code-invocation premise cannot survive § 1102.5(b)'s textual protection of disclosures of reasonably-believed violations of law.

26. Apple's Seventh Affirmative Defense pleads the Verge article as after-acquired evidence learned "shortly after" termination. (Amended Answer). Yet, Apple's Rule 30(b)(6) testifies the Verge article was a pre-termination basis: "*That was part of the reasons for your termination because there was — it came to our attention that you had posted, again, the images, which, again, we can look at them, on Twitter, and you also had 'The Verge' article."* Warner Dep. 79:14-22. "Apple did consider the images and videos that you had posted included in 'The Verge.'" Warner Dep. 81:18-22. Apple's counsel further stated on the record: *"I have not seen anything that says that Apple did not know about 'The Verge' article*." Warner Dep. 83:3-4.

27. Apple's prior agency filings expressly disclaim pre-termination knowledge of the Verge article — directly contradicting Apple's current Rule 30(b)(6) testimony. For instance, in 2022, Apple's counsel at Orrick wrote in a sworn statement to the federal government that Apple

terminated the Plaintiff's employment "*because she violated Apple policy by intentionally disclosing confidential information about Apple products on Twitter and, as Apple later discovered, to the press.*" (Pl.'s Decl. Ex. 25 at 210 -- Apple's March 4, 2022 Position Statement to U.S. Dept of Labor). After-acquired evidence is limited to remedies mitigation under *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995), and *Salas v. Sierra Chemical Co.*, 59 Cal. 4th 407 (2014). Apple cannot use the Verge article as both pre-termination basis and after-acquired evidence. An affirmative defense pleaded without a factual basis is Rule 11 territory. *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360-63 (1995); *Salas v. Sierra Chem. Co.*, 59 Cal. 4th 407 (2014).

## VII. APPLE CANNOT RESCUE ITS DEFENSE THROUGH A "PARTIAL" SAME-DECISION ARGUMENT OR ANY OTHER SURVIVING AFFIRMATIVE DEFENSE

28. Apple's brief frames Gobbler as "alone sufficient grounds for termination" with other reasons "bolster[ing]" the determination. Dkt. 367 at 7, 11. Apple invites the Court to assume that even if some of its stated reasons fail, the remaining one(s) carry the same-decision defense by clear and convincing evidence. That is not how *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703 (2022), works. An employer cannot meet the clear-and-convincing same-decision burden by conceding the falsity, bad faith, or pretextual character of part of its asserted basis and then asking the Court to assume it would have made the same decision on the residue. The same-decision defense requires affirmative proof, not the partial collapse of a manufactured defense.

29. The ear-scan component is disclaimed by Apple's 30(b)(6); the Gobbler/Glimmer component has no articulable basis on Apple's binding testimony; the Alpha/Omega code names are undecipherable on Apple's own record; Apple's photograph-confidentiality theory rests on a consent form from 2017 covering a 20-minute unrelated session and on using a disparate-treatment comparator as a defense witness; Apple sent one of the witnesses who decided to fire

the Plaintiff to be the Rule 30(6)(b) witness and then claim privilege about her own conduct; and the confidentiality designation is itself unenforceable as against public policy. The Seventh Affirmative Defense (after-acquired-evidence Verge article) is foreclosed by Apple's own contradictory Rule 30(b)(6) testimony. Apple has no legitimate-independent-reason basis remaining. Further, Apple's footnote 7 reliance on the September 25, 2025 NLRB partial withdrawal is addressed in Plaintiff's concurrent Opposition to Defendant's Request for Judicial Notice and rests on a discretionary, unreviewable prosecutorial decision that the NLRB itself characterized as such.

## VIII. APPLE NOW CLAIMS REPORTING SEX CRIMES IS MISCONDUCT

30. Apple's MSJ identifies invocation of a criminal statute as misconduct; the 30(b)(6) admits the decisionmaker's confusion about the basic harassment-complaint subject "would not have changed the decision," and admits West received corrective-action feedback for the same conduct Plaintiff complained of. *Fourth, the defense rests on circumstances Apple manufactured* — the texts Plaintiff was terminated for failing to produce were inaccessible because Apple placed her on leave the day before she planned to retrieve them; the harassment-complaint confusion was the product of Apple's investigators' framing for Bertolus; the refusal-to-cooperate was the product of Apple's manufactured demand for oral-only communications during an active federal agency proceeding. *Ray v. Henderson*, 217 F.3d 1234, 1244-45 (9th Cir. 2000); *Yanowitz*, 36 Cal. 4th at 1052-53. The four-failure structure is itself the substantial responsive evidence *Loggins* requires.

31. There are new instances of this following the prior filings. Bowman's email proposing to terminate the Plaintiff mentioned "redactions" and Apple's corporate witness was not prepared to identify what "redacting" referred to in Bowman's email, did not speak with Bowman before the Rule 30(b)(6) deposition, and could not articulate what specific texts

Plaintiff allegedly provided or what about the broader chain "directly contradicted" the allegation. Warner Dep. 153:24-25; 154:25-155:5; 155:17-156:7; 156:8-10 The factual basis regarding the "redaction" — is an unsupported assertion by an Apple HR employee Apple's own corporate designee did not prepare to defend.

## IX. THE INVESTIGATION SHIELD-AND-SWORD FORECLOSES APPLE'S DEFENSE ON ALL FOUR CLAIMS

32. Apple's three stated reasons each rest on investigation outputs. Gobbler allegations rest on Apple's investigative determination that the disclosed material was confidential. Both Gobbler and the Sous Chef incident intersected on the investigators' "refusal to cooperate" finding. The Sous Chef incident rests on Okpo's "misleading" finding. Each is the conclusion of an investigation Apple conducted "under privilege" and "at the direction of counsel." Okpo Decl. ¶ 4 ("I conducted the investigations after I was directed to do so by Apple's attorneys and at their direction throughout the investigation").

33. During depositions and in discovery responses, Apple's counsel claimed privilege on many topics including: findings of the Waibel and Okpo investigations into Plaintiff's harassment and hostile-work-environment complaints; whether Apple's investigators found any evidence supporting any of Plaintiff's complaints; the substance of the "misleading" finding underlying Reason 3; the basis for the "refusal to cooperate"; the substance of the investigation underlying confidentiality determination; communications with attorneys regarding the investigations; what evidence Apple considered in any investigation; the substance of what Kagramanov and Jacobs planned to discuss with Plaintiff on September 9; and the planning around the ear-scan tweet as a basis or defense.

34. An employer relying on an investigation as a legitimate basis for an adverse action must establish that the investigation produced "a reasoned conclusion . . . supported by substantial evidence" through "an appropriate investigation." *Cotran v. Rollins Hudig Hall*

Case: 26-4716, 11/13/2026, DktEntry: 10.2, Page 72 of 161

*International, Inc.*, 17 Cal. 4th 93, 108 (1998). The *Cotran* standard governs the same-decision defense under Plaintiff's claims, because the investigative basis is the foundation of Apple's stated reasons for the adverse action at issue. An inadequate or biased investigation is itself evidence of pretext. *Nazir v. United Airlines, Inc.*, 178 Cal. App. 4th 243, 277-83 (2009). An employer affirmatively relying on investigation outputs waives privilege over substance of investigations. *Wellpoint Health Networks. v. Superior Court*, 59 Cal. App. 4th 110, 128 (1997).

35. *Cotran*'s "reasoned conclusion supported by substantial evidence" standard fails here on Apple's own record. Inquiries into the details of Apple's investigations into the Plaintiff and her concerns either claim ignorance, direct retaliation, confidentiality, and/or privilege.: the confidentiality investigation— Apple's Rule 30(b)(6) cannot identify what photographs were confidential or why (Warner Dep. 52:17-22, 52:24-53:13, 55:6-10); the Kagramanov "refusal to cooperate" investigation— completed in 42 minutes, with no Apple policy requiring oral-only communication (Kagramanov Dep. 57:7-15, 72:3-13), reaching its conclusion "in partnership with our legal counsel" (Kagramanov Dep. 95:8-13); and the Okpo "misleading" investigation— closed because Plaintiff requested written communications about a sub-issue, no Apple policy prohibiting written-communications (Okpo Dep. 106:6-10, 116:4-14), and resting on a "redaction" characterization Apple's Rule 30(b)(6) cannot defend (Warner Dep. 153:24-155:5, 155:17-156:7, 187:25-188:5). No reasoned conclusion supported by substantial evidence; no appropriate investigation. *Cotran*, 17 Cal. 4th at 95-96, 108. Either Apple has investigation outputs to defend (and they fail *Cotran*) or it does not (and the three stated reasons have no remaining articulated basis).

36. Kagramanov's call would have been subject to Apple's confidentiality constraints — Plaintiff would have been prohibited from disclosing what Apple said — while Apple simultaneously invokes privilege over what Kagramanov and Jacobs planned to discuss with her.

responded "Instruct you not to answer to the extent it related to anything that was done in connection with a privileged investigation." Warner Depo. 340.

49. Plaintiff asked: "Ms. Warner, did Apple consider using Yannick as the final decision-maker in terminating my employment related to my sexual harassment complaint against Dan knowing that one of my open complaints was that Yannick 20· was trying to obstruct future litigation in order to protect Dan?" Warner Depo. 340. Counsel responded "There's so much wrong with that question, I don't know where to start" and "privileged." Id.

50. Further, Apple's argument that Bertolus did not personally know of the agency complaints (Dkt. 367 at 19) has no evidentiary support, is disputed and misframes the cat's paw inquiry, which reaches decisionmakers acting on information curated by individuals harboring retaliatory animus regardless of the decisionmaker's own knowledge. *Staub*, 562 U.S. at 421-22. Further, Apple's binding corporate testimony is that the decisionmaker's confusion about basic facts "would not have changed the decision." Warner Dep. 243.

51. Bowman's contradictory comparator evidence ("over a dozen" terminations against Bertolus's "at least two") and her detailed identification of policies violated (Bowman Decl. ¶¶ 2-6, where Bertolus's deposition reflects no such ability) are structurally incoherent with Apple's "Bertolus is the sole decisionmaker" framing. Further, Bertolus testified he could not identify any other employee fired in his organization. (Bertolus Depo. 29 – "*I don't remember the exact name or ·number*"). Either Bowman is a decisionmaker (defeating *Choochagi* independence) or she is supplying specifics Bertolus could not (sham rehabilitation)..

52. Defendant submitted Bertolus errata changing p. 158:13 from "feminine" to "familiar" under Reason Code 3 ("correct transcription errors"). The change is substantive, not transcriptional. *Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*, 397 F.3d 1217, 1224-26 (9th Cir. 2005). When confronted at deposition with the testimony (p. 177:14-178:11),

Bertolus said "I don't remember saying that" and "That's not what I said" — not "I said familiar." (Bertolus 158, 177). Further, the term and concept of "familiar" was used by both Warner and West to describe West's misconduct ("*we got·too friendly, and that's not appropriate*", West Depo 24; "*there was feedback about the familiarity, his having a clearer line between professional and not,*" Warner 145); which, if Bertolus' revision is honest, is him ratifying the misconduct Apple already condemned, in order to continue to try to justify the firing.

## XII. THE PUBLIC-POLICY CONTEXT FORECLOSES APPLE'S CONFIDENTIALITY DEFENSE

53. In 2017, Senator Al Franken asked Apple's CEO where the Face ID training data had come from, who the participants were, and how their consent had been obtained. Apple's response repeated general language about "informed consent" and "participants from around the world" without answering the specific questions. Pl. Opp./Reply Decl. The actual source of much of the Face ID training data was a program Apple deployed on its workforce: software on Apple-issued iPhones carried by employees that captured face images, video, and biometric data — at work, at home, anywhere those phones traveled — including the friends, family, romantic partners, children, and strangers around them, none of whom were told the program existed or asked to consent. Pl. Opp./Reply Decl.

54. Plaintiff publicly raised concerns about this program, filed complaints with U.S. and international regulators, and Apple fired her — now defending the termination on the ground her disclosures violated some confidentiality agreement. Pl. Opp./Reply Decl. The information Plaintiff disclosed is the same information Senator Franken formally and Apple declined to provide. The effect of the ruling Apple seeks is that information a Senator was entitled to receive but was denied, that members of the public have a direct privacy interest in, that Apple has not denied, and that — if true — exposes Apple to substantial enforcement and consumer liability, becomes information any Apple employee can be fired for telling anyone.

55. Apple's reliance on § 232.5(d)'s proprietary-information carve-out fails for many reasons including on this ground: information whose disclosure is independently protected under § 1102.5(b), Gov. Code § 12964.5, and Cal. Civ. § 1668 cannot be 'proprietary' within the meaning of § 232.5(d), or the carve-out would swallow each independent protection. California Civil Code § 1668 forbids contracts to exempt anyone from responsibility for their own violation of law. *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 669-70 (1988); *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167, 176-77 (1980); *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937 (2008). Apple's *Erhart* and *Tides* citations involve enforceable confidentiality agreements applied to information that did not fall within an statutory protection. Here the agreement itself is unenforceable as applied to disclosures protected by § 1102.5(b), § 96(k), § 232.5, Gov. Code § 12964.5, and Cal. Civ. § 1668. Apple's citations to *Feminist Women's Health* (employee refused to perform contracted-for duty) and *Holmes v. Petrovich* (privacy in employer email accounts) involve materially different conduct and do not reach contractual confidentiality designations that operate to shield evidence of unlawful conduct from disclosure to enforcement bodies.

## XIII. PLAINTIFF'S MOTION SHOULD BE GRANTED

### A. THE § 98.6(B)(1) PRESUMPTION AND THE NINTH CIRCUIT'S TEMPORAL-PROXIMITY PRESUMPTION ATTACH AND REMAIN UNREBUTTED

56. Defendant's opposition offers no analysis of Labor Code § 98.6(b)(1), no engagement with Evidence Code §§ 603 or 605, and no authority on the operation of the presumption. The argument is waived. *Nelson v. Brunswick Corp.*, 503 F.2d 376, 381 (9th Cir. 1974). The objective triggers are established on Apple's admissions and on Plaintiff's record of protected activity; employer knowledge; and adverse action within 90 days. Each protected activity Apple itself identifies in its stated reasons falls within the Ninth Circuit's temporal-proximity-presumption window for retaliatory motive. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

57. Apple also offers no engagement with Cal. Lab. Code § 96(k) (lawful conduct during nonworking hours away from the employer's premises) or Cal. Gov. Code § 12964.5 (declaring unenforceable any agreement that "purports to deny the employee the right to disclose information about unlawful acts in the workplace"). Each is independently dispositive under § 98.6 via § 98.6(a) and operates independently as a *Tameny* tether. Each is waived. *Nelson*, 503 F.2d at 381. § 98.6(b)(1) is governed by California Evidence Code § 605 and shifts the burden of proof, not merely production. Fed. R. Evid. 302; *Snead v. Metropolitan Property & Casualty Insurance Co.*, 237 F.3d 1080, 1090-91 (9th Cir. 2001). Apple offers no rebuttal evidence; its only proffered reasons are themselves protected activity. Retaliation cannot rebut a presumption of retaliation. *Bachelder*, 259 F.3d at 1124-25. Liability under § 98.6 is established.

## B. THE DIRECT-EVIDENCE FRAMEWORK FORECLOSES MCDONNELL DOUGLAS ANALYSIS

58. Where the employer's own words supply direct evidence that protected activity motivated the adverse action, *McDonnell Douglas* burden-shifting does not apply. *Wallace*, 245 Cal. App. 4th at 123; *Bachelder*, 259 F.3d at 1124-25; *DeJung*, 169 Cal. App. 4th at 550. Each of Apple's three stated reasons is direct evidence of retaliation because each is itself protected activity: the August 30 Twitter post complaining about Apple's surveillance and retaliation is protected under Cal. Const. Art. I § 1, Labor Code §§ 96(k), 232.5(c), 1102.5(b), and Gov. Code § 12964.5; the request for written communications to preserve a record for the pending NLRB charge is protected under § 1102.5(b) ("providing information to . . . any public body"); the hostile-work-environment complaint invoking the pandering statute is protected under FEHA § 12940(h), Title VII, § 1102.5(b), and § 98.6. No burden-shifting is required.

59. Apple applies the pre-*Lawson* framework, demanding "substantial responsive evidence" of pretext from Plaintiff. Dkt. 367 at 11, citing *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102 (2007). *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703,

718 (2022), expressly rejected that framework for § 1102.5. After Plaintiff's contributing-factor showing, the burden remains with Apple to prove by clear and convincing evidence that it would have taken the same action absent the protected activity. There is no third-stage pretext burden on Plaintiff under § 1102.5. *Loggins* predates *Lawson* and applies the now-superseded framework. The same-decision burden lies with Apple and fails for the reasons set forth.

### C. APPLE'S WAIVER ON ADDITIONAL RETALIATION GROUNDS IS INDEPENDENTLY DISPOSITIVE

60. Plaintiff's MSJ established record evidence that Apple retaliated against Plaintiff for her EHS complaints. Pl. MSJ; Pl. Opp./Reply Decl. Apple's Opposition does not engage with these grounds substantively. Under FRCP 56(e)(2), the Court may consider these facts undisputed for purposes of the motion, and Apple's waiver is independently dispositive of liability under § 6310, *Tameny*, § 98.6, and § 1102.5. Independently, the four-failure pattern of Apple's defense is itself substantial responsive evidence of retaliatory animus across the full range of Plaintiff's protected activity, including the EHS-related grounds. *Ray*, 217 F.3d at 1244-45; *Yanowitz*, 36 Cal. 4th at 1052-53. Further, § 6310 preemptive retaliation under *Lujan v. Minagar*, 124 Cal. App. 4th 1040, 1046 (2004), developed in Plaintiff's MSJ ¶¶ 45, 56, regarding Apple's August 4, 2021 leave imposed concurrent with pre-EPA-inspection crack-sealing and hours before Plaintiff was to retrieve laptop evidence — not addressed by Apple's Opposition and dispositive of the § 6310 claim.

## XIV. PRELIMINARY INJUNCTION

61. Apple opposes the preliminary injunction on the ground that loss of income is not irreparable harm (citing *Sampson v. Murray*, 415 U.S. 61 (1974), and *L.A. Memorial Coliseum*, 634 F.2d 1197 (9th Cir. 1980)) and that this Court has previously denied reinstatement TROs and PIs (citing *Done*, *Wadsworth*, *Hines*). *Likelihood of success* is established for the reasons set forth in the MSJ and within; on this record summary judgment is warranted. *Irreparable harm*

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**,
*an individual*,

**Plaintiff**,

v.

**APPLE INC.**,
*a corporation*,

**Defendant**.

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION; & OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

**Under Cal. Labor Code 98.6, 1102.5 6310, & the Tamney Termination in Violation of Public Policy**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

expressly preserves and does not waive any argument, objection, or factual point not addressed in this brief because of space, time, the procedural posture, the manner in which Defendant raised the point (including in footnotes), or the improper basis on which Defendant raised it. The Court should not draw any adverse inference from Plaintiff's non-engagement with any specific argument by Defendant; the appropriate inference, where Defendant advances arguments without record support, is denial of the cross-motion.

9. *Punitive-damages and sanctions framing.* The litigation conduct documented in this brief is relevant not only to the cross-motion ruling but to the punitive-damages and fine assessment in the next phase. *See, e.g., Roby v. McKesson Corp.*, 47 Cal. 4th 686, 712-13 (2009) (litigation conduct relevant to reprehensibility under *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003)).

## III. EVIDENTIARY POSTURE

10. *Rule 30(b)(6) testimony of Adelmise Warner.* Plaintiff cites Defendant's Rule 30(b)(6) deposition of Adelmise Warner (May 12, 2026) throughout this filing. That testimony post-dates Plaintiff's April 23 motion and Defendant's May 7 opposition/cross-motion because Defendant did not produce its corporate witness for deposition until May 12, six weeks past the discovery cutoff. The Magistrate has characterized Defendant's Rule 30(b)(6) posture as "unreasonable" and stated Defendant "should know better." Dkt. 357 at 1-2. Plaintiff could not have cited testimony Defendant had not yet given. The testimony is Defendant's binding corporate position under Rule 30(b)(6), is responsive to Defendant's MSJ and supporting declarations, and is properly considered on this cross-motion record. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996); *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040-41 (9th Cir. 2003).

11. *Rule 37(c)(1) — strike of Bowman Exhibits F–R.* Defendant produced the thirteen comparator termination letters attached as Bowman Exs. F through R at the end of discovery,

precluding Plaintiff from deposing the comparators, requesting supporting investigation files, or testing whether the terminations involved similarly situated conduct. Plaintiff moves to strike under Rule 37(c)(1); the disclosure was neither substantially justified nor harmless. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106-07 (9th Cir. 2001); *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179-80 (9th Cir. 2008). Alternative relief under Rule 56(d) is set forth in the Reply Declaration.

12. *Sham-affidavit objections.* Plaintiff objects under *Kennedy v. Allied Mutual Insurance Co.*, 952 F.2d 262 (9th Cir. 1991), and *Van Asdale v. International Game Technology*, 577 F.3d 989 (9th Cir. 2009), to: Bertolus Decl. ¶¶ 6, 7, 11; Bertolus Decl. ¶ 6 (comparator universe of "at least two" against Bowman Decl. ¶ 7's "over a dozen"); Okpo Decl. ¶¶ 5-9 (against Okpo Dep. 71:9-15); Aloe Decl. ¶ 12.

13. *Errata to Bertolus deposition.* Defendant submitted Bertolus errata changing p. 158:13 from "feminine" to "familiar" under Reason Code 3 ("correct transcription errors"). The errata is improper under *Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*, 397 F.3d 1217, 1224-26 (9th Cir. 2005), because it substantively changes testimony. At the deposition, when confronted with the testimony (p. 177:14-178:11), Bertolus's response was "I don't remember saying that" and "That's not what I said" — not "I said familiar." The original transcript controls.

14. *EPA documents.* Plaintiff authenticates Exhibits 13-15 under FRE 902(4) (certified copies of public records) and 902(5) (publications of public authorities), with FOIA-disclosure correspondence in the Reply Declaration establishing provenance. *See* Reply Decl. Ex. AA.

## IV. DEFENDANT'S STATED REASONS COLLAPSE ON DEFENDANT'S OWN BINDING ADMISSIONS

F through R under Rule 37(c)(1), or in the alternative defer ruling under Rule 56(d); (5) strike the Bertolus deposition errata at p. 158:13 under *Hambleton*; (6) apply sham-affidavit doctrine to Bertolus Decl. ¶¶ 6, 7, 11, Okpo Decl. ¶¶ 5-9, and Aloe Decl. ¶ 12; (7) find waiver of attorney-client privilege over the substance of the investigations Defendant has affirmatively relied on, or in the alternative strike Defendant's reliance on those investigations as legitimate independent reasons, or in the further alternative draw an adverse inference; (8) reject Defendant's proposed order; and (9) grant such further relief as the Court deems just and proper.

55. Defendant's litigation conduct in advancing this defense — after a Rule 11 warning, after years of contradictory sworn filings, while shielding from discovery the very investigations on which the defense rests — is properly considered in the punitive-damages and fine assessment in the next phase. *Roby*, 47 Cal. 4th at 712-13.

Respectfully filed,



**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed May 21 2026 in San José, California
(408) 883-4428
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

Docusign Envelope ID: D4B0B35E-DB8C-8B4B-80DD-748FB1951DDF

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

ASHLEY GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-4597-EMC

**DECLARATION OF EKELEMCHI OKPO IN SUPPORT OF DEFENDANT APPLE INC.'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION**

Date: June 11, 2026
Time: 1:30 p.m.
Dept: Courtroom 5, 17th Floor
Judge: Honorable Edward M. Chen

Docusign Envelope ID: D4B0B35E-DB8C-8B4B-80DD-748FB1951DDF

I, Ekelemchi Okpo, declare as follows:

1. I am currently a Labor Relations Business Partner with Apple Inc. I have been employed by Apple since October 2020. I submit this declaration in support of Apple's Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment and Preliminary Injunction. I know the facts set forth in this declaration to be true of my own personal knowledge and/or my review of documents maintained and relied upon by Apple in the regular course of business and to which I have access in the regular course of my job duties. If called as a witness, I could and would testify competently to the matters set forth in this declaration.

2. After receiving a bachelor's degree in political science, I obtained a law degree from Michigan State University in 2015 and I am a licensed attorney, though I am not counsel for Apple. While in law school, I took employment law classes and attended a dispute resolution clinic focused on labor issues. I actively attend webinars regarding the current landscape of labor and employment law, including those hosted by law firms, and review articles on the same topics. I have been working in the Labor and Employee Relations space for a decade, and I am familiar with employment issues and workplace investigations.

3. Before joining Apple in 2020, I spent four years working at General Motors and Bridgestone Americas in Labor and Employee Relations. At both of these companies, my job responsibilities included conducting employment investigations.

4. From October 2020 through August 2022, I worked as an Employee Relations ("ER") Business Partner at Apple. In my role as an ER Business Partner, I was responsible for investigating employee concerns, including those regarding retaliation, harassment, and discrimination. In some instances, such as my investigation into Ms. Gjovik's concerns, I conducted the investigations after I was directed to do so by Apple's attorneys and at their direction throughout the investigation.

5. A true and correct copy of an email I received from Ms. Gjovik on July 28, 2021 is attached as **Exhibit A**. In that email, Ms. Gjovik wrote: "I am requesting a long term solution … First, a new role at Apple that is not a hostile work environment and not in unsafe work conditions (and I mentioned that because I will not be at Apple after Dec 31 2022, I cannot find a new role to

Docusign Envelope ID: D4B0B35E-DB8C-8B4B-80DD-748FB1951DDF

transfer to for such a short period of time, so I need your assistance with placement). The 2nd option is an exit package that will compensate me and provide benefits through that time."

6. After sending this email, Ms. Gjovik and I spoke about her desire not to interact with her managers while I investigated her concerns.

7. A true and correct copy of an email thread with emails I sent to Ms. Gjovik on August 4 and August 5, 2021 is attached as **Exhibit B**. I am informed and believe that this email was also used as Exhibit 24 at Ms. Gjovik's deposition in this matter. In the August 5 email, I wrote: "If you would like to return to work and not remain on administrative leave as you requested we can make those arrangements."

8. A true and correct copy of an email thread containing an email I sent to Ms. Gjovik on August 23, 2021 is attached as **Exhibit C**. I am informed and believe that this email was also used as Exhibit 26 at Ms. Gjovik's deposition in this matter. In the August 23 email, I wrote: "Regarding the leave, you requested to be on paid leave while I investigate your concerns. If you'd like to return to work we can make those arrangements."

9. Ms. Gjovik never responded to my August 5, 2021 or August 23, 2021 emails to request to return to work.

I certify under penalty of perjury and pursuant to the laws of the United States that the foregoing is true and correct.

Executed May 6, 2026 in Austin, Texas.

Ekelemchi Okpo

Ekelemchi Okpo

Docusign Envelope ID: D4B0B35E-DB8C-8B4B-80DD-748FB1951DDF

# EXHIBIT A

Docusign Envelope ID: D4B0B35E-DB8C-8B4B-80DD-748FB1951DDF

**Subject:** Ashley:Ekelemchi - Notes
**From:** "Ashley Gjovik" Redacted
**Received(Date):** Wed, 28 Jul 2021 04:02:34 +0000
**To:** "Ekelemchi Okpo" Redacted
**Cc:** "Antonio Lagares (ER)" Redacted
**Date:** Wed, 28 Jul 2021 04:02:34 +0000

---

Hi Ekelemchi!

It was great to talk to you again today. I'm capturing our outstanding actions below.

Also as mentioned, I'm still looking for a short-term response to mitigate the current hostile work environment I'm experiencing reporting to Dave and Dan and Helen. I've asked several times now, including today, that all 1:1s with them be in writing only, during the duration of this investigation. I also asked that there not be any new projects added to my workload during the duration of this investigation, and this is especially important now that my manager decided to substantially increase the amount of work I need to do beyond what a single role is capable of, and all unfavorable work. I would like for him not to add any new work beyond what I had a month ago. I do see his current actions with this workload as retaliation and a negative employment action. Also, as I've mentioned, I am actively suffering emotional harm as I'm continued to be exposed to their behavior. I look forward to hearing about next steps on this.

Further, as mentioned previously and on going, I am requesting a long term solution to the hostile work environment and unsafe work conditions. At this point it is clear my team will not stop the sexism, harassment, discrimination, and retaliation — so I need to be removed from this situation. As mentioned, I refuse to quit or to take medical leave as a response to the hostility; this is on Apple ER to resolve, not for me to hide from. There are two options we've discussed. First, a new role at Apple that is not a hostile work environment and not in unsafe work conditions (and I mentioned that because I will not be at Apple after Dec 31 2022, I cannot find a new role to transfer to for such a short period of time, so I need your assistance with placement). The 2nd option is an exit package that will compensate me and provide benefits through that time. As mentioned this would only be a payment & exit to mitigate the current hostile work environment and unsafe work conditions and would not include any litigation/arbitration waiver agreements nor any non-disclosure agreements beyond what I've already signed as an employee. Any further contractual agreements beyond what I've already signed would need to be reviewed by my team of lawyers and the compensation for each would need to be negotiated by each new specific requirement.

Here's our outstanding to dos. See you tomorrow!

**Ashley's To Dos**

- Gather Redacted emails for tomorrow's meeting

Docusign Envelope ID: D4B0B35E-DB8C-8B4B-80DD-748FB1951DDF

- Add the actual emails with metadata for 2016- Product Defect Whistleblowing & 2016 - Retaliation and Constructive Termination #2 files

**Ekelemchi To Dos**

- Set up follow up meeting tomorrow — please set up for after 11am so I have time tomorrow morning to look for all the Redact emails.

**7/28 To Do, Remaining Folders:** Redacted

- 2017-21 Sexist Culture in PSQ
- 2018 - Hostile Work Env
- 2018-21 Sexual Comments
- 2019-2021 Failure to address Hostile work env
- 2019-2021 Hostile work env
- 2021 - Retaliation, IIED, Constructive Termination #3

**Cast of Characters and Complaints for 2017+**

- Dan West: Sexism, Hostile Work Env, Failure to Resolve Hostile Work Env, Retaliation; failure to report work place injuries
- David Powers: Sexism, Hostile Work Env, Failure to Resolve Hostile Work Env, Retaliation, Labor Code violations (unsafe work conditions; failure to respond to complaints about unsafe work conditions); ADA & FMLA violations
- Redacted Sexism, Hostile Work Env
- Helen Polkes: Retaliation, Failure to Address Hostile Work Env, ADA violations; failure to respond to complaints about unsafe work conditions
- Redacted Casual sexism
- Redacted: Casual sexism or equal opportunity a-hole, TBD

**Ashley:Ekelemchi**

Scheduled: Jul 27, 2021 at 4:30 PM to 6:00 PM, CDT

Location: Virtual Conference One-Time Room

Invitees: Ashley Gjovik, Ekelemchi Okpo

Docusign Envelope ID: D4B0B35E-DB8C-8B4B-80DD-748FB1951DDF

----( Virtual Conference One-Time Room )----

[One-Time Room]

—

**Ashley M. Gjøvik**

Engineering Program Manager

* Mac Systems Quality Strategic Planning & Communications

* Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity

** Redacted

Docusign Envelope ID: D4B0B35E-DB8C-8B4B-80DD-748FB1951DDF

# EXHIBIT B

Docusign Envelope ID: D4B0B35E-DB8C-8B4B-80DD-748FB1951DDF

ASHLEY MARIE GJOVIK
12/16/2025
JULIE L. ANDERSON, CSR 11422
**Exhibit 24**

**From:** **Ashley Gjøvik** Redacted
**Subject:** Fwd: Apple Confidential: Next Steps
**Date:** August 5, 2021 at 2:02 PM
**To:** Ashley Gjovik Redacted

Sent from my iPhone

Begin forwarded message:

> **From:** Ekelemchi Okpo < Redacted >
> **Date:** August 5, 2021 at 9:38:39 AM PDT
> **To:** Ashley Gjovik Redacted >
> **Subject: Re: Apple Confidential: Next Steps**
>
> Ashley,
>
> I'm disappointed about you misrepresentating our discussion. As we discussed, and I confirmed in my follow up email, you requested and Apple agreed, to have you on paid administrative leave while I look into your concerns so that you can remain out of the workplace while the investigation continues. We did not discuss you being on an indefinite leave.
>
> To preserve the integrity of the investigation I requested, but did not require, that you refrain from sharing the content of our communications. As I shared, this is done in order to preserve the integrity of my investigation and to protect the privacy of your co-workers and those whom you've identified as witnesses. I did not imply, nor did we ever discuss, the removal of your access to Slack.
>
> If you would like to return to work and not remain on administrative leave as you requested we can make those arrangements. I'll be in touch with you soon about the investigation.
>
> Best,
>
> Ekelemchi Okpo
> Corporate Employee Relations
> Redacted
>
> This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.
>
>> On Aug 4, 2021, at 12:53 PM, Ekelemchi Okpo < Redacted > wrote:
>>
>> **Apple Confidential**
>>
>> Hi Ashley,
>>
>> I wanted to confirm our conversation a few minutes ago. Per your request, you are now on paid administrative leave so as to not interact with your managers. You will receive your regular pay and benefits during this time. You are not expected to perform any work until the investigation is completed and closed. I will work with your manager to set your out of office message.
>>
>> This administrative leave ensures that you are removed from the workplace, workplace interactions and contributions and your day to day roles and responsibilities while I conduct a thorough and complete investigation into your concerns. As discussed, in order to preserve the integrity of my investigation and to protect the privacy of your co-workers and those whom you've identified as witnesses, please respect the investigation process and refrain from sharing our communications. In accordance with Apple policy, this request doesn't limit you from discussing the concerns you raised about your Apple experiences or that I'm investigating your concerns.
>>
>> I am reviewing the issues we discussed and will send you an email by early next week to confirm the scope of my investigation. If you have any questions at any time, please feel free to email me.
>>
>> Best,

Ekelemchi Okpo
Corporate Employee Relations
Redacted

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

ASHLEY GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-4597-EMC

**DECLARATION OF MEGAN BOWMAN IN SUPPORT OF DEFENDANT APPLE INC.'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION**

Date: June 11, 2026
Time: 1:30 p.m.
Dept: Courtroom 5, 17th Floor
Judge: Honorable Edward M. Chen

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

> One of our greatest assets is information about our products and services, including future product offerings. Never disclose confidential, operational, financial, trade-secret, or other business information without verifying with your manager whether such disclosure is appropriate. … Never share confidential information about Apple's products or services without your manager's approval.

4. Attached as **Exhibit C** is a true and correct copy of the version of Apple's Misconduct and Discipline Policy that was in effect at the time of Ms. Gjovik's termination. That policy states in part:

> Conduct that may warrant immediate termination of employment includes, but isn't limited to: … Violating confidential, proprietary, and trade secret information obligations (including those stated in Apple's Intellectual Property Agreement) … failing to cooperate with an investigation …

5. Attached as **Exhibit D** is a true and correct copy of the version of Apple's Employee Use of Electronic Systems and Communications Policy that was in effect at the time of Ms. Gjovik's termination. That policy states in part:

> Inappropriate use of Apple property or other assets may result in disciplinary action, up to and including termination of employment. Examples of inappropriate use of electronic systems and communications include, but are not limited to: Violating your obligation regarding propriety, and trade secret information. This includes sending or posting Apple confidential materials outside of Apple…

6. Attached as **Exhibit E** is a true and correct copy of the version of Apple's Social Media and Online Communications Policy that was in effect at the time of Ms. Gjovik's termination. That policy states in part:

> [K]eep in mind that Apple's policies and guidelines apply to any activities that affect … Apple's business interests. This is true even if you blog, tweet, write, post, comment, share visual or other media, or otherwise communicate online outside of work … So before you click or tap "send," keep these guidelines in mind: Protect Apple's confidential information. As we conduct business around the world, our competitive strategy requires us to keep Apple's intellectual property and proprietary information confidential. This includes non-public information such as the … design of Apple products … All Apple employees have an obligation to protect this information.

7. I am aware that Apple has terminated over a dozen employees in addition to Ms Gjovik for disclosing confidential product-related information in violation of Apply policy.

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

Attached as **Exhibits F to R** are true and correct copies of termination letters for thirteen such employees (redacted to protect their identities and third-party privacy interests).

I certify under penalty of perjury and pursuant to the laws of the United States that the foregoing is true and correct.

Executed May 6, 2026 in Cupertino, California.

Megan Bowman

Megan Bowman

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT F

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

Date: February 28, 2018

To: Comparator 01 Employee ID: 22511
From: Jon Andrews, Senior Director
Re: Termination of employment

---

In February 2018, Apple became concerned that you may have engaged in inappropriate workplace behavior, including, but not limited to, violating Apple policy(s) on confidentiality. Accordingly, Apple conducted an investigation. On February 27, 2018, you were suspended (with full pay and benefits) while Apple continued the investigation.

Based on all the information reviewed, Apple has determined that you engaged in conduct that warrants termination of employment. Specifically, you admitted to leaking Apple confidential information to a reporter. Disclosing Apple confidential information is a violation of Apple policy. Therefore, your employment with Apple will be terminated effective March 2, 2018. You will be relieved of all work duties effective immediately. Red Redact your Human Resources representative, will assist you in exiting Apple.

Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage. Information about your benefits continuation options will be mailed to your home approximately two weeks after your termination date. In addition, within 30 days of your termination date, you will receive a separate COBRA packet explaining your options for continuing healthcare coverage. Contact Apple's HR HelpLine at hrh Redacted or Redacted if your address has or will change.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review policy. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact the HR HelpLine at Redacted or hrh Redacted.

cc: Master Personnel File

Enclosures: Unemployment Insurance Brochure - CA, When Benefits End Brochure

Jon Andrews

Case: 26-4716, 11/13/2026, DktEntry: 10.2, Page 97 of 161
Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT G

Date: **June 12, 2025**

To: Comparator 02 Employee ID**: 720721**
From: **Sergey Tatarchuk**
**Software Development Engineering Manager**
Re: Termination of employment

---

On **April 4, 2025,** Apple became concerned that you may have engaged in inappropriate workplace behavior, including, but not limited to not protecting confidential Apple information resulting in leaks of iOS 19 features violating Apple's Business Conduct Policy - Protecting Apple.

Based on all the information reviewed, Apple has determined that you engaged in conduct that warrants termination of employment, including, but not limited to violation of Apple's Business Conduct Policy - Protecting Apple (Confidential Information). Therefore, your employment with Apple will be terminated effective **June 20, 2025.**

Your final pay that includes regular pay through your termination date, all accrued unused vacation pay and any ESPP contributions made in the current period will be sent to you by Payroll via your normal payment method.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review process. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact People Support at Redacted

As a reminder, your obligations under the Intellectual Property Agreement ("IPA") continue even after your employment with Apple ends. If you need a copy of your signed IPA please contact People Support at Redacted.

Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage.
A general information packet will be mailed to your home within two weeks of the date your employment or coverage ends. You will also receive a COBRA packet from Apple's COBRA vendor, typically within two weeks (but not longer than 44 days) of your employment end date, that contains time-critical information and explains your options for continuing healthcare coverage. Contact People Support at Redacted if your address has changed or will change.

**encl:** **Unemployment Insurance Brochure, When Benefits End brochure**

**CC:** **Personnel File**

Rev. Nov 2021

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT H

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

Date: **September 22, 2025**

To: Comparator 03 — Employee ID**: 51893**

From: **Darin Adler**
**VP, Software Engineering**

Re: Termination of employment

---

On **August 14, 2025,** Apple became concerned that you may have engaged in inappropriate workplace behavior, specifically, you failed to protect confidential Apple information by disclosing non-public information regarding unreleased products, as well as Apple earnings information prior to its public release. This conduct represents serious violations of multiple Apple policies, including, but not limited to, Apple's Business Conduct Policy – Protecting Apple, Apple's Intellectual Property Agreement, and Apple's Insider Trading Policy.

After a thorough review of all available information, Apple has concluded that your actions constitute misconduct warranting termination of employment for violation of Apple's Insider Trading, Business Conduct and Intellectual Property Agreement policies. Accordingly, your employment with Apple will be terminated effective **September 22, 2025.**

Your final pay that includes regular pay through your termination date, all accrued unused vacation pay and any ESPP contributions made in the current period will be sent to you by Payroll via your normal payment method.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review process. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact People Support at Redacted

As a reminder, your obligations under the Intellectual Property Agreement ("IPA") continue even after your employment with Apple ends. If you need a copy of your signed IPA please contact People Support at Redacted

Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage.
A general information packet will be mailed to your home within two weeks of the date your employment or coverage ends. You will also receive a COBRA packet from Apple's COBRA vendor, typically within two weeks (but not longer than 44 days) of your employment end date, that contains time-critical information and explains your options for continuing healthcare coverage. Contact People Support at Redacted if your address has changed or will change.

Rev. Nov 2021

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT I

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

Date: 10/15/2025

To: Comparator 04      Employee ID: 495549
From: Stacie Sherwood
Director
Re: Termination of employment

---

On August 19th, Apple became concerned that you may have engaged in inappropriate workplace behavior, including, but not limited to violating Apple policies. Accordingly, Apple conducted an investigation. On August 22nd, you were placed on Paid Admin Leave (with full pay and benefits) while Apple conducted an investigation.

Based on all the information reviewed, Apple has determined that you engaged in conduct that warrants termination of employment, including, but not limited to violation of Apple's Business Conduct Policy: Judgement and Global Securities's Guidelines for Securing your Workplace: Remote/Home. Specifically you took sensitive materials, related to an Ultra project, home without approval. While working with these materials at home you did so in an open environment and did not implement Global Securities Guidelines for Securing your Workplace. Therefore, your employment with Apple will be terminated effective 10/22/2025.

Your final pay that includes regular pay through your termination date, all accrued unused vacation pay and any ESPP contributions made in the current period will be sent to you by Payroll via your normal payment method.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review process. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact People Support at Redacted.

As a reminder, your obligations under the Intellectual Property Agreement ("IPA") continue even after your employment with Apple ends. If you need a copy of your signed IPA please contact People Support at Redacted

Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage. A general information packet will be mailed to your home within two weeks of the date your employment or coverage ends. If you timely elect to enroll in COBRA and pay any applicable premiums, then your healthcare coverage will be retroactively effective to the day after your Apple coverage ended. You will also receive a COBRA packet from Apple's COBRA vendor, typically within two weeks (but not longer than 44 days) of your employment end date, that contains time-critical information and explains your options for continuing healthcare coverage. Contact People Support at Redacted if your address has changed or will change.

encl: Unemployment Insurance Brochure
When Benefits End brochure
CC: Personnel File

Rev. January 2025

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT J

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

TERMINATION LETTER
Sent via email

Date: Tuesday June 29, 2021

To: Comparator 05

Employee ID: 6222554

Re: Termination of Employment

Dear Comparator 05

Recently, Apple became concerned that you may have engaged in inappropriate workplace behaviour, including, but not limited to, violating Apple policy. Accordingly, Apple conducted an investigation.

Following an investigation conversation on March 4, 2021 with Global Security and Apple Employee Relations and further review of relevant documents and information, we have determined that your actions warrant immediate "for cause" termination of employment.

Apple Inc. will pay all outstanding accrued wages and vacation pay up to the date of termination. All payments will be subject to deductions required by law. Please ensure that you have returned all Apple property that you are in possession of or are responsible for.

Please note that your benefits coverage will cease after today, Tuesday, June 29, 2021. If you have any payroll, benefits, employee stock purchase plan or RSP questions, please contact Apple's People Support Line at Redacted

A Record of Employment (ROE) will be sent electronically to Service Canada after your last regular payroll cheque is paid to you. If you require a copy of your ROE for your own records you will be able to access it on the Service Canada website at Redacted Redacted In order to view or access your ROE you must create an account, once your account is created you will receive a password to access your account.

Sincerely,

Marc Johnston
Senior Product Quality Manager
Apple Inc.

*Original to Canada People Records* *Copies to: Manager/Employee*

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT K

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

Date: December 8, 2020

To: Comparator 06 Employee ID: 590232

From: Paul Glendenning
Manager, Software Development Engineering

Re: Termination of employment

---

On October 19, 2020, Global Security became concerned that you may have engaged in inappropriate workplace behavior, including, but not limited to violating Apple policy(s). Accordingly, Apple conducted an investigation.

Based on all the information reviewed, Apple has determined that you engaged in conduct that warrants termination of employment, including, but not limited to violation of Apple's Misconduct and Discipline and Business Conduct policies. Therefore, your employment with Apple will be terminated effective December 11, 2020.

You will receive your final pay on December 11, 2020. It will include your regular pay through your termination date, all accrued unused vacation pay and any ESPP contributions made in the current period. Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage. Please see special instructions regarding your opportunity to receive two months of Apple paid Cobra benefits. Information about your benefits continuation options will be mailed to your home approximately two weeks after your termination date. In addition, within 30 days of your termination date, you will receive a separate COBRA packet explaining your options for continuing healthcare coverage. Contact Apple's People Support at peo Redacted if your address has or will change.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review policy. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact People Support at Redacted or peo Redacted.

Apple Need to Know Confidential

APL-GAELG_00004024

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT L

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

Date: November 6, 2020

To: Comparator 07 Employee ID: 505751
From: Manjit Walia
Systems Design Manager
Re: Termination of employment

---

On October 5, 2020 , Apple became concerned that you may have engaged in inappropriate workplace behavior, including but not limited to, violating Apple policy(s). On October 5, 2020 you were suspended (with full pay and benefits) while Apple conducted an investigation.

Based on all the information reviewed, Apple has determined that you engaged in conduct that warrants termination of employment, including, but not limited to, violation of Apple's Business Conduct and Global Security policies. Therefore, your employment with Apple will be terminated effective November 11, 2020.

Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage. Information about your benefits continuation options will be mailed to your home approximately two weeks after your termination date. In addition, within 30 days of your termination date, you will receive a separate COBRA packet explaining your options for continuing healthcare coverage. Contact Apple's People Support at peo Redacted if your address has or will change.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review policy. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact People Support at Redacted or peo Redacted

As a reminder, your obligations under the Intellectual Property Agreement ("IPA") continue even after your employment with Apple ends. This includes, but is not limited, the obligation to not disclose Apple's confidential or proprietary information such as unreleased product information, new product schedules, budgets, marketing plans, organization charts, customer lists, personnel information, vendor contacts, etc. If you need a copy of your signed IPA please contact People Support at Redacted or peo Redacted .

cc: Master Personnel File (send to peo Redacted )

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT M

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

Date: July 21, 2020

To: Comparator 08 Employee ID**:** 264465

From: Vaneet Pathak
Systems Design Manager 3, Product Integrity

Re: Termination of Employment

---

In recent months**,** Apple became concerned that you may have engaged in inappropriate workplace behavior, including but not limited to, violating Apply policy(s). Accordingly, Apple conducted an investigation.

Based on all the information reviewed, Apple has determined that you engaged in conduct that warrants termination of employment, including, but not limited to, violation of confidentiality obligations under Apple's Intellectual Property Agreement (signed 12/2013) and multiple Apple policies, including, but not limited to, Apple's Business Conduct and Misconduct policies. Therefore, your employment with Apple will be terminated effective July 24, 2020.

Your final paycheck includes regular pay through your termination date. All accrued unused vacation pay and any ESPP contributions made in the current period will be sent to you as a direct deposit from Payroll after the close of the current pay period. Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage. Information about your benefit continuation options will be mailed to your home approximately two weeks after your termination date. In addition, within 30 days of your termination date, you will receive a separate COBRA packet explaining your options for continuing healthcare coverage. To receive the information without delay, contact Apple's People Support Team at peo Redacted or Redacted if your address has or will change.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review policy. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact the People Support Team at Redacted or peo Redacted.

cc: Master Personnel File

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT N

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

Date: September 27, 2019

To: Comparator 09 Employee ID: 532752
From: Cristobal Baray
Manager, Software Engineering
Re: Termination of employment

---

On September 12, 2019, Apple became concerned that you may have engaged in inappropriate workplace behavior, including but not limited to violating Apple policy(s). On September 12, 2019, you were suspended (with full pay and benefits) while Apple conducted an investigation.

Based on all the information reviewed, Apple has determined that you engaged in conduct that warrants termination of employment, including, but not limited to demonstrating poor judgment and violation of Apple's Business Conduct and Misconduct and Discipline policies. Therefore, your employment with Apple will be terminated effective October 2, 2019.

Your final paycheck that includes regular pay through your termination date, all accrued unused vacation pay and any ESPP contributions made in the current period will be paid as a direct deposit on your termination date. Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage. Information about your benefits continuation options will be mailed to your home approximately two weeks after your termination date. In addition, within 30 days of your termination date, you will receive a separate COBRA packet explaining your options for continuing healthcare coverage. Contact Apple's People Support at peo Redacted or Redacted if your address has or will change.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review policy. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact People Support at Redacted or peo Redacted.

As a reminder, your obligations under the Intellectual Property Agreement ("IPA") continue even after your employment with Apple ends. This includes, but is not limited, the obligation to not disclose Apple's confidential or proprietary information such as unreleased product information, new product schedules, budgets, marketing plans, organization charts, customer lists, personnel information, vendor contacts, etc. If you need a copy of your signed IPA please contact People Support at Redacted or peo Redacted.

cc: Master Personnel File (send to peo Redacted)

encl: Unemployment Insurance Brochure
Final paycheck paid by direct deposit on termination effective date

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT O

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

Date: December 21, 2018

To: Comparator 10

Employee ID: 153515

From: Colleen Schellenberg
Market Leader
Chinook Centre
Calgary, AB
Apple Canada Inc.

Re: Termination of Employment

---

Dear Comparator 10

Further to our discussions, your employment with Apple Canada will cease as of February 16, 2018. This letter confirms the details of the termination of your employment. In acknowledgement of your service and in accordance with the terms of your Employment Agreement dated July 9, 2010, we are providing you with the following separation package:

1. Statutory Notice Period

Your statutory notice period will run from December 22, 2018 until February 16, 2019 when your employment with Apple Canada will be terminated. You will continue to receive your usual salary during this period on regular payroll dates. You will not, however, be required to report to work. As you will not be required to report to work we would appreciate the return of any keys, Apple badge or property that you may have. Please note that should you have any expenses, those must be completed and submitted within two weeks of the date of this letter.

A Record of Employment (ROE) will be sent electronically to Service Canada after your last regular payroll cheque is paid to you. If you require a copy of your ROE for your own records you will be able to access it on the Service Canada website at http://www.servicecanada.gc.ca/eng/online/mysca.shtml. In order to view or access your ROE you must create an account, once your account is created you will receive a password to access your account.

2. Severance Offer

Apple Canada is also prepared to offer you an additional severance payment, whereby within 5 business days of your termination date, you will receive a lump sum payment equivalent to forty (40) weeks pay, subject to statutory withholdings.

Items 1 and 2 above include any notice and severance requirements under the Alberta Employment Standards Code and your Employment Agreement.

3. Benefits

Apple will maintain premiums for your eligible medical and dental benefits until February 16, 2019. If you obtain other employment, become self-employed, or otherwise become eligible for benefits other than through Apple, we ask that you advise us of that event so that we may discontinue your benefits.

Medical and Dental Insurance may additionally have conversion privileges. Most often, terminated employees have 60 days from when their group insurance ends. To find out more, go to the Desjardins Plan member Website, under Tools and Resources click on "end of employment or retirement," and follow the steps to enrol with Health Track Insurance.

Original to Records: Canada HR Records

*Copies to: Manager, Employee*

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

Basic Life Insurance and Optional Life Insurance may also have conversion privileges. Most often, terminated employees have 31 days from their termination date to convert their life insurance. If you would like to consider this option please contact the HR Helpline at Redacted

If you have any payroll, employee stock purchase or RSU questions, please contact our payroll department by calling our HR Helpline at Redacted For any questions regarding existing RRSP's with Manulife please contact them directly at Redacted.

We remind you that ComPsych, Apple's provider for the Employee Assistance Program can provide you with any confidential counselling or other transitional support that you may require for the period up to February 16, 2019. You can reach ComPsych at Redacted

4. Conditions

(a) It shall be a condition of Apple Canada's obligations to provide the severance arrangements described in item(s) 2 above, and the continuation of benefits from your termination date through February 16, 2019 described in 3 above, that you execute a copy of the enclosed Final Release & Indemnity, and that all of the terms of your severance arrangements be held in the strictest of confidence by you, to be disclosed only to your professional and financial advisors, immediate family members, and as may be required by law.

(b) It shall be a further condition of Apple Canada's obligations to provide the severance arrangements described herein that you agree you will not, at any time, disclose to anyone, in any manner, any of the confidential or proprietary information of Apple. You will also return to Apple Canada, all of the records and copies of records dealing with the operations and activities of Apple in your possession, and all company owned property, including but not limited to computer equipment, literature, files, credit cards, or other Apple Canada property you may have in your office, at home, or elsewhere.

(c) Apple Canada will pay all outstanding accrued vacation pay up to the date of termination.

(d) All payments will be subject to deductions required by law.

(e) Regardless of your decision regarding acceptance of the arrangements set out above, Apple Canada will provide you a letter confirming your employment. Please direct any requests for such a letter to the HR HelpLine.

We urge you to carefully read and consider this document, including the enclosed Final Release & Indemnity, and seek independent legal advice. Please indicate your acceptance of this offer by signing and returning the Final Release & Indemnity to Redacted, Employee Relations, by 5pm MDT Friday January 4, 2019. You may contact Redacted

Yours truly,

Colleen Schellenberg
Market Leader
Apple Canada Inc

Original to Records: Canada HR Records

*Copies to: Manager, Employee*

APL-GAELG_00004030

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT P

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

Date: August 16, 2018

To: Comparator 11 Employee ID: 74074

From: Gustavo Chaurais

Re: Termination of employment

---

On July 10, 2018, Apple became concerned that you may have engaged in inappropriate workplace behavior, including, but not limited to, violating Apple policy(s). Accordingly, Apple conducted an investigation.

Based on all the information reviewed, Apple has determined that you engaged in conduct that warrants termination of employment, including, but not limited to violation of the Misconduct & Discipline policy and Business Conduct policy. Therefore, your employment with Apple will be terminated effective August 16, 2018.

Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage. Information about your benefits continuation options will be mailed to your home approximately two weeks after your termination date. In addition, within 30 days of your termination date, you will receive a separate COBRA packet explaining your options for continuing healthcare coverage. Contact Apple's HR HelpLine at hrh Redacted or Redacted if your address has or will change.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review policy. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact the HR HelpLine at Redacted or hrh Redacted

cc: Master Personnel File

**encl: [Unemployment Insurance Brochure - CA]**
**[Final paycheck - CA only]**

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT Q

Date: August 18, 2017

To: Comparator 12 Employee ID: 304207
From: Anush Nadathur
Software Engineering Manager
Re: Termination of employment

---

On July 3, 2017 Apple became concerned that you may have engaged in inappropriate workplace behavior, including but not limited to, violating Apply policy(s). Accordingly, Apple conducted an investigation.

Based on all the information reviewed, Apple has determined that you engaged in conduct that warrants termination of employment, including, but not limited to, violation of Apple's Business Conduct, and Misconduct and Discipline policies. Therefore, your employment with Apple will be terminated effective August 23, 2017.

Your final paycheck that includes regular pay through your termination date, all accrued unused vacation pay and any ESPP contributions made in the current period will be paid as a direct deposit on your termination date. Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage. Information about your benefits continuation options will be mailed to your home approximately two weeks after your termination date. In addition, within 30 days of your termination date, you will receive a separate COBRA packet explaining your options for continuing healthcare coverage. Contact Apple's HR HelpLine at hrh Redacted or Redacted if your address has or will change.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review policy. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact the HR HelpLine at Redacted or hrh Redacted.

cc: Master Personnel File
Kelley Carlon, Employee Relations Business Partner

encl: Unemployment Insurance Brochure
Final paycheck paid as direct deposit on termination date

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

# EXHIBIT R

Date: 8/3/16

To: Comparator 13 Employee ID: 249324

From: Andrew Liu, Manager

Re: Termination of employment

---------------------------------------------------------------------------------------------------------------------------------------

On July 22, 2016, Apple became concerned that you may have engaged in inappropriate workplace behavior, including, but not limited to, violating Apple policy(s). Accordingly, Apple conducted an investigation.

Based on all the information reviewed, Apple has determined that you engaged in conduct that warrants termination of employment, including, but not limited to, violation of Apple's Business Conduct policy. Therefore, your employment with Apple will be terminated effective August 8, 2016. Annie Classick, your Human Resources representative, will assist you in exiting Apple.

Your final paycheck that includes regular pay through your termination date, all accrued unused vacation pay and any ESPP contributions made in the current period will be paid to you via direct deposit. Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage. Information about your benefits continuation options will be mailed to your home approximately two weeks after your termination date. In addition, within 30 days of your termination date, you will receive a separate COBRA packet explaining your options for continuing healthcare coverage. To receive the information without delay, contact Apple's HR HelpLine at hrh Redacted or Redacted if your address has or will change.

If you believe the decision to terminate your employment was not made in accordance with Apple policy or if you have additional information that you believe would alter this decision, you may request a review per Apple's Decision Review Policy. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, please contact the HR HelpLine at Redacted or hrh Redacted

cc: Master Personnel File
Victor Cousins

Docusign Envelope ID: FBC6D4C3-806F-8834-81FA-7AD50572E541

encl: Unemployment Insurance Brochure

Docusign Envelope ID: 3ECCED9A-CC39-89D5-8367-6F870D1D204E

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ASHLEY GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-4597-EMC

**DECLARATION OF ROBERT ALOE IN SUPPORT OF DEFENDANT APPLE INC.'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION**

Date: June 11, 2026
Time: 1:30 p.m.
Dept: Courtroom 5, 17th Floor
Judge: Honorable Edward M. Chen

Case: 26-4716, 11/13/2026, DktEntry: 10.2, Page 124 of 161
Docusign Envelope ID: 3ECCED9A-CC39-89D5-8367-6F870D1D204E

I, Robert Aloe, Ph.D., declare as follows:

1. I am currently employed by Apple Inc. I have worked for Apple for almost twelve years. I am currently working on Generative AI Safety. I know the facts set forth in this declaration to be true of my own personal knowledge and/or my review of documents maintained and relied upon by Apple in the regular course of business and to which I have access in the regular course of my job duties. If called as a witness, I could and would testify competently to the matters set forth in this declaration.

2. I have a Bachelor of Science from University of Detroit Mercy in Electrical Engineering and Mathematics, a Masters of Engineering from University of Detroit Mercy in Electrical Engineering, and a Ph.D. from the University of Notre Dame in Computer Science and Engineering.

3. From July 2017 to June 2020, I worked as a Video Engineering Manager, Senior Data Scientist, Incubation, Computer Vision Engineer, including working on Face ID for the iPhone and iPad. I was the Directly Responsible Individual ("DRI") at that time for some user studies Apple was conducting to test new features of Face ID for the iPhone. In that position I oversaw several user studies in which some Apple employees chose to voluntarily participate and elect to upload data to help develop, test, and train the next version of the algorithm underlying Face ID.

4. Ashley Gjovik participated in user studies in connection with the Face ID development project for the iPhone. These studies used an internal application that was initially called Gobbler and then renamed Glimmer in 2017. I engaged in email correspondence with Ms. Gjovik regarding her participation in the Face ID user studies and the use of the Glimmer application to help collect data for those studies. A true and correct copy of an email I sent to Apple employees, including Ms. Gjovik, inviting them to participate in Face ID user studies is attached as **Exhibit A** (marked as Exhibit 12 during my deposition).

5. A true and correct copy of an email I sent to Apple employees, including Ms. Gjovik, is attached as **Exhibit B** (marked as Exhibit 10 during my deposition). The email included "Do's and Don'ts" regarding the use of Glimmer, including directives to "[p]lease review any and all images before you upload them or file a radar, making sure that nothing sensitive, confidential, or

private is included in the images" and a directive to "[m]ake sure data you upload wouldn't be deemed inappropriate, including due to nudity or partial nudity."

6. Apple required employees like Ms. Gjovik who elected to participate in the iPhone Face ID user studies beginning in 2017 to be approved to use a certain pre-release version of an iPhone. As part of the approval process, Ms. Gjovik signed multiple Informed Consent Forms ("ICFs") related to Face ID user studies during her time at Apple. A true and correct copy of the ICF that she electronically signed on May 14, 2019 (and that remained in effect as of September 2021) is attached as **Exhibit C** (which I am informed and believe was marked as Exhibit 11 to Ms. Gjovik's deposition). Based on her agreement to the ICF, Ms. Gjovik was approved participate in the study.

7. Gobbler/Glimmer is an internal Apple application that Apple uses to allow employees to securely encrypt data from the phone and send it to a backend server to upload user study data from the phone. Employees must individually select images to upload through the Glimmer application; no images are ever auto-uploaded. The images that can be uploaded through Glimmer are not just photographs (like an iPhone user would see in their Photos app); they are images from a separate module of the phone that provide insights into confidential intrinsic camera characteristics that are relevant to Face ID's operation, and these images are only viewable with confidential Apple tools. Images that an employee chooses to upload through Glimmer (if any) remain encrypted on Apple's servers and can only be accessed by individuals authorized to view data related to the specific user study in which the employee is participating (*e.g.*, here, a small group of engineers working on Face ID). Employees who need to use this data for their jobs use specific software that allows them to view the encrypted data.

8. I saw an article on The Verge dated August 30, 2021, which contained confidential non-public information about the user study we were doing at Apple to develop Face ID for the iPhone. The images and video linked at that article showed information not visible to Apple's customers, competitors, or hackers about how the camera used for Face ID operates and the data Apple uses to develop the algorithm behind Face ID.

9. In early September 2021, I confirmed that the images Ms. Gjovik had posted on X

Docusign Envelope ID: 3ECCED9A-CC39-89D5-8367-6F870D1D204E

contained confidential non-public information. Ms. Gjovik publicly shared Face ID user study images she accessed through the Glimmer application in at least three separate Twitter posts. Each of these images reveals confidential information about the studies Apple was using to develop and test the algorithm behind Face ID; that information was not known to the public and could inform competitors and hackers about the specific technology Apple was using to capture information using Face ID. Ms. Gjovik's disclosures also included information about the technology Apple was using to capture information using Face ID that could be used by hackers to break into the system.

10. I consider this leak serious because it revealed information concerning the technology Apple was using for Face ID which would be valuable to Apple's competitors and potential hackers. Public disclosure of these internal product development details is a clear violation of company policy and had the potential to cause significant harm to Apple. It was not the fact that Apple was developing Face ID that was confidential. It was the specifics of the technology Apple was using to develop Face ID and the algorithms that power Face ID that was confidential.

11. I have since reviewed additional disclosures that Ms. Gjovik admits to having made to a reporter at The Verge that show specific details about how the Face ID algorithm functions and how Apple determines what counts as a "success" in an attempted Face ID recognition (though she blurred out those details when she publicly posted images from the Glimmer app, and directed the reporter to do the same). The information Ms. Gjovik shared with this reporter is highly confidential and reveals additional non-public information about the technology Apple was using to test and develop the algorithm behind Face ID. I consider this disclosure a serious violation of Apple policy and potentially damaging to Apple.

12. Ms. Gjovik never uploaded any images from her Glimmer application in 2021, meaning that the images she publicly posted and shared with a reporter were not on any of Apple's servers. Those images were only on her device, and they were encrypted and only accessible by her through the internal Glimmer application.

13. If an employee signs up to participate in a user study at Apple, the employee can later elect to withdraw from the study at any time or request deletion of their study data at any time. To my knowledge Ms. Gjovik never asked to be removed from any Face ID user study or to have

Docusign Envelope ID: 3ECCED9A-CC39-89D5-8367-6F870D1D204E

any images of her deleted.

14. I have published posts and articles about my experiences at Apple, but none of them contained any Apple confidential information. Nothing I posted contained internal images or data from the Face ID study as Ms. Gjovik did. As I stated at my deposition, I would expect to be fired if I posted the images Ms. Gjovik posted on Twitter and shared with a reporter. If I had employees reporting to me that published or shared those images or data, I would partner with the people team because it is a clear violation of confidentiality and would potentially warrant termination of employment.

I certify under penalty of perjury and pursuant to the laws of the United States that the foregoing is true and correct.

Executed on May 6, 2026 in Cupertino, California.

Robert Aloe, Ph.D.

Docusign Envelope ID: 3ECCED9A-CC39-89D5-8367-6F870D1D204E

# EXHIBIT A

**Subject:** Participating in Pearl Loop...
**From:** "Robert McKeon" Redacted
**Received(Date):** Fri, 04 Aug 2017 02:45:02 +0000
**To:** "recipients not specified: ;"
**Date:** Fri, 04 Aug 2017 02:45:02+0000

---

**Hi!**

My name is Robert McKeon, and I am a member of the Video Engineering team. As you may know, we are supporting an effort to gather Pearl data for algorithm development. To participate, you must be Red and Redacted disclosed, and have access to a Reda device. It involves setting up your Reda device with an application called the Gobbler (available from AppShack). Then, as you continue to use your device, use the Gobbler application to periodically upload data that has been logged. We are particularly interested in having you upload data after a failure in the Pearl feature.

To participate, please take the time to download the ICF (Informed Consent Form) from the Attache link below and review it. Please select the ICF for the Country/Region you work:

-USA: Redacted

Pearl Hand Carry ICF:

-Brazil: Redacted

-Tel Aviv: Redacted

-EU without France and Germany: Redacted
Redacted

We have instituted an electronic ICF process, where shortly, you will receive an email from "no-reply Redacted" asking you to complete your registration with Gobbler where you will be asked to confirm you have had an opportunity to review this ICF. This will enable you to use Gobbler to upload data.

We have started up this area Redacted in ConnectMe that people can reference as a Help page for Gobbler. It's pretty sparse right now, but we hope to fill it up as more people give us feedback on tips and tricks for using the Pearl Loop system. Note that you have to be whitelisted to access this area.

**In terms of data collection, we want more. The algorithm uses deep learning and the more data the better.**

Exhibit 12
McKeon Aloe, R.
04/03/26
aptus

APL-GAELG_00002757

Docusign Envelope ID: 3ECCED9A-CC39-89D5-8367-6F870D1D204E

VERY IMPORTANT: Make sure you find and upload your enrollment, which should be in the first time folder. You can do this right after going through the enrollment process. The file has the word "enroll" in it and should be the oldest file in the Gobbler.

**For filing a bug, do the following:**

**1. Try to repeat the behavior/scenario multiple times**

**2. If it still fails, unlock with passcode**

**3. Lock again, repeat step 1**

**4. Unlock with passcode**

**5. Try the same behavior/scenario in slightly different lighting/head pose**

**5. Then file a bug whether it passes or fails**

**6. Select all the data for that folder, and file a radar.**

**7. Usually it is good to file the bug, then go back in radar and fill in more details because there isn't the room/format available inside the Gobbler.**

**A helpful bug is one that gives more than one sample of data because the nature of the algorithm is a deep net, and they are hungry for data. Failure analysis on one sample is difficult; statistical failure analysis depends on multiple samples from multiple people.**

**For uploading data: all data that has your face in it is good data. It is helpful to delete scans that have no face which were most likely caused by normal phone movements. If a scan says Face Detection passed when there's no face, please file a bug.**

Please feel free to contact me if you have any questions.

Thanks!

**Robert McKeon Aloe**

Redacted

☐ **Video Engineering**

Redacted

Docusign Envelope ID: 3ECCED9A-CC39-89D5-8367-6F870D1D204E

# EXHIBIT B

Docusign Envelope ID: 3ECCED9A-CC39-89D5-8367-6F870D1D204E

**Subject:** Glimmer Announcements
**From:** "Robert McKeon" Redacted
**Received(Date):** Tue, 12 Sep 2017 22:47:58 +0000
**To:** "Glimmer Authlisted" Redacted
**Cc:** "Vivek Mohan" Redacted, "Brad Post" Redacted ,"Austen Schmidt" Redacted "David Kuo" Redacted ,"Ram Ramanathan" Redacted
**Date:** Tue, 12 Sep 2017 22:47:58 +0000

---

Hi All,

Congrats to everyone on the announce! I'm thrilled we can take more unrestricted data. I want to thank everyone again for uploading your data and filing radars. This data is the most valuable because we get to see how people actually use the device.

I know Glimmer may be broken in the latest build, and that's being fixed.

Also, I wanted to clarify data to upload. There are some legal restrictions which we didn't have to worry about because certain scenarios were not likely as a result of the carry restrictions. Please read the following and verify all your data before upload. You can swipe between scans, so looking through them should take just a few minutes before upload. We want to be very careful to not upload data that could put Apple into bad light.

# Do’s and Don’ts:

Please be aware that only you should be uploading images of yourself. Please review any and all images before you upload them or file a radar, making sure that nothing sensitive, confidential, or private is included in the images.

Using Glimmer, you can upload Pearl ID data that is:

- Captured in your home, so long as no one else is in the image

- Captured in public in the ***United States***, if others in the background wouldn’t have a reasonable expectation of privacy (such as on a public sidewalk)

**DO:**

- Use common sense. Make sure data you upload is work appropriate.

- Make sure data you upload wouldn’t be deemed inappropriate, including due to nudity or partial nudity.

Exhibit 10
McKeon Aloe, R.
04/03/26
aptus

Docusign Envelope ID: 3ECCED9A-CC39-89D5-8367-6F870D1D204E

**DON'T:**

- Upload data captured outside the United States unless you have signed an ICF for that specific country **and** there is no one else in the background.

  * If you have questions about whether you've signed an ICF for your country that allows you to use Glimmer, please contact Robert McKeon Aloe Redacted

- Upload data captured in bathrooms, changing rooms, locker rooms, or similar areas

- Upload data captured in private locations, including private residences other than your home.

- Upload data captured in your home that contains images of family members or other individuals in the background. Future ICF's may allow images of family members to be submitted once Apple has received their consent.

- Incidental captures of people in the background in situations where there is an expectation of privacy

- Confidential information of any kind (pictures, notes, etc...)

**Robert McKeon Aloe**

Redacted

**Video Engineering**

Redacted

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ASHLEY GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-4597-EMC

**DEFENDANT APPLE INC.'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION**

Date: June 11, 2026
Time: 1:30 p.m.
Dept: Courtroom 5, 17th Floor
Judge: Honorable Edward M. Chen

## III. RELEVANT FACTS

On August 28, 2021, Plaintiff posted a tweet regarding an internal Apple study regarding AirPods that Apple was developing at the time. Decl. of Melinda S. Riechert ("Riechert Decl."), Ex. A ("Gjovik Dep. Vol. I") 233:23-234:12; Dkt. 142 (Fifth Am. Compl.) at PDF p. 38 (Figure 3). On August 30, 2021, Plaintiff posted several tweets that included screenshots of images of locally captured data on her Apple-provided phone from an internal Face ID study. *Id.* 241:22-243:15; *id.* (Figure 3). These images contained confidential Apple product information in violation of her Intellectual Property Agreement ("IPA") and multiple Apple policies. *See* Decl. of Robert Aloe, Ph.D. ("Aloe Decl.") ¶¶ 8-10, Ex. C; Decl. of Megan Bowman ("Bowman Decl.") Exs. A-E. That same day, The Verge published an article containing a video of images stored on Plaintiff's Apple-provided iPhone that she had leaked. Gjovik Dep. Vol. I, 287:1-19; Riechert Decl. Ex. B ("Gjovik Dep. Vol. III") 399:3-400:3; https://www.theverge.com/22648265/apple-employee-privacy-icloud-id. The images in the article also contained confidential information. Aloe Decl. ¶ 8. Plaintiff tweeted a link to the article that afternoon and yet more images, also confidential. Gjovik Dep. Vol. I, 242:5-243:15; Dkt. 142 at PDF p. 38 (Figure 3); Aloe Decl. ¶ 9.[1]

Plaintiff's leaks quickly came to Apple's attention. Decl. of Yannick Bertolus ("Bertolus Decl.") ¶ 4; Riechert Decl. Ex. C ("Bertolus Dep.") 67:9-23. Apple considered the leaks serious because they revealed confidential information. Bertolus Decl. ¶ 4; Aloe Decl. ¶¶ 8-10. Public disclosure of confidential internal product information is a clear violation of company policy and specific confidentiality agreements Plaintiff signed, and had the potential to cause significant harm to Apple. Bertolus Decl. ¶¶ 6-7; Bowman Decl. Exs. A-E; Aloe Decl. ¶¶ 6, 8-10, Ex. C. Apple tried to speak with Plaintiff as part of an investigation into her disclosure, but she refused, insisting on communicating only in writing. Riechert Decl. Ex. D ("Kagramanov Dep.") 56:12-17, 57:4-10 and Dep. Ex. L; *id.* 59:14-24 (explaining importance of "live dialogue" in investigations).

On September 9, 2021, after reviewing the images she posted (which confirmed both the

---

[1] Gjovik admits that she had no idea if the images she could see locally on her phone were ever uploaded or visible to Apple. Gjovik Dep. Vol. I 110:18-111:24 ("Q. But you don't know if it was, in fact, auto uploading the content; correct? A. Correct."). She never opted to upload the images she posted, so none were actually in Apple's possession. Aloe Decl. ¶ 12.

fact of her undisputed disclosure and the confidential nature of what she disclosed), Apple Vice President Yannick Bertolus determined Plaintiff's conduct was "egregious" and terminated her employment. Bertolus Decl. ¶¶ 6-7, 12. This conduct was alone grounds for the termination. *Id.* ¶¶ 6, 12. The termination letter Bertolus sent also noted Plaintiff's refusal to cooperate with the investigation into her leaks by insisting on communicating only in writing, and her efforts to mislead Apple personnel investigating complaints she had made, which further supported his decision. *Id.* ¶ 10, Ex. A.[2]

Apple has terminated over a dozen employees for similarly disclosing confidential product research and development information. Bowman Decl. ¶ 7, Exs. F through R.[3] These terminations, like Plaintiff's, are consistent with Apple's Misconduct and Discipline Policy, which makes clear that conduct that may warrant immediate termination includes "[v]iolating confidential, proprietary, and trade secret information obligations (including those stated in Apple's Intellectual Property Agreement)" as well as making misrepresentations during or "failing to cooperate with an investigation" *Id.* Ex. C at 1-2; *see also id.* Ex. B at 6 ("Never share confidential information about Apple's products or services without your manager's approval."); *see also* Exs. D, E.

Prior to choosing to reveal confidential product-related information publicly, Plaintiff had for years raised a panoply of concerns—regarding potential vapor intrusion from floor cracks in her office building, Apple's return to office expectations post-COVID, interactions with her managers, and complaints about her work environment and job description—to Apple's EH&S, HR, and ER teams. *See, e.g.*, Dkt. 360, Ex. 19. Apple responded to Plaintiff's concerns and

---

[2] After Apple terminated Plaintiff on September 9, it learned that Plaintiff's unauthorized disclosures of confidential product information had been even more extensive than previously known: she disclosed images and screenshots of the Glimmer application interface—including technical details relevant to Face ID's internal operations—to journalists and employees not approved to know about the application or the user studies conducted through it. Gjovik Dep. Vol. I, 280:7-281:9 (disclosed unblurred images of Glimmer app to The Verge), 292:1-19 (disclosed Glimmer metrics), 294:19-295:6; 295:10-12, 296:9-297:2, 297:19-298:20 ("I gave all of this to [the reporter]); Gjovik. Dep. Vol. III 399:20-400:3; 401:7-14 (disclosed unblurred text), 412:9-13, 413:6-18, Ex. 32 (told reporter to "remove any code / #s etc" she had disclosed).

[3] Indeed, Plaintiff herself previously raised concerns to Apple that other employees may be leaking confidential product information and that such conduct violated Apple policy. Gjovik Dep. Vol. I 53:1-14, 53:25-55:13 ("Q. You reported it because you felt that these people were violating their confidentiality obligations to Apple; correct? A. That they might be, but that's for Apple to decide. I was just obligated to report the issue and let Apple investigate.").

communicated with her about them. *See, e.g.*, Riechert Decl. Ex. E ("Okpo Dep.") 38:19-40:10, Ex. AA. Apple also allowed Plaintiff to take paid administrative leave in August 2021 while it investigated her concerns, because Plaintiff asked not to have to talk with any of her managers during that time (which effectively meant she could not perform her job duties). Decl. of Ekelemchi Okpo ("Okpo Decl.") ¶¶ 5-6, Ex. B ("Per your request, you are now on paid administrative leave so as to not interact with your managers."); Gjovik Dep. Vol. I, 310:17-311:17, Ex. 25 ("I said: then put me on paid leave with benefits until they're done."). Although Plaintiff now characterizes it as a forced involuntary leave, she never responded to Apple's multiple offers to have her return to work. Okpo Decl. ¶ 9.[4] Plaintiff provided voluminous information she claimed warranted investigation, including a partial excerpt of a text message chain she said proved her second-level manager was "pimping" her; Apple ER attempted to speak to Plaintiff after reviewing the full text chain to understand her selective presentation of only that one text without the broader chain which directly contradicted her allegation, but she refused, insisting that all communications be in writing. Okpo Dep. 102:21-103:13, Ex. EE; *id.* 104:1-12, 105:3-11 (explaining importance of real-time discussion to "ER investigate (sic) process"). Plaintiff was not terminated until after she leaked confidential product information—long after she had begun raising (and Apple had been responding to) her array of grievances.[5] Any concerns Plaintiff previously raised were not a factor in Bertolus's decision to terminate her employment. Bertolus Decl. ¶ 11.

## IV. <u>LEGAL STANDARD</u>

### A. <u>Motions for Summary Judgment</u>

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine

---

[4] Plaintiff had also previously been offered and accepted paid leave in May 2021, during an earlier phase of Apple's investigation into concerns she raised. Gjovik Dep. Vol. I 307:23-309:7, Ex. 23.

[5] Plaintiff's messages from summer 2021 show her motivation for shifting from raising concerns (which Apple investigated while she remained employed) to terminable misconduct. *See* Gjovik Dep. Vol. III, 471:8:472:4 (June 8, 2021 text) ("Give me my money b's. I EARNED IT. I WANT MY EXIT PACKAGE."); *id.* 469:9-470:16, ("July or August" 2021 text) ("[A]s I told ER, I'm sticking around until they fire me so I can sue for the most money."); *id.* 472:15-473:12 (Aug. 30, 2021; "don't recall exact[ly]" when bio was changed) (Twitter bio reads "(not fired yet!).")

adverse employment action. *Id.* at 1111–12. Third, after such proffer, the burden shifts back to the employee to provide "substantial responsive evidence" that the proffered reasons were pretextual. *Id*. (quoting *Martin v. Lockheed Missiles & Space Co.*, 29 Cal. App. 4th 1718, 1735 (1994)).

The last of Plaintiff's retaliation claims—Section 1102.5 (Count II)—is governed by a similar but distinct framework. *See Lawson v. PPG Architectural Finishes*, *Inc.*, 12 Cal. 5th 703, 718 (2022). First, the employee must demonstrate "by a preponderance of the evidence" that the protected whistleblowing was a "contributing factor" to an adverse employment action. *Id*. at 712. Second, if the employee has made that showing, the employer then bears "the burden of proof to demonstrate by clear and convincing evidence" that the alleged adverse employment action would have occurred "for legitimate, independent reasons" even if the employee had not engaged in protected whistleblowing activities. *Id.; see also Ververka v. Dep't of Veterans Affs.*, 102 Cal. App. 5th 162, 173 (2024), *as modified* (June 5, 2024), *review denied* (Aug. 14, 2024). Employers, in other words, still have a "same-decision defense" even if the plaintiff employee satisfies her initial burden under Section 1102.5. *Id.* at 718; *accord* Cal. Civil Jury Instruction No. 4604.

## V. ARGUMENT

### A. Apple is Entitled to Judgment on All of Plaintiff's Claims.

#### 1. The Only Adverse Action Was Plaintiff's Termination.

Apple does not deny that it terminated Plaintiff. There are no other adverse employment actions at issue. Although Plaintiff suggests that she was "suspen[ded]" and "forced" to take leave (Dkt. 359 ¶ 48), the undisputed evidence makes clear that is not true. *See* Okpo Decl. ¶¶ 6-9, Exs. B, C (Plaintiff informed she was free to return "at any time" from paid leave she had requested, yet did not respond); Gjovik Dep. Vol. I, 309:8-310:15 (Plaintiff never requested to be reinstated from paid leave). Thus, the only adverse action at issue is Plaintiff's termination on September 9, 2021.[6]

[6] The operative complaint makes passing reference to a handful of other dissatisfactions—*e.g.*, that Plaintiff's managers were allegedly "reassigning her best projects" while also "quadrupl[ing] her workload," "snapping at" her, and "ignoring" her (*see* Dkt. 142 ¶ 109)—none of these are mentioned in Plaintiff's motion and none rise to the level of an actionable adverse employment action in any event. *See Holmes v. Petrovich Dev. Co.*, 191 Cal. App. 4th 1047, 1063 (2011) (plaintiff must prove "substantial adverse change in the terms and conditions" of employment).

**2. Apple Legitimately Terminated Plaintiff for Publishing Confidential Product-Related Information.**

While Plaintiff claims Apple terminated her employment in retaliation for some or all of her various alleged protected activities, she cannot escape the legitimate, nonretaliatory, and independent reason for Apple's termination of her employment: that she undisputedly leaked confidential Apple product information in violation of her IPA and multiple Apple policies. It is telling that Plaintiff's recitation of facts in her motion references the Glimmer images she leaked only once, and obliquely: "The post included a screenshot image. (Ex. 27.)" Dkt. 359 ¶ 15. That is a mischaracterization at best and a deliberate effort to mislead at worst. Apple's legitimate reason for terminating Plaintiff—the facts of which Plaintiff does not and cannot dispute—dooms her retaliation claims.

The second step of either the *McDonnell Douglas* framework or Section 1102.5 framework is decisive here, because there is abundant, conclusive, and undisputed evidence that Apple's termination decision was a direct response to Plaintiff's leaking of confidential internal Apple product information. *See Batarse v. Serv. Emps. Int'l Union, Loc. 1000*, 209 Cal. App. 4th 820, 831 (2012) ("A defendant moving for summary judgment [in a retaliation case] … may skip to the second step of the analysis and demonstrate that it had a legitimate business reason, unrelated to … retaliation, for taking its employment action."); *Ververka*, 102 Cal. App. 5th at 173 (under Section 1102.5 framework, "if an employer satisfies its burden at the second step in making a same decision showing, the employer is not liable regardless of whether the employee made an initial showing that his or her protected disclosure was a 'contributing factor'").

In this case, Plaintiff has not tendered evidence undermining Apple's reasons for her termination or linking Apple's termination decision to some other motivation (other than through pure speculation). Thus, under the *McDonnell Douglas* framework, regardless of whether Plaintiff could establish a *prima facie* case that she had engaged in various forms of protected action, Apple has produced evidence showing a legitimate, nonretaliatory reason for its termination decision. And under the Section 1102.5 framework, even if Plaintiff could demonstrate by a preponderance of the evidence that her alleged protected whistleblowing was a contributing factor (which she cannot do),

clear and convincing evidence establishes that her termination would have occurred anyway for a legitimate, independent reason: her choice to post confidential internal Apple product information online and to a reporter at the Verge.

Courts routinely grant summary judgment to employers on retaliation claims under the *McDonnell Douglas* framework in circumstances like these. *See Sears v. Hous. Auth. of the Cnty. of Monterey*, No. 11-cv-1876, 2014 WL 1369594, at *9 (N.D. Cal. Apr. 7, 2014) (granting summary judgment; "The disclosure of confidential information is a legitimate, non-retaliatory basis for termination."); *McGrory v. Applied Signal Tech., Inc.*, 212 Cal. App. 4th 1510, 1528 (2013) (affirming summary judgment for employer; deception or refusal to cooperate with internal investigation is legitimate reason for termination); *Veto*, 2024 WL 5036760, at *4 (granting summary judgment on Section 6310 claim where employer offered a legitimate, nonretaliatory reason for terminating employee, including that employee made false statements to security); *Cuevas v. SkyWest Airlines*, 17 F. Supp. 3d 956, 965 (N.D. Cal. 2014) (granting summary judgment on Section 6310 claim where employer offered substantial evidence that it suspended and fired employee for repeated instances of insubordination and employee failed to demonstrate pretext), *aff'd*, 644 F. App'x 791 (9th Cir. 2016); *accord E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) ("[W]hether to fire an employee for lying to the employer in the course of the business's conduct of an important internal investigation is basically a business decision; this decision, as with most business decisions, is not for the courts to second-guess as a kind of super-personnel department.").

Cases abound where California courts applying the *McDonnell Douglas* framework found summary judgment appropriate after the employer supplied evidence of legitimate, nonretaliatory reasons why it terminated or otherwise took action against an employee. *See Wilkin v. Cmty. Hosp. of Monterey Peninsula*, 71 Cal. App. 5th 806, 823 (2021) (employee repeatedly violated policy on patient medication administration); *Batarse*, 209 Cal. App. 4th at 825 (employee "presented false information in his employment application and interviews"); *Wills v. Superior Court*, 195 Cal. App. 4th 143, 171 (2011) (employee violated policy prohibiting verbal threats and threatening conduct). The same is true of California courts evaluating retaliation claims under the second step of the

Section 1102.5 framework. *See Vatalaro v. County of Sacramento*, 79 Cal. App. 5th 367, 385-86 (2022) (employee was "insubordinate, disrespectful, and dishonest" and "never meaningfully disputed the alleged act[s]"). California courts have even reversed jury verdicts in favor of the employee where the evidence showed that the employer had legitimate reasons for the challenged adverse action. *See McRae v. Dep't of Corr. & Rehab.*, 142 Cal. App. 4th 377, 398 (2006).

Just as in *Wilkin* and *Wills*—where the employers' stated reasons were grounded in violations of policy—here, Apple's termination decision was clearly grounded in Plaintiff's violation of Apple policies and her own IPA.[7] Plaintiff's violation was no minor transgression, either. Like the *Batarse* employee's false representations in an employment application, Plaintiff's broadcasting on multiple occasions of confidential information about unreleased Apple products was an "egregious" violation. Bertolus Decl. ¶¶ 6-7, 12. On these facts, judgment is warranted. *See Raphael v. Tesoro Corp.*, No. 2:15-CV-05080-SVW-JEM, 2016 WL 6634915, at *10 (C.D. Cal. Oct. 26, 2016), *aff'd*, 729 F. App'x 566 (9th Cir. 2018) (granting summary judgment; "violation of company policy is a legitimate, non-retaliatory reason in the termination of an employee").

There can be no genuine issue of material fact that Apple has demonstrated—by any applicable evidentiary standard, including by clear and convincing evidence—that it had legitimate, nonretaliatory reasons for terminating Plaintiff (under the *McDonnell Douglas* framework) and that her termination would have occurred in any event for legitimate, independent reasons (under the Section 1102.5 framework). Courts have found summary judgment for the employer appropriate on similar or even less extensive or compelling evidence of the employer's legitimate reasons. *See Siazon v. Hertz Corp.*, No. 17-CV-05935-EMC, 2019 WL 1170778, at *12 (N.D. Cal. Mar. 13,

---

[7] Plaintiff has repeatedly insisted that post-termination proceedings before the NLRB somehow "invalidated" her IPA and retroactively authorized her disclosure of confidential Apple product information. *See, e.g.*, Dkt. 306 ¶ 48 (claiming Apple is "legally prohibited from enforcing" its IPA). Not so. *See* Req. for Judicial Not. ("RJN"), Ex. A (Apr. 3, 2025 NLRB Settlement Agreement clarifying that Apple "will not enforce the definition of Proprietary Information (or similar terms) set forth in any version of the [IPA], ***to the extent that such definition covers terms and conditions of employment protected under Section 7 of the Act***") (emphasis added); RJN Ex. B (Sept. 25, 2025 NLRB order dismissing Plaintiff's claim she was wrongfully terminated, finding that "***when she revealed to the media confidential product development information*** about a Respondent study" she was not engaging in "protected concerted activity" and thus was not protected by the Act) (emphasis added).

2019) (granting summary judgment where employer had "offered substantial evidence that it terminated and/or did not rehire [the employee] because of his poor job performance"), *aff'd*, 847 F. App'x 448 (9th Cir. 2021); *accord Ostly v. City & Cnty. of San Francisco*, No. 21-CV-08955-EMC, 2023 WL 4053800, at *9 (N.D. Cal. June 15, 2023), *aff'd*, No. 23-16000, 2024 WL 3963839 (9th Cir. Aug. 28, 2024) (granting summary judgment where "Plaintiff has produced no evidence beyond the most conclusory and tenuous allegations that Defendant Boudin knew about any of his allegedly protected speech, let alone retaliated against it."). Whether on summary judgment or at trial, the evidence permits only one conclusion: Apple terminated Plaintiff for the legitimate reason that she repeatedly leaked confidential information about and images of internal Apple product development, in violation of multiple Apple policies and her IPA.

It is immaterial that Plaintiff previously raised concerns about a host of issues, and those complaints may have amounted to protected activity under one or more whistleblower statutes. "Employers are sometimes forced to remove employees who are … engaging in improper work conduct," and "[p]recedent does not prevent [an employer] from removing such an employee simply because the employee [previously] engaged in a protected work activity." *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 354 (2008); *accord Joaquin v. City of Los Angeles*, 202 Cal. App. 4th 1207, 1223 (2012) (citing *Richey v. City of Indep.*, 540 F.3d 779, 784 (8th Cir. 2008)) ("An employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action."); *Nash-DeCamp Co. v. Agric. Lab. Rels. Bd.*, 146 Cal. App. 3d 92, 103 (1983) ("Simply because the employee has participated in union or other protected activities does not insulate the employee from discharge for misconduct or provide immunity from routine employment decisions."). Plaintiff was not fired until she engaged in the unprotected activity of leaking confidential product information; her prior complaints do not operate as a shield preventing her from being held accountable for misconduct.

Plaintiff also cannot evade summary judgment by attempting to take issue with the fact that her termination letter cited not only her disclosure of confidential information, but also additional misconduct that Bertolus believed supported termination. It is undisputed that Bertolus concluded

that her leaks of confidential product information themselves warranted termination. Bertolus Decl. ¶ 6; *accord* Bowman Decl. Ex. B. Bertolus's judgment that Plaintiff also violated Apple policies in other ways—such as providing misleading information and refusing investigation interviews—only served to bolster his conclusion that termination was appropriate. Bertolus Decl. ¶¶ 6-8, 12.

**3. <u>Plaintiff Lacks "Substantial Responsive Evidence" Demonstrating Apple's Reasons for Terminating Her Were Pretext.</u>**

For Plaintiff's Section 1102.5 retaliation claim, Apple's legitimate reason for termination is enough to conclude the analysis and compel a grant of summary judgment to Apple. *See Lawson*, 12 Cal. 5th at 712, 718 n.2. For Plaintiff's remaining retaliation claims governed by the *McDonnell Douglas* framework, Apple's showing of legitimate, nonretaliatory reasons shifts the burden to Plaintiff to produce "substantial responsive evidence from which a trier of fact could find [Apple's] articulated reason untrue and pretextual." *Loggins*, 151 Cal. App. 4th at 1112. There is no such evidence, much less "substantial responsive evidence."

Plaintiff "must do more than establish a *prima facie* case and deny the credibility of [Apple's] witnesses. [She] must produce specific, substantial evidence of pretext." *Horn v. Cushman & Wakefield W.*, 72 Cal. App. 4th 798, 807 (1999); *see also Stetsyk*, 2021 WL 12302250, at *15 (*Tameny*); *Cuevas*, 17 F. Supp. 3d at 959 (Section 6310); *Cervantes*, 2021 WL 6496829, at *10 (Section 98.6). She must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable [fact finder] could rationally find them unworthy of credence." *Horn*, 72 Cal. App. 4th at 807*; see also Villanueva v. City of Colton*, 160 Cal. App. 4th 1188, 1195 (2008).

Rather than point to such specific, substantial evidence of pretext, Plaintiff can at most offer speculative theories of other reasons that might have played a role in Apple's termination decision *sub silentio*. Such "speculation" "cannot be regarded as substantial responsive evidence" "that the employer's showing was untrue or pretextual." *Martin*, 29 Cal. App. 4th at 1735; *see also Loggins*, 151 Cal. App. 4th at 1109 (applying *Martin* to employment-retaliation claims). Plaintiff's mere "belief that [Apple] had retaliated against her and [was] lying about [its] motivation" is not "substantial evidence from which a jury can find that [Apple's] reasons for [its] actions are false or

pretextual." *McRae*, 142 Cal. App. 4th at 398; *Thompson v. City of Monrovia*, 186 Cal. App. 4th 860, 875-76 (2010); *cf. Tarin v. Cnty. of Los Angeles*, 123 F.3d 1259, 1265 (9th Cir. 1997) (affirming summary judgment to employer on retaliation where employee "point[ed] to nothing in the record, other than her own conclusory statements, to refute the [employer's] explanations for its decisions"), *superseded by statute on other grounds as explained in Leisek v. Brightwood Corp.*, 278 F.3d 895, 899 n. 2 (9th Cir. 2002). Instead, Plaintiff must show, "***without*** relying upon suspicion, imagination, speculation, or conjecture[] that [the employer] acted in retaliation." *Nejadian v. Cnty. of Los Angeles*, 40 Cal. App. 5th 703, 727 (2019) (emphasis added); *see also Kerr v. Rose*, 216 Cal. App. 3d 1551, 1564 (1990) (suspicions of improper motives based on conjecture and speculation insufficient to defeat summary judgment).[8]

That she cannot do. To the extent Plaintiff claims there is evidence linking her alleged protected activities to Apple's termination decision, Plaintiff's "characterization of the facts finds no support in the record." *Vatalaro*, 79 Cal. App. 5th at 386. And to the extent Plaintiff points to separate administrative proceedings, even administrative "notice[s] identifying reasonable cause to believe an action for retaliation may be sustained [are] not 'a free pass through summary judgment'"—and Plaintiff has nothing like that here anyway. *Evans v. Dep't of Pub. Health of City & Cnty. of S.F.*, No. CV 08-3329 EDL, 2009 WL 4907933, at *4-5 (N.D. Cal. Dec. 14, 2009) (citation omitted); *accord Simpson v. Martinez*, No. C-11-2642 EMC, 2013 WL 1120891, at *3 (N.D. Cal. Mar. 18, 2013) (evaluating constitutional claims and rejecting plaintiff's "assert[ion] that because he filed grievances, the search must have been retaliatory," because he put forward "no evidence of personal knowledge, as opposed to offering speculation, of such a motive").

---

[8] Ample Ninth Circuit authorities are in accord. *See Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (affirming summary judgment; "The evidence adduced by [the employee] establishes only that this set of events could conceivably have occurred; it does not give rise to a reasonable inference that it did in fact occur. To find liability on this evidence would require undue speculation. To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations."); *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008) (no triable issue of fact as to retaliation where employer "had ample basis" for its action and plaintiff "present[ed] no evidence contradicting" defendant's explanation "other than [plaintiff's] unsubstantiated statement"); *Korkosz v. Clark Cnty.*, 379 F. App'x 593, 596 (9th Cir. 2010) (similar); *Davis v. City of Seattle*, 343 F. App'x 230, 232 (9th Cir. 2009) (similar).

Case: 26-4716, 11/13/2026, DktEntry: 10.3, Page 145 of 161

Nor is it enough for Plaintiff to argue that Apple's termination decision occurred, in her view, close in time to her alleged protected activities. Courts have squarely rejected that position, explaining that although a plaintiff can in some instances satisfy the initial burden of establishing a *prima facie* case by producing evidence of "nothing more than ... the proximity in time between the protected action and the allegedly retaliatory employment decision," such evidence of temporal proximity "only satisfies the plaintiff's initial burden." *McRae*, 142 Cal. App. 4th at 388. That is, "temporal proximity, [while] sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual." *Loggins*, 151 Cal. App. 4th at 1112. A retaliation claim cannot survive based merely "on the logical fallacy of … 'after this, therefore because of this.'" *Villaneda v. Sayre*, No. C-13-5004 EMC (PR), 2014 WL 688795, at *3 (N.D. Cal. Feb. 21, 2014) (citation omitted). But here, there is no admissible evidence of anything else.

Plaintiff also cannot show that Apple's termination decision was out of step with Apple's practice of handling leaks. Indeed, the record demonstrates the opposite: Apple regularly terminates employees over similar leaks of confidential internal information. Bowman Decl. ¶ 7, Exs. F to R. While Plaintiff has attempted to point to instances where Apple did not terminate employees over leaks, she could not produce any evidence to that effect. *See, e.g.*, *Trujillo v. U.S. Postal Serv.*, 330 F. App'x 137, 140 (9th Cir. 2009) ("no evidence" employer treated similar conduct differently). Much less can she point to a sufficient pattern of different treatment. Perhaps more importantly, to the extent there might be isolated incidents where Apple acted differently in response to employee leaks, Plaintiff cannot show that such incidents involved similarly clear and egregious leaks. *Cf. Loggins*, 151 Cal. App. 4th at 1113 (finding "no evidence" the employee's coworkers engaged in similarly "substantial" misuse of the employer's "time and resources" (emphasis omitted)).

Because Plaintiff's protestations of pretext wholly fail to raise a triable issue as to any material fact, while Apple has presented overwhelming evidence that it terminated Plaintiff for legitimate, nonretaliatory reasons, summary judgment in Apple's favor is warranted on Plaintiff's non-Section 1102.5 retaliation claims. *Cf. Siazon*, 2019 WL 1170778, at *13 (granting summary

judgment on discrimination claim governed by the *McDonnell Douglas* framework where the employee "produced practically no evidence" of pretext, such as evidence "disputing the accuracy" or "factual basis" of the employer's stated reasons for terminating the employee); *Flanagan v. City of Richmond*, No. 14-CV-02714-EMC, 2015 WL 5964881, at *20 n.9 (N.D. Cal. Oct. 13, 2015), *aff'd*, 692 F. App'x 490 (9th Cir. 2017) (granting summary judgment because "a plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive"; "[t]o be cognizable on summary judgment, evidence must be competent."); *Smith v. Cnty. of Santa Clara*, No. 5:11-CV-05643-EJD, 2016 WL 4076193, at *21 (N.D. Cal. Aug. 1, 2016) (summary judgment appropriate where employees "offer no evidence outside of their own speculation that [the employer] did not honestly believe that the conduct for which [the employees] were disciplined constituted violations of [employer] policy").

**B. Plaintiff's Motion Should Be Denied.**[9]

Plaintiff seeks summary judgment on two alternative bases (though she styles these across three "issues" to be decided under L.R. 7-4 (a)(3); *see* Dkt. 359 ¶ 6:

- **Issues 1 and 3**: Apple's stated reason for terminating her must be false, and Plaintiff's contrary narrative must be true, because Plaintiff had engaged in a host of allegedly protected activity and therefore must have been terminated as retaliation for some or all of it.[10]
- **Issue 2**: Even if Apple's stated reason for termination were credited, her termination would still be unlawful because California law allows employees to disclose confidential product information of their employers, so long as they do so while complaining about their employer.

Plaintiff is wrong both on the facts and the law. Since Plaintiff admits disclosing the confidential Apple product information, she cannot prevail on her claim. There is no admissible evidence that Apple's stated reason for terminating Plaintiff was false. Plaintiff's insistence that it

---

[9] Plaintiff's motion was untimely and her voluminous exhibits failed to comply with this Court's instructions for concise declarations and exhibits, with highlighting for voluminous entries. Dkt. 273; *see also* Jan. 13, 2026 Hrg. Tr. (Dkt. 300) at 7:1-14. It could be denied on those bases alone.

[10] It is impossible to tell which of Plaintiff's myriad complaints she believes was the "true" motive for her termination; her allegations have morphed repeatedly, the only throughline being that Apple must have done something wrong.

was does not entitle her to judgment; on the contrary, the competent evidence compels judgment in Apple's favor. The fact that Plaintiff complained does not insulate her – an employee who engages in misconduct is not safe from termination based on that misconduct simply because the employee engaged in protected activity prior to the termination.

On the second point, courts have repeatedly held that employees do not have the right to disclose confidential product information of their employer, even if they believe the employer is engaged in some type of misconduct. Apple was entitled to terminate Plaintiff's employment for disclosing confidential information about and images from internal user studies and product development applications. Her conduct is not protected by California or federal law.

Finally, Plaintiff is not entitled to the extraordinary remedy of reinstatement (her **Issue 4**).

### 1. Much of Plaintiff's Evidence is Inadmissible, Immaterial, or Both.

When ruling on cross-motions for summary judgment, the court must "consider each party's evidence to evaluate whether summary judgment [is] appropriate." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011). Plaintiff attempts to support her motion exclusively through her own declaration and evidence attached thereto. But much of her "evidence" (or characterizations masquerading as evidence) should be disregarded.[11]

- **Exhibits 32, 34, 35, 36, 37 (Entire Deposition Transcripts),** cited at Dkt. 359 *passim*: The Court expressly directed the parties to excerpt or highlight "what it is you want me to look at." Jan. 13, 2026 Hrg. Tr. (Dkt. 300) at 7:1-14, 8:22-9:5; *see also* Dkt. 273 at 1 ("While Plaintiff is entitled to support her motion with a declaration, it must be concise."). Plaintiff filed 651 pages of declaration and exhibits, including the entire transcripts of every deposition she took—the vast majority of which she never cited. She made no effort to highlight, annotate, or otherwise point the Court to any relevant portions. The Court should disregard these excessive filings. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (court "not required to comb the record" at summary judgment). Moreover, to the extent Plaintiff's declaration characterizes deposition testimony inconsistent with the actual transcripts, such characterizations

[11] Apple focuses on the evidence Plaintiff submitted that was actually cited in her motion. Much of the would-be "evidence" she included was never cited, and thus is presumptively immaterial.

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
Apple Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

ASHLEY GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-4597-EMC

**DEFENDANT APPLE INC.'S OPENING BRIEF RE REMAINING DISCOVERY DISPUTES AND OPPOSITION TO PLAINTIFF'S OPENING BRIEF RE DISCOVERY DISPUTES**

Dept: Courtroom TBD
1301 Clay Street
Oakland, CA 94612
Judge: Honorable Kandis A. Westmore

# Exhibit P

**From:** Perry, Jessica R.
**Sent:** Tuesday, April 14, 2026 9:11 AM
**To:** Ashley M. Gjovik (Legal Matters)
**Cc:** Riechert, Melinda; Mantoan, Kathryn G.; Booms, Ryan; Horton, Nicholas J.; Weaver, Nicholas; Davidson, Sarah
**Subject:** RE: Gjovik v Apple - Remaining Discovery Issues Raised by Apple (Per Dkt. No. 327)

Ashley,

Apple approaches this meet and confer process mindful of the Court's guidance and the federal rules. Judge Westmore expects parties to confer in good faith and narrow disputes to avoid wasting the Court's limited resources. Rule 26(b)(1) requires relevance and proportionality—no party is entitled to demand unlimited or unduly burdensome searches. And given that fact discovery is set to close on April 16, Judge Chen has made clear that disputes raised in this process "should not be numerous."

Your approach below—which demands discovery that is neither relevant nor proportionate to the needs of case and attempts to revisit resolved disputes and revive long inactive ones—disregards these directives. Notwithstanding, Apple does its best to respond to the many issues you have raised below.

**Dispute 1 – YOUR DEPOSITION**
Apple disagrees with your characterizations and erroneous statements. Apple promptly attempted to schedule your deposition, and eventually noticed it for April 8, 2026 in accordance with Judge Westmore's March 30, 2026 order (Dkt. No. 327 at 5)—after you refused to appear for the earlier date Apple had noticed. We decline to engage in further discussion about ground rules or advance concessions you are trying to impose on our right to take this deposition. We expect that you will sit for your court-ordered deposition on April 20.

**Dispute 2 – BERTOLOUS DEPOSITION**
Your assertion that Apple "refused to make Mr. Bertolus available before April 17" is incorrect. As you know, Mr. Bertolus is a third-party witness and not under Apple's control; we do not have the ability to "make him available" at any date and time of your choosing. On January 14, Apple asked you for your availability to take his deposition. We did not hear from you until March 16. By that time, Mr. Bertolus was not available for deposition until April 17. And this "dispute" will be entirely moot once Mr. Bertolus appears and testifies on that date, as he is prepared to do.

**Dispute 3 – 30(b)(6) DEPOSITION**
Your assertion that you "noticed" a 30(b)(6) deposition in August 2025 is false. Rather, on August 5, 2025, you wrote in an email: "I will want to complete at least my first Rule 30(b)(6) deposition prior to the next status conference and will work on that notice." On August 7, 2025, Apple responded: "We await your list of 30(b)(6) topics." You did not provide any topics at that time, or at any time until this month. Moreover, five months later, at the January 13, 2026 case management conference, you represented to the Court, "I'm ready now and, like, a year ago to file my motion for summary judgment."

On April 1, 2026, you emailed Apple a list of fourteen sprawling proposed 30(b)(6) topics that are in no way proportionate to the needs of this case—which is simply about the reason Apple fired you. On April

Nevertheless, Apple endeavors below to address the key issues identified in your April 9, 2026 email.

**Apple Will Produce All Documents It Agreed to Produce by April 16: RFP Nos. 2, 5, 11, 12-17, 26, 33-34, 50-51, 58, 61.**

You inquired into the status of RFPs for which Apple stated that it agrees to search for responsive documents (RFP Nos. 2, 5, 11, 12-17, 26, 33-34, 50-51, 58, 61). Apple has diligently searched for, reviewed, and produced numerous documents responsive to these requests. As of the date of this letter, Apple's production is substantially complete. Apple will finalize and complete its production by the fact discovery deadline.

**We Will Not Re-Litigate Resolved Disputes: RFP Nos. 7-10 (Set One); RFP Nos. 20, 24, 28-32, 37, 40-44, 54 (Set Two).**

Your disputes regarding RFP Nos. 7-10 (Set One), 24, 28-32, 37, 40-44, 54 (Set Two)—which are at issue in Dispute 6 and/or Dispute 7—were previously resolved in Dkt. No. 327. Further, your dispute regarding RFP No. 20—which is at issue in Dispute 6—was resolved during the parties' prior meet and confer. The Court does not need to expend any of its limited resources (*see* Dkt. No. 327 at 1) to address these resolved disputes.

**Your Remaining Disputes Are Untimely, and In Any Event, Without Merit.**

As for the remaining RFPs, your attempt to raise new or renewed disputes at this late stage—nearly eleven months after Apple served its responses, and with fact discovery set to close within days—is improper. Judge Westmore's Omnibus Discovery Order cannot reasonably be read to invite you to demand, just one week before fact discovery closes, further information and documents in response to every request you have ever served—many of which have been dormant for months after Apple timely responded and objected.

Notwithstanding your delay in following up on Apple's responses and productions, Apple will nonetheless, to the best of its ability, address the points raised in your meet and confer letter.

**RFP Nos. 8, 10, 18, and 52 (Set Two): You failed to raise an issue.**

With respect to RFP Nos. 8, 10, 18, and 52, you merely state that Apple refused to produce responsive documents without identifying any issue with Apple's refusal, and thus it is not possible for the parties to "meaningfully meet and confer via email regarding [any] outstanding issue," as the Court directed. Dkt. No. 327 at 6-7. In any event, none of your requests are relevant to the reason for your termination—the key remaining liability issue.

**RFP Nos. 7, 8, 19, 36, 43, 47, 51, and 59 (Set Two): Apple properly declined to search for or log responsive documents.**

With respect to RFP Nos. 7, 8, 19, 36, 43, 47, 51, and 59, you claim that "Apple refuses to search AND refuses to create a privilege log, violating FRCP 26(b)(5)(A)."

Each of these requests—or at least a distinct portion of each of these requests—seek ***only*** attorney-client privileged documents. RFP No. 7 ("documents created by Apple's Legal ... department[]"); 8 ("communications between Apple and any outside legal counsel"); 19 ("communications, meeting notes, or strategy documents created by Apple's Legal ... team[]"); 36 ("Apple ... Legal ... Department files"); 43 ("communications, messages, emails, notes, summaries, or reports exchanged ... among ... [the] Apple Legal ... team[]"); 47 ("documents, communications, messages, and emails ... among Apple's Legal Department"); 51 ("internal Apple communications (including Legal ... team messages)"); 59 ("communications, documents, or legal memos created by ... outside counsel").

These requests—or at least the portions identified above—are improper under FRCP 26(b)(1), and Apple properly declined to search for or log documents responsive to those requests (or any improper portion

Dispute 9 is not tethered to any specific RFP(s), and for that reason alone, you have failed to raise any issue about which the parties can meet and confer or which you could potentially escalate to Judge Westmore. *See* Dkt. No. 327 at 7 ("If the dispute involves written discovery, the opening brief should include the pertinent request(s) and response(s) as an exhibit.").

In any event, Apple has produced documents related to concerns that you raised during your employment with Apple, at least some of which you may seek to construe as protected activity as defined under federal or state whistleblower, retaliation, or labor laws. *See e.g.*, APL-GAELG_00001760-1793 (34-page "Issue Confirmation" document provided by Plaintiff to Apple Employee Relations summarizing all concerns Plaintiff raised during her employment with Apple ranging from 2015 through 2021).

**Dispute 10: APPLE'S RESPONSES TO REQUESTS FOR PRODUCTION & OKPO'S TESTIMONY**

Dispute 10—asserting that "Apple's RFP responses [are] contradicted by Okpo deposition testimony"—is not tethered to any specific RFP(s), and for that reason alone, you have failed to raise any issue about which the parties can meet and confer or which you could potentially escalate to Judge Westmore. *See* Dkt. No. 327 at 7 ("If the dispute involves written discovery, the opening brief should include the pertinent request(s) and response(s) as an exhibit."). You argue that "[t]estimony from Ekelemchi Okpo at his April 7, 2026 deposition directly contradicts Apple's RFP responses," but you do not specifically identify any testimony (by page/line), nor do you specifically identify any RFP that is allegedly contradicted so we do not know what you are referencing.

**Disputes 11 and 12: PROTECTIVE ORDER**

We disagree with many of your statements in Disputes 11 and 12. However, we will not further elaborate here, as we've already done so in briefing before the Court, and we understand that you are not requesting any meet and confer regarding these disputes.

Thank you.

---

**From:** Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>
**Sent:** Thursday, April 9, 2026 11:59 PM
**To:** Perry, Jessica R. <jperry@orrick.com>
**Cc:** Riechert, Melinda <mriechert@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Booms, Ryan <rbooms@orrick.com>; Horton, Nicholas J. <nhorton@orrick.com>; Weaver, Nicholas <nweaver@orrick.com>; Davidson, Sarah <sdavidson@orrick.com>
**Subject:** Re: Gjovik v Apple - Remaining Discovery Issues Raised by Apple (Per Dkt. No. 327)

**[EXTERNAL]**

**Plaintiff's Initial Discovery Disputes Per Dkt. 327 — Outstanding Issues**

Counselors,

Pursuant to Judge Westmore's March 30, 2026 Omnibus Discovery Order (Dkt. 327 at 6-7), this email raises Plaintiff's outstanding fact discovery disputes for which Plaintiff may seek court intervention in her April 23, 2026 opening brief. I reserve the right to elaborate during the meet-and-confer period. All prior objections, rights, and privileges are preserved.

**DISPUTE 1: PLAINTIFF'S DEPOSITION**

Apple suspended Plaintiff's court-ordered deposition on April 8, 2026 after approximately 14-17 minutes, despite Plaintiff appearing as ordered, being sworn in, and repeatedly stating she would continue. Apple had refused to reschedule less than an hour earlier. Apple then noticed the continuation for April 20, 2026—four days after the cutoff—while "reserving all rights." Plaintiff has filed an Administrative Motion with Judge Chen since Apple's delay exceeds the fact discovery timeline. Plaintiff also made objections, requested meet/confer, and Apple has generally refused to meet/confer or make any compromises. Plaintiff also alleges Defendant has engaged in unlawful conduct during the prior deposition and related to the deposition generally, including with coercion and duress, which constitutes criminal intimidation and harassment.

**DISPUTE 2: DEPOSITION OF YANNICK BERTOLUS**
Apple refused to make Mr. Bertolus available before April 17, one day after the cutoff, despite requests dating to August 2025. Apple did not disclose this to Judge Chen when seeking its own extension. Included in Plaintiff's pending Administrative Motion.

**DISPUTE 3: RULE 30(b)(6) DEPOSITION OF APPLE INC.**
Plaintiff first noticed this deposition no later than August 2025. On April 8, Apple formally refused to produce any witness without filing a protective order or motion to quash. Apple needs to comply with the request and subpoena. Apple also needs to meet/confer. Included in Plaintiff's pending Administrative Motion.

**DISPUTE 4: APPLE'S INTERROGATORY RESPONSES**
Judge Westmore ordered Apple to supplement within 7 days (Dkt. 327 at 2-3):
• Interrogatory No. 2 (affirmative defenses)—supplement for all 14 defenses, subparts (a), (c), (d).
• Interrogatory No. 3 (protected activity)—supplement.
• Interrogatory Nos. 4-12—answer.
Please confirm whether served. If served, Plaintiff reserves the right to dispute adequacy.

**DISPUTE 5: FAILURE TO IDENTIFY TERMINATION DECISION-MAKER(S)**
Apple has failed to identify the decision-maker(s), timeline, or specific policy provisions relied upon for Plaintiff's termination—despite orders from Judge Chen (Dkt. 215, 234) and Judge Westmore (Dkt. 327). The April 7, 2026 deposition of Apple's own ER investigator Ekelemchi Okpo confirmed he met with VP Yannick Bertolus and SVP John Ternus about the investigation prior to termination—yet Apple has never identified either as a decision-maker. Plaintiff preserves this dispute.

**DISPUTE 6: APPLE'S DEFICIENT RFP RESPONSES (SET TWO)—ALL REQUESTS**
Threshold Issues: Apple served responses May 27, 2025—nearly eleven months ago—and has produced little to nothing on most "rolling basis" commitments with no follow-up. Three systemic deficiencies:

- (1) Improper narrowing. Apple narrowed nearly every request to ~14 custodians regarding vapor intrusion at 825 Stewart only. Plaintiff's claims involve privacy, surveillance, NDAs, biometrics, labor organizing, and complaints to EPA, NLRB, Cal/OSHA, EEOC, CDPH.
- (2) Blanket relevance objections to environmental evidence. Apple cites Perius, Bozeman, Wheeler. Judge Westmore rejected this for RFP 23 (Dkt. 327 at 4). Apple's continued refusal on same grounds is inconsistent.
- (3) Blanket privilege refusals without logging. For RFPs 7, 8, 19, 36, 43, 47, 51, 59, Apple refuses to search AND refuses to create a privilege log, violating FRCP 26(b)(5)(A).

A. Protected Activity & Apple's Knowledge (RFPs 1-7, 11-16, 21, 43-49)
• RFPs 1, 3, 4, 5, 6: Narrowed to vapor intrusion only. Must include ALL protected activity.
• RFP 2: Narrowed to specific custodians. Production status unknown.
• RFP 7: Apple refused to search Legal Department and refuses to log. Must produce non-privileged documents and log the rest per FRCP 26(b)(5)(A).
• RFPs 11-16: Limited to centrally maintained complaint systems only. Must include emails and Slack among decision-makers—Okpo testimony confirms extensive email and meeting communications exist outside these systems.
• RFP 21: Narrowed to termination only. Must include admin leave, monitoring, speech suppression.
• RFPs 43, 47: Apple refuses to search Legal and refuses to log. Violates FRCP 26(b)(5)(A).
• RFPs 44, 45: Apple refused entirely. ER/HR assessments showing retaliatory motive.
• RFP 46: Apple refused. Before-and-after of protected activity.
• RFP 48: Only formal evaluations. Must include informal feedback, one-on-ones, Slack.

• RFP 49: Apple refused. Peer communications showing changing treatment.

B. Environmental/EHS Evidence (RFPs 9, 23-34)
• RFP 23: ORDERED PRODUCED (Dkt. 327 at 4). Confirm status.
• RFPs 9, 24, 25, 27, 28, 29, 30, 31, 32: Refused on same grounds rejected for RFP 23.
• RFP 26: Apple agreed to produce policies. Status unknown.
• RFP 33: Apple agreed to produce EPA outreach documents. Status unknown.
• RFP 34: Apple agreed to produce internal response to EPA outreach. Status unknown.

C. Termination & Adverse Actions (RFPs 35-39, 50-51, 55-57, 59-62)
• RFPs 35, 36, 39, 55, 56, 57, 60: Produced for listed custodians. Must include documents referencing protected activity. Apple refuses to search Legal and won't log for RFP 36.
• RFP 37: Threat assessments/monitoring logs—refused entirely.
• RFP 38: Justification for removing Plaintiff from meetings/channels—refused. Alleged adverse actions.
• RFPs 50, 51: Apple agreed to extend search through Oct 15, 2021. Status unknown. Apple refuses to search Legal for RFP 51 and won't log.
• RFP 59: Apple refused entirely, claiming all risk evaluation documents are privileged and will not even log them. Violates FRCP 26(b)(5)(A).
• RFPs 61, 62: Apple claims Sept 3/7 meetings "never occurred." Request seeks preparation documents for scheduled/proposed meetings, which Okpo confirmed were scheduled.

D. Policies, NDAs, Comparators (RFPs 10, 17-20, 58)
• RFP 10: Public statements/FAQs re employee speech/NDAs/environmental safety—refused.
• RFP 17: Agreements signed by Plaintiff—agreed to produce. Status unknown.
• RFP 18: NDA enforcement communications—refused.
• RFP 19: Produced termination-related only; refuses to search Legal, won't log.
• RFP 20: Policies re wages/working conditions discussion—refused. Relevant to NLRA/Section 7.
• RFP 58: Comparator evidence—Apple agreed to produce. Status unknown.

E. Surveillance & Monitoring (RFPs 22, 40-42)
All four refused entirely. Alleged adverse actions in the 5AC.
• RFP 22: Blocking/monitoring Plaintiff's digital access.
• RFP 40: Admin access logs for Plaintiff's accounts.
• RFP 41: Logs of who accessed Plaintiff's email/Slack/iMessage.
• RFP 42: Internal requests to monitor/audit Plaintiff.

F. PR/Communications/Government Affairs (RFPs 8, 52-54)
• RFP 8: Communications with outside counsel/PR/gov affairs—refused. Non-privileged PR must be produced. Apple refuses to log.
• RFP 52: PR/reputation management—refused.
• RFP 53: Government Affairs—Apple found nothing in limited search.
• RFP 54: Communications/PR/Media teams—refused.

G. Incorporation Requests (RFPs 63-64)
• RFP 63: Incorporates prior RFP from May 2024. Apple objected as "unintelligible." Plaintiff maintains these requests are incorporated to the extent prior objections have been resolved.
• RFP 64: Incorporates RFP Set One (Oct 2024). Apple states it stands on its amended responses from Feb 2025. Outstanding disputes from Set One are raised separately below.

H. Privilege Log Deficiency
Apple explicitly refuses to create a privilege log for RFPs 7, 8, 19, 36, 43, 47, 51, 59—violating FRCP 26(b)(5)(A). See separate Dispute 8 below.

I. "Rolling Basis" Responses—Status Unknown (11 Months)
RFPs 2, 5, 11, 12, 13, 14, 15, 16, 17, 26, 33, 34, 50, 51, 58: Apple committed to produce "on a rolling basis" eleven months ago. Please confirm status for each.

**DISPUTE 7: APPLE'S RFP RESPONSES (COMPEL)**

Case: 26-4716, 11/13/2026, DktEntry: 10.2, Page 155 of 161

Outstanding disputes from Set One, including those from Plaintiff's March 16, 2026 motion to compel (Dkt. 310) which Judge Westmore directed further meet-and-confer on:
• Request Nos. 7-10, 23, 24, 28-32 (environmental/EHS records).
• Request Nos. 37, 40-44, 54 (documents referencing Plaintiff).
• RFP 23: Ordered produced for narrowed time period (Dkt. 327 at 4). Status unknown.
Please confirm status and whether Apple is amending any refusals.

**DISPUTE 8: APPLE'S PRIVILEGE LOG IS OVERBROAD AND DEFICIENT**
Apple's privilege log suffers from two independent deficiencies:
(1) Overbroad privilege claims. Apple has claimed privilege over categories of documents that do not appear to be privileged, including: (a) factual investigation reports containing factual findings (not legal advice); (b) the ER investigation tracking system containing witness statements and evidence; (c) communications among non-attorney HR/ER personnel discussing factual workplace complaints; and (d) documents labeled "Apple Confidential" by Apple employees, which is a corporate label and not a legal privilege. Apple's own witness Okpo testified that investigation plans, reports, and factual findings were shared with business leaders including VP Bertolus and SVP Ternus—disclosure to non-attorney business personnel for business purposes undermines any privilege claim.
(2) Insufficient detail. For documents Apple has logged, the log does not provide sufficient information to evaluate the privilege claim. FRCP 26(b)(5)(A) requires a description of the "nature of the documents" sufficient to "enable other parties to assess the claim." Apple's log entries are generic and formulaic, failing to identify the specific legal advice sought or provided, the attorney involved, or why the document is privileged rather than merely confidential business communication.
(3) Complete refusal to log. For at least RFPs 7, 8, 19, 36, 43, 47, 51, 59, Apple refuses to even create a privilege log, stating it "will not identify such documents in a privilege log, to the extent any exist." This is a per se violation of FRCP 26(b)(5)(A). A party cannot refuse to search for documents and simultaneously claim privilege over documents it has not reviewed.

**DISPUTE 9: DISCOVERY RE PLAINTIFF'S PROTECTED ACTIVITY**
Apple refuses to produce any documents related to Plaintiff's protected activity or Apple's knowledge of it, calling it "categorically irrelevant." Knowledge of protected activity is a threshold element of every retaliation claim. Judge Westmore rejected this position for RFP 23 (Dkt. 327 at 4).

**DISPUTE 10: APPLE'S RFP RESPONSES CONTRADICTED BY OKPO DEPOSITION TESTIMONY**
Testimony from Apple's ER investigator Ekelemchi Okpo at his April 7, 2026 deposition directly contradicts Apple's RFP responses and confirms the existence of undisclosed documents:
• (1) Investigation tracking system. Okpo testified Apple maintains a centralized system tracking the Gjovik case with "lots of documents" including "reporting parties' statements and evidence, witness statements, everything that's involved in a workplace investigation." Apple's RFP responses do not mention this system and apparently never searched it.
• (2) Written investigation plan. Okpo created a written plan shared with Lagares and employment counsel (Priscilla Perez, Debbie Rice). Not produced or logged.
• (3) Keynote investigation report. Okpo created a Keynote presentation with factual findings and recommendations shared with Lagares, Perez, Rice, Adelmise Warner, Joni Reicher, Megan Bowman, and Yannick Bertolus. Factual findings are not privileged. Not produced or logged.
• (4) Meeting with Bertolus and Ternus prior to termination. Okpo met with VP Bertolus and SVP Ternus about the investigation before the termination. Nothing produced reflecting this meeting. Apple still has not identified the termination decision-maker.
• (5) 8-10 meetings with employment counsel. Non-privileged facts—attendees, dates, topics—are discoverable.
• (6) Email communications. Okpo emailed Lagares about the case initially before shifting to oral at counsel's direction. These emails exist and are searchable.
• (7) Waibel investigation report. Okpo reviewed a report from prior investigator Jenna Waibel. Not produced or logged.
• (8) Scope far broader than "vapor intrusion." Okpo's issue confirmation covers retaliation, hostile work environment, sexism, harassment, workload changes, manager misconduct. Apple's narrowing of every RFP to vapor intrusion is contradicted by the scope of Apple's own investigation.
• (9) EHS retaliation never investigated. Okpo confirmed his investigation excluded retaliation for EHS complaints despite Gjovik raising them. Apple cannot call these "irrelevant" when its own investigator confirmed they were never investigated—that gap is itself evidence of retaliation.

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**,
*an individual*,

**Plaintiff**,

v.

**APPLE INC.**,
*a corporation*,

**Defendant**.

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**MOTION FOR LEAVE TO FILE PAST DEADLINE AND OPPOSITION TO DEFENDANT'S ADMIN. MOTION**

**REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

# MOTION FOR LEAVE TO FILE PAST DEADLINE; OPPOSITION TO ADMIN. MOTION

1. Plaintiff respectfully apologizes for filing her Motion for Summary Judgment and Preliminary Injunction (Dkt. No. 359) and supporting Declaration (Dkt. No. 360) on April 24, 2026, one day after the April 23 deadline set in Dkt. No. 273. Chambers copies were mailed by FedEx 2-day shipping today, April 25 2026, and set to arrive to the court Monday April 27 2026.

2. Plaintiff respectfully requests (a) leave under Fed. R. Civ. P. 6(b)(1)(B) to accept Dkt. Nos. 359 and 360 as filed, and (b) extension of Defendant's opposition deadline from May 7 to May 11, 2026. Plaintiff complied with every other directive in Dkt. No. 273: the motion is exactly 25 pages in Times New Roman 12-point, double-spaced, one-inch margins; the preliminary injunction is included within the motion; declaration is 19 pages of combined testimony and document authentication. Plaintiff missed the date because the operative basis for the Defendant's termination reasons did not crystallize until six days before the deadline, requiring redirection of the motion's legal theory in compressed time, by a *pro se* plaintiff drafting her first Motion for Summary Judgement in her first litigation with no support.

## I. The Operative Termination Rationale Did Not Crystallize on the Record Until April 17, 2026

3. From the inception of this litigation, Defendant identified a variety of vague and undefined reasons for terminating Plaintiff on September 9, 2021. Despite much protest from the Plaintiff demanding details, it was not until April 17 2026 that Defendant confirmed there were three reasons for the termination at the time of the termination and what those reasons were.

4. The first two reasons — a single Twitter post, apparently made around August 30, 2021, but which Defendant could not conclusively identify – and Plaintiff's request that discussions with Apple's investigators be conducted in writing while she had pending federal

labor charges filed against them --- were mostly disclosed in some form prior. However, the third — that Plaintiff had created a "misleading impression" or that there were "inconsistencies" in her account during an internal investigation — was repeatedly pled and represented to Plaintiff, this Court, and government agencies in vague, unspecified terms for nearly five years and the underlying facts were never disclosed in any detail until April 6 2026 and then confirmed and further detailed on April 17 2026.

5. Plaintiff repeatedly sought to compel Defendant to identify the substance of its rationale for terminating her. Plaintiff's motions to strike Defendant's affirmative defenses (Dkt. Nos. 192-93, 221) led to this Court's May 19, 2025 order requiring Defendant to plead concrete factual allegations, observing that the supporting information was "at least in part, within [Defendant's] possession, custody, or control." Dkt. No. 215 at 4-8. Defendant's amended Answer continued to use boilerplate. *See* Am. Ans. ¶ 211.

6. On July 3 and July 17, 2025, Plaintiff served Special Interrogatories Sets One and Two, asking for the complete factual basis of each stated termination reason and each affirmative defense. Defendant refused to answer most of the interrogatories—and where it did, it used generalities and still refused to provide a factual basis. On March 16, 2026, Plaintiff filed a motion to compel; Defendant defended its prior responses as adequate (Dkt. No. 317). On March 30, 2026, Magistrate Judge Westmore rejected Defendant's interrogatory-counting methodology, granted the motion to compel, and ordered supplementation. Dkt. No. 327. The same order observed that this case has produced "an unprecedented number of discovery disputes" expending "a considerable amount of the Court's limited judicial resources." *Id.* at 1.

7. Defendant's amended response (served April 6, 2026) added a single phrase to its prior boilerplate for its Affirmative Defense: that the "inconsistencies" Defendant had referenced for years included "an incident regarding a Sous Chef at a local restaurant." Gjovik Decl. ¶ 7 &

Ex. E (redline). The phrase identified a topic but not the substance — what the inconsistency was, what Plaintiff had allegedly misrepresented, and how it bore on a termination decision the central decisionmaker had made nearly five years earlier remained undefined. Apple also still did not mention this in its response to the interrogatory asking for the formal reason for firing the employee at the time of the termination – indicating this was a post hoc rationalization rather than formal documented justification at the time of the termination.

8. The actual factual basis only came out at deposition and it came out after the close of discovery. Defendant did not make its witnesses available until April 7-17, 2026, with the Vice President who sent the termination letter — Yannick Bertolus — produced on April 17, one day after the discovery cutoff. Dkt. No. 352 at 2 (Court confirming Bertolus "is not available for a deposition until April 17, 2026"). Apple has still refused the Rule 30(b)(6) deposition seeking to obtain additional details about its investigations into the Plaintiff and other material facts – and even after this court ordered it to comply and sit for the deposition, it has refused to respond to the Plaintiff's emails on the matter and will not commit to a date. On April 22, 2026, Magistrate Judge Westmore characterized Defendant's position on the Rule 30(b)(6) deposition as "unreasonable" and stated that Defendant "should know better." Dkt. No. 357 at 1-2.

9. Regarding the "sous chef incident," the April 7 Okpo and April 13 West depositions complicated the picture rather than clarifying it. Mr. Okpo, the Employee Relations investigator who produced the "misleading impression" finding, testified that the finding rested on Plaintiff's in-the-moment text describing the sous chef as "cute" — but also testified that he was not involved in the termination decision and did not know Plaintiff had been fired. Mr. West, Plaintiff's skip-level supervisor whose conduct was the subject of Plaintiff's complaint, testified that Defendant's own ER investigators told him his conduct toward Plaintiff at the dinner was "not appropriate." He also confirmed under oath that he had told Plaintiff in text

messages that what he did that night with the sous chef "was one of the worst things [he'd] ever done." He also disclosed that the sous chef is now deceased.

10. Mr. Bertolus's April 17 testimony was therefore the first occasion on which a person with authority to terminate Plaintiff confirmed under oath that this rationale was a stated reason for the September 9, 2021 termination — not an internal ER finding (Okpo), not feedback to the supervisor (West), but an actual reason for firing Plaintiff.

11. At his deposition, his decision to terminate the employee was based on her July-August 2021 complaint of sexual misconduct against Dan West related to the dinner in 2017. Bertolus testified that he had reviewed only a limited version of the underlying text exchange between Plaintiff and West, provided to him by Apple legal; that he had "absolutely no idea" the subject was the sous chef, having thought it was his "personal friend," the head chef Jared Gallagher; and that, when shown the full exchange Defendant had produced in discovery, he saw "not even as much" at the time of termination. Yet, Bertolus maintained the Plaintiff was the one to mislead and her complaint was made in bad faith. When asked whether the supervisor's communications with Plaintiff were appropriate, Mr. Bertolus responded: "you seem pretty feminine — I don't even want to even go there and speculate." When questioned later, Bertolus stated he did not remember saying that and Apple's counsel objected to the line of questioning.

12. Plaintiff, knowing how critical the deposition testimony was, told the court reporter during the deposition that she would need an urgent copy because it was required for her Motion for Summary Judgement. She also repeatedly contacted the service provider asking for updates and ETAs. Plaintiff did not receive a copy of the Bertolus transcript until 3:25 PM on April 22, 2026, the day before the motion was due. Gjovik Decl. ¶ 4 & Ex. B. Plaintiff has been billed for $4,036.09 for the expedited transcript – required to make the April 23 deadline.

## II. THE RULE 6(B)(1)(B) FACTORS FAVOR ACCEPTANCE

13. Excusable neglect under Rule 6(b)(1)(B) is a "flexible" inquiry considering prejudice to the opposing party, length of delay, reason for delay, and good faith. *Pioneer Investment Services, Inc. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395 (1993); *Pincay v. Andrews*, 389 F.3d 853, 859 (9th Cir. 2004) (en banc); *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010); *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1223-25 (9th Cir. 2000). *Pro se* status is a relevant equitable consideration. *Briones v. Riviera Hotel & Casino*, 116 F.3d 379, 382 (9th Cir. 1997). Defendant identified no prejudice, the hearing date is unaffected, and Plaintiff already offered to provide Defendant with additional days to respond.

14. The good-faith analysis turns on the realistic capacity of a *pro se* plaintiff in Plaintiff's circumstances to integrate the operative record, after the Defendant concealed material facts for years, on a six-day timeline. This is the first motion for summary judgment Plaintiff has ever drafted, the first depositions she has ever taken, and the first complex federal discovery she has ever conducted. She has no associates, paralegal, support staff, or professional baseline against which to estimate time for unfamiliar procedural tasks. She is in Chapter 7 bankruptcy, presently homeless, insolvent, and disabled, and supports this litigation through public donations. Dkt. No. 360 ¶¶ 50-56.

15. Plaintiff received the Bertolus transcript one day before the deadline. Plaintiff worked through the night of April 23-24 to bring an initial 50-page draft within the Court's 25-page limit (Dkt. No. 273) rather than file an over-length motion in violation of the order; she filed when she could comply with the order. Plaintiff sent contemporaneous notice to chambers between filing the motion and the declaration on April 24. Gjovik Decl. ¶ 5 & Ex. C. Plaintiff also warned Defendant's counsel in writing on April 21 and April 22, 2026 that Defendant's conduct was making her late and asked them to stop engaging in conduct that would prevent her from working on the motion. Gjovik Decl. ¶ 3 & Ex. A.