**No. 26-4716**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

ASHLEY M. GJOVIK,

*Plaintiff-Appellant,*

v.

APPLE INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-cv-04597-EMC
Hon. Edward M. Chen

# EXCERPTS OF RECORD
# VOLUME 3 OF 4

Ashley M. Gjovik
2108 N St., Ste. 4553
Sacramento, CA 95816
(408) 883-4428
legal@ashleygjovik.com

*Plaintiff-Appellant, In Propria Persona*

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**, *an individual*,

**Plaintiff**,

v.

**APPLE INC.**, *a corporation*,

**Defendant**.

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT AND PRELIMINARY INJUNCTION**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

# I. DECLARATION OF ASHLEY GJOVIK IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION

I, Ashley Gjovik, declare as follows:

1. I am the Plaintiff in this action, appearing in propria persona. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to them. I submit this Declaration in support of my Motion for Summary Judgment and Preliminary Injunction, and to provide good cause for the late filing of the Motion.

## A. GOOD CAUSE FOR LATE FILING

2. I file this Motion two days after the April 22, 2026 deadline set by the Court's scheduling order. I respectfully request that the Court accept the filing as timely under Fed. R. Civ. P. 6(b)(1)(B) upon a showing of excusable neglect. The factors under *Pioneer Investment Services, Inc. v. Brunswick Associates Ltd. Partnership,* 507 U.S. 380, 395 (1993), and *Ahanchian v. Xenon Pictures, Inc*., 624 F.3d 1253, 1261 (9th Cir. 2010), each support acceptance of the filing.

3. ***Reason for Delay:*** The operative discovery record in this matter materially changed in the two weeks preceding the filing date. On or about April 14 2026, Defendant first produced records showing the August 4-18, 2021 crack-sealing activity at my office at 825 Stewart Drive (APL-GAELG_013). This is documentary support for one of the environmental safety-retaliation theories advanced in the Motion under California Labor Code § 6310 and it was the first disclosure Apple's ever made regarding its EH&S activities at the building after it placed me on leave (see Ex. 17).

4. On April 6, 2026, per the Court's Order (Dkt. 327) granting the Plaintiff's motion to compel (Dkt. 309), Defendant served verified amended responses to Plaintiff's Interrogatories, Sets Two and Three, which are cited throughout the Motion and which contain Defendant's sworn basis for key facts including the "*misleading complaint*" termination reason (Rog No. 2, Set Two, AD #1), Defendant's identification of the August 23, 2021 Issue Confirmation as the document setting forth the

protected activity (Rog No. 3, Set Three), and Defendant's sworn position that the privacy speech and the alleged confidential disclosure are the same conduct (Rog No. 8, Set Three).

5. Despite the me requesting depositions in August 2025, Defendant's witnesses were only made available for deposition beginning April 3, 2026 (McKeon) then April 7 2026 (Okpo), then April 13 2026 (West), then April 16 2026 (Kragmanov), and April 17 2026 (Bertolus). Defendant refused to make the corporation available and, per my motions to this court, Apple Inc has been ordered to sit for that deposition in May 11-14, 2026 (Dkt. 357, 352, 346). Apple has not responded to emails about this.

6. The deposition of Yannick Bertolus — the Apple Vice President who sent my termination letter and approved the termination decision — did not occur until April 17, 2026, one day after the discovery cutoff. Apple said that was the earliest he could be made available (Dkt. 346).

7. Prior to taking these depositions, I did not expect to reveal such surprising evidence. However, once the depositions were underway – and especially with the Bertolus deposition – I realized the evidentiary basis for my case was much different then I previously thought. It forced me to have to change my strategy in filing this Motion as to reflect the strongest evidence in the case – which is apparently related to sexual harassment, discrimination based on gender, and retaliation arising from complaints of sexual misconduct.

8. I had to pay for an expedited transcript of the Bertolus deposition and I only received the certified transcript on April 22, 2026, the day before the Motion was due. The Bertolus transcript is cited at approximately thirty locations in the Motion and is material to the direct-evidence, cat's-paw, and same-decision analyses. Filing without thorough review would have required submitting a motion based on an incomplete record that excluded the testimony of the supposed central decisionmaker.

9. ***Prejudice to Defendant***: No prejudice to Defendant arises from the delay. The hearing date set by the Court is unaffected. The Plaintiff set the response day out an additional day to compensation for the same-day delay. The delay is just hours. It should have no effect on the hearing

date, the opposition schedule, or any other deadline set by the Court. I've only been working on the Motion and supporting papers and have tried to limit any delay as much as possible.

10. ***Good Faith***: I appear in propria persona without counsel or support staff. I was very ill for approximately one week during the April 2026 deposition period, which further compressed the time available. I have concurrent deadlines in a parallel environmental citizen-suit case (5:25-cv-07360), in which I was required to prepare and file oppositions to dispositive motions by three defendants (including Apple). I requested extensions multiple times in that case and was unable to prepare every filing simultaneously. I have worked continuously to complete this Motion as promptly as practicable and have filed on the earliest date the record permitted an accurate filing.

11. I also have a discovery motion in this case scheduled for April 23, 2026, which I had previously advised the parties and the Court I lacked capacity to prepare alongside the present Motion but no modification was allowed. I filed that Motion at midnight (358) and it took several hours to prepare. The factors under *Pioneer* and *Ahanchian* favor acceptance of the filing. I respectfully request that the Court accept the Motion as timely filed.

## B. DEPOSITION TESTIMONY OF YANNICK BERTOLUS

12. On April 17, 2026, I conducted the deposition of Yannick Bertolus, the Apple Vice President who sent my termination letter on September 9, 2021. The following paragraphs authenticate specific testimony by Mr. Bertolus that I have cited or intend to cite in connection with this Motion.

13. ***Testimony Regarding the "Redacted" Text Exchange***: During the April 17, 2026 deposition, I questioned Mr. Bertolus about what he personally reviewed before approving the termination of my employment. Mr. Bertolus testified that the "*misleading*" finding supporting one of the three stated termination reasons rested on what he described as a "redacted text exchange" with Dan West. When I asked Mr. Bertolus to clarify whether "*redacted*" meant "*black boxes over text*," Mr.

43. At the time of the West deposition, I had only very recently learned, for the first time, from Okpo, that Defendant's "misleading complaint" finding rested on text-message statements I had made during and after the December 29, 2017 dinner.

44. Defendant had only disclosed this as the factual basis for the "misleading complaint" finding in its April 6, 2026 verified amended response to Plaintiff's Interrogatory No. 2, Set Two, AD #1. Ex. 47. In the nearly five years between my termination on September 9, 2021 and April 6, 2026, Defendant had not previously disclosed that its "*misleading*" rationale rested on Mr. West arranging sexual relationships for me and my response to that sexual interference.

45. During the April 13, 2026 deposition of Mr. West, I asked Mr. West to recall approximately what age Andrew would have been in 2017. Mr. West answered: "He's since passed away. Back then — ." Ex. 36, West Dep. 96:14. My immediate response, on the record, was: "He did? That's — Melinda — I'm going to yell at her later. This is really messed up. Go ahead, Mr. West." Ex. 36, West Dep. 96:15-17. "Melinda" is a reference to Melinda S. Riechert of Orrick, Herrington & Sutcliffe LLP, Defendant's counsel attending the deposition on Defendant's behalf.

46. Moments later on the record, I stated: "I didn't know he passed away. That's upsetting. I'm sorry. Apple opened a whole can of worms here, Mr. West." Ex. 36, West Dep. 96:20-22.

47. My statement that "Apple opened a whole can of worms" reflected my contemporaneous understanding that Defendant's litigation position — that I had been "misleading" in my harassment complaint because I had apparently expressed interest in dating Andrew during the late night encounter Mr. West arranged — was a position Defendant continued to maintain despite the fact that the only non-party witness who could speak to his own state of mind, understanding, or experience of the arrangement had died. It also forced me to have to intrude into the privacy of Andrew's family and memory of Andrew in order to litigate this case. I find this very disturbing and concerning.

48. I found, and continue to find, Defendant's continued reliance on this rationale after Andrew's death to be extremely distressing. Defendant's position is apparently that my complaint about the December 29, 2017 conduct is contradicted by my in-the-moment statements during the encounter. Andrew, the only other non-party to the encounter, cannot corroborate, contradict, or provide his own account. Defendant has nonetheless maintained the "misleading complaint" rationale throughout this litigation, including in its Amended Answer (Answer ¶ 211), then detailed in its April 6, 2026 verified amended interrogatory response (Ex. 47), and through Mr. Bertolus's April 17, 2026 sworn testimony (Ex. 32).

49. At no point since Andrew's death has Defendant withdrawn, modified, or qualified the "misleading complaint" rationale. During the April 13, 2026 disclosure of Andrew's death during the West deposition, I raised my concern about Defendant's continued reliance on this rationale with Defendant's counsel.

## F. Irreparable Harm Supporting Preliminary Injunction

### i. Financial Insolvency & Homelessness

50. I am currently in Chapter 7 bankruptcy (25-11496). I do not have a permanent residence. I am living in a motel, the cost of which is paid for solely by public donations from my social media followers. I am completely insolvent. I testified to these facts on the record during the April 13, 2026 deposition of Dan West, and Mr. West did not dispute them. Ex. 36, West Dep. 86:1 – 87:8.

51. The financial harm from my termination is ongoing and compounding. My Apple compensation at the time of my termination, reflected in Exhibit 44, included a salary of $169,000 a year and for now I would just like to have that bi-weekly pay reinstated so I can pay rent, bills, purchase food, and other necessities.

52. Since my termination, I have been unable to secure comparable compensation. The loss of income from a senior engineering program management position at Apple, combined with my

Case: 26-1716, 11/13/2026, DktEntry: 10.3, Page 8 of 253

reinstate my employment, Apple would comply, and that his assumption was that reinstatement would be to "an equivalent job in the organization." Ex. 36, West Dep. 86:5-25. Defendant's own witness has confirmed on the record that reinstatement is feasible.

### H. AUTHENTICATION OF EXHIBITS

58. I authenticate the following exhibits filed in support of Plaintiff's Motion. Unless otherwise stated, each exhibit is a true and correct copy of the document described.

59. Attached as Exhibit 1 is the "alarming" email from EH&S in March 2021.

60. Attached as Exhibit 2 is Apple Business Conduct Ticket HRC00015205, produced by Defendant in discovery.

61. Attached as Exhibit 3 is Apple Business Conduct Ticket HRC000015213, produced by Defendant in discovery.

62. Attached as Exhibit 4 is Apple Business Conduct Ticket HRC00015667, produced by Defendant in discovery.

63. Attached as Exhibit 5 is Apple Business Conduct Ticket HRC000015730, produced by Defendant in discovery.

64. Attached as Exhibit 6 is Apple Business Conduct Ticket HRC000015725, produced by Defendant in discovery.

65. Attached as Exhibit 7 is Apple Business Conduct Ticket HRC000016297, produced by Defendant in discovery.

66. Attached as Exhibit 8 is Apple Business Conduct Ticket HRC000016312, produced by Defendant in discovery.

67. Attached as Exhibit 9 is Apple Business Conduct Ticket HRC00016422, produced by Defendant in discovery.

68. Attached as Exhibit 10 is Apple Business Conduct Ticket HRC00017148, produced by Defendant in discovery.

69. Attached as Exhibit 11 is Apple Business Conduct Ticket HRC000017207, produced by Defendant in discovery.

70. Attached as Exhibit 12 is my correspondence with the U.S. Environmental Protection Agency regarding vapor-intrusion conditions at 825 Stewart Drive, beginning April 2021.

71. Attached as Exhibit 13 is Apple's request that EPA sign a non-disclosure agreement covering EPA's inspection of 825 Stewart Drive, and related correspondence reflecting EPA's refusal.

72. Attached as Exhibit 14 is EPA's August 2021 inspection documentation for 825 Stewart Drive.

73. Attached as Exhibit 15 is the EPA's October 7, 2021 letter documenting "freshly sealed cracks" and related concerns at 825 Stewart Drive.

74. Attached as Exhibit 16 is Apple document APL-GAELG_00002159, the March 18, 2021 email from Michael Steiger to Elizabeth Schmidt, Scott Sidlow, and Sue Creighton, produced by Defendant in discovery.

75. Attached as Exhibit 17 is Apple documents APL-GAELG-00003870 through APL-GAELG-00003874, produced by Defendant in discovery, reflecting crack-sealing activity at 825 Stewart Drive beginning August 4, 2021.

76. Attached as Exhibit 18 is Apple documents APL-GAELG-00001509 through APL-GAELG-00001512, the September 9, 2021 12:24 PM email from Jenna Waibel to Elizabeth Schmidt and Antone Jain, produced by Defendant in discovery.

77. Attached as Exhibit 19 is Apple document APP 00001761 (also bates-stamped PL_PROD_11_06500), the August 23, 2021 Issue Confirmation I finalized and transmitted to Apple Employee Relations, produced by Defendant in discovery.

78. Attached as Exhibit 20 is my charge filed August 12, 2021 with the California Department of Fair Employment and Housing and the U.S. Equal Employment Opportunity Commission.

79. Attached as Exhibit 21 is the Right to Sue letter issued September 9, 2021.

80. Attached as Exhibit 22 is my NLRB charge in Case No. 32-CA-282142, filed August 26, 2021.

81. Attached as Exhibit 23 is my California Labor Commissioner complaint filed August 29, 2021.

82. Attached as Exhibit 24 is Defendant Apple Inc.'s Responses to Plaintiff's Interrogatories, Set One, verified by Megan Bowman on August 4, 2025.

83. Attached as Exhibit 25 is Apple's March 4, 2022 Position Statement submitted by Jessica R. Perry of Orrick, Herrington & Sutcliffe LLP to the U.S. Department of Labor, OSHA, in Ashley Gjovik v. Apple Inc., Case No. 9-3290-22-051.

84. Attached as Exhibit 26 is the September 15, 2021 email from David Eberhart of O'Melveny & Myers to me.

85. Attached as Exhibit 27 is Bertolus Deposition Exhibit 1 (my August 30, 2021 Twitter post).

86. Attached as Exhibit 28 is Bertolus Deposition Exhibit 35 (The Verge article titled "Apple Cares About Privacy, Unless You Work at Apple," dated August 30, 2021).

87. Attached as Exhibit 29 is Bertolus Deposition Exhibit M (the September 9, 2021 termination letter).

88. Attached as Exhibit 30 is Bertolus Deposition Exhibit N (the September 9, 2021 email chain between Megan Bowman and Yannick Bertolus).

Case: 26-4716, 11/13/2026, DktEntry: 10.3, Page 11 of 258

89. Attached as Exhibit 31 is Bertolus Deposition Exhibit P (the September 9, 2021 6:54 PM email from Yannick Bertolus to me transmitting the termination letter).

90. Attached as Exhibit 32 is a true and correct copy of the cited pages of the certified deposition transcript of Yannick Bertolus, taken April 17, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, the testimony regarding the "redacted text exchange," the admission that Mr. Bertolus had "absolutely no idea it was Andrew," the exchange in which Mr. Bertolus used the word "feminine" in response to a question about appropriate senior-subordinate communications and later denied having said it, the exchange in which Mr. Bertolus confirmed Apple's theory that I had made "bad faith complaints," and Mr. Bertolus's summary of the three termination reasons, each quoted above.

91. Attached as Exhibit 33 is Okpo Deposition Exhibit B, the August 16, 2021 draft Issue Confirmation sent by Mr. Okpo to me.

92. Attached as Exhibit 34 is a true and correct copy of the cited pages of the certified deposition transcript of Ekelemchi Okpo, taken April 7, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, pages 35–47, 48–51, 71, 102–105, 106, 116, 118, 121–123, and any additional pages cited in the Motion .

93. Attached as Exhibit 35 is a true and correct copy of the cited pages of the certified deposition transcript of Aleks Kagramanov, taken April 16, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, pages 29–30, 38–39, 57–59, 65, 69, 72–73, 91–97, 106, 115–116, 118–119, 120, 130–131, and any additional pages cited in the Motion.

94. Attached as Exhibit 36 is a true and correct copy of the cited pages of the certified deposition transcript of Dan West, taken April 13, 2026, together with the reporter's certification and cover sheet. The transcript includes, without limitation, pages 15, 24–26, 42–43, 49–51, 52, 58, 81, 85–

Case: 26-4716, 11/13/2026, DktEntry: 10.3, Page 12 of 258

87, 93, 94, 95, 96, 101, 105, 106, 107–109, 113, and any additional pages cited in the Motion or in Section V above.

95. Attached as Exhibit 37 is a true and correct copy of the cited pages of the certified deposition transcript of Robert McKeon, including pages 46, 59, 72, 81, 87, 88, 90, 93, 99, 101, and any additional pages cited in the Motion, together with the reporter's certification and cover sheet.

96. Attached as Exhibit 38 is Apple's Business Conduct Policy referenced in my termination letter.

97. Attached as Exhibit 39 is Apple's Confidentiality and Intellectual Property Agreement.

98. Attached as Exhibit 40 is Apple's Social Media and Online Communications Policy.

99. Attached as Exhibit 41 is emails with Kragamanov.

100. Attached as Exhibit 42 is the NLRB complaint issued against Apple concerning Apple's confidentiality and related employment policies (NLRB Case No. 32-CA-284428 and related), introduced as an exhibit at the Bertolus deposition.

101. Attached as Exhibit 43 is the national settlement agreement between Apple, the NLRB, and me regarding the foregoing policies.

102. Attached as Exhibit 44 is my most recent Apple W-2 and pay records reflecting my compensation in effect on September 9, 2021.

103. Attached as Exhibit 45 is documentation regarding my Apple-provided medical, dental, and vision insurance plans in effect on September 9, 2021.

104. Attached as Exhibit 46 is the annual performance review feedback Apple produced during discovery.

105. Attached as Exhibit 47 is Defendant Apple Inc.'s Amended Responses to Plaintiff's Interrogatories, Set Two, verified on April 6, 2026.

106. Attached as Exhibit 48 is Defendant Apple Inc.'s Amended Responses to Plaintiff's Interrogatories, Set Three, verified on April 6, 2026.

107. Attached as Exhibit 49 is Defendant Apple Inc.'s Responses to Plaintiff's Requests for Admission, including without limitation the responses cited in the Motion.

108. Exhibit 50 is the Court's Order dated January 13, 2026 (Dkt. No. 273).

## I. VERIFICATION

109. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

110. Executed on April 24, 2026, at San José, California.



**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed April 24 2026 in San José, California
(408) 883-4428
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

# Ethics

Manage Attachments (2): Screen Shot 2021-07-23 at 2.04.15 PM.png [download] Screen Shot 2021-07-23 at 2.04.43

| | | | |
|---|---|---|---|
| **Number** | HRC000015205 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Anonymous User | **Source** | Inbound Email |
| **HR service** | Business Conduct Helplin | **Opened** | 2021-07-23 13:59:42 |
| **HR Service Subtype** | Report a concern | **Opened by** | CST Guest |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Timos Gies | **Watch list** | |
| | | **Restricted** | ☐ |

**Title** Speaking about Apple to the media

**Description:**

CASE
2021-7-4227 - Other

A HW employee was quoted in The NY Times speaking about Apple's return to work practice that goes into effect in the fall. The matter was raised to ER to determine if this violates the policy on public communication.

**Additional comments:**

**Work notes (Private)**

Conversation ☑ **All (33)** ☑ **Assigned to (1)** ☑ **Assignment group (1)** ☑ **Source (1)** ☑ **Description (2)** ☑ **HR service (1)** ☑ **Opened by (1)** ☑ **Opened for (1)** ☑ **Priority (1)** ☑ **Title (2)** ☑ **Pending Reason (1)** ☑ **State (4)** ☑ **Subject person (2)** ☑ **Case Resolution (1)** ☑ **Business Conduct Policy (1)** ☑ **Investigation Team (1)** ☑ **HR Service Subtype (1)** ☑ **Restricted (1)** ☑ **System update (2)** ☑ **Work notes (3)** ☑ **Email (5)**

**2021-08-09 16:31:51** **Timos Gies** - Changed: Case Resolution, State, Work notes

Case Resolution: Duplicate Report

State: Closed Complete was: Pending

ER confirmed they already have a case open on this matter, so I have closed this as a duplicate.

**2021-07-29 18:16:11** Case HRC000015205 -- work notes added - Email sent

Sent: timos Redacted

**2021-07-29 18:16:04** **Antonio Lagares** - Changed: Work notes

Hi Timos,

We are aware of this matter and it is part of a broader investigation and collaboration with ER/Legal.

TL

## Ethics

Manage Attachments (7): IMG_1383.jpeg [download] Screen Shot 2021-07-24 at 1.49.23 PM.png [download] Screen

| | | | |
|---|---|---|---|
| **Number** | HRC000015213 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Redacted | **Source** | Inbound Email |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-07-24 14:05:56 |
| **HR Service Subtype** | Report a concern | **Opened by** | Redacted |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Kathleen Emery | **Watch list** | |
| | | **Restricted** | ☐ |

**Title** Concerns with ee posts

**Description:**

An Apple employee has made false accusations regarding Apple's return to work plans and remote work pilot publicly as part of a New York Times article and on Twitter (saying that we have not articulated why we are asking employees to come back into the office.
Referred to ER

**Additional comments:**

**Work notes (Private)**

Conversation ☑ All (40) ☑ Assigned to (1) ☑ Assignment group (1) ☑ Additional comments (1) ☑ Source (1) ☑ Description (2) ☑ HR service (1) ☑ Opened by (1) ☑ Opened for (1) ☑ Priority (1) ☑ Title (3) ☑ State (3) ☑ Subject person (2) ☑ Case Resolution (1) ☑ Business Conduct Policy (1) ☑ Investigation Team (1) ☑ HR Service Subtype (1) ☑ Restricted (1) ☑ System update (7) ☑ Work notes (3) ☑ Email (7)

**2021-08-02 15:44:40** **Kathleen Emery** - Changed: State

State: Closed Complete was: Work in Progress

**2021-08-02 15:44:34** **Kathleen Emery** - Changed: Work notes

ER acknowledged

**2021-07-28 17:57:40** Case HRC000015213 -- work notes added - Email sent

Sent: kemery Redacted

**2021-07-28 17:57:38** **Antonio Lagares** - Changed: Work notes

We are aware and addressing this issue.

TL

On Jul 28, 2021, at 17:47, Business Conduct Redacted wrote:

Hi ER

I am forwarding this email and attachments from Redacted PBP for ISS, about Ashley Gjovik's twitter posts and false accusations.

We do not need an update.

Kathleen

////

Hi Business Conduct,

An Apple employee has made false accusations regarding Apple's return to work plans and remote work pilot publicly as part of a New York Times article and on Twitter (saying that we have not articulated why we are asking employees to come back into the office and that we are putting people's lives at risk).

This same employee is part of the remote work advocacy Slack channel, and has also made some troubling comments in that Slack channel.

As a member of the People Team who has been involved in helping with the communications to employees who have expressed concern about returning to work, I know we have taken great care in connecting with our employees to understand their perspective and to address these concerns in a thoughtful way. It's very concerning to me that someone would go out of their way to accuse Apple of putting people's lives at risk in such public news forums, including making statements that are not true.

Thanks,
Redacted

https://twitter.com/ashleygjovik/status/1418969039099994112
<https://twitter.com/ashleygjovik/status/1418969039099994112>
Redacted | People Business Partner - AI/ML | Redacted
<mailto: Redacted

Additional information:

Full-length article in which the original quote and other Apple confidential information originally appears:

https://www.nytimes.com/2021/07/23/business/return-to-office-vaccine-mandates-delta-variant.html?referringSource=articleShare <https://www.nytimes.com/2021/07/23/business/return-to-office-vaccine-mandates-delta-variant.html?referringSource=articleShare>

Specific excerpts:
There is no mention of the fact that People Business Partners individually reached out and contacted the 1500+ employees who signed the letter to better understand their individual situations and summarize this info to share back with Tim, only a statement that "Tim did not respond".

Tweets where multiple Apple employees are publicly sharing and commenting on internal Apple documents in a way that could be damaging to our employment

<84e08ca5-4ac5-425b-860d-e7dbb95b9ea5_MSG1627519457976_4238.png><Screen Shot 2021-07-24 at 1.49.35 PM_MSG1627519462591_6904.png><image0_MSG1627519460351_3278.png>
<image1_MSG1627519461439_7471.png><86147da3-eb20-412d-a3c6-95e15d60f1aa_MSG1627519459955_8905.png><IMG_1383_MSG1627519462191_7424.jpeg><Screen Shot 2021-07-

# Ethics

Manage Attachments (1): Screen Shot 2021-08-17 at 10.59.38 AM.png [download]

| | | | |
|---|---|---|---|
| **Number** | HRC000016297 | **State** | Closed Complete |
| **Subject person** | Ashley Gjovik | **Priority** | 3 - Low |
| **Opened for** | Redacted | **Source** | Inbound Email |
| **HR service** | Business Conduct Helpline | **Opened** | 2021-08-17 11:06:46 |
| **HR Service Subtype** | Report a concern | **Opened by** | Redacted |
| **Assignment group** | BCGC SN Access | **Collaborators** | |
| **Assigned to** | Kathleen Emery | **Watch list** | |
| | | **Restricted** | ☐ |

**Title** PBP sharing SLACK postings

**Description:**

PBP was notified of a situation on slack,
ER and I advised PBP to share this with Debbie Rice and Adelmise as they are already investigating and BCHL doesn't need to be included

**Additional comments:**

**Work notes (Private)**

Conversation ☑ All (39) ☑ Assigned to (1) ☑ Assignment group (1) ☑ Source (1) ☑ Description (4) ☑ HR service (1) ☑ Opened by (1) ☑ Opened for (1) ☑ Priority (3) ☑ Title (2) ☑ State (3) ☑ Subject person (2) ☑ Case Resolution (1) ☑ Business Conduct Policy (1) ☑ Investigation Team (1) ☑ HR Service Subtype (1) ☑ Restricted (1) ☑ System update (1) ☑ Work notes (6) ☑ Email (7)

**2021-09-01 13:15:33 Kathleen Emery** - Changed: State

State: Closed Complete was: Work in Progress

**2021-09-01 13:14:51 Kathleen Emery** - Changed: Description, Title

Description:
PBP was notified of a situation on slack, ER and I advised PBP to share this with Debbie Rice and Adelmise as they are already investigating and BCHL doesn't need to be included

Title: PBP sharing SLACK postings was: Complaint / On Notice

**2021-08-27 21:32:38 Kathleen Emery** - Changed: Description

Description:
PBP was notified of a situation on slack, Referred to ER and Debbie Rice

**2021-08-24 16:32:29 Debbie Rice** - Changed: Work notes

Hi-
Attorney Client Privilege Thanks.

> On Aug 24, 2021, at 2:55 PM, Adelmise Warner Redacted > wrote:
>
> +Debbie
>
> Thanks, Krista. Attorney Client Privilege
>

Attorney Client Privilege

> Adelmise
>
>> On Aug 24, 2021, at 2:33 PM, Krista Heieck Redacted wrote:
>>
>> Hi Kathleen -
>>
>> I am not sure what you are referencing specifically, but any case having to do with Ashley G. Is currently being escalated to Adelmise and or Debbie directly, and is being investigated.
>>
>> Adelmise, Kathleen please connect with each other on the question that you have. Red and I are not involved in this directly
>>
>> Thank you
>> Krista
>>
>>
>> Krista Heieck
>>
>> Corporate Employee Relations
>>  Apple, Inc.
>> Santa Clara Valley
>> Redacted
>>
>>
>>
>> For assistance with HR Programs and services, see People Web or contact the People Support at Redacted or Redacted
>>
>>  Apple HR
>>
>>
>> This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.
>>
>>> On Aug 24, 2021, at 1:57 PM, Business Conduct Redacted Redacted > wrote:
>>>
>>> Hi Red and Krista
>>>

# Fwd: Questions about TRW Microwave

**From: Ashley Gjovik <ashleygjovik@apple.com>** Wed, Jul 28, 2021 at 5:13 PM EDT (GMT-04:00)
To: Ekelemchi Okpo <eokpo@apple.com>; Antonio Lagares (ER) <alagares@apple.com>

FYI, latest update from the EPA on Apple/Northrup Grumman & the Stewart 1/TRW Microwave Superfund site.

—
**Ashley M. Gjøvik**
 Engineering Program Manager
✦ Mac Systems Quality Strategic Planning & Communications
✦ Product Systems Quality Internal Communications; Employee Engagement; Inclusion, Equity, & Diversity
☎ (408) 204-9976

Begin forwarded message:

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Subject: Fwd: Questions about TRW Microwave**
**Date:** July 28, 2021 at 2:13:07 PM PDT
**To:** Ashley Marie Gjovik <ashleygjovik@apple.com>

—
**Ashley M. Gjøvik**
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
https://www.linkedin.com/in/ashleygjovik/
https://muckrack.com/ashleygjovik

Begin forwarded message:

**From:** "PerezSullivan, Margot" <PerezSullivan.Margot@epa.gov>
**Subject: RE: Questions about TRW Microwave**
**Date:** July 28, 2021 at 1:24:00 PM PDT
**To:** Ashley Gjovik <ashleygjovik@icloud.com>

Hi Ashley,

Thanks again for your continued interest in this site and providing your on-the-ground observations. EPA communicates regularly with responsible parties on issues related to superfund sites as part of the agency's CERCLA obligations. Similarly, EPA also routinely follows up on concerns raised by the public in regards to superfund sites. The agency takes these communications and on-the-ground observations seriously. Please continue to check the website for any site updates.

Please do connect me with the reporter you're working with on this and thank you again for voicing your concerns and providing us with such detailed information.

Margot

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 C: 415.412.1115
E: perezsullivan.margot@epa.gov

---

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Tuesday, July 27, 2021 6:31 PM

**To:** PerezSullivan, Margot <PerezSullivan.Margot@epa.gov>
**Subject:** Re: Questions about TRW Microwave

Thank you very much, Margot. I look forward to hearing how the conversation goes and if any changes will be made to the plan of record.

—
**Ashley M. Gjøvik**
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
https://www.linkedin.com/in/ashleygjovik/
https://muckrack.com/ashleygjovik
(415) 964-6272

On Jul 22, 2021, at 3:15 PM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:

Hi Ashley, I'm meeting with the site team next week, regarding the reporter you're working with I'm the right person to work with.  Thanks so much for your patience – we will be touch!

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 C: 415.412.1115
E: perezsullivan.margot@epa.gov

---

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Tuesday, July 20, 2021 5:07 PM
**To:** PerezSullivan, Margot <PerezSullivan.Margot@epa.gov>
**Subject:** Re: Questions about TRW Microwave

Hi Margot! Thanks….I see the May test was 10hr.

Ok, so my question about when the last time a 24hr+ indoor air test was performed in the TRW Microwave/825 Stewart building where the COCs were within the acceptable EPA range for indoor air in industrial buildings…. Is NEVER. They've always failed. Got it.

Did you talk to Apple & NG about the cracks in the floor and floor sealing plan? They told me they didn't notify the EPA about and didn't plan to, despite me telling them they probably are required too. They kept saying everything was "voluntary."

If the journalist wants to talk to someone at the EPA about all this, who should I have them reach out to? It's a very big publisher, so I assume they will want to chat. You?

-Ashley

—
**Ashley M. Gjøvik**
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
https://www.linkedin.com/in/ashleygjovik/
https://muckrack.com/ashleygjovik
(415) 964-6272

On Jul 20, 2021, at 1:05 PM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:

Message

**From**: Reynolds, Rebekah [Reynolds.Rebekah@epa.gov]
**Sent**: 8/10/2021 7:41:00 PM
**To**: Schulman, Michael [Schulman.Michael@epa.gov]; Plate, Mathew [Plate.Mathew@epa.gov]
**CC**: Poalinelli, Edwin [POALINELLI.EDWIN@EPA.GOV]
**Subject**: RE: Site visit: TRW Microwave Site 825 Stewart Drive building

I spoke with the attorney for apple.

We are not going to be signing the proposed NDA. She is going to send a letter to me saying that everything you create during the Site Walk (e.g., field notes, photos) is being claimed by Apple as CBI and we will treat it as such under our CBI regulations at 40 CFR Part 2. After the visit, you can send apple back everything you created and they can substantiate their claim. You may want to work with the apple representative while you are there to minimize any creation of CBI. So, for example, if it is possible to take a photo at an angle that wouldn't be claimed as CBI that would get you the info you need, you would probably want to do that.

Let me know if you have any questions.

Thanks.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, August 9, 2021 1:05 PM
**To:** Plate, Mathew <Plate.Mathew@epa.gov>; Reynolds, Rebekah <Reynolds.Rebekah@epa.gov>
**Cc:** Poalinelli, Edwin <POALINELLI.EDWIN@EPA.GOV>
**Subject:** FW: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Matt, FYI below, Apple is very interested in exactly where we want to go in the building. Apparently, this is a product development building with sensitive work underway. Attached are the figures and photos associated with past mitigation measures. I've requested a copy of the NDA, which Rebekah will review and if we can sign. I now also have a Montrose briefing with Enrique at 1-2 pm on Aug 19 that I need to attend, can you do an earlier morning start time? Or, if later, cover some of the site walk for me?

Thanks!
Michael

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Monday, August 9, 2021 11:41 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – I sent them quite a few maps as they were looking for details on each of the areas you want to visit. Here is the list I sent to them and attachments from previous reports that show where these areas are:

1. The sub-slab depressurization system. **Attachment 1** shows the locations of the roof vents and the interior vapor collection riser pipes, which collectively comprise the system.
2. The building's concrete slab and cracks that were sealed to prevent vapor intrusion as well as any building concrete slab penetrations (e.g., from pipes or seams in the building). EPA also asked to see the spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. These items are shown on **Attachment 2**; however, much of this may no longer be accessible.

Message

**From:** Debra Rubenstein [drubenstein@apple.com]
**Sent:** 8/11/2021 7:16:29 PM
**To:** Reynolds, Rebekah [Reynolds.Rebekah@epa.gov]
**CC:** Colin Scanlon [cscanlon@apple.com]
**Subject:** Letter re CBI for EPA Visit to 825 Stewart Drive, Sunnyvale
**Attachments:** 8-11-21 Letter to EPA re CBI for 825 Stewart Drive.pdf

Rebekah,
In follow up to our conversation, I enclose a letter on behalf of Apple Inc. claiming CBI relating to any information collected and/or documented during the EPA site visit on August 19, 2021. Any questions let me know.
Debra

*****************************************************************

**Debra Rubenstein** | Senior Counsel I Environment Health & Safety I  Apple Inc. | desk +1 669.276.9741 | mobile +1 408.893.9762 | One Apple Park Way MS 60-2LAW Cupertino, CA 95014 | drubenstein@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.

August 11, 2021

**VIA Email** reynolds.rebekah@epa.gov
Rebekah Reynolds, Assistant Regional Counsel
US EPA Region 9
75 Hawthorne Street
***Mail Code:*** ORC-3-2
San Francisco, CA 94105

**Re: 825 Stewart Drive, Sunnyvale, CA – TRW Microwave Superfund Site (the Site)**

Dear Ms. Reynolds,

Please accept this letter on behalf of Apple Inc. (Apple) in follow up to our discussion on August 10, 2021, and to formally request that any information relating to Apple operations at the Site (including but not limited to any hardware, process or other sensitive information) viewed or documented by EPA during its upcoming Site visit on August 19, 2021, be maintained as confidential business information (CBI) pursuant to *40 CFR Part 2, Subpart B, §2.203(b).*

A CBI claim is defined as "a claim or allegation that business information is entitled to confidential treatment for reasons of business confidentiality, or a request for a determination that such information is entitled to such treatment." *40 CFR §2.201(h)*

"The basis for claims of business confidentiality include the concept of trade secrecy and other related legal concepts which give (or may give) a business the right to preserve the confidentiality of business information and to limit its use or disclosure by others in order that the business may obtain or retain business advantages it derives from its rights in the information. The definition is meant to encompass any concept which authorizes a Federal agency to withhold business information under 5 U.S.C. 552(b)(4), as well as any concept which requires EPA to withhold information from the public for the benefit of a business under 18 U.S.C. 1905 or any of the various statutes cited in §§2.301 through 2.309." *40 CFR §2.201(e)*

We have been informed that EPA is interested in viewing the following areas at the Site:

- The sub-slab depressurization system.
- The building's concrete slab and cracks that were sealed to prevent vapor intrusion as well as any building concrete slab penetrations (e.g., from pipes or seams in

**Apple**
One Apple Park Way
Cupertino, CA 95014
T 408 996-1010
www.apple.com

# Apple Confidentiality Agreement

This Apple Confidentiality Agreement (the "**Agreement**") between Apple Inc., a California corporation located at One Apple Park Way, Cupertino, California 95014 United States ("**Apple**") and Environmental Protection Agency, located at Environmental Protection Agency 75 Hawthorne Street San Francisco, CA 94105, United States, ("**Company**"), is effective as of August 9, 2021 ("**Effective Date**").

## 1. Scope

This Agreement governs any Confidential Information disclosed in connection with the Purpose.

In this Agreement: (i) "**Confidential Information**" means any nonpublic information, or material, which may include product plans, specifications, designs, photographs, costs, prices, project names, business plans, marketing plans, forecasts, orders, materials, components, prototypes, or pre-release products, disclosed by one party or any of its Affiliates (the "**Discloser**") to the other party or any of its Affiliates (the "**Recipient**") in connection with the Purpose, including information Recipient learns from Discloser's employees or Consultants or through inspection of Discloser's property; (ii) "**Purpose**" means Apple's evaluation, purchase or use of Company's, or its Affiliates', goods, services, technology, or other property (including intellectual property, real property, and personal property); (iii) "**Affiliate**" means any entity that Controls, is Controlled by, or is under common Control with a party; (iv) "**Control**" means the legal, beneficial, or equitable ownership, directly or indirectly, of more than 50% of the capital stock (or other ownership interest, if not a corporation) of such entity ordinarily having voting rights; and (v) "**Consultants**" means a party's bankers, accountants, auditors, attorneys, financial advisers, and independent contractors.

Confidential Information also includes: the fact that the parties and their respective Affiliates and Consultants have discussed the Purpose; the substance of their discussions; and the terms, conditions, and existence of this Agreement.

## 2. Disclosure and Use Restrictions

Recipient may only disclose Confidential Information to its employees or Consultants who: (i) have a need to know in order to accomplish the Purpose; and (ii) are bound by a written agreement that prohibits any unauthorized disclosure or use of the Confidential Information that is at least as restrictive as the terms and conditions of this Agreement. Recipient shall not disclose, and shall cause its Consultants not to disclose, Confidential Information to any other person or entity without Discloser's prior written consent in each instance. Recipient and its Consultants may only use Confidential Information for the Purpose. Recipient and its Consultants must use a reasonable degree of care to protect Confidential Information it receives and to prevent any unauthorized use or disclosure of Confidential Information. Recipient shall be directly liable for any liabilities, losses, damages, costs, and expenses, including reasonable attorneys' fees, as incurred by either party and their respective

# 825 Site Visit - Aug 19, 2021

Thursday, August 19, 2021 8:03 AM

- 07:50: Meet on-site: NGG: Michael Shannon; The Dextra Group: Kurt Batsel; AECOM: Holly Holbrook
- Meet Colin Scanlon - Apple Lease manager: cscanlon@apple.com / Apple, Real Estate & Development Mobile: 510.290.7726
  - HVAC - not sure how operating

- Pre-arrange Site Visit Agenda:
  - The sub-slab depressurization system that was installed underneath the site building to vent vapors to the atmosphere.
  - The building's concrete slab and cracks that where sealed to prevent vapor intrusion. As well as any building concrete slab penetrations (e.g., from pipes or seams in the building).
  - Past indoor air sampling locations.
  - The location where contaminated soil was excavated from underneath the building.
  - The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
  - The emulsified vegetable oil in-situ bioremediation system.
  - The location of groundwater monitoring wells.

- Holly: 4 HVAC zones 1st floor
  - Can't access vent riser pipes - no ports

- Building Elevator Maintenance:
  - Elevator shaft in GW in a pvc sleeve.

- IA-4: Open area in front of elevator.
- Matt: Roof, West Bldg Vents are exactly 10' from HVAC, just meeting code. Not great for VOCs bc venting into hvac. Would be better / need to extend 10' high.
- Matt: Roof, East bldg stack issues. Vents too close to chiller. Cut too low.
- Photo. PVC pipes in in service room; unk source. Suspect drain from roof (it's flat). Around pipe openings sealed (good). Room is has hvac air (good).
- Older concrete floor cracks well sealed. Photo examples.
- SS-05 under carpet (photo). Identified by Apple. Right SS diameter, but grout sealed. Seems mislabeled as SS-5 location not shown here in 2016 VI rpt. Matt: Seal sub slab ports. Not abandoned properly. Rusted. Use brass and SS. Reinstall or abandon. Seal and can redrill if needed. Don't need a permanent SS port.
- SS-4 (photo) not poured well.
- Room 12-19 has drain. Room under negative pressure -4. It's hvac well balanced. Sample this room bc of drain and neg pressure.
- Matt: Room 12-14 (w/saw?) pressure 5.6 pascals. Has positive pressure. Would sample in hallway because has lower pressure. Otherwise sampling vent air.
- Justin with Apple, part of tour. Rooms are supposed to be warm, but have high turn over. Bldg has turn over. Didn't change for COVID. On 24 hrs because do thermal testing overnight.
- IA-2. Environmental room. Raised floor.
- Cube office work area IA-7: 3 pascals lower then hallway.
- IA-8 Has a higher pressure. Unlikely to be an issue here.
- IA sample where pressure is lower
- Need to look at past SS concentrations
- IA-9: Bathroom neg pressure. -15.7 pascals. Drain has no measurable floor, but the drain cover are too small to get tubing down. Can't feel flow. EPA assumption is all drains leak, but not representative.

Message

**From:** Plate, Mathew [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2A7EDF98DF8C470C895094D9D93F04D6-MPLATE]
**Sent:** 8/16/2021 6:42:35 PM
**To:** Qazzaz, Bilal [qazzaz.bilal@epa.gov]; Williams, Jennifer [Williams.Jennifer@epa.gov]
**Subject:** RE: DRAFT—Travel Request for Pechanga Technical Systems Audit
**Attachments:** SFD 7 Branch SIP HS Framework - MEMORANDUM 1-29-2021R1.docx

It looks fine to me. Here is a copy of the Superfund Travel request for my work Thursday that was approved … in case you have any questions on what to expect:

The "Interim Decision Framework for Region 9 Field Actions During the COVID-19 Virus Pandemic" is a SF document (attached) that links to:
Coronavirus (COVID-19) Guidance Documents for Field Activities | US EPA

## Title

TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA Travel Request Form

## Branch

["QA Staff","SFD 7 (CA Clean-up Section Branch)"]

## Name(s) of Staff

Michael Schulman (SFD-7-1); Matt Plate (QA)

## Destination

TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA

## Proposed Travel Start

2021-08-19

## Description of why this work is urgent and essential

A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and the cracks are significant, this could impact the effectiveness of the VI mitigation system the protectiveness of human health.

The onsite work will include visual inspections to the: (1) The vapor intrusion passive sub-slab depressurization system. (2) The building's concrete slab and past cracks that where sealed to prevent vapor intrusion. (3) Past 2013 to 2015 indoor air sampling locations. (4) The indoor location where contaminated soil was excavated from underneath the building. (5) The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. (6) The groundwater in-situ bioremediation system (outdoors).

See less

## Phase and Staff Travel

EPA staff travel

## email

Schulman.Michael@epa.gov

## Guidance

["Pre-Travel considerations and checklist","Interim Decision Framework for Region 9 Field Actions During the COVID-19 Virus Pandemic","The National EPA Guidance: Interim Health and Safety Guidelines Related to COVID-19 for Conducting Superfund Site Work ","CDC recommendation that fully vaccinated wear masks indoors"]

See more

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION IX**
**75 Hawthorne Street**
**San Francisco, CA 94105**

October 7, 2021

Mr. Kurt Batsel
The Dextra Group, Inc.
On behalf of Northrup Grumman Corp
batsel@dextra-group.com

SENT VIA EMAIL

**Re: EPA Site Visit and Vapor Intrusion Field Assessment, 825 Stewart Avenue Sunnyvale, CA, TRW Microwave Superfund Site (CERCLIS ID# CAD009159088)**

Dear Mr. Batsel:

Thank you for organizing for me and Matt Plate to conduct the August 19, 2021 site visit of the 825 Stewart Drive building, which is currently leased by Apple, Inc. (Apple). The site visit was attended by Michael Shannon with Northrup Grumman Corp (NGC), you, and NGC's consultant Holly Holbrook with AECOM. During the site visit an Apple leasing manager provided access throughout the building. The purpose of the site visit was for EPA to inspect the following items to assess the potential for vapor intrusion into the building:

- The sub-slab depressurization (SSD) system that was installed underneath the three connected site buildings that passively vents soil gas vapors to the atmosphere.
- The building's concrete slab and the April 2015 cracks that where sealed to prevent potential vapor intrusion.
- The building's concrete slab and penetrations from pipes or seams.
- The previously installed soil gas sampling vapor ports.
- The locations where past indoor air sampling has been conducted.
- The operation of the HVAC system and the HVAC air venting and intakes on the roof.
- The location where contaminated soil was excavated in 2014 from underneath the building.
- The location where the spaces between the walls of the three buildings' sections were sealed in 2015.
- A review of any post-2015 building modifications or changes to the buildings.
- The groundwater emulsified vegetable oil in-situ bioremediation system.
- The location of groundwater monitoring wells.

Based on EPA's inspection of the building and real-time indoor pressure readings, the building HVAC system is well balanced to maintain a positive pressure within the occupied building areas, and the likelihood for vapor intrusion is low and not expected. EPA understands that

Apple intentionally operates the HVAC system to balance room pressures, heating, and air turn-over to support long-term product development operations. EPA also noted that the exposed concrete floor was present throughout the building with adequately sealed cracks. However, during the site visit EPA did identify the following items that EPA asks NGC to address.

- **SSD System Vent Pipes:** From Matt Plate's visual inspection on the roof, four of the SSDS exhaust vents are approximately 10-feet of the HVAC's intakes vents and lower or at a comparable height to the intakes. This distance is an acceptable building code distance; however, a distance greater than 10-feet and/or a height that is elevated above the building ventilation system components need to be considered as the SSD system may vent low concentrations of site contaminants of concern outside, creating the potential for contaminates to be pulled into the HVAC intakes and into the building. This scenario and potential impacts to indoor air quality need to be evaluated and mitigated and EPA asks NGC to provide a proposal to do so. As the interior SSD system vertical vent pipes cannot be easily moved and rerouting of piping on the roof may compromise the effectiveness of the passive SSD system, consideration needs to be given to extending the height of vent pipes. For vent pipes that cannot be extended (e.g., under the east building chiller), consideration should be given to rerouting the vent pipes away from HVAC intakes and converting the SSD system to an active system with a blower fan.

- **HVAC Operation:** EPA's observations of the HVAC system and pressures within the building were limited to the day of the site visit and the operation of the building at the time. While a balanced HVAC system was observed maintaining a positive pressure, EPA requests that HVAC and building test and balance information for the HVAC systems be provided to EPA to confirm this.

- **Sub-slab Sampling Ports:** The historical concrete sub-slab vapor sampling ports, left in place, have not been regularly sampled or maintained and several could not be located (SS-10 and SS-11). These ports need to be located and maintained where future sub-slab sampling will be conducted, or decommissioned if a justification is provided that the ports are no longer needed. EPA also requests an updated figure for the building showing all sub-slab vapor sampling port locations including measurements from exterior and interior walls, their ID names, and callouts presenting historical VOC detections. The figure used to locate the sub-slab ports in the field only showed approximate locations.

- **SSD System Maintenance and Inspections:** In May 2021 GES, on behalf of NGC, prepared the first Annual Maintenance Inspection memorandum for the 825 Steward Ave SSD System. The memorandum documented a November 2020 inspection and NGC prepared the memorandum to address the 2019 EPA Five Year Review Report recommendation to incorporate "long-term stewardship measures for the current vapor mitigation measures in place." EPA asks that NGC document in a work plan or technical memorandum the scope of the annual SSD system maintenance inspections, including how and when the inspections will be reported to EPA.

EPA requests that NGC provide a written response in the next 30-days addressing EPA's comments above. Please feel free to contact me anytime at schulman.michael@epa.gov or

415-972-3064 if you have any questions or comments. Thank you again for your cooperation and participation in the site visit and these follow-up items.

Sincerely,



Digitally signed by MICHAEL SCHULMAN
Date: 2021.10.07 18:38:47 -07'00'

Michael Schulman
Remedial Project Manager
Superfund & Emergency Response Division

cc: Joshua Nandi, Northrop Grumman Corp.

**From:** Michael Steiger Redacted
**Subject:** Fwd: [Important] Action Needed- SD01 EHS Request
**To:** Elizabeth Schmidt Redacted Scott Sidlow Redacted ,Sue Creighton Redacted
**Received(Date):** Thu, 18 Mar 2021 08:38:56 -0700
**Date:** Thu, 18 Mar 2021 08:38:56 -0700

---

Hi all- see below.

I would like to get your input on our comms plan for this— I've setup an ical today for 15 mins. Overall, the risks of VI at this site are low. But the comms plan with this individual are very important to get right.

A couple of key facts:

1 - Apple is only leasing the facility. Other third parties (Northrup Grumman) are responsible for contamination.

2 - There is a voluntary VI mitigation system on the building installed by owner. Even though it's voluntary and goes beyond compliance, EPA signed off on the system and has concluded that the risk of VI is minimal.

3 - As part of our VI program, we are planning to do some additional floor sealing and indoor air testing. This building was one of our high priority sites for the VI program given that it has a VI mitigation system.

Michael

---

Michael T. Steiger, P.E. | Environment, Health and Safety

Redacted

Begin forwarded message:

**From:** Antone Jain Redacted

**Subject: [Important] Re: Action Needed- SD01 EHS Request**

**Date:** March 17, 2021 at 11:14:17 AM PDT

**To:** Austin DeBaene Redacted

**Cc:** Tom Huynh Redacted , Michael Steiger Redacted

Begin forwarded message:

**From:** Ashley Gjovik Redacted
**Subject: Re: Action Needed- SD01 EHS Request**
**Date:** March 17, 2021 at 9:32:23 AM PDT
**To:** Jane Markham
**Cc:** msq-managers Redacted

I have questions… Lots of questions…
For those of you who still don't know why I was out on leave so long last year: I was severely poisoned by hazardous waste vapor intrusion at the apartment I was living at —and thought I could by dying, until we figured out what was actually happening and I moved out. I'll share the newspaper article about my experience when it comes out in a couple weeks (biz conduct approved as long as I only talked publicly about residential concerns). Following the experience, the chemical contamination in the Bay Area has become a bit of a personal crusade.
Jane, please let me know if there's someone with EHS I can talk to directly to ask questions? Also, are we allowed to talk to the EPA Project Manager of our site directly too, or must we only go through EHS?

Is Stewart 1 (aka the TRW Microwave Inc Superfund site, part of the notorious "Triple Site") being singled out in anyway for this? Or are all Apple Silicon Valley buildings getting this level of inspection? Or only Apple's Silicon Valley Superfund sites?

Was there a vapor intrusion incident in an Apple building, or Stewart 1 specifically, that led them to do this survey? I just found a report from 2016 saying vapor intrusion was found under the homes next to our office. I found a 2019 EPA settlement agreement for further remediation as well — but I can't find details on how it came about. I'm very curious why they're doing this now.

What type of air monitoring are they doing? Summa canisters? 24, 48hrs? Ongoing? Are there real time alerts if they find VI? Will employees be notified?

Will they test the drinking water? They will always say this type of contamination "shouldn't get into the drinking water," but it can happen. Both the soil & groundwater under our building are contaminated.

They should also be inspecting any labs that have plumbing fixtures, like a sink or an eye wash station, etc. Vapor intrusion is notorious for coming up through pluming as well as utility lines. If they have concerns about VI in our building, managers should also call out any labs with plumbing (so at least the coffee lab).

Will they be sharing their findings? Some sort of risk assessment? We really should be better informed about these types of environmental risks at our offices. The chemicals under SD01 if in high enough quantities, can cause cancer, disruption of nervous and endocrine systems, and birth defects & miscarriages. (Well that's not a very inclusive physical environment for

women!)

If there's any new concerns, like if TCE is actually found in our air or water, I believe the federal Right to Know statute requires Apple to inform employees of the presence of the chemicals. I've never seen any notice or disclosure about the status of SD01 since I've worked there. I was only warned by folks who grew up in the area when I joined MSQ. That's messed up. But also if folks know, then they can report unusual chemical smells, the immediately physical symptoms, etc. And we can get the EPA to jump on any issues sooner than later.

->

<PastedGraphic-8.png>

https://www.nytimes.com/2018/03/26/lens/the-superfund-sites-of-silicon-valley.html

<PastedGraphic-9.png>

<PastedGraphic-10.png>

https://www.theatlantic.com/technology/archive/2013/07/not-even-silicon-valley-escapes-history/277824/

-Ashley

—

Ashley M. Gjøvik

Engineering Program Manager

Redacted

On Mar 17, 2021, at 8:46 AM, Jane Markham Redacted wrote:

Good Morning,

The Corporate EHS team is conducting a rather large scale project across the SCV building portfolio which includes a vapor intrusion survey within each building. This will require EHS to walk through each space that has exposed flooring and conduct visual observations along with air monitoring.

Can the lab managers for spaces below please confirm if their space has exposed concrete or utility lines coming up through the flooring. Thanks!

| ROOM | Yes/No |
| --- | --- |
| Power Rangers (1302) | |

# 1. IDENTIFIED FLOOR SEALING AREAS DURING EKI 6 MAY 2021 SITE WALK

| ID | Room/Location | Feature Description (a) | Photos (b) | Option for Feature Sealing (c,d,e,f) | Completed Actions by ARC Pacific (c,d,e,f) | Sealing Confirmed? (Y/N/Partial) |
|---|---|---|---|---|---|---|
| 1 | Lab 1026 MPOE Closet | • Unsealed annular gap around electrical grounding rod and through the concrete slab, located inside MPOE closet. | Folder 01 | • Seal the annular gap around the electrical grounding rod. | • Observed feature, sealing was confirmed. | • Y |
| 2 | Main Lobby | • Single crack > 1 mm in concrete slab. | Folder 02 | • Seal the crack in the concrete slab > 1 mm wide. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 3 | | • Multiple gaps in concrete seams along previous trench work that goes across the lobby. | | • Seal all gaps in the concrete seams > 1 mm wide. | • Observed feature, sealing work is in-progress. | • Partial – Complete sealing work and provide photo of sealed feature. |
| 4 | Elevator | • Single crack > 1 mm in concrete slab (approximately 1.5 feet in length), between the slab and elevator threshold. | Folder 03 | • Seal the crack in the concrete slab > 1 mm wide. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 5 | Southern Hallway (East of the Main Lobby) | • 4-inch galvanized steel pipe comes through the floor. Pipe wrap visible in the annular gap between the pipe and the concrete slab. | Folder 04 | • Trim/remove pipe wrap from pipe at floor level or ¼-inch below floor level, if feasible.<br>• Seal around the annular space of the pipe at floor level, sealing the pipe to the concrete slab. | • Observed feature, sealing was confirmed. | • Y |
| 6 | Southern Door Foyer | • Single gap in concrete seam (approximately 4 feet in length) located in foyer of southern entrance. | Folder 05 | • Seal the gap in the concrete seam > 1 mm wide. | • Observed feature, sealing was confirmed. | • Y |
| 7 | Hallway Outside of Lab 1302 | • Single gap in concrete seam (approximately 1.5 feet in length, along previous trench work that goes across a hallway near Lab 1302. | Folder 06 | • Seal the gap in the concrete seam > 1 mm wide. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 8 | Hallway Outside of Lab 1221 | • Multiple gaps in concrete seams along previous trench work, located in the hallways on each side of the double door nearest Lab 1221. | Folder 07 | • Seal all gaps in the concrete seams > 1 mm wide. | • EKI did not observe this feature. | • Unknown – Complete sealing work and provide photo of sealed feature. |

| ID | Room/Location | Feature Description (a) | Photos (b) | Option for Feature Sealing (c,d,e,f) | Completed Actions by ARC Pacific (c,d,e,f) | Sealing Confirmed? (Y/N/Partial) |
|---|---|---|---|---|---|---|
| 9 | Room 1203 | • Hole filled with degraded sealant, underneath carpet. | Folder 08 | • Remove degraded sealant at floor level or ¼-inch below floor level, if feasible.<br>• Seal the inside of the hole, sealing to the concrete slab. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 10 | Elevator Mechanical Room | • Multiple gaps in concrete seams within Elevator Mechanical Room. | Folder 09 | • Seal all gaps in the concrete seams > 1 mm wide. | • Observed feature, sealing was confirmed. | • Y |
| 11 | Electrical Room 1106 | • Single gap in concrete seam that goes across the Electrical Room. | Folder 10 | • Seal the gap in the concrete seam > 1 mm wide. | • Observed feature, sealing was confirmed. | • Y |
| 12 | | • Multiple cracks > 1 mm in concrete slab. | | • Seal all cracks in the concrete slab > 1 mm wide. | • Observed feature, sealing was confirmed. | • Y |

## 2. IDENTIFIED FLOOR SEALING AREAS DURING 11 AUGUST AND 18 AUGUST 2021 SITE WALKS PERFORMED BY APPLE

| ID | Room/Location | Feature Description (a) | Photos (b) | Option for Feature Sealing (c,d,e,f) | Completed Actions by ARC Pacific (c,d,e,f) | Sealing Confirmed? (Y/N/Partial) |
|---|---|---|---|---|---|---|
| 13 | Southern Portion of Central Hallway | • Multiple saw cuts in concrete slab along previous trench work in the hallway. | Folder 2021-08-11 Apple Site Walk | • Seal saw cuts in the concrete slab. | • Observed feature, sealing was confirmed. | • Y |
| 14 | Room 1400 The Wall | • Multiple gaps in concrete slab along concrete seam. | Folder 2021-08-11 Apple Site Walk | • Seal gaps in the concrete slab along concrete seam. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 15 | | • Single crack in concrete slab. | | • Seal the crack in the concrete slab. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 16 | Electrical Room 1501 | • Unsealed annular gap around electrical grounding rod. | Folder 2021-08-11 Apple Site Walk | • Seal the annular gap around the electrical grounding rod. | • Observed feature, sealing work incomplete. | • N – Complete sealing work and provide photo of sealed feature. |
| 17 | Northwest Vestibule | • Three holes (potentially location of former door stop) in concrete slab. | Folder 2021-08-18 Apple Site Walk | • Apple indicated a maintenance ticket would be submitted to re-install the door stop. | • n/a – Per Apple, this feature is not included in ARC Pacific's scope. Apple to address this identified floor sealing area. | • n/a – Per Apple, this feature is not included in ARC Pacific's scope. Apple to address this identified floor sealing area. |
| 18 | Room 1400 The Wall | • One hole in concrete slab, located outside of a chamber. | Folder 2021-08-18 Apple Site Walk | • Seal the inside of the hole. | • n/a – Feature added to ARC Pacific's Scope by Apple on 18 August 2021. | • N – Complete sealing work and provide photo of sealed feature. |

Notes
(a) The Floor Assessment Survey was performed by EKI on 6 May 2021. Apple performed a site walk on 11 August 2021. The sealing confirmation walk was performed by EKI on 18 August 2021. During the 11 August and 18 August 2021 site walks, Apple identified additional floor sealing areas, some of which have been added to ARC Pacific's scope (see Section 2).
(b) Photos are in the SD01 folder located in Box folder: https://apple.box.com/s/ngcbda9ixv48q54wjf3y24kipmesmrep.
(c) Floor receptacles within the building are not within the scope of the Floor Penetration Survey.
(d) Certain electrical equipment and/or wiring may need to be deenergized by a qualified person prior to sealing. Contractor bears all responsibility for de-energizing or lock/tag out of all equipment, wiring, conduits, wireways, etc. to allow for safe contractor access.
(e) Sealant selection is the contractor's responsibility. EKI Environment & Water, Inc., has provided information specific to the use of these recommended sealants including the Floor Sealing Guidelines (EKI, 2021a), the Sealant Selection Matrix (EKI, 2021b), and cut sheets and installation instructions provided by the sealant manufacturers to inform their selection. Contractors can access this information in the Box folder here: https://app.box.com/folder/136387661002.
(f) Contractor must procure and mobilize to the site with all equipment, tools, and supplies (i.e., backer rod, crack chasing bits, etc.) required to perform the sealing work. All sealants must be installed or applied in a manner consistent with the manufacturer's instructions.

**From:** Jenna Waibel Redacted
**Subject:** Updated notes from 7/7 meeting with A. Gjovik
**Received(Date):** Thu, 9 Sep 2021 12:24:52 -0700
**Cc:** Antone Jain Redacted
**To:** Elizabeth Schmidt Redacted
**Attachment:** smime.p7s
**Date:** Thu, 09 Sep 2021 12:24:52 -0700

---

Hi Elizabeth,

I'm providing notes to you from our last meeting with Ashley Gjovik to address her EHS concerns, which occurred on 7/7/2021. Antone is copied since he was present the meeting- he can answer additional questions you may have as well.

Antone asked that we add the third bullet point from the bottom, which was missed in the prior notes. Please see below.

---

Meeting notes 7/7/2021

Present in meeting: Michael Steiger and Antone Jain from EHS, Ashley Gjovik, Jenna Waibel from Employee Relations

The purpose of the meeting was to follow up on Ashley's continued concerns about the safety of the Stewart 1 building.

The meeting was opened explaining Antone's presence since he had not been in prior meetings with Ashley: he joined this meeting to step in for Michael since Michael will be leaving Apple in the following days. Michael explained that Antone is very familiar with the Vapor Intrusion program as well, and is responsible for scheduling the next steps in the testing plan.

- Michael said he wanted to clarify that they always intended to do indoor testing, which Ashley had previously misunderstood: it's the 3rd step in the process they follow.

- Antone walked through testing steps:

  * Routine floor pathway survey

  * Routine maintenance on floor sealing (preventative, optional work)

* Indoor air testing once step 2 is done (about a month from now)

• Ashley expressed concern that the last VI testing was done in 2015, and said that doesn't sound like regular maintenance.

* Michael and Antone said it is standard for the program.

• Ashley asked if the cracks in the floor are deep enough for air to be coming through?

* Antone said he has done numerous floor surveys and there is no reason for concern with the floor condition at SD01. Antone said the last testing in 2015 showed no concerns. This is maintenance, not work done due to concerns.

* Ashley asked if this work was reported to the EPA?

* Michael/ Antone answered that it was not reported since it is voluntary work.

• Ashley asked that EHS conduct a specific air test prior to floor sealing to know what the air contained prior to that building work.

* Michael said testing in advance is not the protocol we follow. He said it is not needed and not in the standard process that is necessary.

• Ashley said her desk is on the hottest spot in the building, and was concerned whether EHS inspected the floor under the carpet.

* Antone said they didn't look under the carpet.

• Ashley asked if they were going to test the Sim City lockdown area since she regularly has to work in there, and that is where she said she had a “fainting spell".

* Antone and Michael said they were pursuing the approval for that access.

- Michael said: We already went above and beyond, and you're asking if we went above and beyond going above and beyond.

- Michael asked Ashley: What would be resolution for you?

    * Ashley said: I'm very anxious to have indoor testing. After all the chemical exposure, and being at an active superfund. She wants to have full remote work.

- Antone explained the testing will be done over a week's time with a passive sampler.

    * Ashley objected to this approach: she asked them to test with the HVAC turned off for 48 hours and with no one in the building.

    * Antone explained: The HVAC will still be on. They don't clear the building. This is more representative of the exposure that would exist with people actually present.

- Michael said he would share a website with the passive sampling device and the EPA passing sampling recommendations.

- Michael clarified that VI and Superfund are separate. Not connected concepts.

- Ashley said she is connected with CA Dept of Public Health Investigations Unit, EPA, and she believes that this Unit considers testing after HVAC off for 48 hours to be the gold standard. Michael said they (CA Dept of Public Health Investigations Unit and EPA) are not the experts in VI. Antone clarified that different methods of testing give different information, and passive sampling during occupancy is more representative of actual conditions, which is why we do it.

- Michael said the vapor intrusion mitigation system and HVAC system would provide protection even if there were cracks in the floor. It was installed after the 2015 testing as additional mitigation. It's a voluntary system.

- Ashley asked why do we keep calling this "routine" floor testing?

- Antone explained that it is routine for two reasons: 1) it is not triggered by any issues or external factors; we are doing it for preventative maintenance purposes and 2) doing floor surveys and sealing on approximately a five year cadence since tenant improvements in 2015 is a standard time-scale for reviewing potential floor movements. We have done this at a couple other buildings as part of the routine process of our vapor intrusion program.

- Towards the end, when Ashley started talking about other buildings, Antone said: "The other buildings are not part of the topic of this call."

- Jenna said EHS has committed to providing Ashley the data after the testing is complete, and that questions about buildings other than SD01 were outside the scope this call.

- Ashley changed to a different topic: she said she has two accommodations processes moving forward, but that Helen was bullying her by saying she wasn't likely to get it approved. I told Ashley that bullying is a strong word, and that if she felt strongly that was occurring we should report it and look into that. Ashley said she had already told my boss about it. I asked Ashley that we have any further conversation about that in a separate call, since it does not involve EHS.

We ended the call before the 30 minutes were past- approximately 25 minutes were taken for the entire call. Ashley wished Michael well in his departure from Apple.

**Jenna Waibel**

**Corporate Employee Relations**

Redacted

**This Electronic Mail (e-mail) contains confidential and privileged information intended only for the use of the individual or entity to which it is sent. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is STRICTLY PROHIBITED. If you have received this communication in error, please immediately notify the sender by reply e-mail or telephone.**

# EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

## TABLE OF CONTENTS

**1. SUMMARY OF CONCERNS ........ 2**

**2. SOFTWARE ENGINEERING ........ 4**

A. iOS Release Management Team (2015-2016) ........ 4

i. Brad Reigel ........ 4

ii. Rob Marini ........ 4

iii. Rob Marini, Aron Talburt, & Brad Reigel (aka “RAB”) ........ 5

iv. Linda Keshishoglou ........ 5

v. Venkat Memula ........ 6

vi. Bodhi Gerfen ........ 6

vii. Bill Stevenson ........ 7

B. Spring 2016 Transfer (Component EPM; EFFA EPM) ........ 7

viii. Stacey Lysik ........ 9

ix. Brad Reigel ........ 9

C. SWE Failure Analysis Team (2016) ........ 9

x. Shandra Rica & Evan Buyze ........ 10

**3. HARDWARE ENGINEERING ........ 12**

D. Mac Systems Quality (2017-Current) ........ 12

xi. David Powers ........ 12

xii. Jason Ivan ........ 17

E. Product Systems Quality (2017-Current) ........ 18

xiii. Dan West ........ 19

xiv. John Basanese ........ 22

xv. Reed Johnson ........ 23

**4. ADMINISTRATION ........ 23**

F. Human Resources ........ 23

xvi. Helen Polkes ........ 23

G. Employee Relations ........ 24

xvii. Overall ........ 24

xviii. Jenna Waibel ........ 25

xix. Ekelemchi Okpo ........ 28

H. Apple Real Estate Environment, Health, & Safety ........ 29

xx. Overall ........ 29

xxi. Michael Steiger ........ 31

**5. BOARD OF DIRECTORS ........ 33**

I. Finance & Audit Committee ........ 33

xxii. Ronald Sugar ........ 33

# EMPLOYEE RELATIONS – ISSUE CONFIRMATION

Ashley Gjovik | EO Draft v1, with AG rev v2 | 22 Aug 2021

**Disability Claim**

- Chemical Exposure (# 302048282250-0001)
  - 2020

**Protected Activities & Whistleblowing:**

- Aug 5, 2021: Planned for weeks to go to the office this day to get my computer with more evidence. I told ER several times. Was then "removed from the workplace" by ER on 8/4.
- Aug 3-4, 2021: working with colleagues to collect evidence of building floor cracks and EHS activities in order to understand safety risk. Notified ER of this.
- Aug 3, 2021: posted in Remote Work Adv reminder that nothing in Apple's policies "should be interpreted as restricting your right to speak freely bout your wages, hours, or working conditions." Added angel & microphone emoji and said "Friendly reminder" while citing Apple's own polices/quotes.
- July 2021: escalated concerns one of our PSQ employees was bragging about smuggling iPods into Syria and running a side business transporting people across the Syria/Lebanon border. Complained about general lawlessness in my org.
- July 26, 2021: post in Women in SWE slack about employment relations concerns – asking if anyone else had issues with ER's handling of complaints, or if they even feel comfortable reporting issues? Lots of responses.
- July 30, 2021: Tweeted me too about EAP & medical leave in response to hostile work env, and ADA accommodations in response to unsafe work conditions
- July 23-34, 2021: Quoted in NYT with concerns about safety risk in Apple bringing us back on stie with COVID, next date was sleected as quote of the day.
- July 19, 2021: raise concerns in Apple Slack Language-Matters about Dave & Dan saying "open kimono" all the time and never stopping when I ask them to. Let ER know.
- July 16, 2021: My Sedgwick/Apple accommodation follow up question form is shared on Twitter in protest of how invasive it is. I told Cher she could share it publicly after expressing my own frustration and the responding eruption on Slack about it. I also shared the ER Medical Release form I had concerns about on Slack earlier this week and it appears that form or one like it was referenced in The Verge article about Apple's poor behavior around disabilities yesterday. The Verge writer also retweeted my chemical exposure follow up question form too. I told ER, "I'm glad public pressure might influence Apple to correct & improve its employee policies."
- June 14, 2021, I email Tim & Deirdre about Remote Work Advocacy and share a letter, video, survey results, and letter signatures.
- May 20-21 2021, I sent email to Dave, Dan, HR, & ER about concerns Apple not speaking up in support of Palestinians and Muslims; Helen replies not really addressing my concerns. I reply to Helen, Dave, & Dan and re-iterate my concerns and further elaborate my concerns around Muslim inclusion with the recent news of Uyghur forced labor; Helen replies actually addressing this time and lets me know I&D is looking into the whole situation and I'm welcome to talk to them.
- In April 2021, Jenna Waibel investigated David Powers for a creating a hostile work env based on gender and disability & Rob Yepez for sexual harassment.
- April 2021, field workers comp complaint for chemical exposure and notified managers, HR, ER, & EHS.
- April 2021, notified Federal EPA of my concerns about my office building & Apple's oversight of it.

said he'd cancel the EPM role, that "its an experiment that didn't work out," and convert it to engineering headcount. Dan did say that Dave needed to follow up on the "no equal outcomes" dogwhistle-type comment and that he'd talk to him about it.

- You told me that Kai Yun left West's organization because of how she was treated, and West did nothing about it.Yun's team was responsible for high quality Macs with high tech monitors. You believe that Yun's responsibilities were reassigned to a white male outside of West's organization.You believe that West, Basanese and Powers made the decision to reassign the work.
- You shared that on April 29, 2021, you told West that you could no longer work for Powers, and to reorganize your role so that you can report directly to him. You mentioned that West told you that from an organizational structure standpoint, it made no sense for you to report to him. You also told me that during the same conversation, West told you to quit Apple. You shared that West has since stopped meeting with you, and has reassigned your job responsibilities to others.

- **Evidence:** Box folder including emails & photos
- **Witnesses:**

- **DW Concern 4:** Sexual harassment**;** pimping & pandering with receipt of indirect benefits
- **Examples:**
  - 5/8/2018 You shared that during a meeting, West made a "spanking" gesture with his hand to describe how you "keep him in line". Dan asked to delete this video.
  - I was eating out at a Michelin star restaurant in Mt View in winter of 2017. It was a restaurant Dan insisted I try several times, so when I sat down I texted him that I looked forward to the meal. I didn't realize before that Dan West and Yannick Bertolus (Dan's boss, our VP) are very very good friends with the head Chef of the restaurant. As soon as I texted Dan, he replied right away and within maybe 10min the Chef came out to greet me personally as a friend of Dan and was bringing out special dishes I didn't ask for. He also came out to talk to me mid-way and was telling me very personal stuff about Yannick. About 1/2 way through the dinner the Chef and Dan both told me they were trying to set me up with the Sous Chef at the restaurant, Andrew. Apparently they told Andrew the same thing. Andrew was 24, ten years my junior. I expressed no interest in Andrew or dating him — but they persisted. Dan also told the head Chef he would pay my entire bill, and he did. I protested strongly to both the Chef and Dan and told the Chef to reject Dan's payment and I would pay myself, but they wouldn't let me. They both also continued to send the Sous Chef out to wait on me instead of the waiter and pressured both of us to exchange numbers. It's was humiliating. I've met Dan's wife & daughter a couple times and they were/are both aware of this night and say it's is a running topic in the household of how weird and inappropriate it was of Dan to do that.
  - Ashley texted Dan in Dec after the dinner and told him she's dating a professor now and need sto turn down the sous chef and Dan said "I'm not even a little concerned. Regarding Andrew – to bad it didn't work out, but there was absolutely no pressure from me. I don't know him too well. Just learn and move on."
  - Ashley was supposed to go to her office on Aug 5 to retrieve the laptop with the texts send during that night at the restaurant, but ER put me on leave and removed me from the "workplace" on 8/4 before I could & they knew I was planning on it.
  - You told me that in March 2021, West's daughter gave you a ride to Stanford, and during the car ride she told you that they still talk at home about how bizarre the restaurant incident was.
  - You mentioned that in 2020, West made a comment in Slack that Powers will unbutton the top 3 buttons of his shirt during the next all hands meeting. You told me that when you addressed West

- 6/8 - I have to present the I&D training I did to Dan staff even though I asked Dave to do it while I was out and asked Jenna if Dave could do it because I don't feel comfortable marketing our I&D training while I'm reporting Dave and a manager (likely Jason) for being sexist
- 6/10 - I then meet with Jenna and she tells me the only other steps are to "complain about her to her manager, but I'm not allowed to discuss any details of the investigation" and to "escalate safety concerns to EHS." She also suggests I request ADA accommodations for remote work so I don't have to go back to Stewart 1. She tells me "I don't need a diagnosis, I just need a doctor signature."
- 6/10: "You said you were concerned that Dave was not coached on gender discrimination: as the investigation did not find any policy violations, the ongoing support for you and Dave to work effectively moving forward is to improve communication between the two of you."-Jenna
- 6/10: "I committed to share your continued concerns with EHS about workplace safety, specifically vapor intrusion in Stewart 1, since they are the appropriate parties to respond. Finally, we talked about the Accommodation process, in response to your concern about the safety of your building with the expectation of returning in September. I advised that now is the right time to begin that process to discuss your accommodation request to continue to work remotely, and pursue documentation from your physician to support that request. Please see the below form to meet with your doctor and begin this process. Since this process can take a while, I recommend we start it now to ensure we have plenty of time in the interactive discussion. " -Jenna
- 7/13: Me: When I talked to Tony last week he told me confidently that no medical staff from Sedgwick would be getting involved in the request, and Sedgwick would simply contact my doctor to confirm he his a doctor and he did sign the paper before approving the request. You might want to sync with Tony before you have the Nurse reach out.This was in line with what you originally told me at the beginning of this process, when you offered the form — that there doesn't need to be a diagnosis and I only need a doctor signature.I can talk to the nurse if I need to, and I do actually have a diagnosis, but it sounds like there's a disconnect on your approach for this.
- 7/13: I refuse to sign that medical release form until it's revised to say I'm only releasing to Sedgwick, not to Apple Inc.

- **Evidence:** Box folder including emails & photos; emails
- **Witnesses:** *You know what y'all did***.**

**xix. <u>Ekelemchi Okpo</u>**

- **Concerns:** Use of Paid Administrative Leave as a Neg Employment Action; Intimidation; Retaliation
- **Examples:**
  - **5/21:** Jenna to me: Hi Ashley, Thanks for our call this morning. I'm glad to hear you are feeling well supported in this offer of time off. We agreed that you would take administrative leave, with full pay and benefits, starting Monday for two weeks, beginning Monday May 24, 2021 while I look into the concerns you have raised. You will return to work on Monday, June 7, 2021. We agreed this time will not be formally submitted in a time off system, and will not decrease your sick time or paid time off balance. For the next two weeks, we agreed you will not do any work. You will post an away message that lets folks know you will be out, but I left it to your judgement on what else you say about your time out. During this time off, I committed to you that I would continue my review and hope to have findings to share by the end of the two week period. We agreed that the best way to reach you is to send you a text message on your work number. Other than that, we agreed you would not do any work or

respond to work emails during this time. You can continue to contact me with additional information or questions about my investigation at any time.

- 7/27: me to EO & AL: Also as mentioned, I'm still looking for a short-term response to mitigate the current hostile work environment I'm experiencing reporting to Dave and Dan and Helen. I've asked several times now, including today, that all 1:1s with them be in writing only, during the duration of this investigation. I also asked that there not be any new projects added to my workload during the duration of this investigation, and this is especially important now that my manager decided to substantially increase the amount of work I need to do beyond what a single role is capable of, and all unfavorable work. I would like for him not to add any new work beyond what I had a month ago. I do see his current actions with this workload as retaliation and a negative employment action. Also, as I've mentioned, I am actively suffering emotional harm as I'm continued to be exposed to their behavior. I look forward to hearing about next steps on this. Further, as mentioned previously and on going, I am requesting a long term solution to the hostile work environment and unsafe work conditions. At this point it is clear my team will not stop the sexism, harassment, discrimination, and retaliation — so I need to be removed from this situation. As mentioned, I refuse to quit or to take medical leave as a response to the hostility; this is on Apple ER to resolve, not for me to hide from. There are two options we've discussed. First, a new role at Apple that is not a hostile work environment and not in unsafe work conditions (and I mentioned that because I will not be at Apple after Dec 31 2022, I cannot find a new role to transfer to for such a short period of time, so I need your assistance with placement). The 2nd option is an exit package that will compensate me and provide benefits through that time. As mentioned this would only be a payment & exit to mitigate the current hostile work environment and unsafe work conditions and would not include any litigation/arbitration waiver agreements nor any non-disclosure agreements beyond what I've already signed as an employee. Any further contractual agreements beyond what I've already signed would need to be reviewed by my team of lawyers and the compensation for each would need to be negotiated by each new specific requirement.
- 7/16: Antonio adds EO to the investigation
- 7/28: me to EO, text: EO refuses to respond about putting exchanges in writing before my 1:1 w/ Dave that day, texting EO up to the minute, then I cancel the meeting myself and cc EO
- 8/4: Tells me I'm "being put on leave." Refuses to give me any time of timeline or ETA for updates or conclusion. Says I don't need to check email or work phone at all, but also refuses to contact me on my personal accounts. Says I don't even need to respond to the issue confirmation. I ask to continue to use Slack and he says he wants me "removed from work place interactions." I said I wanted the leave to start 8/5, EO said no, starts today/now. I say this feels like a negative employment action, and EO essentially says it's voluntary but I also don't have a choice.
- 8/20 – I asked to attend an apple university class I was previously invited too (and Dean's Cohen & Stout approved me still attending) and EO told me I couldn't go "because I was on leave."

- **Evidence:** Box folder; emails
- **Witnesses:** *You know what y'all did*

## H. Apple Real Estate Environment, Health, & Safety

### xx. <u>Overall</u>



 

**From:** noreply@eeoc.gov
**Subject:** Notice of Scheduled Interview
**Date:** August 12, 2021 at 8:17 PM
**To:** ashleygjovik@icloud.com

N

You are scheduled for an interview by Phone with the Equal Employment Opportunity Commission (EEOC) regarding your inquiry **556-2021-00608**. This email confirms your appointment with an EEOC representative of the **San Jose** office for **09/02/2021 at 12:00 PM PDT**.

On the day of your interview, please have the password for your EEOC Public Portal user account with you

Before your interview, please visit EEOC Public Portal as soon as possible to provide additional information about your inquiry. Providing additional information is optional, but can help make the interview more productive and efficient. You may add or edit the additional information up until you have your interview with EEOC. The information you provide is confidential and will not be disclosed to your employer during an investigation.

**ANSWERING THESE QUESTIONS IS NOT THE SAME AS FILING A CHARGE OF DISCRIMINATION.**

A charge of discrimination is a signed statement asserting that an organization engaged in employment discrimination. It requests EEOC to take remedial action. The laws enforced by EEOC, except the Equal Pay Act, require you to file a charge before you can file a lawsuit for unlawful discrimination. There are strict time limits for filing a charge.

To change or cancel your appointment, please log into the EEOC Public Portal and select the Schedule an Interview option for your inquiry.

*Notice of Confidentiality: The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact us at digitalsupport@eeoc.gov and destroy all copies of the original message and attachments.*

**From:** **ANDRAE ALEXANDER** ANDRAE.ALEXANDER@EEOC.GOV
**Subject:** EEOC Charge NO. 556-2021-00608 Charge Filing Confirmation
**Date:** September 10, 2021 at 11:06 AM
**To:** ashleygjovik@icloud.com

AA

RE: Ashley M. Gjovik v. APPLE INC
EEOC Charge NO. 556-2021-00608

This is to confirm that the above-referenced charge was filed with the EEOC San Jose Local Office and dual- filed with the CA DFEH on September 9, 2021. Attached, you will find: 1) confirmation letter, 2) charge of discrimination, 3) State of California Department of Fair Employment and Housing Right to Sue. The EEOC has served the Respondent, APPLE INC, with the charge.

For information regarding the status of charge, please visit the EEOC Public Portal at (https://publicportal.eeoc.gov/portal/.

Should you file a lawsuit against the Respondent regarding this matter and/or settle the matter with the Respondent, the EEOC will require you to provide a copy of the court complaint and/or settlement agreement.

EEOC San Jose Local Office
96 North Third Street Suite 250
P.O. Box 487
San Jose, CA 95103
(408) 889-1950– office
(408) 291-2603 - fax
sanjgov@eeoc.gov

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency — GAVIN NEWSOM, GOVERNOR

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING** — KEVIN KISH, DIRECTOR

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I Email: contact.center@dfeh.ca.gov

EEOC Number: 556-2021-00608C

Case Name: Ashley M. Gjovik v. APPLE INC

Filing Date: Sep 09, 2021

**NOTICE TO COMPLAINANT AND RESPONDENT**

This is to advise you that the above-referenced complaint is being dual filed with the California Department of Fair Employment and Housing (DFEH) by the U.S. Equal Employment Opportunity Commission (EEOC). The complaint will be filed in accordance with California Government Code section 12960. This notice constitutes service pursuant to Government Code section 12962.

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To: [ ] FEPA [X] EEOC

Agency(ies) Charge No(s): **556-2021-00608**

**CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT & HOUSING** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| **ASHLEY M GJOVIK** | **415-964-6272** | |

Street Address / City, State and ZIP Code

**1050 BENTON STREET #2310, SANTA CLARA,CA 95050**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| **APPLE INC** | **501+** | **(408) 996-1010** |

Street Address / City, State and ZIP Code

**1 APPLE PARK WAY, CUPERTINO, CA 95014**

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

Street Address / City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

[ ] RACE [ ] COLOR [X] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[X] RETALIATION [ ] AGE [X] DISABILITY [ ] GENETIC INFORMATION
[ ] OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: **01-01-2017** Latest: **07-15-2021**

[X] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**I have been employed by Apple as a Senior Engineering Program Manager since February 23, 2015, reporting to David Powers (nondisabled/male) Director of MSQ. I am also assigned work by his manager, Dan West (nondisabled/male), Senior Director of PSQ.**

**Since January 2017, Powers subjected me to sex-based discrimination and retaliation by referring to me as emotional/aggressive, giving men credit for my work, criticizing me, excluding me from meetings, and refusing to address harassment/sexism from colleague Jason Ivan. West subjected me to sex-based discrimination and retaliation by excluding me from meetings, making sexual comments and gestures, and personally humiliating me. West failed to address my discrimination concerns about Powers raised since 2017. I find all of this offensive. In March 2021, I began to raise concerns about the safety of my office due to it being an EPA Superfund site, which I believe caused injury and I filed a workers compensation claim. Powers personally attacked me due to my disability by stating that due to expressing safety concerns I would receive an employee warning, and not more, because I**

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

**Digitally signed by Ashley M Gjovik on 09-09-2021 07:27 PM EDT**

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*)

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:<br>☐ FEPA<br>☒ EEOC | Agency(ies) Charge No(s):<br>**556-2021-00608** |
|---|---|---|

**CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT & HOUSING** and EEOC

*State or local Agency, if any*

**was having mental health issues which I found to be offensive.**

**Around April 9, 2021, Jenna Waibel in Apple Employee Relations launched an investigation into sexual harassment and hostile work environment due to sex, despite me telling her I did not want the investigation due to fear of retaliation, but she persisted only to conclude around June 3, 2021 saying she found no policy violations. After, I complained to Antonio Lagares (nondisabled/male), Senior Manager of Employee Relations, because Waibel failed to investigate all of my allegations, because the hostile work environment continued, and I was subject to retaliation. Soon thereafter, Lagares appointed Ekelemchi Okpo (nondisabled/male), Employee Relations Investigator, to conduct a new investigation into the hostile work environment based on sex and disability I have been subjected to since 2015, and sexual harassment since 2015. Apple alleges they are conducting an investigation.**

**After engaging in protected activity, around May 6, 2021, West reassigned my work to others without explanation and ostracized me. Around July 15, 2021, Powers dramatically increased my workload with unfavorable projects. Around July 2, 2021, Employee Relations forced me to submit a reasonable accommodation request to not be exposed to the hazardous chemicals, instead of addressing my concerns for the health/safety of all employees. Waibel asked I not share my concerns with other employees, refused to take/answer my safety questions, or allow the EH&S team to take/answer my safety questions. In retaliation, on August 4, 2021, Apple placed me on an indefinite paid administrative leave even though I objected. However, to date, Apple argues I requested to be placed on leave, which is misleading.**

**I believe that I was discriminated against due to my disability and retaliated against after engaging in protected activity, in violation of the Americans with Disabilities Act of 1990, as amended. I believe that I was discriminated against due to my sex, female, and retaliation against after engaging in protected activity, in violation of the Title VII of the Civil Rights Act of 1964, as amended.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>**Digitally signed by Ashley M Gjovik on 09-09-2021 07:27 PM EDT** | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(*month, day, year*) |

**STATE OF CALIFORNIA** Gavin Newsom, *Governor*

DEPARTMENT OF INDUSTRIAL RELATIONS
Labor Commissioner's Office
*Retaliation Complaint Investigation Unit*
2031 Howe Avenue Suite 100
Sacramento, CA 95825
Phone: (916) 263-2991 Email: retaliation@dir.ca.gov

October 22, 2021

Ashley Gjovik
1050 Benton Street #2310
Santa Clara, CA 95050

Re: Ashley Gjovik v. Apple Inc.
State Case No. RCI-CM-842830

Dear Ashley Gjovik:

This office has received your retaliation complaint, filed with this office on August 29, 2021, alleging that you suffered unlawful retaliation in violation of California law.

**Parties are encouraged to engage in settlement discussions amongst themselves. Alternatively, if you are interested in participating in an informal meeting to resolve your complaint, please send an email to retaliation@dir.ca.gov with "SETTLEMENT" in the subject line. Your participation is voluntary. Only if both parties agree, your case <u>will be temporarily assigned</u> to a Deputy Labor Commissioner who is experienced in working with parties to reach satisfactory settlements.**

**Please keep in mind that RCI investigations can be lengthy and may not result in your desired outcome. Settlement allows the parties to come to a compromise and provide relief, resolution, and peace of mind.**

As soon as the case is assigned to an investigator, you and the employer will be contacted and given an opportunity to present documents, position statements, or witness names to support your respective positions. Hold on to these documents until the assigned investigator requests them from you.

We suggest that you obtain the first and last names, addresses, and telephone numbers for witnesses who may be able to tell us more about your claim. Also, please save any documentation that you may have, such as wage statements, emails, letters, text messages, or notices. It is helpful if you keep notes of any conversations you have had, noting the date and with whom the conversation took place. Also, if you have a recollection of what happened, it is helpful if you write it down while your memory is fresh. A chronology of events can be very useful.

Do not delete, destroy, or discard any potential evidence that relates to the claims, facts, or defenses raised by the complaint. This includes, but is not limited to, any relevant electronic evidence, such as text messages, social media posts, emails, or

voicemails. If you have a policy or practice of regularly deleting, destroying, or discarding documents, information, or things, those policies or practices should be suspended in relation to any potential evidence. Deleting, destroying, or discarding any potential evidence is against the law.

Please tell us if your address or phone number changes. If we are unable to contact you, we will be unable to proceed with the investigation, and we will be forced to close your case.

The enclosed "Summary of Procedures" will provide additional information about our process. Again, we will be in contact with you to let you know who the investigator is that will be investigating your complaint.

During the investigation, you are required to mitigate your damages by looking for other employment or working elsewhere. As you apply for employment opportunities, keep detailed records of the positions you apply for, any interviews that you attend, and any employment offers that are made to you. If you do accept an offer, please let me know. Keeping these records will assist the agency with calculating and proving what you may be owed.

If you filed a retaliation complaint because you made a workplace health or safety complaint, you may also file a separate complaint with the U.S. Department of Labor within 30 days of the date of the violation.

Keep in mind that legal claims cannot be brought indefinitely; legal claims have a "statute of limitations," which is a time limit. Filing a complaint with our agency may not prevent the statute of limitations from running out on all the claims you may have, so if you are interested in pursuing this claim or other related claims in a lawsuit, consult with an attorney right away.

Sincerely,

Alejandro Cortez
Deputy Labor Commissioner

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
Apple Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ASHLEY GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-4597-EMC

**DEFENDANT APPLE INC.'S RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET ONE**

**PROPOUNDING PARTY:** Plaintiff Ashley Gjovik

**RESPONDING PARTY:** Defendant Apple Inc.

**SET NUMBER:** One

Confidentiality Agreement and could not to be disclosed to third parties. The form read, in part, "YOUR CONFIDENTIALITY OBLIGATIONS … By agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple."

Further, upon joining Apple, Plaintiff had agreed to comply with Apple's confidentiality policies relating to proprietary information related to Apple's research and development. She signed a Confidentiality and Intellectual Property Agreement (the "Confidentiality Agreement"). The provisions of the Confidentiality Agreement legally prohibited the dissemination of information relating to product development and research. It provided that employees were prohibited from disseminating the following:

> (a) Trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple . . .

Plaintiff agreed to "strictly comply" with Apple's rules and policies relating to confidential product information and understood that breach of the agreement through prohibited disclosure of confidential product information could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings."

On August 28, 2021, Plaintiff tweeted details about a separate proprietary study Apple was conducting, the "Omega"[2] study, which she learned about in connection with her employment, was invited to participate in, but ultimately declined to participate. Like the Alpha study, the details of the Omega study were not known except to a small select group within Apple, and certainly not outside Apple, and thus they were covered by Plaintiff's Confidentiality Agreement in which she

---

[2] To safeguard Apple's confidential information, the study is referenced as "Omega" for purposes of this response.

agreed to keep non-public information relating to product development and research confidential. Despite this, Plaintiff's tweet both identified the name and purpose of the study regarding an unreleased product under development. The next day, Apple received a complaint through its Business Conduct Hotline that Plaintiff had publicly disclosed confidential information about the Omega study.

On August 30, 2021, Plaintiff tweeted photographs of herself created by the Alpha application, thus again disclosing confidential Apple product information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the Alpha study. The story also included a video comprised of photographs of Plaintiff created by the Alpha application.

Plaintiff knew or should have known her conduct was inappropriate, including because she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations regarding non-public information relating to product development and research. For example, in January 2020, Plaintiff reported to Apple conduct of former employees who had given an interview in which they disclosed, among other things, internal code names, which Plaintiff acknowledged were "trade secret."

Upon learning of her unauthorized disclosures, Apple launched an investigation. On September 9, 2021, an Apple investigator requested to speak with Plaintiff as part of that investigation. Plaintiff refused to speak with the investigator, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Plaintiff had improperly disclosed confidential Apple product information without authorization and had violated her confidentiality obligations barring disclosure of non-public information relating to product development and research. Additionally, Apple concluded that Plaintiff had failed to cooperate and to provide accurate and complete information during the Apple investigatory process.

On September 9, 2021, Apple notified Plaintiff it was terminating her employment effective the following day for her unauthorized disclosure of Apple confidential information, her violation of her confidentiality agreements regarding disclosure of non-public information relating to product

orrick

**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015

+1 650 614 7400

**orrick.com**

**Jessica R. Perry**

**E** jperry@orrick.com
**D** +1 650 614 7350
**F** +1 650 614 7401

March 4, 2022

**VIA ELECTRONIC MAIL**

Andrea Diangco, Regional Investigator
Whistleblower Protection Program
U.S. Department of Labor, OSHA
300 Fifth Avenue, Room 1280
Seattle, Washington 98104
diangco.andrea@dol.gov

Ashley Gjovik, Complainant
1050 Benton Street, Apt. 2310
Santa Clara, California 95050
ashleymgjovik@protonmail.com

**Re: *Ashley Gjovik v. Apple Inc.*, Case No. 9-3290-22-051**

Dear Ms. Diangco:

This firm is counsel to Respondent Apple Inc. in the above-referenced matter. This letter is Apple's initial response to the amended complaint ("Complaint") filed by Ashley Gjovik on November 2, 2021. This response[1] contains confidential business information belonging to Apple; accordingly, Apple requests that it be kept confidential and that Apple receive pre-disclosure notification pursuant to 29 C.F.R. § 70.26 in the event of any FOIA request covering this response.

Apple submits this response without waiving its right to respond further, including to any additional submission that Ms. Gjovik may make. While we believe that this response demonstrates Ms. Gjovik's retaliation claim has no merit, please let us know if you believe additional information would be helpful.

Except as expressly admitted below, Apple denies Ms. Gjovik's allegations in the Complaint in full.

## I. INTRODUCTION

Ms. Gjovik's retaliation claims here hinge on her proving that Apple retaliated against her for raising concerns about (1) unsafe work conditions and (2) an Apple board member's alleged conflict of interest regarding efforts to remediate those alleged conditions. All of her claims are without merit.

---

[1] Apple has a compendium of evidence in support of this response available upon request, should you believe it would be helpful in connection with your review of Ms. Gjovik's Complaint.

Apple did not terminate Ms. Gjovik's employment because she voiced concerns, but instead because she violated Apple policy by ***intentionally disclosing confidential information about Apple products on Twitter and, as Apple later discovered, to the press***, in clear breach of her confidentiality obligations. And she refused to meaningfully cooperate in Apple's investigatory process.

Indeed, Ms. Gjovik's termination was well after she first voiced the concerns on which the present Complaint is based. According to Ms. Gjovik, she first raised concerns to Apple in March 2021, more than six months before she was terminated; in the interim, Apple engaged repeatedly and in good faith in an effort to address Ms. Gjovik's concerns. Apple had legitimate business reasons to terminate Ms. Gjovik's employment, and the six-month time gap is too attenuated to support any inference causation – a key element of each of Ms. Gjovik's three claims under the Occupational Safety and Health Act ("OSHA") section 11(c), the Sarbanes-Oxley Act ("SOX"), and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

## II. FACTUAL BACKGROUND

### A. Apple Prohibits Discrimination, Harassment, and Retaliation.

Apple has a firm and long standing commitment to diversity and inclusion and does not tolerate discrimination, harassment, or retaliation of any kind. Apple takes seriously its legal obligations to maintain a workplace free of discrimination, harassment, and retaliation and complies with all federal and state requirements imposed upon it. Apple has and strictly enforces its non-discrimination, anti-harassment, and non-retaliation policies.

Apple has an Employee Relations ("ER") team within its People function that investigates internal complaints of discrimination, harassment, and retaliation. Employees can complain openly or anonymously. And there are many avenues for them to raise complaints: they may speak directly to any Apple manager, contact Apple's People Support team and/or their People Business Partner, contact the confidential Business Conduct Helpline via phone, email, or online submission, or submit a confidential or anonymous report to EthicsPoint, Apple's third-party vendor. Apple policy strictly prohibits retaliation for reporting any complaints or concerns.

### B. Ms. Gjovik Worked at Apple for Six Years in a Role That Furnished Her Access to Highly Confidential Apple Product Information – Which She Agreed to Protect.

Apple hired Ms. Gjovik as an iOS Build Engineer Project Manager at Apple's Sunnyvale, California location in February 2015. She subsequently transitioned to an Engineering Program Manager role and then was

orrick

Andrea Diangco
March 4, 2022
Page 4

C. **Ms. Gjovik Disclosed Apple's Confidential Information In Violation Of Her Written Confidentiality Agreements and Refused to Meaningfully Participate in the Investigation Into Her Conduct.**

On August 28, 2021, Ms. Gjovik tweeted[4] details about a proprietary study Apple was conducting, codenamed "Omega," about a confidential Apple product.[5] Like the Alpha study, the details of Omega were not known except to a small select group within Apple, and certainly not outside Apple, and Ms. Gjovik agreed to keep them confidential under her Confidentiality Agreement. Despite this, Ms. Gjovik's tweet both identified the name and purpose of the study regarding an unreleased product under development. Ms. Gjovik's tweet was retweeted the same day by an account dedicated to posting predictions about future Apple products. The next day, Apple received a formal complaint through its Business Conduct Hotline that Ms. Gjovik had publicly disclosed confidential information about the Omega study.

On August 30, 2021, Ms. Gjovik tweeted photographs and a video of herself created by the Alpha application, thus disclosing Apple confidential information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the Alpha study.[6]

Ms. Gjovik knew her conduct was inappropriate; she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations. In January 2020, Ms. Gjovik reported to Apple conduct of former employees who gave an interview in which they disclosed, among other things, internal code names, which Ms. Gjovik stated were "trade secret."

Upon learning of her unauthorized disclosure, Apple promptly launched an investigation. On September 9, an Apple investigator requested to speak with Ms. Gjovik as part of that investigation. Ms. Gjovik refused to be interviewed, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Ms. Gjovik had violated her confidentiality agreements and Apple policy.

---

[4] In March 2021—the same time Ms. Gjovik asserts she began raising alleged concerns with Apple—Ms. Gjovik created and has since maintained an active Twitter account.

[5] As with the Alpha study, Apple refers to this study by the codename "Omega" in an effort to safeguard Apple's confidential product information.

[6] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple*, The Verge (Aug. 30, 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id.

4161-3255-5828

building's safety, explaining that measures were in place to mitigate the potential for vapor intrusion. EHS again reviewed the three-step project announced in February 2021 and explained it was part of Apple's regular maintenance, not due to concerns regarding the safety of the building. EHS also explained that no EPA reporting was necessary because Apple's planned work was routine and voluntary.

Far from retaliating against Ms. Gjovik in an effort to stifle her concerns about workplace safety, Apple devoted significant time and resources to addressing them.

**2. Apple Investigated Ms. Gjovik's Concerns About an Alleged Conflict Of Interest by an Apple Board Member.**

On July 19, 2021, Ms. Gjovik wrote to the EPA regarding her belief that a member of Apple's Board of Directors (Ronald Sugar) had a conflict of interest regarding the Stewart 1 building. She contended that because Mr. Sugar had previously been the CEO of Northrup Grumman – which Ms. Gjovik asserted was primarily responsible for maintaining environmental safety at Stewart 1 – Mr. Sugar had made or supported decisions favorable to Northrup Grumman in connection with Stewart 1, at Apple's expense. Ms. Gjovik forwarded her communications with the EPA to the ER team on July 27, 2021 and again the following day.

Apple did not stifle Ms. Gjovik's concerns; it instead investigated them and found that they lacked merit. By the time Apple's investigation regarding this issue was complete, however, Ms. Gjovik had been terminated for breach of her confidentiality obligations.

**3. Apple Granted Ms. Gjovik's Request To Be Placed On Paid Administrative Leave.**

On July 20, 2021, Ms. Gjovik raised new concerns that she believed her managers were creating a "hostile work environment."[10] When she met with an ER Investigator to discuss those concerns, Ms. Gjovik suggested administrative leave as a "short-term" solution to the alleged issue and confirmed her suggestion in the email summary she sent ER after their discussion.

On August 4, 2021, Ms. Gjovik met with ER again and expressly requested to be placed on paid administrative leave. ER agreed and confirmed by email:

---

[10] Apple expressly denies Ms. Gjovik's hostile work environment claims, which are not at issue here but instead are the subject of her separate charges with the DFEH, EEOC, and NLRB. Apple does, however, discuss her hostile work environment allegations herein to the limited extent relevant here (e.g., responding to her claim that she was "suspended" in August 2021 which in fact she requested and was granted paid administrative leave).

orrick



> I want to confirm our conversation a few minutes ago. ***Per your request, you are now on paid administrative leave so as to not interact with your managers***.

Ms. Gjovik did not email ER back. But that same day, Ms. Gjovik misrepresented their meeting in a tweet, alleging that Apple had "suspended" her by placing her on an involuntary "indefinite" leave. ER emailed Ms. Gjovik to correct her misrepresentation the following day. ER told Ms. Gjovik that since the paid leave was at her request, she could return to work at any time. Ms. Gjovik never responded.

## III. ARGUMENT

Apple terminated Ms. Gjovik's employment because she chose to disclose confidential Apple product information she was under an obligation to keep in confidence, and then refused to participate into the internal investigation of that disclosure. Simply put, there was no retaliation under OSHA, SOX, or CERCLA. Ms. Gjovik has not established—and cannot establish—a *prima facie* case of retaliation. All three statutes require that Ms. Gjovik show: (1) she engaged in a protected activity; (2) Apple knew or suspected that she engaged in the protected activity; (3) she suffered an adverse action; and (4) the protected activity was at least a contributing factor[11] in the adverse action. *See* 29 U.S.C.A. § 660(c)(1) (OSHA 11(c)); 18 U.S.C.A. § 1514A(a) (SOX); 42 U.S.C.A. § 9610(a) (CERCLA).[12] Because none of her expressions of concern was a "contributing factor" in her termination, she cannot establish retaliation on the facts.

---

[11] While the three statutes have different causation standards, it is immaterial because Ms. Gjovik cannot establish causation even under the most lenient "contributing factor" standard. 29 C.F.R. § 1980.104(e)(2)(iv) (SOX) (contributing factor causation standard); 29 C.F.R. § 24.104(e)(2)(iv) (CERCLA) (motivating factor causation standard); 29 C.F.R. § 1977.6(b) (OHSA) (but-for causation standard).

[12] Apple does not concede that Ms. Gjovik can establish any of the four elements of a retaliation claim under these statutes. For example, Ms. Gjovik's allegedly activity would not qualify as protected under SOX (and thus could not ground any SOX whistleblower claim). In the Complaint and memorandum Ms. Gjovik submitted to the DOL, she asserts that she engaged in a number of activities including reporting an Apple board member's alleged conflict of interest, reporting that Apple failed to notify employees they worked on a Superfund site, and reporting a failure to address workplace safety, among others. None of these alleged actions constitute protected SOX activity, however. *See* 18 U.S.C. § 1514A(a)(1) (employee must allege conduct the employee "reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders"); *see also Verfuerth v. Orion Energy Sys., Inc.*, 879 F.3d 789, 793-94 (7th Cir. 2018) (complaints about conflicts of interest and violations of internal company protocol not about "fraud" within meaning of SOX); *Gauthier v. Shaw Grp., Inc.*, 2012 WL 6043012, at *6 (W.D.N.C. Dec. 4, 2012) (dismissing plaintiff's complaint, finding that his reports were related to nuclear safety, not fraud against shareholders); *Levi v. Anheuser-Busch Cos., Inc.*, ALJ Case No. 2006-SOX-37, 2006 WL 3246840, at *16 (May 3, 2006) (complaints about workplace safety and manager incompetence did not contain any allegations of fraud). For purposes of this responsive statement, however, Apple focuses on select elements of her *prima facie* case (as a failure to establish any of them is fatal) without prejudice to additional arguments that may be available.

Andrea Diangco
March 4, 2022
Page 10

**A. <u>Apple Terminated Ms. Gjovik For Legitimate Reasons Unrelated to Her Concerns.</u>**

Apple terminated Ms. Gjovik for legitimate business reasons: she violated her own written confidentiality agreements with Apple and Apple's policies, both by disclosing confidential product information and by refusing to cooperate in an internal investigation. Because Apple would have terminated Ms. Gjovik for this conduct even had she never raised any safety or conflict of interest (or any other) concerns, Ms. Gjovik's claims fail under CERCLA, SOX, and OSHA. *See Crosby v. U.S. Dep't of Lab.*, 53 F.3d 338 (Table), 1995 WL 234904, at *1 (9th Cir. 1995) (affirming that employer did not violate CERCLA where the employer showed that it had legitimate, nondiscriminatory reasons for terminating the employee, including poor work quality, insubordination, and refusal to work on a project); *Riedell v. Verizon Commc'ns*, ALJ Case No. 2005-SOX-00077, 2006 WL 3246893, at *11 (Aug. 14, 2006) (dismissing SOX claim where complainant failed to offer evidence sufficient to undermine employer's contention that he was fired for legitimate reason of refusing to participate in a meeting with management); *Solis v. Consol. Gun Ranges*, 2011 WL 1215028, at *8 (W.D. Wash. Mar. 30, 2011) (determining under OSHA section 11(c) that employee's protected activity was not but-for cause of termination where employer showed that it would have terminated employee in any event).

The ***only*** reason that Apple terminated Ms. Gjovik's employment was due to her own deliberate breaches of her confidentiality agreements and violations of Apple policy. Disclosing confidential product information and refusing to meaningfully participate in internal investigations are both bases for immediate termination under Apple's Misconduct and Discipline policy. They are also recognized as legitimate bases for termination under relevant case law. *See, e.g., Galinsky v. Bank of Am., Corp.*, ALJ Case No. 2011-SOX-010, ARB Case No. 11-057, 2012 WL 5391424, at *10-11 (ARB Oct. 31, 2012) (substantial evidence supported finding that complainant would have been discharged in any event due to, among other things, violating company policy by downloading sensitive corporate information for his personal use); *Grove v. EMC Corp.*, ALJ Case No. 2006-SOX-00099, 2007 WL 7135739, at *24-25 (July 2, 2007) (finding that complainant's termination was due to his unreasonable refusal to cooperate in respondent's investigation of the issues he raised and thus not actionable under SOX).

Ms. Gjovik knew when she disclosed the confidential information on social media that she was violating Apple's policies; she had reported others less than two years prior for doing the exact same thing. There is no evidence that Apple's reasons for termination were pretext, nor is there any evidence that Apple harbored animus toward Ms. Gjovik for raising concerns; on the contrary, it took them seriously and engaged in good faith investigations of the issues she raised. Indeed, Ms. Gjovik's termination was consistent with Apple's practice of terminating other employees who violated their confidentiality agreements by disclosing unreleased product information; since 2017, Apple has terminated the employment of at least nine employees for violating their confidentiality obligations.

In short, Ms. Gjovik's expressions of concern played no role in her termination – nor is there any evidence that they did – and her retaliation claims should be dismissed.

Date: September 9, 2021

To: Ashley Gjovik Employee ID:293492
From: Yannick Bertolus
cc: Personnel file

via Email
ashleygjovik@icloud.com

via FedEx
501 33rd Ave, Apt 406A
San Francisco, CA 94121

Re: Termination of employment

Apple has determined that you have engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. You disclosed confidential product-related information in violation of Apple policies and your obligations under the Intellectual Property Agreement (IPA). We also found that you failed to cooperate and to provide accurate and complete information during the Apple investigatory process.

Your access to Apple systems has been suspended as of today and your employment will terminate on September 10, 2021. You will receive your final pay which will include regular pay through your termination date, all accrued unused vacation pay and any ESPP contributions made in the current period.

Although your pay and most of your benefits will end on your last day of employment, you may have the option of continuing some of your benefit plans, including your current health care coverage. Information about your benefits continuation options will be mailed to your home approximately two weeks after your termination date. In addition, within 30 days of your termination date, you will receive a separate COBRA packet explaining your options for continuing healthcare coverage. Contact Apple's People Support at 1-800-473-7411 if your address has or will change.

If you have information that indicates the decision to terminate your employment was not made in accordance with Apple policy or if you have new information that you believe would alter this decision, you may request a review per Apple's Decision Review policy. Your request for a Decision Review must be received within two months of your termination date. To request a Decision Review or get more information about the process, contact People Support at 800-473-7411.



EXHIBIT M
Witness: Y. Bertolus
Date: April 17, 2026
Stenographer: Carrie Gibson, CSR No. 13937

As a reminder, your obligations under the IPA continue even after your employment with Apple ends. This includes, but is not limited, the obligation to not disclose Apple's confidential or proprietary information such as unreleased product information, new product schedules, budgets, marketing plans, organization charts, customer lists, personnel information, vendor contacts, etc. If you need a copy of your signed IPA please contact People Support at 800-473-7411.

You are also obligated to return to Apple all Apple owned equipment and devices. You will receive a pre-paid FedEx box to ensure the prompt return of Apple devices. If you need assistance, please contact Aleks Kagramanov at akagramanov@apple.com.

Attachments included

**Subject:** Re: Ashley Gjovik Summary
**From:** "Megan Bowman" Redacted
**Received(Date):** Fri, 10 Sep 2021 01:44:58 +0000
**To:** "Yannick Bertolus" Redacted
**Attachment:** AG Term Letter FINAL.pdf
**Attachment:** US_CA_Unemployment_en.pdf
**Attachment:** US_When_Benefits_End_FT_JAN2021_en.pdf
**Date:** Fri, 10 Sep 2021 01:44:58 +0000

---

Ok, thanks.

Here are the attachments you can send to Ashley in an email notifying her of the termination. We will also send this via FedEx tonight. Here is her email address:
Redacted

Below is the text and subject line you can use. Please copy me on the email you send to her.

Thanks,
Megan

*****

Subject: Employment Status

Email Text:
Hi Ashley,
Please see attached.

Yannick

> On Sep 9, 2021, at 6:26 PM, Yannick Bertolus Redacted wrote:
>
> Understood. I agree with the termination decision.
>
> Yannick
>
>> On Sep 9, 2021, at 6:20 PM, Megan Bowman Redacted
Redacted wrote:
>>
>> Yannick,
>>
>> This afternoon, Sophi Jacobs and Aleks Kagramanov, members of our Global Security and ER teams, reached out to Ashley to talk with her about allegations that she had disclosed confidential product-related information on Twitter.

EXHIBIT N
Witness: Y. Bertolus
Date: April 17, 2026
Stenographer: Carrie Gibson, CSR No. 13937

\>>
\>> Ashley chose not to talk with the team and asked for all communication to be in writing. She was informed that because she chose not to participate in the discussion, Apple would move forward with the information that we had, and that due to the seriousness of the allegations her systems access would be suspended.
\>>
\>> Ashley disclosed confidential product-related information on Twitter,
and this conduct on its own, warrants termination. In addition, she failed to cooperate in Apple's investigative process today and during the ER investigation into her workplace concerns. More specifically, she failed to accurately and completely provide information, including actively redacting relevant information from documents that she presented to Apple's ER Investigator.
\>>
\>> Based on her conduct which violates Apple policies, the People team recommends that her employment be terminated.
\>>
\>> Thanks,
\>> Megan
\>>
\>

---

Ok, thanks.

Here are the attachments you can send to Ashley in an email notifying her of the termination. We will also send this via FedEx tonight. Here is her email address: Redacted

Below is the text and subject line you can use. Please copy me on the email you send to her.

Thanks,

Megan

---

---

*****

Subject: Employment Status

Email Text:

Hi Ashley,

Please see attached.

Yannick

On Sep 9, 2021, at 6:26 PM, Yannick Bertolus Redacted wrote:

Understood. I agree with the termination decision.

Yannick

> On Sep 9, 2021, at 6:20 PM, Megan Bowman Redacted wrote:
>
> Yannick,
>
> This afternoon, Sophi Jacobs and Aleks Kagramanov, members of our Global Security and ER teams, reached out to Ashley to talk with her about allegations that she had disclosed confidential product-related information on Twitter.
>
> Ashley chose not to talk with the team and asked for all communication to be in writing. She was informed that because she chose not to participate in the discussion, Apple would move forward with the information that we had, and that due to the seriousness of the allegations her systems access would be suspended.
>
> Ashley disclosed confidential product-related information on Twitter, and this conduct on its own, warrants termination. In addition, she failed to cooperate in Apple's investigative process today and during the ER investigation into her workplace concerns. More specifically, she failed to accurately and completely provide information, including actively redacting relevant information from documents that she presented to Apple's ER Investigator.
>
> Based on her conduct which violates Apple policies, the People team recommends that her employment be terminated.
>
> Thanks,
> Megan

**Subject:** Employment Status
**From:** <yber Redacted >
**Received(Date):** Fri, 10 Sep 2021 01:53:55 +0000
**To:** <ash Redacted
**Cc:** "Megan Bowman Redacted
**Attachment:** AG Term Letter FINAL.pdf
**Attachment:** US_CA_Unemployment_en.pdf
**Attachment:** US_When_Benefits_End_FT_JAN2021_en.pdf
**Date:** Fri, 10 Sep 2021 01:53:55 +0000

---

Hi Ashley,

Please see attached.

Yannick

EXHIBIT O
Witness: Y. Bertolus
Date: April 17, 2026
Stenographer: Carrie Gibson, CSR No. 13937

APL-GAELG_00001143



PL_PROD_12_0113

Deposition of

**Yannick Bertolus**

April 17, 2026

Ashley Gjovik

vs.

Apple Inc.

aptus COURT REPORTING
www.aptusCR.com | 866.999.8310

Page 65

the question back?
(Record read back as follows:
"Q. Do you recall any kind of outcome of those investigations?")
MS. PERRY: Okay. So to the extent that you were -- that any outcomes of the investigations were conveyed to you in a privileged setting, I want you to be careful not to disclose that.
BY MS. GJOVIK:
**Q. Can you answer, please?**
A. I'm going to follow the advice of -- of legal here.
**Q. Okay. So I think why she just did that is that you indicated you tried to separate from -- you don't want to be involved. But we had an employee relations investigator be deposed who said that he was giving you updates. So I think that's why they -- that would be my guess. And that's just me -- commentary. That's not a question for you. But I understand you're passing on that one.**
**Okay. So do you recall around the time when you were made aware there was an investigation into me?**
A. Sorry. Repeat the question. Sorry.
**Q. Yeah. Do you remember the time -- like,**

Page 66

**month, at least -- of when you were made aware there was an Apple investigation into me, into my conduct?**
A. Yeah. As I answered, I think a few -- a minute or so ago, I -- it was many months. I don't remember exactly the date.
**Q. September or August or earlier?**
**No recollection?**
A. I thought it was many months, not just a month or two.
You're referring to which investigation?
**Q. The investigation into my conduct. So me being bad. Apple saying, "Ashley's being bad. We're looking into it."**
**Do you remember the temporal --**
A. Well, yeah --
MS. PERRY: Objection, to the extent it lacks foundation.
Go ahead.
THE DEPONENT: Yeah, I think you're putting words in my mouth here, or you're putting words in Apple's mouth.
All I -- what I referred to earlier where I was made aware that you had concerns about the building and after -- and I don't know exactly when it was. Earlier in 2021. And that you raised some

Page 67

concerns about David Powers and Dan West, and that those were being looked into.
BY MS. GJOVIK:
**Q. Thank you. Sorry.**
**I was trying to clarify that I wasn't asking about that part. I was asking about the investigation into me, like, leaking or whatever the -- my misconduct with the investigations.**
**I'm asking when you became aware that Apple was investigating me.**
A. Oh, that was not months before. That was days before --
**Q. Yeah, that's --**
A. Yeah.
MS. PERRY: Hold on. Please let him finish his answers before you interrupt him.
BY MS. GJOVIK:
**Q. Sorry.**
**Go ahead.**
A. Yeah. So that's was days, not months.
**Q. Do you remember roughly how many days?**
A. We're talking a week, two weeks. I don't know.
**Q. Okay. It was a long time ago.**
**Is there anything you can share about that**

Page 68

**investigation that's not privileged?**
A. I saw that you leaked information, and I also saw -- and that's the misleading that I referred to earlier -- a redacted text exchange with Dan West. And then I was also notified at the time that you did not participate in the investigation.
**Q. Okay. Thank you.**
**So I still haven't got an answer of what this redacted text exchange is. So you've actually given me the most information of anyone on that.**
**Can you tell me anything else you remember about what that text exchange was or what was redacted or why that was -- sorry. That was a bunch of -- I got really excited I might get an answer. I'd like to ask you about that redacted text message exchange you mentioned.**
**Do you recall any content from that message you said you reviewed?**
A. I don't remember specifics. But I remember that it was really misleading and that it felt taken totally out of context and that when you saw the whole exchange of texts, it was painting a different picture than what you tried to paint.
**Q. Okay. And when you say "redacted," do you mean, like, black boxes over text?**

Page 69

A. No.
**Q. What did you mean when you said "redacted"?**
A. I mean what you presented to the investigator versus the full text exchange.
**Q. So if I had presented, like, a screenshot but not the full exchange -- or sorry.**
**Can you clarify what you meant by what I presented versus the full exchange?**
A. I don't remember the -- all those details.
**Q. Okay. But it wasn't, like, black boxes intentionally covering up text, to your recollection; is that correct?**
A. That's not the way I remember it, no.
**Q. That helps. Because I didn't remember that either. Thank you.**
**Okay. So -- and it was a text message with Mr. West, you said.**
**Do you remember the time frame of when that text message was?**
A. No, I don't.
**Q. Okay. And is it your understanding that that issues was the misrepresentation allegation against me?**
A. That was an example of you misleading the investigators and a violation of the business

Page 70

conduct.
**Q. Okay. Can you -- can you list the other things I did wrong too again, please, again?**
A. You mean what warranted your termination?
**Q. Yes, please.**
A. You disclosed product-related information and -- and trade secrets on Twitter, which was a violation of your confidentiality and intellectual property agreement. And then you failed to cooperate with the investigation. And then there was the -- what we just discussed with the misleading of the ER investigations that looked into your complaints.
**Q. Okay. And of course, for the record, I disagree with all this. But I'm not going to fight you about it. That's not what this deposition is.**
**But when you said failed to cooperate in the investigation, do you recall the details of what that failure to cooperate was?**
A. You refused to -- I mean -- yes. You refused to, I believe, answer the phone or the emails or the way they were trying to reach out to you to ask you more questions about your leaking information on Twitter.
**Q. Do you recall seeing whatever exchange that was yourself?**

Page 71

A. No.
**Q. Okay. Do you recall how it was described to you?**
MS. PERRY: Okay. I'm going to -- if the question is do you recall, you can answer that question. So let's take this question by question. Because I'm going to instruct you, to the extent these questions ask for privileged information.
MS. GJOVIK: Okay.
THE DEPONENT: So can you repeat the last question, then?
BY MS. GJOVIK:
**Q. Do you recall how that allegation -- the facts underlying the allegation of refusal to cooperate were presented to you?**
A. No.
**Q. We just reviewed that email you had with Ms. Bowman, and she said something about refusal to cooperate.**
**Do you remember getting any additional details beyond what she said in her own email?**
A. No.
**Q. Okay. And then the -- the leaking -- it sounds like you reviewed the post at issue.**
**Can you confirm: Did you review any of the**

Page 72

**posts that Apple was stating was leaking?**
A. I remember quite vividly seeing a picture in black and white, which I believe was a screenshot of an internal tool as part of a user study. That was a violation of your confidentiality agreement, as well as the user study agreement that you had participated in.
**Q. Did you see the Twitter post or just the image? Do you recall?**
A. I recall seeing the image.
**Q. Okay. So you wouldn't have seen them on Twitter yourself, then; someone at Apple showed them to you; is that correct?**
A. Yes.
**Q. Okay. Do you recall what the content of the image -- or how many images were you shown that you reviewed?**
MS. PERRY: So again, I'm going to instruct you not to answer, to the extent that this is getting into what specifically an attorney investigation showed you.
To the extent that you want to ask him questions about what he was aware of, you can do that. But you need to separate that from what investigators showed him or what specifically

Page 97

MS. PERRY: Objection. Vague and ambiguous. Overbroad.
BY MS. GJOVIK:
**Q. Mr. Bertolus, you just said that the line you just read is a policy violation that justified my termination related to investigations. You also said that there were two separate violations related to investigation, one about misleading or misrepresenting and one about failure to cooperate.**
**Can you please elaborate which violation you're talking about with that term you just read?**
A. Well, the sentence here would cover both.
**Q. And why?**
A. Because you did not fully cooperate in the investigation, one, by refusing to answer on the leaks; two, by misleading and not providing full context in that text exchange.
**Q. Okay. And I know -- I'm sorry -- this is really annoying.**
**Okay. So for the first one, for failure to cooperate, can you be more specific? You said refusal to answer. But no one called me that I'm aware of I didn't answer.**
**So can you specify what the more specific violation is you're referring to?**

Page 98

A. Well, you're making statements I can't verify. So it's -- I'm a little confused.
**Q. Okay. Well, let me rephrase. Sorry. I'm dealing with very ambiguous information from Apple. So I'm trying to -- trying to frame it right.**
**The failure to cooperate violation, because that was part of my termination reason, can you provide more details of what your understanding is of how I failed to cooperate?**
A. So you posted that -- you leaked on Twitter. And when global security tried to reach out to you, you did not participate in that. That's one. And you also did not fully cooperate in the investigation on your workplace concerns by misguiding the investigator by not showing fully a text exchange.
**Q. Thank you.**
**For the first one, can you provide more details on what exactly my misconduct was that was seen as refusal to cooperate?**
MS. PERRY: Objection. Asked and answered.
BY MS. GJOVIK:
**Q. Mr. Bertolus, are there any factual details you can provide that underline the allegation that I refused to participate in an investigation with global security on September 9th?**

Page 99

A. I think that would be better answered by global security.
**Q. Agreed.**
**But if you made the determination to fire me and said you made that independently yourself and reviewed the information yourself, I would assume that you would have more details than just a blanket assertion.**
**So I would like to know if you have more details.**
A. The leak on Twitter of that internal tool was so egregious that that in itself warranted termination. The fact that you did not cooperate was an addition to that, but not the main reason. The main was your leak.
**Q. Thank you.**
**I'm still trying to hone in on the failure to cooperate, what that actually means, though. So I'm not asking you these questions -- these retaliation lawsuits, Apple says one thing, and then I have to say, like, that's not what they mean, or this is what really happened.**
**So if they just say something vague, it's hard for me to come up with facts to show what really happened. So I'm just trying to figure out what the**

Page 100

**actual facts are and the different stories from different people, which is why I'm probably annoying you a lot right now asking this a million times. And I'm so sorry.**
**But if you -- I'm going to ask again: Do you know any information about what that allegation of refusal to cooperate was with global security on September 9th, other than what you've told me so far?**
A. Sorry.
Can you repeat the question again?
**Q. Yeah.**
**Do you have any other information that you recall about the factual details about why I was refusing to cooperate -- why Apple said I was refusing to cooperate when global security contacted me on September 9th, other than what you've shared already?**
A. No.
**Q. Okay. So then we don't have to keep asking that a million times. I'm sorry.**
**Okay. So then when you said you determined that it was justified that I should be terminated based on this policy violation we're just reading a million times -- I'm sorry -- and you stated this example of refusal to cooperate, can you explain your**

**determination of why that refusal to cooperate would violate this policy without any factual details of what occurred?**

MS. PERRY: Objection. Vague and ambiguous. Misstates testimony. Lacks foundation.

MS. GJOVIK: Let me ask again a different way.

BY MS. GJOVIK:

**Q. Mr. Bertolus, is it correct that you just said that you believe I violated this policy term that we just read and we've been discussing when I refused to cooperate when global security contacted me on September 9th, 2021?**

A. I mean, you could ask the court reporter. But I think I said that this was an example that covers both things.

**Q. I think you -- I'm just trying to avoid objections.**

**So because you said that, can you provide any factual details of why you believe this policy term and the violation applies to the facts underlying what occurred on September 9th?**

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

MS. GJOVIK: I'm going to keep that one.



I'd like him to answer.

THE DEPONENT: So I think you showed me the email that the HR sent to me; right?

BY MS. GJOVIK:

**Q. Yes, Megan Bowman's email.**

A. I think it stated on there, which is the information I'm getting, that you did not cooperate with global security. And when I read this again today, it says clearly:

"You are also required to fully cooperate in any Apple investigation."

So that looks pretty clear to me.

**Q. I'm sorry.**

**What I'm trying to get you to confirm is that you made the decision to terminate my employment based on that allegation, just based on what was told to you, but not knowing what the factual basis was underlying the allegation.**

MS. PERRY: So I'm going to instruct you not to answer, to the extent that this starts to get into what was communicated to you by counsel.

MS. GJOVIK: I think -- I think I have enough now for that. I don't want to keep annoying him.

///



BY MS. GJOVIK:

**Q. I'm sorry, Mr. Bertolus.**

**Would you like to continue reading this policy?**

A. Yes, please.

**Q. Okay. Please let me know more stuff I did wrong.**

A. Okay. You can keep going. You can keep going.

**Q. And we've already used up, like, 20 minutes on this. So if possible, if we can skip over stuff you don't think is going to be applicable, I'd appreciate it.**

A. I mean, you asked me to review this. So --

**Q. I know.**

A. Keep scrolling, please. You can keep scrolling. Thank you. Okay. You can keep scrolling.

Okay. So this is yet another example when you leaked the information:

"Assets include Apple's proprietary information, such as intellectual property," et cetera.

So:

"Watch what you say. Never



disclose confidential trade secrets or other business information without verifying with your manager whether such disclosure is appropriate."

And then you had no authorization to disclose what you did on Twitter. It should be shared on a need-to-know basis. Obviously Twitter, no need to know.

You can keep scrolling to the nondisclosure.

So there again:

"Never share confidential information about Apple's products or services without your manager's approval," which you did.

You can keep scrolling, please. You can keep scrolling. You can --

**Q. And I'm actually -- unless you insist, I'm going to be the one to say I think I have enough from this now that you've identified some stuff, because I've struggled to get Apple to identify anything.**

**So unless you want to go -- insist on going though the whole thing, I would ask if we could do -- maybe do a follow-up response from you, if you'd like to add additional.**

**I'd like to go to that misconduct and**

that you improperly disclosed Apple confidential information.
"Since you have chosen not to participate in the discussion, we will move forward with the information that we have. Given the seriousness of these allegations, we are suspending your access to Apple systems."
And then I responded:
"Hi, Aleks. As mentioned, I'm definitely willing to participate in your investigation. I only asked that the discussion be kept to email and said nothing about not participating in the discussion at all. I offered to help via email to ensure we have a documented record of our conversations, considering everything that's currently going on with my investigation and my complaints to the government" --
And sorry. That time stamp's off. It's Eastern. So that's 3:07 p.m. That's still within an hour of his original email.
Okay. Back to reading:
"I have been speaking out about



work conditions, about workplace safety, concerns about discrimination and retaliation, and about concerns about intimidation and corruption, as reported to the government in public record. I'm very concerned about what you are calling 'serious allegations.'
"Can you please provide me additional detail on what these allegations are? And when you say 'move forward,' are you simply" -- it should say suspending, but it says suspecting -- "my access to Apple system, or are you doing something more? And if so, what?
"Your email is very unexpected, and I'm caught quite off guard if this is a real issue. I'd like the opportunity to remedy any actual issues. Please let me know what the issues are, so I can make a good faith attempt at that.
"In the meantime, without additional context or effort to communicate with me in email, this



really does feel like intimidation and additional retaliation, and I will consider it as such."
Mr. Bertolus, have you ever seen any part of this email exchange before I just showed it to you now?
A. No, I have not.
Q. Okay. And now that you've seen this exchange -- and this was authenticated by Mr. Kagramanov -- would you say that it looked like I was refusing to cooperate?
A. You refused to talk to the investigator, so what we said is factual.
Q. So to clarify, you know, I was saying I'd talk to him in email. I just said I didn't want to get on the phone.
So can you clarify, are you saying that the only way to cooperate would be getting on the phone with him?
A. After leaking proprietary information and violating your confidentiality agreement, I think an appropriate next step would have been to speak to the investigator and cooperate that way.
Q. Okay. And do you think that my explanation of why I wanted to keep a written record then was



appropriate?
A. I don't see why, I mean, that's relevant for me to answer that.
Q. Do you think I should have been able to at least ask to have a witness or record the phone call?
MS. PERRY: Objection. Calls for speculation. Incomplete hypothetical.
MS. GJOVIK: I can't hear you.
MS. PERRY: Objection. Calls for speculation. Incomplete hypothetical.
BY MS. GJOVIK:
Q. You can still answer. Because he made the determination and made an assessment of cooperation.
A. The primary reason you were terminated is because you violated your confidentiality agreement when you posted those pictures on Twitter.
Q. Okay. Thank you.
Mr. Bertolus --
MS. GJOVIK: So this is Plaintiff's production 10, Exhibit 53 KC.
(Exhibit 53 was marked for identification.)
BY MS. GJOVIK:
Q. Mr. Bertolus, are you aware that the NLRB had issued a complaint against Apple, suing them for

Page 161

**I had asked you a couple times if you knew what the text message exchange was about.**
**Did you know what the subject matter was about when you fired me?**
A. I -- at the time, I did. But yeah, I don't have more recollection than -- than that.
**Q. Yeah. Okay.**
**So were you also aware that Mr. West had been suggesting I go to this restaurant, and I had indicated I couldn't afford it. And then when I got my promotion, he said he was going to promote me so that I did go, and so that's why I was telling him that I was there?**
MS. PERRY: Objection. Lacks foundation. Calls for speculation.
MS. GJOVIK: That's fine.
THE DEPONENT: What's the question again?
BY MS. GJOVIK:
**Q. Were you aware that Mr. West was urging me to go to this restaurant and eat there. I said I couldn't afford there. And then he was going to promote me, and so then I did go. And that's why I'm telling him that I was there?**
MS. PERRY: Same objections.
MS. GJOVIK: Yeah.

Page 162

THE DEPONENT: Can you -- sorry. I don't mean to be --
BY MS. GJOVIK:
**Q. No, that's fine.**
**Mr. Bertolus --**
A. Wait. Can you ask the question without the --
**Q. Let me ask it more simply.**
A. Thank you. Yes.
**Q. Mr. Bertolus, were you aware that Mr. West and I had been having discussions about Chez TJ, where Mr. West had been urging me to have dinner there?**
MS. PERRY: Objection. Lacks foundation. Calls for speculation.
MS. GJOVIK: Okay.
THE DEPONENT: I wasn't, except when he -- when I reviewed the text exchange where you misguided the investigator.
BY MS. GJOVIK:
**Q. Sorry.**
**Again, Mr. Bertolus, you had indicated you had not reviewed the actual text exchange when you made the termination decision. But now I'm confused.**
**Had you read any of these texts when you made the termination decision?**

Page 163

MS. PERRY: Objection, to the extent it's argumentative. And misstates the witness's prior testimony.
MS. GJOVIK: I'm just trying to understand if he knew what the subject matter of the text was when he made the decision or not.
MS. PERRY: He's already answered that question for you. He said --
MS. GJOVIK: I thought he said no.
MS. PERRY: No, that's not what he said. You're misstating his testimony.
MS. GJOVIK: Help me understand, please.
MS. PERRY: You asked him if he was aware of the subject matter, and he said he did at the time. He told you he had reviewed the text at the time, and then he told you he didn't remember it now. That was his testimony just a few moments ago.
THE DEPONENT: That's correct.
BY MS. GJOVIK:
**Q. Okay. So can you describe for me what you recollect now that you reviewed at that time?**
A. Well, now you've just shown me a whole lot more than I had ever seen before.
I was focusing on the fact, at the time of

Page 164

your termination, that you took an exchange and misled the investigator by just taking a small section of the exchange, and that was misguiding.
**Q. To the best of your recollection, do you remember seeing the actual text messages between me and Dan West when you made the termination decision?**
A. To the best of my recollection, I do. But to the best of my recollection, not even as much, I think, as what you've just shown me today.
**Q. Okay. And were you aware that the subject matter was Chez TJ and the sous chef, Andrew?**
A. I remember that it was Chez TJ. I had absolutely no idea it was Andrew. Even when it was presented to me just now, I thought it was Jared himself, not Andrew.
**Q. Oh, I'm sorry.**
A. That tells you how much I didn't know the details of all that.
**Q. Well, and I'm sorry. When I said Andrew, I meant more, like, just the subject matter of setting up with Andrew, versus who decided what.**
**But you did know this was Chez TJ-related when you had made the decision to terminate my employment; is that correct?**
A. Yes.

misguided the investigators, the way I recollect the meeting at the time.

**Q. And do you think if the broader context is given, then -- or -- misrepresentation indicates, like, I was making false complaints there, like I'm the problem.**

**So can you help me understand why that limited view of the conversation was seen as, like, misconduct by me? Was it something, like, them thinking that I was making, like, bad faith complaints?**

A. Yes.

**Q. Okay.**

A. As it relates to that text exchange, yes.

**Q. And so -- and I think you were saying something earlier about me being -- I think you said feminine, and didn't continue.**

**So is that a similar thing, that, like, because I was being --**

A. Sorry to cut you off.

Can you say that again? What would I have said? I don't remember saying that.

**Q. We don't have to go back. We'll see what was on the actual record. I don't know if you actually said it. I thought you said something. But**



**we'll if you have to say it. Like, I think it was Okpo who kind of, like, opened the door.**

**Would you say that if I was being flirty or acting like I was going along in the minute that if I made a complaint later that I thought Mr. West was being appropriate in a sexual nature, that I can't complain later?**

MS. PERRY: Objections. Vague. Ambiguous. Overbroad.

MS. GJOVIK: I'd like him to answer.

THE DEPONENT: That's not what I said.

BY MS. GJOVIK:

**Q. Can you help me understand, then, what I did during that exchange that means that I can't complain about it later without it being misconduct?**

MS. PERRY: Objection. Vague. Ambiguous. Overbroad.

MS. GJOVIK: Okay.

MS. PERRY: He didn't conduct the investigation.

MS. GJOVIK: He said he reviewed the content, though, and made a determination.

MS. PERRY: No, that's not what he said. You're misstating his testimony.

///



BY MS. GJOVIK:

**Q. Mr. Bertolus, can you tell me everything you can without violating privilege of why you think that my representation conduct related to this exchange with Andrew and Chez TJ was misconduct by me?**

A. I don't again remember. It was a long, long time ago.

What I do remember at the time was that you had taken a snippet out of the whole discussion, and that it was misguiding.

**Q. Okay. I have a couple more I want to quickly show you.**

**I guess were you aware that Apple chose to use this as a formal reason for justifying my termination in the litigation?**

MS. PERRY: Objection.

THE DEPONENT: I'm sorry.

To use what?

BY MS. GJOVIK:

**Q. The Chez TJ and Andrew stuff.**

MS. PERRY: Objection. Lacks foundation.

THE DEPONENT: You were terminated because you violated your confidentiality agreement when you posted those -- that picture on Twitter, failed to cooperate in the investigation right after that, and



misguided the employee relation investigator by showing only a snippet of that text exchange.

BY MS. GJOVIK:

**Q. Okay. Do you think it's fair for me to defend about this when I can't call Andrew, because he's apparently now deceased?**

MS. PERRY: Objection. Vague. Ambiguous. Overbroad. Calls for speculation. Also to the extent it lacks foundation.

THE DEPONENT: As I mentioned earlier, I did not even know that -- that the whole exchange was about Andrew.

MS. GJOVIK: I quickly want to show you something. Thank you. And again, I'm sorry -- I'm sorry for all that and having to bring up your personal information too.

Okay. So I want to show you an email. This is Exhibit -- Plaintiff's production 12I.

(Exhibit I was marked for identification.)

BY MS. GJOVIK:

**Q. This is an email between Dan and John and me and Kai from 2018 that I had given employee relations as evidence that I wanted them to investigate, that there were issues that should be addressed. And**

Case: 26-1716, 11/13/2026, DktEntry: 10.3, Page 74 of 253

Deposition of

**Ekelemchi Okpo**

April 07, 2026

Ashley Gjovik

vs.

Apple Inc.

www.aptusCR.com | 866.999.8310

Page 37

BY MS. GJOVIK:

**Q. What report?**

A. The report that, as I mentioned earlier, Jenna previously worked with you.

**Q. And then did Ms. Gjovik also report to you retaliation for raising EH&S concerns?**

A. Yes.

**Q. Do you remember the ways she reported those issues to you? Like, was it emails? Documents? Verbal?**

MS. RIECHERT: Objection.

THE WITNESS: Other than what was included in the issue confirmation document, I don't recall.

BY MS. GJOVIK:

**Q. Okay. And so you said that normally employee relations would investigate complaints about retaliation before raising EH&S concerns, and you mentioned that previously Jenna was involved with the EH&S complaints.**

**At the time that you were doing your investigation, what was your understanding of who, if anyone, at Apple was investigating Ms. Gjovik's complaints about retaliation for her making EH&S complaints?**

A. My understanding is that Jenna Waibel looked

Page 38

into those concerns.

**Q. The earlier investigation or one concurrent with your investigation?**

A. The earlier investigation.

**Q. Okay. And then you're saying that you did not investigate Ms. Gjovik's complaints about retaliation specific to EH&S complaints?**

MS. RIECHERT: Okay. What he did in his investigation is privileged, and I am not going to let him answer about that.

MS. GJOVIK: He sent emails saying he wasn't investigating it. We can pull it up now, or he can just answer.

MS. RIECHERT: If you want to show him the email, that's fine. I thought it related to EH&S complaints, not retaliation for raising EH&S complaints. But you can show us the email.

BY MS. GJOVIK:

**Q. Okay. So -- so this one is Exhibit AA. This is an email from August 3rd. And --**

A. Can you make that a bit bigger?

**Q. Yeah. Sorry about that.**

MS. RIECHERT: I'll second that one.

(Exhibit AA was marked for identification.)

Page 39

BY MS. GJOVIK:

**Q. Okay. This is an email you sent -- I had sent an email asking about the scope of the investigation, and you had said you were focused on the new concerns Ms. Gjovik raised since Jenna closed out her investigation on June 3rd. The items listed below and in Jenna's issue confirmation email were previously investigated, and Apple took corrective action in response to her investigative findings. As we discussed, if you have new information, please let us know.**

**And then you said, "Additionally, EHS is focused on reviewing your building and physical workplace safety issues. They will be in contact with you further to address those concerns."**

**So I think Melinda is actually correct there. That was saying that just EHS was looking into it, not Jenna. There was no mention that Jenna was looking into anything.**

**So that raised the question, again, then, of was there anyone at Apple investigating Ms. Gjovik's complaints about retaliation for raising EHS issues between July and September 2021?**

MS. RIECHERT: I think he already answered that; so I'll object to asked and answered. He

Page 40

mentioned the --

MS. GJOVIK: What was the answer?

MS. RIECHERT: -- the issue confirmation document.

MS. GJOVIK: But that would imply that he was investigating, and he hasn't confirmed if he was investigating those complaints.

MS. RIECHERT: You can answer if that was one of the things in the issue confirmation document you were looking into.

BY MS. GJOVIK:

**Q. If you don't -- sorry. Go ahead.**

A. I -- I investigated what was in the issue confirmation. I don't -- it's been a long time.

**Q. It's fine. Just tell me what you recall. You know, I don't want speculation.**

**Do you recall that anyone, yourself or someone else, was investigating Ms. Gjovik's complaints about retaliation specific to environmental health and safety issues between July 2021 and her termination in September 2021?**

MS. RIECHERT: Are you talking about complaints of issues or complaints of retaliation for issues?

MS. GJOVIK: Retaliation for issues.

MS. RIECHERT: Okay. I think he's answered that.
MS. GJOVIK: No, he didn't. He hasn't answered.
BY MS. GJOVIK:
**Q. So if you don't recall if anyone was, I just need you to say you don't recall if anyone was.**
MS. RIECHERT: He said that he was if it was in the issue confirmation. He just can't recall what was in the issue confirmation.
MS. GJOVIK: He never said that. You just said that. That's a speaking objection. And I object to your speaking objection. That's coaching the witness.
BY MS. GJOVIK:
**Q. Mr. Okpo, please answer the question.**
A. That's exactly what I said.
MS. RIECHERT: We can have the reporter read it back if you want.
THE WITNESS: Yeah.
BY MS. GJOVIK:
**Q. So your answer is if -- anything that was in the issue confirmation was something that you investigated?**
A. That's correct.



**Q. Okay. Great. Let's look at the issue confirmation. This is Exhibit D. This is the -- what I believe in the email we agreed was the final issue confirmation.**
(Exhibit D was marked for identification.)
BY MS. GJOVIK:
**Q. You had sent an earlier version. Let's see. This is Exhibit B.**
**Mr. Okpo, does this look like the version of the issue confirmation, to your best recollection, that you had sent Ms. Gjovik in August of 2021?**
A. Yeah. I'm reading.
(Exhibit B was marked for identification.)
BY MS. GJOVIK:
**Q. Yeah. I would like you to actually authorize it -- authenticate it, so we can go through each of the ten pages. If you can read it, and then let me know when you're ready to go to the next one.**
A. Yeah. If you could -- don't mind making it just slightly bigger.
**Q. Yeah. We can do half pages. Let me know when you want me to scroll down, and then let me know when you want me to go to the next one.**



A. Will do.
**Q. Okay.**
A. Please scroll down. Okay. Okay. Okay. Okay. Okay. Scroll. Okay. You can keep -- you can keep scrolling. You can keep scrolling. Okay. Keep scrolling. Keep scrolling. Okay. Keep scrolling. Okay. Okay. Okay.
**Q. There's still more. One more.**
A. I see. Okay. All right.
**Q. Should stay for the closing. You don't want to skip that.**
A. Okay.
**Q. Does that look like an email that you sent?**
A. Yes, it does. Thanks for that.
**Q. Oh, thank you. Sorry. To clarify, that was -- I believe you said that was a PDF document attached to an email that you sent to Ashley Gjovik in August 2021?**
A. Yes.
**Q. Okay. Thank you. And you read through all the content just now? That's what we were doing; right?**
A. Yeah. I -- yes.
**Q. Yeah. Did you see any mention of complaints about retaliation for environmental health and safety concerns?**



A. No.
**Q. I didn't either. And, in fact, you wrote, "On Wednesday August 4, 2021, you," Ashley Gjovik, "told me," you, Okpo, "that the above were all of your," Ashley Gjovik's, "concerns."**
**Is that true what it says?**
A. Yes.
**Q. Yeah. Did Ashley Gjovik ever tell you she had concerns about retaliation due to making EHS concerns?**
**If you said something, I couldn't hear it. Can you say it louder, please?**
A. Yeah. I just -- I don't recall.
**Q. Okay. You did add at the bottom here, "As a reminder, the scope of my investigation," Okpo's investigation, "does not include the concerns that you," Gjovik, "has raised with our Environmental Health and Safety team. Those concerns will be handled by our team of EHS experts."**
A. Correct.
**Q. Yeah. So you remember Ms. Gjovik making complaints about EHS issues?**
A. Yes.
**Q. Yeah. But you don't recall Ms. Gjovik ever making complaints about retaliation due to making EHS complaints?**

Page 49

**confirmed, did not document any complaints about retaliation due to raising EHS concerns. And you had said you only investigated what was written in the issue confirmation. And I asked you to distinguish which issue confirmation, and I showed you this issue confirmation now, which has a header even about environmental health and safety concerns and talks about retaliation for raising health and safety concerns.**

**So, Mr. Okpo, did you investigate Ms. Gjovik's complaints about retaliation due to raising EHS concerns as she requested in this issue confirmation?**

MS. RIECHERT: Objection. Attorney-client privilege. Instruct him not to answer.

MS. GJOVIK: I don't think that's privileged. I think that's actually the most fundamental question of this entire lawsuit.

MS. RIECHERT: Okay. Well, the investigation that he did was conducted under the advice of counsel, and what he did in connection with that investigation is privileged.

MS. GJOVIK: Okay. So as far as the facts go then, then we have no evidence that Apple ever investigated Ms. Gjovik's complaints about retaliation due to EHS concerns, July through September 2021. That's apparently where we're at.

Page 50

And it sounds like if I ask any further questions about whether you investigated anything in Ms. Gjovik's issue confirmation, you're going to claim privilege?

MS. RIECHERT: Correct. What he actually did to investigate.

MS. GJOVIK: What about the scope of the investigation?

MS. RIECHERT: Well, he's talked about these two documents.

MS. GJOVIK: Well, that's what you're not -- what I asked --

MS. RIECHERT: What he actually did is one thing, but if you ask him about the issue confirmation documents, he can talk about those documents. Just not what he did in response to them.

MS. GJOVIK: Yeah. But it was a binary question: Did he do anything at all, yes or no, regarding the complaints about retaliation due to making EHS complaints?

MS. RIECHERT: And that would ask him to answer -- require him to answer what he did in the investigation, and that's what I am not going to permit him to do.

MS. GJOVIK: But an answer could be "Nothing,

Page 51

I did absolutely nothing," or --

MS. RIECHERT: Right.

MS. GJOVIK: -- the answer could be, "I did something," and you're claiming privilege to those answers?

MS. RIECHERT: Correct. Because either would show what he did or didn't do.

MS. GJOVIK: Just a reminder, you can't claim privilege to misconduct.

MS. RIECHERT: I can claim privilege to an investigation that was conducted under the advice of counsel.

MS. GJOVIK: But you can't claim privilege to a lack of an investigation.

MS. RIECHERT: We can litigate that. We can argue that issue later. Let's not waste this witness's time on it.

MS. GJOVIK: Again, this is just the prima facie; so we'll keep coming back to this one. Okay.

BY MS. GJOVIK:

**Q. Mr. Okpo, thank you.**

**Can you -- what can you tell me, if anything, about what you did investigate as part of your investigation?**

MS. RIECHERT: I'll object to that on

Page 52

attorney-client privilege, and instruct him not to answer.

BY MS. GJOVIK:

**Q. Zero details. Okay.**

**Mr. Okpo, did you talk to witnesses?**

MS. RIECHERT: You can answer that generally.

THE WITNESS: Yes.

BY MS. GJOVIK:

**Q. Thank you. Can you tell me who you talked to?**

MS. RIECHERT: Objection. Attorney-client privilege. Instruct him not to answer.

BY MS. GJOVIK:

**Q. Mr. Okpo, can you tell me if you talked to any of the witnesses recommended by Ms. Gjovik?**

MS. RIECHERT: Objection. Attorney-client privilege. Instruct you not to answer.

BY MS. GJOVIK:

**Q. Okay. You did say that you did review the files provided. Actually, let's look at those for a second. Actually, it sounds like you're struggling a little too, Mr. Okpo.**

**Do you want to take five minutes? I can use five minutes.**

MS. RIECHERT: Yeah. It's been just over an hour.

Page 101

A. Oh, is that a question? Yes, I remember.
Q. Yeah. Yeah.
A. Yes.
Q. Okay. Mr. Okpo, is there anything that you are able to share that you might have done in response to Ms. Gjovik's complaints about concerns about that prior investigation?
MS. RIECHERT: Objection. Instruct him not to answer. Attorney-client privilege.
BY MS. GJOVIK:
Q. Okay. So, Mr. Okpo, do you remember reaching out to Ms. Gjovik on September 3rd, 2021, asking to speak with her?
A. Yes.
Q. This is Exhibit DD.
(Exhibit DD was marked for identification.)
BY MS. GJOVIK:
Q. The bottom shows an email from September 3rd from Mr. Okpo asking to connect. He sent it September 3rd, 10:07 a.m., and said, "I wanted to follow up on the text message I sent this morning. Are you available to connect with me at 10:30 a.m.? If not, please suggest a time and I'll be happy to reschedule."
Is that the email that you recollect?

Page 102

A. Yes.
Q. Yeah. And then the -- above that is a response sent my Ms. Gjovik.
Do you remember Ms. Gjovik's response?
A. Yeah.
Q. Yeah. Do you remember Ms. Gjovik asking you to keep communications in writing?
A. Yes.
Q. Yes. Did you ever agree or disagree to that request? Let me rephrase.
Did you ever respond directly to Ms. Gjovik's request to keep communications in writing?
A. No.
Q. Okay. And then, Mr. Okpo, you -- do you remember contacting Ms. Gjovik again on September 7th?
A. Yes.
Q. Yeah. So -- and is it your recollection that there was no communication in response to Ms. Gjovik's response on the third until your response on the 7th?
A. Yes.
Q. Yeah. This is Exhibit EE.
(Exhibit EE was marked for identification.)
BY MS. GJOVIK:
Q. And on September 7th, Mr. Okpo said, "Based on

Page 103

interviews I've conducted so far and evidence I've reviewed, there are some inconsistencies I'd like to discuss with you in detail, and give you the opportunity to provide additional information."
Mr. Okpo, what did you mean by that?
A. I was going through my investigation and I found some additional documents that were inconsistent with how you had laid out your complaints specific to the allegation that Dan West pressured you into engaging with a sous chef.
Q. That was the one thing you were reaching out about?
A. Yes.
Q. And that was the thing you were reaching out about on the 3rd and 7th?
A. It was -- yes.
Q. Okay. And then do you recall Ms. Gjovik's response on the 7th, which is shared on the screen right now from Exhibit EE, an email response at 6:45 p.m.?
A. Yes.
Q. And Ms. Gjovik asked you, again, if we could keep communication in writing. Says she is happy to discuss.
Did you ever respond to her email?
A. This specific email, no.

Page 104

Q. Mr. Okpo, were you opposed to communicating in writing?
A. The work that we do, investigating claims, it would be very difficult to get to the heart of the issue and fact-find via email. What I mean by that is, as investigators, similar to what you're doing here, it's important to receive answers or -- from the -- the person you're interviewing in realtime so that you could ask follow-up questions where appropriate. And so it wouldn't have -- it's just not part of my process or our ER investigate process to conduct investigations via email.
Q. Do you -- do you feel like you understood why Ms. Gjovik was asking to keep things in writing?
A. No.
Q. No. Were you aware at this point, either the email you sent on the 3rd or the 7th, that Ms. Gjovik had already filed complaints with the EEOC, the California DFEH, the NLRB, and/or the California Department of Labor?
A. Only through counsel.
Q. Wouldn't it be reasonable to assume that someone who had filed complaints with the government about the same issues would want documentation to share with the government about the communications about those

Page 105

**issues?**
MS. RIECHERT: Objection. Speculation.
BY MS. GJOVIK:
**Q. Mr. Okpo, have you had other investigations where employees had asked to keep communications in writing?**
A. Yes.
**Q. Yeah. Have you ever said yes and agreed?**
A. During the actual investigation process, I've been consistent around the need to have live conversations.
**Q. What if -- and have counsel for employees, if they're already preparing to sue Apple, have they also asked sometimes to keep things in writing rather than have oral conversations?**
MS. RIECHERT: Counsel for employees?
MS. GJOVIK: Yes.
MS. RIECHERT: Okay.
BY MS. GJOVIK:
**Q. Because I specified earlier that employees asked, so I just want to be sure that I'm also including the other group.**
A. So to make sure I understand your question, are you asking me if counsel for employees have direct -- have asked me directly to keep communication

Page 106

with their clients in writing?
**Q. Yes. That's the question.**
A. No.
**Q. No. Okay. And then -- let's see. So you've never agreed to keep things in writing.**
**Is there any policy that you're aware of, Apple, like, work policy that says investigations have to be oral and cannot -- communications are not allowed to be in writing?**
A. Not that I am aware of.
**Q. Yeah. Okay. And then this email that we're looking at right now, Ms. Gjovik had raised that she had just discovered that one of her coworkers had actually sued Apple over the alleged misconduct of Mr. West, and raised that to you with some concerns.**
**Did you ever respond to that?**
A. Respond to what?
MS. RIECHERT: I'll misstate what the email says -- misstates what the email says, but you can ask if he responded to your "PS."
BY MS. GJOVIK:
**Q. Okay.**
A. No. I didn't respond to this -- this email.
**Q. While you were conducting this investigation of Ms. Gjovik's concerns, were you aware that Crystal**

Page 107

**Brown had sued Apple over alleged misconduct by Dan West?**
A. No.
**Q. Okay. And then -- let's see. I would like to look at Exhibit FF. It's another email.**
(Exhibit FF was marked for identification.)
BY MS. GJOVIK:
**Q. On this one, Ms. Gjovik emailed you on August 20th, 2021, while she was on administrative leave, and wrote, "I continue to struggle to understand just how this current leave is not punishment, retaliation, or otherwise a negative employment action.**
**"P.S. I should get you the updated issue Confirm," or confirmation, "before Monday. It's taken a lot of time to sort through and make sense."**
**Did you ever respond to this email to your recollection?**
A. No.
**Q. Do you -- is there anything you can share that you did in response to the employee complaining of retaliation by you?**
MS. RIECHERT: Objection. Instruct the witness not to answer. Attorney-client privilege.

Page 108

BY MS. GJOVIK:
**Q. Is there any kind of process or protocol or policy in place at Apple when the employee complains to the employee relations investigator of the retaliation -- alleged retaliation by that investigator?**
A. I don't understand the question. Can you repeat it?
**Q. Yeah. Is there any kind of standard process or procedure that you're aware of when an employee complains to their investigator that the investigator themselves is also retaliating against them allegedly?**
A. Standard process or procedure?
**Q. How would you -- let me rephrase it.**
**If an employee was to complain to you that they felt that you were retaliating against them allegedly, how do you normally handle that sort of complaint?**
A. I don't know that I could answer that question. I think it would just depend on the circumstances. But, generally speaking, right, whenever someone from the People team, employee relations, or a member of management is made aware of an employee raising workplace concerns, we take those concerns very seriously and look into them.
**Q. Did you investigate yourself, Mr. Okpo, based**

Page 113

Q. Do you recall that Ms. Gjovik complained to you that she believed leave was used to basically, like, distract her while nothing was being investigated and then was brought back and had complained that things were actually even worse than prior?
A. That's not my recollection around the distraction allegation.
Q. So putting aside the term "distraction," do you recall Ms. Gjovik complaining to you that she didn't feel Waibel had actually investigated most or all things and complained that the alleged hostile work environment, retaliation were worse after she came back from the leave?
A. Yes. I recall you having general concerns about that investigation.
Q. Yeah. Mr. Okpo, do you recall Ms. Gjovik expressing concerns to you, prior to her being placed on administrative leave in August, that she was concerned the exact same thing might happen if she was placed on leave by Apple again?
A. I don't. I don't recall.
Q. Mr. Okpo, do you remember ever giving Ms. Gjovik an ETA of when she might be able to come back from work from that administrative leave?
A. I am sorry. Can you repeat the question?

Page 114

Q. Do you ever -- do you recall ever giving Ms. Gjovik an ETA, estimated time of arrival, of when she may be able it come back from that leave in August and September?
A. That would not be a normal practice. It would be dependent on the investigation.
Q. Okay. So we're looking at -- sorry. Go ahead. Did you have more?
A. No.
Q. Okay. Exhibit C is an email from August 24th with you saying you're -- "I am not able to communicate a timeframe on next steps, but as the investigation progresses, I will provide you additional updates."
A. Right. That's consistent with my testimony.
(Exhibit C was marked for identification.)
BY MS. GJOVIK:
Q. Okay. And, Mr. Okpo, the next update you gave, was that that September 3rd email, to the best of your recollection?
A. Yes.
Q. Yeah. And then the next email after that was September 7th to the best of your recollection, that one we looked at?
A. It sounds right.

Page 115

Q. Okay. And then did you send Ms. Gjovik an email on September 9th as well?
MS. RIECHERT: Do you want to show it to him?
MS. GJOVIK: I couldn't find it in time. I was looking so hard for it, but it was the one you produced. I didn't have a copy.
MS. RIECHERT: Is that the one that says -- says something like "since you won't talk to me, I'm going to finish my investigation"?
MS. GJOVIK: Yeah. Yeah. But that's also -- objection. Leading objection.
You just told him what the letter said instead of letting him answer.
MS. RIECHERT: No, I was -- oh, well, he couldn't remember it sounds like --
MS. GJOVIK: He hasn't answered, though, Melinda.
BY MS. GJOVIK:
Q. So putting aside Melinda's speaking objection, Mr. Okpo, do you recall sending Ms. Gjovik an email on September 9th, 2021?
A. I don't remember the specific date.
Q. Do you remember sending her any additional emails after that one we looked at from September 7th?
A. Yes. I would have closed out stating that

Page 116

since you refused to engage with me orally, I had no other choice but to closeout the investigation based on the information I currently had.
Q. You closed out the entire investigation because Ms. Gjovik would not talk to you about the sous chef complaint? Is that what you just said?
A. I needed to talk to you about some inconsistencies, and without having the opportunity to connect with you verbally, I had to closeout the investigation.
Q. For that one specific issue you said that the request was about, or you closed out the entire investigation?
A. Closed out the investigation.
Q. You previously said you didn't remember what date you -- you did, if it was before or after the employee was terminated. Is that still true?
A. I am sorry?
Q. You previously said you did not recall if the -- if the investigation was closed prior to or after the termination of the employee. Is that still correct?
MS. RIECHERT: And you're giving the date as 9/10?
MS. GJOVIK: The notification of the termination was September 9th, effective September 10th,

sous chef, but he did not say anything more, and I think it is material what exactly he thought the inconsistency was.

MS. RIECHERT: Yes. He can answer that.

BY MS. GJOVIK:

**Q. Yeah.**

A. Okay. I found that there were misrepresentations of facts based on your framing of the concerns around Dan allegedly pressuring you into romantically engaging with a sous chef.

**Q. What were the conflicting facts?**

A. The claim that Dan pressured you into engaging with the sous chef. However, I found the full text thread where you use language like "the sous chef being cute," you know, at one point you mentioned that you had met another gentleman, and, sorry, it wouldn't work out with the sous chef. And Dan was very explicit "no pressure from me at all."

And so two very inconsistent scenarios there.

**Q. Okay. Mr. Okpo, in your experience, do sometimes employees go along with a behavior by their superiors that sometimes they feel is inappropriate, but they might not feel comfortable objecting in realtime about that conduct, but then complain later?**

MS. RIECHERT: Objection. Improper



hypothetical.

BY MS. GJOVIK:

**Q. Mr. Okpo, do you recall Ms. Gjovik telling you she wanted to go the office -- her office on August 4th specifically to look for that email -- that text exchange because she didn't have a copy and didn't recall what was said at that time?**

A. No.

**Q. Do you remember her protesting when she was being told she was being put on administrative leave that she had said she wanted to go to the office to get that exact exchange and also take pictures of the cracks in the floor?**

A. No.

**Q. No. Mr. Okpo, what knowledge do you have -- what do you recollect about the EPA inspection of Ms. Gjovik's office that occurred in August 2021?**

A. None. That was not an issue that I was privy to.

**Q. Okay. And then, Mr. Okpo, we're almost out of time.**

**You said you closed the investigation. Can you confirm you closed the investigation, then the same day you sent that email -- so September 9th, 2021, is when you -- you closed the investigation of Ms. Gjovik's**



**concerns?**

MS. RIECHERT: Objection. Misstates the testimony.

BY MS. GJOVIK:

**Q. Mr. Okpo, what was the date that you closed the investigation of Ms. Gjovik's concerns?**

A. Whenever I sent you that email stating that I would be closing out the investigation. I don't recall the specific date.

**Q. Okay. And so if the employee had responded and said, "Oh, okay. I'll get on the phone with you," would you have reopened the investigation?**

A. Absolutely.

**Q. Okay. So completely contingent on oral communication?**

A. Correct. That allows an investigator to conduct a thorough investigation.

**Q. Okay. And has -- no, I'm not going to waste time about that.**

**Do you recall the emails about the employee complaining that she had heard Mr. West was going around and having all-hands -- or having staff meetings talking about the "Ashley issue" and telling staff that he would give an update on the "Ashley issue" at the October all-hands, and Ms. Gjovik complaining**



**that it seemed like Dan West already knew that she was going to be fired while she was already on administrative leave?**

A. That was a lot in that question.

MS. RIECHERT: I was going to say, there was about five things in that.

BY MS. GJOVIK:

**Q. Do you remember or do you recall Ms. Gjovik complaining to you that she was hearing from her coworkers statements being made allegedly by Dan West that indicated that he did not plan she was ever coming back to work?**

A. With that specific -- with that specific language, no.

**Q. What about the "Ashley issue" complaint?**

A. Yes.

**Q. Yeah. And that she complained that Dan West said he was going to talk about the "Ashley issue" at an October all-hands, and he was saying this in August 2021?**

A. That was your claim.

**Q. Did you do anything to investigate those complaints?**

MS. RIECHERT: Objection. Instruct him not to answer. Attorney-client privilege.

CERTIFICATE OF REPORTER

I, Haleema Saleh, a Certified Shorthand Reporter, do hereby certify: That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me At the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

In witness whereof, I have hereunto Subscribed my name.

Dated: April 10, 2026



___________________________

Haleema Saleh, RPR, CSR No. 14506



DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik
vs. Apple Inc.
Date of Deposition: 04/07/2026
Job No.: 10188180

I, EKELEMCHI OKPO, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2026, at ____________________.

_________________________________

EKELEMCHI OKPO

NOTARIZATION (If Required)

State of ________________
County of _______________
Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by_______________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)



DEPOSITION ERRATA SHEET

Case Name: Ashley Gjovik
vs. Apple Inc.
Name of Witness: Ekelemchi Okpo
Date of Deposition: 04/07/2026
Job No.: 10188180
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________



DEPOSITION ERRATA SHEET

Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________
Page _____ Line ______ Reason ______
From _______________________ to ________________________

_______ Subject to the above changes, I certify that the transcript is true and correct

_______ No changes have been made. I certify that the transcript is true and correct.

_____________________________________

EKELEMCHI OKPO

Deposition of

**Aleks Kagramanov**

April 16, 2026

Ashley Gjovik

vs.

Apple Inc.

aptus COURT REPORTING
www.aptusCR.com | 866.999.8310

**that response?**
A I don't recall what my reaction was at that moment.
**Q Okay. In your professional capacity, doing this for years, looking at that email, would you characterize that email as refusal to cooperate?**
A I would determine that as refusal.
**Q Can you tell me why.**
A Because we don't facilitate investigations over email.
**Q Is that an official policy?**
A I don't recall what the specific policy is.
**Q Is there any written policy that Apple has that says that?**
A I don't recall a specific policy.
**Q And refusal to cooperate, is that an allegation of misconduct by the employee that it's being made against?**
A Refusal to cooperate, we typically go off of the information we have.
**Q So is it misconduct by the employee to refuse to cooperate or that's just something that changes the direction of the investigation process?**
MS. RIECHERT: Objection. Lack of foundation.



BY MS. GJOVIK:
**Q Can you think of -- I'm going to withdraw that one and try again.**
**Can you think of other examples where employees ask to keep communications in writing?**
A I can't recall an instance.
**Q Okay. Can you recall any instructions to -- from anyone at Apple to you or your team to not have communications with employees in writing?**
A I don't recall a specific instance.
**Q You said the process is getting on the call and not have it -- not having the email. So the refusal to cooperate is having the only written record. Do you know who communicated that process, or is that a process that you created?**
A I can't recall who owns that process.
**Q So your understanding that a refusal to get on a call and a request to keep things in writing was a refusal to cooperate, what were you basing that on if there was no written policy or formal policy that things had to be only on a call?**
MS. RIECHERT: Objection. Improper hypothetical.
MS. GJOVIK: I don't think so.
///



BY MS. GJOVIK:
**Q But go ahead.**
A I mean, I decided that, you know, you not engaging in a live process is refusal to participate.
**Q So that was just your unilateral view and assessment?**
A It was -- so it was my determination but also in partnership with our legal counsel.
**Q Also in partnership.**
**Did you make your own determination prior to the determination by legal counsel?**
A I don't recall what -- what that process was, actually.
**Q Okay. So you say you determined that it's refusal to cooperate by asking to have things in writing. Can you explain why asking to have things in writing is a problem.**
A Yes. I mean, the intention for having a live conversation is to ensure that we have a natural recollection of, you know, whatever the discussion is at hand relating to the investigation. It also allows for natural follow-up questions in the moment and also to kind of just gauge tone, behavior in the call where we have that natural live dialogue.
**Q Mr. Kagramanov, are you aware that all of**



**the content that Apple has subsequently alleged was leaked or improperly disclosed was all already published social media posts or commentary and participation in press articles; so -- and under the employee's own name; so there was not much for them to actually investigate?**
MS. RIECHERT: Objection. Assumes -- he's already said he doesn't know anything about any of the allegations. So...
MS. GJOVIK: I just kind of want him to have to say no.
BY MS. GJOVIK:
**Q That's a no?**
A No.
**Q If you had known -- and you said Glimmer. So let's say it was just the Glimmer thing, and again facts not in evidence. But they keep pointing to photos I shared with "Verge" of just my face taken by an app. And I was complaining of surveillance because it was taking pictures of me in my home and naked and stuff, and I thought that was wrong. So it was just my face.**
**If you had known that what they were concerned was an article published -- it was August 30th; so almost, like, a week and a half**

Page 69

**investigations, is it typical to have HR legal involved in that process?**
A I mean, I don't recall a specific instance. I think it's all case by case.
**Q Can you recall any other examples where you're emailing an employee and the employee was terminated within the day that you requested a meeting?**
A I also don't recall a specific example.
**Q Okay. So Ashley Gjovik would then be the only example you recall?**
A I was not aware that you were terminated.
**Q You were never notified that I was terminated on September 9th?**
A I was not involved in that process.
**Q That's interesting. Okay. Thank you.**
**And then looking at the same exhibit, we have at 2:50 p.m. an email from you, and it wrote: We are investigating allegations that you improperly disclosed Apple confidential information. Since you have chosen not to participate in the discussion, we will move forward with the information that we have, and given the seriousness of these allegations, we are suspending your access to Apple systems. Best, Aleks Kagramanov.**

Page 70

**You sent that email?**
A Correct.
**Q Can you share any information or context of why you chose the language you chose in that email?**
MS. RIECHERT: Don't give any information provided by counsel. Instruct you not to answer based on attorney-client privilege.
THE WITNESS: Yeah, I do not recall how it was formulated.
BY MS. GJOVIK:
**Q Did you write this email?**
A It was sent by me.
**Q Did you draft the words used or did you send something someone else wrote?**
MS. RIECHERT: So again, objection to the extent you're asking to the role of legal in drafting this language, and in terms of attorney-client privilege, I'd instruct him not to answer.
BY MS. GJOVIK:
**Q How about this. Mr. Kagramanov, the email that you sent here at 2:50 p.m., did someone else write the content of that email?**
MS. RIECHERT: Same objection.
MS. GJOVIK: I'm not asking who.
MS. RIECHERT: If other than legal, then

Page 71

you're welcome to ask him. But if he worked on it with legal, then you're not entitled to ask him.
MS. GJOVIK: I think he can say whether he wrote it or not.
MS. RIECHERT: I'll instruct him not to answer if it was legal that was involved in helping him write this.
BY MS. GJOVIK:
**Q Okay. And, Mr. Kagramanov, now, instead of sensitive intellectual property matter, it says disclosed Apple confidential information. What was the Apple confidential information that was disclosed, to your knowledge?**
A Because I don't lead that investigation, I don't know. I wasn't aware.
**Q And the suspension of access to Apple systems in your message, is that something that you coordinated to suspend access to Apple systems?**
A I don't recall who was -- who was responsible or involved in that.
**Q Do you recall when the access to Apple systems was suspended?**
A I don't recall.
**Q Okay. And when it says Apple systems, which systems?**

Page 72

A I also am not aware.
**Q Okay. Do you recall any other examples -- so you had sent the original email at 2:08 p.m. per Exhibit A. And in this one, this response where you're suspending access to systems was sent at 2:50 p.m. So this would be 42 minutes later.**
**Do you recall any other examples of contacting an employee for initial conversation and suspending all their account access in less than an hour?**
A I don't recall a specific example.
**Q So Ashley Gjovik would be the only one?**
A Correct, that I can recall.
**Q Thank you.**
**And then the next one, this is at 3:07 p.m. So this is still within one hour of the initial email you sent. Ms. Gjovik responds: Hi, Aleks. As mentioned, I'm definitely willing to participate in your investigation. I only asked that the discussion be kept to email. I said nothing about not participating in the discussion at all. I offered to help via email to ensure we have a documented record of our conversations considering everything that's currently going on with my investigation and my complaints to the government. I have been speaking**

work rules he was planning on sharing.

MS. RIECHERT: Same. Asked and answered.

BY MS. GJOVIK:

**Q Mr. Kagramanov, during that call, when you said -- you indicated that you were going to say that the investigation was confidential and not to share it with anyone. And the employee has a complaint with the government and says that they're giving an affidavit the next day, would your statement imply or expressly say that the employee is not allowed to share with the government investigator during the affidavit what occurred during that interview?**

A I can't -- I can't, like, speculate what would have been said at that time.

**Q So based on the rules -- you said your job is, like, to share these rules with employees to support them. So it's, like, you must do that a bit.**

**The employee in this case says, I have this case, and I'm about to give an affidavit tomorrow. You're insisting employee get on the phone call. You said you would tell them that it's confidential, they can't tell anyone.**

**So if the employee says -- if I say, well, I have an affidavit tomorrow and I want to testify about what happens here, am I allowed, what would**



**your response be?**

MS. RIECHERT: Objection. Hypothetical, speculation.

MS. GJOVIK: Still has to answer.

THE WITNESS: If you were -- if you could just clarify the question. If you were saying -- you're saying that if you disclose in a live discussion with me and the investigator that you have an affidavit, if that would change the confidentiality expectations?

BY MS. GJOVIK:

**Q It was disclosed in the email; so you already knew that.**

**I'm asking, if I asked for clarification -- if you're saying -- when you say it's confidential and you can't share with anyone, and I said, does that apply for my affidavit to the government, what your answer would be?**

MS. RIECHERT: Same objections. Hypothetical, speculation.

MS. GJOVIK: Okay. He still has to answer.

THE WITNESS: I would probably take partnership with my management team because I'm not familiar with that process.

///



BY MS. GJOVIK:

**Q Okay. So the employee said that in the emails that they had that affidavit coming up and was concerned, but I believe you testified that you did not recall ever escalating that or asking for feedback with the management team or anyone else; is that correct?**

A My recollection is that the -- I had legal counsel in partnership in that scenario.

**Q Oh, so you're saying that the email about the affidavit, that was shared with Apple legal?**

MS. RIECHERT: Objection. Instruct him not to answer. Attorney-client privilege.

MS. GJOVIK: This lawsuit is like a sodoku puzzle with your privilege claims, Melinda. I'm trying to put this together.

BY MS. GJOVIK:

**Q So okay. If we're in that -- we're in that meeting and I ask that question point blank, you said you'd bring it to your management team. Would that imply that you'd then cancel or pause that meeting so you could talk to them and figure out what to do?**

A I don't recall what the specific involvement was at that specific stage.

**Q So you just said, if the employee said, I**



**would like guidance if Apple is going to claim that the details of its investigation, this call, are confidential, if I can share that during any affidavit, and you testified you would need to talk to management about that and see what to do because you didn't have expertise on that. If that's occurring during a live phone call on September 9th, how would you handle that?**

MS. RIECHERT: First of all, objection that that's not what your email to him said. You didn't ask if you could share it with the government in the affidavit.

MS. GJOVIK: That's what I'm saying. That's the problem, that if I have to raise that at the call and ask and the call is already occurring and he's saying he has to talk to management, who are already on the call, what he's going to do then with that call.

THE WITNESS: Yeah. I would probably --

MS. RIECHERT: You can answer, but the same objections that it's hypothetical. But you can answer the question.

THE WITNESS: Yeah. If you brought that up in realtime during the call, I wouldn't, you know, commit to a specific response. I would probably take

Page 97

some counsel.
BY MS. GJOVIK:
**Q Yeah.**
**What about if I said I would attend but I want to bring a witness, maybe a coworker with me just to have a witness with me? What would you have said?**
A I would have declined that request.
**Q Okay. And if I had requested to do an audio recording of what's discussed so I have a copy of what's discussed, what would you say?**
A I would have declined that request.
**Q Okay. Same if I asked for, like, a video recording, like Apple tools, so we could both have a copy of what's discussed, what would your response be?**
A I would also have declined that request.
**Q And let's say we do have the call and there is discussion and then I go on Twitter about it and complain that Apple is retaliating against me and talk about what's discussed but you had said it was confidential, would you find that's probably a breach of your confidentiality rules if I'm complaining and sharing details of what's discussed?**
MS. RIECHERT: Objection. Hypothetical,

Page 98

speculation.
BY MS. GJOVIK:
**Q Please answer.**
A You know, I can't control -- we can't control how -- you know, what you post on social media. And I think you have discretion to talk about your workplace conditions and experience, but posting something that's confidential would be a violation of our policies.
**Q And you're saying that the entire interview that you were trying to schedule would be confidential by default?**
A Correct. It's confidential.
**Q So if that discussion included complaints about workplace conditions, you're saying that would be confidential?**
A The workplace conditions is separate from the actual investigation that was going to be facilitated.
**Q Mr. Kagramanov, are you aware that the stated reason for firing me by Apple includes an article that includes the photos of my face from the Glimmer app and a "Verge" article called "Apple Cares About Privacy Unless You Work At Apple," and the Twitter post reference, we're also sharing that**

Page 99

**article. And there was a number of Apple employees coming together to complain about their work conditions that they felt were invasions of their privacy by Apple using Apple's tools and processes.**
**And you can answer -- you don't know that, you already said. You weren't aware of that; right?**
A No.
**Q Assuming facts not in evidence that that is true, then the conversation for that investigation would, by its very nature, be all about work conditions. And so then the rule of not sharing what's discussed then would include work conditions. And then if I was to complain about it later based on the rule you just shared and testified to, that would be violating the confidentiality rule that Apple created; is that correct?**
MS. RIECHERT: Objection. Calls for a legal conclusion.
MS. GJOVIK: He created a confidentiality --
MS. RIECHERT: And also hypothetical -- improper hypothetical and speculation.
MS. GJOVIK: Still has to answer.
THE WITNESS: Again, discussing workplace conditions, you know, you have that discretion. Discussing the confidential nature of the actual

Page 100

investigation would be in violation.
BY MS. GJOVIK:
**Q So are you standing by your prior testimony that anything that was discussed during that call then would be considered confidential and the employee is not to share it?**
A The nature of that investigation and the meeting would be confidential.
**Q Okay. What if the employee was to go to Twitter and complain that Apple's called them to a meeting and said they thought it was intimidation and retaliation and was complaining about some prior posts they made in generalities? Would you say that is a violation of the confidentiality rule you created for that meeting?**
MS. RIECHERT: Objection. Improper hypothetical and speculation.
BY MS. GJOVIK:
**Q You can still answer.**
MS. RIECHERT: And vague. I'm not sure exactly -- if you can perhaps repeat the question.
MS. GJOVIK: You know that's what I do, Melinda.
BY MS. GJOVIK:
**Q Please answer.**

Apple tries to get the employee to agree to voluntarily leave the company during the call?

A I don't recall a specific instance of that as well.

Q And were you ever, that you recall, provided any information -- because you -- sorry. Back up.

You had said that you -- generally, your employee relations function was assigned to the global security organization. So if a global security employee has an employee relations issue, concern, you'd be the default one to investigate it. But then you may also be called in for the workplace violence and threat assessment stuff for any other organization at Apple in the Americas; is that correct?

A That's correct.

Q Okay. And then were you provided any context, any information of why you were being brought in to support a hardware engineering employee who was being subject to an investigation that you testified was not related to workplace violence or threat assessment?

A I don't recall being -- being told any kind of context.

Q Do you recall any other cases where you were



being asked to support an investigation into a non-global security employee who was being investigated by global security?

A I can't recall a specific case for that.

Q Other than Ashley Gjovik.

A That's correct.

MS. GJOVIK: Do you want to take, like, ten minutes? I'm going to walk my dog and think if I can see any more questions because I'm going to pay this court reporter a lot of money anyways; so I'm going to think of more questions. We can take a little break.

MS. RIECHERT: Fine with me to take a break.

MS. GJOVIK: What was that?

MS. RIECHERT: Fine with me. We can take a break.

MS. GJOVIK: Okay. So we can come back, let's say, 10:30?

MS. RIECHERT: Okay.

MS. GJOVIK: Thank you, guys.

(Recess taken.)

MS. GJOVIK: Okay. So we can go back on the record.

BY MS. GJOVIK:

Q I did think of one other thing I'd like to



do. So I'd like to share Exhibit K with you. This is Apple's privilege log.

So of course, I'm not asking you to disclose anything that's protected by privilege. And Melinda will, of course, object to anything that touches that. So I don't want to know the content of what's shared.

But this is a privilege log that Apple provided during the litigation, and -- for this case, and there are eight references to your name. And I thought it might help you recollect perhaps the people you were talking to or messages sent about the case. And maybe this helps -- this is information that Apple's counsel already shared in a privilege log. So maybe not sharing more than this, if this is protected by privilege, but you could maybe remember which specific people you were talking to.

So with the first one, this is row -- it's really small. I'm sorry. They use, like, size 8 font. This row 261 on September 9, there's a row for communications on messages app with attachments between Isela Perez, Adelmise Warner, Alex Kagramanov, and Joni Reicher. And it says direct message with Warner, Kagramanov, and two others.

Do you recall texting with those three other



people on September 9th about this matter?

A I do not recall texting.

(Exhibit K was marked for identification.)

BY MS. GJOVIK:

Q Okay. Is it typical for you to text with HR or legal when you're assisting with investigations?

A I think it's case by case on those situations.

Q Okay. And this text message does not include Sophi Jacobs from what I can tell. So do you recall communicating with HR and legal but not including Sophi regarding this matter on the 9th?

A I do not recall the nature of that exchange.

Q Do you have any thought about what you would be talking to regarding this matter to HR legal without including Sophi?

A Yeah, I do not recall what that exchange would have been.

Q And let's go -- just so you recall who people are, this is Apple's little chart, actually.

So they have you as an employee relations business partner. And Isela Perez is listed as corporate attorney manager for legal-HR. Joni Reicher is listed as employee relations senior director for people support ops.

**Q So in that thread, you'd have -- you'd be messaging with both legal executives and HR executives but without Sophi Jacobs. And you have no recollection of what that was about?**
A Yeah, I don't recall the nature of that exchange.
**Q Okay. And then on row 273 of Exhibit K, between September 7th and September 9th, there's 20 replies in an email with attachments sent by you, Adelmise Warner, Isela Perez, and Debbie Rice.**
**Do you remember Debbie Rice too, maybe the title?**
A I don't recall her exact title. I believe it was legal.
**Q Senior director, legal-HR?**
A Yeah.
**Q In your experience, when you were supporting these investigations, is it typical for you to work with directors and senior directors in HR and legal?**
A I would say it's case by case.
**Q Can you recall any other cases where you were messaging directly with senior directors about the case?**
A I cannot recall a specific case.
**Q Other than Ashley Gjovik?**



A Correct.
**Q And let's see. So for this one, we can go back to that 9/7 one. Where did that go?**
**So on the 9/7 to 9/9, we have emails sent by yourself and Ms. Warner and Perez and Rice, all these executives, and the thread also had this Melissa Polinsky and Sophi Jacobs on it with 20 replies.**
**Does that help your recollection that's maybe the email where you got looped in on this investigation on the 7th?**
A I don't recall specifically. Could be when I got looped in.
**Q And the subject line is listed by Apple as AG forward internal application Glimmer/Gobbler, privileged and confidential, and then attachment is AG talkingpoints.pages.**
**Do you remember anything about that?**
A I don't recall that specific attachment.
**Q Okay. And then let's see. Where's the other one?**
**We have another email on the 9th. It's sent by you. So this column, sent by you. It's row 269, to Isela Perez, Debbie Rice, Adelmise Warner, Joni Reicher, and Deirdre O'Brien email with attachments and six pages. And it was titled AG emails, with a**



**screenshot 2021/09/09. And this was just sent by you per Apple's record. So you would have screenshot something and sent a message called AG emails.**
**Does that help your recollection if you were sharing the emails you had with Ashley Gjovik with other people at Apple?**
A I don't recall the specific nature of the attachments or the email exchanges.
**Q Okay. Do you have any idea what else you would be sharing with them referencing AG emails at the same time you were emailing Ashley Gjovik?**
MS. RIECHERT: Objection. Speculation.
THE WITNESS: Yeah, I do not.
BY MS. GJOVIK:
**Q Okay. Is it typical for you to send updates about the supporting employees through these investigations by global security to Deirdre O'Brien?**
A I don't recall a specific case.
**Q Other than Ashley Gjovik?**
A Correct.
**Q And do you recall who Deirdre O'Brien is?**
A I don't recall her specific title. I believe it was, like -- she was, like, the head of HR.
**Q And retail, yes.**



**Let's go find her actual -- we'll put that -- O'Brien -- O'Brien, senior vice president of people and retail.**
**Do you recall why you would be sending updates about the investigation into Ashley Gjovik just setting up a phone call with Sophi Jacobs -- sending updates to the senior vice president of HR and retail at Apple?**
A I don't recall the nature of what led up to that.
**Q And you're saying you don't recall what you were screenshoting in those messages you sent them that you attached here?**
A That's correct.
**Q And then we have another one on September 9th sent by you, email with attachments, two pages, to Tony DeMario and Sophi Jacobs.**
**Who's Tony DeMario?**
A I believe he was Sophi's manager.
**Q It says global security manager, investigations and child safety. Sound right?**
A That sounds right.
**Q And so it says you sent them messages, AG intro email draft with attachment AG intro email pages.**

Page 129

**an employee's employment, saying they violated some policy, are they supposed to go through employee relations?**
A I don't recall the process.
**Q Okay. Assumably, they would have to involve HR to, like, end the employment status; correct?**
A Correct. There's a level of HR involvement.
**Q And are there policies or protocols for someone reviewing the requested reason to terminate the employee within HR employee relations when someone wants to fire an employee?**
MS. RIECHERT: Objection. Lacks foundation.
BY MS. GJOVIK:
**Q Okay.**
A Yeah, I don't recall the process.
**Q So in this case, because there were, like, senior ER and HR executives involved getting updates on this, if someone in HR is facilitating that termination, safe to assume they skipped you because your superiors were already involved, the ones you were emailing?**
MS. RIECHERT: Objection. Lacks foundation.
MS. GJOVIK: Still has to answer.
THE WITNESS: Yeah, I don't recall what or how it was prompted for my level of engagement.

Page 130

BY MS. GJOVIK:
**Q And you say you worked in employee relations. So, like, Deirdre O'Brien was, like, your boss, right, top boss; is that correct?**
A That would be correct.
**Q Frozen. Sorry.**
A It's frozen.
**Q It's frozen.**
**But you said that Deirdre O'Brien -- so under Tim Cook, Deirdre O'Brien would be the highest-level person that you reported up under?**
A Yeah. I believe that would be the case.
**Q Okay. Did you regularly provide updates on any other cases or activities that you were working on to Deirdre O'Brien, that you recall?**
A No. I don't recall a specific case.
**Q Other than Ashley Gjovik?**
A That's correct.
**Q Did you have any, like, updates you'd provide her? Status updates? Any meetings you'd have with her regularly, ongoing? Any regular communication with Deirdre O'Brien?**
A No.
**Q Do you recall any other communication you had had with Deirdre O'Brien in those three years you**

Page 131

**worked in that role?**
A No. I don't recall any since.
**Q Other than the noted emails about Ashley Gjovik?**
A That's correct.
MS. GJOVIK: Well, that's cool. So when you had to meet Deirdre O'Brien, it was about me.
Okay. We're at 10:52. I thank you for your time. I know you don't work there anymore. I appreciate you answering the subpoena and answering all my questions. Again, it sounds like you just weren't provided a lot of information about this stuff. So I appreciate you answering what you could answer, and thank you again for your time.
MS. RIECHERT: So I'd like to reserve the right of the witness to read and correct the transcript once he receives a copy of it.
MS. GJOVIK: Within the rules allowed under federal and California laws. He can't just completely change responses. You can correct errors and stuff, of course, within allowances, yeah.
MS. RIECHERT: And I'd like an expedited and a rough, please.
MS. GJOVIK: And, like, I'm filing my summary judgment motion in, like, a week. So you're

Page 132

definitely not going to -- would you plan to have any corrections you're going to have before the deadline for me filing my motion or are you going to claim that I can't use this as evidence until you file whatever corrections?
MS. RIECHERT: You do what you think you should do. I can't -- I can't answer that question.
MS. GJOVIK: Okay. This is the first time you've said that you're, like, planning on correcting anything. Can you share if you already noticed things that you want to have corrected?
MS. RIECHERT: Not at all.
MS. GJOVIK: Okay. She's a lot of fun. Melinda keeps me on my toes.
Okay. Thank you, everyone.
(Deposition concluded at 10:53 a.m.)

Page 133

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and date herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 04/18/2026



Vesna Walter
RPR, CCRR, CSR No. 11989

Page 134

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik
vs. Apple Inc.
Date of Deposition: 04/16/2026
Job No.: 10188334

I, ALEKS KAGRAMANOV, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2026, at ____________________.

_________________________________
ALEKS KAGRAMANOV

NOTARIZATION (If Required)

State of ________________

County of _______________

Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ______________________________ (Seal)

Page 135

DEPOSITION ERRATA SHEET

Case Name: Ashley Gjovik
vs. Apple Inc.
Name of Witness: Aleks Kagramanov
Date of Deposition: 04/16/2026
Job No.: 10188334
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________

Page 136

DEPOSITION ERRATA SHEET

Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________
Page _____ Line ______ Reason ______
From ________________________ to ________________________

_______ Subject to the above changes, I certify that the transcript is true and correct

_______ No changes have been made. I certify that the transcript is true and correct.

______________________________________
ALEKS KAGRAMANOV

Deposition of

**Dan West**

April 13, 2026

Ashley Gjovik

vs.

Apple Inc.

aptus. COURT REPORTING

www.aptusCR.com | 866.999.8310

was privileged.
MS. GJOVIK: Okay. We'll confer about that later.
BY MS. GJOVIK:
**Q Do you know an employee relations investigator named Ekelemchi Okpo?**
A Yes.
**Q Do you recall anything about Mr. Okpo's investigation into my concerns in 2021?**
MS. RIECHERT: Again, anything that Mr. Okpo did to investigate your concerns was conducted under the direction of counsel and is therefore attorney-client privileged.
BY MS. GJOVIK:
**Q Are you aware that I made complaints against Apple and asked for Apple to investigate my complaints regarding health and safety and environmental issues in 2021?**
A Yes.
**Q Do you remember me raising those types of concerns to you directly in 2021?**
A Can you be more specific. What type of --
**Q Yeah.**
A Yeah.
**Q Let's start with EHS concerns at the building where I worked.**



A Yes.
**Q What do you remember about that?**
A You were concerned about vapor intrusion.
**Q What was that?**
A As you described it to me at the time, this is gas coming in from under the building.
**Q How does that usually happen, to your understanding?**
A No idea.
**Q Do you remember texting me about this with your assertion of the specific safety protocols that were supposed to be in place?**
A No. No, I don't.
**Q Do you remember anything about cracks in the floor?**
A Yes, I do.
**Q What do you remember about that?**
A That you were very concerned about the cracks.
**Q Why?**
MS. RIECHERT: Objection. Lacks foundation as to why you were concerned about the cracks.
BY MS. GJOVIK:
**Q Do you remember me expressing any further detail about why I would be concerned about cracks in the floor?**



A Yes. You were worried that the cracks were the entryway for the gases.
**Q Do you have any background information about why cracks might be a risk at a toxic waste site with solvent contamination under the floor?**
A Can you restate the question, please.
**Q I'm going to table that one. We're going to go deeper into that building in a second. So I'm actually going to skip that one. Withdraw.**
**Okay. Do you have any -- she's going to object to that one. Melinda objects to everything.**
**Were there any changes in the organization policies, practices as an outcome of the investigations by employee relations into my complaints that you're aware of?**
A No. But I don't fully understand your question. So...
**Q Let me rephrase.**
**Did employee relations suggest any corrective actions or changes to you for the organization as an outcome of the investigations into my complaints?**
MS. RIECHERT: You said changes to the organization?



MS. GJOVIK: To practices, policies, whatever employee relations suggests.
MS. RIECHERT: I'll object that it's compound. So changes to the organization, the policies, or the practice as a result of the investigation --
MS. GJOVIK: Let me rephrase.
BY MS. GJOVIK:
**Q Did employee relations suggest any type of corrective action or changes were needed as an outcome of the investigation into my complaints?**
A Yes.
**Q Can you share any of those details of what they said.**
A The biggest one that I recall was around our relationship and me being very clear about separating friendship from work.
**Q Can you tell me more about that, please.**
A That's really the extent of it, is we got too friendly, and that's not appropriate.
**Q What does too friendly mean?**
A The text messages between each other, that sort of thing.
**Q Any specific examples you remember that they**

**noted were, you said, not appropriate?**

A Yeah. For example, your meal at Chez TJ.

(Reporter clarification.)

BY MS. GJOVIK:

**Q Can you spell that for her, please.**

A C-h-e-z T-J.

**Q What is Chez TJ?**

A It's a restaurant.

**Q Do you go there often?**

A Not anymore.

**Q You used to go there often?**

A Yes.

**Q Are you friends with the owners or chefs?**

A I used to be, yes.

**Q Why did you stop going?**

A I thought the food quality went down.

**Q And why was that relevant to me?**

A Because you went there for a meal.

**Q Why is that inappropriate?**

A You -- you texted me while you were there, and that's why.

**Q It was inappropriate that I thought it was okay to text you when I was at a restaurant to tell you I was at a restaurant?**

A It was -- it was that I -- between the chef



and I, we split the dinner for you.

**Q How much did you pay for my dinner? Do you remember?**

A No recollection.

**Q Do you think it was over $100?**

A Somewhere between 100 and 150 would be my guess.

**Q And employee relations said it was inappropriate to have text messages or to pay for employees' dinners, or what was the issue?**

A To pay for the dinner.

**Q But it was okay to text?**

A Yeah.

**Q Why was it inappropriate to pay for a dinner?**

A It's just -- I was your skip-level leader at the time, and that's just not a very common occurrence.

**Q Why did you pay for my dinner?**

A It's a while ago. I think part of it was I knew how expensive that meal was and I knew that you were stretching to pay for it, as you told me. And I wanted you to have a great experience there because it was one of my family favorite restaurants. So we thought we would splurge for it.



**Q It was really good. I remember that. It was a very good dinner. Thank you.**

**So yeah, I had shared some stuff with you about my background. Do you remember about me telling you about my financial situation and kind of my work experience? Anything that you can recollect?**

MS. RIECHERT: Objection. Compound, vague.

BY MS. GJOVIK:

**Q You said I shared information with you about my financial background. Do you remember any details of what I shared with you?**

A I don't remember the details. I just remember that -- the one detail I remember is you talking about the cost of your apartment and how tough that was.

**Q To your recollection, did I have anyone else financially supporting me at that time?**

A Not that I know of.

**Q To your recollection, had I expressed concern that I couldn't afford a dinner at a place like that because I didn't have financial resources?**

A No. And I didn't think that you would go there if you couldn't afford it, but I knew it was a stretch.

**Q Do you remember stating that once I got a**



**promotion, when I was promoted in 2018, that then I could have now afforded to go there because of the promotion?**

A No.

**Q I'm sorry. I can't remember if it was 2017 or 2018.**

**Okay. Is there anything else employee relations told you that needed to change?**

A Not that I recall.

**Q Anything else employee relations told you that was inappropriate?**

A Not that I recall.

**Q Have you ever bought any other employees a dinner like that?**

A Not dinners but certainly bottles of wine that were very expensive, things like this, yeah.

**Q Why do you do that?**

A I think it's a nice gesture. Like, people like to feel cared for, and I think people really appreciate it.

**Q Did you follow employee relations' advice?**

A Yes.

**Q I'm going to switch a little bit.**

**Do you have any insight from Apple about the reason my employment was terminated?**

Page 105

MS. RIECHERT: Second objection -- my first one is that you misstated the testimony, and the second is that it's an improper hypothetical.
BY MS. GJOVIK:
**Q Let me rephrase.**
**Mr. West, the -- what we're talking about what you did in 2017 with that dinner, if one of your direct reports did that, like, now, how would you respond if you found out?**
A I think I'd warn them the same way, like, hey, you can do this for your friends, but be careful of the managerial -- like, if there's a power imbalance there, I think that's what makes it difficult.
**Q Mr. West, wouldn't you say that it's difficult for employees to say no to their supervisors about stuff because of that power imbalance?**
MS. RIECHERT: Objection. Vague.
MS. GJOVIK: I don't think that's vague.
THE WITNESS: So -- okay.
MS. RIECHERT: Do you want an answer?
MS. GJOVIK: Yeah.
MS. RIECHERT: Okay. Could you repeat the question.

Page 106

BY MS. GJOVIK:
**Q Mr. West, wouldn't you say that the power imbalance makes it difficult for employees to say no to their supervisors about things?**
MS. RIECHERT: Objection. Vague.
THE WITNESS: In certain scenarios, that's a true statement, I think.
BY MS. GJOVIK:
**Q Yeah.**
**Are there actually, like, regulations and strict rules about things that should not be asked of or done to employees because of the power dynamics and coercion?**
MS. RIECHERT: Objection. Compound.
THE WITNESS: I'm not a lawyer; so I can't speak to the details of that. But there's certainly some things that we can't -- that we shy away from.
BY MS. GJOVIK:
**Q Yeah.**
**Mr. West, in your -- for any of the roles you went through, even back in 2021, you mentioned you did some stuff with, like, health or medical studies on employees, user studies. Isn't that something where coercion becomes an issue, especially if the studies can have a population in France or**

Page 107

**Germany?**
MS. RIECHERT: Objection. Improper hypothetical, compound.
THE WITNESS: Can you be more specific.
BY MS. GJOVIK:
**Q Mr. West, in your experience managing teams that do different types of user studies or testing, have you heard there are special rules in countries like France or Germany that prohibit -- and UK, GDPR, that prohibit certain testing or requests of employees specifically because the risk of coercion and a power imbalance?**
MS. RIECHERT: Is he aware of those rules? Is that the question?
MS. GJOVIK: Yeah.
THE WITNESS: No.
BY MS. GJOVIK:
**Q No.**
**So you --**
A Not those rules. I don't know the reason for those rules.
**Q But you said that there can be a power imbalance. It can be more difficult for employees sometimes to say no to stuff if it's their supervisor asking?**

Page 108

A Yes.
**Q Yeah.**
**Didn't you even text me that you aren't even sure if I really mean no sometimes because you don't know if I can be honest with you --**
MS. RIECHERT: Objection.
BY MS. GJOVIK:
**Q -- or something like that?**
A I don't remember that text. I would need to see -- see the text and the context of the text.
**Q Mr. West, do you sometimes wonder, if you ask something of employees in your organization, if they'd actually honestly tell you no or if they might be afraid to tell you no?**
A Yeah, sometimes.
**Q And so, like, on that night when I was out to dinner, I said Andrew is cute. It sounds like I said something like, see where it goes or whatever. I haven't looked back at exactly what I said. But it sounds like you were make looking back and wondering if I was actually answering honestly because you're my supervisor; is that right?**
A That definitely was not the impression that I had going through that.
**Q Oh, can you explain then why you're thinking**

Page 109

**now differently that that was inappropriate.**
A I think we've said this -- or I've said this a couple of times. This is -- this goes back to the guidance that I got from Ekelemchi after those discussions.
**Q You said power imbalance, though. What did you mean by that?**
A I'm -- I was -- at the time, I was your boss's boss.
**Q So what does the power imbalance have to do with matchmaking?**
MS. RIECHERT: Objection. Assumes facts not in evidence.
MS. GJOVIK: It's just his own testimony.
MS. RIECHERT: He said nothing about matchmaking.
BY MS. GJOVIK:
**Q Mr. West, why did you think a power imbalance concern was relevant to the feedback you said you got from employee relations regarding the appropriateness of what you did with me and Andrew that night?**
A I don't know how to answer that differently. Yeah, maybe we can come back to that. I've got to think a little bit.

Page 110

**Q I would like to come back to that.**
A Yeah.
**Q So as I mentioned earlier, come to find out one of Apple's stated reasons for terminating my employment -- this is not a question. I'm just giving background. I see Melinda doing stuff. One of their stated reasons for terminating my employment was requesting a written record of communications to employee relations after I had reported retaliation by them and NRLB charges filed against them and EEOC charges -- I just want it on the record -- to the government. And they're saying, because I refused to get on the phone without a written record, that was some kind of misconduct. That was one of the reasons that justified immediate termination without any warning.**
**And, Mr. West, I already asked you this. So I'm just going to tell you again what they said because I think it's wild, and I think you're going to think it's wild. They were planning exclusively Mr. Okpo to contact me to want to ask me about saying that Andrew was cute in those texts to you and not immediately objecting that night and calling that inconsistencies in reporting my concerns and told me that they closed the investigation to all of my**

Page 111

**concerns that I had filed because I wouldn't get on the phone with them when they wanted to talk to me whether I thought Andrew was cute and would consensually hook up with him because they thought that was inconsistent.**
**Considering that, Mr. West, does that seem like a --**
MS. RIECHERT: I'd object to all of that as assumes facts not in evidence.
BY MS. GJOVIK:
**Q Considering all that, Mr. West, does that seem like --**
MS. GJOVIK: Melinda, go ahead. What are all your objections?
MS. RIECHERT: Yeah, if you want to ask a question. I'd just object to your summary of what happened.
MS. GJOVIK: Okay. Well, we'll go over that in summary judgment next month.
BY MS. GJOVIK:
**Q Mr. West, considering all of that, does that seem like a reasonable reason to terminate an employee who worked at Apple over six years?**
MS. RIECHERT: Assumes facts not in evidence and improper hypothetical.

Page 112

MS. GJOVIK: He still has to answer.
THE WITNESS: Yeah. I wasn't part of the -- like, I was a part of the investigation in that they were asking me questions. I was not part of this decision-making. I was not part of those meetings that you're referring. So I have no idea what they were going to talk to. I don't know.
BY MS. GJOVIK:
**Q Mr. West, I'm curious, because you indicated you had some idea of why Apple stated they terminated my employment, but so far I think I've given at least three examples that you claim you were not actually aware of as being the reasons Apple is now stating they terminated my employment; is that correct?**
MS. RIECHERT: Objection. Misstates his prior testimony.
THE WITNESS: Can you give me the three examples.
BY MS. GJOVIK:
**Q The thing where I wouldn't get on the phone to tell them whether I would hook up with Andrew or not, because apparently if I thought he was cute, that nothing he did was wrong; the ear scans. What was the other one? Inconsistencies -- oh, and the double workplace violence also said they fired me**

Page 137

(Deposition concluded at 11:56 a.m.)

Page 138

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and date herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 04/14/2026

Vesna Walter
RPR, CCRR, CSR No. 11989

Page 139

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Ashley Gjovik
vs. Apple Inc.
Date of Deposition: 04/13/2026
Job No.: 10188332

I, DAN WEST, hereby certify under penalty of perjury under the laws of the State of ________________ that the foregoing is true and correct.

Executed this ______ day of __________________, 2026, at ____________________.

_________________________________
DAN WEST

NOTARIZATION (If Required)
State of ________________
County of _______________
Subscribed and sworn to (or affirmed) before me on this _____ day of ____________, 20__, by________________________, proved to me on the basis of satisfactory evidence to be the person who appeared before me.
Signature: ______________________________ (Seal)

Page 140

DEPOSITION ERRATA SHEET
Case Name: Ashley Gjovik
vs. Apple Inc.
Name of Witness: Dan West
Date of Deposition: 04/13/2026
Job No.: 10188332
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.
Page _____ Line ______ Reason ______
From ________________________ to _________________________
Page _____ Line ______ Reason ______
From ________________________ to _________________________
Page _____ Line ______ Reason ______
From ________________________ to _________________________
Page _____ Line ______ Reason ______
From ________________________ to _________________________
Page _____ Line ______ Reason ______
From ________________________ to _________________________
Page _____ Line ______ Reason ______
From ________________________ to _________________________
Page _____ Line ______ Reason ______
From ________________________ to _________________________
Page _____ Line ______ Reason ______
From ________________________ to _________________________
Page _____ Line ______ Reason ______
From ________________________ to _________________________
Page _____ Line ______ Reason ______
From ________________________ to _________________________

# Re:

**From: Ashley Gjovik <ashleygjovik@icloud.com>** Thu, Sep 9, 2021 at 6:07 PM EDT (GMT-04:00)
To: Aleks Kagramanov <akagramanov@apple.com>
Cc: Ashley G (Work) <ashleygjovik@apple.com>

Hi Aleks,

As mentioned, I'm definitely willing to participate in your investigation. I only asked that the discussion be kept to email — I said nothing about not participating in the discussion at all.

I offered to help via email to ensure we have a documented recored of our conversations considering everything that's currently going on with my investigation and my complaints to the government.

I have been speaking out about work conditions, about workplace safety, concerns about discrimination & retaliation, and about concerns about intimidation and corruption (as reported to the government in public record).

I'm very concerned about what you are calling "serious allegations." Can you please provide me additional detail on what these allegations are? And when you say move forward, are you simply suspecting my access to Apple system? Or are you doing something more — and if so what?

Your email is very unexpected and I'm caught quite off guard if this is a real issue. I'd like the opportunity to remedy any actual issues. Please let me know what the issues are so I can make a good faith attempt at that.

In the meantime, without any additional context or effort to communicate with me in email, this really does feel like intimidation and additional retaliation and I will consider it as such.

Best,
-Ashley

—
**Ashley M. Gjøvik**
**Santa Clara University School of Law**
Juris Doctor Candidate & Public International Law Certificate Candidate, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik
(415) 964-6272

> On Sep 9, 2021, at 2:50 PM, Aleks Kagramanov <akagramanov@apple.com> wrote:
>
> We are investigating allegations that you improperly disclosed Apple confidential information. Since you have chosen not to participate in the discussion, we will move forward with the information that we have, and given the seriousness of these allegations, we are suspending your access to Apple systems.
>
> Best,
>
> Aleks Kagramanov
> Employee Relations
> AMR Threat Assessment & Workplace Violence (TAT)
> Apple
> One Apple Park Way, mail stop
> Cupertino, CA 95014, USA
> iPhone +1-408-202-4963
> akagramanov@apple.com
>
>> On Sep 9, 2021, at 2:27 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

EXHIBIT 92
Witness: Y. Bertolus
Date: April 17, 2026
Stenographer: Carrie Gibson, CSR No. 13937

FYI, I forwarded your email & my reply to the investigator on my NLRB case so he's aware you just reached out to me the day before my Affadavit is supposed to be taken.

This feels a little like witness intimidation, etc...

—
**Ashley M. Gjøvik**
 Senior Engineering Program Manager, Apple
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik
(415) 964-6272

> On Sep 9, 2021, at 2:10 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:
>
> Hi Aleks! Happy to help! Please send any questions / updates via email so we keep everything written please.
>
> I will respond via email as quickly as I can. Thanks!
>
> —
> **Ashley M. Gjøvik**
>  Senior Engineering Program Manager, Apple
> Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
> ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik
> (415) 964-6272
>
>> On Sep 9, 2021, at 2:08 PM, Aleks Kagramanov <akagramanov@apple.com> wrote:
>>
>> Hi Ashley,
>>
>> This is Aleks Kagramanov from Employee Relations. We're looking into a sensitive Intellectual Property matter that we would like to speak with you about. We would like to connect with you at as soon as possible today; within this hour, and you should see an iCal come through shortly. We sincerely appreciate you prioritizing this call and being flexible. If you absolutely cannot make this time, please propose a few other times for us to connect today. I wanted to send this introductory email so you know who I am when I set it up. I can share more details when we meet.
>>
>> As part of Apple's policy, your cooperation and participation is imperative.
>>
>> Thank you in advance, and talk soon.
>>
>> Best,
>>
>> Aleks Kagramanov
>> Employee Relations
>> AMR Threat Assessment & Workplace Violence (TAT)
>> Apple
>> One Apple Park Way, mail stop
>> Cupertino, CA 95014, USA
>> iPhone +1-408-202-4963
>> akagramanov@apple.com

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

**APPLE, INC.** **Case 32-CA-284428**

**and**

**ASHLEY GJOVIC, an Individual**

**<u>COMPLAINT AND NOTICE OF HEARING</u>**

This Complaint and Notice of Hearing is based on a charge filed by Ashley Gjovik ("Charging Party" or "Gjovik"). It is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Rules and Regulations of the National Labor Relations Board (the Board) and alleges that Apple, Inc. ("Respondent"), has violated the Act as described below.

1. The charge was filed by Gjovik on October 12, 2021, and a copy was served on Respondent by U.S. mail on October 13, 2021.

2. (a) At all times reasonably encompassed by this complaint and any answer Respondent may file, i.e., all material times, Respondent, a California corporation with a headquarters at One Apple Park Way, Cupertino, CA and retail facilities throughout the U.S., has been engaged in the development, manufacture, and retail sale of consumer electronics and software.

(b) Annually, in the course and conduct of its operations, Respondent derives gross revenues in excess of $500,000, and purchased and received at its California facilities products, goods and materials valued in excess of $5,000 directly from points outside the State of California.

(c) At all times reasonably encompassed by this complaint and any answer Respondent may file, i.e., all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

3. Since at least April 13, 2021, in a **Frequently Asked Questions** page on its intranet, a copy of which is attached to this Complaint as Attachment A and is incorporated herein in its entirety, Respondent has defined confidential information as follows:

> Apple Confidential information is anything not explicitly, publicly, or purposefully disclosed by Apple. Examples of Apple Confidential information include unannounced products (including their release dates, pricing, and specifications), unannounced sales promotions, certain AppleWeb announcements, organizational charts, financial forecasts, and customer information.

4. Since at least April 13, 2021, Respondent has maintained a "**Confidentiality and Intellectual Property Agreement**" (IPA), a copy of which is attached to this Complaint as Attachment B and is incorporated herein in its entirety.

(a) Under the section heading "**I. Confidential and Proprietary Information**," the IPA states, inter alia:

> You understand that your employment by Apple creates a relationship of confidence and trust with respect to any confidential, proprietary, or non-public information that may be disclosed to you or otherwise learned by you in the course of employment at Apple, including but not limited to any confidential information of third parties disclosed to Apple. As referred to herein, "Proprietary information" means all information not generally known outside Apple and/or kept confidential by Apple, including for example but not limited to (a) trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple; (b) sales, profits, organization, customer lists, pricing, sources of material, supply, costs, manufacturing, financials, forecasts, market research, or any other information relating to the business operations or affairs of Apple or persons or companies dealing with Apple; and (c) the employment and personnel information of Apple, such as compensation, training, recruiting, and other human resources information.

(b) There is a footnote at the end of the paragraph quoted above that states:

> Nothing in this Agreement should be interpreted as restricting your rights to speak freely about your wages, hours, or working conditions as legally permitted.

(c) Under the section heading "**I. Confidential and Proprietary Information**," the IPA further states:

> **A. Treatment of Proprietary Information**. You understand and agree that your employment by Apple prohibits you, during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple. You understand and agree to strictly comply with all of Apple's rules and policies regarding Proprietary Information and use best efforts to safeguard such Proprietary Information and protect it against disclosure, misuse, loss, or theft. Upon termination of employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof, whether on paper or any other medium, containing any Proprietary Information.

5. Since at least April 13, 2021, Respondent has maintained a **Business Conduct Policy** (BCP), and since at least April 13, 2021, Respondent has maintained as part of the BCP the rules and provisions set forth below. A copy of the 2020 version of the BCP is attached to this Complaint as Attachment C and is incorporated herein in its entirety.

(a) Under the section heading "**The Way We Do Business Worldwide**," the BCP states, inter alia:

> **Your Responsibilities and Obligation to Take Action**
>
> Everything we do is a reflection of Apple. We expect you to:
>
> - **Follow the Policy**. Comply with the letter and spirit of Apple's Business Conduct Policy and all applicable legal requirements.
> - **Speak up**. If you see or hear of any violation of Apple's Business Conduct Policy, other Apple policies, or legal or regulatory requirements, you must notify either your manager, People Team, Legal, or Business Conduct.

disclosed to Apple, please promptly contact the *Apple IP Transactions Department* at [redacted] and we will be pleased to review the matter with you.

11. Since at least April 13, 2021, Respondent has maintained a "**Checklist for Employees Leaving Apple**" (Checklist), a copy of which is attached to this Complaint as Attachment I and is incorporated herein in its entirety.

(a) The Checklist states, inter alia:

Confidentiality: As a reminder, you are expected to continue to abide by the provisions of the Intellectual Property Agreement after your employment with Apple ends. Examples include but are not limited to unreleased product information, new product schedules, budgets, marketing plans, organization charts, customer lists, and vendor contacts.

12. By the conduct described above in paragraphs 3, 4(a), 4(c), 5(a), 5(c) – 5(p), and 6 – 11, Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

13. The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

**WHEREFORE,** as part of the remedy for the unfair labor practices alleged above, the General Counsel seeks an Order requiring:

- Respondent to physically and electronically post, and electronically distribute to all current and former employees employed by Respondent at any time since April 13, 2021 at all its facilities in the United States and its Territories, any Notice that may issue in these proceedings if Respondent customarily uses electronic means such as an electronic bulletin board, e-mail, website, text messaging, internal apps, or intranet to communicate with those employees.

The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**SETTLEMENT AGREEMENT**

**IN THE MATTER OF**

**APPLE INC.** **Case 32-CA-284428**

Subject to the approval of the Regional Director for the National Labor Relations Board, the Charged Party Apple Inc. and the Charging Party Ashley Marie Gjovik

**HEREBY AGREE TO SETTLE THE ABOVE MATTER AS FOLLOWS**:

**POSTING OF NOTICE TO EMPLOYEES** — The Charged Party will post a link to a copy of the Notice in English and in additional languages if the Regional Director decides that it is appropriate to do so, on the Policies and Notices page of its People intranet and keep such link continuously posted there for 60 consecutive days from the date it was originally posted. Such link will read, "This Notice is Posted Pursuant to a Settlement Agreement Approved by the Regional Director of Region 21 of the National Labor Relations Board in Case 32-CA-284428." Charged Party will also post, on a public-facing website maintained indefinitely by Charged Party containing legal notices, an explanation of revisions to the definition of Confidential Information (or comparable term) in the Confidentiality and Intellectual Property Agreement. To document its compliance with this requirement, the Charged Party will submit screen shots of the posting to include screen shots of the path to the intranet page that shows the Notice, along with a fully completed Certification of Posting form, via the Agency's e-filing portal at www.nlrb.gov. Should further investigation or verification of the intranet or website posting become necessary, the Charged Party will provide appropriate intranet or website access to the Compliance Assistant or Compliance Officer assigned to the case(s).

**COMPLIANCE WITH NOTICE** — The Charged Party will comply with all the terms and provisions of said Notice**.**

**NON-ADMISSION**—By entering into this Agreement the Charged Party does not admit to any violation of the National Labor Relations Act ("Act").

**ADDITIONAL TERMS** – The Charged Party agrees that it will not enforce the definition of Proprietary Information (or similar terms) set forth in any version of the Confidentiality and Intellectual Property Agreement ("IPA") effective as of the date that this Agreement is executed to the extent that such definition covers terms and conditions of employment protected under Section 7 of the Act.

A further material term of this Agreement is that the Charged Party is directed to prospectively clarify the definition of Proprietary Information (or similar terms) in the IPA and make other clarifications to the IPA relating to the Section 7 rights of employees or at its option issue a new IPA for certain employees with prospective effect, with such clarified definition of Proprietary

Charged Party Initials: MLS Charging Party Initials: AMG

**EXHIBIT 101**
Witness: Y. Bertolus
Date: April 17, 2026
Stenographer: Carrie Gibson, CSR No. 13937

Information (or similar terms) or such new agreement as reflected in the attached Appendix A, and has agreed to revise certain other policies, as reflected in the attached Appendix B.[1]

**SCOPE OF THE AGREEMENT** — This Agreement settles only the allegations in the above-captioned case(s), including all allegations covered by the attached Notice to Employees made part of this agreement, and does not settle any other case(s) or matters, including, but not limited to, 32-CA-282142, 32-CA-283161, and 32-CA-284441. It does not prevent persons from filing charges, the General Counsel from prosecuting complaints, or the Board and the courts from finding violations with respect to matters that happened before this Agreement was approved regardless of whether General Counsel knew of those matters or could have easily found them out. The General Counsel reserves the right to use the evidence obtained in the investigation and prosecution of the above-captioned case(s) for any relevant purpose in the litigation of this or any other case(s), and a judge, the Board and the courts may make findings of fact and/or conclusions of law with respect to said evidence.

**PARTIES TO THE AGREEMENT** — If the Charging Party fails or refuses to become a party to this Agreement and the Regional Director determines that it will promote the policies of the National Labor Relations Act, the Regional Director may approve the settlement agreement and decline to issue or reissue a Complaint in this matter. If that occurs, this Agreement shall be between the Charged Party and the undersigned Regional Director. In that case, a Charging Party may request review of the decision to approve the Agreement. If the General Counsel does not sustain the Regional Director's approval, this Agreement shall be null and void.

**AUTHORIZATION TO PROVIDE COMPLIANCE INFORMATION AND NOTICES DIRECTLY TO CHARGED PARTY** — Counsel for the Charged Party authorizes the Regional Office to forward the cover letter describing the general expectations and instructions to achieve compliance, a conformed settlement, original notices and a certification of posting directly to the Charged Party. If such authorization is granted, Counsel will be simultaneously served with a courtesy copy of these documents.

Yes __________ Initials          No MLS Initials

**PERFORMANCE** — Performance by the Charged Party with the terms and provisions of this Agreement shall commence immediately after the Agreement is approved by the Regional Director, or if the Charging Party does not enter into this Agreement, performance shall commence immediately upon receipt by the Charged Party of notice that no review has been requested or that the General Counsel has sustained the Regional Director. The Charged Party agrees that in case of non-compliance with any of the terms of this Settlement Agreement by the Charged Party, and after 14 days notice from the Regional Director of the National Labor Relations Board of such non-compliance without remedy by the Charged Party, the Regional Director will reissue the complaint previously issued on October 3, 2024, in the instant case. Thereafter, the General Counsel may file a motion for default judgment with the Board on the

[1] Charged Party, through counsel, will provide Charging Party with notice of these revisions.

Charged Party Initials: MLS          Charging Party Initials: AMG

## Performance and Accomplishments Section:

Key Accomplishments:

Good job creating content and presentation for MSQ All Hands, and collecting feedback afterwards.

Created 5 Simple Things training and drove course with my managers. Training went very well, and Ashley presented it to Dan staff. After we collected feedback, there was one piece of feedback Ashley didn't like, and asked me to pursue who gave the feedback. As the survey was anonymous, I told her I wouldn't do that, but it difficult for her to let go. There have been multiple instances over the past couple of years where feedback comes in that we can use to be constructive and get better. I encourage Ashley to look at it in that light.

Helped to create a new bottom 5 process along with documentation for the review period. She worked with each of my managers, and came up with a proposal similar to HLP. Feedback from managers was positive; they thought this was the best version that we've done.

Continued to add content to PSQ Portal, including "From the Desk of Dan" and "How I Got Here". In addition, she worked with Red on the Innovation Portal.

Created MSQ Important Dates calendar, and we agreed she would do her best to keep it up. There is room for improvement here. Some dates were off and various milestones were missing from time to time. Please work with cross-functional teams to maintain this.

Ashley has taken on some mentorship opportunities within the organization. Said one, "She was a wonderful mentor to me." Said another, "She took it upon herself to reach out to my intern and meet with her regularly and make it feel at home"

Ashley does a great job holding people accountable for deliverables. This is something I've seen, and has been noted by others. With regards to that, it's important to see the bigger picture, and to know when to push versus give space. Said one, "She has escalated to me that the team has not completed their tasks and when I investigate, it turns out it's because we were in a major product push. I think she can lose effectiveness and influence within the team when obvious priorities over PSQ Portal work arise and she is rigid." Said another, "I'd like to see Ashley work on understanding that her top priority is not always the top priority of the leader she is working with. I've had several instances of her relentlessly pushing/badgering/shaming me to complete a task she assigned to me." Focus on when to push and how to place deadlines that don't align with product milestones.

Goals & Development Section

- Align on your goals for the upcoming year. We had a conversation in July to discuss your role, and we need to get back to that. Focus on what you can do, and have that conversation with me. **Joint conversation versus me imposing**
- Status reports should consist of work-related activities only. It's ok to share what's going on in your personal life, but please keep the weekly status report focused on your work at Apple. **Weekly status reports are to provide team members relevant business tasks. Please keep weekly status report focused on Apple work.**
- When working cross-functionally, agree with leaders on deliverables and schedule. Align deliverables so it doesnt intersect too deeply with key product milestones.
- Tighten up MSQ Important Dates calendar. There is no perfect here, as dates are changing constantly, but it's something I need you to continue to monitor closely.
- Continue driving PSQ Portal initiatives, including How I Got Here articles for MSQ.
- Consider how you provide feedback on others. Said one, "I find her feedback to be harsh when commenting on others. I don't appreciate when anyone in the org bashes others when speaking to me, especially when I haven't even asked for feedback on the person." Focus on giving constructive feedback that is actionable.
- There are times when you can jump to conclusions without having all the data. Said one, "An example would be her saying 'this person declined the meeting' and implying or outright saying that they are dodging giving an update. When in fact, upon me asking, they have a serious exec review that was put on top of the meeting." Think about times where you made an assumption too quickly about a situation that wasn't correct. Also, consider what possible positive outcomes could occur in the same situation.

**On 7/2/21, West, Dan (HWE) wrote:**
The ratings above represent my work with Ashley primarily on to PSQ confluence page. A few comments on her work:

Positives:
- I like that she attempts to hold me accountable for deliverables. She raises action items and missed dates respectfully and directly. More has been done on the portal as a result of this.

- She is willing to engage in debate around content and priorities for the portal. There have been times when she was pushing for something and I had to make a call to back off. While she didn't agree, and even pushed back hard, she respected the call.

Negatives:
- Sometimes she loses track of the big picture. She has escalated to me that the team has not completed their tasks and when I investigate it turns out it's because we were in a major product push. I think she can lose effectiveness and influence with the team when obvious priorities over PSQ Portal work arise and she is rigid. Where I think she needs to focus, is when to push and how to place deadlines that don't intersect with product milestones. For example, Fall and Spring are always very busy with product convergence, so let's avoid deadlines in those areas.

- Assuming good intent - Sometime during the year a switch flipped where Ashley seemed to stop assuming good intent with most leadership. I see the leadership team as largely aligned on I&D topics, yet she is letting perfection be the enemy of the progress. One example of this is the 5 simple things exercise in MSQ. This is driving the right conversations in the organization and driving positive action. Yet some of her feedback instilled concern in the org and made it less likely for leaders to roll out similar exercises for their teams.

**On 6/4/21,** Redacted **wrote:**
I worked with Ashley pretty closely this year on the PSQ Tools Managers pages. This was hard going with all the project commitments, pandemic etc and took far longer to complete than originally planned. Ashley kept driving it though and holding us to deliverables. I think the end product worked out well and certainly wouldn't have happened but for her efforts. Ashley has a lot of passion for the I&D space, she has regularly reached out to me to see what's going on in Cork in this space and shown an

review that was put on top of the meeting. This is unnecessary and adds to the lack of teamwork.

- The reason I mark below expectations on results is that she seems to push back hard on tasks that she could be very impactful. She typically will say "DP doesn't want me to do that." And that might be true (and fair), but sometimes it seems like she just doesn't want to do that type of task. Just an assumption, but something to look at.
- Lastly, I find her feedback to be very harsh when commenting on others. I'm a senior person and I don't appreciate when people (anyone) in the org bashes others when speaking to me, especially when I haven't even asked for feedback on the person.

Overall, it's gotten to the point with me where I don't enjoy working with Ashley and, when possible, I avoid interactions. This is unfortunate because this has not always been the case, we've had a good relationship before the things I've listed became more prevalent.

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
Apple Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ASHLEY GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-4597-EMC

**DEFENDANT APPLE INC.'S AMENDED RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET TWO**

**PROPOUNDING PARTY:** Plaintiff Ashley Gjovik

**RESPONDING PARTY:** Defendant Apple Inc.

**SET NUMBER:** Two

Defendant Apple Inc. ("Apple") amends its response to Plaintiff Ashley Gjovik's Interrogatories, Set Two, served on July 17, 2025, as follows:

**<u>INTERROGATORY NO. 2</u>:**

For each affirmative defense Apple Inc asserts in Apple's Amended Answer (or otherwise plans to use in this litigation) that bars, limits, or reduces the employee's recovery on any claim in this action:

(a) State the complete factual basis for each defense;

(b) State the complete legal basis for each defense;

(c) Identify all Documents that support each defense; and,

(d) Identify all Persons with knowledge of facts supporting each defense.

**<u>AMENDED RESPONSE TO INTERROGATORY NO. 2</u>:**

Apple objects to this Interrogatory because it contains fourteen "discrete subparts." *See* Dkt. No. 327 at 2-3.

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent that Plaintiff seeks to define "Apple Inc" as "Employer Apple Inc and its counsel," and therefore seeks to invade the attorney-client privilege.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, overly broad, and unduly burdensome, particularly in its request that Apple state the "complete" bases or identify "all" documents or persons related to each affirmative defense. *See Aldapa v. Fowler Packing Co. Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015) (citations omitted) ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents.").

Apple objects to subpart (b) of this Interrogatory on the grounds that the Court sustained Apple's prior objection to that subpart. *See* Dkt. No. 327 at 3:2-3.

Subject to and without waiving the foregoing objections and pursuant to the Court's March 30, 2026 Order directing a further response to portions of this Interrogatory (Dkt. No. 327 § I.A.iii.), Apple responds as follows:

**Affirmative Defense No. 1:** "As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that no conduct by or attributable to it was the cause in fact or legal cause of the damages, if any, suffered by Plaintiff. Plaintiff was placed on paid administrative leave per her own request. Plaintiff's employment was terminated for legitimate, non-discriminatory, and non-retaliatory reasons. Specifically, Apple determined that she had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to provide accurate and complete information during the Apple investigatory process."

**(a) State the complete factual basis for each defense;**

In May 2021, Plaintiff raised hostile work environment and gender bias concerns to Apple. Plaintiff met with Jenna Waibel in Employee Relations regarding her concerns and requested that she be permitted to go on administrative leave while the related investigation was ongoing. Apple granted this request, and informed Plaintiff that the leave would be paid with benefits and that Apple would complete its investigation while she was on leave. Her two-week leave began on May 24, 2021 and she returned to work on June 7, 2021.

In late July 2021, Plaintiff again raised hostile work environment concerns regarding managers in her department. Ekelemchi Okpo in Employee Relations met with Plaintiff about her request to identify both short- and long-term solutions to her perceived negative experiences with her managers. Plaintiff initially proposed multiple solutions, including transferring to a new role under new management or an exit package with compensation and benefits to mitigate the impact of what she alleged as a hostile work environment. On August 4, 2021, Plaintiff and Okpo met again. Plaintiff specifically requested to be placed on a paid administrative leave so as to not interact with her managers while Apple's investigation was ongoing. Immediately after the meeting, Okpo emailed Plaintiff to summarize their conversation. That email stated, in part, "I wanted to confirm our conversation a few minutes ago. Per your request, you are now on paid administrative leave so as not to interact with your managers." Okpo's message reiterated that Plaintiff would receive her

regular pay and benefits during the time she was on paid administrative leave.

However, that same day, Plaintiff misrepresented her conversation and the agreement with Okpo multiple times—to colleagues, on Twitter, and to a reporter—claiming that Apple placed her on an involuntary and indefinite leave. In response to Plaintiff's public misrepresentations, the next day Apple offered Plaintiff the opportunity to return to work: "If you would like to return to work and not remain on administrative leave as you requested we can make those arrangements." Plaintiff never responded to Apple's offer. Later in August, Okpo again made clear to Plaintiff that she was free to return to work even while the investigation was ongoing: "Regarding the leave, as discussed you requested to be on paid leave while I investigate your concerns. If you'd like to return to work we can make those arrangements." Plaintiff did not respond to this offer, either.

Plaintiff provided information to Okpo during the course of his investigation into her concerns that differed from the evidence obtained in the investigation, omitted relevant context and created a misleading impression of the underlying facts. On September 7, 2021, Okpo emailed Plaintiff asking to arrange a meeting to discuss "inconsistencies" he had identified – namely, between what Plaintiff selectively provided him and the underlying documents, including with respect to an incident regarding a Sous Chef at a local restaurant. Plaintiff refused to meet with Okpo, stating that she wanted to communicate only in writing.

As a Senior Engineering Program Manager, Plaintiff had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Plaintiff was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. Participation in certain studies was voluntary and required her to agree to confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

During her employment, Plaintiff participated several user studies designed to collect data to help refine the algorithms for FaceID. These studies used an internal and proprietary application for uploading encrypted data the device collected for the study to Apple's encrypted servers. Apple required all participants—as a condition of participating—to maintain strict confidentiality.

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
Apple Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ASHLEY GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-4597-EMC

**DEFENDANT APPLE INC.'S AMENDED RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET THREE**

**PROPOUNDING PARTY:** Plaintiff Ashley Gjovik

**RESPONDING PARTY:** Defendant Apple Inc.

**SET NUMBER:** Three

Defendant Apple Inc. ("Apple") amends responses to Plaintiff Ashley Gjovik's Interrogatories, Set Three, served on July 17, 2025, as follows, pursuant to the Court's March 30, 206 Order (Dkt. No. 327):

**INTERROGATORY NO. 3:**

Do You contend that Plaintiff engaged in any "protected activity" as defined under federal or state whistleblower, retaliation, or labor laws during her employment with Apple?

(a) If yes, identify each such activity with date ranges for the acknowledged activity.

(b) If no, state that You contend Plaintiff engaged in no protected activities.

**AMENDED RESPONSE TO INTERROGATORY NO. 3:**

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, overly broad, and unduly burdensome, particularly in its request that Apple identify "any protected activity" Plaintiff ever engaged in at any point during her employment with Apple. *See Aldapa v. Fowler Packing Co. Inc.*, 310 F.R.D. 583, 591 (E.D. Cal. 2015) (citations omitted) ("Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."); *Moses v. Halstead*, 236 F.R.D. 667, 672 (D. Kan. 2006) ("On numerous occasions this Court has held that a request or interrogatory is overly broad or unduly burdensome on its face if it (1) uses an omnibus term such as 'relating to' or 'concerning,' and (2) applies to a general category or group of documents or a broad range of information. Here, the term 'concerning' modifies an enormous amount of information, i.e., all issues raised in the pleadings. The Court therefore finds Allstate's overbreadth objection to be valid."). Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks a complete statement of Apple's positions as to particular issues.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it seeks a legal conclusion about whether any of Plaintiff's concerns qualify as a "protected activity" under any "federal or state whistleblower, retaliation, or labor laws."

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information regarding issues on which Plaintiff has the burden of proof and must herself identify as part of substantiating her claims in this case as a precursor to Apple being in a position to frame its responses and defenses.

Subject to and without waiving any of the foregoing objections and pursuant to the Court's March 30, 2026 Order (Dkt. No. 327 § I.A.iii.), and construing this vague and overbroad Interrogatory to ask whether Plaintiff ever raised any concerns that may be construed as protected under federal or state whistleblower, retaliation, or labor laws, Apple responds as follows:

Apple does not dispute that Plaintiff raised concerns during her employment with Apple, at least some of which may be construed as protected activity as defined under federal or state whistleblower, retaliation, or labor laws.

(a) On August 23, 2021, Plaintiff provided Apple Employee Relations a 34-page "Issue Confirmation" document summarizing all concerns she had during her employment with Apple ranging from 2015 through 2021, including dates of communications with others about her concerns spanning a six-year period. In that document, Plaintiff also identified specific communications within that six-year span she alleges constitute protected activity under various laws. Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Issue Confirmation document, produced by Plaintiff at Bates number 01673-01710 and produced by Apple at APL-GAELG_00001760-1793.

**<u>INTERROGATORY NO. 4</u>:**

Regarding Plaintiff's Recent Disclosures concerning Workplace Safety:

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

produced by Plaintiff at Bates number 01673-01710 and produced by Apple at APL-GAELG_00001760-1793, and Apple's privilege logs.

**INTERROGATORY NO. 6:**

Regarding Plaintiff's Actions and Disclosures concerning Labor Activities,

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 6:**

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026, Order. *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id.* at 3:9-10.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is argumentative and seeks a legal conclusion about which, if any, of Plaintiff's communications qualify as protected concerted activity under unidentified labor laws because her definitional phrase "and other concerted activities for mutual aid or protection" suggests that each of the terms in the definition preceding that phrase are also "concerted activities for mutual aid or protection," which calls for a legal conclusion about the scope and coverage of the National Labor Relations Act or other labor laws.

Apple objects to this Interrogatory because it contains multiple "discrete subparts" embedded within a vague, compound, and overbroad definition of "Labor Activities" – what are in effect multiple separate interrogatories. *See Synopsys*, 319 F.R.D. at 295. Plaintiff's vague,

compound, and overbroad definition of "Labor Activities" includes at least seven separate lines of inquiry related to "employee organizing, workplace protests, employee petitions, unionization-related activities, inquiries about labor rights, complaints about potential violations of labor laws, and other concerted activities for mutual aid or protection."

Apple objects to subparts (a) and (b) of this Interrogatory on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to subpart (c) of this Interrogatory on the grounds that Plaintiff defines "Persons" as not only Apple employees, but also "agents, contractors, consultants, and any other individuals acting on behalf of Apple" which is overly broad.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, compound, overly broad in time and scope, unduly burdensome, and not proportional to the needs of the case. Plaintiff's definition of "Labor Activities"—to include "employee organizing, workplace protests, employee petitions, unionization-related activities, inquiries about labor rights, complaints about potential violations of labor laws, and other concerted activities for mutual aid or protection"—is overbroad, vague, and burdensome. Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm people who may have seen or heard of any statement she made during her employment. Plaintiff does not define "Actions." Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound, overbroad, and deficient. *See Moses*, 236 F.R.D. at 672.

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections, Apple responds as follows:

The only activity Apple is aware that may constitute "employee organizing, workplace protests, employee petitions, unionization-related activities, inquiries about labor rights, complaints about potential violations of labor laws, and other concerted activities for mutual aid or protection" (as opposed to actions related to Plaintiff's individual employment claims) relate to Apple's response to COVID-19, regarding which Plaintiff signed an employee petition and sent an email to Tim Cook and Deirdre O'Brien.

(a)-(b) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she created and shared with Apple that she asserted contained the information relevant to facilitate the investigation of her concerns about Apple's response to COVID-19.

(c) The most knowledgeable persons regarding Plaintiff's concerns about Apple's response to COVID-19 are: Plaintiff and Dori Farrah.

(d) Apple Human Resources employee Dori Farrah reached out to Plaintiff to understand and address her concerns about Apple's response to COVID-19.

(e) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she created and shared with Apple that she asserted contained the information relevant to facilitate to the investigation of her concerns about Apple's response to COVID-19.

**INTERROGATORY NO. 7:**

Regarding Plaintiff's Disclosures concerning Compliance with Federal White Collar Laws,

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 7:**

communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound, overbroad, and deficient. *See Moses*, 236 F.R.D. at 672.

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections, Apple responds as follows:

Apple is not aware of any "Disclosures" concerning "Federal White Collar Regulations." However, Plaintiff's August 23, 2021 Issue Confirmation characterizes some of her concerns as pertaining to alleged fraud, racketeering, organized witness tampering, organized intimidation, corporate corruption, cronyism, and nepotism, even though none of her allegations in that Issue Confirmation support any such inference. Apple assumes Plaintiff is referring to the issues presented in her August 23, 2021 Issue Confirmation and responds on that basis.

(a)-(b) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Issue Confirmation document, produced by Plaintiff at Bates number 01673-01710 and produced by Apple at APL-GAELG_00001760-1793.

(c) The most knowledgeable persons regarding Plaintiff's concerns raised in her August 23, 2021 Issue Confirmation are: Plaintiff and Ekelemchi Okpo.

(d) Apple investigated the issues Plaintiff identified in the August 23, 2021 Issue Confirmation.

(e) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the Box folders she created and shared with Apple that she asserted contained the information relevant to facilitate the investigation of the issues raised in her August 23, 2021 Issue Confirmation, the Issue Confirmation, and Apple's privilege logs.

**<u>INTERROGATORY NO. 8</u>:**

Regarding Plaintiff's Disclosures concerning Privacy,

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 8:**

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026, Order . *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id*. at 3:9-10.

Apple objects to this Interrogatory because it contains multiple "discrete subparts" embedded within a vague, compound, and overbroad definition of "Privacy" – what are in effect multiple separate interrogatories. *See Synopsys*, 319 F.R.D. at 295. Plaintiff's vague, compound, and overbroad definition of "Privacy" includes at least seven separate lines of inquiry related to "to employee privacy rights, employer searches and surveillance of employees, employer monitoring of employee activities at work and outside of work, employee personal data collection and protection, and California constitutional privacy rights."

Apple objects to subparts (a) and (b) of this Interrogatory on the grounds that Plaintiff defines "You" as "Employer Apple Inc and its counsel." Apple objects to this definition to the extent it includes Apple's counsel as it seeks to invade the attorney-client privilege.

Apple objects to subpart (c) of this Interrogatory on the grounds that Plaintiff defines "Persons" as not only Apple employees, but also "agents, contractors, consultants, and any other individuals acting on behalf of Apple" which is overly broad.

Apple objects to this Interrogatory (and each of the discrete subparts therein) on the grounds that it is vague, compound, overly broad in time and scope, unduly burdensome, and not

proportional to the needs of the case. Plaintiff's definition of "Privacy"—to include "employee privacy rights, employer searches and surveillance of employees, employer monitoring of employee activities at work and outside of work, employee personal data collection and protection, and California constitutional privacy rights"—is vague, overbroad and burdensome. Plaintiff defines "Disclosure" to encompass any communication she ever made to anyone, including social media posts, and then asks Apple to confirm all people who may have seen or heard of any statement she made during her employment. Plaintiff's Interrogatory is facially vague, compound, overbroad, and deficient. *See Moses*, 236 F.R.D. at 672.

Apple objects to this Interrogatory (and each of the discrete subparts therein) to the extent it seeks information not within Apple's possession, custody, or control, including information held by former employees.

Subject to and without waiving any of the foregoing objections, Apple responds as follows:

The only communications Apple is aware of pertaining to Plaintiff raising concerns about "Privacy" involve her public dissemination of confidential Apple product information.

(a)-(b) On August 20, 2021, Plaintiff told another Apple employee, Cher Scarlett, via text that she sent Zoe Schiffer of The Verge information and images pertaining to an internal Apple application and internal Apple user study. This communication was not reported to Apple until September 15, 2021. Additionally, between August 29, 2021, and September 15, 2021, Apple received four separate reports from other Apple employees that Plaintiff had publicly disclosed confidential information pertaining to an internal Apple application and internal Apple user studies. Plaintiff also publicly shared confidential Apple product information on her social media and in an article published online by The Verge.

(c) The most knowledgeable persons regarding Plaintiff's disclosure of Apple's confidential product information, the investigation thereof, and Plaintiff's termination are: Plaintiff, Robert Aloe, Yannick Bertolus, Aleks Kagaramanov, Ekelemchi Okpo, Megan Bowman.

(d) Apple investigated Plaintiff's breach of her confidentiality agreement and violation of Apple policies and terminated her employment.

(e) Pursuant to Federal Rule of Civil Procedure 33(d), Apple refers Plaintiff to the documents produced in this case related to Plaintiff's improper disclosure of confidential product information to Zoe Schiffer and The Verge, her Twitter posts regarding the same, and Apple's privilege logs.

**INTERROGATORY NO. 9:**

Regarding Plaintiff's Disclosures concerning discrimination, harassment, or retaliation,

(a) Identify all such communications You are aware of;

(b) State when You first became aware of each such communication;

(c) Identify all Persons at Apple who received, reviewed, or discussed each such communication;

(d) Describe all actions taken by Apple in response to each such communication, including but not limited to investigations, reviews, escalations, document creation, and any changes to policies or procedures;

(e) Identify any documents relating to the actions described in subpart (d).

**AMENDED RESPONSE TO INTERROGATORY NO. 9:**

Apple amends its response to this interrogatory pursuant to the Court's March 30, 2026, Order. *See* Dkt. No. 327 § I.A.iii. Notwithstanding the Court's direction to Apple to amend its response to this interrogatory, Plaintiff did not provide the Court with the Interrogatory in support of her discovery letter brief and thus the Court did not have the ability to rule on the scope, validity, or form of this Interrogatory. *See id.* at 3:9-10.

Apple objects to this Interrogatory as vague on the grounds that Plaintiff does not define "discrimination, harassment, or retaliation."

Apple objects to this Interrogatory because it contains multiple "discrete subparts" embedded within a vague, compound, and overbroad reference to "discrimination, harassment, or retaliation"– what are in effect multiple separate interrogatories. *See Synopsys*, 319 F.R.D. at 295. Plaintiff's vague, compound, and overbroad reference to "discrimination, harassment, or retaliation" arguably references many separate lines of inquiry because in her August 23, 2021 Issue Confirmation she alleged many different instances of alleged discrimination, harassment, and

**VERIFICATION**

I, Megan Bowman, am the Director of Human Resources, Hardware Engineering, for Apple Inc. and I am authorized to make this verification on its behalf. I have read the following:

- **DEFENDANT APPLE INC.'S AMENDED RESPONSES TO PLAINTIFF'S INTERROGATORIES, SET THREE**

Based on information and belief and/or personal knowledge, I believe the matters stated therein to be true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in San Carlos, California on April 6, 2026.

Megan Bowman

Megan Bowman

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

RYAN D. BOOMS (SBN 329430)
rbooms@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202 339 8500

Attorneys for Defendant
Apple Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ASHLEY GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-4597-EMC

**DEFENDANT APPLE INC.'S RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION, SET ONE**

**PROPOUNDING PARTY:** Plaintiff Ashley Gjovik

**RESPONDING PARTY:** Defendant Apple Inc.

**SET NUMBER:** One

**RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

Apple objects to this Request on the grounds that it is improper to use a request for admission to seek an admission regarding what documents state. *See Schmitz v. Asman*, No. 2:20-cv-00195-DJC-CKD PS, 2024 WL 1160539, at *3 (E.D. Cal. Mar. 18, 2024).

Based on its understanding of the Request, Apple responds:

Apple admits that on September 9, 2021, at 2:08 PM PDT, Alexs Kagramanov (from Apple Employee Relations) emailed Plaintiff requesting a conversation regarding a "sensitive Intellectual Property matter." Apple denies Plaintiff's characterization of the 2:10 PM PDT email and on that basis denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 22:**

Admit that Plaintiff emailed Apple at 3:07 PM, stating her willingness to participate in their investigation and requesting that Apple disclose any allegations against her.

**RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

Apple objects to this Request on the grounds that it is improper to use a request for admission to seek an admission regarding what documents state. *See Schmitz v. Asman*, No. 2:20-cv-00195-DJC-CKD PS, 2024 WL 1160539, at *3 (E.D. Cal. Mar. 18, 2024).

Based on its understanding of the Request, Apple responds:

Apple admits that on September 9, 2021, at 3:07 PM PDT, Plaintiff emailed Alexs Kagramanov. Apple further admits that Plaintiff stated in that email, among other things, that she was "willing to participate in [the] investigation." Apple further admits that Plaintiff asked, "Can you please provide me additional detail on what these allegations are?" Apple denies Plaintiff's characterization of the 3:07 PM PDT email and on that basis denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 23:**

Admit that on August 5, 2021, Apple Employee Relations representative Ekelemchi Okpo sent Plaintiff an email stating that she must request permission from Apple before returning to work.

**REQUEST FOR ADMISSION NO. 28:**

Admit that Jessica Perry, esq. was retained by Apple and began communicating with Apple management and HR/ER related to Plaintiff's complaints no later than Aug. 17 2021.

**RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

Apple objects to this Request on the grounds that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine or any other applicable privilege

Based on its understanding of the Request, Apple responds:

Apple admits that there were attorney-client privileged communications involving Jessica Perry related to Plaintiff no later than August 17, 2021. Apple will not admit or deny the remainder of the Request on the basis that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

**REQUEST FOR ADMISSION NO. 29:**

Admit that Apple created a Keynote deck about Plaintiff on or before August 26 2021 that was titled "exit outcomes" and the content included discussion of the termination of Plaintiff's employment.

**RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

Apple objects to this Request on the grounds that it seeks information protected from disclosure by the attorney-client privilege, the work-product doctrine or any other applicable privilege.

Based on its understanding of the Request, Apple responds:

Apple admits that a Keynote file entitled Draft Exit Outcomes ACP.key was emailed on August 26, 2021. Apple will not admit or deny the remainder of the Request on the basis that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

**REQUEST FOR ADMISSION NO. 30:**

Admit that between 2015-2020, Plaintiff received primary medical care from Apple Inc directly or through Apple subsidiaries generally known as "AC Wellness" or "Apple Wellness."

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**,
*an individual*,

**Plaintiff**,

v.

**APPLE INC.**,
*a corporation*,

**Defendant**.

**Case No. 3:23-cv-04597-EMC**

**District Judge**: Honorable Edward M. Chen

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION**

**Under Cal. Labor Code 98.6, 1102.5 6310, & the Tamney Termination in Violation of Public Policy**

**Hearing:**

Dept: Courtroom 5, 17th Floor, San Francisco

Date: June 11 2026 1:30 p.m.

# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION

## V. NOTICE OF MOTION AND MOTION

1. **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE** that on June 11 2026 at 1:30 PM, in Courtroom 5, 17th Floor, Plaintiff Ashley Gjovik will move the Court under Federal Rules of Civil Procedure 56 and 65 for: (1) partial summary judgment on liability for specific theories under her *Tameny* claim and her retaliation claims under California Labor Code §§ 98.6, 1102.5, and 6310, with damages reserved for trial; and (2) a preliminary injunction reinstating Plaintiff to payroll and medical benefits at the level in effect on the date of her termination. Plaintiff's other pending claims and/or subclaims are preserved for trial. This Motion is based on this Notice, the Memorandum of Points and Authorities, the concurrently filed Declarations of Ashley Gjovik and hyperlinked exhibits, the pleadings and records on file, and any further evidence received at the hearing. The schedule was set by the Order at Dkt. No. 273 and Motion filed in compliance with Civ. L.R. 7-2 - 7.5.

## VI. MEMORANDUM OF POINTS AND AUTHORITIES

### A. INTRODUCTION

2. Defendant Apple Inc. fired Plaintiff on September 9, 2021, and stated three reasons. Each is itself conduct California law protects against retaliation: (1) a Twitter post made during nonworking hours complaining about a culture of retaliation and the employer's surveillance of workers; (2) a repeated request that investigatory communications be in writing due to concerns of misrepresentation and made to preserve a record for her NLRB proceeding and her other pending complaints; and (3) Plaintiff's sexual harassment complaint against her senior director. Defendant has admitted this record across its sworn pleadings, interrogatory responses, RFA responses, and the depositions of five witnesses, including the Vice President who sent the termination email. The material facts are undisputed.

Case: 26-4716, 11/13/2026, DktEntry: 10.3, Page 129 of 253

establishing liability under § 98.6 and *Tameny*; Whether the undisputed evidentiary record establishes causation under the applicable substantive standards, establishing liability under *Tameny*, § 1102.5, § 98.6, and § 6310; Whether Plaintiff is entitled to a preliminary injunction reinstating her to payroll and to medical, dental, and vision insurance pending final judgment.

## C. STATEMENT OF FACTS

7. Plaintiff was employed by Apple as a Senior Engineering Program Manager from February 23, 2015 until her termination on September 9, 2021, reporting up through Director David Powers and Senior Director Dan West to Yannick Bertolus (SW QE Engineering VP, Hardware). (Answer ¶¶ 153, 183; Ex. 32, Bertolus Dep. 22:13-15, 24:10-14, 27:3-4.) She received positive reviews, raises, and promotions each year. (FAC ¶¶ 59-60, 69.)

8. On March 17, 2021, Plaintiff emailed her management chain raising vapor-intrusion concerns about her office at 825 Stewart Drive, a federal Superfund site. (Answer ¶¶ 72, 73.) On March 18, Michael Steiger (EH&S) forwarded that email internally to Schmidt, Sidlow, and Creighton. (Ex. 16.) Powers forwarded Plaintiff's email stating Plaintiff "should be keeping these emails private and not needlessly scaring the team about something she doesn't know about." (Answer ¶ 75.) On March 22, Powers told Plaintiff she was "not allowed" to discuss her safety concerns with anyone other than him, EHS, and investigator Jenna Waibel. (Ex. 19 at 16.) On April 5, West texted Plaintiff that raising EHS concerns was "kicking a hornet's nest." (Answer ¶ 79.) Plaintiff reported concerns about environmental compliance at her office to the U.S. EPA from April 2021 through Aug. 2021. (Answer ¶ 89; Ex. 12.)

9. Plaintiff was organizing with coworkers around COVID-19 safety concerns. On June 14, 2021, Plaintiff emailed Tim Cook and SVP of People and Retail Deirdre O'Brien with a petition/letter, video, survey results, and employee signatures. On July 23, 2021, the New York Times quoted Plaintiff criticizing Apple's COVID-19 return-to-work response; on July 24, it

made her quote the Quotation of the Day. (Answer ¶ 115.) Apple admits press outlets covered Plaintiff through August and September 2021, that she provided quotes and information to journalists, and that it reviewed her public social-media posts before terminating her. (Answer ¶¶ 206, 246.) Apple opened an investigation into the Plaintiff due to her public communications about workplace safety related to COVID-19. (Ex. 2-3).

10. Between July 23 and August 23, 2021, Apple opened at least ten Business Conduct tickets tracking Plaintiff's press activity, Twitter posts, Slack activity, and website. (Exs. 2-11.) Employee Relations Business Partner Manager Antonio Lagares, supervisor of Waibel, Okpo, and Kagramanov, personally updated the first tickets: "we are aware and addressing this issue" (July 28); "we are aware of this matter and it is part of a broader investigation and collaboration with ER/Legal" (July 29). (Exs. 2-3.) Subsequent entries directed that "any case having to do with Ashley G. is currently being escalated to Adelmise [Warner, Sr. Director, Employee Relations] and or Debbie [Rice, Sr. Director, Legal – HR] directly and is being investigated." (Exs. 4-11.)

11. Plaintiff had complained to EPA that there were cracks in the floor and Apple refused to tell EPA. Between July 27 and August 2, 2021, Apple was notified that the EPA had requested an inspection of Plaintiff's office. (Answer ¶ 117.) Apple asked EPA to sign a nondisclosure agreement asserting the inspection and any violations were Apple Confidential; EPA refused. (Ex. 13.) On August 4, 2021, Apple EHS began air testing at Plaintiff's office and began sealing cracks and gaps in the floor, work continuing through August 18. (Ex. 17.) Within hours of testing commencing, Okpo placed Plaintiff on indefinite administrative leave and "removed her from the workplace". (Ex. 34, Okpo Dep. 71:9-15.)

12. Apple admits telling Plaintiff the leave "ensures that [she] [is] removed from the workplace." (Answer ¶ 249.) Plaintiff was planning to retrieve from her office the next day,

August 5, a laptop containing text-message evidence relevant to her harassment complaint against West. (Ex. 19 at 21.) Okpo later cited Plaintiff's inability to produce the full text exchange as the basis for his "misleading complaint" finding. (Ex. 34, Okpo Dep. 121:7-18.) EPA's August 19 inspection report noted "freshly sealed cracks" (Exs. 14-15.)

13. On August 16, 2021, Okpo sent Plaintiff a draft "Issue Confirmation" of her complaints; Plaintiff revised and finalized it on August 23 and filed it through the Business Conduct Helpline as Ticket HRC000017207, which was directed on August 23 to Rice and Warner and closed August 27. (Ex. 33; Ex. 19; Ex. 11.) Okpo testified that "anything that was in the [I]ssue [C]onfirmation was something that [he] investigated." (Ex. 34, Okpo Dep. 41:20-25.) The document records Plaintiff's complaints of sexual harassment, hostile work environment, discrimination, workplace safety issues, and retaliation, including West's 2017 arrangement of a sexual or romantic liaison between Plaintiff and a sous chef at a restaurant where West, Bertolus, and the head chef are personal friends, accompanied by a $200+ dinner West paid for. (Ex. 19 at 5-31.) Okpo's document provided that "the scope of [his] investigation does not include the concerns that [Plaintiff] raised with [Apple's] Environmental Health and Safety team." (Ex. 34, Okpo Dep. 44:2-10.) Okpo testified that Waibel's prior investigation had closed in June 2021 and that he does not know who was investigating Plaintiff's retaliation-for-EHS complaints during July-September 2021. (Ex. 34, Okpo Dep. 45:5-47:1.)

14. On August 12, 2021, Plaintiff filed a charge with DFEH and the EEOC; her Right to Sue letter issued September 9, 2021, hours before termination. (Answer ¶ 220; Exs. 20-21.) On August 26, she filed NLRB Case No. 32-CA-282142. (Answer ¶¶ 152, 208, 220; Ex. 22.) On August 29, she filed an OSHA Whistleblower Protection Program complaint and a California Labor Commissioner complaint. (Answer ¶¶ 155, 230-31, 239; Ex. 23.) On August 26, 2021 — three days after Plaintiff transmitted her Issue Confirmation to Rice and Warner, and four days

before the Twitter post Bertolus identified as the basis for his termination decision — Apple circulated by email an internal Keynote file entitled "Draft Exit Outcomes ACP.key." (Apple's Resp. to Pl.'s RFA No. 29.)

15. On August 30, 2021 at 9:35 AM, Plaintiff posted on Twitter stating: "We're learning about #Apple's long history of systemic oppression & retaliation against employees when employees express concerns about discrimination, harassment, & other abuse. Why wouldn't Apple try to use our data & their internal surveillance infrastructure against us?" The post included a screenshot image. (Ex. 27.) Bertolus later identified this tweet as the one that triggered his termination decision. (Ex. 32, Bertolus Dep. 2005-2012.) Earlier that day, The Verge published an article titled "Apple Cares About Privacy, Unless You Work at Apple," including quotes from the Plaintiff and which noted "Apple did not respond to a request for comment from The Verge." (Ex. 28.) Apple admits Plaintiff shared the article, provided information, and helped the reporter. (Answer ¶¶ 159, 232.)

16. On September 3, 2021, Okpo emailed Plaintiff asking to meet; Plaintiff responded in writing requesting communications continue in writing, citing her pending government complaints. (Answer ¶ 165.) Okpo did not respond for four days. (Ex. 34, Okpo Dep. 102:13-20.) On September 7 Okpo emailed again. (Answer ¶ 165.) Okpo testified his outreach concerned only the Chez TJ text exchange; he closed his entire investigation of all of Plaintiff's complaints because she requested written communications about that sub-issue; and he acknowledged no Apple policy prohibits written-communication investigations or requires oral only communication. (Ex. 34, Okpo Dep. 103:6-10, 106:6-10, 116:4-14, 118:11-16.)

17. On September 9, 2021 at 12:24 PM, Waibel emailed Elizabeth Schmidt and Antone Jain transmitting notes from the July 7 meeting with Plaintiff regarding her EHS concerns and asserting Apple did not need to involve EPA. (Ex. 18.) At 2:08 PM, Kagramanov

emailed Plaintiff from Employee Relations, without subject line, referencing a "sensitive intellectual property matter" and demanding she "connect as soon as possible today, within this hour." (Answer ¶ 174.) At 2:10 PM, Plaintiff offered in writing to participate in writing. (Answer ¶ 175.) At 2:27 PM, Plaintiff replied that the timing — the day before her NLRB affidavit — felt like witness intimidation and that she had forwarded the exchange to the NLRB attorney. (Answer ¶ 176.)

18. At 2:50 PM, without responding to Plaintiff's offer, Kagramanov emailed that "[s]ince you have chosen not to participate in the discussion, we will move forward with the information that we have," and suspended Plaintiff's system access — 42 minutes after initial contact. (Answer ¶ 178; Ex. 35, Kagramanov Dep. 69:18-25, 72:3-6.) Kagramanov sent screenshots of the exchange to SVP Deidre O'Brien and copied Sr. Director Joni Reicher and Corporate Attorney Manager Isela Perez; he testified this was the only case in his three years at Apple in which he communicated directly with O'Brien, and that he cannot recall any other case of suspending system access within an hour of initial contact. (Ex. 35, Kagramanov Dep. 72:7-13, 115:20-116:1, 118:21-119:3, 130:13-131:5.)

19. At 6:20 PM, Bowman (HR Business Partner Director, BHR Hardware (R&D)) emailed Bertolus summarizing that Kagramanov and Sophi Jacobs (Corporate Attorney Manager, Investigations) "reached out to Ashley to talk with her about allegations that she had disclosed confidential product-related information on Twitter." (Ex. 30.) Six minutes later, Bertolus replied: "Understood. I agree with the termination decision." (*Id.*) At 6:54 PM, Bertolus sent Plaintiff the termination letter drafted by Bowman. (Exs. 29, 31; Answer ¶ 183.)

20. The letter stated: "Apple has determined that you have engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. You disclosed confidential product-related information in violation of Apple policies and your

*Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). Because state law supplies the rule of decision, substantive standards, presumptions, and burdens of proof are governed by California law. Fed. R. Evid. 302; *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *Hanna v. Plumer*, 380 U.S. 460 (1965); *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1090-91 (9th Cir. 2001). California Evidence Code §§ 603 and 605 govern the operation of § 98.6(b)(1)'s rebuttable presumption.

24. Where the employer's own words supply direct evidence that protected activity motivated the adverse action, *McDonnell Douglas* burden-shifting is unnecessary. *Wallace v. County of Stanislaus*, 245 Cal.App.4th 109, 123 (2016); *DeJung v. Superior Court*, 169 Cal.App.4th 533, 550 (2008); *Bachelder v. Am. West Airlines*, 259 F.3d 1112, 1124-25 (9th Cir. 2001); *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997). The direct-evidence standard requires evidence that, if believed, proves retaliatory motive "without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).

**ii. TAMENY TERMINATION IN VIOLATION OF PUBLIC POLICY**

25. California recognizes a tort claim for wrongful discharge where termination contravenes a fundamental public policy tethered to a statutory or constitutional provision. *Tameny v. Atl. Richfield Co.*, 27 Cal.3d 167, 172 (1980). The policy must be (a) delineated in a statutory or constitutional provision; (b) public; (c) well-established at the time of discharge; and (d) substantial and fundamental. *Stevenson v. Superior Court*, 16 Cal.4th 880, 889-90 (1997); *Gantt v. Sentry Ins.*, 1 Cal.4th 1083, 1095 (1992).

26. Multiple statutory and constitutional provisions supply the required public-policy tether. Article I, § 1 of the California Constitution is self-executing and confers a private right of action. *Hill v. NCAA*, 7 Cal.4th 1, 15-20 (1994); *Barbee v. Household Auto. Fin. Corp.*, 113 Cal.App.4th 525 (2003). Workplace-safety reporting to regulatory agencies also satisfies *Tameny*. *Green v. Ralee Eng. Co.*, 19 Cal.4th 66, 79 (1998); *Boston v. Penny Lane Ctrs., Inc.*,

170 Cal.App.4th 936, 947 (2009). Plaintiff's *Tameny* claim is tethered to Article I, § 1, Cal. Labor Code §§ 96(k), 232.5, 1102.5, and 6310, and Gov. Code § 12940(h).

**iii. CAL. LABOR CODE §§ 98.6/98.7; § 98.6 via §§ 96(k) & 232.5**

27. Section 98.6(a) prohibits retaliation for "conduct described in § 96" and for the exercise of other rights within the Labor Code. Section 96(k), incorporated into § 98.6(a), reaches "lawful conduct occurring during nonworking hours away from the employer's premises." Cal. Lab. Code § 96(k); *Barbee*, 113 Cal.App.4th at 535-37. Section 232.5(c) independently prohibits discharge for disclosure of "information about the employer's working conditions." "Working conditions" is construed broadly to encompass wages, workplace safety, harassment and discrimination practices, workload, and internal policies affecting employees. *Grant-Burton v. Covenant Care, Inc.*, 99 Cal.App.4th 1361, 1371 (2002). The California Court of Appeal has affirmed liability under §§ 232.5 and 1102.5, applying the "substantial motivating reason" standard. *Zirpel v. Alki David Prods., Inc.,* 93 Cal.App.5th 563, 578-82 (2023).

28. Government Code § 12964.5 independently declares unenforceable any agreement or policy that "purports to deny the employee the right to disclose information about unlawful acts in the workplace," including information the employee reasonably believes pertains to unlawful conduct. Cal. Gov. Code § 12964.5(a)(2), (b). Section 98.6(b)(1), enacted by SB 497 and effective January 1, 2024, provides that where an employer takes adverse action within 90 days of protected activity, "there shall be a rebuttable presumption in favor of the employee's claim." Its operation is governed by California Evidence Code §§ 603 and 605, which shift the burden of proof to the employer. Cal. Evid. Code §§ 603, 605; Fed. R. Evid. 302.

**iv. CAL. LABOR CODE § 1102.5**

29. Section 1102.5(b) prohibits retaliation for disclosing information the employee reasonably believes reveals a legal violation. Supervisors qualify regardless of investigatory authority, and the reasonable-belief standard does not require citation of a specific statute.

Case: 26-4716, 11/13/2026, DktEntry: 10.3, Page 136 of 258

responses — are addressed below as evidence of pretext and as foreclosing same-decision defense. The prima facie burden is protected activity, adverse action, and causation, and the showing on summary judgment is "minimal." *McRae v. Dep't of Corr. & Rehab*., 142 Cal.App.4th 377, 386 (2006); *Wallis v. J.R. Simplot Co*., 26 F.3d 885, 889 (9th Cir. 1994).

32. A party cannot defeat summary judgment by contradicting its own prior sworn admissions. *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir. 1991); *Van Asdale v. Int'l Game Tech.,* 577 F.3d 989, 998-99 (9th Cir. 2009). The material facts are established by Defendant's own sworn record: the Amended Answer, Apple's verified Response to Plaintiff's Rog #1 (Aug. 4, 2025), Apple's DOL position statement (Mar. 4, 2022), the termination email and Bowman-Bertolus email chain (Exs. 29, 30), and the depositions of Bertolus, West, Okpo, Kagramanov, and McKeon.

33. Protected activity, knowledge, and adverse action are admitted. Defendant admits the Twitter post and Verge article (Answer ¶¶ 159, 232); the written-communications requests to Okpo and Kagramanov (Answer ¶¶ 165, 175, 180); the hostile-work-environment complaint concerning West (Answer ¶¶ 102, 211), the full scope of which Plaintiff documented in her August 23 Issue Confirmation (Ex. 19); Plaintiff's EPA reporting beginning April 2021 (Answer ¶ 89) and her complaints of retaliation for that activity (Ex. 34, Okpo Dep. 35-47); her NYT COVID-19 quotation (Answer ¶ 115); her Remote Work Advocacy campaign addressed to Cook and O'Brien (Ex. 1); and her filings with agencies (Answer ¶¶ 152, 155, 208, 220, 230-31, 239).

34. Defendant admits reviewing Plaintiff's social-media posts before termination (Answer ¶ 246); each ER investigation and Business Conduct ticket system documents knowledge in real time, with Lagares personally updating tickets tracking Plaintiff's protected speech (Exs. 2-11). The August 23 Issue Confirmation was directed to Rice and Warner (Ex. 11); Kagramanov sent screenshots to O'Brien (Ex. 35, Kagramanov Dep. 115:20-116:1, 118:21-

119:3). Defendant admits the suspension of Plaintiff's system access (Answer ¶ 178), her administrative leave (Answer ¶ 249), and her termination (Answer ¶¶ 153, 183).

35. Apple has conceded in verified discovery that Plaintiff raised "concerns during her employment with Apple, at least some of which may be construed as protected activity as defined under federal or state whistleblower, retaliation, or labor laws," and has identified the August 23 Issue Confirmation as the document setting forth those concerns. (Apple's Am. Resp. to Pl.'s Rog No. 3 (Set Three), Apr. 6, 2026.)

36. Bertolus admitted he relied on characterizations from HR, Legal, and Global Security and had not independently reviewed the underlying records. (Ex. 32, Bertolus Dep. 102:2-12, 131:4-7.) The morning of his deposition, Bertolus spoke with non-lawyer employees Robert McKeon and Sophi Jacobs "to confirm that what you leaked was proprietary" (*id.* 2112-2128, 2134-2148), contradicting his earlier testimony that he "only worked with the lawyers" (*id.* 394-397); Apple's counsel instructed him not to answer whose idea it was (*id.* 2129-2132). Knowledge is undisputed at every level of the organization that participated in the termination.

**ii. PLAINTIFF ENGAGED IN PROTECTED ACTIVITY UNDER EACH OF THE FOUR STATUTES AS A MATTER OF LAW.**

37. Whether Plaintiff's conduct qualifies as protected activity is a question of statutory construction the Court decides on the undisputed facts. Each category qualifies under multiple provisions. **Privacy / working conditions — Twitter post and linked Verge article.** Plaintiff's August 30 Twitter post linking to the Verge article (Ex. 27) is protected under California public policy, each of which tethers the *Tameny* claim. Apple admits Plaintiff shared the article, helped the reporter, provided Gobbler-application details, and allowed inclusion of screenshots. (Answer ¶¶ 159, 232.) Bertolus testified this tweet was the basis for his termination decision. (Ex. 32, Bertolus Dep. 2005-2012.)

38. Article I, § 1 of the California Constitution declares privacy an inalienable right,

self-executing and enforceable against private actors. *Hill*, 7 Cal.4th at 15-20; *Barbee*, 113 Cal.App.4th 525. Plaintiff's public speech about employer surveillance of her body, home, and personal activities concerns a legally protected privacy interest. Section 96(k) via § 98.6(a) reaches lawful conduct during nonworking hours off the employer's premises. *Barbee*, 113 Cal.App.4th at 535-37. Section 232.5(c) via § 98.6(a) prohibits discharge for disclosure of "working conditions," broadly construed; surveillance of employees through company applications and biometric collection are working conditions. *Zirpel*, 93 Cal.App.5th at 578-82. Government Code § 12964.5 independently declares unenforceable any agreement purporting to restrict disclosure of reasonably-believed-unlawful workplace conduct. Section 1102.5(b) independently covers disclosure of practices Plaintiff reasonably believed violated state and federal law. *Killgore*, 51 F.4th at 984-90.

39. Apple testified that it believes "[t]he only communications Apple is aware of pertaining to Plaintiff raising concerns about 'Privacy' involve her public dissemination of confidential Apple product information," specifically identifying the August 30 tweet, the Verge article, and related communications. (Apple's Am. Resp. to Pl.'s Rog No. 8 (Set Three), Apr. 6, 2026.) Apple's own sworn response confirms that the protected privacy speech and the conduct it labels a "confidential disclosure" are the same conduct.

40. Apple's position on the Verge article is internally contradictory. Apple's verified Rog #1 and its verified factual bases for Affirmative Defenses Nos. 1, 2, 3, 8, 9, 10, and 13 each treat the August 30 Verge article as a pre-termination basis for the decision. Apple's Seventh Affirmative Defense pleads the same Verge article as something Apple "learned — shortly after Plaintiff's employment was terminated." (Answer, Seventh Affirmative Defense.) Apple has admitted it was contacted by the Verge for comment before publication and chose not to respond. (Apple's Resp. to Pl.'s RFA No. 18.) The article itself reports that "Apple did not

respond to a request for comment." (Ex. 28.) Apple's pre-termination awareness is established on its own admission.

41. **Sexual harassment complaint — DFEH/EEOC and Issue Confirmation.** Plaintiff's DFEH/EEOC charge (Exs. 20-21), her August 23 Issue Confirmation (Ex. 19), and her ongoing complaints from May 2021 through August 2021 (Apple's Am. Resp. to Pl.'s Rog No. 2 (Set Two, AD #1), Apr. 6, 2026) are protected activity. EEOC/DFEH charges are categorically protected under Title VII's participation clause, 42 U.S.C. § 2000e-3(a), and Gov. Code § 12940(h); participation protection is not conditioned on the merits. *Wrighten v. Metro. Hosps., Inc.*, 726 F.2d 1346, 1356 (9th Cir. 1984). Plaintiff's internal complaints are separately protected under the FEHA opposition clause. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1043, 1046-47 (2005). Statements made during an employer's internal investigation are independently protected. *Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271 (2009).

42. West's sexual-matchmaking conduct combined with the $200+ dinner, within a power-imbalance relationship West himself acknowledged, is conduct a reasonable person could believe unlawful. *Miller v. Dep't of Corr.*, 36 Cal.4th 446, 461-73 (2005); Cal. Gov. Code § 12923. West testified that Apple's own ER investigators told West his conduct was "not appropriate" and reflected a "power imbalance" — confirming the reasonableness of Plaintiff's belief from Apple's own witnesses. (Ex. 36, West Dep. 24:20-21, 25:1.) The complaint is also a § 1102.5(b) disclosure to persons with authority over another employee. *Killgore*, 51 F.4th at 984-90. Plaintiff's 2021 performance review included feedback from West dated July 2, 2021: "sometime during the year a switch flipped where Ashley seemed to stop assuming good intent with most leadership. I see the leadership team as largely aligned on I&D topics, yet she is letting perfection [be] the enemy of the progress." (Ex. 46.) This criticized Plaintiff for making complaints related to Inclusion and Diversity at Apple and treated her performance improvement

as requiring her to cease raising such concerns.

43. Defendant's theory that Plaintiff's complaint was "misleading" arises out of an assertion that Plaintiff texted during the 2017 dinner that the sous chef was "cute" and had accepted the dinner. That is an independent FEHA violation. FEHA does not condition the right to complain on contemporaneous protest. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986) (voluntariness not a defense; welcomeness is the inquiry). Treating a protected complaint as itself misconduct is retaliation under § 12940(h). *Yanowitz*, 36 Cal.4th at 1043.

44. Okpo testified the basis of his September 3 and 7 outreach — the outreach on which Apple built Reason (2) — was that Plaintiff had texted during the 2017 dinner that the sous chef was "cute," and he refused to communicate in writing about it. (Ex. 34, Okpo Dep. 3048-3060, 102:13-20, 116:4-14.) Reason (2) thus rests on Plaintiff's refusal to submit to unrecorded oral questioning, by a male investigator, about whether she had been interested in engaging in sexual activity the man her supervisor set her up with during the conduct underlying her harassment complaint. Plaintiff has a right to complain and a right to be free from intrusive questioning regarding her sexual activities. *Barbee*, 113 Cal.App.4th at 540 (citing *Roman Catholic Bishop v. Superior Court*, 42 Cal.App.4th 1556, 1567 (1996)).

45. **Hazardous waste / EHS — Stewart 1 / TRW Microwave Superfund Site.** Plaintiff's EPA reporting and internal EHS complaints (see SOF; Answer ¶¶ 89, 117; Exs. 12-18) are protected under § 6310(a), § 98.6(a), § 1102.5(b), and *Tameny* (via *Green*, 19 Cal.4th at 82). This activity is protected under § 6310(a), § 98.6(a), § 1102.5(b), and *Tameny* (via *Green*, 19 Cal.4th at 82). *Hentzel*, 138 Cal.App.3d at 299-300; *Cabesuela*, 68 Cal.App.4th at 109; *Freund*, 347 F.3d at 758-60. Section 6310 also prohibits preemptive retaliation, which is directly on point given Apple's August 4 pre-inspection crack-sealing and its simultaneous removal of Plaintiff from the workplace. *Lujan*, 124 Cal.App.4th at 1046.

Case: 26-1716, 11/13/2026, DktEntry: 10.3, Page 141 of 258

46. **COVID-19 / return-to-work and Remote Work Advocacy.** Public statements about Apple's COVID-19 return-to-work response concern employee working conditions under § 232.5 and implicate workplace safety under § 6310. The statements occurred during nonworking hours and are further protected under § 96(k) via § 98.6(a). Each provision tethers *Tameny*. Plaintiff's June 14 direct communication to O'Brien establishes actual knowledge by the SVP — the same executive to whom Kagramanov later sent screenshots of the September 9 exchange in a pattern he testified was the only such communication in his three years at Apple. (Ex. 35, Kagramanov Dep. 115:20-116:1, 130:13-131:5.)

47. **Participation in proceedings — agency filings and written-communications request.** The agency filings and written-communications requests are each protected under § 1102.5(b), which reaches employees "providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry." The NLRB, EEOC, DFEH, OSHA, and California Labor Commissioner are each public bodies. Plaintiff's California Labor Commissioner complaint provides an independent § 98.6 basis. The *Tameny* claim is tethered to § 1102.5's public-body provision and to the state-law filings. Okpo admitted he closed the entire investigation of all of Plaintiff's complaints because she requested written communications about a single sub-issue, and acknowledged no Apple policy prohibits written-communication. (Ex. 34, Okpo Dep. 103:6-10, 106:6-10, 116:4-14, 118:11-16.) Kagramanov admitted the "refusal to cooperate" determination rested on Plaintiff's request for a written record, and acknowledged no written Apple policy requires live investigation meetings. (Ex. 35, Kagramanov Dep. 57:7-15, 65:1-2, 106:6-10.) Apple's "refusal to cooperate" rationale therefore rests on conduct in which Plaintiff expressly offered, in writing, to cooperate. (Apple's Resp. to Pl.'s RFA No. 22.)

### iii. DEFENDANT'S ADMITTED REASONS ARE DIRECT EVIDENCE OF RETALIATION; OVERLAPPING AFFIRMATIVE DEFENSES FAIL.

48. Defendant admits it terminated Plaintiff on September 9, 2021 (Answer ¶¶ 153,

183), the August 4 administrative leave (Answer ¶ 249), and the September 9 suspension of system access (Answer ¶ 178). Termination is the paradigmatic adverse action; suspension and forced leave also qualify. *Yanowitz*, 36 Cal.4th at 1054; *Kortan v. California*, 5 F.Supp.2d 843, 853 (C.D. Cal. 1998). Where the employer's own words supply direct evidence that protected activity motivated the adverse action, no burden-shifting analysis is required. *Wallace*, 245 Cal.App.4th at 123; *Bachelder*, 259 F.3d at 1124-25. Each of Defendant's three stated reasons is direct evidence of retaliation, because each is itself protected activity.

49. **Reason (1) — August 30 Twitter post.** Defendant's termination email cites Plaintiff's disclosure of "confidential product-related information" under the IPA. (Ex. 29.) The operative conduct is the August 30 tweet Bertolus identified at deposition — a post complaining about Apple's "long history of systemic oppression & retaliation against employees" and Apple's use of "internal surveillance infrastructure" against employees, illustrated by a screenshot image. (Ex. 27; Ex. 32, Bertolus Dep. 2005-2012.) That tweet is protected under Art. I § 1, §§ 96(k), 232.5, 1102.5(b), and 98.6, and tethers *Tameny*. Terminating Plaintiff for this tweet is per se retaliation: Apple fired her for a tweet complaining of Apple's retaliation against employees.

50. **Reason (2) — request for written communications.** Defendant's termination email cites Plaintiff's "fail[ure] to cooperate and to provide accurate and complete information." (Ex. 29.) The operative conduct is Plaintiff's September 3 and September 9 written-communications requests — made to preserve a record for her NLRB affidavit and pending government complaints. (Answer ¶¶ 165, 175; Ex. 34, Okpo Dep. 102:13-20; Ex. 35, Kagramanov Dep. 57:7-15.) Kagramanov and Okpo both testified the "refusal to cooperate" determination rested on this request, and each admitted no Apple policy prohibits written-communication investigations. (Ex. 35, Kagramanov Dep. 57:7-15, 65:1-2, 106:6-10; Ex. 34, Okpo Dep. 106:6-10, 116:4-14.) That conduct is protected under § 98.6 and *Tameny*.

51. **Reason (3) — hostile-work-environment complaint.** Defendant characterizes Plaintiff's complaint about West as "misleading." (Answer ¶ 211.) Plaintiff' opposed West's 2017 conduct and her complaints were documented in her August 23 Issue Confirmation. (Ex. 19; Answer ¶ 220.) The conduct is protected under FEHA § 12940(h), Title VII, § 1102.5(b), § 98.6, and *Tameny*. Apple has verified, under oath, that its "misleading" finding rested on Plaintiff's account of "an incident regarding a Sous Chef at a local restaurant." (Apple's Am. Resp. to Pl.'s Rog No. 2 (Set Two, AD #1), Apr. 6, 2026.) It's retaliation for the complaint.

### iv. CAUSATION IS ESTABLISHED UNDER THREE INDEPENDENT THEORIES.

#### 1) THE § 98.6(B)(1) REBUTTABLE PRESUMPTION ATTACHES AND CANNOT BE REBUTTED.

52. Section 98.6(b)(1), effective January 1, 2024, provides that when an employer takes adverse action within 90 days of protected activity, "there shall be a rebuttable presumption in favor of the employee's claim." The presumption attaches mechanically from four objective facts: protected activity within § 98.6, employer knowledge, adverse action, and adverse action within 90 days. Because § 98.6(b)(1) is created by a California statute governing the substantive element of causation in a California claim, California law governs its operation in federal court. Fed. R. Evid. 302; *Snead*, 237 F.3d at 1090-91. Under California Evidence Code § 605, a presumption affecting the burden of proof shifts the burden of proof — not merely production — to the party against whom the presumption operates. Section 98.6(b)(1) is a § 605 presumption: construing it as a mere § 603 burden-of-production presumption would render the enactment surplusage, because § 98.6's existing prima facie case already required the same showing. The statute shifts the burden of proof to the employer to establish a legitimate, independent reason. Defendant cannot rebut the presumption. Its only stated reasons are the three in the September 9 termination email, each itself protected activity. Retaliation cannot rebut a presumption of retaliation. See *Bachelder*, 259 F.3d at 1124-25. Every protected activity

addressed in this Motion falls within the 90-day window.

**2) DEFENDANT'S ADMISSION THAT IT FIRED PLAINTIFF FOR PROTECTED ACTIVITY ESTABLISHES CAUSATION DIRECTLY.**

53. Where the employer's own statement of its reasons is direct evidence that protected activity motivated the adverse action, no burden-shifting analysis is required. *Wallace*, 245 Cal.App.4th at 123; *Bachelder*, 259 F.3d at 1124-25. Defendant has admitted that each of its three stated reasons is conduct Plaintiff engaged in; each is protected activity as a matter of law.

54. Under § 1102.6, Plaintiff must show that protected activity was "a contributing factor" — any factor which, alone or in combination, "tends to affect in any way the outcome of the decision." *Marano v. Department of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993), adopted in *Lawson*, 12 Cal.5th at 713. An admitted reason is, by definition, a factor that affected the outcome. The *Tameny* and § 6310 "substantial motivating reason" standards are satisfied by the same admission. *Haney v. Aramark Uniform Servs., Inc.*, 121 Cal.App.4th 623, 641 (2004); CACI 4605. Defendant cannot carry its § 1102.6 same-decision burden. Defendant has articulated no legitimate independent reason.

**3) THE UNDISPUTED EVIDENTIARY RECORD INDEPENDENTLY ESTABLISHES CAUSATION.**

55. Circumstantial evidence is evaluated under the totality of the circumstances. *Light v. Cal. Dep't of Parks & Recreation*, 14 Cal.App.5th 75, 94 (2017); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 361 (2000). Every category of circumstantial evidence of retaliation is present. *Temporal proximity.* Termination occurred 10 days after the Twitter post; within 6 days of the September 3–7 written-communications requests; 14 days after the NLRB filing; 11 days after the OSHA and Labor Commissioner filings; 21 days after EPA's inspection; 28 days and hours after the EEOC/DFEH charge; and 17 days after the Issue Confirmation was transmitted to Rice and Warner. Kagramanov suspended Plaintiff's system access 42 minutes after initial contact on September 9; Bertolus approved termination six minutes after receiving Bowman's summary.

Case: 26-4716, 11/13/2026, DktEntry: 10.3, Page 145 of 258

Proximity this close "can by itself constitute sufficient circumstantial evidence of retaliation." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000); *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003).

56. *Preemptive retaliation and evidence-blocking.* Section 6310 prohibits action taken in anticipation of further protected activity. *Lujan*, 124 Cal.App.4th at 1046; *Sauers*, 1 F.3d at 1128. Defendant began sealing cracks in Plaintiff's office on August 4 in anticipation of EPA's August 19 inspection (Ex. 17); EPA's inspection identified "freshly sealed cracks" as a concern (Exs. 14-15). On the same August 4, Okpo removed Plaintiff from the workplace on administrative leave, hours before she planned to retrieve laptop evidence from her office relevant to her harassment complaint against West (Ex. 19 at 21; Ex. 34, Okpo Dep. 71:9-15). Okpo later cited Plaintiff's inability to produce the full text exchange as the basis for his "misleading complaint" finding. (Ex. 34, Okpo Dep. 121:7-18.) The timing is Defendant's admission that Plaintiff was removed from the workplace to block her access to evidence.

57. *Cat's-paw causation.* An employer is liable where a biased subordinate's act is a proximate cause of the adverse action, even if the final decisionmaker is not personally biased. *Staub*, 562 U.S. at 422. Independent review does not sever causation where the review relies on facts supplied by the biased subordinate. *Id.* at 421; *France v. Johnson*, 795 F.3d 1170, 1177-80 (9th Cir. 2015). California applies the same framework. *Reeves v. Safeway Stores, Inc.*, 121 Cal.App.4th 95, 113-14 (2004). Apple's three ER investigators on Plaintiff's matter each reported to ER Business Partner Manager Antonio Lagares, who personally updated the Business Conduct tickets tracking Plaintiff's protected speech. (Exs. 2-11.) Kagramanov transmitted screenshots of his September 9 exchange to SVP O'Brien, Sr. Director Reicher, and Corporate Attorney Manager Perez. (Ex. 35, Kagramanov Dep. 115:20-116:1, 118:21-119:3, 130:13-

131:5.) On the evening of September 9, HR Business Partner Director Bowman emailed Bertolus a summary of the investigators' characterizations at 6:20 PM (Ex. 30); Bertolus admitted he relied on characterizations supplied by HR, Legal, and Global Security and had not reviewed the underlying records. (Ex. 32, Bertolus Dep. 102:2-12, 131:4-7.) Bertolus's reliance on subordinate characterizations extends further. Asked whether he recalled any details of the "refusal to cooperate" ground beyond Bowman's email: "No." (*Id.* 1842-1847.) Asked for factual details underlying that finding: "I think that would be better answered by Global security." (*Id.* 2526-2527.) Asked for any other information about the refusal-to-cooperate basis: "No." (*Id.* 2562-2568.) As to the image, Bertolus testified he saw only the image as presented to him by an unspecified person at Apple, stripped of its surrounding anti-retaliation speech context. (*Id.* 1849-1864.) *Poland* is satisfied. *Poland v. Chertoff*, 494 F.3d 1174 (9th Cir. 2007).

58. *Deviation from procedure.* Defendant skipped every step of its normal disciplinary sequence. Plaintiff received no warning, no performance improvement plan, no counseling, and no contemporaneous explanation of the subject of the investigation. (FAC ¶¶ 59-60, 69.) Kagramanov refused to identify the subject of the Sept. 9 inquiry (Ex. 35, Kagramanov Dep. 38:22-39:4), suspended Plaintiff's access within 42 minutes (*id.* 72:3-13), and testified he could not recall any other case of suspending an employee's access within an hour of initial contact (*id.* 72:7-13) or any other case of communicating directly with SVP O'Brien (*id.* 130:13-131:5). Deviation from established procedure supports causation. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005).

59. *Pre-planned exit.* Apple has admitted that on August 26, 2021 it circulated an internal Keynote titled "Draft Exit Outcomes ACP.key." (Apple's Resp. to Pl.'s RFA No. 29.) The exit deck predates the Twitter post Bertolus identified as the trigger (Ex. 32, Bertolus Dep. 2005-2012) by four days, and predates Bertolus's "six-minute" approval (Ex. 30) by fourteen

Case: 26-4716, 11/13/2026, DktEntry: 10.3, Page 147 of 258

days. An exit drafted before the stated reason arose cannot have been caused by that reason. Further, Apple has verified that in late July 2021 Plaintiff's proposed resolutions included "transferring to a new role under new management or an exit package with compensation and benefits." (Apple's Am. Resp. to Pl.'s Rog No. 2 (Set Two, AD #1), Apr. 6, 2026.) Six weeks later, Apple terminated Plaintiff for cause and paid no severance. An employer that rejects a negotiated separation and then manufactures a for-cause termination on the same underlying facts has supplied its own evidence of pretext. Apple has further admitted that in the nearly five years since termination, it has never "initiated or threatened Plaintiff with formal legal proceedings" for any alleged breach of contract or intellectual-property violation. (Apple's Resp. to Pl.'s RFA No. 14.)

60. *Shifting and internally contradictory explanations.* Defendant's statement of reasons has shifted across every sworn and official account: the September 9 termination email (two reasons, no specifics, Ex. 29); the September 15 Eberhart letter (adding ear-scan and Gobbler rationales, Answer ¶ 184; Ex. 26); the March 2022 DOL position statement (two reasons using undefined code names "Alpha" and "Omega," characterizing administrative leave as Plaintiff's own request, omitting any "misleading" complaint reason, Ex. 25); the August 2025 verified Rog #1 (same undefined code names, adding an August 28 tweet, again omitting the "misleading" complaint, Ex. 24); and the Amended Answer (pleading three reasons including the "misleading" complaint, Answer ¶ 211). Apple's Seventh Affirmative Defense simultaneously pleads the Verge article as after-acquired while Apple's other accounts treat it as a pre-termination basis. Apple's DOL account treats the leave as Plaintiff's own request; the Amended Answer admits the leave "ensures that [she] [is] removed from the workplace" (Answer ¶ 249).

61. *Inadequate and biased investigation; Cotran privilege problem.* An employer cannot rely on an investigation as a legitimate basis for termination unless the investigation

produced "a reasoned conclusion . . . supported by substantial evidence" through "an appropriate investigation." *Cotran v. Rollins Hudig Hall Int'l, Inc.*, 17 Cal.4th 93, 108 (1998). An inadequate or biased investigation is itself evidence of pretext. *Nazir v. United Airlines, Inc.*, 178 Cal.App.4th 243, 277-83 (2009). Okpo closed the entire investigation of Plaintiff's Issue Confirmation because she requested written communications about a single sub-issue. (Ex. 34, Okpo Dep. 116:4-14.) Kagramanov declared Plaintiff in "refusal to cooperate" within 42 minutes on the basis of an unwritten policy. (Ex. 35, Kagramanov Dep. 57:7-15, 72:3-6.) Bertolus did not review the full text exchange, did not read the Verge article, could not identify the tool in the Twitter image, and could not name the policies he invoked without prompting. (Ex. 32, Bertolus Dep. 2005-2012, 2008-2009, 131:4-7, 1012-1019, 1307-1341.)

62. Defendant cannot simultaneously shield the investigation's substance from discovery and rely on it as a legitimate independent reason. Across the depositions, Defendant invoked privilege over: the content of Okpo's investigation (Ex. 34, Okpo Dep. 974-976, 1254-1272, 2027-2028, 2715-2716) and the basis for Kagramanov's "refusal to cooperate" determination (Ex. 35, Kagramanov Dep. 2383-2388). An employer that withholds investigation substance under privilege cannot rely on those investigations to satisfy *Cotran*. *Disparate treatment.* McKeon — the DRI for the application at issue and the person Bertolus consulted the morning of his deposition — had himself published extensive LinkedIn and Medium articles about Face ID, user studies, and Apple development processes from 2018 through 2022 without discipline. (Ex. 37, McKeon Dep. 81:14-17, 90:20-24, 93:9-18.) McKeon could offer no coherent basis distinguishing his publications from Plaintiff's image. (*Id.* 99:5-9, 81:22-25.) Asked whether, as a manager, he would discipline a subordinate for publishing articles like his own or seek HR guidance: "I would not." "No. It would not." (*Id.* 2342-2362.) Selective enforcement of confidentiality designations supports an inference of retaliatory motive. *Earl v.*

Case: 26-4716, 11/13/2026, DktEntry: 10.3, Page 149 of 258

*Nielsen Media Research, Inc.*, 658 F.3d 1108, 1113-14, 1117 (9th Cir. 2011). Under the totality of the undisputed record, no rational trier of fact could find that protected activity was unrelated to Plaintiff's termination. The combined evidence of temporal proximity, preemptive action, deviation from procedure, shifting and internally contradictory explanations, biased and inadequate investigation, and disparate treatment satisfies each causation standard.

## F. CONCLUSION

63. On the undisputed record, Plaintiff has established liability under the *Tameny*, § 98.6, § 1102.5, and § 6310 claims on the protected activities and admitted reasons addressed in this Motion. Per the Court's direction, Plaintiff separately seeks a preliminary injunction reinstating her to payroll and to medical, dental, and vision insurance at the level in effect on September 9, 2021, pending final judgment. (Order at Dkt. No. 273, Jan. 13, 2026.) *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Irreparable harm is established by Plaintiff's ongoing loss of income and employer-provided health coverage; loss of health insurance threatening access to medical care is irreparable harm. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020).

64. The balance of equities favors reinstatement: Defendant's own witness testified he would provide Plaintiff an equivalent position if legally ordered to reinstate. (Ex. 36, West Dep. 86:12-25.) The public interest favors enforcement of California's anti-retaliation statutes. Plaintiff respectfully requests that the Court enter an Order: Granting summary adjudication of liability on Plaintiff's Tameny, § 1102.5, § 98.6, and § 6310 claims on the protected activities, admitted reasons, and causation theories addressed in this Motion, with damages and remaining factual theories reserved for trial; Granting a preliminary injunction reinstating Plaintiff to payroll and restoring her medical insurance coverage pending final judgment; and granting such further relief as the Court deems proper.

Respectfully filed,

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**, *an individual*,

Plaintiff,

v.

**APPLE INC**, *a corporation*,

Defendant.

**Case No. 3:23-cv-04597-EMC**

**Magistrate Judge**: Honorable Kandis Westmore

## PLAINTIFF'S OPENING DISCOVERY BRIEF RE REMAINING FACT DISCOVERY DISPUTES

grounds that the testimony has undermined. Apple must either produce the documents or, if withholding on privilege, log them with sufficient specificity to permit assessment under Rule 26(b)(5)(A).

11. **Apple's categorical privilege assertions are overbroad.** Rule 26(b)(5)(A) requires a party withholding on privilege grounds to "expressly make the claim" and describe withheld documents in a manner that "will enable other parties to assess the claim." The party asserting privilege bears the burden on a document-by-document basis. *In re Grand Jury Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992). Categorical assertions do not satisfy the Rule and can result in waiver. *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1149 (9th Cir. 2005). Apple's April 20, 2026 email declares Okpo's entire investigation file privileged and extends the same reasoning categorically to investigation-related communications generally.

12. **Apple improperly instructed witnesses not to answer foundational questions at deposition.** Judge Chen's Standing Order § e provides that, when privilege is claimed at deposition, the witness must nonetheless answer questions about the date, participants, other recipients, and "general subject matter" of the communication, "unless such information itself is privileged." At the depositions in this case, Apple asserted blanket privilege and instructed witnesses not to answer foundational questions about the internal investigations into Plaintiff's complaints—when they took place, who conducted them, who participated, and the general subject matter. That information is not itself privileged, and the instructions were improper.

13. **Apple has not produced a privilege log meeting this Court's requirements, and refused to search or log documents responsive to RFP No. 43.** This Court's Standing Order ¶ 20 requires a detailed privilege log specifying for each document or category the author, recipients, dates, subject matter, and "specific basis for the claim," warning that "[f]ailure to

furnish this information promptly may be deemed a waiver." Apple's log does not satisfy these requirements as to the categorical investigation withholdings, and Apple provided no log at all for its deposition privilege claims. Separately, Apple refused to even search for documents responsive to RFP No. 43, stating it "will not search, review, or produce" communications involving Apple Legal or internal investigations teams. Those documents therefore appear on no log. A party cannot categorically exempt documents from the discovery obligation based on an anticipated privilege claim. Apple's authorities (*Herrera*, *Mikkelsen*) addressed requests that defined "YOU" to include attorneys; RFP No. 43 identifies specific Apple groups whose cross-group communications about Plaintiff are relevant regardless of privilege status of any particular communication.

14. **Relief Requested.** Plaintiff requests an order:

(i) compelling Apple, within 14 days, to produce all non-privileged documents concerning Plaintiff's protected activity and Apple's knowledge of that activity, including internal Apple-side records reflecting complaints raised, investigations undertaken, and responses formulated;

(ii) compelling Apple, within 14 days, to search, review, and either produce or log all documents responsive to RFP Nos. 4, 7, 11–16, 36, 43, 44, 55, 56, and 60, including communications involving Apple Legal and internal investigations personnel;

(iii) compelling Apple, within 14 days, to serve a complete privilege log meeting the requirements of this Court's Standing Order ¶ 20 as to all withheld documents across both sets of Requests for Production and as to all privilege claims asserted at depositions in this case;

(iv) compelling Apple, within 7 days, to provide in writing, as to each privilege claim asserted at deposition, the foundational information required by Judge Chen's Standing Order, § e (including the date of the communication, the participants, the general subject matter, and other persons to whom the substance has been disclosed); and

15. (v) compelling Apple to produce for *in camera* review the contested investigation-related entries on its privilege log, so the Court can assess the privilege claims on a document-by-document basis.

# RE: Gjovik v Apple - Remaining Discovery Issues Raised by Plaintiff (Per Dkt. No. 327)

From Ashley M. Gjovik (Legal Matters) <legal@ashleygjovik.com>

To Perry, Jessica R.<jperry@orrick.com>

CC Riechert, Melinda<mriechert@orrick.com>, Mantoan, Kathryn G.<kmantoan@orrick.com>, Booms, Ryan<rbooms@orrick.com>, Horton, Nicholas J.<nhorton@orrick.com>, Weaver, Nicholas<nweaver@orrick.com>, Davidson, Sarah<sdavidson@orrick.com>, Perry, Jessica R.<jperry@orrick.com>

Date Thursday, April 23rd, 2026 at 3:43 PM

---

Hello,

Thank you for finally providing an update on your production. Can you please send a amended, signed response to my RFP with your responses to those requests which you appear to provide at least partially below. My request for a final update from Apple regarding their response to my RFPs was a basic requirement of the FRCP and Apple should have done it by the 16th and without protest. Again, Apple was required to provide a final update on the status of their production -- and notify me if anything was still pending or underway at the close of discovery -- but instead Apple refused to provide any updates, said they did not have to, and accused me of misconduct for even asking.

I was unable to challenge Apple's responses until Apple provided its final responses, which it appears Apple is just starting to do now -- but it should be in a signed discovery response in compliance with FRCP.

I also ask again if Apple will be producing anything regarding my RFP for the NEU records, or more records for the medical record subpoenas -- nothing has been provided.

I also ask again if Apple will provide any updated privilege log including for its prior redactions. I also ask again if Apple will be justifying its production redactions that were simply titled "redacted" and no privilege claim. Same for deposition objections regarding privilege.

I also ask again if Apple will be disclosing its IME expert -- and if its disclosing Cher Scarlett -- neither have been disclosed despite repeated inquiries about the matters.

Regarding your statement that some RFPs are directed at Apple legal -- they are not. If Apple legal is the party that holds those documents, that's Apple's decision and it would have known at the time what the impact during discovery would be if it took the approach it apparently took regarding its privilege claims and decision makers. I'm not asking Apple to log every document it searches or view, but I am asking it to provide privilege log entries for anything responsive and relevant, but which its withholding under privilege claims.

Regarding RFPs RFP Nos. 1, 3, 4, 5, 6, 44, 45, 46, Apple has a duty to produce records that are relevant and responsive, even if it concurrently objections to the requests also being overbroad or vague. I do not believe they are overbroad or vague, and I also will challenge Apple's claims of privilege as improper -- and you know that I've raised the issue for two years now. Apple cannot claim privilege as a shield for records, then also a sword for justifying a termination, without providing records and information normally required in retaliation litigation.

- Dispute Nos. 1, 2, 4, 11-13 – as we stated in our April 20 email at 8:59pm, we believe there is no outstanding dispute on these issues.
- Dispute No. 3 – we do not believe there is any outstanding dispute as this issue was re-solved by Magistrate Westmore's April 22 Order at Dkt. 357.
- Dispute No. 5 – we believe we addressed this fully in our April 20 email at 8:59pm. If you disagree, the parties are at an impasse.
- Disputes No. 6 & 7 – please see our response below.
- Dispute No. 8 – we believe we addressed this fully in our emails on April 14 at 9:11am and April 20 at 8:59pm. If you disagree, the parties are at an impasse.
- Dispute No. 9 – we believe this dispute is subsumed into disputes 6 and 7 (discussed be-low).
- Dispute No. 10 – we believe we addressed this fully in our emails on April 14 at 9:11am and April 20 at 8:59pm. If you disagree, the parties are at an impasse.

As to Dispute Nos. 6 & 7, we endeavor to find some middle ground. Your April 9, 2026 email flagged the following disputes:

- **"DISPUTE 6: APPLE'S DEFICIENT RFP RESPONSES (SET TWO)—ALL REQUESTS"**
  - Note: This set included 64 RFPs. You appear to seek to put every one at issue.
- **"DISPUTE 7: APPLE'S RFP RESPONSES (COMPEL)"**
  - Request Nos. 7-10, 23, 24, 28-32 (environmental/EHS records).
    - Note: RFP Nos. 7-10, as we understand you, are from Set One; all others are from Set Two.
  - Request Nos. 37, 40-44, 54 (documents referencing Plaintiff).
    - Note: All of these are from RFP Set Two, and thus nested in Dispute No. 6.

Apple has already served responses and objections—and, where it said it would do so, has already produced documents—responsive to every one of these requests. Your April 9 email did not pro-pose any narrowing as to ***any*** of them; it simply insisted that Apple comply with the requests as drafted without addressing ***any*** of Apple's objections (including as to proportionality) or proposing any compromises. To date—other than to agree, for ten of your requests, to narrow the time frame to align to Judge Westmore's ruling as to RFP No. 23—you have offered no compromises as to the substance, breadth, or scope of any RFP. And you had not previously attempted to meet and confer regarding any of these requests (other than RFP No. 20) at any prior point during discovery.

We do not believe Plaintiff's efforts amount to good-faith meet and confer. However, to attempt to actually reach resolution, we identify below those RFPs where we hope the parties can agree. For others, we truly cannot move forward in any meaningful way unless you provide more information specifically about what you intended by requests that are vague (and many of which ask Apple to produce "all documents" about issues you raised, without identifying those issues [something you and you alone are positioned to do]); what you think Apple has failed to pro-duce; and what more you believe it is reasonable and proportionate to ask Apple to search for.

Apple has already expended significant time and energy identifying, collecting, reviewing, and producing over ***4,000 pages*** of documents; and you have produced to Apple over ***40,000 pages*** of documents (thousands of

- **<u>Your Positions Lack Merit in Any Event.</u>**
  - **<u>RFP Nos. 8, 10, 18, and 52 (Set Two): You failed to raise an issue.</u>**

Your April 17 email fails to raise any issues regarding RFP Nos. 8, 10, 18, or 52.

  - **<u>RFP Nos. 7, 8, 19, 36, 43, 47, 51, and 59 (Set Two): Apple properly declined to search for or log clearly privileged documents.</u>**

You do not dispute that at least a distinct portion of each of these requests seeks ***only*** attorney-client privileged documents. That is improper under Rule 26(b)(1). *Herrera v. Gen. Atomics*, No. 21CV1632-AJB(BLM), 2022 WL 1343001, at *6 (S.D. Cal. May 3, 2022) (rejecting demand for a privilege log where RFPs defined "YOU" to include attorneys, which "renders the RFPs impermissibly overbroad and creates an unreasonable burden on Defendant to identify every privileged document," and concluding that any logging obligation arises only after the definition of "YOU" is reconsidered excluding attorneys); *Mikkelsen Graphic Eng'g Inc. v. Zund Am. Inc.*, No. 07C0391, 2009 WL 3061978, at *3 (E.D. Wis. Sept. 23, 2009) ("To avoid the need to waste resources on the preparation of a privilege log listing obviously privileged information, plaintiff should tailor its requests to exclude materials that are obviously privileged, such as communications between defendants and their counsel relating to the present litigation.").

With respect to RFP No. 43. Apple did not refuse to search and log "the entire request," as you incorrectly claim. Apple objected to RFP No. 43 to the extent it seeks "communications, messages, emails, notes, summaries or reports exchanged between or among Apple's … Legal or internal investigations teams" and stated that it "will not search, review, or produce documents responsive to ***<u>this part</u> of this Request***." Apple stands on its objections. *See Planet Aid, Inc. v. Reveal, Ctr. for Investigative Reporting*, No. 17-cv-03695, 2018 WL 6079617, at *2 (N.D. Cal. Nov. 21, 2018).

  - **<u>RFP Nos. 1-6, 11-16, 19, 21, 35-36, 48, 55-57, and 60 (Set Two): Apple reasonably construed the requests.</u>**

In its April 14 email, Apple explained that, in light of its objections to RFP Nos. 1-6, 11-16, 19, 21, 35-36, 48, 55-57, 60 (Set Two), it reasonably construed these requests and responded either that it had already produced certain specified responsive documents or that it will produce such documents, to the extent they exist. Nearly eleven months after Apple served its objections and responses to these RFPs and with the discovery cut-off behind us, you still have never explained, on an RFP-by-RFP basis, why you believe Apple's objections lack merit, nor have you ever identified what else you believe Apple should produce in response to each RFP. There is no real discovery dispute here.

  - **<u>RFP Nos. 9, 22, 25, 27, 38, 45-46, 49 and 62 (Set Two): Apple properly refused to provide certain documents.</u>**

In its April 14 email, Apple outlined why it properly refused to provide documents in response to RFP Nos. 9, 22, 25, 27, 38, 45-46, 49 and 62 (Set Two). Of these RFPs, your most recent email only references RFP No. 25, which seeks documents pertaining to 3250 Scott, which is not relevant to this case. Your 5AC alleges that, prior to your termination, you raised concerns that "[your] apartment was built on toxic waste" and that you had been exposed to chemicals as a result. *See* 5AC ¶ 78 (alleging that you published an article titled "I thought I was dying: My apartment was built on toxic waste"). Your 5AC does not allege that, prior to your termination, you raised concerns that you had been

exposed to chemicals as a result of Apple's alleged activities at 3250 Scott. Indeed, you allege elsewhere that you "discovered" Apple's alleged activities at 3250 Scott on February 23, 2023, more than a year after your termination. 5AC ¶ 142. Following this "discovery," you began to allege you had been exposed to chemicals as a result of Apple's alleged activities at 3250 Scott. Such "[r]eports made after [your] employment ended cannot form the basis for a whistleblower retaliation claim." *Anderson v. Graybar Elec. Co.*, No. CIV.09-251 (MJD/FLN), 2010 WL 2545508, at *9 (D. Minn. June 18, 2010).

**Dispute 8: Privilege Log**

Your April 17 email repeats the arguments from your April 9 email while ignoring Apple's April 14 response, including the cited authority showing your position lacks merit.

**Dispute 9: Apple's Production of Documents Regarding Alleged Protected Activity**

As we mentioned on April 14, this dispute is not tethered to any specific RFP(s), and thus there is no issue about which the parties can meet and confer or which you could potentially escalate to Judge Westmore. *See* Dkt. No. 327 at 7.

In any event, you continue to falsely assert that Apple "refuses" to produce documents related to the concerns that you raised during your employment, despite acknowledging that Apple produced the Issue Confirmation, which is just one of many documents related to concerns you raised that Apple has produced—indeed, a document you yourself authored that purported to catalog all of your complaints. Continuing to insist that Apple has the burden to repeat back to you all of the concerns you raised—and that you documented during your employment, in a memo Apple has already produced back to you—serves no legitimate purpose. Apple has also produced non-privileged documents related to its knowledge of concerns you raised, including email communications back and forth with you over a series of months.

**Dispute 10: Apple's Responses to Requests for Production & Okpo's Testimony**

You now claim that Dispute 10—asserting that "Apple's RFP responses [are] contradicted by Okpo deposition testimony"—is tethered to RFPs 4, 7, 11-16, 36, 43-44, 55-56, and 60. But like your April 9 email, your April 17 email does not specifically identify any testimony of Mr. Okpo's (by page/line), let alone explain how that testimony allegedly contradicts any of the cited RFPs, so we still do not know what you are referencing. Nor is your arguing with us that you believe Mr. Okpo's testimony contradicts your reading of documents Apple had produced a genuine discovery dispute. That is for you to argue to the fact-finder; it is not a discovery dispute Judge Westmore can (or should) adjudicate.

In any event, Apple disputes your contention that Apple "never searched for" certain unspecified documents or that it "searched and is withholding them without logging them." As we have repeatedly informed you, Apple has not waived privileged with respect to Mr. Okpo's investigation. Your reliance on *Wellpoint Health Networks, Inc. v. Superior Court* is misplaced. There, the court was presented with a hostile work environment claim, which requires a plaintiff to show, among other things, that defendant "failed to take prompt and adequate remedial action." *Wellpoint*, 59 Cal. App. 4th 110, 126-27. The court held that if a defendant raises as a defense to a hostile work environment claim that it investigated and took appropriate action, then "the adequacy of the investigation [is] directly at issue"

and privilege over that investigation is waived. *Id.* at 128. Here, your claims for wrongful termination and retaliation do not require Apple to prove it took appropriate remedial action in response to the concerns you raised, and thus Apple has no need to (and does not intend to) rely on the adequacy of its investigation into those concerns. As such, there has been no waiver. *See Christensen v. Goodman Distrib. Inc.*, No. 18-cv-02776, 2020 WL 4042938, at *5 (E.D. Cal. July 17, 2020) (distinguishing *Wellpoint* and finding no waiver of privilege over investigation into concerns plaintiff had raised where "plaintiff's claims [were] for retaliation and wrongful termination, which do not require a showing of … the adequacy of the employer's investigation").Finally, your assertion that an investigation cannot be both a "privileged litigation preparation" and a "genuine workplace investigation" is incorrect. *See In re Grand Jury Subpoena (Mark Torf/Torf Env't Mgmt.)*, 357 F.3d 900, 907-11 (9th Cir. 2004); *Mendez v. Saint Alphonsus Reg'l Med. Ctr., Inc.*, No. 1:12-CV-26-EJL-CWD, 2014 WL 3406015, at *3 (D. Idaho July 10, 2014).

Thank you.

On Monday, April 20th, 2026 at 8:41 PM, Perry, Jessica R. <jperry@orrick.com> wrote:

Ashley,

We once again ask that you comply with Judge Westmore's order that the outstanding discovery disputes flagged by each party on April 9, 2026 be discussed in a separate thread (*i.e.*, one thread for outstanding issues raised on that date by Apple, and one for outstanding issues raised on that date by you).

We kept the name of this thread as is to make clear it relates to issues Apple raised on April 9 (in my 10:12 p.m. PT email; Issues No. 1-5), and in turn respond to the positions you set forth regarding those specific issues in your most recent email in this thread (from April 17, 2026 at 12:00 a.m. (*i.e.*, the very start of that day)). I have also re-inserted my April 16 at 5:44pm message to you which you cut and pasted at the very end of the email chain when you sent your most recent reply. Please respond, if at all, on an issue-by-issue basis so the parties' meet and confer as to particular points is clear.

**1. Your Continued Deposition**: Pursuant to the parties' April 15, 2026 email agreement that you will sit for your continued deposition on April 28, 2026, there is nothing further to confer regarding at this time.

**2. Discovery Regarding Alleged Emotional Distress Damages**: Your April 17, 2026 email stated that you were providing "Amended responses to all of Apple's Interrogatories and Request for Production" and would be sending "the final batches of document production" shortly (*i.e.*, after the fact discovery cut-off). The discovery cut-off has now passed. Apple will move to exclude any evidence of alleged emotional distress damages not timely produced or disclosed. We consider this issue resolved.

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 3:23-cv-04597-EMC (KAW)

**ORDER REGARDING 4/21/26 JOINT LETTER RE PLAINTIFF'S REQUESTED RULE 30(B)6) DEPOSITION**

Re: Dkt. No. 356

On April 14, 2026, Judge Chen extended Plaintiff's deadline to take the deposition of Apple, Inc.'s corporate witness, pursuant to Federal Rule of Civil Procedure 30(b)(6), to May 14, 2026. (Dkt. No. 352 at 4.) Judge Chen ordered the parties to meet and confer regarding the deposition topics, and ordered them to file a joint discovery letter before the undersigned should they be unable to reach an agreement. *Id.* at 4-5.

During the parties' meet and confer efforts, Plaintiff agreed to narrow the topics from 14 to 10. (Joint Letter, Dkt. No. 356.) They could not, however, agree on the remaining 10 deposition topics and filed the instant joint discovery letter on April 21, 2026. *Id.*

Plaintiff contends that she seeks information regarding the remaining topics (2-9, 12, and 14) that was not provided by the other deponents or Apple's responses to written discovery. (Joint Letter at 1.) In opposition, Apple argues that no Rule 30(b)(6) deposition should occur, and that the noticed topics are not proportional to the needs of the case and/or are unreasonably cumulative of discovery that Plaintiff has already obtained. (Joint Letter at 2.) During the meet and confer process, Apple proposed responding in writing to "certain discrete questions" from Plaintiff's notice" in lieu of a Rule 30(b)(6) deposition, but Plaintiff rejected that proposal. *Id.* at 3.

Apple is being unreasonable. As an initial matter, deposing individual fact witnesses is fundamentally different than deposing a corporate witness under Rule 30(b)(6). In the case of

Rule 30(b)(6) designees, the corporation is responsible for preparing the corporate witnesses and the testimony binds the entity they are representing. *Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 486-87 (N.D. Cal. 2012); *see also Storms v. Paychex, Inc.*, No. LACV2101534JAKJEMX, 2023 WL 4291436, at *8 (C.D. Cal. May 24, 2023) For that reason, courts in this district have generally required the production of a corporate witness in this circumstance, because, "[e]ven if the general topics to be addressed at the 30(b)(6) deposition will overlap to some extent, the questions asked and the answers given might not." *Mitchell Eng'g v. City & Cnty. of San Francisco*, No. C 08-04022 SI, 2010 WL 455290, at *1 (N.D. Cal. Feb. 2, 2010). Thus, Apple's argument that Plaintiff has already deposed individual employees rendering the Rule 30(b)(6) deposition "unreasonably cumulative" is unavailing.

Moreover, to the extent that Apple is asserting privilege on multiple topics, whether the privilege exists depends on the questions asked. Apple does not know what questions will be asked, and surely some questions will not be privileged. Nothing is stopping Apple from raising privilege objections during the deposition in real-time. Furthermore, despite Apple's protestations to the contrary, it is not Plaintiff's responsibility to identify what nonprivileged information she is seeking beyond the noticed topics before this deposition can go forward. (*See* Joint Letter at 3.)

Finally, as a practical matter, answering 10 written questions is an inadequate substitute for a Rule 30(b)(6) deposition, and Apple should know better.

Accordingly, the Court orders that the Rule 30(b)(6) deposition go forward. The only topic that the Court finds irrelevant to the remaining claims is Topic 12, which seeks information pertaining to post-termination social media communications and monitoring. All other topics (2-9, and 14) pertain to pre-termination issues or the termination itself and may be explored. The parties are ordered to meet and confer regarding scheduling the deposition, which shall take place between May 11-14, 2026, as both parties are available on those dates. (*See* Joint Letter at 2, 3.)

IT IS SO ORDERED.

Dated: April 22, 2026

KANDIS A. WESTMORE
United States Magistrate Judge

Case: 26-1716, 11/13/2026, DktEntry: 10.3, (160 of 253)

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK,
*an individual*,

Plaintiff,

vs.

APPLE INC.,
*a corporation*,

Defendant.

CASE NO.
3:23-CV-04597-EMC

**PLAINTIFF'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE (DKT. 327)**

**RULE 72(A)**

## ISSUE 1: The Discovery Schedule Is Clearly Erroneous Because It Renders Relief Unavailable Before Summary Judgment

4. The Magistrate Judge imposed a sua sponte omnibus schedule running past the April 27summary judgment deadline (Dkt. 274). Plaintiff's discovery brief: April 23. Apple's response (may raise new disputes): April 30. Plaintiff's reply: May 7. No ruling until after May 7. The order does not once mention the summary judgment deadline in its seven pages.

5. Plaintiff must file summary judgment on April 27 without knowing whether she will receive discovery sought since October 2024. All disputes not raised in the omnibus briefs are "deemed waived." Plaintiff gets 15 pages; Apple gets 25 plus the ability to raise new disputes.

6. The volume of accumulated disputes the court cited as justification is the court's own creation. Plaintiff requested a conference in February 2025 (Dkt. 162-165) to prevent this accumulation. The court refused (Dkt. 170, 181). Plaintiff's objection is preserved on appeal (9th Cir. Case No. 25-2028). A schedule that ensures no discovery relief before the dispositive deadline — based on a backlog the court itself was aware of and intentionally maintained and worsened, with no legitimate basis — is clearly erroneous.

## ISSUE 2: The Continued Deposition Combined with the Designation Framework is Contrary to Law

7. Dkt. 327 orders four more hours of deposition by April 8. Read together with Dkt. 326(designations automatically enforced as a gag order), the combined effect is: Plaintiff testifies; Apple designates new testimony — as it did with 72% of the prior transcript; under Dkt. 326, the gag order attaches automatically with no pre-enforcement judicial review; the omnibus schedule forecloses raising new designation disputes before May 7; and summary judgment is due April 27 2026.

8. Plaintiff withdrew her agreement to additional hours after Apple's blanket designation, unsigned narrowed designations, and enforcement motions seeking contempt. The court held Plaintiff to the original agreement without addressing the reason she withdrew — that every moment of new testimony potentially expands the universe of permanent gag orders, take down orders, and legal basis for Apple to threaten the Plaintiff with prosecution -- with no resolution mechanism before summary judgment or ever based on the Magistrate Judge's pattern of refusing to apply the correct legal standard,

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

**Ashley M. Gjovik,**
*an individual*,

Plaintiff,

vs.

**Apple Inc.,**
*a corporation,*

Defendant.

**Case No.**
**3:23-CV-04597-EMC**

**PLAINTIFF'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE (DKT. 326)**

**RULE 72(a)**

# PLAINTIFF'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE (DKT. 326)

***(Order Denying Motion to Enforce Protective Order; Sua Sponte De-Publication, Gag, and Sealing Directives)***

1. This filing is made as of right under Federal Rule of Civil Procedure 72(a), 28 U.S.C. § 636(b)(1)(A), and N.D. Cal. Civil Local Rule 72-2. On Feb. 26 2026, Apple filed a "Motion to Enforce the Protective Order" where it requested gag orders, take-down orders, findings of contempt, sealing of records, and other sanctions. (Dkt. 294). Apple also claimed it was an "emergency" and asked for hearing in less than a week and with only a couple days for the plaintiff to respond at all. (Dkt. 295). This followed Apple's initial attempt to obtain the same injunctions and sanctions via discovery Letter (Dkt. 280), which Apple initially refused to even file to the docket and instead tried to *email* to court staff instead. (Dkt. 279 – "*OBJECTIONS to Apple's 2/18 off-docket emails to court staff seeking sanctions against the Plaintiff for her NLRB charges against Apple and her related speech protected under the NLRA and many other laws and policy by Ashley M Gjovik*").

2. The plaintiff objected at Dkt. 297 and 307. On March 30 2026 at Dkt. 329 the court denied Apple's Motion due to Apple's intentional defiance of the court's order but then granted all of the extraordinary relief Apple asked for without any showing by Apple to justify their requests, with no legal analysis or justification, and without considering the Plaintiff's arguments or evidence. Since Feb. 18 2026, Apple's advocacy of these sanctions and requested injunctions have filled this docket with dozens of docket entries consisting of thousands of pages, while urgent discovery issues have been delayed and denied review, and most recently, the court has said she refuses to hear any further discovery issues at all until after the close of discovery and summary judgment motions are filed.

## STANDARD OF REVIEW

3. Under Rule 72(a), the district judge "may reconsider any pretrial matter... where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. §636(b)(1)(A). "A decision may be contrary to law if it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Tremblay v. OpenAI*, 23-cv-03223-AMO (N.D. Cal. Feb. 10, 2025),citing *Rojas v. Bosch Solar Energy Corp.,* 2020 WL 6557547, at *3 (N.D. Cal. July 20, 2020). A finding is clearly erroneous when "the district court is left with the definite and firm conviction that a mistake has been committed." *Zepeda v.*

*Paypal, Inc.,* 2014 WL 4354386, at *3 (N.D. Cal.Sept. 2, 2014). The full factual and legal analysis is set forth in Plaintiff's original filing at Dkt. 332,which is incorporated by reference.

## PRELIMINARY NOTE ON THE PROTECTIVE ORDER

4. The Protective Order (Dkt. 235) was entered over Plaintiff's objection. Plaintiff filed a Motion to Quash (Dkt. 211), sought emergency relief from the Ninth Circuit (Case No. 25-2028), filed NLRB charges, and stated on the record that her signature was given under coercion and duress. (Dkt.220 at 4-5). There was no mutual assent. No court made an independent finding of good cause under Rule 26(c). The court announced it would impose the model order regardless of Plaintiff's position, then directed Plaintiff to sign. (July 2, 2025 Tr. at 4:1-17:25). The resulting document is neither a voluntary stipulation nor a Rule 26(c) protective order supported by a good cause finding. Plaintiff preserves this objection and incorporates by reference the arguments at Dkt.332 ¶¶ 71-77, 88-99.

## THE ORDER AT ISSUE

5. The Magistrate Judge denied Apple's Motion to Enforce Protective Order (Dkt. 294) for failure to meet and confer. Having denied that motion, the court then ordered: (1) a prospective gag order prohibiting Plaintiff from discussing designated information; (2) a retrospective de-publication order compelling deletion of already-published speech; (3) a directive to negotiate sealing of public docket entries; and (4) a pre-announced inclination to grant Apple's sealing motion if the parties cannot agree.

## ISSUE 1: THE ORDER IS CONTRARY TO LAW BECAUSE A MAGISTRATE JUDGE LACKS AUTHORITY TO ISSUE INJUNCTIVE RELIEF

6. The gag order prohibits Plaintiff from speaking about designated subjects. The de-publication order compels Plaintiff to delete already-published speech — a mandatory injunction subject to the heightened standard of *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Both are injunctive relief. *Bastidas v. Chappell*, 791 F.3d 1155 (9th Cir. 2015).

7. 28 U.S.C. § 636(b)(1)(A) expressly excludes "a motion for injunctive relief" from a magistrate judge's authority. This exclusion is jurisdictional. Gomez v. United States, 490 U.S. 858, 876(1989). The Magistrate Judge acknowledged this limitation during the February 20 conference, stating "there is no injunction" when Plaintiff objected to compelled deletion. (Dkt. 301-1, at 38:56). This Court characterized those statements favorably at Dkt. 303. The March 30 order does what the Magistrate Judge said she would not do and what this Court characterized her as not doing. The order is contrary to law.

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

**Ashley M. Gjovik,**
*an individual,*

Plaintiff,

vs.

**Apple Inc.,**
*a corporation,*

Defendant.

**Case No.**
**3:23-CV-04597-EMC**

**PLAINTIFF'S OBJECTIONS UNDER RULE 72(a) TO MAGISTRATE JUDGE'S ORDER AT DKT. 327**

disputes, which has expended a considerable amount of the Court's limited judicial resources." The court uses this premise to justify a compressed omnibus schedule that no party requested. Like the de-publication order at Dkt. 326, this schedule was imposed sua sponte. The schedule runs past summary judgment, requires all remaining disputes to be briefed simultaneously with summary judgment preparation, and deems waived any dispute not raised within the page limits. The premise for this schedule is the court's own creation.

7. The causal chain is documented in the record. In February 2025 — fourteen months before these orders — Plaintiff filed four discovery letters (Dkt. 162-165) identifying the disputes that were already accumulating. She specifically requested a telephonic conference to address them before they grew. (Dkt. 162 at 1: "A discovery conference with Judge Westmore is necessary to break this impasse"). The court refused. It terminated all four letters because they were unilateral (Dkt. 170) and ordered the parties to meet and confer.

8. Plaintiff objected. She filed a motion for reconsideration (Dkt. 171) specifically requesting a judge-supervised conference because Apple was refusing to engage. The court denied it (Dkt. 181). Plaintiff raised the issue on appeal (9th Cir. Case No. 25-2028), warning that the court's refusal to intervene would result in an unmanageable accumulation of disputes. That is what occurred. Apple refused to meet and confer for months. (Dkt. 220, Exs. A, H, I). Apple then filed its own unilateral letter (Dkt. 219), which the court entertained. The asymmetry is on the record: Plaintiff's unilateral letters were terminated; Apple's unilateral letter was heard.

9. Plaintiff's objection to the February 2025 order is preserved. She raised the issue on appeal to the Ninth Circuit (Case No. 25-2028), specifically warning that the refusal to hold a discovery conference would result in an unmanageable accumulation of disputes. That is what occurred. The party now bearing the consequences of the resulting compressed schedule — overlapping discovery briefing with summary judgment preparation, waiver of any dispute not raised within 15 pages, and no ruling before the dispositive deadline — is the same party who requested judicial intervention fourteen months ago to prevent this outcome.

10. Dkt. 327 is seven pages long. It does not once reference this Court's April 27, 2026 summary judgment deadline at Dkt. 274. The Magistrate Judge set a briefing schedule running through May 7 without acknowledging that the district judge's dispositive deadline falls in the middle of it. The

Magistrate Judge's discovery schedule cannot effectively nullify this Court's dispositive motion deadline by ensuring discovery relief is unavailable before the deadline arrives.

11. This Court set summary judgment briefing for April 27, 2026. (Dkt. 274). The Magistrate Judge's schedule requires: Plaintiff's discovery opening brief by April 23; Apple's responsive brief by April 30 (which may raise new disputes); Plaintiff's reply by May 7; then under submission with no ruling date.

12. Plaintiff must file summary judgment on April 27 without knowing whether she will receive discovery sought since October 2024. Apple's responsive brief is due April 30 — three days after summary judgment — and may "raise any additional disputes" (Dkt. 327 at 7). Plaintiff's reply is due May 7, limited to 10 pages, confined to Apple's new disputes only. No ruling on any dispute will issue until some unspecified date after May 7.

13. The schedule also contains a waiver trap: "all disputes not raised in these briefs will be deemed waived." (Dkt. 327 at 6). Plaintiff has 15 pages to raise every remaining discovery dispute or lose them forever. Apple gets 25 pages to respond and raise new disputes.

14. The schedule requires Plaintiff to simultaneously prepare a 15-page discovery brief, a summary judgment motion, four hours of deposition testimony, a 26(g) hearing, sealing negotiations, de-publication compliance, and oppositions in concurrent federal litigation (Case No. 5:25-cv-07360-PCP) — all within approximately three weeks, without counsel. The reasonableness of this schedule must be evaluated against the fact that the court itself refused the February 2025 conference that would have prevented the backlog now used to justify it.

15. The schedule also creates a structural access-to-justice problem. Dkt. 327 directs that all disputes be raised in the omnibus briefs due April 23 and prohibits raising new issues outside that process. If Plaintiff needs emergency relief before April 16 — for example, a motion to compel Apple to produce a deposition witness, or authorization for alternative recording, or a ruling on whether the Gobbler deposition testimony will be designated and gagged before she relies on it for summary judgment — there is no procedural vehicle that produces a ruling before fact discovery closes. The Magistrate Judge has effectively closed her docket to new filings. This Court has consistently directed Plaintiff to bring discovery matters to the Magistrate Judge. The result is that Plaintiff has no available forum for emergency discovery relief during the final two weeks of discovery.

16. **Requested ruling:** (a) Can the court rely on the volume of accumulated disputes as

Case: 26-4716, 11/13/2026, DktEntry: 10.3, Page 168 of 253

justification for a compressed schedule when the court itself refused Plaintiff's February 2025 request for a conference to resolve those disputes before they accumulated? (b) Is the discovery schedule consistent with this Court's summary judgment deadline? (c) Should the summary judgment deadline be extended, or the discovery schedule compressed, so that discovery disputes are resolved before the dispositive motion is filed? (d) Does requiring a pro se plaintiff to simultaneously prepare discovery briefing, summary judgment, sit for deposition, attend a 26(g) hearing, negotiate sealing, and comply with a de-publication order constitute a denial of due process?

## ISSUE 2: DOES THE CONTINUED DEPOSITION ORDER, COMBINED WITH THE DESIGNATION FRAMEWORK AND GAG ORDER, CREATE AN EXPANDING SPEECH RESTRICTION ON THE EVE OF SUMMARY JUDGMENT?

***Standard: Contrary to law — de novo review. Due process; First Amendment.***

17. Plaintiff initially agreed to four additional hours of deposition. She withdrew that agreement after Apple's conduct following the December 16, 2025 deposition: the blanket designation of 72% of the transcript, the unsigned narrowed designations, the refusal to cure, and the filing of enforcement motions seeking contempt and compelled deletion of speech. (Dkt. 319 at 2). The reason for the withdrawal was specific: Apple would designate new testimony as Confidential, the gag order would attach, and Plaintiff would be unable to use her own words in her summary judgment motion due three weeks later. The Magistrate Judge held Plaintiff to the original agreement without addressing the reason she withdrew it. The court stated "whether Apple has satisfied its discovery obligations in this case is independent from Plaintiff's discovery obligations — there is no tit for tat." (Dkt. 327 at 5). But this is not about proportionality. It is about whether the court can order a party to generate more speech that will be automatically restricted under a framework the court has not validated.

18. Dkt. 327 orders Plaintiff to sit for four additional hours of deposition by April 8, 2026. This order must be read together with Dkt. 326, which provides that "information designated 'Confidential' by Apple is considered Confidential until found otherwise." The combined effect is:

19. (a) Plaintiff testifies for four more hours. Apple designates new testimony as "Confidential" — as it did with 72% of the prior deposition. Nothing in any order limits Apple's ability to designate new testimony, and Apple designated 72% of the prior transcript. (Dkt. 302 at 18).

ability to conduct depositions before the close of fact discovery? Should this Court authorize audio recording under Rule 30(b)(3) or require the Magistrate Judge to address the issue before April 16?

## TIMELINESS

68. These objections are timely. The order at Dkt. 327 was issued March 30, 2026. Rule 72(a) allows objections within 14 days. This filing is submitted within that period.

## RELIEF REQUESTED

69. Plaintiff respectfully requests that this Court rule on each of the ten numbered issues above, and:

- 1. Resolve the conflict between the omnibus discovery schedule and the April 27, 2026 summary judgment deadline, either by ordering expedited resolution of outstanding discovery disputes before the dispositive deadline or by extending the deadline;
- 2. Order Apple to produce all responsive, non-privileged documents on environmental RFPs 7-10, 24, and 28-32 consistent with the Magistrate Judge's own ruling on RFP 23, which rejected the categorical irrelevance theory Apple asserted identically on all of them;
- 3. Correct the interrogatory count consistent with Synopsys and the Rule 33 Advisory Committee Note, and order Apple to respond to Interrogatories 3-16. If the Magistrate Judge requires the interrogatories to be filed before she will rule, authorize Plaintiff to file them immediately notwithstanding the page limits and scheduling restrictions in Dkt. 327;
- 4. Order supplementation of Interrogatory No. 1 to identify the decision-maker(s), the investigation timeline, and the specific policies allegedly violated;
- 5. Reconsider the medical records ruling in light of the prior proceedings at Dkt. 276, 277, and 291, which the court's unreviewed exhibits documented;
- 6. Clarify the deposition instruction to confirm that "I don't understand" and responses contesting a question's premise constitute answers, and that questions premised on policies the NLRB required Apple to rescind are subject to objection;
- 7. Establish an emergency escalation process for designation disputes arising from the court-ordered depositions, so that challenges can be resolved before summary judgment;
- 8. Address Plaintiff's inability to depose Apple's witnesses and authorize alternative recording

Case: 26-4716, 11/13/2026, DktEntry: 10.3, (170 of 253)

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

**Ashley M. Gjovik,**
*an individual,*

Plaintiff,

vs.

**Apple Inc.,**
*a corporation,*

Defendant.

**Case No.**
**3:23-CV-04597-EMC (KAW)**

**Discovery Letter**

**Plaintiff's Request for Production**
**Set One: 7, 8, 9, & 10**
**Set Two: 23, 24, 28, 29, 30, 31, 32, 37, 40, 41, 42, 43, 44, & 54**

# DEFENDANT'S REFUSAL TO PRODUCE DOCUMENT RELATED TO PLAINTIFF'S PROTECTED ACTIVITY

1. Plaintiff Ashley Gjovik requests that the Court compel Defendant Apple Inc. to produce documents responsive to the seventeen Requests for Production identified below. Every one of these Requests seeks evidence of Plaintiff's environmental, health, and safety ("EH&S")-related protected activity and Apple's knowledge of it — threshold elements of all four retaliation causes of action in this case. Apple has refused to produce any documents in response to each of these requests. Apple's stated basis is a unilateral claim that the Plaintiff's protected activity is irrelevant to the Plaintiff's whistleblower retaliation claims, because, Apple says, it fired her for other reasons and that's all that needs to be said.

2. This submission addresses a discrete category of disputed discovery. Plaintiff is not raising every outstanding RFP dispute here. There are additional issues including other categories of requests (i.e. related to adverse employment actions, retaliation, and nexus) and also all categories where Apple has represented it is searching but has produced nothing and provided no production timeline. This letter addresses only the "protected activity" requests where Apple has taken the position that the entire subject matter is irrelevant and it will not produce regardless of what a search might yield. Discovery closes April 16, 2026 and Apple needs to produce these documents.

# MEET AND CONFER

3. Plaintiff served her first set of Requests for Production in this case on October 30, 2024. Apple responded on November 29, 2024, refusing all EH&S-related requests on relevance grounds. Plaintiff objected in writing in December 2024, again in January 2025 but Apple declined to modify its position. Plaintiff filed a discovery dispute letter with this Court on February 11, 2025 (Dkt. 163) but this court would not hear the issue without more meet/confer. (Dkt. 170) and Defendant still would not change its position.

4. Plaintiff served a second set of Requests for Production on April 25, 2025. Apple responded on May 27, 2025, asserting the same relevance objections across the new EH&S requests. During the July 2 2025 telephonic conference with this Court, Apple repeatedly referenced the Plaintiff's prior attempts to meet/confer and escalate the matter as some sort of misconduct by the Plaintiff, and even asked this court (both Judge Westmore and Judge Chen) to prevent the Plaintiff from being able to file more motions or letters without leave of court. (Dkt. 230, 302-3).

5. On February 26, 2026, Plaintiff sent a final written demand to Apple demanding that Apple confirm whether it intended to produce documents they previously objected to outright, to identify which requests remained under active review, and provide an anticipated completion date. Apple's counsel responded on March 5, 2026, refusing to identify which items were still active, refusing to provide any ETA, and refusing to provide any response about Apple's prior objections, refusal to produce the requests here within. Plaintiff followed up on March 6, 2026 asking again for this information. Apple did not respond. The parties are at impasse. Apple has maintained its position that EH&S records are categorically irrelevant without modification since no later than November 2024 and will not compromise.

# LEGAL STANDARD & APPLE'S OBJECTIONS

records. The Federal Rules require that objections be stated with specificity and that a party withholding documents on privilege grounds identify those documents with sufficient particularity to permit the opposing party to assess the claim. Fed. R. Civ. P. 34(b)(2)(B); 26(b)(5)(A). Apple has done neither.

11. Further, Apple's knowledge of the protected activity is an essential element. *Muino v. Florida Power & Light Co.,* ARB Nos. 06-092 (ARB Apr. 2, 2008); *Hasan v. Enercon Services, Inc.,* ARB No. 04-045 (ARB May 18, 2005). The identification of protected activity and the chronology of Apple's internal response to it must be established prior to the other elements of the case can be analyzed. *Melendez v. Exxon Chemicals Americas*, ARB No. 96-051 (ARB July 14, 2000).

12. Apple holds that evidence and is required to produce it. Documents related to the reasons for terminating an employee are relevant in a wrongful termination case and failure to produce them justified monetary sanctions. *London v. Dri-Honing Corp.*, 117 Cal. App. 4th 999 (2004) (over $6,000 in monetary sanctions).

## THE REQUESTS AT ISSUE

13. The following seventeen Requests all seek evidence of Plaintiff's EH&S protected activity and Apple's knowledge of it. Apple's complete responses are attached as Exhibit A. Apple has produced no documents in response to any of them.

- **RFP S1-No. 7:** *"All indoor air testing results and reports, air test plans, cracked slab repair plans, cracked slab inspection reports, cracked slab sealing reports, SSD/SSV maintenance reports, engineer certifications of work performed, invoices, work orders, related to the CERCLA engineering controls at 825 Stewart Drive from Jan 1 2021 through Sept 10 2021."*
- **RFP S1-No. 8:** *"Any status report, meeting notes, or other type of summary sent to or from Gjovik's management chain and/or Helen Polkes, Jenna Waibel, Ekelemchi Okpo, or Tony Lagares concerning the August 19 2021 US EPA inspection of 825 Stewart Drive, from July 25 2021 through Sept. 10 2021."*
- **RFP S1-No. 9:** *"All documents in possession of Gjovik's management chain, Helen Polkes, Jenna Waibel, Ekelemchi Okpo, Tony Lagares, Atone Jain, Michael Seiger, or Tom Huynh that concern both the Plaintiff and the property at 3250 Scott Blvd, from Sept. 1 2020 through Sept. 10 2021."*
- **RFP S1-No. 10:** *"Any 'safety plan' or 'EHS plan' or 'operations and maintenance plan' for 825 Stewart Drive or 3250 Scott Blvd in place between Jan. 1 2020 and Sept. 10 2021."*
- **FRP S2-No. 23:** *"All internal audits, assessments, or reports concerning environmental hazards, chemical exposure, vapor intrusion, or air quality testing at Apple's 825 Stewart Drive and 3250 Scott Boulevard campuses between January 1, 2019 and the present."*
- **RFP S2-No. 24:** *"All communications, reports, or correspondence between Apple and any environmental contractor (including air quality, chemical, EH&S, or facilities consultants) regarding vapor intrusion; Superfund status; site contamination; cracks in slab or mitigation systems; safety concerns at 825 Stewart or 3250 Scott."*
- **RFP S2-No. 28:** *"All photos, diagrams, maps, or schematics of the site showing known or suspected environmental hazard zones, testing data overlays, mitigation systems, or construction modifications at 825 Stewart or 3250 Scott."*
- **RFP S2-No. 29:** *"All video surveillance footage, security camera recordings, or internal access logs showing*

*activity in or around Plaintiff's office, work area, or assigned workspace at 825 Stewart Drive, including: Floor repairs; Crack sealing; HVAC or environmental testing; Construction or remediation work. Between May 1, 2021 and September 10, 2021. To the extent Apple claims any footage was deleted, altered, or is inaccessible, Plaintiff requests identification of the system used, retention policies, last known location of footage, and whether any hold or preservation request was implemented."*

- **RFP S2-No. 30:** *"All documents, communications, calendar entries, meeting agendas, security logs, or visitor records relating to or preparing for the EPA inspection of Apple's 825 Stewart Drive site, received by or sent to Apple between July 25, 2021 and August 20, 2021, including: Notice of EPA inspection; Internal planning emails or meetings; Notes regarding facility preparation; Communications with EPA Region 9; Any mention of Plaintiff's workspace or prior complaints in connection with that inspection."*
- **RFP S2-No. 31:** *"All internal documents, messages, emails, legal memos, or investigative notes discussing the August 19, 2021 EPA inspection of 825 Stewart Drive, including any reference to Plaintiff, her former office, her prior complaints, or any environmental hazards, as well as: site preparation steps or remediation taken before the inspection; results or feedback from the inspection; any post-inspection action plan or discussion of violations; discussion of Plaintiff's prior warnings being substantiated."*
- **RFP S2-No. 32:** *"All internal Apple communications or reports between July 25, 2021 and September 10, 2021, referencing both: (a) Plaintiff's disclosures or agency complaints; and (b) the EPA inspection or violations at 825 Stewart Drive."*
- **RFP S2-No. 37:** *"All threat assessments, incident reports, or monitoring logs created by Apple or its contractors concerning Plaintiff, including any reference to: Social media activity; Slack discussions; Agency disclosures; Public organizing efforts between January 1, 2021 and September 30, 2021."*
- **RFP S2-No. 40:** *"All administrative access logs, audit trails, or monitoring records from Apple's internal systems (including Slack, Apple Mail, iMessage, project management tools, or admin dashboards) showing access to, interaction with, or administrative actions taken on Plaintiff's accounts, devices, or workspaces from March 1, 2021 to September 10, 2021."*
- **RFP S2-No. 41:** *"All logs or records showing who accessed, reviewed, or modified Plaintiff's email, Slack history, iMessage content, file shares, or internal communications during the same time period, including Date/time of access; System used; Identity or role of accessing user; Whether screenshots, archives, or downloads were created."*
- **RFP S2-No. 42:** *"All internal requests, tickets, or communications submitted by Apple employees to Apple's internal tech, security, or compliance teams to monitor, audit, preserve, or report on Plaintiff's communications, Slack activity, or device use, including any legal hold requests; IT monitoring triggers; surveillance justifications; Slack 'lookups' or search reports."*
- **RFP S2-No. 43:** *"All internal communications, messages, emails, notes, summaries, or reports exchanged between or among any of the following groups: Plaintiff's managers or direct supervisors; Apple's Human Resources (HR) personnel; Employee Relations (ER) team; Apple Security personnel; Apple Legal or internal investigations teams; any executive team or risk management personnel discussing, referencing, or relating to Plaintiff between February 1, 2021 and September 10, 2021."*
- **RFP S2-No. 44:** *"All internal reports, summaries, or tracking notes created by Apple ER or HR relating to Plaintiff's conduct, speech, disclosures, or risk profile, including drafts and confidential annotations, from*

*Feb 2021 to Sept 2021."*

- **RFP S2-No. 54:** *"All documents, emails, messages, PR plans, or communications created by Apple's Communications, Public Relations, or Media Teams that mention Plaintiff; Refer to or track press coverage of Plaintiff; Propose or implement messaging strategies; coordinate with Legal, HR, or ER about Plaintiff's termination or complaints between February 1, 2021 and December 31, 2021."*

14. Apple's response to each of these Requests asserts, in substance, the same positions: that whether Apple engaged in the conduct Plaintiff complained about is not relevant to her claims, whether Apple knew about the Plaintiff's complaints is not relevant, and how Apple responded to Plaintiff's complaints is not relevant. Apple has produced no documents responsive to any of these requests, and repeatedly stated it will not produce any documents responsive to any of these Requests.

## RELIEF REQUESTED

15. Plaintiff requests that the Court: (1) order Apple to produce all documents responsive to RFP Nos. 7, 8, 9, 10 (Set One) and 23, 24, 28, 29, 30, 31, 32, 37, 40, 41, 42, 43, 44, 54 (Set Two) within fourteen (14) days; (2) order Apple to provide a complete and compliant privilege log for any documents withheld as privileged in response to these Requests within the same period.

16. In the event Apple fails to comply with the Court's order, issue an evidence sanction deeming established that Plaintiff engaged in EHS protected activity as described in the Fifth Amended Complaint, including internal and external complaints about conditions at 825 Stewart Drive and 3250 Scott Blvd.; and Apple was aware of that protected activity prior to the adverse employment actions taken against Plaintiff.

17. The two facts that would be deemed admitted (that Plaintiff engaged in EHS protected activity and that Apple knew about it) are precisely the facts Apple is refusing to allow discovery on. Having chosen to obstruct that discovery, Apple should not be permitted to contest those facts at trial.

Respectfully submitted,



**/s/ Ashley M. Gjovik**
**Ashley Gjovik (Plaintiff/*In Propria Persona*)**
Filed March 16 2026 in San José, California
(415) 964-6272
ashleymgjovik@protonmail.com
2108 N. St. Ste. 4553, Sacramento, CA 95816

Case: 26-4716, 11/13/2026, DktEntry: 10.3 (175 of 253)

Ashley M. Gjovik, JD
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

**Ashley M. Gjovik,**
*an individual,*

Plaintiff,

vs.

**Apple Inc.,**
*a corporation,*

Defendant.

**Case No.**
**3:23-CV-04597-EMC (KAW)**

**Declaration & Exhibits in Support of Discovery Letter**

**Re: Plaintiff's Request for Production No. Set One: 7, 8, 9, & 10; Set Two: 23, 24, 28, 29, 30, 31, 32, 37, 40, 41, 42, 43, 44, & 54**

workspace at 825 Stewart Drive, including: Floor repairs; Crack sealing; HVAC or environmental testing; Construction or remediation work" to try to prove that Apple engaged in the conduct that she purportedly complained of; however, whether Apple, in fact, engaged in the conduct that Plaintiff purportedly complained of is not relevant to any of her claims. *See Perius v. Abbott Labs.*, 07 C 1251, 2008 WL 3889942, at *4-5 (N.D. Ill. Aug. 20, 2008); *Bozeman v. Per-Se Techs., Inc.*, 1:03-CV-3970-RLV-JMF, 2006 WL 8431279, at *1, *4 (N.D. Ga. May 23, 2006); *Wheeler v. Aliceson*, 1:12-CV-00860-LJO, 2015 WL 3507369, at *6, n.2 (E.D. Cal. June 3, 2015). Apple objects to this Request on the grounds that it seeks documents, including but not limited to ESI, that is not proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 30:**

All documents, communications, calendar entries, meeting agendas, security logs, or visitor records relating to or preparing for the EPA inspection of Apple's 825 Stewart Drive site, received by or sent to Apple between July 25, 2021 and August 20, 2021, including: Notice of EPA inspection; Internal planning emails or meetings; Notes regarding facility preparation; Communications with EPA Region 9; Any mention of Plaintiff's workspace or prior complaints in connection with that inspection.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the phrases "security logs," "notice of EPA inspection," and "facility preparation." Apple objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work product doctrine. Apple objects to this Request on the grounds that it is overbroad in scope and time and unduly burdensome as a result. The request is overbroad as to scope because it seeks documents regardless of whether they pertain to Plaintiff or her purported complaints. Apple objects to this Request on the grounds that it seeks information not relevant nor reasonably calculated to lead to the discovery of admissible information. Plaintiff appears to seek documents relating to "the EPA inspection of Apple's 825 Stewart Drive site" to try to prove that Apple engaged in the conduct that she purportedly complained of; however, whether Apple, in fact, engaged in the conduct that Plaintiff purportedly complained of is not

relevant to any of her claims. *See Perius v. Abbott Labs.*, 07 C 1251, 2008 WL 3889942, at *4-5 (N.D. Ill. Aug. 20, 2008); *Bozeman v. Per-Se Techs., Inc.*, 1:03-CV-3970-RLV-JMF, 2006 WL 8431279, at *1, *4 (N.D. Ga. May 23, 2006); *Wheeler v. Aliceson*, 1:12-CV-00860-LJO, 2015 WL 3507369, at *6, n.2 (E.D. Cal. June 3, 2015). Apple objects to this Request on the grounds that it seeks documents, including but not limited to ESI, that is not proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 31:**

All internal documents, messages, emails, legal memos, or investigative notes discussing the August 19, 2021 EPA inspection of 825 Stewart Drive, including any reference to Plaintiff, her former office, her prior complaints, or any environmental hazards, as well as: site preparation steps or remediation taken before the inspection; results or feedback from the inspection; any post-inspection action plan or discussion of violations; discussion of Plaintiff's prior warnings being substantiated.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the phrases "any environmental hazards," "site preparation steps," "remediation," and "prior warnings being substantiated." Apple objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work product doctrine. Apple objects to this Request on the grounds that it is overbroad in scope and time and unduly burdensome as a result. The request is overbroad as to scope because it seeks documents regardless of whether they pertain to Plaintiff or her purported complaints. Apple objects to this Request on the grounds that it seeks information not relevant nor reasonably calculated to lead to the discovery of admissible information. Plaintiff appears to seek documents relating to "the EPA inspection of Apple's 825 Stewart Drive site" to try to prove that Apple engaged in the conduct that she purportedly complained of; however, whether Apple, in fact, engaged in the conduct that Plaintiff purportedly complained of is not relevant to any of her claims. *See Perius v. Abbott Labs.*, 07 C 1251, 2008 WL 3889942, at *4-5 (N.D. Ill. Aug. 20, 2008); *Bozeman v. Per-Se Techs., Inc.*, 1:03-CV-3970-RLV-JMF, 2006 WL 8431279, at *1, *4 (N.D. Ga. May 23, 2006); *Wheeler v. Aliceson*, 1:12-CV-00860-LJO, 2015 WL 3507369, at *6, n.2 (E.D. Cal. June 3, 2015). Apple objects to this

Request on the grounds that it seeks documents, including but not limited to ESI, that is not proportional to the needs of the case.

**<u>REQUEST FOR PRODUCTION NO. 32</u>:**

All internal Apple communications or reports between July 25, 2021 and September 10, 2021, referencing both: (a) Plaintiff's disclosures or agency complaints; and (b) the EPA inspection or violations at 825 Stewart Drive.

**<u>RESPONSE TO REQUEST FOR PRODUCTION NO. 32</u>:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the phrases "disclosures" and "agency complaints." Apple objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work product doctrine. Apple objects to this Request on the grounds that it is overbroad in scope and unduly burdensome as a result. The request is overbroad as to scope because it seeks documents regardless of whether they pertain to Plaintiff or her purported complaints. Apple objects to this Request on the grounds that it seeks information not relevant nor reasonably calculated to lead to the discovery of admissible information. Plaintiff appears to seek documents relating to "the EPA inspection or violations at 825 Stewart Drive" to try to prove that Apple engaged in the conduct that she purportedly complained of; however, whether Apple, in fact, engaged in the conduct that Plaintiff purportedly complained of is not relevant to any of her claims. *See Perius v. Abbott Labs.*, 07 C 1251, 2008 WL 3889942, at *4-5 (N.D. Ill. Aug. 20, 2008); *Bozeman v. Per-Se Techs., Inc.*, 1:03-CV-3970-RLV-JMF, 2006 WL 8431279, at *1, *4 (N.D. Ga. May 23, 2006); *Wheeler v. Aliceson*, 1:12-CV-00860-LJO, 2015 WL 3507369, at *6, n.2 (E.D. Cal. June 3, 2015). Apple objects to this Request on the grounds that it seeks documents, including but not limited to ESI, that is not proportional to the needs of the case.

**<u>REQUEST FOR PRODUCTION NO. 33</u>:**

All documents, communications, messages, email threads, or meeting notes reflecting EPA Region 9's initial outreach or notification to Apple in or around March 2021 regarding Plaintiff's complaint or environmental concerns at 825 Stewart Drive.

requests, tickets, or communications" sent to Apple's tech, security, or compliance teams to "monitor, audit, preserve, or report on Plaintiff's communications, Slack activity, or device use" and is not limited to dates or incidents. Apple objects to this Request on the grounds that it seeks information not relevant nor reasonably calculated to lead to the discovery of admissible information. Apple objects to this Request on the grounds that it seeks documents, including but not limited to ESI, that is not proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 43:**

All internal communications, messages, emails, notes, summaries, or reports exchanged between or among any of the following groups: Plaintiff's managers or direct supervisors; Apple's Human Resources (HR) personnel; Employee Relations (ER) team; Apple Security personnel; Apple Legal or internal investigations teams; any executive team or risk management personnel discussing, referencing, or relating to Plaintiff between February 1, 2021 and September 10, 2021.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 43:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to "managers and direct supervisors," "Security personnel," "internal investigations teams," "any executive team," and "risk management personnel."

Apple objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or attorney work product doctrine, or calls for a legal conclusion, specifically since this Request references "all internal communications, messages, emails, notes, summaries or reports exchanged between or among ... Apple Legal or internal investigations teams,", et al, and other documents likely to contain legal advice or attorney work product. Parties may only obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense, as codified in FRCP 26(b)(1). The attorney-client privilege protects confidential communications between attorneys and their clients made for the purpose of obtaining or providing legal advice, as established in *Upjohn Co. v. United States*, 449 U.S. 383 (1981). Furthermore, the work product doctrine, as codified in FRCP 26(b)(3) and established in *Hickman v. Taylor*, 329 U.S. 495 (1947), protects documents and tangible things prepared in anticipation of litigation by or for a party or its representative, including attorneys. Given that this Request clearly attempts to seek privileged

communications, it is improper under FRCP 26. Apple will not search, review, or produce documents responsive to this part of this Request beyond the documents and communications already reviewed and produced, nor will Apple identify any additional documents in a privilege log, to the extent any exist, as a result of this improper Request.

Apple objects to this Request on the grounds that it is overbroad in scope and time and unduly burdensome as a result. The request is overbroad as to scope because Apple has many "Human Resources," "Employee Relations," "Security," "Legal," and other employees; accordingly, it would be unduly burdensome to search for responsive documents in the possession of such Apple employees. Apple objects to this Request on the grounds that it seeks information not relevant nor reasonably calculated to lead to the discovery of admissible information. Apple objects to this Request on the grounds that it seeks documents, including but not limited to ESI, that is not proportional to the needs of the case.

**REQUEST FOR PRODUCTION NO. 44:**

All internal reports, summaries, or tracking notes created by Apple ER or HR relating to Plaintiff's conduct, speech, disclosures, or risk profile, including drafts and confidential annotations, from Feb 2021 to Sept 2021.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 44:**

Apple objects to this Request on the grounds that it is vague and ambiguous, including but not limited to the phrase "[a]ll internal reports, summaries, or tracking notes," "Plaintiff's conduct, speech, disclosures, or risk profile" and "drafts and confidential annotations." Apple objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work product doctrine. Apple objects to this Request on the grounds that it is overbroad in scope and time and unduly burdensome as a result. The request is overbroad as to scope because Apple has many "ER or HR" employees; accordingly, it would be unduly burdensome to search for responsive documents in the possession of any "ER or HR" employee. Apple objects to this Request on the grounds that it seeks information not relevant nor reasonably calculated to lead to the discovery of admissible information. Apple objects to this Request on the grounds that it seeks documents, including but not limited to ESI, that is not proportional to the needs of the case.

3:23-CV-04597-EMC



UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

-----------------------------------x
ASHLEY GJOVIK, an individual, :
Plaintiff, : U.S. D.C. Case No.:
v. : 3:23-CV-04597-EMC
APPLE INC, a corporation, :
Defendant. :
-----------------------------------x

Telephonic Conference Call

Wednesday, July 2, 2025

AT:

3:09 p.m.

Taken via Zoom videoconference

CERTIFIED

Court Reporter:
KATHERINE SCHILLING, RPR
CA CSR No. 14163

# A P P E A R A N C E S

Appearing for the Plaintiff, ASHLEY GJOVIK, an individual:

ASHLEY M. GJOVIK, PRO SE
2108 N Street
Suite 4553
Sacramento, California 95816
(408) 883-4428
legal@ashleygjovik.com
(Present via videoconference)

Appearing for the Defendant, APPLE INC, A CORPORATION:

MELINDA S. RIECHERT, PARTNER
ORRICK, HERRINGTON & SUTCLIFFE, L.L.P.
1000 Marsh Road
Menlo Park, California 94025-1015
(650) 614-7423
mriechert@orrick.com
(Present via videoconference)

In the presence of:
MAGISTRATE JUDGE KANDIS A. WESTMORE
OAKLAND COURTHOUSE
1301 Clay Street
Oakland, California94612
(Present via videoconference)

ALSO PRESENT:

Cindy C. Fan, Deputy Clerk

rights.

And, in fact, if you read the whole thing, you know, you'll see that there are -- there is a process for -- you know, you can challenge designations, if they designate something confidential and you don't agree that it's confidential, you know --

MS. GJOVIK: I'm so sorry if my statements are offensive. I know you guys spent, it sounds like, a lot of time on this in trying to find a way to improve these processes. I just want to underline that my concerns were rooted in the way that this was to be applied based on the conversations with opposing counsel over the last two years. So it was more of the application of the official policy, not necessarily the policy itself.

THE COURT: Okay. All right. And so if we're okay -- if we -- you know, if we're finished with that issue and you're prepared to go ahead and just sign off on the Model Protective Order, then we can move on to the next issue, which --

MS. GJOVIK: Yes.

THE COURT: -- is --

MS. RIECHERT: Could we just focus on that, when will the parties be signing -- I can sign it

today, if that helps. I just want to be sure we get this in.

THE COURT: Yeah. I think that the parties should just get it signed as soon as possible and then get it to me. You know, Ms. Riechert, you could just go ahead and, you know, once you get her -- get Ms. Gjovik's signature on it, go ahead and e-file it, and I will sign it. It's pretty straightforward.

So Ms. Gjovik, can you sign it as soon as possible?

MS. GJOVIK: Yes, that's fine. I'll send it today.

THE COURT: Okay. Today would be great. And then, Ms. Riechert, you can sign it or whoever signs --

MS. RIECHERT: Yes.

THE COURT: -- can sign it. And then you submit that to me --

MS. RIECHERT: Yeah.

THE COURT: -- and then I'll sign it. That becomes the court's order. And then the next question -- I mean, the next issue is the fashioning of alternative procedures for discovery disputes.

Now, Apple is requesting to do, I guess,

CERTIFICATE OF COURT REPORTER

I, Katherine Schilling, hereby certify that the testimony in the foregoing transcript, numbered pages 3 through 59, taken on July 2, 2025, was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel, or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.



Signed: .......................

Name: Katherine Schilling, RPR, CSR 14163

Date: JULY 21, 2025

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
--oOo--

| | | |
|---|---|---|
| ASHLEY M. GJOVIK, | ) | Docket No. 3:23-CV-04597 |
| | ) | San Francisco, California |
| Plaintiff, | ) | January 13, 2026 |
| | ) | 2:31 p.m. |
| v. | ) | |
| | ) | |
| APPLE, INC., | ) | Re: Status conference |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS
BEFORE THE HONORABLE EDWARD M. CHEN
UNITED STATES DISTRICT JUDGE

APPEARANCES (via Zoom):

For the Plaintiff: ASHLEY M. GJOVIK by
MS. ASHLEY M. GJOVIK (PRO SE)
2108 N Street, Suite 4553
Sacramento, CA 95816

For the Defendant: ORRICK HERRINGTON & SUTCLIFFE, LLP by
MS. MELINDA S. REICHERT
1000 Marsh Road
Menlo Park, CA 94025

Remotely Reported by: JENNIFER COULTHARD, CSR, RMR, CRR, CRC
United States District Court
Official Court Stenographer
501 I Street, Suite 4-200
Sacramento, California 95814
Jennifer_Coulthard@Yahoo.com
(530)537-9312

Proceedings reported via mechanical steno - transcript produced via computer-aided transcription.

VIDEOCONFERENCE PROCEEDINGS

SAN FRANCISCO, CALIFORNIA - JANUARY 13, 2026 - 2:31 p.m.

P R O C E E D I N G S

--oOo--

(In open court via Zoom:)

THE CLERK: Court is calling the case Gjovik versus Apple, Inc., Case Number 23-4597.

Please state your appearance for the record beginning with the plaintiff.

MS. GJOVIK: Hi. I'm Ashley Gjovik. I'm the plaintiff.

MS. RIECHERT: This is Melinda Riechert representing Apple.

THE COURT: All right. Thank you, Ms. Riechert.

I think we should move this case to resolution one way or the other, and it appears that both sides may be interested in filing summary judgment motions. And what I'd like to do is to set a case schedule to get this underway and to see what we can do here.

The schedule that was suggested by the plaintiff is overly ambitious. The schedule that's suggested by the defense I think is maybe doable. I think under this proposal, there would be a pretrial in October is what you're suggesting. And that the key dates would be completion of nonexpert discovery by the end of March and summary judgment filings no later than April 30th, correct, Ms. Riechert?

VIDEOCONFERENCE PROCEEDINGS

MS. RIECHERT: Correct, Your Honor.

THE COURT: And that does fit -- and we would hear it by June 4th or thereabouts. So there is a way that that does comport with my normal sequencing and template in terms of time schedule, and I think what we're talking about is probably cross-motions for summary judgment. You want to bring a motion for summary judgment, I think the defendant wants to bring a motion for summary judgment. Is that --

MS. GJOVIK: I do, your Honor. In our last two conferences we actually talked about this, and you were suggesting that we schedule a dual summary judgment, and we were supposed to get our dates and then the bankruptcy delayed stuff for three months, and we were circling back.

THE COURT: Okay.

MS. GJOVIK: But I'm ready now and, like, a year ago to file my motion for summary judgment.

You had stated in that last hearing for the transcript that it seemed best to have it both at the same time for the -- on the merits prima facia and then the employer's proffered explanation for the termination.

THE COURT: Well, whatever you want to bring it on. I mean, whatever you think you can do, but I -- what I want to do is talk about how we're going to schedule it, because you can do it two ways. Each side files -- sets a brief for their motions, or you can do the staggered effect where one party

# C E R T I F I C A T E

I certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

/s/ Jennifer Coulthard ______________________ March 2, 2026
JENNIFER L. COULTHARD, RMR, CRR DATE
Official Court Reporter

**OFFICE OF THE CLERK**
**UNITED STATES DISTRICT COURT**
**Northern District of California**

## CIVIL MINUTES

**Date:** January 13, 2026

**Time:** 2:30-2:45
15 Minutes

**Judge:** EDWARD M. CHEN

**Case No.**: 3:23-cv-04597-EMC

**Case Name:** Gjovik v. Apple Inc.

**Pro Se Plaintiff:** Ashley Gjovik
**Attorney for Defendant:** Melinda Riechert

**Deputy Clerk:** Vicky Ayala

**Court Reporter:** Jennifer Coulthard

## PROCEEDINGS HELD VIA ZOOM WEBINAR

Status Conference – held.

## SUMMARY

Parties stated appearances.

Parties advised the Court they will file motions for summary judgment. Court set the following briefing schedule: Plaintiff's summary judgment brief is due 4/23/2026. Defendant's opposition brief and cross motion for summary judgment is due 5/7/2026. Plaintiff's reply and opposition brief is due 5/21/2026. Defendant's final reply brief is due 5/28/2026. MSJ hearing set for 6/11/2026 at 1:30pm in person.

Court advised parties to adhere to the 25-page limit for their opening and opposition briefs. The Defendant's final reply brief is subject to a 15-page limit. While Plaintiff is entitled to support her motion with a declaration, it must be concise. Plaintiff may also file a motion for a preliminary injunction to have her pay reinstated pending resolution of this case, but this motion must be included within Plaintiff's motion for summary judgment. Any briefing on such a motion shall not circumvent applicable page limits or the page limits set for the MSJ briefing

Court set a **10/19/2026,** trial date allocating 5 days with a half-day schedule**.** Scheduling order to issue.

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

**Ashley M. Gjovik,**
*an individual,*

Plaintiff,

vs.

**Apple Inc.,**
*a corporation,*

Defendant.

**Case No. 3:23-CV-04597-EMC**
(RICO, Civil Rights, Retaliation, Labor Code Violations, Toxic Torts, Cal. Bus. & Prof. Code § 17200, IIED/NIED).

## Plaintiff's Opposition to Defendant's Emergency Motion for a Stay

HEARING:
Dept: Courtroom 5, 17th Fl. & Zoom
Judge: Honorable Edward M. Chen
Date: October 23 2025
Time: 1:30 PM PST

Massachusetts, her reputation) in order to compel the Plaintiff to disclose sensitive details about a potential law enforcement action and to make public statements against her Estate trustee, the Defendant attempted and conspired to obstruct, delay, and affect commerce through extortion in violation of the Hobbs Act. The Defendant and counsel in California, Oregon, Washington D.C. took these acts in furtherance of their unlawful goal to take property from the Plaintiff and reduce the value of the Estate under threat of economic harm to the Plaintiff. *United States v. Koziol,* 993 F.3d 1160, 1170 (9th Cir. 2021)("[T]hreats of sham litigation, which are made to obtain property to which the defendant knows he has no lawful claim, are 'wrongful' under the Hobbs Act.").

93. **Wire/Mail Fraud in Violation of 18 U.S.C. § 1343**: Defendant materially false statements to the Trustee about Defendant's intention to file this "Motion to Stay," claiming it was something to protect the Estate but instead intending to sabotage this litigation and thus also the Estate, in order to induce the Trustee's consent, was a chargeable act of wire fraud. Further, Defendant's false statements to federal courts in this "Motion to Stay" constitutes a scheme to defraud designed to interfere with judicial proceedings and gain unfair litigation advantage. These communications, transmitted by wire to the Trustee and the federal courts, constitute wire fraud under 18 U.S.C. § 1343 and are RICO predicate acts. The commission of mail/wire fraud with intent to reduce the value of a bankruptcy estate is an established RICO predicate act. *Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997).

94. **Pattern of Racketeering Activity**: The conduct described above, combined with the underlying RICO violations alleged in this action, further establishes a pattern of racketeering activity spanning multiple years and involving systematic interference with federal proceedings, witness intimidation, and false statements to federal courts. This pattern demonstrates Defendant's ongoing criminal enterprise designed to avoid accountability through procedural manipulation and interference with federal judicial proceedings.

## XVIII. Reservation of Rights / Request for Reconsideration and/or Leave to Amend

95. Plaintiff requests leave from the court to file a Motion to Amend to re-add her RICO claims, and/or asks the court to reconsider her January 31 2025 "Motion to Amend" filed at Dkt.

155, along with the new issues noted, either bifurcating and allowing a RICO case to proceed concurrently, or combining with the retaliation case at least related to the predicate acts directly injuring the Plaintiff related to her employment with, whistleblowing against, participation in federal and state proceedings about, and witnessing and informing to the government about the Defendant and other wrongdoers.

96. Plaintiff asks for the court's similar consideration of Amendment for at least her Bane Civil Rights Act, Ralph Civil Rights Act, Dodd Frank whistleblower, SOX whistleblower, IIED/NIED, Toxic Torts, Breach of Contract and Breach of Good Faith/Fair Dealing, and Cal. Bus. & Prof. Code § 17200 claims (See, Complaint at Dkt. 1, SAC at Dkt. 32, TAC at Dkt. 47, 4AC at Dkt. 76, and 5AC at Dkt. 142), at least where those claims are similarly related to the pending retaliation and labor violation claims. Plaintiff does not waive any rights to later appeal these or other dismissals.

97. Plaintiff preserves the right to seek leave to amend this complaint to include these additional RICO predicate acts and related claims arising from Defendant's bankruptcy interference. Plaintiff requests amendment and notes these potential violations to prevent any waiver argument and to establish the full scope of Defendant's misconduct relevant to this Court's analysis of their current motion. Plaintiff also requests the court's reconsideration of her January 31 2025 "Motion to Disqualify" Apple's law firm of Orrick, Herrington & Sutcliffe from this lawsuit as they have admitted they were retained weeks prior to the termination (Dkt. 156).

## Concurrently Filed Motions with the Bankruptcy Court

98. Plaintiff will concurrently filed a Motion for Order to Show Cause and Sanctions in bankruptcy court (*In re Ashley M. Gjovik*, 25-11496, D. Mass.), which details Apple's systematic interference with estate administration and abuse of bankruptcy procedures.

99. This filing reveals Apple's fundamental conflict of interest: they simultaneously serve as defendant in the estate's primary asset (this $30 million retaliation lawsuit) and as a disputed creditor through Apple Card debt. Notably, in 2024 the Consumer Financial Protection Bureau fined both Apple and Goldman Sachs $89 million primarily for launching the Apple Card

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

___________________

| | |
|---|---|
| **Ashley M. Gjovik,** Plaintiff, | No. 3:23-cv-04597-EMC |
| vs. | |
| **Apple Inc.,** Defendant. | San Francisco, California<br>August 5, 2025<br>2:32 p.m. |

**BEFORE: THE HONORABLE EDWARD M. CHEN, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS VIA ZOOM VIDEOCONFERENCE**

**STATUS CONFERENCE**

Official Court Reporter:
**Andrea K. Bluedorn, RMR, CRR**
United States District Court Reporter
Northern District of California
14418 S 42nd Street
Phoenix, AZ 85044
(715) 965-2298

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

couple months from now or what do you think?

MS. RIECHERT: Longer than that. I'm not sure where we are at on getting the deposition taken.

THE COURT: But months from now?

MS. RIECHERT: Yeah. I think Ms. Gjovik brought up October for the deposition. Was that correct?

MS. GJOVIK: We had agreed to October. There wasn't an open dispute on this.

THE COURT: Okay. When do you think you would be prepared to file your motion, Ms. Gjovik?

MS. GJOVIK: So, Your Honor, my concern is it sounds like we have a bifurcated case so I would be filing for prima facie. They -- I think there's an open question if they think they're ready for prima facie. They appear to be making their affirmative defense case but I still have not been disclosed from them of what all of their affirmative defenses are.

That said, I feel like I could make my prima facie case now, like 60 day, 90 day.

THE COURT: Well, I don't want to -- I think we should structure it as cross-motions because they do overlap a fair amount and so I don't want you to file yours then say, well, I need more information to get the second half. So it sounds like there needs to be some discovery on both sides.

MS. GJOVIK: From the defense -- I am waiting for their interrogatories of what they even are in detail and how

**C E R T I F I C A T E**

I, ANDREA K. BLUEDORN, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Northern California.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 25th day of August, 2025.

/s/ Andrea K Bluedorn
Andrea K. Bluedorn, RMR, CRR

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASHLEY GJOVIK**, *an individual*, Plaintiff, v. **APPLE INC**, *a corporation*, Defendant. | **U.S. D.C. Case No.** 3:23-CV-04597-EMC<br>**Judge**: The Honorable Edward M. Chen<br>**Discovery Magistrate:** Judge Kandis A. Westmore<br>**PLAINTIFF'S OBJECTION TO DEFENDANT'S UNILATERAL DISCOVERY LETTER (DKT. 219), REQUEST TO STRIKE IN PART, AND REQUEST FOR TELEPHONIC CONFERENCE**<br>**U.S. C.A. Case No**. 25-2028<br>**NLRB Case No.'s:** 32-CA-282142; 32-CA-283161; 32-CA-284441; 01-CA-365726.<br>**NLRB Settlement Agreement No.**: 32-CA-284428 |

> "Please proceed with this attached version of the exhibits … this version of the PDF includes: A revised cover page with a descriptive title; Exhibit labels restored on two pages that were missing them; Formatting adjustments to align with standard filing practices. You have my authorization to sign my name and e-file this document under protest and subject to extensive legal objections, as outlined in our prior correspondence. This authorization is made under coercion and duress, in light of your insistence that you will file regardless of my stated concerns."

On Tuesday, May 13, 2025 at 7:14 PM, Defense Counsel Riechert wrote:

> "…We are concerned with your statement… Either we have your authorization to file or we don't. If we don't, we will proceed in accordance with Section 17 of Judge Westmore's standing order."

On Tuesday, May 13, 2025 at 7:20 PM, Plaintiff replied:

> "You already have my authorization to file the joint letter and exhibits…What you're now requesting is not additional authorization — it is a demand that I alter the record to erase the fact that you are proceeding over my objections and under circumstances I have described as coercive and retaliatory. I will not do that. You have what you need to file. What you're asking now is not legally required, and your effort to pressure me into softening my position will be treated as further witness intimidation and retaliation … and applicable labor and whistleblower protections. Any further efforts to coerce me regarding how I characterize my own consent will be documented and submitted to the courts and relevant oversight agencies. File the letter as agreed — and include my full statement in the record."

At 7:50 PM, Defense Counsel Riechert wrote:

> "Ashley. In light of your protests, I would feel more comfortable if you file it. See attached. You have my authorization to file."

At 8:08 PM, Plaintiff responded:

> "I will file the documents with the court at your request. However, I want to be absolutely clear that I do not agree that the joint document reflects my consent, nor do I accept the process by which it was developed. I've now spent over ten hours today reviewing your edits, responding to redlines, and managing shifting demands — all while under repeated threats that you would file the letter without my agreement, and while attempting to meet deadlines in other active federal matters/
>
> After insisting for weeks that you would file regardless of my objections (following over a year of threats to seek this order by any means), your sudden reversal — solely because I declined to revise or retract my documented protest

fact, Defendant noted concerns they wanted the order to expressly prohibit Plaintiff from sharing information and testifying to government agencies and law enforcement about the evidence she received from Apple during discovery – which the Plaintiff complained was criminal obstruction.

### D. The "Informed Consent" Agreement Issue

16. During the May 2, 2025 recorded meet-and-confer session, Defendant indicated that the protective order was being pursued primarily to restrict Plaintiff's testimony concerning an internal *"informed consent"* agreement and "*why they fired her.*" (25-2028 Dkt. No. 19-3). Defendant asserts this document authorizes the collection and retention of personal images of Plaintiff and of the public, including photos of naked bodies, by internal Apple applications without notice or ability to opt-out, and which they intentionally stated in internal documents knowingly violates French and German privacy laws. (Dkt. No. 47, 76; 25-2028 Dkt. No. 27-6, 33).

17. Plaintiff filed Discovery Objection Letters about Defendant's improper request for a protective order on February 11, 2025. Plaintiff wrote to the court that Apple:

> "…designated virtually every document exchanged in discovery as 'Confidential' by default, regardless of whether it actually contains sensitive material. Courts reject such blanket confidentiality designations… Apple's default designations are particularly troubling given its refusal to provide even basic employment records unless Plaintiff agrees to its overbroad restrictions…. Apple insists on a protective order that would prevent Plaintiff from using discovery materials in regulatory or legal proceedings. Such provisions improperly restrict a whistleblower's ability to report misconduct and violate public policy…. Apple has refused reasonable compromises. "

Dkt. 165 at 4-5, Feb. 11, 2025 filing.

### E. Historical Context and Prior Adjudications

18. Defendant has declined to produce the agreement or permit review. This rationale echoes prior allegations made by Defendant in 2021, when it sent Plaintiff a cease and desist email, a week after she was fired, vaguely mentioning images Plaintiff posted of herself on Twitter and shared with a reporter. That rationale was publicly criticized at the time, including in national media, and subsequently discredited by independent adjudicators. For example, on October 14, 2021, Gizmodo described Apple's post-hoc, stated reason for firing the Plaintiff as *"settl[ing] on an absurd*

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

Attorneys for Defendant
Apple Inc.

[Additional counsel on following page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ASHLEY GJOVIK,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 23-cv-4597-EMC<br><br>**DEFENDANT APPLE INC.'S AMENDED ANSWER TO PLAINTIFF'S FIFTH AMENDED COMPLAINT**<br><br>Judge: Honorable Edward M. Chen |

admit or deny the remaining allegations in paragraph 70 and on that basis denies them.

71. As to paragraph 71 of the Fifth Amended Complaint, Apple denies the allegations.

72. As to paragraph 72 of the Fifth Amended Complaint, Apple admits that on March 17, 2021, an Apple employee sent an email to Plaintiff and other MSQ managers and states that the email speaks for itself. Apple denies the allegations in paragraph 72 to the extent they contradict or mischaracterize the email.

73. As to paragraph 73 of the Fifth Amended Complaint, Apple admits that on March 17, 2021, Plaintiff sent an email and states that the email speaks for itself. Apple denies the allegations in paragraph 73 to the extent they contradict or mischaracterize the email.

74. As to paragraph 74 of the Fifth Amended Complaint, Apple admits that on March 17, 2021, Plaintiff sent an email and states that the email speaks for itself. Apple denies the allegations in paragraph 74 to the extent they contradict or mischaracterize the email.

75. As to paragraph 75 of the Fifth Amended Complaint, Apple admits that Powers forwarded Plaintiff's email to West and states that the email speaks for itself. Apple denies the allegations in paragraph 75, sentence 1 to the extent they contradict or mischaracterize the email. Unless specifically admitted, Apple denies the remaining allegations in paragraph 75.

76. As to paragraph 76 of the Fifth Amended Complaint, Apple states that Plaintiff's March 17, 2021 email speaks for itself. Apple denies the allegations in paragraph 76, sentence 1 to the extent they contradict or mischaracterize the email. Apple admits the allegations in paragraph 76, sentence 2. Apple lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 76 and on that basis denies them.

77. As to paragraph 77 of the Fifth Amended Complaint, Apple denies the allegations in the final sentence of paragraph 77. Apple lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 77 and on that basis denies them.

78. As to paragraph 78 of the Fifth Amended Complaint, no response is required, as the allegations pertain to Plaintiff's counts five and six, which have been dismissed with prejudice.

79. As to paragraph 79 of the Fifth Amended Complaint, Apple admits that Plaintiff

117. As to paragraph 117 of the Fifth Amended Complaint, on information and belief, Apple admits that in late July 2021, the U.S. EPA asked Northrop Grumman to visit 825 Stewart. Unless specifically admitted, Apple denies the remaining allegations in paragraph 117.

118. As to paragraph 118 of the Fifth Amended Complaint, Apple denies the allegations.

119. As to paragraph 119 of the Fifth Amended Complaint, Apple denies the allegations.

120. As to paragraph 120 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny what Plaintiff knew or did not know and on that basis denies the allegations in paragraph 120, sentence 1. Apple denies the allegations in paragraph 120, sentences 2 and 3. With respect to the allegations regarding 3250 Scott, no response is required, as the allegations pertain to Plaintiff's counts five and six, which have been dismissed with prejudice.

121. As to paragraph 121 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

122. As to paragraph 122 of the Fifth Amended Complaint, Apple admits the allegations in paragraph 122, sentence 1. Apple denies the allegations in paragraph 122, sentences 2 and 3. Apple lacks knowledge or information sufficient to admit or deny the allegations in paragraph 122, sentence 4 and on that basis denies those allegations.

123. As to paragraph 123 of the Fifth Amended Complaint, Apple denies the allegations.

124. As to paragraph 124 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

125. As to paragraph 125 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

126. As to paragraph 126 of the Fifth Amended Complaint, Apple denies the allegations.

127. As to paragraph 127 of the Fifth Amended Complaint, Apple lacks knowledge or

information sufficient to admit or deny the allegations in paragraph 127, sentences 1 and 3 and on that basis denies them. Apple denies the remaining allegations in paragraph 127.

128. As to paragraph 128 of the Fifth Amended Complaint, Apple denies the allegations.

129. As to paragraph 129 of the Fifth Amended Complaint, Apple denies the allegations.

130. As to paragraph 130 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

131. As to paragraph 131 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations in paragraph 131, sentences 1, 2, and 3 and on that basis denies them. Apple admits that Plaintiff told Apple that she worked with colleagues to gather evidence. Unless specifically admitted, Apple denies the remaining allegations in paragraph 131.

132. As to paragraph 132 of the Fifth Amended Complaint, Apple admits that on August 4, 2021, Okpo emailed Plaintiff and states that the email speaks for itself. Apple denies the allegations in paragraph 132, sentence 2 to the extent they contradict or mischaracterize the email. Apple denies the remaining allegations in paragraph 132. Plaintiff requested to be on paid administrative leave.

133. As to paragraph 133 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

134. As to paragraph 134 of the Fifth Amended Complaint, Apple denies the allegations in paragraph 134, sentences 1 and 2. Apple lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 134 on that basis denies them.

135. As to paragraph 135 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

136. As to paragraph 136 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

137. As to paragraph 137 of the Fifth Amended Complaint, Apple lacks knowledge or

information sufficient to admit or deny the allegations and on that basis denies those allegations.

155. As to paragraph 155 of the Fifth Amended Complaint, Apple admits the allegations.

156. As to paragraph 156 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

157. As to paragraph 157 of the Fifth Amended Complaint, Apple admits that in August 2021, Plaintiff was a recipient of three mass internal emails and states that the emails speak for themselves. Apple denies the allegations in paragraph 157 to the extent they contradict or mischaracterize the emails. Unless specifically admitted, Apple denies the remaining allegations in paragraph 157.

158. As to paragraph 158 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations in paragraph 158, sentence 1 and on that basis denies them. Apple denies the remaining allegations in paragraph 158.

159. As to paragraph 159 of the Fifth Amended Complaint, Apple admits that around August 30, 2021, Plaintiff shared an article titled, "Apple cares about privacy, unless you work at Apple" and states that the article speaks for itself. Unless specifically admitted, Apple denies the remaining allegations in paragraph 159.

160. As to paragraph 160 of the Fifth Amended Complaint, Apple states that Plaintiff's tweet sharing the "Apple cares about privacy..." article speaks for itself. Apple denies the allegations in paragraph 160, sentence 1 to the extent they contradict or mischaracterize the tweet. To the extent paragraph 160, sentence 1 refers to other "posts," Apple lacks knowledge or information sufficient to admit or deny the allegations in that sentence and on that basis Apple denies them. Apple denies the allegations in paragraph 160, sentence 2.

161. As to paragraph 161 of the Fifth Amended Complaint, Apple states that the "Apple cares about privacy..." article speaks for itself. Apple denies the allegations to the extent they contradict or mischaracterize the article.

162. As to paragraph 162 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

163. As to paragraph 163 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations in paragraph 163, sentences 1 and 2 and on that basis denies them. On information and belief, Apple admits that on or around September 3, 2021, Reuters published an article and that it speaks for itself. Apple denies the allegations in paragraph 163, sentence 3 to the extent they contradict or mischaracterize the article. Apple lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 163, sentence 3 and on that basis denies those allegations.

164. As to paragraph 164 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

165. As to paragraph 165 of the Fifth Amended Complaint, Apple admits that Okpo contacted Plaintiff on September 3, 2021 and September 7, 2021, asking to meet. Apple admits that on September 3, 2021 and on September 7, 2021, Plaintiff made a request to Okpo that they keep their exchanges in writing. Unless specifically admitted, Apple denies the remaining allegations in paragraph 165.

166. As to paragraph 166 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

167. As to paragraph 167 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

168. As to paragraph 168 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

169. As to paragraph 169 of the Fifth Amended Complaint, Apple admits that a former administrative assistant in West’s organization filed a complaint against Apple. Apple denies Plaintiff's characterization of it and all other remaining allegations in this paragraph.

170. As to paragraph 170 of the Fifth Amended Complaint, Apple admits that a former administrative assistant in West’s organization filed a complaint against Apple. Apple further admits that the administrative assistant ultimately voluntarily resigned her Apple employment and later filed a complaint against Apple. Apple admits that the parties in that matter reached a resolution of the claims that resulted in the filing of a notice of settlement. Apple lacks knowledge

or information sufficient to admit or deny whether Plaintiff posted material on Twitter about that matter or whether she messaged a current employee certain legal filings and on that basis denies those allegations. Apple denies Plaintiff's characterization of that matter and all other remaining allegations in this paragraph.

171. As to paragraph 171 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

172. As to paragraph 172 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

173. As to paragraph 173 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them. Regarding footnote 30, Apple admits that certain allegations in the Complaint and Corrected Complaint in NLRB Case No. 32-CA-284428 related to policies about searches of electronic devices. The Complaint and Corrected Complaint in NLRB Case No. 32-CA-284428 asserted that such policies violated Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1). Answering further, that Complaint and Corrected Complaint contain allegations that the NLRB has determined should be submitted to an administrative hearing and do not have any preclusive effect. In its Answer to the Corrected Complaint, Apple denied the allegations relating to such policies. Apple denies that it committed any unfair labor practices. Unless specifically admitted, Apple denies the remaining allegations in footnote 30.

174. As to paragraph 174 of the Fifth Amended Complaint, Apple admits that Kagramanov emailed Plaintiff on the alleged date and time but denies the remaining allegations in paragraph 174, sentence 1. Apple lacks knowledge or information sufficient to admit or deny whether Plaintiff knew or “did not know the team” and on that basis denies that allegation. Apple admits the remaining allegations in paragraph 174, sentence 2. Apple admits the allegations in paragraph 174, sentences 3 and 4. Apple denies the allegations in paragraph 174, sentence 5.

175. As to paragraph 175 of the Fifth Amended Complaint, Apple admits that Plaintiff emailed Kagramanov at the alleged time and states that the email speaks for itself. Apple denies the allegations in paragraph 175 to the extent they contradict or mischaracterize the email. Apple

lacks knowledge or information sufficient to admit or deny whether she was "certain she was about to be fired" and on that basis denies that allegation.

176. As to paragraph 176 of the Fifth Amended Complaint, Apple admits that Kagramanov did not respond to Plaintiff's 2:10 PM email before Plaintiff emailed Kagramanov at 2:27 PM. Apple states that Plaintiff's 2:27 PM email speaks for itself. Apple denies the allegations in paragraph 176, sentence 1 to the extent they contradict or mischaracterize the email. Apple lacks knowledge or information sufficient to admit or deny the allegations in paragraph 176, sentence 2 and on that basis denies them.

177. As to paragraph 177 of the Fifth Amended Complaint, Apple denies the allegations in paragraph 177, sentence 1. Apple states that the statute cited in footnote 32 speaks for itself. Apple denies the allegations in footnote 32 to the extent they contradict or mischaracterize the statute. Apple lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 177 and on that basis denies them.

178. As to paragraph 178 of the Fifth Amended Complaint, Apple admits the allegations in paragraph 178, sentence 1. Apple denies the remaining allegations in paragraph 178.

179. As to paragraph 179 of the Fifth Amended Complaint, Apple denies the allegations in paragraph 179, sentences 1 and 3. Apple admits the allegations in paragraph 179, sentence 2.

180. As to paragraph 180 of the Fifth Amended Complaint, Apple admits that Plaintiff emailed Kagramanov at the alleged time and states that the email speaks for itself. Apple denies the allegations to the extent they contradict or mischaracterize the email. Plaintiff lacks knowledge or information sufficient to admit or deny the allegation in the final sentence of paragraph 180 and on that basis denies it.

181. As to paragraph 181 of the Fifth Amended Complaint, Apple admits the allegations.

182. As to paragraph 182 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

183. As to paragraph 183 of the Fifth Amended Complaint, Apple admits that on

220. As to paragraph 220 of the Fifth Amended Complaint, Apple admits that Plaintiff expressed purported concerns about alleged sex, gender, and disability discrimination. Apple admits that on September 9, 2021, Plaintiff filed a charge of discrimination with the EEOC and states that the charge speaks for itself. Apple denies the allegations in paragraph 220, sentence 1 to the extent they contradict or mischaracterize the EEOC charge. The allegation that Plaintiff exercised "fundamental rights" calls for a legal conclusion to which no response is required. To the extent a response is required, Apple denies any characterization inconsistent with applicable law. Apple lacks knowledge or information sufficient to admit or deny whether she "testified" and on that basis denies those allegations. Apple lacks knowledge or information sufficient to admit or deny the allegations in paragraph 220, sentence 2 and 3 and on that basis denies them. Apple denies the allegations in paragraph 220, sentence 4. Apple admits that, before the termination of her employment, Plaintiff filed a discrimination charge in NLRB Case No. 32-CA-282142, the same charge referenced above in paragraph 152, sentence 1. Apple denies that it committed any unfair labor practices. Apple lacks knowledge or information sufficient to admit or deny whether, before the termination of her employment, Plaintiff filed an employment discrimination claim with the U.S. Department of Justice Civil Rights Division and on that basis denies those allegations. Unless specifically admitted, Apple denies the remaining allegations in paragraph 220.

221. As to paragraph 221 of the Fifth Amended Complaint, Apple denies the allegations.

222. As to paragraph 222 of the Fifth Amended Complaint, Apple denies the allegations.

223. As to paragraph 223 of the Fifth Amended Complaint, Apple denies the allegations in paragraph 223, sentence 1. Apple admits that West and Plaintiff texted about Plaintiff speaking with politicians. Unless specifically admitted, Apple denies the remaining allegations in paragraph 223.

224. As to paragraph 224 of the Fifth Amended Complaint, Apple denies the allegations.

243. As to paragraph 243 of the Fifth Amended Complaint, Apple denies the allegations.

244. As to paragraph 244 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations and on that basis denies them.

245. As to paragraph 245 of the Fifth Amended Complaint, Apple lacks knowledge or information sufficient to admit or deny the allegations in paragraph 245, sentences 1 and 3 and on that basis denies them. Apple denies the remaining allegations in paragraph 245.

246. As to paragraph 246 of the Fifth Amended Complaint, Apple denies the allegations in paragraph 246, sentences 1 and 2. Apple lacks knowledge or information sufficient to admit or deny the allegations in paragraph 246, sentences 3 and 4 and on that basis denies them. No response is required for paragraph 246, sentence 5 because it has been stricken. Apple admits it has admitted that, prior to terminating Plaintiff's employment, it reviewed certain of Plaintiff's public posts on social media. Unless specifically admitted, Apple denies the remaining allegations in paragraph 246, sentence 6.

247. As to paragraph 247 of the Fifth Amended Complaint, Apple denies the allegations.

248. As to paragraph 248 of the Fifth Amended Complaint, Apple denies the allegations.

249. As to paragraph 249 of the Fifth Amended Complaint, Apple denies the allegations in paragraph 249, sentences 1, 2, 3, and 4. Apple admits that Apple told Plaintiff that the paid administrative leave that she had requested "ensures that [she] [is] removed from the workplace[.]" Unless specifically admitted, Apple denies the remaining allegations in paragraph 249, sentence 5. The statement in paragraph 249, sentence 6 calls for a legal conclusion to which no response is required. To the extent a response is required, Apple denies any characterization inconsistent with applicable law. Moreover, to the extent Plaintiff alleges that Apple refused to let Plaintiff return to work, Apple denies such allegations. The statement in paragraph 249, sentence 7 calls for a legal conclusion to which no response is required. To the extent a response is required, Apple denies any characterization inconsistent with applicable law.

4. As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that Plaintiff consented to certain of the conduct that she now claims was wrongful.

5. As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that recovery in this action by Plaintiff is barred in whole or in part to the extent Plaintiff failed to exercise reasonable care and diligence to mitigate any damages allegedly accruing to her. Plaintiff had a duty to mitigate any damages by seeking alternative employment, and if she did not exercise reasonable care and diligence to seek alternative employment, her failure to do so precludes her from recovering damages for lost wages. Apple is currently unaware of the efforts, if any, which Plaintiff took to seek alternative employment, and asserts this defense to preserve its right to limit or reduce any potential damages awarded to Plaintiff pending further discovery.

6. As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple is entitled to an offset for any monies Plaintiff received from any source after Plaintiff ceased to be employed by Apple under the doctrine prohibiting double recovery set forth by *Witt v. Jackson*, 57 Cal. 2d 57 (1961), and its progeny. Plaintiff had a duty to mitigate any damages by seeking alternative employment, and if she did obtain alternative employment, that income should offset any damages, if awarded. Apple is currently unaware of the extent, if any, to which Plaintiff received income through alternative employment, and asserts this defense to preserve its right to an offset pending further discovery.

7. As a separate defense to the Fifth Amended Complaint and to claim therein, Apple alleges that Plaintiff's recovery is barred in whole or in part by her own unclean hands and by the doctrines of unclean hands, *in pari delicto* and/or after-acquired evidence, or in the alternative, these doctrines cut off or reduce her alleged damages. Plaintiff's employment was terminated for legitimate, non-discriminatory and/or non-retaliatory business reasons. Specifically, Apple determined that she had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to

provide accurate and complete information during the Apple investigatory process. Moreover, Apple learned—shortly after Plaintiff's employment was terminated—that Plaintiff admitted that she disclosed confidential product-related information to a journalist at the Verge in violation of Apple policies and her obligations under her Intellectual Property Agreement. Moreover, in the years since Plaintiff's employment was terminated, Plaintiff has continued to provide inaccurate and/or incomplete information to government entities and the public.

8. As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that assuming *arguendo* that discriminatory or retaliatory reasons had been a motivating factor in any employment decision toward Plaintiff (which they were not), Apple would have made the same decisions toward Plaintiff in any case for legitimate, non-discriminatory and/or non-retaliatory business reasons. *Harris v. City of Santa Monica*, 56 Cal.4th 203 (2013). Plaintiff was placed on paid administrative leave per her own request. Plaintiff's employment was terminated for legitimate, non-discriminatory and/or non-retaliatory business reasons. Specifically, Apple determined that she had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to provide accurate and complete information during the Apple investigatory process.

9. As a separate defense to the Fifth Amended Complaint and to each claim therein, Apple alleges that any alleged action that it took with respect to Plaintiff was privileged and justified and protected by the doctrine of business necessity. Plaintiff was placed on paid administrative leave per her own request. Plaintiff's employment was terminated for legitimate, non-discriminatory and/or non-retaliatory business reasons. Specifically, Apple determined that she had engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. Plaintiff disclosed confidential product-related information in violation of Apple policies and her obligations under her Intellectual Property Agreement. Apple also found that she had failed to cooperate and to provide accurate and complete information

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M GJOVIK,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 23-cv-04597-EMC

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO STRIKE AND DENYING PLAINTIFF'S MOTION FOR MORE DEFINITE STATEMENT**

Docket Nos. 192-93

Pending before the Court are two motions filed by Ms. Gjovik: (1) a motion to strike and (2) a motion for a more definite statement. Ms. Gjovik differentiates between the two motions as follows: the motion to strike is targeted at Apple's affirmative defenses whereas the motion for a more definite statement is directed to "Apple's evasive denials" in its answer. Docket No. 205 (Reply at 8); *see also* Docket No. 193 (Mot. at 1) (referring to "key denials that are evasive, vague, or implausible under the circumstances"). Having considered the parties' briefs and accompanying submissions, the Court hereby **GRANTS** in part and **DENIES** in part the motion to strike and **DENIES** the motion for a more definite statement. The hearing on the motions is hereby **VACATED**.

## I. DISCUSSION

### A. Motion for More Definite Statement

Federal Rule of Civil Procedure governs a motion for a more definite statement. It provides as follows:

> A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The

in large part, within the possession, custody, or control of Ms. Gjovik. Accordingly, the motion to strike is granted, but Apple has leave to amend.

3. No. 8

In the eighth affirmative defense, Apple asserts: "Plaintiff's recovery is barred in whole or in part by her own unclean hands and by the doctrines of unclean hands, *in pari delicto* and/or after-acquired evidence, or in the alternative, these doctrines cut off or reduce her alleged damages." Ms. Gjovik's primary argument is that Apple has failed to provide a factual basis for the defense.

The Court grants the motion to strike, but with leave to amend. Similar to above, Ms. Gjovik is likely aware of the factual predicate for the defenses – *i.e.*, Apple's position is that she was terminated because she disclosed, without authorization, confidential information and then failed to participate in Apple's investigation of the matter. Nevertheless, Apple should still provide some concrete allegations along the lines of the above to support the defense, particularly because this information is, at least in part, within its possession, custody, or control. *See Izett*, 2018 U.S. Dist. LEXIS 211459, at *2.

4. No. 12

In the twelfth affirmative defense, Apple states that "Plaintiff's claims are barred in whole or in part by the applicable statutes of limitation, including Cal. Civ. Proc. Code §§ 335.1, 338(a), and 340(a)." According to Ms. Gjovik, the defense should be stricken because Apple has failed to plead a factual basis to support the defense. She also argues that none of the specific statutes cited by Apple are applicable in her case.

The Court denies the motion to strike. Given that Ms. Gjovik worked for Apple from 2015 to 2021, *see* 5AC ¶ 12, and the sprawling nature of Ms. Gjovik's operative complaint, *see, e.g.*, 5AC ¶ 60 *et seq.* (alleging harassment by managers in the department Ms. Gjovik worked in from 2015 to 2017), it is fair for Apple to assert the defense to ensure that conduct outside of the relevant limitations periods is not actionable. Also, as Apple points out, (1) § 335.1 applies to the claim for wrongful termination in violation of public policy, *see Prue v. Brady Co./San Diego, Inc.*, 242 Cal. App. 4th 1367, 1382 (2015); (2) § 338(a) applies to, *inter alia*, the § 1102.5 claim,

United States District Court
Northern District of California

Case: 26-4716, 11/13/2026, DktEntry: 10.3, Page 214 of 253



- No. 14: "[Apple] was fully justified, and exercised reasonable care, prudence, skill and business judgment with respect to Plaintiff, and any decisions with respect to Plaintiff were made without regard to Plaintiff's alleged disability, national origin, age or other protected basis."

Ms. Gjovik moves to strike the defenses as legally untenable and/or factually unsupported.

The motion to strike is granted, but with leave to amend. The Court does not agree that the defenses are legally untenable. As Apple explains in its opposition, it is simply contending that it did not act unlawfully and that it had a legitimate basis to terminate Ms. Gjovik. The Court strikes the defenses only because Apple has not provided concrete facts to support the defenses. In its opposition, Apple already indicates what those facts will be (*i.e.*, it terminated Ms. Gjovik for disclosing, without authorization, confidential information and for not participating in Apple's investigation into the matter), but those facts should still be articulated in the pleading.

To the extent Ms. Gjovik suggests that all or some of the defenses are not "true" affirmative defenses, that is unclear. Context may inform whether the defenses are affirmative defenses or instead are defenses related to elements that Ms. Gjovik has the burden of proving as part of her prima facie case. Thus, the Court does not strike on that basis.

8. <u>Nos. 2-3</u>

Affirmative Defenses Nos. 2 and 3 relate to causation. Apple asserts that "no conduct by or attributable to it was the cause in fact or legal cause of the damages, if any, suffered by Plaintiff," and "[s]hould it be determined that Plaintiff was damaged, then said damages were proximately caused by Plaintiff's own conduct." In her motion, Ms. Gjovik argues that the defenses should be stricken because Apple has failed to provide a factual basis for the defense.

The Court grants the motion to strike, but with leave to amend. Admittedly, Ms. Gjovik is aware of Apple's position that she was terminated because she disclosed, without authorization confidential information and failed to participate in the investigation of the matter. Nevertheless, Apple should still provide some concrete allegations to that effect to support the defense.

9. <u>No. 16</u>

The sixteenth affirmative defense is as follows: "Apple reserves the right to assert

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK,**
*an individual*,
Plaintiff,
v.
**APPLE INC,**
*a corporation*,
Defendant.

**U.S. C.A. Case No. 25-2028**

**U.S. D.C. Case No. 3:23-CV-04597-EMC**

**NLRB Case No's 32-CA-284428, 32-CA-282142, 32-CA-283161, & 32-CA-284441**

# MOTION TO QUASH DISCOVERY LETTER & STAY DISCOVERY PENDING APPEAL

**Fed. R. Civ. P. Rule 62(d)**

**Fed. R. Appl. P. Rule (a)(1)(A)**

HEARING:
Dept: Courtroom 5, 17th Floor & Zoom
Judge: The Honorable Edward M. Chen
Date: Thurs. June 26 2025
Time: 1:30 PM PST

# INTRODUCTION

1. Plaintiff Ashley Gjøvik respectfully moves this Court to revoke the referral of discovery disputes to the assigned magistrate judge, recognize the current jurisdictional limitations imposed by Plaintiff's pending appeal and motion for injunction before the Ninth Circuit, and require that any further request by Defendant Apple Inc. for a protective order be presented as a formal motion subject to full briefing and hearing under the Federal Rules of Civil Procedure.

2. This motion is necessitated by escalating procedural and constitutional conflicts involving Apple's pending request for a protective order. Specifically, Apple seeks to suppress core evidence relevant to Plaintiff's surviving and appealed claims—including retaliation under Cal. Labor Code § 1102.5 and 232, invasion of privacy, and unlawful business practices under Cal. Bus. & Prof. Code § 17200—through an informal joint discovery letter filed with the magistrate judge. Apple's proposed use of this protective order is not a discovery matter under Fed. R. Civ. P. 26(c), but rather a substantive attempt to preemptively define the factual basis for Plaintiff's termination while concealing evidence of retaliatory and potentially unlawful conduct.

3. This effort proceeds despite the fact that (1) Plaintiff's appeal (*Gjøvik v. Apple, Inc.*, No. 25-2028) is pending before the United States Court of Appeals for the Ninth Circuit; (2) that appeal includes claims for injunctive relief under § 17200, which are appealable as of right under 28 U.S.C. § 1292(a)(1); and (3) Plaintiff's Rule 8 motion for an injunction and stay of proceedings—including discovery—is currently under consideration by the Court of Appeals.

4. Under *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982), and reaffirmed by the Ninth Circuit in *Natural Resources Defense Council v. Southwest Marine,* 242 F.3d 1163, 1166 (9th Cir. 2001), the district court is divested of jurisdiction "over those aspects of the

case involved in the appeal." That includes any court action which would prejudge or suppress material at the center of Plaintiff's appellate claims or deprive the Court of Appeals of its full jurisdiction to decide the pending motion. See also *Leiva-Perez v. Holder,* 640 F.3d 962, 968 (9th Cir. 2011) (confirming that Rule 8 motions must be evaluated with full consideration of irreparable harm, likelihood of success, and public interest).

5. Furthermore, the referral to the magistrate judge for discovery matters (Dkt. 83) was predicated on a judicial understanding—expressly stated during the July 16, 2024 hearing (Dkt. 88)—that the magistrate would work flexibly and equitably with Plaintiff, who proceeds pro se in a case involving novel statutory and public interest claims. That expectation has not been fulfilled. The magistrate judge has:

- Indicated she intends to grant the protective order without formal motion, briefing, or evidentiary showing;
- Denied Plaintiff the right to a hearing, despite qualifying under her own Standing Order ¶ 23 as a young lawyer;
- Treated the model protective order as presumptively appropriate, contrary to Fed. R. Civ. P. 26(c) and Ninth Circuit precedent; and
- Maintained policies that foreclose motion practice, restrict objections to 1.5-page submissions, and limit Plaintiff's ability to preserve error or raise constitutional objections.

6. These circumstances compel this Court's supervisory intervention to preserve the jurisdictional integrity of the appellate process, ensure compliance with controlling law, and protect Plaintiff's procedural and substantive rights under Rule 26(c), the U.S. Constitution First Amendment, and multiple federal and state whistleblower statutes.

7. This Court lacks jurisdiction to proceed with adjudication or facilitation of a protective order—particularly one involving evidence directly implicated in Plaintiff's pending

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

**Ashley M. Gjovik,**
*an individual,*

Plaintiff,

vs.

**Apple Inc.,**
*a corporation,*

Defendant.

**USDC Case No. 3:23-CV-04597-EMC**
**USCA Case No.'s 24-6058 & 25-2028**

**Plaintiff's Reply in Support of her Motion for Cert. of Final Judgment Under Rule 54(b)**

**Hearing:**
**Dept**: Courtroom 5, 17th Floor & Zoom
**Judge**: The Honorable Edward M. Chen
**Date**: June 12 2025 | Time: 1:30 PM

properly dismissed, then Apple should stand by its past representations and allow appellate review to proceed. It cannot have it both ways. Apple's repeated use of Rule 12(b) to strike, dismiss, or preclude even minimal discovery into these claims now appears less about narrowing the case and more about denying any review at all—by any forum.

## VIII. ALTERNATIVE RELIEF: RENEWED REQUEST FOR LEAVE TO AMEND

To the extent the Court agrees with Apple that the dismissed claims are not final or are inextricably intertwined with surviving claims, Plaintiff respectfully renews her prior request for leave to amend under Rule 15(a). See Dkt. No. 155. The claims at issue were dismissed primarily on procedural and discretionary grounds—such as timeliness, pleading sufficiency, and the scope of prior leave—not on a determination of substantive legal merit. In several instances, Plaintiff was denied leave to amend based on futility without the benefit of discovery or further factual development. Since then, Plaintiff has obtained additional evidence, clarified relevant legal theories, and narrowed the scope of the allegations, as would be reflected in a proposed Sixth Amended Complaint.

If the Court now views these claims as insufficiently final to support Rule 54(b) certification, then denying both amendment and appellate review would effectively preclude any adjudication of those claims. That outcome would be inconsistent with Rule 15's liberal standard and would raise serious concerns of fairness, particularly where the dismissed claims involve matters of public concern, constitutional protections, and systemic corporate misconduct. Accordingly, in the alternative to granting Rule 54(b) certification, Plaintiff respectfully requests that the Court reconsider its prior denial of leave to amend and grant Plaintiff permission to amend the claims at issue in this motion.

## IX. APPLE'S CONDUCT WARRANTS EQUITABLE SCRUTINY

Apple's current position is not merely inconsistent—it is irreconcilable with the procedural record it created. For over a year, Apple filed motion after motion asking the Court to dismiss specific claims on the grounds that they were unrelated, immaterial, or legally defective. In doing so, Apple shaped the course of this litigation, limited discovery, and defeated amendment efforts based on a theory of separability that it now disavows. Apple's strategic reversals have unnecessarily multiplied the proceedings across two forums—at great cost to the Court's resources and to the integrity of the process.

Apple's repeated use of Rule 12(b) to strike, dismiss, or preclude even minimal discovery into these claims now appears less about narrowing the case and more about denying any review at all—by any forum. The result is procedural gridlock: no amendment, no discovery, and no appeal. That outcome undermines not only judicial efficiency, but the basic architecture of fairness embedded in the Federal Rules.

Certification will promote judicial efficiency, avoid duplicative proceedings, and permit timely appellate review of distinct legal and constitutional issues. It will also ensure consistency across forums and avoid further prejudice to Plaintiff, who has otherwise been denied any avenue—through amendment or appeal—to adjudicate these claims. Plaintiff respectfully requests the Court:

1. Grant her Motion for Partial Final Judgment under Rule 54(b) as to the claims identified in her moving papers.
2. In the alternative, if the Court determines that the claims are not final or not sufficiently separable to support Rule 54(b) certification, reconsider its prior denial of leave to amend and grant Plaintiff permission to amend the dismissed claims.

A litigant should not be procedurally barred from both appeal and amendment, particularly where the claims at issue raise significant public policy and constitutional concerns. Plaintiff respectfully asks the Court to grant the requested relief in the interest of fairness, clarity, and judicial economy.

DISCLOSURE REGARDING ASSISTANCE IN PREPARATION: Pursuant to best practices and in the interest of transparency, Plaintiff discloses that she used the assistance of a generative AI platform (ChatGPT, developed by OpenAI) to help organize case records, draft sections of this reply, and cross-reference relevant docket entries and filings. The platform was used strictly as a research and drafting aid under Plaintiff's direction and supervision.

All legal arguments, factual assertions, citations, and procedural decisions were formulated and reviewed by Plaintiff personally. The final content reflects Plaintiff's own legal judgment, interpretation of the record, and responsibility for the filing. Use of this technology was limited to support tasks analogous to those performed by junior counsel or paralegals. No part of this filing was submitted without human review, editing, and substantive oversight.

Dated: April 15 2025

JESSICA R. PERRY (SBN 209321)
jperry@orrick.com
MELINDA S. RIECHERT (SBN 65504)
mriechert@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

KATHRYN G. MANTOAN (SBN 239649)
kmantoan@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

Attorneys for Defendant
Apple Inc.

*[Additional counsel on following page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ASHLEY GJOVIK,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 23-cv-4597-EMC<br><br>**DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFF'S "MOTION REQUESTING CERTIFICATION OF APPEALABILITY UNDER FED. R. CIV. P. 54(B)"**<br><br>Dept: Courtroom 5, 17th Floor<br>Judge: Honorable Edward M. Chen<br>Date: June 12, 2025<br>Time: 10:30 a.m. |

- *SOX and Dodd-Frank*. These claims alleging whistleblower retaliation—which were dismissed with prejudice in the May 2024 Order—are not proper subjects for Rule 54(b) certification because they overlap factually and legally with Plaintiff's remaining retaliation claims (specifically, her Section 6310 claim, and her Section 98.6 (predicated on Section 96(k)) claim). *Compare* 3AC ¶¶ 166-68, 170-72 (SOX and Dodd-Frank claims alleging retaliation for complaining about "Ronald Sugar and her office") *with* 5AC ¶¶ 148 (alleging that she "complained about Apple Board Member Ronald Sugar and her office"), 235 (Section 6310 claim alleging retaliation for "complain[ing] about safety and health conditions or practices at the workplace"), and 253 (Section 98.6 claim alleging retaliation for complaining about "Apple's conduct at her office"). Legally, these retaliation-based claims necessarily will involve adjudication of why Plaintiff was terminated, including Apple's common defense across retaliation claims (namely, that it fired her for the lawful reasons that she disclosed confidential information and refused to participate in an internal investigation into her disclosures).
- *UCL*. Plaintiff's dismissed UCL claim—alleging a violation of her right to privacy—factually overlaps with remaining claims alleging retaliation for complaining about purported violations of her right to privacy. *Compare* 4AC ¶ 193 (UCL claim alleging that "Apple is unlawfully coercing employees to provide personal data, including biometrics") *with* 5AC ¶ 215 (*Tameny* claim alleging that "[w]hile false and pretextual, Apple's proffered reason for terminating Plaintiff is illegal itself. Apple claims it fired Plaintiff for complaining about Apple's surveillance of employees, including coercive data collection of biometrics and invasive 24/7 video recording."). Indeed, even after the dismissal with prejudice of her UCL claim, Plaintiff has argued that "privacy breaches," *inter alia*, "form the core of Plaintiff's claims." *See* Dkt. No. 156-1 at ¶ 45.
- *IIED premised on purported post-termination conduct.* Plaintiff's IIED claim premised on purported post-termination conduct should not be certified because it factually and legally overlaps with the remaining retaliation claims. Plaintiff's IIED allegations of "outrageous conduct" are essentially allegations of post-termination adverse actions,

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK | 3:23-CV-04597-EMC
VERSUS | FEBRUARY 21, 2025
APPLE, INC. | SAN FRANCISCO, CA

BEFORE THE HONORABLE EDWARD M. CHEN
UNITED STATES DISTRICT JUDGE

TRANSCRIPT OF MOTION HEARING

A P P E A R A N C E S:

FOR THE GOVERNMENT:
ASHLEY M. GJOVIK, ESQUIRE
2108 N. ST
SACRAMENTO, CA 95816
ashleymgjovik@protonmail.com

FOR THE DEFENDANT:
MELINDA S. RIECHERT, ESQUIRE
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CA 94025
mriechert@orrick.com

---

BETH A. KRUPA, RMR, CRR (VIA ZOOM)
United States Court Reporter
401 West Evans Street
Florence, SC 29501
Beth_krupa@scd.uscourts.gov

(Stenotype/Computer-Aided Transcription)

what's your proof that these were, in fact, available as of 2020 and 2021?

MS. RIECHERT: We submitted all of that with our motion, Your Honor, in a request for judicial notice which has the links, how we got to the links, how they were available, when they were made public.

THE COURT: It relies on the way back?

MS. RIECHERT: Some of it in the way back --

MS. GJOVIK: No.

MS. RIECHERT: -- but you can see the information on the website. If you go through all the RJN, you can see how we found all of that --

MS. GJOVIK: I objected. There's no way back. There's no proof that was even available other than the day --

THE COURT: Hold on. Hold on. You are not to interrupt. I will come back to you.

So continue, Ms. Riechert.

MS. RIECHERT: Yes, Your Honor. So in the RJN, we go through all the documents that she now relies on to support her claim that she found in -- she says she found in 2023. And we show how that stuff was available on the website in 2020 or 2021.

One of them we don't have a way back going back that far. That doesn't mean it wasn't available before

then, we just didn't have a way back. But for all of the others, we show that they were available in 2020 and 2021 and she could have found them then if she used the same diligence in 2023, that she uses -- she should have used that same diligence in 2021.

So if she did find them in 2023, they were available in 2021. So why didn't she find them in 2021? Maybe they were difficult to find, but she ultimately found them. And so, therefore, she could have found them earlier.

THE COURT: What's your response to the notion that there's at least a factual question here about how reasonably or how easily they were -- could have, this record, this information about the factory could have been found when she went to all these different agencies and as she put it, they couldn't figure it out?

MS. RIECHERT: The agencies couldn't figure out because there was no problem. Believe me, they would have come after Apple if there was a problem. It's the plaintiff who's claiming there's a problem not the agencies.

But we have submitted all of this evidence to show that it was available. It's not disputed that it was available back then. We submitted all of the evidence that showed it was.

clear, you make it clear to the plaintiff that she's got to comply with your rules. She's got to get these things done on time and she's got to comply with the page limit requirements.

THE COURT: Right. I am going to say that in my order, whatever I decide, that I expect at this point, I've given dispensation, because she's not represented although she has a legal education.

But from this point on, the rules are going to be enforced. So I will make that clear and I'm going to make that clear in the order. Whatever goes forward from here, that's going to be my expectation.

So I will take the matter under submission, but it's my intent to close the pleading stage of this case and move forward with whatever is left and we'll set a further schedule at that point.

MS. RIECHERT: There is another motion by the plaintiff to further amend the complaint that is set for hearing.

THE COURT: Well, I've already indicated that my inclination is to close the pleadings in this case. We've already had now a fifth amended complaint. We need to move forward with what we've got after I decide the issue before me now. So you will hear from me shortly.

MS. RIECHERT: Thank you very much, Your Honor.

THE COURT: Thank you, everyone.

MS. GJOVIK: Thank you, Your Honor.

THE CLERK: This hearing is concluded.

(Proceedings adjourned at 9:49 a.m.)

************************************************

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript of the proceedings taken from my stenographic notes in the above-entitled matter.

/S/ Beth A. Krupa — March 28, 2025
Date

Beth A. Krupa, RMR, CRR
Official Court Reporter
U.S. District Court
District of South Carolina

Case: 25-4716, 11/13/2026, DktEntry: 10.3, (228 of 253)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

ASHLEY M GJOVIK,
Plaintiff,
v.
APPLE INC.,
Defendant.

Case No. 23-cv-04597-EMC

**ORDER GRANTING DEFENDANT'S ADMINISTRATIVE MOTION TO STAY; AND DENYING PLAINTIFF'S ADMINISTRATIVE MOTION TO STAY**

Docket Nos. 158-59

Currently pending before the Court are two administrative motions, one filed by Apple and one filed by Ms. Gjovik. In its motion, Apple asks the Court to stay briefing and the hearing on Ms. Gjovik's recently filed motion to amend until after the Court resolves Apple's motion to dismiss (which is fully briefed and set to be heard on February 21, 2025).[1] In her motion, Ms. Gjovik asks the Court to stay the hearing on Apple's motion to dismiss until after the Court resolves her recently filed motion to amend, as well as her recently filed motion to disqualify defense counsel.[2]

Having considered the papers submitted, the Court hereby **GRANTS** Apple's motion and **DENIES** Ms. Gjovik's. There is no principled reason to defer the hearing on Apple's motion to dismiss and to entertain Ms. Gjovik's motion to amend first. Indeed, it makes sense to defer hearing on the motion to amend because how the Court rules on the motion to dismiss may inform

[1] Apple originally noticed the motion for a hearing on February 13 but the Court sua sponte rescheduled the hearing for February 21.

[2] To be clear, in its motion for relief, Apple does not ask for a stay for the motion to disqualify, only for the motion to amend.

the motion to amend. Ms. Gjovik is not prejudiced by this sequencing. To the extent there may be some overlap in issues between the motion to dismiss and the motion to amend, Ms. Gjovik could (and should) have flagged those issues in her opposition to the motion to dismiss which she filed on January 21 and 22, 2025, *i.e.*, only 9-10 days before she filed her motion to amend.

As for Ms. Gjovik's request that her motion to disqualify be heard before the motion to dismiss, there is no need to do so. In her motion to disqualify, Ms. Gjovik contends, *inter alia*, that defense counsel is a fact witness and that defense counsel has conducted itself inappropriately in discovery. These have no impact on the motion to dismiss which focuses on the allegations made in the operative fifth amended complaint ("5AC").

Accordingly, the Court grants Apple's motion to stay but denies Ms. Gjovik's. The motion to dismiss shall proceed for a hearing on February 21, 2025. The briefing schedule and hearing date for the motion to amend is temporarily **VACATED**. The briefing schedule and hearing date for the motion to disqualify remains as is.

This order disposes of Docket Nos. 158 and 159.

**IT IS SO ORDERED**.

Dated: February 5, 2025

EDWARD M. CHEN
United States District Judge

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

ASHLEY M. GJOVIK, *an individual*,

Plaintiff,

vs.

APPLE INC., a corporation,

Defendant.

Case No. 3:23-CV-04597-EMC

**MOTION TO AMEND & SUPPLEMENT THE PLAINTIFF'S COMPLAINT**

**Motion Hearing:**
Dept: Courtroom 5 (& Zoom)
Judge: Honorable Edward M. Chen
Date: February 27, 2025
Time: 1:30 PM PT

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**, *an individual*,
Plaintiff,

vs.

**APPLE INC**, a corporation,
Defendant.

CAND No. 3:23-CV-04597-EMC
9th Cir No.: 24-6058

## PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF THE MOTION TO AMEND & SUPPLEMENT THE COMPLAINT

**MOTION HEARING:**
Dept: Courtroom 5 (& Zoom)
Judge: Honorable Edward M. Chen
Date: February 27, 2025
Time: 1:30 PM PT

# Points & Authorities

## Introduction

1. Plaintiff seeks leave to amend her complaint to (1) reassert some claims that were previously dismissed (some without prejudice and others with prejudice for reasons Plaintiff contends violated due process), (2) add newly discovered evidence pivotal to the dismissed claims, and (3) clarify allegations regarding the camera application and the employer's knowledge and abuse of nude photographs of Plaintiff. [1]

2. Plaintiff initially filed her Complaint on Sept. 7 2023. Defendants moved to dismiss certain claims, including RICO, Bane Act, Ralph Act, and ultrahazardous activities, with the Court dismissing some with prejudice and some without prejudice on May 20 2024 and Oct. 1 2024. Plaintiff's Fifth Amended Complaint was filed on Nov. 26 2024, and after filing, Plaintiff discovered critical photographic evidence on Dec. 19 2024 that fundamentally alters the analysis of prior dismissals related to the camera app and Apple's knowledge. This newly uncovered evidence directly addresses the Court's or Defendants' prior objections regarding proof that the employer was aware of the complaints involving the camera application and nude photos it captured. This revealed that the employer had possession of, and knowledge about these photographs, contrary to arguments that Plaintiff could not prove the employer or Apple's awareness.

3. This also revealed new legal violations and legal bases for the case – as it provided direct evidence of retaliation for matters pled in the SAC, but which were diminished due to the page limit reduction. Defendant also retaliated against Plaintiff for protesting Defendants use of nude photos of her to intimidate her to not tell anyone about misconduct occurring during Batterygate. Apple not only retaliated against Plaintiff for these protected, public complaints in Aug. 2021, but Defendant's retaliation included doing the same thing she was complaining about to her again (now with Gobbler photos).

4. In addition, recent administrative findings by the Air Board bolster Plaintiff's ultra-hazardous activities claim that were dismissed with prejudice for discretionary or procedural

---

[1] Plaintiff does not waive the opportunity to appeal or request amendment of other claims not specifically mentioned here.

Case: 25-4716, 11/13/2025, DktEntry: 10.3, Page 233 of 253

reasons, contrary to the liberal standard of amendment in the Federal Rules. On Aug. 29 2024 and Sept. 12 2024, the Air Board issued notice of findings of substantial violations reinforcing that the employer engaged in conduct consistent with strict liability and serves as a critical legal basis for the retaliation claims.

5. Because Rule 15(a)(2) instructs courts to "freely give leave when justice so requires," and because none of the *Foman v. Davis,* 371 U.S. 178 (1962) factors (undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice to defendant, or futility) would bar amendment, Plaintiff respectfully requests this Court grant leave. Another Motion to Dismiss is currently pending. Plaintiff moves to amend in good faith to avoid piecemeal litigation and to provide the Court with the most complete set of allegations for a proper adjudication.

## Factual Background on Newly Discovered Evidence

6. Plaintiff filed her Fifth Amended Complaint on Nov. 26 2024. On Dec. 19 2024, U.S. Dept. of Labor finally released the documents in response to a FOIA request that Plaintiff filed on Dec. 17 2023. Initially, U.S. Dept. of Labor refused to release the documents despite being mandated to provide whistleblower retaliation case files to the complainant and respondent after an investigation. Plaintiff eventually threatened to report them to Senator Elizabeth Warren's office again and have her staff investigate as to what is taking so long – which resulted in U.S. Dept. of Labor releasing the documents ten business days later. The documents included the evidence and statements Apple, via counsel at Orrick, provided to U.S. Dept. of Labor on the environmental and health/safety claims. Apple had repeatedly refused to provide Plaintiff evidence about how, when, and why it terminated her employment and this was the first time she saw several critical documents – but it was through FOIA, not discovery.

7. The U.S. Dept of Labor documents revealed an incredible amount of information, including the evidence and statements, but also allowing the Plaintiff to understand the timelines and involvement of different individuals. The FOIA documents revealed to her that the two pieces of evidence Apple used to justify her termination was a complaint filed anonymously from a public portal that complained of Plaintiff's social media activity, and appears Apple's lawyers may have written it themselves. The second document was an email sent from a global security employee with private texts with Plaintiff including photos taken of Plaintiff by the Gobbler application, including Plaintiff undressed and with her breasts showing. The global security employee declared

the content was Apple Confidentail and Intellectual Property, and Apple cited this as evidence as to why it fired the Plaintiff. When Apple send the documents to OSHA, it appears they did redact the Plaintiff's breasts with a caption of "Apple Confidential," implying some sort of property right to Plaintniff's naked body.

8. On Dec. 26 2024, Apple's counsel released Plaintiff's performance review for the first time. Plaintiff had requested this critical evidence since early 2024 but Defendant had claimed it was confidential, protected by attorney client privilege, or otherwise unavailable to her. The review revealed multiple instances of direct evidence of retaliation for protected activities as well as additional Unfair Labor Practices under the NLRA. Defendant had this information since at least July 2021.

## Factual Background on Batterygate

9. In 2016, Plaintiff worked as the Engineering Program Manager leading Software Engineering Failure Analysis for all of Apple's new and existing embedded products. In this role she was one of the first people brought into the Apple meetings to discuss the emerging issues which became known as "*Batterygate*." Plaintiff was retaliated against by her management in that role for trying to investigate the issue when they preferred to *"ignore it and hope it goes away."* The matter was very contentious. Plaintiff was told to find a new job, and transferred to Hardware Engineering.

10. When Apple was sued over Batterygate, Plaintiff was called in for document collection by Apple legal and their external counsel, where she was forced to give them naked photos of her, which they demanded and told her they would take with or without her cooperation, and then said they would keep them in their "permanent evidence locker." The plaintiff interpreted this as witness intimidation, which was effective and kept her quiet until August 2021, when she complained about the matter, and it was covered the press. Plaintiff also complained about the application Apple put on her phone called "Gobbler" which took photos, videos, and biometrics 24/7 whenever it "thought it saw a face" in front of the front camera – including when she was in the bathroom, bedroom, and/or naked.

11. Apple Inc. has faced significant legal repercussions due to the "*Batterygate*" scandal, which involved the company intentionally slowing down older iPhone models to manage battery performance without informing users. This practice led to allegations of consumer deception and

planned obsolescence. In November 2020, Apple agreed to pay $113 million to settle investigations by 34 U.S. states and the District of Columbia, which accused the company of concealing battery issues and throttling device performance to prompt customers into purchasing new devices. The settlement also required Apple to provide truthful information about iPhone power management across its website, software update notes, and device settings.

12. Earlier, in March 2020, Apple settled a class-action lawsuit in the U.S. by agreeing to pay up to $500 million to affected iPhone users. Under this settlement, consumers could receive $25 per impacted device, with the total amount varying based on the number of claims submitted.[2]

13. Internationally, in February 2020, France's consumer watchdog fined Apple €25 million (approximately $27 million) for failing to inform consumers that iOS updates could slow down older iPhones. The Directorate General for Competition, Consumption, and the Repression of Fraud oncluded that consumers were not adequately informed, leading to the substantial fine. These legal actions underscore the global response to Apple's handling of iPhone battery performance issues and highlight the importance of corporate transparency and consumer rights.

## Legal Standard for Amendment

14. Under Federal Rule of Civil Procedure 15(a)(2), courts should "freely give leave [to amend] when justice so requires." The Supreme Court in *Foman v. Davis,* 371 U.S. 178 (1962), identified factors against granting leave—such as undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of amendment. Where none of these factors predominate, leave to amend is appropriate.

15. A motion to supplement a complaint in federal court is governed by Federal Rule of Civil Procedure 15(d), which allows a party to file a supplemental pleading to include events that have occurred after the original complaint was filed. Under Rule 15(d), the court may permit supplementation when the new allegations are related to the original claims and supplement, rather than replace, the initial pleading. Courts in the Ninth Circuit have held that Rule 15(d) should be applied liberally in the interests of judicial economy and fairness. *Keith v. Volpe*, 858 F.2d 467, 473

---

[2] Cal. AG, *Attorney General Becerra Announces $113 Million Multistate Settlement Against Apple for Misrepresenting iPhone Batteries and Performance Throttling*, November 18, 2020, https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-113-million-multistate-settlement-against

discovered facts. The new facts can correct previous deficiencies and satisfy the elements of each re-pled claim, meeting the plausibility standard under Federal Rules of Civil Procedure 12(b)(6).

## New Legal Basis: California Civ. Code § 1708.85

21. California Civ. Code § 1708.85 provides a private right of action for individuals whose private, sexually explicit images or recordings have been distributed without consent, commonly referred to as nonconsensual pornography or revenge porn. Under this statute, a person may bring a civil lawsuit against anyone who intentionally or recklessly distributes a private, sexually explicit visual depiction of another without consent, causing harm. The statute applies when the depicted person had a reasonable expectation that the material would remain private, and the distribution was made with knowledge or reckless disregard of the harm it would cause. *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016).

22. The law provides compensatory damages, injunctive relief, punitive damages, and attorney's fees (Cal. Civ. Code § 1708.85(c)-(d)). Additionally, Section 1708.85(e) explicitly states that a defendant cannot use the First Amendment as a defense if the distribution was made with an intent to harass, cause harm, or retaliate against the victim. Courts applying this statute in federal cases in California have upheld claims when the plaintiff establishes that the images were shared without consent and that they suffered reputational, emotional, or financial harm as a result *Gong v. Google, Inc.*, 2016 WL 6025469, at *3 (N.D. Cal. Oct. 14, 2016). Given the statute's intent to provide robust protection against the malicious distribution of private sexual content, courts have interpreted it broadly in favor of victims seeking redress.

23. The legal framework established by § 1708.85 supports potential claims against corporate entities, especially if an employee or agent of the corporation is responsible for the unauthorized distribution within the scope of their employment. This aligns with principles of vicarious liability, where employers can be held accountable for the actions of their employees performed during their employment.

### 1. Comparison to NXIVM

24. The NXIVM case provides a pertinent example of how organizations can misuse intimate information to manipulate and control individuals, drawing parallels to violations under Cal. Civil Code § 1708.85. NXIVM, under the leadership of Keith Raniere, operated a secret

society known as DOS, where women were coerced into providing "*collateral*"—including nude photographs and other compromising materials—which was then used to blackmail and intimidate them into compliance. *United States v. Raniere*, 384 F. Supp. 3d 282, 293 (E.D.N.Y. 2019). This coercion was a central element in the charges against Raniere, leading to his conviction on multiple counts, including sex trafficking and racketeering.[3]

25. Similarly, California Civil Code § 1708.85 addresses the non-consensual distribution of intimate images, recognizing the profound harm such actions inflict on individuals. While the NXIVM case primarily involved criminal charges, the underlying misuse of intimate images as a means of control and coercion underscores the importance of legal protections like those provided by § 1708.85. This statute empowers victims to seek civil remedies against those who unlawfully distribute their private images, reflecting a societal commitment to safeguarding personal privacy and autonomy. In essence, the NXIVM case exemplifies the severe consequences of exploiting intimate information, reinforcing the necessity of robust legal frameworks to protect individuals from such violations.

**2. A Profound Violation of Fundamental Human Rights**

26. A corporation attempting to assert property rights or intellectual property claim over an employee's breasts raises serious legal, ethical, and constitutional concerns, implicating privacy rights, bodily autonomy, intellectual property law, and workplace discrimination laws. Under Cal. Civil Code § 1708.85, the non-consensual distribution or claim of ownership over intimate images is explicitly unlawful, recognizing an individual's fundamental right to control their own body and private images. Any attempt by an employer to assert intellectual property rights over an employee's body—particularly intimate images obtained through workplace surveillance, document collection, or coercion—would likely constitute an invasion of privacy, sexual harassment (Title VII, FEHA), and a violation of the constitutional right to bodily autonomy. Further, such a claim could be a form of extortion, coercion, or retaliation, particularly if used to silence or intimidate the employee in connection with legal proceedings or whistleblower

[3] U.S. DOJ, *NXIVM Leader Keith Raniere Sentenced to 120 Years in Prison for Racketeering and Sex Trafficking Offenses,* October 27, 2020, https://www.justice.gov/usao-edny/pr/nxivm-leader-keith-raniere-sentenced-120-years-prison-racketeering-and-sex-trafficking

complaints.

27. Copyright law (17 U.S.C. § 102) does not recognize a corporation's ownership of an individual's body or likeness, and any attempt to claim such rights could also run afoul of California's Right of Publicity laws (Cal. Civ. Code § 3344), the Bane Act (Cal. Civ. Code § 52.1), and federal labor laws protecting employees from coercion and intimidation. If an employer were to assert ownership over intimate images of an employee, it could face civil liability for invasion of privacy, sexual harassment, retaliation, and even potential criminal exposure under laws prohibiting non-consensual image distribution and coercion (e.g., 18 U.S.C. § 2261A – stalking, 18 U.S.C. § 875 – extortion). In sum, any corporate attempt to claim intellectual property rights over an employee's body would be legally indefensible and constitute a profound violation of fundamental human rights.

## Request to Replead the Bane and Ralph Civil Rights Acts, Dodd-Frank, & RICO Act Claims

28. Appleseed, a former employee of Apple's Global Security team, played a pivotal role in the harassment and retaliation that Plaintiff endured after engaging in protected activities, including whistleblowing on toxic emissions from a semiconductor plant operated by Apple. Appleseed's conduct was not an isolated incident, but part of a coordinated, ongoing effort orchestrated by Apple to retaliate against Plaintiff and obstruct her legal rights.

29. In violation of Plaintiff's privacy rights, Appleseed shared a private, non-consensual photograph of Plaintiff. This photograph, which was taken without Plaintiff's consent through an internal work app, was subsequently used by Appleseed in her harassment campaign and by Apple in their farcical defense.

30. Appleseed engaged in a pattern of defamation, including labeling Plaintiff a "*liar*" and "*predator*" in both public and private forums. Appleseed's statements were aimed at undermining Plaintiff's credibility, isolating her from potential support, and discouraging others from speaking out in support of Plaintiff. Appleseed's actions were not only aimed at Plaintiff's personal reputation but also sought to intimidate witnesses and potential allies, in violation of Plaintiff's rights under state law, including the Bane Act and Ralph Act.

31. Appleseed also engaged in cyberstalking by threatening individuals who showed

support for Plaintiff and attempting to coerce them into severing ties with her. These acts of intimidation were part of a larger campaign to silence Plaintiff and prevent her from pursuing legal action. Appleseed's conduct was egregious and is directly connected to the ongoing retaliation Plaintiff has faced for her whistleblowing.

32. In a particularly egregious turn of events, Appleseed revealed that Apple's Global Security team had directly coerced her into filing a false complaint against Plaintiff. Appleseed disclosed that Apple Global Security threatened her, using her position within the company, to compel her to falsely accuse Plaintiff of wrongdoing. This act of coercion demonstrates that the retaliation and harassment faced by Plaintiff were not merely the acts of an individual employee but were directed and sanctioned by Apple itself. Appleseed's role in filing the complaint against Plaintiff was not voluntary, but rather a direct result of Apple's corporate policies aimed at protecting the company's image by silencing whistleblowers and retaliating against those who report misconduct.

33. Apple's actions and omissions in this case go beyond mere negligence and instead reflect a pattern of intentional misconduct, as well as a deliberate attempt to obstruct justice, retaliate against Plaintiff for engaging in protected activities, and conceal evidence. The misconduct was orchestrated at the corporate level, with employees acting under the direct or tacit approval of Apple's leadership, specifically through its Global Security division. The plaintiff asserts that the following legal violations occurred as a result of Defendant's intentional actions:

34. Plaintiff's RICO, Bane Act, and Ralph Act claims were dismissed without prejudice, and Plaintiff now has newly discovered evidence about a coordinated scheme involving the global security and legal, the camera application, and possible conspirators. This evidence addresses prior deficiencies and directly supports the elements of a pattern of misconduct and intimidation, which are crucial for these claims.

## Violation of the Bane Civil Rights Act (Civ. Code § 52.1)

35. The Bane Act (Cal. Civ. Code § 52.1) prohibits any person or entity from interfering with an individual's constitutional or statutory rights through threats, intimidation, or coercion. Courts have held that coercive and retaliatory actions designed to deter an individual from exercising legal rights fall squarely within the Bane Act's protections. *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 843 (2004).

36. The Bane Act provides a remedy for individuals whose constitutional rights are interfered with by threats, intimidation, or coercion. In this case, Apple's conduct constitutes a direct violation of Plaintiff's rights under the Bane Act and that now also includes a new legal base related to the newly discovered evidence.

37. Defendant's deliberate misuse of Plaintiff's intimate images, coupled with its legal and security personnel's orchestrated efforts to harass and intimidate Plaintiff through false reports, legal threats, and retaliatory lawsuits, constitutes an unlawful attempt to suppress Plaintiff's rights through coercion and intimidation.

38. Defendant engaged in coercive conduct designed to suppress Plaintiff's ability to seek legal redress and report workplace misconduct, including:

- Retaliatory misuse of intimate images as a tool to intimidate and silence Plaintiff.
- Fraudulent legal actions and false declarations designed to discredit Plaintiff in litigation and discourage further whistleblower disclosures.
- Coordinated suppression of evidence and obstruction of justice to prevent Plaintiff from accessing materials necessary for her case.

39. These actions establish intentional coercion by Defendant to interfere with Plaintiff's constitutional and statutory rights, including her rights under California labor and whistleblower laws, thereby violating the Bane Act.

## VIOLATION OF THE RALPH CIVIL RIGHTS ACT (CIV. CODE § 51.7)

40. 36. The Ralph Act (Cal. Civ. Code § 51.7) protects individuals from violence, threats, intimidation, and harassment based on their protected status or engagement in protected activity. Courts have held that threats of violence or intimidation aimed at suppressing legal rights constitute violations of the Ralph Act. *Cabesuela v. Browning-Ferris Indus.*, 68 Cal. App. 4th 101, 112 (1998). Defendant's retaliatory conduct, including the use of fraudulent legal processes and SWATing attempts against Plaintiff, directly constitutes unlawful intimidation under the Ralph Act.

41. The Ralph Act offers protection against violent threats and harassment, similar to the Bane Act, but it specifically addresses discrimination and violence based on a person's protected activities. Apple's direct involvement in orchestrating the harassment and intimidation suffered by Plaintiff qualifies as a violation of the Ralph Act and that now also includes a new legal base related to the newly discovered evidence.

42. Key facts supporting Plaintiff's Ralph Act claim include: Appleseed's multiple false reports to law enforcement, which were intended to "SWAT" Plaintiff—an action that is per se a violation of the Ralph Act; Appleseed falsely accusing Plaintiff of crimes and filing a retaliatory lawsuit seeking a five-year gag order to prevent Plaintiff from speaking about harassment and sextortion; Coercive tactics designed to deter Plaintiff from engaging in protected speech and legal activity.

43. Under California law, the Ralph Act explicitly states that knowingly filing false reports to law enforcement to incite retaliatory harm, such as SWATing, is a per se violation. Cal. Civ. Code § 51.7. Given Defendant's coordination of these unlawful actions through its security and legal teams, its ongoing suppression of Plaintiff's rights through coercion and intimidation firmly meets the legal standards for both the Bane Act and Ralph Act violations.

## Violation of the Dodd-Frank Act (15 U.S.C. § 78u-6(h)(1))

44. Plaintiff seeks to replead and strengthen her claim under the Dodd-Frank Wall Street Reform and Consumer Protection Act's whistleblower protections, codified at 15 U.S.C. § 78u-6(h)(1). The Dodd-Frank Act provides robust protections against retaliation for employees who report securities law violations to the U.S. Securities and Exchange Commission (SEC) or other regulatory authorities. Given newly discovered evidence of Defendant Apple's deranged retaliatory conduct, as well as findings from parallel investigations by the National Labor Relations Board (NLRB), repleading this claim is necessary to fully present the extent of Apple's unlawful retaliatory practices.

45. Under 15 U.S.C. § 78u-6(h)(1)(A), an employer may not discharge, demote, suspend, threaten, harass, or in any other manner discriminate against a whistleblower in the terms and conditions of employment because of lawful disclosures of securities law violations. Plaintiff engaged in protected whistleblowing activity when she submitted complaints regarding Apple's unlawful confidentiality policies, suppression of employee rights under federal labor and securities laws, and financial misconduct. Apple's retaliatory campaign—ranging from termination to continued post-employment harassment—constitutes clear violations of these protections. See *Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) (confirming that employees who report violations to regulatory authorities are protected under Dodd-Frank's anti-retaliation provisions).

46. Furthermore, Apple's misconduct is bolstered by the recent NLRB finding that

Plaintiff's charge alleging that Apple's confidentiality policies violate federal labor laws is supported by substantial evidence, resulting in an administrative complaint against Apple. The NLRB's finding directly supports Plaintiff's argument that Apple's employment policies, including its nondisclosure agreements and internal restrictions on employee speech—violate not only labor laws but also Dodd-Frank policy rules designed to encourage whistleblower disclosures and prevent corporate cover-ups of securities violations. The SEC has issued guidance clarifying that employer-imposed restrictions on whistleblower communications—such as those found in Apple's policies—are illegal under Dodd-Frank. See *SEC Exchange Act Rule 21F-17(a)*, 17 C.F.R. § 240.21F-17(a) (prohibiting companies from enforcing agreements or policies that restrict individuals from communicating directly with the SEC about potential violations).

47. Given these facts, Plaintiff's Dodd-Frank retaliation claim must be reinstated and expanded to reflect Apple's systemic efforts to silence whistleblowers, its retaliatory actions against Plaintiff, and its ongoing policy violations confirmed by federal enforcement agencies. Plaintiff respectfully requests leave to amend her complaint to fully plead Apple's violations of 15 U.S.C. § 78u-6(h)(1), as well as its violations of the SEC's whistleblower protection rules.

## Violation of the RICO Act (18 U.S.C. §§ 1962(c) and (d))

48. Plaintiff asserts that Apple's actions, including the orchestration of harassment, intimidation, defamation, and the concealment of evidence, constitute an ongoing pattern of racketeering activity under the RICO Act. This includes Apple's deliberate efforts to suppress whistleblowers, obstruct justice, and intimidate those involved in investigating and reporting corporate wrongdoing.

49. Unlike typical civil claims, the RICO Act is designed to address patterns of criminal conduct by organizations that systematically engage in illegal activity. Apple, through its Global Security division, engaged in such a pattern by orchestrating harassment and retaliation through its agents, with the intention of obstructing legal processes and protecting its corporate interests. This campaign, which involved coercing Appleseed to file a false complaint that threatened to review nude photos and manipulating the outcome of Plaintiff's legal claims, is a clear example of criminal racketeering conduct under the statute.

50. Under RICO § 1962(c), it is unlawful for any person associated with an enterprise engaged in interstate commerce to conduct its affairs through a pattern of racketeering activity.

Under RICO § 1962(d), it is unlawful to conspire to engage in such racketeering activity. See *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The new evidence uncovered in this case further establishes Defendant's pattern of extortion, witness intimidation, and obstruction of justice, including through the misuse of Plaintiff's nude photos as a coercive tool to silence and retaliate against her, twice.

51. The Hobbs Act (18 U.S.C. § 1951) defines extortion as the obtaining of property from another, with their consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. Here, Defendant and its agents wrongfully retained and misused Plaintiff's nude images, leveraging them as a retaliatory tool to discredit and silence her in legal proceedings and public discourse. This constitutes wrongful coercion through fear and intimidation, a predicate act under RICO.

52. Federal and state law prohibits extortion and blackmail (18 U.S.C. § § 875 & 873; Cal. Penal Code § § 518 & 137), including any attempt to threaten or coerce a person into refraining from exercising their legal rights through the use of threats involving personal or reputational harm. Defendant's agents, including its legal and security personnel, engaged in systematic efforts to use Plaintiff's private images as leverage to intimidate her into silence regarding workplace violations, labor law breaches, and whistleblower complaints – and they did so crossing state lines and impacting interstate commerce. The coercive and retaliatory use of these images, coupled with Defendant's attempts to shield this evidence from discovery, constitutes criminal extortion and blackmail under federal law and strengthens the RICO claim under 18 USC §§ 1962(c) and (d).

53. Apple's corporate actions were not the result of inadvertent error but were intentionally designed to retaliate against Plaintiff, suppress her rights, and protect the company from the negative consequences of her whistleblowing. The fact that Appleseed, an agent of Apple, was coerced into filing a false complaint against Plaintiff under the direction of Apple's leadership and then the complaint used by Apple's counsel in their defense against Plaintiff, shows that this conduct was planned and executed with the intent to harm Plaintiff and obstruct justice, fulfilling the requirements for a RICO violation.

54. Additionally, Defendant's ongoing refusal to disclose these materials in litigation, fraudulent assertions of privilege over them, and direct involvement in attempting to suppress Plaintiff's protected disclosures further establish a coordinated scheme of witness intimidation and

obstruction of justice. This evidence underscores Defendant's role as the central figure in a RICO enterprise designed to protect itself from liability through fraudulent, retaliatory, and coercive actions, making the amendment to the complaint necessary to reflect these violations.

55. Apple's ongoing engagement in criminal misconduct is further demonstrated by the criminal bribery case against Apple's Chief Compliance Officer & Head of Global Security, Tom Moyer. Moyer was indicted in November 2020 for attempting to bribe Santa Clara County Sheriff's officials with $70,000 worth of iPads in exchange for concealed carry weapons permits for Apple's Global Security team. Although the case was initially dismissed in 2021, the California Sixth District Court of Appeal reinstated the charges in August 2023, determining that the evidence of bribery was sufficient to warrant prosecution.[4] Bribery under 18 U.S.C. § 201 (Bribery of Public Officials) and related California statutes constitutes a predicate act under RICO, as it demonstrates Apple's pattern of unlawful corporate conduct and its willingness to engage in corrupt dealings with law enforcement officials to protect its internal security and legal interests.

56. This is particularly relevant given that Apple's Global Security employee, Appleseed, worked under Moyer and engaged in a pattern of harassment, intimidation, and retaliatory actions against Plaintiff. Appleseed's involvement in the misuse of Plaintiff's private images, filing false statements in litigation, and assisting Apple in concealing key evidence must be viewed in light of Apple's history of unlawful conduct within its Global Security operations. The direct connection between Moyer's bribery case and Appleseed's actions in furtherance of Apple's retaliation and suppression efforts further supports the existence of a RICO enterprise engaging in repeated corrupt, criminal conduct.

57. Further exacerbating the intimidation and coercion, Appleseed falsely accused Plaintiff of crimes and filed a retaliatory lawsuit seeking a five-year gag order against Plaintiff. This lawsuit, which attempted to prohibit Plaintiff from speaking publicly or privately about Appleseed, Apple, or the retaliatory conduct she endured, was a direct effort to suppress Plaintiff's ability to report ongoing harassment, workplace misconduct, and the nonconsensual use of her private images. If successful, this gag order would have entirely silenced Plaintiff's ability to discuss the sextortion, threats, and witness intimidation that were perpetrated against her. The filing of

---

[4] *The People v. Moyer,* 94 Cal. App. 5th 999, 312 Cal. Rptr. 3d 773 (Cal. Ct. App. 2023).

fraudulent criminal accusations and the misuse of legal proceedings as a weapon to obstruct justice and suppress Plaintiff's claims further reinforce Apple's role in a RICO enterprise using coercion, threats, and legal retaliation as a means of control and suppression.

## Request to Replead Retaliation & UCL Claims Based on New "Revenge Porn" Facts

### Termination in Violation of Public Policy & Cal. Labor Code 1102.5

58. Plaintiff's claims under Cal. Civil Code § 1708.85 directly reinforce her whistleblower retaliation (Cal. Lab. Code § 1102.6) and wrongful termination in violation of public policy (Tameny) claims, as the employer's misconduct constitutes both retaliation for protected disclosures and violations of fundamental public policy. Under Cal. Labor Code § 1102.6, once a plaintiff demonstrates that they engaged in protected activity—such as reporting misconduct or violations of law—the burden shifts to the employer to prove that the adverse action was based on legitimate, non-retaliatory reasons. *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703 (2022).

59. Here, Plaintiff reported Apple's unlawful surveillance practices, privacy violations, and the misuse of intimate images both internally and to regulatory agencies, constituting protected activity under California law. Apple and its agents retaliated by using Plaintiff's nude images to intimidate and discredit her, falsely asserting confidentiality over them, and weaponizing legal threats to silence her. These acts violate public policy protections enshrined in Civil Code § 1708.85, which prohibits the malicious distribution of private images, making it a fundamental policy concern of the state.

60. Because Tameny claims require a nexus between termination and a violation of public policy, Apple's actions—retaliating against Plaintiff by intentionally misusing her intimate images after she engaged in protected activity—directly satisfy the public policy exception to at-will employment. *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980). Thus, the employer's retaliatory conduct not only substantiates liability under Civil Code § 1708.85 but also strengthens Plaintiff's claims under Labor Code § 1102.6 and *Tameny* for wrongful termination in violation of public policy.

### Violation of Cal. Bus. & Prof. Code § 17200 (UCL)

61. Plaintiff also seeks leave to amend the complaint to replead and supplement the cause of action under California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.), predicated on the unlawful dissemination or threatened dissemination of intimate images in violation of Cal. Civ. Code § 1708.85 ("*Revenge Porn*" or nonconsensual pornography statute). This request is supported by newly discovered facts regarding the unauthorized capture and/or sharing of Plaintiff's nude photographs, and it aligns with Rule 15(a)'s instruction to *"freely give leave"* where justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

62. The employer (and/or its agents, including the Global Security Employee obtained nude or intimate photographs of Plaintiff without her effective knowledge or consent. Defendants, through employees and agents, threatened to share or indeed shared these intimate images, in retaliation for Plaintiff's whistleblowing and other protected activities. This conduct violates Cal. Civ. Code § 1708.85, which prohibits the intentional distribution or threatened distribution of intimate images without consent, when done to cause emotional distress. By engaging in a practice that is "unlawful" (i.e., violating Cal. Civ. Code § 1708.85), Defendants' acts also constitute unlawful business practices under Cal. Business & Professions Code § 17200.

63. California's UCL defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice" (Cal. Bus. & Prof. Code § 17200). To state a claim under the "unlawful" prong, a plaintiff need only allege a violation of another law—that violation then serves as the predicate act rendering the business practice unlawful. (*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1143 (2003).)

64. Here, a new underlying predicate violation is Civ. Code § 1708.85, which expressly prohibits the intentional or reckless dissemination of intimate images without consent, commonly known as "*revenge porn*" or "*nonconsensual pornography.*" By engaging in this unlawful conduct—threatening and actually disseminating Plaintiff's nude photos—Defendants have committed a statutory violation that "*independently violates the law*." *See Farmers Ins. Exch. v. Superior Court*, 2 Cal.4th 377, 383 (1992).

65. Under the UCL, a private plaintiff must demonstrate economic injury (Cal. Bus. & Prof. Code § 17204). Plaintiff was severely injured by the Defendant terminating her employment

and denylisting her from future employment, causing direct and tangible losses of income and benefits. Plaintiff anticipates showing that she suffered economic losses, such as costs incurred to protect herself from further dissemination (e.g., security measures, internet takedown services, or other expenditures), as well as harm to her earning capacity or employment prospects stemming from the disclosure or threat of disclosure of intimate images.

66. Plaintiff would be entitled to injunctive relief, restitution, or other relief authorized under the UCL. *Cel-Tech*, 20 Cal.4th at 179; *Korea Supply*, 29 Cal.4th at 1144. While the UCL does not typically allow damages, it can provide equitable remedies—including injunctions to prohibit further sharing of the images and restitution to restore any money or property lost due to Defendants' misconduct.

67. Plaintiff only recently became aware of concrete evidence confirming the nude photos were captured and threatened to be shared in retaliation, thus clarifying the Civ. Code § 1708.85 violation. Defendant had this information for years, and intentionally concealed it from Plaintiff – however, as long as Plaintiff pursued her legal claims, it was always certain to come out eventually – or at least allow Apple to send nude photos of Plaintiff to any agency that would investigate her claims.

68. The Legislature's enactment of Cal. Civ. Code § 1708.85 demonstrates a keen policy interest in protecting victims from nonconsensual pornography. Preventing such unlawful conduct is precisely the type of protective measure that Cal. Bus. & Prof. Code § 17200 was designed to address. (*See Cel-Tech*, 20 Cal.4th at 181.) Defendants cannot claim prejudice, as discovery is ongoing, and the Court has yet to resolve the matters on the merits. Adding a UCL claim at this juncture ensures all related issues are addressed in a single lawsuit, preserving judicial resources.

69. Given Rule 15(a)'s "extreme liberality" (*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003)), and the absence of any Foman factor such as bad faith, undue delay, or futility (*Foman, 371 U.S. at 182*), the Court should grant Plaintiff leave to amend her complaint to add a UCL cause of action predicated on the "unlawful" prong violation (Cal. Civ. Code § 1708.85 ).

## Replead IIED Claims to include Revenge Porn

70. The newly revealed nude photographs taken by the employer's app, along with the

ongoing harassment, significantly escalate the extreme and outrageous nature of Defendants' conduct, thereby strengthening Plaintiff's IIED allegations. Given that Defendant's unlawful dissemination of Plaintiff's intimate images occurred across multiple jurisdictions—California, New York, and Massachusetts—Plaintiff seeks to incorporate relevant state laws from each jurisdiction to strengthen her Intentional Infliction of Emotional Distress (IIED) claim. Each of these states recognizes the severe emotional harm and reputational damage caused by the non-consensual distribution of intimate images and provides statutory protections against such conduct.

### 3. California Law: Civil Code § 1708.85 – Unauthorized Distribution of Intimate Images

71. California Civil Code § 1708.85(a) provides that a person is liable for damages if they intentionally distribute intimate images of another without consent, knowing that the person depicted had a reasonable expectation of privacy, and the disclosure causes serious emotional distress. The September 15, 2021 email, in which Plaintiff's unauthorized nude images were sent as part of Defendant's retaliatory scheme, falls squarely within the scope of this statute.

72. This conduct also meets the extreme and outrageous conduct threshold required for an IIED claim, as it was designed to shame, humiliate, and silence Plaintiff for engaging in protected whistleblowing activity. See *Hughes v. Pair,* 46 Cal. 4th 1035, 1051 (2009) (holding that conduct is sufficiently "outrageous" for an IIED claim when it is so extreme that it exceeds all bounds of decency in a civilized community).

73. Furthermore, California law provides for both compensatory and punitive damages against individuals or entities who intentionally weaponize intimate images to cause harm. Given that Defendant deliberately withheld the existence of this evidence and misrepresented material facts regarding its possession and use of Plaintiff's intimate images, Defendant's conduct is even more egregious and supports an IIED claim under California law.

### 4. New York Law: Penal Law § 245.15 – Unlawful Dissemination or Publication of an Intimate Image

74. New York Penal Law § 245.15 criminalizes the intentional and non-consensual dissemination of intimate images when the individual depicted has a reasonable expectation of privacy and the disclosure causes harm. The law specifically applies to instances where: The

offender acts with intent to cause harm to the depicted person, and the victim experiences serious emotional distress as a result of the disclosure.

75. Here, Defendant's transmission and possession of Plaintiff's intimate images—without her consent and as part of a broader retaliatory scheme—fits within New York's statutory framework for unlawful dissemination. Plaintiff was harmed in New York, where she suffered significant emotional distress due to the unauthorized distribution of these images. Because New York law recognizes that revenge porn can cause long-term psychological harm and reputational damage, it directly supports Plaintiff's IIED claim.

76. Furthermore, New York courts have held that intentional emotional distress claims can be supported by conduct that includes the unauthorized dissemination of private images when such conduct is intended to cause severe harm to the victim. See *Howell v. New York Post Co.*, 81 N.Y.2d 115, 122 (1993) (holding that conduct sufficiently extreme and outrageous to support an IIED claim must be "beyond all possible bounds of decency" and "utterly intolerable in a civilized society").

**5. Massachusetts Law: Chapter 272, Section 105 – Criminalization of Revenge Porn**

77. Massachusetts recently criminalized the non-consensual distribution of explicit images under Mass. Gen. Laws ch. 272, § 105, imposing penalties of up to two and a half years in jail and fines of up to $10,000 for individuals who engage in such conduct. Similar to California and New York, Massachusetts recognizes the severe emotional and psychological harm that results from the unauthorized dissemination of intimate images and allows for civil actions based on emotional distress. See *Agis v. Howard Johnson Co.,* 371 Mass. 140, 145 (1976) (recognizing IIED where conduct is so extreme and outrageous as to "exceed all bounds of decency").

78. Defendant's actions meet this standard by intentionally distributing intimate images of Plaintiff as a retaliatory tactic, causing severe emotional and reputational harm. Because Plaintiff experienced emotional distress while in Massachusetts, and because Defendant's wrongful acts had effects in this jurisdiction, Massachusetts law further supports Plaintiff's IIED claim.

79. Given that Defendant's unlawful dissemination of Plaintiff's intimate images caused harm in California, New York, and Massachusetts, Plaintiff is entitled to bring claims under each state's applicable statutes and case law. The intentional release of these images as part of a

coordinated retaliation campaign against Plaintiff constitutes extreme and outrageous conduct, meeting the threshold for an IIED claim in all three jurisdictions.

80. Moreover, Defendant's failure to disclose this material evidence until long after the statute of limitations for certain claims had run further demonstrates their bad faith litigation tactics. Because California, New York, and Massachusetts all provide remedies for the non-consensual distribution of intimate images, Plaintiff seeks to replead her IIED claim to include violations of these laws as a basis for relief.

## Request to Replead Environmental Claims with Air Pollution Law Violations

### Ultrahazardous Activities, Absolute Nuisance, & Nuisance Per Se Claims

81. Plaintiff respectfully requests an opportunity to amend the complaint to replead the ultrahazardous activities, absolute nuisance, and nuisance per se claims, in light of recent federal and state enforcement actions and Apple's admission to knowledge of the harmful conduct and the hazardous environment it facilitated. The recent enforcement actions by the U.S. Environmental Protection Agency (EPA) and Bay Area Air Quality Management District (BAAQMD), in addition to Apple's own admissions in its current motion to dismiss, have brought to light new facts that necessitate revisiting these claims. [See Notice of Pendency at Dkt. 151]

82. Although the ultrahazardous activities claim was dismissed with prejudice, that dismissal was based on "discretionary" grounds that prevented full discovery. Given the Air Board's new finding of violations, Plaintiff can now allege with specificity the employer's inherently dangerous practices that pose an extraordinary risk. Dismissing this claim with prejudice without considering the new regulatory findings would contravene the liberal amendment policy and Plaintiff's due process rights.

83. In light of recent enforcement actions by the EPA, BAAQMD, and other regulatory agencies, it is clear that Apple's semiconductor fabrication facility engaged in activities that can clearly be classified as ultrahazardous. These activities exposed the plaintiff and others to significant environmental harm, including toxic emissions and the release of dangerous chemicals. These actions—conducted knowingly and recklessly by Apple—fall within the scope of ultrahazardous activities that impose strict liability on the defendant for the harm caused,

regardless of fault. The plaintiff seeks to replead this claim to reflect the newly discovered enforcement actions, including penalties and regulatory findings, which demonstrate Apple's involvement in creating and perpetuating an ultrahazardous environment.

84. Plaintiff requests leave to amend the complaint to include a claim for absolute nuisance based on Apple's operation of the hazardous semiconductor facility and the resulting toxic emissions that impacted the health and safety of surrounding residents. In its motion to dismiss, Apple acknowledges the presence of hazardous conditions yet continues to minimize or deny its responsibility for the consequences of those conditions. The plaintiff's allegations, as amplified by recent regulatory actions, show that Apple's conduct has created an unreasonable interference with the use and enjoyment of public and private property in the area. These new facts highlight that Apple's actions meet the standard for absolute nuisance—where strict liability applies due to the inherently dangerous nature of the activities involved.

85. Additionally, the plaintiff requests leave to replead the nuisance per se claim, based on Apple's operation of a facility that violated numerous state and federal environmental laws, including air quality regulations enforced by the BAAQMD and EPA. Apple's conduct has not only violated laws but also created a public health hazard, causing severe damage to the plaintiff's health and well-being, as well as to the broader community. These new facts, combined with Apple's admissions in its motion to dismiss, underscore that Apple's conduct constitutes a public nuisance per se. By operating the semiconductor plant in flagrant violation of environmental protections, Apple's actions are not only unlawful but also endanger the public, further justifying the need for the plaintiff to replead this claim in light of these newly disclosed facts.

86. Apple's motion to dismiss, while seeking to dismiss these claims, inadvertently admits to its knowledge of the hazardous environment created by its operations and its failure to take corrective action. These admissions, when viewed alongside the ongoing federal and state investigations, provide further grounds for the plaintiff to amend the complaint. The newly discovered regulatory actions demonstrate that Apple's conduct has been not only harmful but also flagrant, with no efforts to mitigate the damage caused by its ultrahazardous activities. The plaintiff seeks to update these claims to fully reflect the current state of the law, enforcement actions, and evidence that now implicates Apple in direct violation of environmental statutes and regulations.

87. Plaintiff respectfully requests that the Court grant the opportunity to amend the

complaint to include these updated allegations, based on new information that has come to light, including federal and state enforcement actions and Apple's own admissions. The amended complaint will provide a more comprehensive and accurate picture of the ongoing harm caused by Apple's actions and ensure that the claims align with the current state of the law, regulatory actions, and evidence.

### Retaliation for Reporting Env. Violations under Cal. Labor Code §§ 1102.5 & 6399 (via § 6310)

88. Plaintiff seeks to replead her environmental subclaims under California Labor Code §§ 1102.5 and 6399 (under 6310), which protect employees from retaliation for reporting workplace safety hazards, hazardous material exposure, and violations of state and federal environmental laws. These subclaims were previously dismissed for discretionary reasons; however, recent findings by the U.S. Environmental Protection Agency (EPA) and the California Air Resources Board (CARB) confirming Defendant Apple's violations of environmental regulations provide new and compelling evidence supporting reinstatement of these claims. Additionally, on December 26, 2024, Defendant Apple released Plaintiff's 2021 performance review, which contained material evidence—including direct evidence of retaliation for these specific environmental complaints—that Apple previously concealed, misrepresented, and failed to disclose in prior filings.

89. Under California Labor Code § 1102.5(b), an employer may not retaliate against an employee for disclosing information regarding violations of federal or state laws, regulations, or public policies to a government agency. Plaintiff's whistleblower complaints regarding Apple's improper handling and disposal of hazardous materials, unlawful air emissions, and chemical exposures in the workplace fall squarely within the protections of § 1102.5. The EPA and CARB's findings that Apple violated environmental laws further confirm that Plaintiff's disclosures were not only reasonable but also legally and factually substantiated. These violations, which threaten workers and public health, are precisely the type of environmental hazards that § 1102.5 is designed to encourage employees to report without fear of retaliation. See *Hager v. County of Los Angeles*, 228 Cal. App. 4th 1538, 1549 (2014) (holding that an employer may not retaliate against an employee for reporting violations of environmental and workplace safety laws).

90. Similarly, California Labor Code §§ 6310 and 6399 provide additional protections for employees who report unsafe working conditions and violations of California's occupational

safety and hazardous materials handling laws. Under § 6310, an employer may not retaliate against an employee for complaining about unsafe work conditions, including exposure to toxic substances. Further, § 6399 mandates compliance with regulations governing hazardous material exposure in the workplace. Plaintiff's complaints about chemical exposure risks and Apple's failure to comply with environmental safety regulations fall directly under the scope of these protections. Now that state and federal regulatory agencies have confirmed Apple's violations of environmental laws, the Court has substantial new evidence warranting reinstatement of these claims. See *Cabatit v. Sunnova Energy Corp.*, 60 Cal. App. 5th 317, 324 (2021) (holding that agency findings confirming an employee's safety complaints strengthen a Labor Code § 6310 claim and make dismissal improper).

91. Furthermore, Apple's recent disclosure of Plaintiff's 2021 performance review on December 26, 2024, provides additional direct evidence of retaliation and fraudulent concealment. Despite being aware of the existence of this document and its relevance to Plaintiff's claims, Apple concealed this performance review and misrepresented its contents in prior court filings. The document contains clear evidence that Apple retaliated against Plaintiff for her hazardous waste and environmental safety complaints—contradicting Apple's previous assertions that Plaintiff's termination was unrelated to her protected disclosures. Notably, Apple strategically waited to release this critical document until after Plaintiff had already filed her most recent amended complaint, further demonstrating Apple's bad faith litigation tactics and obstruction of evidence. See *Kennedy v. Eldridge*, 201 Cal. App. 4th 1197, 1205 (2011) (holding that suppression of material evidence constitutes a basis for sanctions and potential disqualification of counsel).

92. Because newly obtained regulatory findings establish that Plaintiff's whistleblower complaints about hazardous waste exposure and workplace safety risks were well-founded, and that Apple was indeed in violation of environmental laws, and because Apple has now belatedly produced critical evidence confirming retaliatory motives that it previously concealed, Plaintiff respectfully requests leave to amend her complaint to reinstate her California Labor Code §§ 1102.5, 6310, and 6399 claims based on this substantial new evidence.

## Civil Conspiracy and Corporate Liability

93. The deliberate actions by Apple's employees, and the direct involvement of Apple's